UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-------------------------------------------------x

**04 - 1 0 5 0 1 PBS**

JANET BAKER, and JAMES BAKER,
JKBAKER LLC and JMBAKER LLC,

Civ. No.

MAGISTRATE JUDGE _Bowler_

Plaintiffs,

v.

**JURY TRIAL DEMANDED**

DEXIA, S.A., DEXIA BANK BELGIUM
(formerly known as ARTESIA BANKING
CORP., S.A.)

Defendants.

RECEIPT # _____ 54517
AMOUNT $ _150_
SUMMONS ISSUED _yes_
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _T.O.M_
DATE _3|12|04_

-------------------------------------------------x

## COMPLAINT

Plaintiffs herein, Janet Baker and James Baker, and the JKBaker LLC and JMBaker LLC,

by and through their respective owners Janet Baker and James Baker (collectively the "Bakers"),

who were owners of the majority of the shares of Dragon Systems, Inc. ("Dragon") and are

current shareholders and creditors of Lernout & Hauspie Speech Products, N.V., a Belgian

Corporation ("N.V.") and referred to sometimes along with its U.S. subsidiary L&H Holdings

USA, Inc. ("Holdings") and its South Korean subsidiary Lernout & Hauspie Korea ("L&H

Korea"), simply as "L&H", by their undersigned attorneys, allege the following regarding their

own action, the actions of the Bakers' representatives, the actions of Dragon, the actions of L&H,

and Defendant Dexia, S.A., Dexia Bank Belgium (formerly known as Artesia Banking

Corporation, S.A. and referred to herein as "Artesia" or "Dexia").

## NATURE OF THIS ACTION

1.      This is an action to recover damages sustained by the Bakers as a result of their

exchange of their approximately 51% interest in Dragon, worth hundreds of millions of dollars,

for artificially inflated and ultimately worthless L&H stock.  Dragon was a worldwide leading

supplier of speech and language technology, including speech recognition software. On June 7, 2000, the Bakers purchased L&H stock in an all-stock transaction whereby Dragon was merged into Holdings, a U.S. subsidiary of L&H. This transaction occurred pursuant to an Agreement and Plan of Merger Among the Bakers, Lernout & Hauspie Speech Products N.V., L&H Holdings USA, Inc., Dragon Systems, Inc., the Bakers and certain other principal shareholders of Dragon, dated March 27, 2000 (the "Merger Agreement").

2.    The Merger Agreement was entered into, and the transaction closed, before exposure of fraudulent transactions and accounting practices that falsely inflated L&H's revenues by 60% or more and induced the Bakers, and other Dragon shareholders, to enter into the Merger Agreement and go forward with the merger. These fraudulent transactions and practices were used to materially and artificially inflate the value of L&H stock.

3.    The merger was completed only months before public exposure of the pervasive fraudulent transactions and accounting practices that enabled L&H to falsely inflate its revenues. Much of L&H's massive accounting fraud could not have taken place without the newly-discovered, improper actions, including off-balance sheet financing, that defendant Dexia provided to L&H and its principals. L&H, along with defendant Artesia, the Flanders Language Valley Fund ("FLV Fund"), Mercator & Noordstar NV ("Mercator"), an Antwerp insurance company, and others set up approximately 30 so-called Language Development Companies ("LDCs") and Cross-Language Development Companies ("CLDCs"), which supposedly licensed millions of dollars worth of software from L&H. L&H improperly recorded all the purported revenue it received from these LDC's and CLDC's, even though these companies were shams and related parties to L&H.

4.    Because the LDCs and CLDCs were start up companies, they did not have funds sufficient to allow Artesia to directly lend to them the millions of dollars they needed to pay

2

L&H for licensing fees. Artesia officials knew that Messrs. Lernout, Hauspie and Willaert could not personally guarantee the bank loans without jeopardizing L&H's recognition of revenue from these licensing fees. Thus, Artesia had Messrs. Lernout, Hauspie and Willaert enter into credit default swap agreements. These agreements allowed Artesia to lend the LDCs and CLDCs the millions of dollars they needed, without a paper trail leading to the ultimate guarantors of the loans – Messrs. Lernout, Hauspie and Willaert. The LDCs and CLDCs then used the funds from these loans to pay L&H for millions of dollars of purported software license fees. However, knowing that disclosure of the true nature of these loans would prevent L&H from recognizing revenue on these transactions due to accounting rules restricting the recognition of revenue from related-party transactions, Artesia used the credit default swaps to disguise the fact that the LDC and CLDC loans were guaranteed by the principals of L&H.

