74.  Artesia also knew that the LDCs would not generate any real revenue to repay the loans, and that L&H intended to attract new investors who would act as a new source of funds:

**REDACTED**

75.  The June 25, 2003 article in the *Belgian Financial Times* confirms that Artesia knowingly issued the Radial loan in furtherance of L&H's fraudulent scheme:

> On September 29, 1998, Artesia issued a loan to a Belgian company known as Radial in the amount of approximately $6 million. Artesia's own documents reveal that Radial was a "special purpose entity" created by senior officers of L&H for the express purpose of creating and funding LDC's. these same bank documents also show that Artesia was aware that Lernout, Hauspie and Willaert did not want to sign the required personal guarantees to obtain this and other LDC and CLDC loans "in order to avoid possible problems with the SEC." As a result, Artesia devised a scheme to have Lernout, Hauspie and Willaert guarantee the Radial loan using "credit default swaps." Unlike personal guarantees, however, these swaps do not have to be revealed in the loan letters of credit. However, the sale of credit default swaps to individual investors is highly unusual, demonstrating the degree to which Artesia was willing to go to participate in L&H's massive accounting fraud.

76.  After setting up Radial to manufacture revenues for L&H in the third quarter of 1998, L&H and Artesia replicated this scheme in the fourth quarter. The name of the holding company this time was Language Investment Co. ("LIC"). Artesia made a loan on December 22, 1998 to LIC for approximately $6 million. LIC then sent the funds in four installments of $1.5 million to four separate LDCs: the (1) Greek, (2) Hungarian, (3) Polish, and (4) Czech development companies. These LDCs then immediately paid these funds to L&H as licensing fees so that L&H could book this "revenue" prior to year-end.

77.  These loans were also secured by credit default swaps. According to an internal, undated memorandum of Artesia written in connection with the loan to LIC and quoted in the

22

Report:                                        **REDACTED**

78.     Indeed, the June 25, 2003 article in the *Belgian Financial Times* also confirmed that Artesia also issued this loan to LIC in furtherance of the fraud:

> Artesia engaged in a similar fraudulent transaction on December 22, 1998, issuing a loan to the Language Investment Company for the purpose of creating 4 LDC's so that L&H could recognize revenues from these LDCs in the fourth quarter of 1998. Again, Artesia used credit default swaps to conceal the fact that the principals of L&H had secretly guaranteed the loans used to set up the 4 LDC's in question.

79.     L&H continued to perpetuate the scheme in 1999. On March 31, 1999, L&H set up the Language Development Fund ("LDF") and transferred $12 million that same day to the bank accounts of seven LDCs at Artesia. The Greek, Czech, Hungarian and Polish Development Companies received $1.5 million each, and the Tamil, Thai and Hindi Development Companies received $2 million each. This time, the $12 million came from Mercator & Noordstar in the form of a $2 million capital contribution and a $10 million loan to LDF. All of these funds made their way into L&H's financial statements as revenue.

80.     Internal Artesia documents quoted in the Report leave no question that Artesia knew that these LDCs were also shell entities created by L&H. A fax dated March 1999 from an L&H employee to Artesia stated:

**REDACTED**


**REDACTED**

23

81.   In the second quarter of 1999, L&H requested that LDF receive a $20 million loan from Artesia. Artesia's internal documents relating to LDF reveal that the bank was fully aware of the fraud being perpetuated at L&H. Specifically, according to an internal e-mail from an Artesia employee (hereafter Artesia Employee 7), dated June 21, 1999:

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

82.   Although Artesia ultimately denied the loan to LDF, on June 25, 1999, it granted a $20 million line of credit to Lernout, Hauspie and Willaert, personally. This time, however, Artesia demanded that the three individuals pledge 650,000 registered shares of L&H as collateral for the loan. The vast majority of this $20 million was used to fund six new LDCs (Malay, Vietnamese, and four other Indian languages not specified at the time), and this money was ultimately booked as revenue on L&H's financial statements. L&H did not reveal the

24

source of the funds received by these LDCs in L&H's SEC Form 10-Q for the quarter ended June 30, 1999, or in its SEC Form 10-K for the year ended December 31, 1999.

