For the fourth quarter of 1999, L&H's total revenues were $110 million, or a 43.5% increase in the revenue of $76.7 million for the fourth quarter of 1998. For the fiscal 1999, the company reported total revenues of $334 million or an increase of 62.7% over the reported revenues of $211.6 million for 1998.

[* * *]

The company reported approximately $13.4 million in net income for the fourth quarter of 1999, before exceptional items, or EPS (Earnings per Share) of $0.22 cents per share on 60.7 million average diluted shares outstanding. Net income for fiscal 1999, excluding exceptional items, totaled $40.2 million or $0.67 per share on 59.6 million average diluted shares compared to $38.2 million or $0.69 per share on 55.2 million average diluted shares during 1998. The exceptional items for the fourth quarter of 1999 resulted in a $2.7 million net loss (unrealized currency exchange loss). For Fiscal 1999 the exceptional items resulted in a $2.5 million net benefit (mainly unrealized currency exchange gain).

[* * *]

"In 1999 we experienced a strong demand for speech and language technologies, applications and solutions, specifically in the Enterprise and Telephony arena. This increase was mainly the result of internal growth and created a positive cash flow from operations of $68 million, reflecting the maturity of our operations," said Gaston Bastiaens, president and CEO of L&H. "During 2000 I believe we will reap the benefits of these changes as we plan to launch separate entities for Healthcare, Internet Translation and Globalization, Enterprise and Telephony Solutions. We foresee L&H's technologies will provide an intuitive speech user interface for the ever growing number of wireless, portable and handheld devices.

The February 9, 2000 Press Release also reported the following:

| Revenues | (000s)<br>3 Months Ended<br>December 31, 1999 | (000s)<br>Year Ended<br>December 31, 1999 |
|---|---|---|
| Technologies & Solutions | $56,416 | $138,660 |
| Applications | $30,034 | $113,693 |
| Consulting & Services | $23,591 | $91,884 |
| Total Net Revenues | $110,041 | $344,237 |

41

| | | |
|---|---|---|
| Income from operations | $22,984 | $66,280 |
| Net Income | $10,645 | $41,741 |
| Cash and marketable Securities | $130,630 | |
| Accounts Receivable | $104,989 | |
| Total Assets | $693,738 | |

117. On June 30, 2000, L&H filed its Form 10-K Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 1999 with the SEC (the "1999 Form 10-K"). The 1999 Form 10-K included substantially the same financial information contained in the February 9, 2000 Press Release. Bastiaens, Dammekens, Lernout, Hauspie, Willaert, Cauwelier and Cloet signed the 1999 Form 10-K.

118. The February 9, 2000 Press Release and the 1999 Form 10-K were materially false and misleading because fourth quarter revenues and accounts receivable were overstated by at least $65.6 million and earnings were overstated. Year end 1999 revenues and accounts receivables were overstated by $174.7 million and earnings were overstated.

119. On May 9, 2000, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Revenues and Strong Earnings for First Quarter 2000; Company Achieves Revenues of $110.7 million and EPS of $0.37 Before Goodwill Amortization and Exceptional Items" (the "May 9, 2000 Press Release"). The May 9, 2000 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the first quarter of 2000, L&H's total revenues were $110.7 million, an increase of 57% over reported revenues of $70.7 million for the first quarter of 1999. The company attributes the increased revenues to continued growth in telephony, enterprise solutions and embedded market strengths. Approximately 74% of the revenue increase was attributed to organic growth.

[* * *]

42

Net income before exceptional items for the first quarter of 2000 reached $12.2 million, or $0.19 per share on 63.9 million average diluted shares outstanding which is a 75% increase when compared to $7.0 million in net income, or $0.12 per share on 58.1 million average diluted shares outstanding for the first quarter of 1999. The excluded exceptional amount in Q1 2000 was a $4.2 million net benefit (mainly unrealized currency exchange gain). Earnings per share, EPS before goodwill amortization, were $0.37 compared to $0.24 during the first quarter of 1999.

