**EXHIBIT B HEREOF TO BE FILED UNDER SEAL – <u>DO NOT SCAN EXHIBIT B</u>**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JANET BAKER, JAMES BAKER, JKBAKER LLC and JMBAKER LLC, | |
| Plaintiffs, | **<u>Jury Trial Demanded</u>** |
| v. | |
| DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., S.A.) | CA No. 04-10501-PBS |
| Defendants. | |

## DECLARATION OF GEORGE COE SUPPORT OF MOTION FOR LEAVE TO FILE CONFIDENTIAL PORTIONS OF BAKER COMPLAINT UNDER SEAL

GEORGE COE, declares pursuant to 28 U.S.C. § 1746 that:

1.     I am an attorney with the law firm of Boies Schiller & Flexner, which represents plaintiffs Janet Baker, James Baker, JKBaker LLC and JMBaker LLC ("Baker Plaintiffs"). I am over the age of 18 and am fully competent to testify. I submit this declaration in support of the Baker Plaintiffs' Motion for Leave to File Confidential Portions of Complaint Under Seal.

2.     Baker Plaintiffs' complaint in this action was filed on March 11, 2004 in redacted form (hereinafter "Baker Plaintiffs' Redacted Complaint"). A true and correct copy of Baker Plaintiffs' Redacted Complaint is annexed hereto as **Exhibit A.**

3.     The allegations in the Baker Plaintiffs' complaint are based upon, *inter alia*, a free-translation of an internal report prepared by a panel of experts for the Belgian authorities responsible for conducting the criminal investigation into L&H in Belgium (the "Report"). The Report is not publicly available. To Baker Plaintiffs' knowledge,

1

**EXHIBIT B HEREOF TO BE FILED UNDER SEAL – <u>DO NOT SCAN EXHIBIT B</u>**

information contained in the Report is not available currently from any public source. As the Court is aware, the Belgian criminal investigation remains pending.

4.    For the reasons set forth in the accompanying Filler Plaintiffs' and Baker Plaintiffs' Joint Motion for Leave to File Confidential Portions of Complaints Under Seal, the Baker Plaintiffs' Redacted Complaint does not include the names of any employees of Artesia Banking Corporation (now known as Dexia Bank Belgium) who are identified in the Report. Nor does Baker Plaintiffs' Redacted Complaint include any direct quotes from the Report.

5.    An unredacted version of Baker Plaintiffs' complaint in this action is annexed hereto as **Exhibit B**. For the Court's convenience, the portions of the unredacted complaint that do not appear in the Baker Plaintiffs' Redacted Complaint, and that Baker Plaintiffs' hereby seek leave to file under seal, are highlighted in **Exhibit B**.

WHEREFORE, for these reasons set forth in the accompanying Filler Plaintiffs' and Baker Plaintiffs' Joint Motion for Leave to File Confidential Portions of Complaints Under Seal, the Baker Plaintiffs respectfully request the Court to direct the Clerk to accept for filing under seal in this action, the unredacted version of Baker Plaintiffs' complaint that is annexed hereto as **Exhibit B**.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Orlando, Florida this 17th day of March 2004.

GEORGE COE



# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------x

**04-10501PBS**

JANET BAKER, and JAMES BAKER,
JKBAKER LLC and JMBAKER LLC,

        Plaintiffs,

v.

DEXIA, S.A., DEXIA BANK BELGIUM
(formerly known as ARTESIA BANKING
CORP., S.A.)

        Defendants.

------------------------------------------------------x

:  Civ. No.

MAGISTRATE JUDGE _Bowler_

:

:

:

:  **JURY TRIAL DEMANDED**

:  RECEIPT # _54517_
:  AMOUNT $ _150_
:  SUMMONS ISSUED _yes_
:  LOCAL RULE 4.1 _____
:  WAIVER FORM _____
:  MCF ISSUED _____
:  BY DPTY. CLK. _F.O.M_
:  DATE _3/12/04_

## COMPLAINT

Plaintiffs herein, Janet Baker and James Baker, and the JKBaker LLC and JMBaker LLC,

by and through their respective owners Janet Baker and James Baker (collectively the "Bakers"),

who were owners of the majority of the shares of Dragon Systems, Inc. ("Dragon") and are

current shareholders and creditors of Lernout & Hauspie Speech Products, N.V., a Belgian

Corporation ("N.V.") and referred to sometimes along with its U.S. subsidiary L&H Holdings

USA, Inc. ("Holdings") and its South Korean subsidiary Lernout & Hauspie Korea ("L&H

Korea"), simply as "L&H", by their undersigned attorneys, allege the following regarding their

own action, the actions of the Bakers' representatives, the actions of Dragon, the actions of L&H,

and Defendant Dexia, S.A., Dexia Bank Belgium (formerly known as Artesia Banking

Corporation, S.A. and referred to herein as "Artesia" or "Dexia").

## NATURE OF THIS ACTION

1.      This is an action to recover damages sustained by the Bakers as a result of their

exchange of their approximately 51% interest in Dragon, worth hundreds of millions of dollars,

for artificially inflated and ultimately worthless L&H stock. Dragon was a worldwide leading

supplier of speech and language technology, including speech recognition software. On June 7, 2000, the Bakers purchased L&H stock in an all-stock transaction whereby Dragon was merged into Holdings, a U.S. subsidiary of L&H. This transaction occurred pursuant to an Agreement and Plan of Merger Among the Bakers, Lernout & Hauspie Speech Products N.V., L&H Holdings USA, Inc., Dragon Systems, Inc., the Bakers and certain other principal shareholders of Dragon, dated March 27, 2000 (the "Merger Agreement").

2.     The Merger Agreement was entered into, and the transaction closed, before exposure of fraudulent transactions and accounting practices that falsely inflated L&H's revenues by 60% or more and induced the Bakers, and other Dragon shareholders, to enter into the Merger Agreement and go forward with the merger. These fraudulent transactions and practices were used to materially and artificially inflate the value of L&H stock.

3.     The merger was completed only months before public exposure of the pervasive fraudulent transactions and accounting practices that enabled L&H to falsely inflate its revenues. Much of L&H's massive accounting fraud could not have taken place without the newly-discovered, improper actions, including off-balance sheet financing, that defendant Dexia provided to L&H and its principals. L&H, along with defendant Artesia, the Flanders Language Valley Fund ("FLV Fund"), Mercator & Noordstar NV ("Mercator"), an Antwerp insurance company, and others set up approximately 30 so-called Language Development Companies ("LDCs") and Cross-Language Development Companies ("CLDCs"), which supposedly licensed millions of dollars worth of software from L&H. L&H improperly recorded all the purported revenue it received from these LDC's and CLDC's, even though these companies were shams and related parties to L&H.

4.     Because the LDCs and CLDCs were start up companies, they did not have funds sufficient to allow Artesia to directly lend to them the millions of dollars they needed to pay

L&H for licensing fees. Artesia officials knew that Messrs. Lernout, Hauspie and Willaert could not personally guarantee the bank loans without jeopardizing L&H's recognition of revenue from these licensing fees. Thus, Artesia had Messrs. Lernout, Hauspie and Willaert enter into credit default swap agreements. These agreements allowed Artesia to lend the LDCs and CLDCs the millions of dollars they needed, without a paper trail leading to the ultimate guarantors of the loans – Messrs. Lernout, Hauspie and Willaert. The LDCs and CLDCs then used the funds from these loans to pay L&H for millions of dollars of purported software license fees. However, knowing that disclosure of the true nature of these loans would prevent L&H from recognizing revenue on these transactions due to accounting rules restricting the recognition of revenue from related-party transactions, Artesia used the credit default swaps to disguise the fact that the LDC and CLDC loans were guaranteed by the principals of L&H.

5.     L&H's recognition of revenue on the LDC and CLDC transactions was entirely improper (a) because much of the funds that these LDCs and CLDCs paid to L&H were, in fact, provided by Artesia based upon off-the-book guarantees given by the principals of L&H, Jo Lernout, Pol Hauspie and others, and (b) because FLV, Mercator and the principals of L&H – all of whom financed these companies – were related parties to L&H and major L&H stockholders.

6.     Artesia knew that L&H established the LDCs and CLDCs to falsely inflate L&H's publicly reported revenues. Indeed, Artesia own internal "risk evaluation" documents, which are quoted in a May 28, 2001 report prepared by a panel of experts for prosecutors in Belgium (the "Report"), summed up the strategic partners as follow:     **REDACTED**

**REDACTED**     Artesia nonetheless joined in the fraud by financing these sham companies to, inter alia, ensure that Artesia would continue to receive lucrative banking fees, while providing L&H's major shareholders – Jo Lernout, Pol Hauspie,

FLV, Mercator and other senior officers of L&H (many of whom were also customers of Artesia) – with substantial wealth created by their falsely inflated L&H stock.

7.    Artesia also understood that it was L&H who was ultimately responsible for ensuring that the loans would ultimately be repaid. Indeed, after the fraud was revealed, L&H admitted that it had initially financed the operations of the LDCs and CLDCs. Accordingly, Artesia requested that L&H's senior officers, Paul Hauspie ("Hauspie"), Jo Lernout ("Lernout") and Nico Willaert ("Willaert") provide personal guarantees. This presented an enormous problem for L&H, however. Under U.S. Generally Accepted Accounting Principles ("GAAP"), if L&H officers personally guaranteed these loans, the strategic parties would be considered "related parties" to L&H, and that fact would have to be disclosed on L&H's financial statements, thus revealing the sham nature of these agreements.

8.    To solve this problem, Artesia devised a scheme that would still protect its interests and, at the same time, conceal the fact that Hauspie, Lernout and Willaert were personally guaranteeing the loans to the strategic partners. Artesia entered into agreements with these L&H officers called "credit default swaps." In effect, these agreements were nothing more than guarantees that were contained in side letters and, therefore, not included in the loans documents. By not disclosing the existence of these side letters to the SEC or the investing public, the parties were able to hide the fact that L&H officers were guarant4eeing the loans, and L&H was able to fraudulently recorded the entire amount of the licensing fees as revenue without making any "related party" disclosure. In total, Artesia made loans worth almost $60 million to L&H-related parties between 1997 and 1999. All of these amounts were then paid back to L&H and improperly included as revenue.

9.    Artesia's own internal documents confirm that Artesia knowingly entered into these credit default swaps for the sole purpose of defrauding the SEC and the investing public.

For example, an email from an employee at Artesia (hereafter Artesia Employee 1) to another Artesia employee (Artesia Employee 2) and other Artesia employees dated September 21, 1999, which was also quoted in the Report, stated,

**REDACTED**

10.    In return for its knowing participation in this fraud, Artesia was able to continue to receive lucrative banking fees, while providing L&H's major shareholders, including Lernout, Hauspie, and others, with substantial wealth through their fraudulently inflated L&H stock. In addition, Artesia charged excessive interest rates in connection with theses loans and received equity interests based on an understanding that L&H ultimately would arrange for buy-outs of the strategic partners at a premium. In effect, Artesia was guaranteed high returns and a future pay-off in return for financing the fraudulent transactions at the outset.