5.    L&H's recognition of revenue on the LDC and CLDC transactions was entirely improper (a) because much of the funds that these LDCs and CLDCs paid to L&H were, in fact, provided by Artesia based upon off-the-book guarantees given by the principals of L&H, Jo Lernout, Pol Hauspie and others, and (b) because FLV, Mercator and the principals of L&H – all of whom financed these companies – were related parties to L&H and major L&H stockholders.

6.    Artesia knew that L&H established the LDCs and CLDCs to falsely inflate L&H's publicly reported revenues. Indeed, Artesia own internal "risk evaluation" documents, which are quoted in a May 28, 2001 report prepared by a panel of experts for prosecutors in Belgium (the "Report"), summed up the strategic partners as follow:    **REDACTED**

**REDACTED**    Artesia nonetheless joined in the fraud by financing these sham companies to, inter alia, ensure that Artesia would continue to receive lucrative banking fees, while providing L&H's major shareholders – Jo Lernout, Pol Hauspie,

FLV, Mercator and other senior officers of L&H (many of whom were also customers of Artesia) – with substantial wealth created by their falsely inflated L&H stock.

7.    Artesia also understood that it was L&H who was ultimately responsible for ensuring that the loans would ultimately be repaid. Indeed, after the fraud was revealed, L&H admitted that it had initially financed the operations of the LDCs and CLDCs. Accordingly, Artesia requested that L&H's senior officers, Paul Hauspie ("Hauspie"), Jo Lernout ("Lernout") and Nico Willaert ("Willaert") provide personal guarantees. This presented an enormous problem for L&H, however. Under U.S. Generally Accepted Accounting Principles ("GAAP"), if L&H officers personally guaranteed these loans, the strategic parties would be considered "related parties" to L&H, and that fact would have to be disclosed on L&H's financial statements, thus revealing the sham nature of these agreements.

8.    To solve this problem, Artesia devised a scheme that would still protect its interests and, at the same time, conceal the fact that Hauspie, Lernout and Willaert were personally guaranteeing the loans to the strategic partners. Artesia entered into agreements with these L&H officers called "credit default swaps." In effect, these agreements were nothing more than guarantees that were contained in side letters and, therefore, not included in the loans documents. By not disclosing the existence of these side letters to the SEC or the investing public, the parties were able to hide the fact that L&H officers were guarant4eeing the loans, and L&H was able to fraudulently recorded the entire amount of the licensing fees as revenue without making any "related party" disclosure. In total, Artesia made loans worth almost $60 million to L&H-related parties between 1997 and 1999. All of these amounts were then paid back to L&H and improperly included as revenue.

9.    Artesia's own internal documents confirm that Artesia knowingly entered into these credit default swaps for the sole purpose of defrauding the SEC and the investing public.

For example, an email from an employee at Artesia (hereafter Artesia Employee 1) to another Artesia employee (Artesia Employee 2) and other Artesia employees dated September 21, 1999, which was also quoted in the Report, stated,

**REDACTED**

10.    In return for its knowing participation in this fraud, Artesia was able to continue to receive lucrative banking fees, while providing L&H's major shareholders, including Lernout, Hauspie, and others, with substantial wealth through their fraudulently inflated L&H stock. In addition, Artesia charged excessive interest rates in connection with theses loans and received equity interests based on an understanding that L&H ultimately would arrange for buy-outs of the strategic partners at a premium. In effect, Artesia was guaranteed high returns and a future pay-off in return for financing the fraudulent transactions at the outset.

11.    Ultimately, a substantial portion of Artesia's loans were repaid with funds obtained by L&H from unsuspecting investors. Artesia and L&H thereby consummated a classic Ponzi scheme in which Artesia provided the initial funding of the LDCs to create the illusion that the LDCs had actual investors and capital, in order to lure new investors to fund the LDCs, at which point Artesia was paid back.

12.    This fraud was exposed, in part, through the inquiry by a reporter with regard to eighteen of L&H's alleged customers in Korea, who purportedly accounted collectively for a large proportion of L&H's reported revenues. These customers readily volunteered that they actually did little or no business with L&H.