83. By mid to late 1999, Artesia became increasingly concerned that its loans would not be repaid. The loans to Radial and LIC were due June 30, 1999, and the $20 million personal loan to Lernout, Hauspie and Willaert was due in October 1999. To avoid a technical default, Artesia extended the loans to December 15, 1999. Artesia subsequently had multiple discussions with Hauspie, Lernout and Willaert to closely track their progress in attracting potential new investors in the LDCs, whose funds would be used by L&H to repay Artesia. L&H and Artesia were effectively seeking to "rob Peter to pay Paul," and creating a quintessential Ponzi scheme in which funds from new investors were used to pay old investors. In an internal memorandum dated September 7, 1999, Artesia Employee 7 reported a conversation that he had with Willaert and others the day before:

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

25

**REDACTED**

84. Similarly, on December 27, 1999, an Artesia employee (Artesia Employee 8) reported in an e-mail to Artesia Employee 7 and other Artesia employees that he had received a telephone call from Willaert, who stated that

**REDACTED**

Willaert also gave Artesia Employee 8 the details of the contact person in Singapore.

85. On or about January 5, 2000, a Lebanese-Armenian businessman, Harout Katchadourian, wired $36 million at the request of Lernout, Hauspie and Willaert to the Singapore bank account of Velstra, a Singaporean company owned by Mercator. This money was then used to pay off the $20 million line of credit, and the two $6 million loans to Radial and LIC, thereby consummating the classic Ponzi scheme.

### The Belgium Prosecutor Confirms that Artesia Conspired with and Substantially Assisted L&H in Connection with his Fraud

86. Based on internal documents obtained from Artesia, a panel of experts retained by the Belgian prosecutors concluded that Artesia intentionally participated in the L&H fraud. The conclusions are damning:

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

### Artesia Lied to Investigators to Conceal Its Role in the Fraud

87.  Artesia took affirmative steps to cover up its role in the fraud at L&H after the investigation of the fraud began in November 2000. For example, Loeff Claeys Verbeke, one of the law firms charged with that investigation and co-author of the Audit Committee Report, asked Artesia about L&H's possible role in securing financing for LIC. On November 24, 2000, Artesia sent a letter to Loeff Claeys Verbeke in response to that inquiry. According to the Report, Artesia's letter stated: **REDACTED**

27

**REDACTED** Artesia made no mention of the credit default swaps executed by the principals of L&H - - Lernout, Hauspie and Willaert - - on the LIC transaction so as not to disclose its complicity in the fraud. As a result, the Audit Committee Report makes no mention of Artesia's role in the fraud. Likewise, none of the Wall Street Journal articles that disclosed the fraud at L&H mentioned any role by Artesia.

### The Merger Agreement

88. On March 27, 2000, L&H, Holdings, Dragon, the Bakers and certain other Stockholders of Dragon entered into the above-referenced Merger Agreement pursuant to which L&H would acquire Dragon from the Bakers and other stockholders in a stock-for-stock deal.

89. The transaction provided that L&H would acquire all of the outstanding stock of Dragon in exchange for common stock of defendant L&H. The deemed price of the Merger was more than $600 million and on the date the terms of the transaction were agreed to, L&H stock was trading at $53.75 per share.

90. The terms of the Merger are set forth in a series of agreements the most critical of which is the Agreement and Plan of Merger (the "Merger Agreement"), dated March 27, 2000, among Lernout & Hauspie Speech Products N.V. ("Buyer" or "L&H"), L&H Holdings USA, Inc. ("Holdings"), Dragon Systems, Inc. ("Company") and Certain Principal Stockholders of Dragon Systems, Inc. ("Principal Stockholders," including the Bakers).

91. On June 7, 2000, the transaction was consummated and L&H acquired all of the outstanding stock of Dragon through the Merger of Dragon into Holdings, a wholly owned subsidiary of L&H. L&H issued a total of 10,011,236 reflecting a 2 for 1 stock split and an agreement arrived at between March 27, 2000 and June 7, 2000 to issue a small amount of additional shares to acquire all outstanding shares of Dragon. The Bakers received 5,109,713 shares of L&H for their 51% ownership interest in Dragon.

92. Pursuant to the Merger Agreements, the Bakers were permitted to sell a small amount of L&H stock but were required to hold, for a period of 4 months, approximately half the shares of the L&H common stock received (adjusted for a subsequent 2 for 1 stock split) and the balance for 1 year. During this period following the Merger, plaintiffs were required to assign the voting rights to all the shares they acquired in the merger, to an entity controlled by the co-founders and co-chairmen of L&H, Jo Lernout and Pol Hauspie.