The May 9, 2000 Press Release also reported the following:

| Revenues | (000s) 3 Month Ended March 31, 2000 |
|---|---|
| Technologies & Solutions | $58,886 |
| Applications | $27,993 |
| Consulting & Services | $23,815 |
| Total Net Revenues | $110,694 |
| Income from operations | $26,722 |
| Net income | $16,447 |

|  | As of March 31, 2000 |
|---|---|
| Cash and Marketable Securities | $179,139 |
| Accounts Receivable | $128,741 |
| Total Assets | $828,141 |

120.   On May 12, 2000, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the May 9, 2000 Press Release (the "Q1 2000 6-K"). Dammekens signed the Q1 2000 6-K.

121.   On June 30, 2000, L&H filed its Form 10-Q Quarterly Report Pursuant to Section 13 or 15(d) for the Securities Exchange Act of 1934 for the quarterly Period ended March 31,

2000 (the "Q1 2000 10-Q"). The Q1 2000 10-Q included substantially the same financial information contained in the May 9, 2000 Press Release. Bastiaens and Dammekens signed the Q1 2000 10-Q.

122. The June 30, 2000 Press Release, the Q1 2000 6-K and the Q1 2000 10-Q were materially false and misleading because revenues and accounts receivable were overstated by at least $58.4 million and earnings were overstated.

123. On August 8, 2000, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Revenues of Approximately $155 Million for Q2, 2000 and Earnings of $0.05 Before Goodwill Amortization and Exceptional Items" (the "August 8, 2000 Press Release"). The August 8, 2000 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> L&H's total revenues were approximately $155 million, an increase of 104% over reported revenues of $76 million for the second quarter of 1999. Thirty-one million dollars of the company's second quarter 2000 revenues came from Dictaphone and Dragon. Excluding Dictaphone and Dragon, L&H's second quarter revenues were $124 million, 63% increase from revenues of $76 million in the second quarter of 1999. The company attributes 72% of this increase to organic growth.
>
> Net income before goodwill and exceptional items for the second quarter of 2000 were $7.1 million, or $0.05 per share on approximately 140 million average diluted shares outstanding as compared to $17.3 million, or $0.15 per share during the second quarter of 1999 on approximately 119 million average diluted shares outstanding
>
> [* * *]
>
> **Geographical Analysis of Revenues in the Second Quarter**
>
> European revenues were approximately $36.4 million or 23% of total revenues compared to $29.3 million or 39% in the second quarter of 1999. Revenues for North America were approximately $48.2 million or 31% of total revenues compared to $18.7 million or 25% of total revenues for the second quarter 1999. The increase

44

in U.S. revenue is largely attributable to the Dictaphone and Dragon acquisitions.

Korea contributed approximately $68 million or 44% of total company revenues. Currently, L&H has over 150 corporate customers in Korea including Art Lab, Digital Life, Digital Sei Young Ltd, EPC, Hanvit Bank, Hanvit Securities, Hung Chang, Hyundai Securities, Koscom, LG Electronics, Samsung Electronics, and Terrasoft. Its second quarter 2000 revenues continued to be strong in Korea.

[* * *]

**The increase in U.S. revenue is largely attributable to the Dictaphone and Dragon acquisitions.**

"The combination of Dragon and Dictaphone with L&H and the retention of the talented executive management from both companies provide us with an organization and resources that are unquestionably the strongest and finest in this industry," said Gaston Bastiaens, president and CEO of L&H. "We are very excited to apply these resources to tackle the ever growing opportunities in healthcare, enterprise and telephony, applications, globalization and the Internet. There has never been a more exciting or promising period in the speech and language technology industry."

"The second quarter of 2000 was filled with successes that we believe we can replicate in other areas of our business," said Jo Lernout, co-founder and chairman of L&H. "During the second quarter we continued to move toward a solutions oriented approach, as evidenced by the introduction of our healthcare solutions, our consumer applications and our NAK prototype solution. We also had numerous solutions sales in Asia. We believe these achievements can serve as a model for additional growth in the U.S. and Europe."

[* * *]

**Balance Sheet & Cash Flow Highlights, June 30, 2000**

Cash and Marketable Securities increased to approximately $200 million from $179 million at the end of the previous quarter.

Accounts Receivable increased to $238 million from $129 million at the end of the second quarter. The increase was due primarily to the inclusion of Dictaphone and Dragon.

45

Short-term debt was $252 million primarily as a result of the assumption of the debt associated with the acquisition of Dictaphone.