11.    Ultimately, a substantial portion of Artesia's loans were repaid with funds obtained by L&H from unsuspecting investors. Artesia and L&H thereby consummated a classic Ponzi scheme in which Artesia provided the initial funding of the LDCs to create the illusion that the LDCs had actual investors and capital, in order to lure new investors to fund the LDCs, at which point Artesia was paid back.

12.    This fraud was exposed, in part, through the inquiry by a reporter with regard to eighteen of L&H's alleged customers in Korea, who purportedly accounted collectively for a large proportion of L&H's reported revenues. These customers readily volunteered that they actually did little or no business with L&H.

13.    Arthur Andersen LLP, Brian Cave LLP and Loeffs Claeys Verbeke (collectively the "Audit Committee Advisors") were retained by L&H to investigate allegations of fraud at

L&H. L&H announced that it had uncovered accounting "errors and irregularities" and would be required to restate its 1998, 1999 and first two quarters of 2000 financial results. A few weeks later the Audit Committee Advisors issued a report dated November 20, 2000 ("Audit Report") concluding that L&H's reported recorded revenues were false and in violation of both generally accepted accounting principles ("GAAP") and L&H's own company policies. In addition, the Audit Report suggested that the Board consider disciplinary action against Messrs. Lernout, Hauspie, Gaston Bastiens ("Bastiens") and Nico Willaert.

14.    L&H has since been liquidated in bankruptcy and its stock is now worthless. Lernout, Hauspie, Bastiens and Willaert have all been arrested by criminal authorities in Belgium investigating the massive accounting fraud at L&H. More recently, Artesia has come under suspicion by these same criminal authorities in Belgium for its role in the L&H fraud.

15.    In sum, L&H was a financial house of cards propped up by accounting gimmicks and trickery to create the appearance of a financially successful company. In truth, however, L&H was nothing more than an illusion of financial prosperity, created by various individuals and entities contributing to the routine "cooking of the books" at L&H.

16.    Plaintiffs' allegations herein are based on a thorough investigation, conducted with the assistance of Plaintiffs' counsel, of all reasonably available information including, but not limited to, publicly available information. Except as alleged in this Complaint, the underlying information relating to defendants' misconduct and the particulars thereof are not available to Plaintiffs and the public, and lie exclusively within the possession and control of defendants and insiders of L&H, thus preventing Plaintiffs from further detailing defendants' misconduct.

17.    Plaintiffs were unaware of Artesia's role in this fraud until a story in the Belgian press, dated June 24, 2003, reported that Artesia had been placed under criminal investigation

and indicted by the Belgian prosecutor for its role in the L&H fraud.  Prior to this June 24, 2003 news story, despite diligent efforts by plaintiffs and their counsel to investigate, plaintiffs were unaware of Artesia's role in the fraud alleged herein, nor could they have learned of this information as the support concerns the private banking relationship between L&H, Lernout, Hauspie, Willaert and Artesia.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19.    Plaintiffs Janet and James Baker are individuals residing in Newton, Massachusetts and Maitland, Florida.

20.    Plaintiff JKBaker LLC is a Delaware limited liability company.

21.    Plaintiff JMBaker LLC is a Delaware limited liability company.

22.    Defendant Dexia S.A. and Dexia Bank Belgium are Belgium entities.

23.    In addition to transacting business in Belgium, Dexia S.A. regularly transacts business in the United States.  It has numerous financial service subsidiaries in the United States including Dexia Credit Local New York Agency, Financial Security Assurance, Dexia Bank New York, Artesia Mortgage Corp., Astris Finance and Dexia Securities U.S.A.

24.    In addition to transacting business in Belgium, Dexia Bank Belgium regularly transacts b usiness i n t he U nited S tates b y v irtue o f h aving i ts D exia B ank N ew Y ork b ranch headquartered in New York.

25.    Artesia Banking Corporation engaged in lending transactions in the United States. In particular, Artesia was part of a banking consortium that lent $230 million as part of L&H's acquisition of Dictaphone.    The borrowers of the funds were Dictaphone of Stratfield Connecticut, L&H, whose U.S. headquarters were in Burlington, Massachusetts, and FLV Fund,

7

jointly and severally.   In addition, Artesia lent money to Vasco Data Security International, located in Illinois.

26.    The amount in controversy in this action exceeds $75,000.00.

27.    Venue in this District is appropriate pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).

## PARTIES AND NON-PARTIES

28.    Plaintiffs Janet and James Baker are individuals who reside in Newton, Massachusetts and Maitland, Florida and are former owners of approximately 51% of the issued and outstanding stock of Dragon.  The JKBaker LLC is a Delaware Limited Liability Company created to hold a portion of the L&H shares purchased by James Baker.  The JMBaker LLC is also a Delaware Limited Liability Company; it was created to hold a portion of the L&H shares purchased by Janet Baker.  James Baker and Janet Baker hold all economic and beneficial interest in the JKBaker LLC and JMBaker LLC, respectively.   Pursuant to the Merger Agreements that give rise to the claims herein, the Bakers received 4,717,564 shares of common stock of defendant L&H, plus 392,149 shares placed in escrow for a total of 5,109,713 shares.

29.    Plaintiffs are also prosecuting claims in the United States District Court for the District of Massachusetts against, among others, Josef Lernout, Pol Hauspie, Nico Willaert, Roel Pieper, Gaston Bastiaens, Carl Dammekens, L&H's former Chief Financial Officer, KPMG LLP, KPMG Belgium, L&H's former auditors, the members of the audit committee of L&H's board of directors, SG Cowen Securities, Corp., FLV Fund, and Mercator & Noordstar and certain other entities and individuals (the "Massachusetts Actions").   The claims asserted in the Massachusetts Actions principally arise under Section 10(b) of the Securities Exchange Act of 1934, and also include common law claims of fraud, aiding and abetting fraud, and negligent misrepresentation. On June 19, 2002, the Court (Saris, J.) denied the motions to dismiss filed by

8

the senior officers of L&H in a related proceeding, see In re Lernout & Hauspie Sec. Litig., 208 F. Supp.2d 74 (D. Mass. 2002), and on August 19, 2002, the court denied the motions to dismiss filed by KPMG LLP and KPMG Belgium.  See In re Lernout & Hauspie Sec. Litig., Case No. 00-CV-11509-PBS, 2002 WL 1990060 (D. Mass. August 19, 2002).  Motions to dismiss by SG Cowen, FLV Fund, Mercator & Nordstar and the L&H audit committee defendants also have been denied.  An action is also pending against three Korean-based banks – Chohung Bank, Hanvit Bank (a/k/a Woori Bank) and Shinhan Bank - in the United States District Court for the Southern District of New York (Cedarbaum, J.).

30.    Artesia Banking Corporation was a wholly-owned subsidiary of Acrofin CVBA a Belgian financial services group.  On March 31, 2001 Dexia S.A. announced that it was acquiring Artesia Banking Corporation from Acrofin and that Artesia would be merged into Dexia S.A.'s wholly-owned banking subsidiary Dexia Bank Belgium.  As set forth above, both Dexia S.A. and Dexia Bank Belgium regularly transact business in the United States.

31.    Non-defendant L&H is a Belgian corporation, with its principal place of business in Ieper, Belgium.  Until it was delisted on December 8, 2000, L&H common stock was listed on the NASDAQ under the ticker symbol "LHSP" or "LHSEQ."  L&H stock was also traded on the EASDAQ until it was "indefinitely suspended" on or about November 9, 2000.  L&H is a party to the Merger Agreement.  On November 29, 2000, L&H filed for protection from its creditors under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware, and contemporaneously commenced bankruptcy proceedings in Belgium.  As set forth above, L&H has been liquidated.

32.    Non-defendant Holdings is a Delaware corporation, a wholly owned subsidiary of L&H, and the corporation into which Dragon was merged.  Holdings is a party to the Merger Agreement.  On November 29, 2000, Holdings also filed for protection from its creditors under

9

Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware. Several former officers and directors have been sued in connection with this matter in an action now pending in federal court in Boston, Massachusetts.

33.     Non-defendant L&H Korea is a Korean corporation and a wholly-owned subsidiary of L&H.   In September 1999 L&H Korea acquired Bumil Information and Communications Co., Ltd. ("Bumil").

34.     Jo Lernout ("Lernout") is one of the founders of L&H. Lernout was President of L&H from January, 1994 until February, 1996, Co-Chairman of the L&H Board from 1996, and a Managing Director of L&H from 1987, until he resigned those offices on November 9, 2000. Lernout served as a member of the Board of Directors of L&H until his resignation on January 16, 2001. Lernout was forced out of his remaining role as the Chief Technology Officer of L&H at the end of February, 2001. As of July 27, 2000, Lernout held, controlled or had beneficial ownership of 43,667,208 shares of L&H stock, or approximately 30% shares outstanding on that date. Lernout was arrested on April 27, 2001 in Ieper, Belgium and charged with forgery and stock price manipulation for his role in L&H's accounting fraud. Lernout also served as a director of FLV Fund from 1996 to 1997, and after 1997 continued to "spend a portion of his time on activities relating to the FLV Fund."

35.     Pol Hauspie ("Hauspie") is one of the founders of L&H. Hauspie was Chairman of L&H from January 1994 until October 1996, Co-Chairman of the L&H Board from 1996, and a Managing Director of L&H from 1987, until he resigned those offices on November 9, 2000. Hauspie resigned his board seat on November 22, 2000. As of July 27, 2000, Hauspie held, controlled o r h ad b eneficial o wnership o f 4 3,667,208 s hares o f L&H s tock, o r a pproximately 30% of the shares outstanding on that date. Hauspie was arrested on April 27, 2001 in Ieper, Belgium and charged with forgery and stock price manipulation for his role in L&H's accounting

10

fraud. Hauspie served as a director of FLV Fund from 1996 to 1997, and after 1997 continued to "spend a portion of his time on activities relating to the FLV Fund."

36.    Gaston Bastiaens ("Bastiaens") joined L&H as President in September 1996, and was appointed Chief Executive Officer of L&H in May, 1997. Bastiaens also was an officer of Holdings and signed the Dragon Merger Agreement on behalf of Holdings. Bastiaens resigned those offices on August 25, 2000, and his board seat on November 9, 2000. He was apprehended by U.S. Marshalls in May 2001 and has been extradited to Belgium on charges of stock manipulation and fraud. As of June 8, 2000, Bastiaens held, controlled or had beneficial ownership of 1,231,000 shares of L&H stock.

37.    Nico Willaert ("Willaert") joined L&H as a director in 1992 and remained on the Board of Directors until November 22, 2000. Willaert was also a Managing Director of L&H from April 1993, and Co-Vice-Chairman of L&H from January 1994, until he resigned those offices on November 9, 2000. Willaert was arrested on April 27, 2001 in Ieper, Belgium and charged with forgery and stock price manipulation for his role in L&H's accounting fraud.

38.    Carl Dammekens ("Dammekens") joined L&H in 1990 as Corporate Controller, and served as a Senior Vice President of Finance from 1993 and as Acting Chief Financial Officer of L&H from 1996 until his appointment as Chief Financial Officer on July 7, 1999. On November 9, 2000, L&H announced that Dammekens would be replaced as Chief Financial Officer. Dammekens was recently terminated by L&H. In addition to holding office in N.V., Dammekens also was an officer of Holdings, a U.S. corporation.