13.    Arthur Andersen LLP, Brian Cave LLP and Loeffs Claeys Verbeke (collectively the "Audit Committee Advisors") were retained by L&H to investigate allegations of fraud at

L&H. L&H announced that it had uncovered accounting "errors and irregularities" and would be required to restate its 1998, 1999 and first two quarters of 2000 financial results. A few weeks later the Audit Committee Advisors issued a report dated November 20, 2000 ("Audit Report") concluding that L&H's reported recorded revenues were false and in violation of both generally accepted accounting principles ("GAAP") and L&H's own company policies. In addition, the Audit Report suggested that the Board consider disciplinary action against Messrs. Lernout, Hauspie, Gaston Bastiens ("Bastiens") and Nico Willaert.

14.    L&H has since been liquidated in bankruptcy and its stock is now worthless. Lernout, Hauspie, Bastiens and Willaert have all been arrested by criminal authorities in Belgium investigating the massive accounting fraud at L&H. More recently, Artesia has come under suspicion by these same criminal authorities in Belgium for its role in the L&H fraud.

15.    In sum, L&H was a financial house of cards propped up by accounting gimmicks and trickery to create the appearance of a financially successful company. In truth, however, L&H was nothing more than an illusion of financial prosperity, created by various individuals and entities contributing to the routine "cooking of the books" at L&H.

16.    Plaintiffs' allegations herein are based on a thorough investigation, conducted with the assistance of Plaintiffs' counsel, of all reasonably available information including, but not limited to, publicly available information. Except as alleged in this Complaint, the underlying information relating to defendants' misconduct and the particulars thereof are not available to Plaintiffs and the public, and lie exclusively within the possession and control of defendants and insiders of L&H, thus preventing Plaintiffs from further detailing defendants' misconduct.

17.    Plaintiffs were unaware of Artesia's role in this fraud until a story in the Belgian press, dated June 24, 2003, reported that Artesia had been placed under criminal investigation

and indicted by the Belgian prosecutor for its role in the L&H fraud. Prior to this June 24, 2003 news story, despite diligent efforts by plaintiffs and their counsel to investigate, plaintiffs were unaware of Artesia's role in the fraud alleged herein, nor could they have learned of this information as the support concerns the private banking relationship between L&H, Lernout, Hauspie, Willaert and Artesia.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19. Plaintiffs Janet and James Baker are individuals residing in Newton, Massachusetts and Maitland, Florida.

20. Plaintiff JKBaker LLC is a Delaware limited liability company.

21. Plaintiff JMBaker LLC is a Delaware limited liability company.

22. Defendant Dexia S.A. and Dexia Bank Belgium are Belgium entities.

23. In addition to transacting business in Belgium, Dexia S.A. regularly transacts business in the United States. It has numerous financial service subsidiaries in the United States including Dexia Credit Local New York Agency, Financial Security Assurance, Dexia Bank New York, Artesia Mortgage Corp., Astris Finance and Dexia Securities U.S.A.

24. In addition to transacting business in Belgium, Dexia Bank Belgium regularly transacts business in the United States by virtue of having its Dexia Bank New York branch headquartered in New York.

25. Artesia Banking Corporation engaged in lending transactions in the United States. In particular, Artesia was part of a banking consortium that lent $230 million as part of L&H's acquisition of Dictaphone. The borrowers of the funds were Dictaphone of Stratfield Connecticut, L&H, whose U.S. headquarters were in Burlington, Massachusetts, and FLV Fund,

7

jointly and severally.   In addition, Artesia lent money to Vasco Data Security International, located in Illinois.

26.   The amount in controversy in this action exceeds $75,000.00.

27.   Venue in this District is appropriate pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).

## PARTIES AND NON-PARTIES

28.   Plaintiffs Janet and James Baker are individuals who reside in Newton, Massachusetts and Maitland, Florida and are former owners of approximately 51% of the issued and outstanding stock of Dragon. The JKBaker LLC is a Delaware Limited Liability Company created to hold a portion of the L&H shares purchased by James Baker. The JMBaker LLC is also a Delaware Limited Liability Company; it was created to hold a portion of the L&H shares purchased by Janet Baker. James Baker and Janet Baker hold all economic and beneficial interest in the JKBaker LLC and JMBaker LLC, respectively.   Pursuant to the Merger Agreements that give rise to the claims herein, the Bakers received 4,717,564 shares of common stock of defendant L&H, plus 392,149 shares placed in escrow for a total of 5,109,713 shares.