### The materially False and Misleading Statements

93. On April 28, 1998, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Q1 Revenues of $35 Million; Strong Earnings of $0.13 Per share Before One Time Charge for First Quarter" (the "April 28, 1998 Press Release"). The April 28, 1998 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the first quarter of 1998, L&H's total revenues were $35.1 million, an increase of 112% over reported revenues of $16.6 million for the first quarter of 1997.
>
> [* * *]
>
> Net income before one time charges and unusual items for the first quarter of 1998 reached $7 million, or $0.13 per share on 52.5 million average diluted shares outstanding which is a 62.5% increase when compared to $2.7 million in net income, or $0.08 per share on $34.4 million average outstanding shares for the first quarter of 1997.

The April 28, 1998 Press Release also reported the following:

|  | (000s)<br>3 Month Ended<br>March 31, 1998 |
|---|---|
| Revenues |  |
| Core Technologies | $11,795 |
| Dictation | $5,641 |
| Translation Services | $11,853 |
| Language Technology | $5,776 |

29

| | |
|---|---|
| Total Net Revenues | $35,065 |
| Loss from operations | ($8,111) |
| Net Loss | ($3,982) |
| | As of March 31, 1998 |
| Accounts Receivable | $35,655 |
| Total Assets | $246,834 |

94. On May 1, 1998, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 of the Securities Exchange Act of 1934 which included as "Exhibit 2" a copy of the April 28, 1998 Press Release (the "Q1 1998 6-K"). Bastiaens signed the Q1 1998 6-K.

95. The April 28, 1998 Press Release and the Q1 1998 6-K were materially false and misleading because revenues and accounts receivable were artificially inflated by at least $2 million and earnings were materially overstated.

96. On July 28, 1998, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record q2 Revenues of $45 Million; Record Net Profits of $9.5 Million or $0.17 EPS Before Exceptional Items" (the "July 28, 1998 Press Release"). The July 28, 1998 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the second quarter of 1998, L&H's total revenues were $45 million, an increase of 113% over reported revenues of $21.1 million for the second quarter of 1997.
>
> [* * *]
>
> Net income before one time charges and unusual items for the second quarter of 1998 reached $9.5 million. This represents $0.17 per share on 55.1 million average diluted shares outstanding which is a 138% increase when compared to $4.0 million in net income, or $0.11 per share on 36.1 million average outstanding shares for the second quarter of 1997.

30

[* * *]

"The strong performance of our company is [sic] all our business activities proves the strength of our integrated speech and linguistic strategy and the ability of our management team to implement," said Gaston Bastiaens, president and CEO of Lernout & Hauspie.

[* * *]

[S]aid Jo Lernout, L&H co-founder and co-chairman "L&H has been very proactive in meeting the market demand by regularly introducing new products, diversifying our sales channels and offering competitive pricing. These efforts have been rewarded with continuing strong revenues and new contract bookings."

The July 28, 1998 Press Release also reported the following:

|  | (000s) 3 Months Ended June 30, 1998 | (000s) 6 Month Ended June 30, 1998 |
|---|---|---|
| Revenues |  |  |
| Core Technologies | $12,023 | $23,818 |
| Dictation | $7,323 | $12,964 |
| Translation Services | $12,288 | $18,064 |
| Language Technology | $13,357 | $25,210 |
| Total Net Revenues | $44,991 | $80,056 |
| Loss from operations | ($31,907) | ($40,018) |
| Net Loss | ($34,543) | ($38,524) |
|  | As of June 30, 1998 |  |
| Accounts Receivable | $42,820 |  |
| Total Assets | $404,270 |  |

97.     On August 7, 1998, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-1 of the Securities Exchange Act of 1934, which

31

included as "Exhibit 2" a copy of the July 28, 1998 Press Release (the "Q2 1998 6-K"). Bastiaens signed the q2 1998 6-K.

98.   The July 28, 1998 Press Release and the q2 1998 6-K were materially false and misleading because revenues and accounts receivable were artificially inflated by at least $800,000 and earnings were overstated.

99.   On October 27, 1998, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record q3 Revenues of $54.9 Million; Record Net Profits of $12.1 or $0.22 EPS Before Exceptional Items" (the "October 27, 1998 Press Release"). The October 27 1998 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the third quarter of 1998, L&H's total revenues were $54.9 million, an increase of 97% over reported revenues of $27.9 million for the third quarter of 1997.
>
> [* * *]
>
> Net income before one-time charges and unusual items for the third quarter of 1998 reached $12.1 million. This represents $0.22 per share on 55.9 million average diluted shares outstanding which is a 133% increase when compared to $5.2 million in net income, or $0.13 per share on 40.5 million average outstanding shares for the third quarter of 1997.