Net working capital was approximately $48 million, down primarily as a result of the assumption of the short-term debt associated with the acquisition of Dictaphone.

Net goodwill was approximately $1,701 million, an increase of approximately $1,283 versus the first quarter as a result of the acquisition of Dictaphone and Dragon.

Long-term debt was approximately $234 million as a result of the assumption of $200 million of Dictaphone senior subordinated notes.

Shareholders' equity was ($1,531) million.

Operating cash flow for the quarter was approximately $12 million and $32 million year-to-date.

Net cash used from investing activities was approximately $71 million and $145 million year-to-date.

Net cash provided by investing activities was approximately $83 million and $191 million year-to-date.

The August 8, 2000 Press Release also reported the following:

| Revenues | (000s) 3 Months Ended June 30, 2000 | (000s) 6 Months Ended June 30, 2000 |
|---|---|---|
| Technologies & Solutions | $78,904 | $137,790 |
| Applications | $50,440 | $78,433 |
| Consulting & Services | $25,562 | $49,378 |
| Total Net Revenues | $154,906 | $265,601 |
| Income (Loss) from operations | ($15,936) | $10,787 |
| Net Loss | ($33,667) | ($17,219) |

124.  On or about August 14, 2000, L&H filed its Form 10-Q Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Quarterly Period

46

ended June 30, 2000 (the "Q2 2000 10-Q"). The Q2 2000 10-Q included the same financial information included in the August 8, 2000 Press Release. Bastiaens and Dammekens signed the Q2 2000 Quarterly 10-Q.

125. The August 8, 2000 Press Release and the Q2 2000 10-Q were materially false and misleading because revenues and accounts receivable were overstated by at least $60.7 million and earnings were overstated.

## Defendants' Fraudulent Scheme Directly and Foreseeably Harmed The Bakers

126. Defendants' fraudulent scheme had the intended and actual effect of fraudulently overstating L&H's revenue, income and assets and L&H's common stock price by, among other things, permitting L&H to fraudulently misrepresent its revenues, income and assets by means of interstate mail and wire, both directly and through L&H's agents. The Bakers were direct and foreseeable recipients of these fraudulent communications and relied on them in multiple ways. Among other things, the Bakers relied on the integrity of L&H's fraudulently inflated financial statements; the Bakers relied on the integrity of the fraudulently inflated market price of L&H common stock; and the Bakers relied on the written and oral misrepresentations of L&H and its representatives. As bankers to L&H, the Defendants regularly received L&H's financial statements and actually knew that the fraud they were perpetrating with L&H was working and that L&H's financial statements were materially and fraudulently inflated as a direct result. As bankers to L&H, the Defendants were actually aware of the Merger from no later than on or about the date that the Merger was publicly announced in March 2000 through and including the closing of the Merger in June 2000. As a result, the Defendants knew or recklessly disregarded that the Bakers were actually relying on L&H's fraudulent financial statements and fraudulently inflated stock price.

47

### Reliance on L&H's Fraudulently Misstated Financial Statements

127.   The Bakers relied on the accuracy of L&H's 1998 and 1999 financial statements. Among other things, the Bakers were entitled to terminate the Merger Agreement prior to closing if it became apparent that L&H's unaudited financial statements for 1999, released prior to execution of the Merger Agreement, were materially misstated. They were fraudulently misstated, due to the misconduct of the Defendants and L&H, but this was concealed from the Bakers, preventing the Bakers from walking away from the Merger, which they would have done if Defendants' fraudulent behavior had been made known:

   a.   The Merger Agreement included L&H's representations and warranties that: (i) all of L&H's filings with the SEC since January, 1998, did not contain any untrue statement of material fact or any material omission; (ii) all financial statements, included in L&H's SEC filings complied in all material respects with SEC accounting requirements and published rules and regulations, and were prepared in accordance with U.S. GAAP; and (iii) L&H's unaudited consolidated financial statements for the year ended December 31, 1999 were prepared in accordance with U.S. GAAP and fairly presented in all material respects the consolidated financial position of L&H as of the date thereof.

   b.   Section 9.1 of the Merger Agreement allowed the Bakers to terminate the Agreement at any time prior to closing "if there has been a breach of any representation [or] warranty ... which causes the conditions set forth in section 7.3(a) ... to be incapable of being satisfied."

   c.   Section 7.3(a) of the Merger Agreement provided that "representations and warranties of [L&H] shall be true and correct in all material respects as of the closing date."