39.    Joo Chul (John) Seo served as President and General Manager of L&H Korea and a director of L&H Korea, from September 1999 until his suspension on or about November 22, 2000.

11

40.     Lernout, Hauspie, Bastiaen, Dammekens, Seo and Willaert are collectively referred to as the "Senior Officers." The Senior Officers are not named as defendants in this litigation because they are each already named as defendants in the Massachusetts Actions referenced above.

41.     FLV Fund is a Belgian venture-capital fund organized by Hauspie and Lernout, among others, to make various strategic investments. FLV Fund has United States offices in Los Altos Hills, California and in Woburn, Massachusetts.

42.     SAIL Trust purports to be a non-profit entity established in 1995 by, *inter alia*, Hauspie, Lernout and the Government of Flanders to support economic development and to assist in the infrastructure financing of the Flanders Language Valley region. S.A.I.L. Trust holds a one-third interest in FLV Management, N.V., which is the manager of the FLV Fund, and has the right to appoint five of FLV Management's directors. Since July 1999, the chief executive officer of the S.A.I.L. Trust has been Paul Behets, who until that time was the partner at KPMG Belgium with primary responsibility for the audits of L&H's financial statements.

43.     LHIC is a Belgium investment fund founded by Hauspie and Lernout in 1998, through which Hauspie and Lernout control 7.6% of L&H's stock. LHIC was purportedly established to make long-term strategic investments in companies in information technology industries such as speech, language and artificial intelligence. Hauspie and Lernout capitalized LHIC with their own shares of L&H common stock and act as advisors to LHIC and its investments. The President and Managing Director of LHIC since its inception has been Francis Vanderhoydonck, who also served as a director of L&H from May 1999 until his resignation on or about May 15, 2001. The Chief Financial Officer of LHIC was Chantal Mestdagh, formerly a KPMG Belgium auditor responsible for the audits of L&H's financial statements. In addition, as note above Dan Blake, a financial analyst at Cowen, was also employed by LHIC.

44.    Mercator & Noordstar, N.V. ("Mercator") is an insurance company located in Antwerp, Belgium. At all relevant times, Mercator owned 6.9% of L&H Holdings, which, in turn, owned 8.9% of L&H. Mercator also directly owned a 0.2% stake in L&H.

45.    KPMG Belgium is a Belgium public accounting firm. KPMG Belgium employs over 950 partners and staff in six cities in Belgium. KPMG Belgium, along with one or more other KPMG entities, has been L&H's outside auditor since 1991, when it absorbed the Belgian accounting firm of Behets, Boes & Co, which had been auditing L&H since the late 1980's. KPMG Belgium issued unqualified reports on L&H's financial statements for each of the years 1997, 1998 and 1999, gave an opinion that those financial statements were prepared in accordance with U.S. GAAP, stated that its audit was conducted in accordance with U.S. GAAS, and consented to L&H's inclusion of KPMG Belgium's reports on those financial statements in filings with the SEC. One of the KPMG Belgium auditors responsible for the L&H audits, Chantal Mestdagh, left KPMG Belgium to become Chief Financial Officer of LHIC. Ms. Mestdagh held that position throughout KPMG Belgium's audits of L&H's 1998 and 1999 financial statements. KPMG Belgium also served as auditors for the FLV Fund.

46.    KPMG LLP is a United States public accounting firm. KPMG LLP was integrally involved in the audits, reporting and SEC filings of L&H and served as L&H's advisor for the merger negotiations, due diligence and merger structure through its Houston, Texas office, its Atlanta, Georgia office and its Dallas, Texas office with regard to the Dragon/L&H transaction through its accountants, Robert McLamb, Paul Beecy, Drew Koecher, and others. Indeed, in its Annual Report for years 1997, 1998 and 1999, L&H listed KPMG LLP's office in identifying its outside auditors.

## SUBSTANTIVE ALLEGATIONS

### Purchase of L&H Shares

47.    On March 27, 2000, L&H, Holdings, Dragon, the Bakers, and certain other principal stockholders of Dragon entered into the Merger Agreement pursuant to which L&H would purchase all the stock of Dragon from the Bakers and other Dragon stockholders in a stock-for-stock transaction (the "Merger."). On that date, L&H was valued at $53.75 per share.

48.    On June 7, 2000, the transactions contemplated by the Merger Agreement were consummated, and the Bakers acquired 5,109,713 shares of L&H common stock.

49.    As a consequence of the fraud conducted by the Defendants, as described below and revealed after the closing of the Merger on June 7, 2000, the shares of L&H acquired by the Bakers in exchange for their ownership interest in Dragon were and are worthless.

### September 1999 – June 2000
### L&H's Stock Price Is Inflated

50.    In March, 2000 when the Bakers and Dragon's other principal shareholders agreed to sell their interests in Dragon to L&H in exchange for L&H stock, the price of L&H stock was at an all-time high, buoyed by reports and financial statements showing exponential increases in L&H revenues, which included tremendous revenue growth in new markets for L&H Asia, particularly the Korean market. These reports were false, but the truth was intentionally concealed from the Bakers.

51.    In 1995, L&H completed its initial public offering and commenced trading on NASDAQ. From 1987 through 1995, the Company had never been profitable and had only produced a few million dollars in annual revenues.

52.    Beginning in the third quarter of 1996, L&H expanded its business primarily through a dizzying array of acquisitions, to reach its goal of becoming "the

14

leading international provider of advanced speech and language technologies, products and services." In its 1997 Form 20-F, the Company stated:

> Beginning in the third quarter of 1996, the Company expanded its business substantially through acquisitions, to include translations services, language technologies and dictation software. The Company also expanded its core speech technologies through acquisitions. More recently the Company has acquired businesses for its translation services division and to augment the Company's language technologies division.

53.    As a result of the company's new focuses, L&H's sales quadrupled from 1995 to 1996. What proceeded was a period of unprecedented growth for L&H, making the Company an international success story and the pride of Belgium.

54.    From 1997 to June 2000, L&H reported incredible revenue growth – bolstered by a number of acquisitions, related-party transactions, and fraudulent accounting. In 1997, the Company's total revenues increase 220% to $99.4 million from $31 million in 1996. In 1998, L&H's revenues purportedly rose 113% to $211.6 million, and by 1999, the total revenues were claimed to be $344 million.

55.    A major focus of L&H's growth was the practice of acquiring complementary businesses and technologies as a means of supplementing its own internal development activities. Under Bastiaens' leadership, L&H acquired at least 20 companies. L&H used its own inflated stock as currency including for the Dragon transaction as set forth above.

**B.    ARTESIA SUBSTANTIALLY ASSISTED L&H IN THE FRAUD**

56.    As detailed below, Artesia knowingly participated in the fraud at L&H by providing loans that it knew L&H was fraudulently booking as revenue. Artesia knew that it was making the loans to shell corporations created and controlled by L&H, which, in turn, were paying these funds to the LDCs and CLDCs, which had no legitimate business operations. Artesia also knew that these funds were then being paid back to L&H in the form of licensing fees that L&H improperly booked as revenue. Furthermore, Artesia devised a scheme to

minimize its own risks relating to these loans through the use of credit default swaps. This scheme allowed L&H's senior officers to guaranty Artesia's loans while, at the same time, fraudulently concealing that fact from the SEC and investors.

57.     Recognition of revenue by L&H from these Artesia loans was improper under U.S. GAAP for at least two reasons. First, although the loans were funneled through various shell entities, in substance, the loans were made to L&H. It is axiomatic under U.S. GAAP that L&H cannot recognize loans as revenue that it ultimately must repay. Second, revenue recognition was improper because the transactions with the LDCs and CLDCs lacked any economic substance. The LDCs and the CLDCs had no operations, employees, assets, products, or customers. There simply were no end-users purchasing any products from the CLDCs, LDCs or L&H. Accordingly, the revenue recognized by L&H from these Artesia loans was a flagrant violation of U.S. GAAP, and Artesia was fully aware of this fact. Furthermore, even if there was some economic substance to these transactions, L&H's financial statements would still have been materially false and misleading, for, at best, the transactions between L&H and the strategic parties were "related party" transactions, the nature of which had to be fully disclosed to investors under the most basic provisions of GAAP.

**Background: L&H Begins to Use Strategic Partners to Artificially Inflate Revenues**

58.     In 1996, L&H formed Dictation Consortium N.V. ("Dictation") to develop software for L&H. In December of that year, L&H then entered into a very profitable licensing agreement with Dictation pursuant to which Dictation provided L&H with $26.6 million in revenue, or 25% of L&H's 1996 sales and 19% of L&H's 1997 sales.

59.     Between December 1996 and early 1998, Dictation "developed" the software, purportedly bearing the research and development costs. However, Dictation was not actually performing any of the work to develop the software. Rather, as defendant Lernout later

acknowledged, L&H employees wrote Dictation's business plan and did the software development work under contract.

60.     Once the development was completed L&H had the option to purchase Dictation. In May of 1998, at the end of the contract, L&H purchased Dictation for $40 million. Thus, in effect, L&H purchased the software that it had developed at a significant premium. L&H then booked the goodwill associated with the purchase as an asset and amortized the cost over a period of years, rather than recording the research and development expenses as current expenses.

61.     Bolstered by the success of the Dictation arrangement, on March 13, 1997, L&H established Brussels Translation Group N.V. ("BTG") as a limited liability company in Belgium, "primarily engaged to acquire, develop, commercialize and license machine translation software." Defendant Artesia was a key player in the creation of BTG, providing the initial financing to allow BTG to operate. Artesia lent a total of $22.9 million to BTG with the intent that L&H would find external investors to repay the loan. However, L&H never disclosed the owners of BTG, and according to a December 7, 2000 article, *The Wall Street Journal* was only able to trace ownership "through a Luxembourg company to two entities based in the Channel Islands, but not further."

62.     In March of 1997, BTG entered into a software development and commercialization agreement with L&H, pursuant to which L&H agreed to provide engineering services to BTG for the development of machine translation services for L&H's iTranslator services, which had been licensed by L&H to BTG. The agreement called for BTG to pay L&H $3.5 million in licensing fees, plus royalties. The licensing fees were increased to $5 million in May 1997. L&H also entered into an agreement to provide BTF with engineering services, under which BTG paid L&H approximately $30 million.

17

63.    From 1997 through 1999, L&H incurred $9 million in expenses to develop the BTG software.  At the end of the contract, in June 1999, L&H purchased BTG for $59 million.  This sum was comprised of an aggregate purchase price of approximately $42.3 million and the assumption of approximately $17 million of debt.  The purchase price exceeded the fair value of the net assets acquired, and the difference was allocated to goodwill or other intangible assets on L&H's financial statements.  Thus, in effect, L&H was able to develop its product, without deducting the research and development expenses, and then was able to capitalize the purchase price it paid for BTG, once again turning what would normally be an expense into an asset.