29.   Plaintiffs are also prosecuting claims in the United States District Court for the District of Massachusetts against, among others, Josef Lernout, Pol Hauspie, Nico Willaert, Roel Pieper, Gaston Bastiaens, Carl Dammekens, L&H's former Chief Financial Officer, KPMG LLP, KPMG Belgium, L&H's former auditors, the members of the audit committee of L&H's board of directors, SG Cowen Securities, Corp., FLV Fund, and Mercator & Noordstar and certain other entities and individuals (the "Massachusetts Actions").   The claims asserted in the Massachusetts Actions principally arise under Section 10(b) of the Securities Exchange Act of 1934, and also include common law claims of fraud, aiding and abetting fraud, and negligent misrepresentation. On June 19, 2002, the Court (Saris, J.) denied the motions to dismiss filed by

8

the senior officers of L&H in a related proceeding, see In re Lernout & Hauspie Sec. Litig., 208 F. Supp.2d 74 (D. Mass. 2002), and on August 19, 2002, the court denied the motions to dismiss filed by KPMG LLP and KPMG Belgium.  See In re Lernout & Hauspie Sec. Litig., Case No. 00-CV-11509-PBS, 2002 WL 1990060 (D. Mass. August 19, 2002).  Motions to dismiss by SG Cowen, FLV Fund, Mercator & Nordstar and the L&H audit committee defendants also have been denied.  An action is also pending against three Korean-based banks – Chohung Bank, Hanvit Bank (a/k/a Woori Bank) and Shinhan Bank - in the United States District Court for the Southern District of New York (Cedarbaum, J.).

30.    Artesia Banking Corporation was a wholly-owned subsidiary of Acrofin CVBA a Belgian financial services group.  On March 31, 2001 Dexia S.A. announced that it was acquiring Artesia Banking Corporation from Acrofin and that Artesia would be merged into Dexia S.A.'s wholly-owned banking subsidiary Dexia Bank Belgium.  As set forth above, both Dexia S.A. and Dexia Bank Belgium regularly transact business in the United States.

31.    Non-defendant L&H is a Belgian corporation, with its principal place of business in Ieper, Belgium.  Until it was delisted on December 8, 2000, L&H common stock was listed on the NASDAQ under the ticker symbol "LHSP" or "LHSEQ."  L&H stock was also traded on the EASDAQ until it was "indefinitely suspended" on or about November 9, 2000.  L&H is a party to the Merger Agreement.  On November 29, 2000, L&H filed for protection from its creditors under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware, and contemporaneously commenced bankruptcy proceedings in Belgium.  As set forth above, L&H has been liquidated.

32.    Non-defendant Holdings is a Delaware corporation, a wholly owned subsidiary of L&H, and the corporation into which Dragon was merged.  Holdings is a party to the Merger Agreement.  On November 29, 2000, Holdings also filed for protection from its creditors under

Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware. Several former officers and directors have been sued in connection with this matter in an action now pending in federal court in Boston, Massachusetts.

33.    Non-defendant L&H Korea is a Korean corporation and a wholly-owned subsidiary of L&H.  In September 1999 L&H Korea acquired Bumil Information and Communications Co., Ltd. ("Bumil").

34.    Jo Lernout ("Lernout") is one of the founders of L&H.  Lernout was President of L&H from January, 1994 until February, 1996, Co-Chairman of the L&H Board from 1996, and a Managing Director of L&H from 1987, until he resigned those offices on November 9, 2000. Lernout served as a member of the Board of Directors of L&H until his resignation on January 16, 2001. Lernout was forced out of his remaining role as the Chief Technology Officer of L&H at the end of February, 2001.  As of July 27, 2000, Lernout held, controlled or had beneficial ownership of 43,667,208 shares of L&H stock, or approximately 30% shares outstanding on that date.  Lernout was arrested on April 27, 2001 in Ieper, Belgium and charged with forgery and stock price manipulation for his role in L&H's accounting fraud.  Lernout also served as a director of FLV Fund from 1996 to 1997, and after 1997 continued to "spend a portion of his time on activities relating to the FLV Fund."

35.    Pol Hauspie ("Hauspie") is one of the founders of L&H.  Hauspie was Chairman of L&H from January 1994 until October 1996, Co-Chairman of the L&H Board from 1996, and a Managing Director of L&H from 1987, until he resigned those offices on November 9, 2000. Hauspie resigned his board seat on November 22, 2000.  As of July 27, 2000, Hauspie held, controlled or had beneficial ownership of 43,667,208 shares of L&H stock, or approximately 30% of the shares outstanding on that date.  Hauspie was arrested on April 27, 2001 in Ieper, Belgium and charged with forgery and stock price manipulation for his role in L&H's accounting

10

fraud. Hauspie served as a director of FLV Fund from 1996 to 1997, and after 1997 continued to "spend a portion of his time on activities relating to the FLV Fund."