The October 27, 1998 Press Release also reported the following:

|  | (000s)<br>3 Months Ended<br>September 30, 1998 | (000s)<br>9 Month Ended<br>September 30, 1998 |
| --- | --- | --- |
| Revenues |  |  |
| Core Technologies | $13,448 | $37,266 |
| Dictation | $9,972 | $22,936 |
| Linguistic Services | $18,094 | $43,304 |
| Language Technology | $13,346 | $31,410 |
| Total Net Revenues | $54,860 | $134,916 |
| Loss from operations | ($34,153) | ($74,172) |

32

| | | |
|---|---|---|
| Net Loss | ($39,262) | ($77,787) |

|  | As of September 30, 1998 |
|---|---|
| Accounts Receivable | $60,513 |
| Total Assets | $523,871 |

100. On October 29, 1998, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the October 27, 1998 Press Release (the "Q3 1998 6-K"). Thomas B. Doherty, L&H's then-Senior vice President of Financial and Financial Planning, signed the Q3 1998 6-K.

101. The October 27, 1998 Press Release and the Q3 1998 6-K were materially false and misleading because revenues and accounts receivable were overstated by at least $10.6 million and earnings were overstated.

102. On April 7, 1999, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Revenues and Record Earnings Before One-Time Charges for Fourth Quarter 1998 and Fiscal Year 1998" (the "April 7, 1999 Press Release"). The April 7, 1999 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> Lernout & Hauspie (Nasdaq: LHSP) (Easdaq: LHSP) (L&H), a worldwide market leader in speech and linguistic technologies, products and services, today announced results for the fourth quarter of $76.7 million in revenue, or a 126% increase in the reported revenue of $33.8 million for the fourth quarter 1997. For the fiscal year 1998, the company reported total revenues of $211.6 million or an increase of 113% over the reported revenues of $99.4 million for 1997.

> [* * *]

> The Company reported approximately $12.9 million in net income, before one-time charges and exceptional items, for the fourth quarter of 1998 or EPS (earnings Per Share) of $0.22 cents per

33

share on 58.3 million average diluted shares outstanding. The Company's fourth quarter net income includes an increase in goodwill amortization expense of approximately $1.5 million or $0.03 per share, relating to the company's previously announced revaluation of in-process research and development acquired in prior quarters to reflect new Untied States Securities and Exchange Commission (the "SEC") guidelines. If not for this change, the Company's net income before one-time charges would have been $0.25 per share.

[* * *]

Net income for the full year of 1998, excluding one-time charges, totaled $37.8 million or $0.69 per share on 55.2 million average diluted shares compared to $20 million or $0.53 per share on 38.9 million average diluted shares during 1997.

[* * *]

"There are a number of factors that have contributed to our successful year. Our revenues increased significantly between 1997 and 1998 not only because there was considerable growth in the market for speech and language technologies, products and services, but particularly because of L&H's ability to deliver new products, solutions and services," said Gaston Bastiaens, president and CEO of Lernout & Hauspie. "The strong growth in each of our business divisions is attributable in part to our professional, successful integration of acquired technologies and especially to our strong internal growth."

[* * *]

"During this past year, the market has gained an even greater appreciation of the vast potential for speech and language technologies. In fact, The Gartner Group recently issued a report citing speech technology, artificial intelligence, natural language technology, wearable computing, biometrics and voice over the Internet as 'technologies to watch' for 1999," said Jo Lernout, co-founder and co-chairman of L&H. "L&H has returned record revenues for 1998 because we are expert in the full range of speech and language technologies, including artificial intelligence, Natural Language Technology (NLT) and vice over the Internet, and can combine them to create multi-lingual speech-enabled offerings. By combining these offerings we can meet a wide range of global needs."