128.   The Dexia Defendants' fraudulent scheme had the intended and actual effect of

48

fraudulently overstating L&H's revenue, income and assets and L&H's common stock price by, among other things, permitting L&H to fraudulently misrepresent its revenues, income and assets by means of interstate mail and wire, both directly and through L&H's agents, including KPMG. The Bakers were direct and foreseeable recipients of these fraudulent communications and relied on them in multiple ways. Among other things, the Bakers relied on the integrity of L&H's fraudulently inflated financial statements; the Bakers relied on the integrity of the fraudulently inflated market price of L&H common stock; and the Bakers relied on the written and oral misrepresentations of L&H and its representatives. As bankers to L&H, the Dexia Defendants regularly received L&H's financial statements and actually knew that the fraud they were perpetrating with L&H was working and that L&H's financial statements were materially and fraudulently inflated as a direct result of the Banks' actions. As bankers to L&H, the Dexia Defendants were actually aware of the Merger from no later than on or about the date that the Merger was publicly announced in March 2000 through and including the closing of the Merger in June 2000. As a result, the Dexia Defendants knew or recklessly disregarded that the Bakers were actually relying on L&H's fraudulent financial statements and fraudulently inflated stock price.

### Fraud On The Market Presumption

129.    The Bakers relied on the existence of an efficient market for L&H stock, and will rely, in part, on the presumption of reliance established by the fraud-on-the-market doctrine. At all relevant times L&H stock traded on the NASDAQ, an open and efficient market. Several entities and individuals, including but not limited to L&H, made material public misrepresentations or failed to disclose material facts regarding L&H's financial results during 1999 and 2000.

130.    These misrepresentations and omissions would tend to induce a reasonable

49

investor to misjudge the value of L&H's stock. In addition, L&H stock was followed by analysts including, inter alia, Auerbach Grayson, Branch Cabell & Co., Ladenburg, Thalmann & Co., S.G. Cowen Sec. Corp. and Deutsche Bank. The price of L&H stock reflected the effect of news from these and other analysts, among other sources, disseminated in the market.

131. Based on the foregoing, plaintiffs are entitled to the presumption of reliance upon the integrity of the market, and the market price of L&H stock.

## FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS FOR VIOLATION OF SECTION 10 OF THE EXCHANGE ACT AND SEC RULE 10b-5

132. Plaintiffs repeat and reallege each paragraph above as though fully set forth herein.

133. Artesia, individually and in concert with, among others Lernout, Hauspie, Willaert, Bastiaens, Dammekens, Seo, and L&H, by the use and means of instrumentalities of interstate commerce and of the mails, knowingly engaged and participated in a continuous course and scheme of fraudulent conduct to overstate the revenues, income and assets of L&H and thereby to artificially inflate the price of L&H common stock and to conceal L&H's true financial condition. Artesia employed devices, schemes and artifices to defraud while in possession of material, adverse, non-public information; they engaged in acts, practices and a course of conduct that included the manipulation of the price of L&H stock; and made, or participated in the making of, untrue and misleading statements of material fact and omitted to state material facts necessary in order to make the statements not misleading. The purpose and effect of these manipulative and deceptive devices, schemes, artifices and attendant manipulation was, among other things, to induce plaintiffs, among others, to rely upon the artificially inflated price of L&H stock.

134. The scheme artificially inflated L&H's financial results, including among other things L&H's reported revenue, which in turn artificially inflated L&H's stock price during 1999

50

and 2000. Artesia employed deceptive artifices and devices, including secret factoring side agreements, in furtherance of the fraudulent factoring scheme.

135.   Artesia participated, directly or indirectly, in the above scheme and Defendants' fraudulent conduct was committed, directly or indirectly, "in connection with" the Bakers' acquisition of L&H shares in the Merger, within the meaning of Section 10(b) and Rule 10b-5.

136.   The making of the fraudulent misrepresentations and omissions in L&H's financial statements, in its annual reports and other SEC filings detailed herein and in L&H press releases, as set forth above, caused the artificial inflation of the price of L&H common stock. Artesia knew that the financial statements of L&H would necessarily be, and were, materially false and misleading by, among other things, overstating revenues, income and assets by material amounts, by virtue of the Artesia's participation in and knowledge of the unlawful acts alleged above.