## Artesia Raises Money for a Untied States Company (Vasco) to Support L&H's Fraudulent Transactions

64.    On March 25, 1998, an Illinois company known as Vasco Data Security International ("Vasco"), a customer of L&H's Burlington, Massachusetts' office, purportedly licensed $800,000 of L&H software.  The technology covered by L&H's license, however, was useless to Vasco, which only agreed to pay the licensing fee in order to obtain a $3 million loan from L&H it desperately needed.  The loan was originally due on January 4, 1999.  But by January 1999, Vasco still could not pay the loan.  Hauspie took advantage of the situation and extorted Vasco to enter into a second licensing agreement with L&H worth $900,000, and to backdate the agreement to December 31, 1998.  According to Vasco's former Chief Technology Officer, Hauspie threatened to call the loan due on January 4, 1999 if Vasco refused to backdate the contract.  In desperation, Vasco acceded, entered into the second licensing agreement, and L&H fraudulently recorded the $900,000 in 1998.

65.    Because Vasco still did not have the financial resources to repay the loan in early 1999, at the behest of Lernout and Hauspie, Artesia organized and managed an $11.5 million private placement of Vasco common stock.  On April 15, 1999, Artesia completed the private placement and wired the $11.5 million to Vasco's account in the Untied States.  Vasco used

18

these funds, in part, to repay L&H. The investors in the private placement included LHIC (a company formed by Lernout and Hauspie to invest in companies that specialized in speech and language based products), which invested $5 million. LHIC obtained a 7% ownership stake in Vasco and a seat on the company's board of director. The seat was filled by defendant Hauspie. Another top investor in Vasco was Mercator, which purchased approximately $1 million of Vasco stock through the private placement managed by Artesia.

### Artesia Orchestrates the Financing of L&H's LDCs and Other Strategic Partners Through Credit Default Swaps and Other Vehicles in Order to Defraud the SEC and the Investing Public

66.     Following the transactions with Dictation, BTG and Vasco, L&H's senior officers and Artesia expanded their fraudulent scheme into what ultimately would be described by *The Wall Street Journal* as "Dictation Consortium-type structure but on steroids." Instead of creating one shell company (i.e., Dictation Consortium or BTG) to funnel false revenue to L&H, L&H created a series of holding companies financed by Artesia. These holding companies, in turn, financed multiple LDCs, which then paid "licensing fees" back to L&H.

67.     One such holding company was Radial Belgium N.V. ("Radial"). On September 29, 1998, Artesia loaned approximately $6 million to Radial, which was a "special purpose entity" created by senior officers of L&H for the express purpose of creating and funding LDCs. Radial wired this money, in $2 million installments, to three LDCs: (a) the Slavic Development Company N.V., (b) the Farsi Development Company N.V., and (c) the Bahassa Development Company N.V. These LDCs were supposed to develop speech recognition products in Slavic, Farsi and Bahassa ((Indonesia), respectively. The Slavic, Farsi and Bahassa LDCs, however, used the $2 million to pay L&H licensing fees. L&H then booked the entire $6 million as revenue in the third quarter of 1998. None of these LDCs had bona fide offices or any operations that would have enabled them to develop speech recognition products.

19

68.    Internal Artesia documents quoted in the Report demonstrate that Artesia knowingly entered into this transaction in furtherance of the fraud.  They show that Artesia knew that its loan was to be used by Radial to finance the three LDCs (all of which had the same business address), that the LDCs and Radial had been created by L&H, and that the monies would be used by the LDCs to pay licensing fees in identical amounts to L&H.  They also show that Artesia knew that the loans would be guaranteed by Lernout, Willaert and Hauspie, and that their actions would enable L&H to fraudulently conceal that fact from the SEC and the investing public.

69.    Artesia recognized from the outset that the "strategic partners" had no equity investors and that they were mere shell companies located at one address.  In an e-mail dated September 21, 1999 from Artesia Employee 1 to Artesia Employee 2 and other Artesia Employees, Artesia Employee 1 stated,

**REDACTED**

70.    Anther document quoted in the Report states,

**REDACTED**

71.    Artesia Employee 1's September 21, 1999 e-mail also stated that,

**REDACTED**

**REDACTED**

72.     Artesia knew that the credit default swaps were highly unusual instruments to be used by individuals and that their sole purpose was to deceive the SEC and investors.  For example, an internal Artesia memorandum entitled "Direction Internal Audit" from two Artesia employees (Artesia Employees 3 and 4) to another Artesia employee (Artesia Employee 5) and others, dated January 31, 2000, notes that the credit default swaps executed by Lernout, Hauspie and Willaert had ·

**REDACTED**

as was documented in a February 14, 2000 internal Artesia memorandum pursuant to discussions with Artesia Employee 2.  (Emphasis supplied).

73.     Because Artesia knew that the credit default swaps were nothing more than guarantees, it went to great lengths to conceal their existence.  An internal Artesia document quoted in the Report notes that Lernout, Hauspie and Willaert refused to execute a loan that made reference to the credit default swaps:

**REDACTED**                          Accordingly, a June

15, 1999 internal Artesia e-mail from Artesia Employee 1 to another Artesia Employee (Artesia Employee 6) concerning LIC and Radial and quoted in the Report states that Artesia did not identify Lernout, Hauspie and Willaert because

**REDACTED**

74.     Artesia also knew that the LDCs would not generate any real revenue to repay the loans, and that L&H intended to attract new investors who would act as a new source of funds:

**REDACTED**

75.     The June 25, 2003 article in the *Belgian Financial Times* confirms that Artesia knowingly issued the Radial loan in furtherance of L&H's fraudulent scheme:

> On September 29, 1998, Artesia issued a loan to a Belgian company known as Radial in the amount of approximately $6 million. Artesia's own documents reveal that Radial was a "special purpose entity" created by senior officers of L&H for the express purpose of creating and funding LDC's. these same bank documents also show that Artesia was aware that Lernout, Hauspie and Willaert did not want to sign the required personal guarantees to obtain this and other LDC and CLDC loans "in order to avoid possible problems with the SEC." As a result, Artesia devised a scheme to have Lernout, Hauspie and Willaert guarantee the Radial loan using "credit default swaps." Unlike personal guarantees, however, these swaps do not have to be revealed in the loan letters of credit. However, the sale of credit default swaps to individual investors is highly unusual, demonstrating the degree to which Artesia was willing to go to participate in L&H's massive accounting fraud.

76.     After setting up Radial to manufacture revenues for L&H in the third quarter of 1998, L&H and Artesia replicated this scheme in the fourth quarter. The name of the holding company this time was Language Investment Co. ("LIC"). Artesia made a loan on December 22, 1998 to LIC for approximately $6 million. LIC then sent the funds in four installments of $1.5 million to four separate LDCs: the (1) Greek, (2) Hungarian, (3) Polish, and (4) Czech development companies. These LDCs then immediately paid these funds to L&H as licensing fees so that L&H could book this "revenue" prior to year-end.

77.     These loans were also secured by credit default swaps. According to an internal, undated memorandum of Artesia written in connection with the loan to LIC and quoted in the

Report:

**REDACTED**

78.    Indeed, the June 25, 2003 article in the *Belgian Financial Times* also confirmed

that Artesia also issued this loan to LIC in furtherance of the fraud:

> Artesia engaged in a similar fraudulent transaction on December
> 22, 1998, issuing a loan to the Language Investment Company for
> the purpose of creating 4 LDC's so that L&H could recognize
> revenues from these LDCs in the fourth quarter of 1998. Again,
> Artesia used credit default swaps to conceal the fact that the
> principals of L&H had secretly guaranteed the loans used to set up
> the 4 LDC's in question.

79.    L&H continued to perpetuate the scheme in 1999. On March 31, 1999, L&H set

up the Language Development Fund ("LDF") and transferred $12 million that same day to the

bank accounts of seven LDCs at Artesia. The Greek, Czech, Hungarian and Polish Development

Companies received $1.5 million each, and the Tamil, Thai and Hindi Development Companies

received $2 million each. This time, the $12 million came from Mercator & Noordstar in the

form of a $2 million capital contribution and a $10 million loan to LDF. All of these funds made

their way into L&H's financial statements as revenue.

80.    Internal Artesia documents quoted in the Report leave no question that Artesia

knew that these LDCs were also shell entities created by L&H. A fax dated March 1999 from an

L&H employee to Artesia stated:

**REDACTED**

**REDACTED.**

81.     In the second quarter of 1999, L&H requested that LDF receive a $20 million loan from Artesia.  Artesia's internal documents relating to LDF reveal that the bank was fully aware of the fraud being perpetuated at L&H.  Specifically, according to an internal e-mail from an Artesia employee (hereafter Artesia Employee 7), dated June 21, 1999:

**REDACTED**


**REDACTED**


**REDACTED**


**REDACTED**

82.     Although Artesia ultimately denied the loan to LDF, on June 25, 1999, it granted a $20 million line of credit to Lernout, Hauspie and Willaert, personally.  This time, however, Artesia demanded that the three individuals pledge 650,000 registered shares of L&H as collateral for the loan.  The vast majority of this $20 million was used to fund six new LDCs (Malay, Vietnamese, and four other Indian languages not specified at the time), and this money was ultimately booked as revenue on L&H's financial statements.  L&H did not reveal the

source of the funds received by these LDCs in L&H's SEC Form 10-Q for the quarter ended June 30, 1999, or in its SEC Form 10-K for the year ended December 31, 1999.

83.    By mid to late 1999, Artesia became increasingly concerned that its loans would not be repaid. The loans to Radial and LIC were due June 30, 1999, and the $20 million personal loan to Lernout, Hauspie and Willaert was due in October 1999. To avoid a technical default, Artesia extended the loans to December 15, 1999. Artesia subsequently had multiple discussions with Hauspie, Lernout and Willaert to closely track their progress in attracting potential new investors in the LDCs, whose funds would be used by L&H to repay Artesia. L&H and Artesia were effectively seeking to "rob Peter to pay Paul," and creating a quintessential Ponzi scheme in which funds from new investors were used to pay old investors. In an internal memorandum dated September 7, 1999, Artesia Employee 7 reported a conversation that he had with Willaert and others the day before:

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

**REDACTED**

84.     Similarly, on December 27, 1999, an Artesia employee (Artesia Employee 8) reported in an e-mail to Artesia Employee 7 and other Artesia employees that he had received a telephone call from Willaert, who stated that

**REDACTED**

Willaert also gave Artesia Employee 8 the details of the contact person in Singapore.

85.     On or about January 5, 2000, a Lebanese-Armenian businessman, Harout Katchadourian, wired $36 million at the request of Lernout, Hauspie and Willaert to the Singapore bank account of Velstra, a Singaporean company owned by Mercator.  This money was then used to pay off the $20 million line of credit, and the two $6 million loans to Radial and LIC, thereby consummating the classic Ponzi scheme.

**The Belgium Prosecutor Confirms that Artesia Conspired with and Substantially Assisted L&H in Connection with his Fraud**

86.     Based on internal documents obtained from Artesia, a panel of experts retained by the Belgian prosecutors concluded that Artesia intentionally participated in the L&H fraud.  The conclusions are damning:

**REDACTED**

**REDACTED**

26

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

**Artesia Lied to Investigators to Conceal Its Role in the Fraud**

87.      Artesia took affirmative steps to cover up its role in the fraud at L&H after the

investigation of the fraud began in November 2000. For example, Loeff Claeys Verbeke, one of

the law firms charged with that investigation and co-author of the Audit Committee Report,

asked Artesia about L&H's possible role in securing financing for LIC. On November 24, 2000,

Artesia sent a letter to Loeff Claeys Verbeke in response to that inquiry. According to the

Report, Artesia's letter stated:                REDACTED

27

**REDACTED**                              Artesia made no mention of the credit default

swaps executed by the principals of L&H - - Lernout, Hauspie and Willaert - - on the LIC

transaction so as not to disclose its complicity in the fraud.  As a result, the Audit Committee

Report makes no mention of Artesia's role in the fraud.  Likewise, none of the Wall Street

Journal articles that disclosed the fraud at L&H mentioned any role by Artesia.