36.     Gaston Bastiaens ("Bastiaens") joined L&H as President in September 1996, and was appointed Chief Executive Officer of L&H in May, 1997. Bastiaens also was an officer of Holdings and signed the Dragon Merger Agreement on behalf of Holdings. Bastiaens resigned those offices on August 25, 2000, and his board seat on November 9, 2000. He was apprehended by U.S. Marshalls in May 2001 and has been extradited to Belgium on charges of stock manipulation and fraud. As of June 8, 2000, Bastiaens held, controlled or had beneficial ownership of 1,231,000 shares of L&H stock.

37.     Nico Willaert ("Willaert") joined L&H as a director in 1992 and remained on the Board of Directors until November 22, 2000. Willaert was also a Managing Director of L&H from April 1993, and Co-Vice-Chairman of L&H from January 1994, until he resigned those offices on November 9, 2000. Willaert was arrested on April 27, 2001 in Ieper, Belgium and charged with forgery and stock price manipulation for his role in L&H's accounting fraud.

38.     Carl Dammekens ("Dammekens") joined L&H in 1990 as Corporate Controller, and served as a Senior Vice President of Finance from 1993 and as Acting Chief Financial Officer of L&H from 1996 until his appointment as Chief Financial Officer on July 7, 1999. On November 9, 2000, L&H announced that Dammekens would be replaced as Chief Financial Officer. Dammekens was recently terminated by L&H. In addition to holding office in N.V., Dammekens also was an officer of Holdings, a U.S. corporation.

39.     Joo Chul (John) Seo served as President and General Manager of L&H Korea and a director of L&H Korea, from September 1999 until his suspension on or about November 22, 2000.

40.    Lernout, Hauspie, Bastiaen, Dammekens, Seo and Willaert are collectively referred to as the "Senior Officers." The Senior Officers are not named as defendants in this litigation because they are each already named as defendants in the Massachusetts Actions referenced above.

41.    FLV Fund is a Belgian venture-capital fund organized by Hauspie and Lernout, among others, to make various strategic investments. FLV Fund has United States offices in Los Altos Hills, California and in Woburn, Massachusetts.

42.    SAIL Trust purports to be a non-profit entity established in 1995 by, *inter alia*, Hauspie, Lernout and the Government of Flanders to support economic development and to assist in the infrastructure financing of the Flanders Language Valley region. S.A.I.L. Trust holds a one-third interest in FLV Management, N.V., which is the manager of the FLV Fund, and has the right to appoint five of FLV Management's directors. Since July 1999, the chief executive officer of the S.A.I.L. Trust has been Paul Behets, who until that time was the partner at KPMG Belgium with primary responsibility for the audits of L&H's financial statements.

43.    LHIC is a Belgium investment fund founded by Hauspie and Lernout in 1998, through which Hauspie and Lernout control 7.6% of L&H's stock. LHIC was purportedly established to make long-term strategic investments in companies in information technology industries such as speech, language and artificial intelligence. Hauspie and Lernout capitalized LHIC with their own shares of L&H common stock and act as advisors to LHIC and its investments. The President and Managing Director of LHIC since its inception has been Francis Vanderhoydonck, who also served as a director of L&H from May 1999 until his resignation on or about May 15, 2001. The Chief Financial Officer of LHIC was Chantal Mestdagh, formerly a KPMG Belgium auditor responsible for the audits of L&H's financial statements. In addition, as note above Dan Blake, a financial analyst at Cowen, was also employed by LHIC.

44.     Mercator & Noordstar, N.V. ("Mercator") is an insurance company located in Antwerp, Belgium. At all relevant times, Mercator owned 6.9% of L&H Holdings, which, in turn, owned 8.9% of L&H. Mercator also directly owned a 0.2% stake in L&H.

45.     KPMG Belgium is a Belgium public accounting firm. KPMG Belgium employs over 950 partners and staff in six cities in Belgium. KPMG Belgium, along with one or more other KPMG entities, has been L&H's outside auditor since 1991, when it absorbed the Belgian accounting firm of Behets, Boes & Co, which had been auditing L&H since the late 1980's. KPMG Belgium issued unqualified reports on L&H's financial statements for each of the years 1997, 1998 and 1999, gave an opinion that those financial statements were prepared in accordance with U.S. GAAP, stated that its audit was conducted in accordance with U.S. GAAS, and consented to L&H's inclusion of KPMG Belgium's reports on those financial statements in filings with the SEC. One of the KPMG Belgium auditors responsible for the L&H audits, Chantal Mestdagh, left KPMG Belgium to become Chief Financial Officer of LHIC. Ms. Mestdagh held that position throughout KPMG Belgium's audits of L&H's 1998 and 1999 financial statements. KPMG Belgium also served as auditors for the FLV Fund.