The April 7, 1999 Press Release also reported the following:

34

| Revenues | 3 Months Ended<br>December 31, 1998 | Year Ended<br>December 31, 1998 |
|---|---|---|
| Core Technologies | $19,086 | $56,352 |
| Dictation | $14,898 | $37,834 |
| Translation Services | $24,596 | $67,900 |
| Language Technology | $18,097 | $49,507 |
| Total Net Revenues | $76,677 | $211,593 |
| Income/(Loss) from operations | $13,836 | ($43,741) |
| Net Loss/(loss) | $10,213 | ($48,630) |

|  | As of<br>December 31, 1998 |
|---|---|
| Accounts Receivable | $81,212 |
| Total Assets | $571,017 |

103. On April 19, 1999, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the April 7, 1999 Press Release (the "Q4 1998 6-K"). Bastiaens, signed the Q4 1998 6-K.

104. On June 30, 1999, L&H filed with the SEC, its Form 20-F Annual Report Pursuant to Section 13 or 15d of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 1998 (the "1998 20-F"). The 1998 20-F included the same financial information contained in the April 7, 1999 Press Release. Bastiaens signed the 1998 20-F on June 29, 1999.

105. The April 7, 1999 Press Release, the Q4 1998 6-K and the 1998 20-F were materially false and misleading because fourth quarter revenues and accounts receivable were overstated by at least $14.5 million and earnings were overstated. Year-end 1998 revenues were overstated by $27.9 million and earnings were overstated.

106. On May 18, 1999, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Strong Revenues and Strong Earnings For First Quarter; Company Achieves Revenues of $70.7 Million and EPS of $0.12 Before Exceptional Items" (the "May 18, 1999 Press Release"). The May 18, 1999 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the first quarter of 1999, L&H's total revenues were $70.7 million, an increase of 102% over reported revenues of $35.1 million for the first quarter of 1998. The company attributes the increased revenues to L&H's continued success in expanding the role speech and language technologies play in a broad range of markets and applications.
>
> [* * *]
>
> Net income before exceptional items for the first quarter of 1999 reached $7 million, or $0.12 per share on 58.1 million average diluted shares outstanding which is a 13% increase when compared to $6.2 million in net income, or $0.12 per share on 52.5 million average outstanding shares for the first quarter of 1998.

The May 18, 1999 Press Release also reported the following:

|  | (000s)<br>3 Month Ended<br>March 31, 1999 |
|---|---:|
| Revenues |  |
|     Technologies & Solutions | $24,726 |
|     Applications | $22,568 |
|     Consulting & Services | $23,414 |
| Total Net Revenues | $70,708 |
| Income from operations | $10,939 |
| Net income | $12,304 |

|  | As of<br>March 31, 1999 |
|---|---:|
| Accounts Receivable | $88,301 |
| Total Assets | $572,233 |

107. On June 1, 1999, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the May 18, 1999 Press Release (the "Q1 1999 6-K"). Dammekens signed the Q1 1999 6-K.

108. The May 18, 1999 Press Release and the Q1 1999 6-K were materially false and misleading because revenues and accounts receivable were overstated by at least $24.7 million and earnings were overstated.

109. On July 28, 1999, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Strong Revenues, Earnings and Cash Flow For Second Quarter; Company Achieves Revenues of $76 Million and EPS of $0.17; Reduced DSO's" (the "July 28, 1999 Press Release"). The July 28, 1999 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the second quarter of 1999, L&H's total revenues were $76.0 million, an increase of 69% over reported revenues of $45.0 million for the second quarter of 1998. L&H's total revenues for the six months ending June 30, 1999 were $146.7 million, an increase of 83% over reported revenues of $80.1 million for the same period in 1998. The company attributes the increased revenues to L&H's continued success in expanding the role speech and language technologies play in a broad range of markets and applications.
>
> [* * *]
>
> Net income of Q2 1999 reached $10.1 million, or $0.17 per share on 59.4 million shares which is a 21% increase when compared to $8.3 million, or $0.15 pr share on 55.1 million shares for the second quarter of 1998. Net income for the first six months ended June 30, 1999 reached $17.1 million, or $0.29 per share on 58.8 million average diluted shares outstanding, which is a 17% increase when compared to $14.6 million in net income, or $0.28 per share on 52.5 million average outstanding shares for the six months ended June 30, 1998.
>
> [* * *]

37

> "L&H has steadfastly pursued its long-term strategy to be the leading provider of speech and language technologies, products and services, particularly as it relates to opportunities in Natural Language Understanding," said Jo Lernout, L&H co-founder and co-chairman. "We are especially pleased with our Q2 successes because they affirm that our strategy is sound and successful. Our continued ability to attract interest from industry leaders, as evidenced by the Intel agreement announced this quarter, reinforces this long term strategy as well."