137.   Artesia engaged in acts, practices and a course of business which operated as a fraud on plaintiffs, and employed manipulative and deceptive devices, schemes and artifices to defraud, by, among other things, entering into arrangements with L&H and/or L&H's Senior Officers and/or related parties of L&H designed to inflate L&H's stock by, inter alia, creating the illusion of revenue at L&H..

138.   As a result of the dissemination of the false and misleading statements set forth above, the market price of L&H stock was artificially inflated during 1999 and 2000 – the time of, and the relevant period leading up to, the Merger. Lacking knowledge of the falsity of these statements, and the deceptive and manipulative devices and contrivances employed by Artesia and L&H to artificially inflate the price of L&H stock, plaintiffs relied upon the integrity of the market price of L&H stock in valuing and entering into the Merger. Had plaintiffs known the truth, they would not have entered into the Merger, and would not have accepted L&H stock in

exchange for their interest in Dragon.

139. As a direct and proximate result of the wrongful conduct alleged herein, the Bakers suffered substantial damage in connection with their acquisition of L&H stock through the Merger.

140. Dexia S.A. and/or Dexia Bank Belgium, by acquiring Artesia, is liable to Plaintiffs for Artesia's wrongful conduct as set forth herein.

141. Artesia's knowledge of the fraud and their intent to perpetrate it is evidenced by, among other things.

    a. One or more emails generated by Artesia recognizing disclosure of loan guarantees given by Senior Officers would not be tolerated by the SEC and Artesia's creation of "credit default swaps" to circumvent disclosure.

    b. The irregular nature of the underlying transactions as set forth above.

    c. As bankers to L&H, Artesia regularly received L&H's financial statements and actually knew that the fraud they were perpetrating with L&H was working and that L&H's financial statements were materially and fraudulently inflated as a direct result.

    d. As bankers to L&H, Artesia was actually aware of the Merger from no later than on or about the date that the Merger was publicly announced in March 2000 through and including the closing of the Merger in June 2000. As a result, Artesia knew or recklessly disregarded that the Bakers were actually relying on L&H's fraudulent financial statements and fraudulently inflated stock price.

    e. Financial incentives to commit fraud, including the continuation of profitable banking relationships between Artesia and L&H, L&H's Senior Officers and certain related parties of L&H.

142. By reason of the foregoing, the Defendants violated Section 10(b) of the

52

Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; and (b) engaged in acts, practices and a course of business which operated as a fraud and a deceit upon plaintiffs in connection with their acquisition of L&H stock through the Merger. The Defendants may be held jointly and severally liable to the Bakers for the aforesaid damages, in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS FOR AIDING AND ABETTING COMMON LAW FRAUD

143. Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

144. As set forth above, L&H intentionally misrepresented its revenues, income and assets, by material amounts, in its financial statements, press releases and public statements, including, among other things, its filings with the SEC. Those misrepresentations were intended to and did have the effect of fraudulently inflating L&H's financial statements and common stock price, specifically including the price of the L&H common stock that L&H exchanged for the Bakers' interest in Dragon.

145. Artesia knew that L&H was a publicly held company that traded on the NASDAQ and EASDAQ and was required to publicly disclose its financial statements and file reports on its financial condition with, among others, the SEC. Artesia knew that the secret provisions of its relationship with L&H as set forth above, including secret "credit swap arrangements" created the illusion of cash on L&H's books and records. In reality, these transactions, served only to render L&H's publicly reported financial results materially false and misleading, and had the effect of fraudulently inflating L&H's stock price.

146. Artesia knowingly or recklessly rendered substantial assistance to L&H's fraudulent scheme by entering into, concealing, and enforcing secret agreements which allowed

53

L&H to misstate its financial results and precipitate L&H's collapse and the collapse of its common stock.

147. As a result of the foregoing, Plaintiffs have suffered harm and sustained damages in an amount to be proven at trial and Dexia S.A. and/or Dexia Bank Belgium, by acquiring Artesia, is liable to Plaintiffs for the wrongful conduct set forth herein.