### The Merger Agreement

88.    On March 27, 2000, L&H, Holdings, Dragon, the Bakers and certain other

Stockholders of Dragon entered into the above-referenced Merger Agreement pursuant to which

L&H would acquire Dragon from the Bakers and other stockholders in a stock-for-stock deal.

89.    The transaction provided that L&H would acquire all of the outstanding stock of

Dragon in exchange for common stock of defendant L&H.  The deemed price of the Merger was

more than $600 million and on the date the terms of the transaction were agreed to, L&H stock

was trading at $53.75 per share.

90.    The terms of the Merger are set forth in a series of agreements the most critical of

which is the Agreement and Plan of Merger (the "Merger Agreement"), dated March 27, 2000,

among Lernout & Hauspie Speech Products N.V. ("Buyer" or "L&H"), L&H Holdings USA,

Inc. ("Holdings"), Dragon Systems, Inc. ("Company") and Certain Principal Stockholders of

Dragon Systems, Inc. ("Principal Stockholders," including the Bakers).

91.    On June 7, 2000, the transaction was consummated and L&H acquired all of the

outstanding stock of Dragon through the Merger of Dragon into Holdings, a wholly owned

subsidiary of L&H.   L&H issued a total of 10,011,236 reflecting a 2 for 1 stock split and an

agreement arrived at between March 27, 2000 and June 7, 2000 to issue a small amount of

additional shares to acquire all outstanding shares of Dragon.  The Bakers received 5,109,713

shares of L&H for their 51% ownership interest in Dragon.

92.    Pursuant to the Merger Agreements, the Bakers were permitted to sell a small amount of L&H stock but were required to hold, for a period of 4 months, approximately half the shares of the L&H common stock received (adjusted for a subsequent 2 for 1 stock split) and the balance for 1 year.  During this period following the Merger, plaintiffs were required to assign the voting rights to all the shares they acquired in the merger, to an entity controlled by the co-founders and co-chairmen of L&H, Jo Lernout and Pol Hauspie.

**The materially False and Misleading Statements**

93.    On April 28, 1998, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Q1 Revenues of $35 Million; Strong Earnings of $0.13 Per share Before One Time Charge for First Quarter" (the "April 28, 1998 Press Release").  The April 28, 1998 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the first quarter of 1998, L&H's total revenues were $35.1 million, an increase of 112% over reported revenues of $16.6 million for the first quarter of 1997.
>
> [* * *]
>
> Net income before one time charges and unusual items for the first quarter of 1998 reached $7 million, or $0.13 per share on 52.5 million average diluted shares outstanding which is a 62.5% increase when compared to $2.7 million in net income, or $0.08 per share on $34.4 million average outstanding shares for the first quarter of 1997.

The April 28, 1998 Press Release also reported the following:

|  | (000s)<br>3 Month Ended<br>March 31, 1998 |
|---|---|
| Revenues |  |
| Core Technologies | $11,795 |
| Dictation | $5,641 |
| Translation Services | $11,853 |
| Language Technology | $5,776 |

| | |
|---|---:|
| Total Net Revenues | $35,065 |
| Loss from operations | ($8,111) |
| Net Loss | ($3,982) |

| | As of<br>March 31, 1998 |
|---|---:|
| Accounts Receivable | $35,655 |
| Total Assets | $246,834 |

94.    On May 1, 1998, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 of the Securities Exchange Act of 1934 which included as "Exhibit 2" a copy of the April 28, 1998 Press Release (the "Q1 1998 6-K"). Bastiaens signed the Q1 1998 6-K.

95.    The April 28, 1998 Press Release and the Q1 1998 6-K were materially false and misleading because revenues and accounts receivable were artificially inflated by at least $2 million and earnings were materially overstated.

96.    On July 28, 1998, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record q2 Revenues of $45 Million; Record Net Profits of $9.5 Million or $0.17 EPS Before Exceptional Items" (the "July 28, 1998 Press Release"). The July 28, 1998 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the second quarter of 1998, L&H's total revenues were $45 million, an increase of 113% over reported revenues of $21.1 million for the second quarter of 1997.
>
> [* * *]
>
> Net income before one time charges and unusual items for the second quarter of 1998 reached $9.5 million. This represents $0.17 per share on 55.1 million average diluted shares outstanding which is a 138% increase when compared to $4.0 million in net income, or $0.11 per share on 36.1 million average outstanding shares for the second quarter of 1997.

[* * *]

"The strong performance of our company is [sic] all our business activities proves the strength of our integrated speech and linguistic strategy and the ability of our management team to implement," said Gaston Bastiaens, president and CEO of Lernout & Hauspie.

[* * *]

[S]aid Jo Lernout, L&H co-founder and co-chairman "L&H has been very proactive in meeting the market demand by regularly introducing new products, diversifying our sales channels and offering competitive pricing. These efforts have been rewarded with continuing strong revenues and new contract bookings."

The July 28, 1998 Press Release also reported the following:

|  | (000s)<br>3 Months Ended<br>June 30, 1998 | (000s)<br>6 Month Ended<br>June 30, 1998 |
|---|---|---|
| Revenues |  |  |
| Core Technologies | $12,023 | $23,818 |
| Dictation | $7,323 | $12,964 |
| Translation Services | $12,288 | $18,064 |
| Language Technology | $13,357 | $25,210 |
| Total Net Revenues | $44,991 | $80,056 |
| Loss from operations | ($31,907) | ($40,018) |
| Net Loss | ($34,543) | ($38,524) |

|  | As of<br>June 30, 1998 |
|---|---|
| Accounts Receivable | $42,820 |
| Total Assets | $404,270 |

97.    On August 7, 1998, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-1 of the Securities Exchange Act of 1934, which

included as "Exhibit 2" a copy of the July 28, 1998 Press Release (the "Q2 1998 6-K"). Bastiaens signed the q2 1998 6-K.

98.    The July 28, 1998 Press Release and the q2 1998 6-K were materially false and misleading because revenues and accounts receivable were artificially inflated by at least $800,000 and earnings were overstated.

99.    On October 27, 1998, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record q3 Revenues of $54.9 Million; Record Net Profits of $12.1 or $0.22 EPS Before Exceptional Items" (the "October 27, 1998 Press Release"). The October 27 1998 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the third quarter of 1998, L&H's total revenues were $54.9 million, an increase of 97% over reported revenues of $27.9 million for the third quarter of 1997.
>
> [* * *]
>
> Net income before one-time charges and unusual items for the third quarter of 1998 reached $12.1 million. This represents $0.22 per share on 55.9 million average diluted shares outstanding which is a 133% increase when compared to $5.2 million in net income, or $0.13 per share on 40.5 million average outstanding shares for the third quarter of 1997.

The October 27, 1998 Press Release also reported the following:

|  | (000s) 3 Months Ended September 30, 1998 | (000s) 9 Month Ended September 30, 1998 |
|---|---|---|
| Revenues |  |  |
| Core Technologies | $13,448 | $37,266 |
| Dictation | $9,972 | $22,936 |
| Linguistic Services | $18,094 | $43,304 |
| Language Technology | $13,346 | $31,410 |
| Total Net Revenues | $54,860 | $134,916 |
| Loss from operations | ($34,153) | ($74,172) |

| | | |
|---|---|---|
| Net Loss | ($39,262) | ($77,787) |

As of
September 30, 1998

| | |
|---|---|
| Accounts Receivable | $60,513 |
| Total Assets | $523,871 |

100.   On October 29, 1998, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the October 27, 1998 Press Release (the "Q3 1998 6-K"). Thomas B. Doherty, L&H's then-Senior vice President of Financial and Financial Planning, signed the Q3 1998 6-K.

101.   The October 27, 1998 Press Release and the Q3 1998 6-K were materially false and misleading because revenues and accounts receivable were overstated by at least $10.6 million and earnings were overstated.

102.   On April 7, 1999, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Revenues and Record Earnings Before One-Time Charges for Fourth Quarter 1998 and Fiscal Year 1998" (the " April 7, 1999 Press Release"). The April 7, 1999 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> Lernout & Hauspie (Nasdaq: LHSP) (Easdaq: LHSP) (L&H), a worldwide market leader in speech and linguistic technologies, products and services, today announced results for the fourth quarter of $76.7 million in revenue, or a 126% increase in the reported revenue of $33.8 million for the fourth quarter 1997. For the fiscal year 1998, the company reported total revenues of $211.6 million or an increase of 113% over the reported revenues of $99.4 million for 1997.
>
> [* * *]
>
> The Company reported approximately $12.9 million in net income, before one-time charges and exceptional items, for the fourth quarter of 1998 or EPS (earnings Per Share) of $0.22 cents per

33

share on 58.3 million average diluted shares outstanding. The Company's fourth quarter net income includes an increase in goodwill amortization expense of approximately $1.5 million or $0.03 per share, relating to the company's previously announced revaluation of in-process research and development acquired in prior quarters to reflect new Untied States Securities and Exchange Commission (the "SEC") guidelines. If not for this change, the Company's net income before one-time charges would have been $0.25 per share.

[* * *]

Net income for the full year of 1998, excluding one-time charges, totaled $37.8 million or $0.69 per share on 55.2 million average diluted shares compared to $20 million or $0.53 per share on 38.9 million average diluted shares during 1997.

[* * *]

"There are a number of factors that have contributed to our successful year. Our revenues increased significantly between 1997 and 1998 not only because there was considerable growth in the market for speech and language technologies, products and services, but particularly because of L&H's ability to deliver new products, solutions and services," said Gaston Bastiaens, president and CEO of Lernout & Hauspie. "The strong growth in each of our business divisions is attributable in part to our professional, successful integration of acquired technologies and especially to our strong internal growth."

[* * *]

"During this past year, the market has gained an even greater appreciation of the vast potential for speech and language technologies. In fact, The Gartner Group recently issued a report citing speech technology, artificial intelligence, natural language technology, wearable computing, biometrics and voice over the Internet as 'technologies to watch' for 1999," said Jo Lernout, co-founder and co-chairman of L&H. "L&H has returned record revenues for 1998 because we are expert in the full range of speech and language technologies, including artificial intelligence, Natural Language Technology (NLT) and vice over the Internet, and can combine them to create multi-lingual speech-enabled offerings. By combining these offerings we can meet a wide range of global needs."