46.     KPMG LLP is a United States public accounting firm. KPMG LLP was integrally involved in the audits, reporting and SEC filings of L&H and served as L&H's advisor for the merger negotiations, due diligence and merger structure through its Houston, Texas office, its Atlanta, Georgia office and its Dallas, Texas office with regard to the Dragon/L&H transaction through its accountants, Robert McLamb, Paul Beecy, Drew Koecher, and others. Indeed, in its Annual Report for years 1997, 1998 and 1999, L&H listed KPMG LLP's office in identifying its outside auditors.

13

## SUBSTANTIVE ALLEGATIONS

### Purchase of L&H Shares

47.    On March 27, 2000, L&H, Holdings, Dragon, the Bakers, and certain other principal stockholders of Dragon entered into the Merger Agreement pursuant to which L&H would purchase all the stock of Dragon from the Bakers and other Dragon stockholders in a stock-for-stock transaction (the "Merger."). On that date, L&H was valued at $53.75 per share.

48.    On June 7, 2000, the transactions contemplated by the Merger Agreement were consummated, and the Bakers acquired 5,109,713 shares of L&H common stock.

49.    As a consequence of the fraud conducted by the Defendants, as described below and revealed after the closing of the Merger on June 7, 2000, the shares of L&H acquired by the Bakers in exchange for their ownership interest in Dragon were and are worthless.

### September 1999 – June 2000
### L&H's Stock Price Is Inflated

50.    In March, 2000 when the Bakers and Dragon's other principal shareholders agreed to sell their interests in Dragon to L&H in exchange for L&H stock, the price of L&H stock was at an all-time high, buoyed by reports and financial statements showing exponential increases in L&H revenues, which included tremendous revenue growth in new markets for L&H Asia, particularly the Korean market. These reports were false, but the truth was intentionally concealed from the Bakers.

51.    In 1995, L&H completed its initial public offering and commenced trading on NASDAQ. From 1987 through 1995, the Company had never been profitable and had only produced a few million dollars in annual revenues.

52.    Beginning in the third quarter of 1996, L&H expanded its business primarily through a dizzying array of acquisitions, to reach its goal of becoming "the

14

leading international provider of advanced speech and language technologies, products and services." In its 1997 Form 20-F, the Company stated:

> Beginning in the third quarter of 1996, the Company expanded its business substantially through acquisitions, to include translations services, language technologies and dictation software. The Company also expanded its core speech technologies through acquisitions. More recently the Company has acquired businesses for its translation services division and to augment the Company's language technologies division.

53.     As a result of the company's new focuses, L&H's sales quadrupled from 1995 to 1996. What proceeded was a period of unprecedented growth for L&H, making the Company an international success story and the pride of Belgium.

54.     From 1997 to June 2000, L&H reported incredible revenue growth – bolstered by a number of acquisitions, related-party transactions, and fraudulent accounting. In 1997, the Company's total revenues increase 220% to $99.4 million from $31 million in 1996. In 1998, L&H's revenues purportedly rose 113% to $211.6 million, and by 1999, the total revenues were claimed to be $344 million.

55.     A major focus of L&H's growth was the practice of acquiring complementary businesses and technologies as a means of supplementing its own internal development activities. Under Bastiaens' leadership, L&H acquired at least 20 companies. L&H used its own inflated stock as currency including for the Dragon transaction as set forth above.

**B.     ARTESIA SUBSTANTIALLY ASSISTED L&H IN THE FRAUD**

56.     As detailed below, Artesia knowingly participated in the fraud at L&H by providing loans that it knew L&H was fraudulently booking as revenue. Artesia knew that it was making the loans to shell corporations created and controlled by L&H, which, in turn, were paying these funds to the LDCs and CLDCs, which had no legitimate business operations. Artesia also knew that these funds were then being paid back to L&H in the form of licensing fees that L&H improperly booked as revenue. Furthermore, Artesia devised a scheme to

15

minimize its own risks relating to these loans through the use of credit default swaps. This scheme allowed L&H's senior officers to guaranty Artesia's loans while, at the same time, fraudulently concealing that fact from the SEC and investors.