The July 28, 1999 Press Release also reported the following:

|  | (000s)<br>3 Months Ended<br>June 30, 1999 | (000s)<br>6 Months Ended<br>June 30, 1999 |
|---|---|---|
| **Revenues** | | |
| Technologies & Solutions | $26,485 | $51,211 |
| Applications | $28,984 | $51,552 |
| Consulting & Services | $20,546 | $43,960 |
| **Total Net Revenues** | $76,015 | $146,723 |
| Income from operations | $15,532 | $26,471 |
| Net Income | $10,114 | $22,418 |

|  | As of<br>June 30, 1999 |
|---|---|
| Accounts Receivable | $87,145 |
| Total Assets | $606,303 |

110. On August 6, 1999, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the July 28, 1999 Press Release (the "Q2 1999 6-K"). Bastiaens, signed the Q2 1999 6-K.

111. The July 28, 1999 Press Release and the Q2 1999 6-K were materially false and misleading because revenues and accounts receivable were overstated by at least $43.7 million and earnings were overstated.

112. On October 27, 1999, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Revenues of $87.5 Million and Strong Earnings of $0.16 for Third Quarter; Record Earnings Before Goodwill Amortization of $18.5 Million or $0.31 per Share" (the "October 27, 1999 Press Release"). The October 27, 1999 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the third quarter of 1999, L&H's total revenues were $87.5 million, an increase of 59% over reported revenues of $54.9 million for the third quarter of 1998. L&H's total revenues for the nine months ended September 30, 1999 were $234.2 million, an increase of 74% over reported revenues of $134.9 million for the same period in 1998.
>
> [* * *]
>
> Net income of Q3 1999, before goodwill amortization, reached $18.5 million, or $0.31 per share on 60.5 million shares. This is a 25% increase compared to $14.7 million before goodwill amortization and one-time charges, or $0.26 per share on 55.8 million fully diluted shares, for the third quarter of 1998. Net income for the first nine months ended September 30, 1999 reached $50 million before goodwill amortization and one-time charges, or $0.85 per share on 59.1 million fully diluted shares which is a 43% increase when compared to $34.7 million in net income, or $0.64 per share on 54.1 million fully diluted shares for the nine months ended September 30, 1998. Net income for the third quarter of 1999 was $9.8 million or $.16 per share on a fully-diluted basis versus a net loss of $35.6 million or $.70 per share net loss for the third quarter of 1998.

The October 27, 1999 Press Release also reported the following:

| Revenues | (000s) 3 Months Ended September 30, 1999 | (000s) 9 Months Ended September 30, 1999 |
|---|---|---|
| Technologies & Solutions | $31,033 | $82,244 |
| Applications | $32,107 | $83,659 |
| Consulting & Services | $24,333 | $68,293 |
| Total Net Revenues | $87,473 | $234,196 |
| Income from operations | $16,827 | $43,296 |

39

| | | |
|---|---|---|
| Net Income | $10,446 | $31,096 |

|  As of September 30, 1999 | |
|---|---|
| Accounts Receivable | $122,871 |
| Total Assets | $640,333 |

113. On November 4, 1999, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the October 27, 1999 Press Release (the "Q3 1999 6-K"). Dammekens, signed the Q3 1999 6-K.

114. On June 30, 2000, L&H filed with the SEC its form 10-Q Quarterly Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Quarterly Period Ended September 30, 1999 (the"Q3 1999 10-Q"). The Q3 1999 10-Q included substantially the same financial information contained in the October 27, 1999 Press Release. Bastiaens and Dammekens signed the Q3 1999 10-Q.

115. The October 27, 1999 Press Release, the Q3 1999 6-K and the Q3 1999 10-Q were materially false and misleading because revenues and accounts receivable were overstated by at least $40.7 million and earnings were overstated.

116. On February 9, 2000, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Revenues of $110 Million and Earnings Per Share of $0.22 for Fourth Quarter; (Before Exceptional Items); Strong Fiscal Year 1999; Announces 2-For-1 Stock Split; Record Earnings of $22.6 Million or $0.37 Earnings Per Share Before Goodwill Amortization and Exceptional Items; Cash Flow of $68 Million from 1999 Operations and DSO's reduced to 86 Days" (the "February 9, 2000 Press Release"). The February 9, 2000 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

40