### THIRD CLAIM FOR RELIEF AGAINST ALL DEFENDANTS FOR COMMON LAW FRAUD

148. Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

149. As set forth above, Artesia intentionally misrepresented and/or concealed their transactions with L&H.

150. Artesia intended by its actions to permit L&H to fraudulently overstate its revenues, income and assets and thereby to inflate the price of the common stock of L&H, causing plaintiffs, among others, to purchase L&H common stock at prices inflated by their fraud.

151. Artesia's knowledge of the fraud and intent to perpetrate it is evidenced by, among other things the facts listed in paragraph 141 of this Complaint, supra.

152. In reliance on the fraudulently inflated L&H financial statements and common stock price directly and immediately produced by Artesia's misrepresentations and omissions, the Bakers entered into, executed and fully performed the Merger Agreement, to their detriment.

153. As a result of this fraudulent conduct, plaintiffs have suffered harm and sustained damages in an amount to be proven at trial and Dexia S.A. and/or Dexia Bank Belgium, by acquiring Artesia, is liable to the Plaintiffs for Artesia's wrongful conduct as set forth herein.

### FOURTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS FOR CONSPIRACY TO COMMIT COMMON LAW FRAUD

154. Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

155. Artesia and L&H's Senior Officers including at least Lernout, Hauspie and Willaert conspired to fraudulently misrepresent and fraudulently inflate L&H's financial statements and common stock trading price, specifically including the price of the L&H common stock that L&H exchanged for the Bakers' interest in Dragon.

156. As set forth above, Artesia entered into, inter alia, credit swap agreements with Senior Officers, which agreements had the effect of rendering fictitious L&H's publicly reported revenues and constituted a fraud on the market for L&H shares.

157. As set forth above, Artesia intentionally misrepresented its transactions with L&H by, among other things set forth above, participating in the "credit swap transactions" described above to enable L&H to report revenues it was not entitled to report.

158. This conspiracy enabled L&H to give the false appearance to the outside world that it was tremendously successful and had significant revenues and growth thereof.

159. Artesia acted intentionally to further the common plan of artificially inflating the financial statements of L&H, knowing that the undisclosed provisions of their arrangements with L&H and its Senior Officers would render fictitious L&H reported financial results. The resulting illusory financial statements of L&H caused plaintiffs, among others, to purchase L&H common stock at fraudulently inflated prices.

160. As a result of Artesia's knowing and intentional participation in the foregoing conspiracy to commit fraud and the consequent fraudulently inflated L&H financial statements and common stock price, the Bakers entered into, executed and fully performed the Merger Agreement, to their detriment.

161. Plaintiffs have been harmed by this conspiracy to commit fraud, and have sustained damages in an amount to be proven at trial and Dexia S.A. and/or Dexia Bank Belgium, by acquiring Artesia, is liable to the Plaintiffs for Artesia's wrongful conduct as set forth herein.

**WHEREFORE,** plaintiffs demand a trial by jury as to all claims so triable and demand judgment as follows:

a. Awarding plaintiffs damages in an amount to be determined at trial against both Defendants, jointly and severally, for the Bakers' purchases of L&H shares, as well as reimbursement for any liabilities and expenses incurred as a result of the impact of the fraud on the Bakers' sales of L&H shares or otherwise;

b. Awarding plaintiffs punitive damages in an amount to be proven at trial;

c. Awarding plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

d. Awarding plaintiffs prejudgment and post-judgment interest; and

e. Awarding such other, further or different relief as the Court may deem just and proper.

Dated: March 11, 2004

_____
Terence K. Ankner (BBO # 552469)
PARTRIDGE, ANKNER & HORSTMAN LLP
200 Berkeley Street, 16th Floor
Boston, MA 02116
Telephone: (617) 859-9999
Facsimile: (617) 859-9998

Karen C. Dyer, Esq.
George R. Coe, Esq.
BOIES, SCHILLER & FLEXNER LLP
255 South Orange Avenue, Suite 905
Orlando, FL 32801-3456
Telephone: (407) 425-7118
Facsimile: (407) 425-7047

Alan Cotler, Esq.
Joan Yue, Esq.
REED SMITH
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103
Telephone: (215) 851-8100
Facsimile: (215) 851-1420

**ATTORNEYS FOR PLAINTIFFS**