The April 7, 1999 Press Release also reported the following:

|  | 3 Months Ended<br>December 31, 1998 | Year Ended<br>December 31, 1998 |
|---|---|---|
| Revenues |  |  |
| Core Technologies | $19,086 | $56,352 |
| Dictation | $14,898 | $37,834 |
| Translation Services | $24,596 | $67,900 |
| Language Technology | $18,097 | $49,507 |
| Total Net Revenues | $76,677 | $211,593 |
| Income/(Loss) from operations | $13,836 | ($43,741) |
| Net Loss/(loss) | $10,213 | ($48,630) |

|  | As of<br>December 31, 1998 |
|---|---|
| Accounts Receivable | $81,212 |
| Total Assets | $571,017 |

103.    On April 19, 1999, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the April 7, 1999 Press Release (the "Q4 1998 6-K"). Bastiaens, signed the Q4 1998 6-K.

104.    On June 30, 1999, L&H filed with the SEC, its Form 20-F Annual Report Pursuant to Section 13 or 15d of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 1998 (the "1998 20-F"). The 1998 20-F included the same financial information contained in the April 7, 1999 Press Release. Bastiaens signed the 1998 20-F on June 29, 1999.

105.    The April 7, 1999 Press Release, the Q4 1998 6-K and the 1998 20-F were materially false and misleading because fourth quarter revenues and accounts receivable were overstated by at least $14.5 million and earnings were overstated. Year-end 1998 revenues were overstated by $27.9 million and earnings were overstated.

106.    On May 18, 1999, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Strong Revenues and Strong Earnings For First Quarter; Company Achieves Revenues of $70.7 Million and EPS of $0.12 Before Exceptional Items" (the "May 18, 1999 Press Release"). The May 18, 1999 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the first quarter of 1999, L&H's total revenues were $70.7 million, an increase of 102% over reported revenues of $35.1 million for the first quarter of 1998. The company attributes the increased revenues to L&H's continued success in expanding the role speech and language technologies play in a broad range of markets and applications.
>
> [* * *]
>
> Net income before exceptional items for the first quarter of 1999 reached $7 million, or $0.12 per share on 58.1 million average diluted shares outstanding which is a 13% increase when compared to $6.2 million in net income, or $0.12 per share on 52.5 million average outstanding shares for the first quarter of 1998.

The May 18, 1999 Press Release also reported the following:

|  | (000s) 3 Month Ended March 31, 1999 |
|---|---|
| Revenues |  |
| Technologies & Solutions | $24,726 |
| Applications | $22,568 |
| Consulting & Services | $23,414 |
| Total Net Revenues | $70,708 |
| Income from operations | $10,939 |
| Net income | $12,304 |
|  | As of March 31, 1999 |
| Accounts Receivable | $88,301 |
| Total Assets | $572,233 |

36

107.    On June 1, 1999, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the May 18, 1999 Press Release (the "Q1 1999 6-K"). Dammekens signed the Q1 1999 6-K.

108.    The May 18, 1999 Press Release and the Q1 1999 6-K were materially false and misleading because revenues and accounts receivable were overstated by at least $24.7 million and earnings were overstated.

109.    On July 28, 1999, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Strong Revenues, Earnings and Cash Flow For Second Quarter; Company Achieves Revenues of $76 Million and EPS of $0.17; Reduced DSO's" (the "July 28, 1999 Press Release").  The July 28, 1999 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the second quarter of 1999, L&H's total revenues were $76.0 million, an increase of 69% over reported revenues of $45.0 million for the second quarter of 1998.  L&H's total revenues for the six months ending June 30, 1999 were $146.7 million, an increase of 83% over reported revenues of $80.1 million for the same period in 1998.   The company attributes the increased revenues to L&H's continued success in expanding the role speech and language technologies play in a broad range of markets and applications.

> [* * *]

> Net income of Q2 1999 reached $10.1 million, or $0.17 per share on 59.4 million shares which is a 21% increase when compared to $8.3 million, or $0.15 pr share on 55.1 million shares for the second quarter of 1998.  Net income for the first six months ended June 30, 1999 reached $17.1 million, or $0.29 per share on 58.8 million average diluted shares outstanding, which is a 17% increase when compared to $14.6 million in net income, or $0.28 per share on 52.5 million average outstanding shares for the six months ended June 30, 1998.

> [* * *]

37

"L&H has steadfastly pursued its long-term strategy to be the leading provider of speech and language technologies, products and services, particularly as it relates to opportunities in Natural Language Understanding," said Jo Lernout, L&H co-founder and co-chairman. "We are especially pleased with our Q2 successes because they affirm that our strategy is sound and successful. Our continued ability to attract interest from industry leaders, as evidenced by the Intel agreement announced this quarter, reinforces this long term strategy as well."

The July 28, 1999 Press Release also reported the following:

|  | (000s)<br>3 Months Ended<br>June 30, 1999 | (000s)<br>6 Months Ended<br>June 30, 1999 |
|---|---|---|
| Revenues |  |  |
| Technologies & Solutions | $26,485 | $51,211 |
| Applications | $28,984 | $51,552 |
| Consulting & Services | $20,546 | $43,960 |
| Total Net Revenues | $76,015 | $146,723 |
| Income from operations | $15,532 | $26,471 |
| Net Income | $10,114 | $22,418 |

|  | As of<br>June 30, 1999 |
|---|---|
| Accounts Receivable | $87,145 |
| Total Assets | $606,303 |

110. On August 6, 1999, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the July 28, 1999 Press Release (the "Q2 1999 6-K"). Bastiaens, signed the Q2 1999 6-K.

111. The July 28, 1999 Press Release and the Q2 1999 6-K were materially false and misleading because revenues and accounts receivable were overstated by at least $43.7 million and earnings were overstated.

38

112.   On October 27, 1999, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Revenues of $87.5 Million and Strong Earnings of $0.16 for Third Quarter; Record Earnings Before Goodwill Amortization of $18.5 Million or $0.31 per Share" (the "October 27, 1999 Press Release"). The October 27, 1999 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the third quarter of 1999, L&H's total revenues were $87.5 million, an increase of 59% over reported revenues of $54.9 million for the third quarter of 1998. L&H's total revenues for the nine months ended September 30, 1999 were $234.2 million, an increase of 74% over reported revenues of $134.9 million for the same period in 1998.
>
> [* * *]
>
> Net income of Q3 1999, before goodwill amortization, reached $18.5 million, or $0.31 per share on 60.5 million shares. This is a 25% increase compared to $14.7 million before goodwill amortization and one-time charges, or $0.26 per share on 55.8 million fully diluted shares, for the third quarter of 1998. Net income for the first nine months ended September 30, 1999 reached $50 million before goodwill amortization and one-time charges, or $0.85 per share on 59.1 million fully diluted shares which is a 43% increase when compared to $34.7 million in net income, or $0.64 per share on 54.1 million fully diluted shares for the nine months ended September 30, 1998. Net income for the third quarter of 1999 was $9.8 million or $.16 per share on a fully-diluted basis versus a net loss of $35.6 million or $.70 per share net loss for the third quarter of 1998.

The October 27, 1999 Press Release also reported the following:

| | (000s)<br>3 Months Ended<br>September 30, 1999 | (000s)<br>9 Months Ended<br>September 30, 1999 |
|---|---|---|
| Revenues | | |
| Technologies & Solutions | $31,033 | $82,244 |
| Applications | $32,107 | $83,659 |
| Consulting & Services | $24,333 | $68,293 |
| Total Net Revenues | $87,473 | $234,196 |
| Income from operations | $16,827 | $43,296 |

39

| Net Income | $10,446 | $31,096 |
|---|---|---|

As of
September 30, 1999

| Accounts Receivable | $122,871 |
|---|---|
| Total Assets | $640,333 |

113.    On November 4, 1999, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the October 27, 1999 Press Release (the "Q3 1999 6-K"). Dammekens, signed the Q3 1999 6-K.

114.    On June 30, 2000, L&H filed with the SEC its form 10-Q Quarterly Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Quarterly Period Ended September 30, 1999 (the"Q3 1999 10-Q"). The Q3 1999 10-Q included substantially the same financial information contained in the October 27, 1999 Press Release. Bastiaens and Dammekens signed the Q3 1999 10-Q.

115.    The October 27, 1999 Press Release, the Q3 1999 6-K and the Q3 1999 10-Q were materially false and misleading because revenues and accounts receivable were overstated by at least $40.7 million and earnings were overstated.

116.    On February 9, 2000, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Revenues of $110 Million and Earnings Per Share of $0.22 for Fourth Quarter; (Before Exceptional Items); Strong Fiscal Year 1999; Announces 2-For-1 Stock Split; Record Earnings of $22.6 Million or $0.37 Earnings Per Share Before Goodwill Amortization and Exceptional Items; Cash Flow of $68 Million from 1999 Operations and DSO's reduced to 86 Days" (the "February 9, 2000 Press Release"). The February 9, 2000 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

40

For the fourth quarter of 1999, L&H's total revenues were $110 million, or a 43.5% increase in the revenue of $76.7 million for the fourth quarter of 1998. For the fiscal 1999, the company reported total revenues of $334 million or an increase of 62.7% over the reported revenues of $211.6 million for 1998.

[* * *]

The company reported approximately $13.4 million in net income for the fourth quarter of 1999, before exceptional items, or EPS (Earnings per Share) of $0.22 cents per share on 60.7 million average diluted shares outstanding. Net income for fiscal 1999, excluding exceptional items, totaled $40.2 million or $0.67 per share on 59.6 million average diluted shares compared to $38.2 million or $0.69 per share on 55.2 million average diluted shares during 1998. The exceptional items for the fourth quarter of 1999 resulted in a $2.7 million net loss (unrealized currency exchange loss). For Fiscal 1999 the exceptional items resulted in a $2.5 million net benefit (mainly unrealized currency exchange gain).

[* * *]

"In 1999 we experienced a strong demand for speech and language technologies, applications and solutions, specifically in the Enterprise and Telephony arena. This increase was mainly the result of internal growth and created a positive cash flow from operations of $68 million, reflecting the maturity of our operations," said Gaston Bastiaens, president and CEO of L&H. "During 2000 I believe we will reap the benefits of these changes as we plan to launch separate entities for Healthcare, Internet Translation and Globalization, Enterprise and Telephony Solutions. We foresee L&H's technologies will provide an intuitive speech user interface for the ever growing number of wireless, portable and handheld devices.

The February 9, 2000 Press Release also reported the following:

| | (000s) 3 Months Ended December 31, 1999 | (000s) Year Ended December 31, 1999 |
|---|---|---|
| Revenues | | |
| Technologies & Solutions | $56,416 | $138,660 |
| Applications | $30,034 | $113,693 |
| Consulting & Services | $23,591 | $91,884 |
| Total Net Revenues | $110,041 | $344,237 |

41

| | | |
|---|---|---|
| Income from operations | $22,984 | $66,280 |
| Net Income | $10,645 | $41,741 |
| Cash and marketable Securities | $130,630 | |
| Accounts Receivable | $104,989 | |
| Total Assets | $693,738 | |

117.   On June 30, 2000, L&H filed its Form 10-K Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 1999 with the SEC (the "1999 Form 10-K"). The 1999 Form 10-K included substantially the same financial information contained in the February 9, 2000 Press Release. Bastiaens, Dammekens, Lernout, Hauspie, Willaert, Cauwelier and Cloet signed the 1999 Form 10-K.

118.   The February 9, 2000 Press Release and the 1999 Form 10-K were materially false and misleading because fourth quarter revenues and accounts receivable were overstated by at least $65.6 million and earnings were overstated. Year end 1999 revenues and accounts receivables were overstated by $174.7 million and earnings were overstated.