57.     Recognition of revenue by L&H from these Artesia loans was improper under U.S. GAAP for at least two reasons. First, although the loans were funneled through various shell entities, in substance, the loans were made to L&H. It is axiomatic under U.S. GAAP that L&H cannot recognize loans as revenue that it ultimately must repay. Second, revenue recognition was improper because the transactions with the LDCs and CLDCs lacked any economic substance. The LDCs and the CLDCs had no operations, employees, assets, products, or customers. There simply were no end-users purchasing any products from the CLDCs, LDCs or L&H. Accordingly, the revenue recognized by L&H from these Artesia loans was a flagrant violation of U.S. GAAP, and Artesia was fully aware of this fact. Furthermore, even if there was some economic substance to these transactions, L&H's financial statements would still have been materially false and misleading, for, at best, the transactions between L&H and the strategic parties were "related party" transactions, the nature of which had to be fully disclosed to investors under the most basic provisions of GAAP.

**Background: L&H Begins to Use Strategic Partners to Artificially Inflate Revenues**

58.     In 1996, L&H formed Dictation Consortium N.V. ("Dictation") to develop software for L&H. In December of that year, L&H then entered into a very profitable licensing agreement with Dictation pursuant to which Dictation provided L&H with $26.6 million in revenue, or 25% of L&H's 1996 sales and 19% of L&H's 1997 sales.

59.     Between December 1996 and early 1998, Dictation "developed" the software, purportedly bearing the research and development costs. However, Dictation was not actually performing any of the work to develop the software. Rather, as defendant Lernout later

acknowledged, L&H employees wrote Dictation's business plan and did the software development work under contract.

60.     Once the development was completed L&H had the option to purchase Dictation. In May of 1998, at the end of the contract, L&H purchased Dictation for $40 million. Thus, in effect, L&H purchased the software that it had developed at a significant premium. L&H then booked the goodwill associated with the purchase as an asset and amortized the cost over a period of years, rather than recording the research and development expenses as current expenses.

61.     Bolstered by the success of the Dictation arrangement, on March 13, 1997, L&H established Brussels Translation Group N.V. ("BTG") as a limited liability company in Belgium, "primarily engaged to acquire, develop, commercialize and license machine translation software." Defendant Artesia was a key player in the creation of BTG, providing the initial financing to allow BTG to operate. Artesia lent a total of $22.9 million to BTG with the intent that L&H would find external investors to repay the loan. However, L&H never disclosed the owners of BTG, and according to a December 7, 2000 article, *The Wall Street Journal* was only able to trace ownership "through a Luxembourg company to two entities based in the Channel Islands, but not further."

62.     In March of 1997, BTG entered into a software development and commercialization agreement with L&H, pursuant to which L&H agreed to provide engineering services to BTG for the development of machine translation services for L&H's iTranslator services, which had been licensed by L&H to BTG. The agreement called for BTG to pay L&H $3.5 million in licensing fees, plus royalties. The licensing fees were increased to $5 million in May 1997. L&H also entered into an agreement to provide BTF with engineering services, under which BTG paid L&H approximately $30 million.

63.    From 1997 through 1999, L&H incurred $9 million in expenses to develop the BTG software. At the end of the contract, in June 1999, L&H purchased BTG for $59 million. This sum was comprised of an aggregate purchase price of approximately $42.3 million and the assumption of approximately $17 million of debt. The purchase price exceeded the fair value of the net assets acquired, and the difference was allocated to goodwill or other intangible assets on L&H's financial statements. Thus, in effect, L&H was able to develop its product, without deducting the research and development expenses, and then was able to capitalize the purchase price it paid for BTG, once again turning what would normally be an expense into an asset.

### Artesia Raises Money for a Untied States Company (Vasco) to Support L&H's Fraudulent Transactions

64.    On March 25, 1998, an Illinois company known as Vasco Data Security International ("Vasco"), a customer of L&H's Burlington, Massachusetts' office, purportedly licensed $800,000 of L&H software. The technology covered by L&H's license, however, was useless to Vasco, which only agreed to pay the licensing fee in order to obtain a $3 million loan from L&H it desperately needed. The loan was originally due on January 4, 1999. But by January 1999, Vasco still could not pay the loan. Hauspie took advantage of the situation and extorted Vasco to enter into a second licensing agreement with L&H worth $900,000, and to backdate the agreement to December 31, 1998. According to Vasco's former Chief Technology Officer, Hauspie threatened to call the loan due on January 4, 1999 if Vasco refused to backdate the contract. In desperation, Vasco acceded, entered into the second licensing agreement, and L&H fraudulently recorded the $900,000 in 1998.