119.   On May 9, 2000, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Revenues and Strong Earnings for First Quarter 2000; Company Achieves Revenues of $110.7 million and EPS of $0.37 Before Goodwill Amortization and Exceptional Items" (the "May 9, 2000 Press Release"). The May 9, 2000 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the first quarter of 2000, L&H's total revenues were $110.7 million, an increase of 57% over reported revenues of $70.7 million for the first quarter of 1999. The company attributes the increased revenues to continued growth in telephony, enterprise solutions and embedded market strengths. Approximately 74% of the revenue increase was attributed to organic growth.

[* * *]

42

Net income before exceptional items for the first quarter of 2000 reached $12.2 million, or $0.19 per share on 63.9 million average diluted shares outstanding which is a 75% increase when compared to $7.0 million in net income, or $0.12 per share on 58.1 million average diluted shares outstanding for the first quarter of 1999. The excluded exceptional amount in Q1 2000 was a $4.2 million net benefit (mainly unrealized currency exchange gain). Earnings per share, EPS before goodwill amortization, were $0.37 compared to $0.24 during the first quarter of 1999.

The May 9, 2000 Press Release also reported the following:

|  | (000s)<br>3 Month Ended<br>March 31, 2000 |
|---|---|
| **Revenues** | |
| Technologies & Solutions | $58,886 |
| Applications | $27,993 |
| Consulting & Services | $23,815 |
| Total Net Revenues | $110,694 |
| Income from operations | $26,722 |
| Net income | $16,447 |

|  | As of<br>March 31, 2000 |
|---|---|
| Cash and Marketable Securities | $179,139 |
| Accounts Receivable | $128,741 |
| Total Assets | $828,141 |

120.    On May 12, 2000, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the May 9, 2000 Press Release (the "Q1 2000 6-K"). Dammekens signed the Q1 2000 6-K.

121.    On June 30, 2000, L&H filed its Form 10-Q Quarterly Report Pursuant to Section 13 or 15(d) for the Securities Exchange Act of 1934 for the quarterly Period ended March 31,

43

2000 (the "Q1 2000 10-Q"). The Q1 2000 10-Q included substantially the same financial information contained in the May 9, 2000 Press Release. Bastiaens and Dammekens signed the Q1 2000 10-Q.

122.    The June 30, 2000 Press Release, the Q1 2000 6-K and the Q1 2000 10-Q were materially false and misleading because revenues and accounts receivable were overstated by at least $58.4 million and earnings were overstated.

123.    On August 8, 2000, L&H issued a press release via Business Wire titled "Lernout & Hauspie Reports Record Revenues of Approximately $155 Million for Q2, 2000 and Earnings of $0.05 Before Goodwill Amortization and Exceptional Items" (the "August 8, 2000 Press Release"). The August 8, 2000 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> L&H's total revenues were approximately $155 million, an increase of 104% over reported revenues of $76 million for the second quarter of 1999. Thirty-one million dollars of the company's second quarter 2000 revenues came from Dictaphone and Dragon. Excluding Dictaphone and Dragon, L&H's second quarter revenues were $124 million, 63% increase from revenues of $76 million in the second quarter of 1999. The company attributes 72% of this increase to organic growth.
>
> Net income before goodwill and exceptional items for the second quarter of 2000 were $7.1 million, or $0.05 per share on approximately 140 million average diluted shares outstanding as compared to $17.3 million, or $0.15 per share during the second quarter of 1999 on approximately 119 million average diluted shares outstanding
>
> [* * *]
>
> **Geographical Analysis of Revenues in the Second Quarter**
>
> European revenues were approximately $36.4 million or 23% of total revenues compared to $29.3 million or 39% in the second quarter of 1999. Revenues for North America were approximately $48.2 million or 31% of total revenues compared to $18.7 million or 25% of total revenues for the second quarter 1999. The increase

44

in U.S. revenue is largely attributable to the Dictaphone and Dragon acquisitions.

Korea contributed approximately $68 million or 44% of total company revenues. Currently, L&H has over 150 corporate customers in Korea including Art Lab, Digital Life, Digital Sei Young Ltd, EPC, Hanvit Bank, Hanvit Securities, Hung Chang, Hyundai Securities, Koscom, LG Electronics, Samsung Electronics, and Terrasoft. Its second quarter 2000 revenues continued to be strong in Korea.

[* * *]

**The increase in U.S. revenue is largely attributable to the Dictaphone and Dragon acquisitions.**

"The combination of Dragon and Dictaphone with L&H and the retention of the talented executive management from both companies provide us with an organization and resources that are unquestionably the strongest and finest in this industry," said Gaston Bastiaens, president and CEO of L&H. "We are very excited to apply these resources to tackle the ever growing opportunities in healthcare, enterprise and telephony, applications, globalization and the Internet. There has never been a more exciting or promising period in the speech and language technology industry."

"The second quarter of 2000 was filled with successes that we believe we can replicate in other areas of our business," said Jo Lernout, co-founder and chairman of L&H. "During the second quarter we continued to move toward a solutions oriented approach, as evidenced by the introduction of our healthcare solutions, our consumer applications and our NAK prototype solution. We also had numerous solutions sales in Asia. We believe these achievements can serve as a model for additional growth in the U.S. and Europe."

[* * *]

**Balance Sheet & Cash Flow Highlights, June 30, 2000**

Cash and Marketable Securities increased to approximately $200 million from $179 million at the end of the previous quarter.

Accounts Receivable increased to $238 million from $129 million at the end of the second quarter. The increase was due primarily to the inclusion of Dictaphone and Dragon.

45

Short-term debt was $252 million primarily as a result of the assumption of the debt associated with the acquisition of Dictaphone.

Net working capital was approximately $48 million, down primarily as a result of the assumption of the short-term debt associated with the acquisition of Dictaphone.

Net goodwill was approximately $1,701 million, an increase of approximately $1,283 versus the first quarter as a result of the acquisition of Dictaphone and Dragon.

Long-term debt was approximately $234 million as a result of the assumption of $200 million of Dictaphone senior subordinated notes.

Shareholders' equity was ($1,531) million.

Operating cash flow for the quarter was approximately $12 million and $32 million year-to-date.

Net cash used from investing activities was approximately $71 million and $145 million year-to-date.

Net cash provided by investing activities was approximately $83 million and $191 million year-to-date.

The August 8, 2000 Press Release also reported the following:

| | (000s) 3 Months Ended June 30, 2000 | (000s) 6 Months Ended June 30, 2000 |
|---|---|---|
| Revenues | | |
| Technologies & Solutions | $78,904 | $137,790 |
| Applications | $50,440 | $78,433 |
| Consulting & Services | $25,562 | $49,378 |
| Total Net Revenues | $154,906 | $265,601 |
| Income (Loss) from operations | ($15,936) | $10,787 |
| Net Loss | ($33,667) | ($17,219) |

124.     On or about August 14, 2000, L&H filed its Form 10-Q Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Quarterly Period

ended June 30, 2000 (the "Q2 2000 10-Q"). The Q2 2000 10-Q included the same financial information included in the August 8, 2000 Press Release. Bastiaens and Dammekens signed the Q2 2000 Quarterly 10-Q.

125.    The August 8, 2000 Press Release and the Q2 2000 10-Q were materially false and misleading because revenues and accounts receivable were overstated by at least $60.7 million and earnings were overstated.

### Defendants' Fraudulent Scheme Directly and Foreseeably Harmed The Bakers

126.    Defendants' fraudulent scheme had the intended and actual effect of fraudulently overstating L&H's revenue, income and assets and L&H's common stock price by, among other things, permitting L&H to fraudulently misrepresent its revenues, income and assets by means of interstate mail and wire, both directly and through L&H's agents. The Bakers were direct and foreseeable recipients of these fraudulent communications and relied on them in multiple ways. Among other things, the Bakers relied on the integrity of L&H's fraudulently inflated financial statements; the Bakers relied on the integrity of the fraudulently inflated market price of L&H common stock; and the Bakers relied on the written and oral misrepresentations of L&H and its representatives. As bankers to L&H, the Defendants regularly received L&H's financial statements and actually knew that the fraud they were perpetrating with L&H was working and that L&H's financial statements were materially and fraudulently inflated as a direct result. As bankers to L&H, the Defendants were actually aware of the Merger from no later than on or about the date that the Merger was publicly announced in March 2000 through and including the closing of the Merger in June 2000. As a result, the Defendants knew or recklessly disregarded that the Bakers were actually relying on L&H's fraudulent financial statements and fraudulently inflated stock price.

47

## Reliance on L&H's Fraudulently Misstated Financial Statements

127.    The Bakers relied on the accuracy of L&H's 1998 and 1999 financial statements. Among other things, the Bakers were entitled to terminate the Merger Agreement prior to closing if it became apparent that L&H's unaudited financial statements for 1999, released prior to execution of the Merger Agreement, were materially misstated.    They were fraudulently misstated, due to the misconduct of the Defendants and L&H, but this was concealed from the Bakers, preventing the Bakers from walking away from the Merger, which they would have done if Defendants' fraudulent behavior had been made known:

a.    The Merger Agreement included L&H's representations and warranties that: (i) all of L&H's filings with the SEC since January, 1998, did not contain any untrue statement of material fact or any material omission; (ii) all financial statements, included in L&H's SEC filings complied in all material respects with SEC accounting requirements and published rules and regulations, and were prepared in accordance with U.S. GAAP; and (iii) L&H's unaudited consolidated financial statements for the year ended December 31, 1999 were prepared in accordance with U.S. GAAP and fairly presented in all material respects the consolidated financial position of L&H as of the date thereof.

b.    Section 9.1 of the Merger Agreement allowed the Bakers to terminate the Agreement at any time prior to closing "if there has been a breach of any representation [or] warranty … which causes the conditions set forth in section 7.3(a) … to be incapable of being satisfied."

c.    Section 7.3(a) of the Merger Agreement provided that "representations and warranties of [L&H] shall be true and correct in all material respects as of the closing date."

128.    The Dexia Defendants' fraudulent scheme had the intended and actual effect of

fraudulently overstating L&H's revenue, income and assets and L&H's common stock price by, among other things, permitting L&H to fraudulently misrepresent its revenues, income and assets by means of interstate mail and wire, both directly and through L&H's agents, including KPMG. The Bakers were direct and foreseeable recipients of these fraudulent communications and relied on them in multiple ways. Among other things, the Bakers relied on the integrity of L&H's fraudulently inflated financial statements; the Bakers relied on the integrity of the fraudulently inflated market price of L&H common stock; and the Bakers relied on the written and oral misrepresentations of L&H and its representatives. As bankers to L&H, the Dexia Defendants regularly received L&H's financial statements and actually knew that the fraud they were perpetrating with L&H was working and that L&H's financial statements were materially and fraudulently inflated as a direct result of the Banks' actions. As bankers to L&H, the Dexia Defendants were actually aware of the Merger from no later than on or about the date that the Merger was publicly announced in March 2000 through and including the closing of the Merger in June 2000. As a result, the Dexia Defendants knew or recklessly disregarded that the Bakers were actually relying on L&H's fraudulent financial statements and fraudulently inflated stock price.