65.    Because Vasco still did not have the financial resources to repay the loan in early 1999, at the behest of Lernout and Hauspie, Artesia organized and managed an $11.5 million private placement of Vasco common stock. On April 15, 1999, Artesia completed the private placement and wired the $11.5 million to Vasco's account in the Untied States. Vasco used

these funds, in part, to repay L&H. The investors in the private placement included LHIC (a company formed by Lernout and Hauspie to invest in companies that specialized in speech and language based products), which invested $5 million. LHIC obtained a 7% ownership stake in Vasco and a seat on the company's board of director. The seat was filled by defendant Hauspie. Another top investor in Vasco was Mercator, which purchased approximately $1 million of Vasco stock through the private placement managed by Artesia.

**Artesia Orchestrates the Financing of L&H's LDCs and Other Strategic Partners Through Credit Default Swaps and Other Vehicles in Order to Defraud the SEC and the Investing Public**

66.      Following the transactions with Dictation, BTG and Vasco, L&H's senior officers and Artesia expanded their fraudulent scheme into what ultimately would be described by *The Wall Street Journal* as "Dictation Consortium-type structure but on steroids." Instead of creating one shell company (i.e., Dictation Consortium or BTG) to funnel false revenue to L&H, L&H created a series of holding companies financed by Artesia. These holding companies, in turn, financed multiple LDCs, which then paid "licensing fees" back to L&H.

67.      One such holding company was Radial Belgium N.V. ("Radial"). On September 29, 1998, Artesia loaned approximately $6 million to Radial, which was a "special purpose entity" created by senior officers of L&H for the express purpose of creating and funding LDCs. Radial wired this money, in $2 million installments, to three LDCs: (a) the Slavic Development Company N.V., (b) the Farsi Development Company N.V., and (c) the Bahassa Development Company N.V. These LDCs were supposed to develop speech recognition products in Slavic, Farsi and Bahassa ((Indonesia), respectively. The Slavic, Farsi and Bahassa LDCs, however, used the $2 million to pay L&H licensing fees. L&H then booked the entire $6 million as revenue in the third quarter of 1998. None of these LDCs had bona fide offices or any operations that would have enabled them to develop speech recognition products.

19

68.     Internal Artesia documents quoted in the Report demonstrate that Artesia knowingly entered into this transaction in furtherance of the fraud.  They show that Artesia knew that its loan was to be used by Radial to finance the three LDCs (all of which had the same business address), that the LDCs and Radial had been created by L&H, and that the monies would be used by the LDCs to pay licensing fees in identical amounts to L&H.  They also show that Artesia knew that the loans would be guaranteed by Lernout, Willaert and Hauspie, and that their actions would enable L&H to fraudulently conceal that fact from the SEC and the investing public.

69.     Artesia recognized from the outset that the "strategic partners" had no equity investors and that they were mere shell companies located at one address.  In an e-mail dated September 21, 1999 from Artesia Employee 1 to Artesia Employee 2 and other Artesia Employees, Artesia Employee 1 stated,

**REDACTED**

70.     Anther document quoted in the Report states,

**REDACTED**

71.     Artesia Employee 1's September 21, 1999 e-mail also stated that,

**REDACTED**

20

**REDACTED**

72.    Artesia knew that the credit default swaps were highly unusual instruments to be used by individuals and that their sole purpose was to deceive the SEC and investors.  For example, an internal Artesia memorandum entitled "Direction Internal Audit" from two Artesia employees (Artesia Employees 3 and 4) to another Artesia employee (Artesia Employee 5) and others, dated January 31, 2000, notes that the credit default swaps executed by Lernout, Hauspie and Willaert had

**REDACTED**

as was documented in a February 14, 2000 internal Artesia memorandum pursuant to discussions with Artesia Employee 2.  (Emphasis supplied).

73.    Because Artesia knew that the credit default swaps were nothing more than guarantees, it went to great lengths to conceal their existence.  An internal Artesia document quoted in the Report notes that Lernout, Hauspie and Willaert refused to execute a loan that made reference to the credit default swaps:

**REDACTED**                Accordingly, a June 15, 1999 internal Artesia e-mail from Artesia Employee 1 to another Artesia Employee (Artesia Employee 6) concerning LIC and Radial and quoted in the Report states that Artesia did not identify Lernout, Hauspie and Willaert because

**REDACTED**

21