### Fraud On The Market Presumption

129.    The Bakers relied on the existence of an efficient market for L&H stock, and will rely, in part, on the presumption of reliance established by the fraud-on-the-market doctrine. At all relevant times L&H stock traded on the NASDAQ, an open and efficient market. Several entities and individuals, including but not limited to L&H, made material public misrepresentations or failed to disclose material facts regarding L&H's financial results during 1999 and 2000.

130.    These misrepresentations and omissions would tend to induce a reasonable

investor to misjudge the value of L&H's stock.  In addition, L&H stock was followed by analysts including, inter alia, Auerbach Grayson, Branch Cabell & Co., Ladenburg, Thalmann & Co., S.G. Cowen Sec. Corp. and Deutsche Bank.  The price of L&H stock reflected the effect of news from these and other analysts, among other sources, disseminated in the market.

131.    Based on the foregoing, plaintiffs are entitled to the presumption of reliance upon the integrity of the market, and the market price of L&H stock.

## FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS FOR VIOLATION OF SECTION 10 OF THE EXCHANGE ACT AND SEC RULE 10b-5

132.    Plaintiffs repeat and reallege each paragraph above as though fully set forth herein.

133.    Artesia, individually and in concert with, among others Lernout, Hauspie, Willaert, Bastiaens, Dammekens, Seo, and L&H, by the use and means of instrumentalities of interstate commerce and of the mails, knowingly engaged and participated in a continuous course and scheme of fraudulent conduct to overstate the revenues, income and assets of L&H and thereby to artificially inflate the price of L&H common stock and to conceal L&H's true financial condition.  Artesia employed devices, schemes and artifices to defraud while in possession of material, adverse, non-public information; they engaged in acts, practices and a course of conduct that included the manipulation of the price of L&H stock; and made, or participated in the making of, untrue and misleading statements of material fact and omitted to state material facts necessary in order to make the statements not misleading.  The purpose and effect of these manipulative and deceptive devices, schemes, artifices and attendant manipulation was, among other things, to induce plaintiffs, among others, to rely upon the artificially inflated price of L&H stock.

134.    The scheme artificially inflated L&H's financial results, including among other things L&H's reported revenue, which in turn artificially inflated L&H's stock price during 1999

50

and 2000. Artesia employed deceptive artifices and devices, including secret factoring side agreements, in furtherance of the fraudulent factoring scheme.

135.    Artesia participated, directly or indirectly, in the above scheme and Defendants' fraudulent conduct was committed, directly or indirectly, "in connection with" the Bakers' acquisition of L&H shares in the Merger, within the meaning of Section 10(b) and Rule 10b-5.

136.    The making of the fraudulent misrepresentations and omissions in L&H's financial statements, in its annual reports and other SEC filings detailed herein and in L&H press releases, as set forth above, caused the artificial inflation of the price of L&H common stock. Artesia knew that the financial statements of L&H would necessarily be, and were, materially false and misleading by, among other things, overstating revenues, income and assets by material amounts, by virtue of the Artesia's participation in and knowledge of the unlawful acts alleged above.

137.    Artesia engaged in acts, practices and a course of business which operated as a fraud on plaintiffs, and employed manipulative and deceptive devices, schemes and artifices to defraud, by, among other things, entering into arrangements with L&H and/or L&H's Senior Officers and/or related parties of L&H designed to inflate L&H's stock by, inter alia, creating the illusion of revenue at L&H..

138.    As a result of the dissemination of the false and misleading statements set forth above, the market price of L&H stock was artificially inflated during 1999 and 2000 – the time of, and the relevant period leading up to, the Merger. Lacking knowledge of the falsity of these statements, and the deceptive and manipulative devices and contrivances employed by Artesia and L&H to artificially inflate the price of L&H stock, plaintiffs relied upon the integrity of the market price of L&H stock in valuing and entering into the Merger. Had plaintiffs known the truth, they would not have entered into the Merger, and would not have accepted L&H stock in

51

exchange for their interest in Dragon.

139. As a direct and proximate result of the wrongful conduct alleged herein, the Bakers suffered substantial damage in connection with their acquisition of L&H stock through the Merger.

140. Dexia S.A. and/or Dexia Bank Belgium, by acquiring Artesia, is liable to Plaintiffs for Artesia's wrongful conduct as set forth herein.

141. Artesia's knowledge of the fraud and their intent to perpetrate it is evidenced by, among other things.

a. One or more emails generated by Artesia recognizing disclosure of loan guarantees given by Senior Officers would not be tolerated by the SEC and Artesia's creation of "credit default swaps" to circumvent disclosure.

b. The irregular nature of the underlying transactions as set forth above.

c. As bankers to L&H, Artesia regularly received L&H's financial statements and actually knew that the fraud they were perpetrating with L&H was working and that L&H's financial statements were materially and fraudulently inflated as a direct result.

d. As bankers to L&H, Artesia was actually aware of the Merger from no later than on or about the date that the Merger was publicly announced in March 2000 through and including the closing of the Merger in June 2000. As a result, Artesia knew or recklessly disregarded that the Bakers were actually relying on L&H's fraudulent financial statements and fraudulently inflated stock price.

e. Financial incentives to commit fraud, including the continuation of profitable banking relationships between Artesia and L&H, L&H's Senior Officers and certain related parties of L&H.

142. By reason of the foregoing, the Defendants violated Section 10(b) of the

Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; and (b) engaged in acts, practices and a course of business which operated as a fraud and a deceit upon plaintiffs in connection with their acquisition of L&H stock through the Merger. The Defendants may be held jointly and severally liable to the Bakers for the aforesaid damages, in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS FOR AIDING AND ABETTING COMMON LAW FRAUD

143.    Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

144.    As set forth above, L&H intentionally misrepresented its revenues, income and assets, by material amounts, in its financial statements, press releases and public statements, including, among other things, its filings with the SEC. Those misrepresentations were intended to and did have the effect of fraudulently inflating L&H's financial statements and common stock price, specifically including the price of the L&H common stock that L&H exchanged for the Bakers' interest in Dragon.

145.    Artesia knew that L&H was a publicly held company that traded on the NASDAQ and EASDAQ and was required to publicly disclose its financial statements and file reports on its financial condition with, among others, the SEC. Artesia knew that the secret provisions of its relationship with L&H as set forth above, including secret "credit swap arrangements" created the illusion of cash on L&H's books and records. In reality, these transactions, served only to render L&H's publicly reported financial results materially false and misleading, and had the effect of fraudulently inflating L&H's stock price.

146.    Artesia knowingly or recklessly rendered substantial assistance to L&H's fraudulent scheme by entering into, concealing, and enforcing secret agreements which allowed

L&H to misstate its financial results and precipitate L&H's collapse and the collapse of its common stock.

147.    As a result of the foregoing, Plaintiffs have suffered harm and sustained damages in an amount to be proven at trial and Dexia S.A. and/or Dexia Bank Belgium, by acquiring Artesia, is liable to Plaintiffs for the wrongful conduct set forth herein.

## THIRD CLAIM FOR RELIEF AGAINST
## ALL DEFENDANTS FOR COMMON LAW FRAUD

148.    Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

149.    As set forth above, Artesia intentionally misrepresented and/or concealed their transactions with L&H.

150.    Artesia intended by its actions to permit L&H to fraudulently overstate its revenues, income and assets and thereby to inflate the price of the common stock of L&H, causing plaintiffs, among others, to purchase L&H common stock at prices inflated by their fraud.

151.    Artesia's knowledge of the fraud and intent to perpetrate it is evidenced by, among other things the facts listed in paragraph 141 of this Complaint, supra.

152.    In reliance on the fraudulently inflated L&H financial statements and common stock price directly and immediately produced by Artesia's misrepresentations and omissions, the Bakers entered into, executed and fully performed the Merger Agreement, to their detriment.

153.    As a result of this fraudulent conduct, plaintiffs have suffered harm and sustained damages in an amount to be proven at trial and Dexia S.A. and/or Dexia Bank Belgium, by acquiring Artesia, is liable to the Plaintiffs for Artesia's wrongful conduct as set forth herein.

## FOURTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
## FOR CONSPIRACY TO COMMIT COMMON LAW FRAUD

154.    Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

155.    Artesia and L&H's Senior Officers including at least Lernout, Hauspie and Willaert conspired to fraudulently misrepresent and fraudulently inflate L&H's financial statements and common stock trading price, specifically including the price of the L&H common stock that L&H exchanged for the Bakers' interest in Dragon.

156.    As set forth above, Artesia entered into, inter alia, credit swap agreements with Senior Officers, which agreements had the effect of rendering fictitious L&H's publicly reported revenues and constituted a fraud on the market for L&H shares.

157.    As set forth above, Artesia intentionally misrepresented its transactions with L&H by, among other things set forth above, participating in the "credit swap transactions" described above to enable L&H to report revenues it was not entitled to report.

158.    This conspiracy enabled L&H to give the false appearance to the outside world that it was tremendously successful and had significant revenues and growth thereof.

159.    Artesia acted intentionally to further the common plan of artificially inflating the financial statements of L&H, knowing that the undisclosed provisions of their arrangements with L&H and its Senior Officers would render fictitious L&H reported financial results.    The resulting illusory financial statements of L&H caused plaintiffs, among others, to purchase L&H common stock at fraudulently inflated prices.

160.    As a result of Artesia's knowing and intentional participation in the foregoing conspiracy to commit fraud and the consequent fraudulently inflated L&H financial statements and common stock price, the Bakers entered into, executed and fully performed the Merger Agreement, to their detriment.

161.    Plaintiffs have been harmed by this conspiracy to commit fraud, and have sustained damages in an amount to be proven at trial and Dexia S.A. and/or Dexia Bank Belgium, by acquiring Artesia, is liable to the Plaintiffs for Artesia's wrongful conduct as set forth herein.

**WHEREFORE,** plaintiffs demand a trial by jury as to all claims so triable and demand judgment as follows:

a.    Awarding plaintiffs damages in an amount to be determined at trial against both Defendants, jointly and severally, for the Bakers' purchases of L&H shares, as well as reimbursement for any liabilities and expenses incurred as a result of the impact of the fraud on the Bakers' sales of L&H shares or otherwise;

b.    Awarding plaintiffs punitive damages in an amount to be proven at trial;

c.    Awarding plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

d.    Awarding plaintiffs prejudgment and post-judgment interest; and

e.    Awarding such other, further or different relief as the Court may deem just and proper.

Dated: March 11, 2004

Terence K. Ankner (BBO # 552469)
PARTRIDGE, ANKNER & HORSTMAN LLP
200 Berkeley Street, 16th Floor
Boston, MA 02116
Telephone: (617) 859-9999
Facsimile: (617) 859-9998

Karen C. Dyer, Esq.
George R. Coe, Esq.
BOIES, SCHILLER & FLEXNER LLP
255 South Orange Avenue, Suite 905
Orlando, FL  32801-3456
Telephone:  (407) 425-7118
Facsimile:  (407) 425-7047

Alan Cotler, Esq.
Joan Yue, Esq.
REED SMITH
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103
Telephone:  (215) 851-8100
Facsimile:  (215) 851-1420

**ATTORNEYS FOR PLAINTIFFS**