# Exhibit B

DOC #56

ORIGINAL

FILED U.S. DISTRICT COURT 2003 MAR 31 PM 1:18

GREGORY P. JOSEPH LAW OFFICES LLC
Gregory P. Joseph (GJ-4208)
Pamela Jarvis (PJ-9058)
Honey L. Kober (HK-8380)
Sandra M. Lipsman (SL-4590)
805 Third Avenue, 31st Floor
New York, New York 10022
Tel: (212) 407-1200
Fax: (212) 407-1280

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

GARY B. FILLER and LAWRENCE PERLMAN,   :
Trustees of the TRA RIGHTS TRUST,             :

                           Plaintiffs,    :

                  v.             :

HANVIT BANK, SHINHAN BANK and       :
CHOHUNG BANK,                    :

                      Defendants.   :
------------------------------------------------------------x

**Jury Trial Demanded**

01-Civ-CV 9510 (MGC)

## SECOND AMENDED COMPLAINT

Plaintiffs, by their attorneys, as and for their second amended complaint, allege the

following upon knowledge as to themselves and their own actions, as to their predecessor in

interest, Seagate Technology, Inc. ("Seagate"), and as to the actions of Seagate and its

representatives. As to all other matters, plaintiffs' allegations are based on information and

belief arising out of the investigation by plaintiffs' counsel. This investigation included, among

other things, the review and analysis of documents concerning, independent investigations into,

and reports about the misconduct of defendants Hanvit Bank ("Hanvit"), Shinhan Bank

("Shinhan") and Chohung Bank ("Chohung") (collectively, the "Korean Banks" or the "Banks"),

as well as Lernout & Hauspie Speech Products NV ("L&H"), L&H's wholly-owned subsidiary,

1

Lernout & Hauspie Korea ("L&H Korea") and L&H's auditors ("KPMG"). Based on this investigation, plaintiffs believe that their information-and-belief allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

## NATURE OF THE ACTION

1.    This is an action to recover damages sustained by Seagate when it sold its approximately $170 million interest in Dragon Systems, Inc. ("Dragon") for artificially inflated, and ultimately worthless, stock of L&H, a global software concern that was touted as "the Microsoft of Europe" prior to its November 2000 bankruptcy and subsequent demise. L&H operated principally in Belgium, the United States, and Korea.

2.    Seagate acquired its L&H holdings in a stock-for-stock merger of Dragon into a shell subsidiary of L&H (the "Dragon Merger" or "Merger"). Within six months of consummation of the Merger, L&H lost 95% of its market capitalization — $9 billion dollars — on revelations that much of its reported income was the fictitious product of fraudulent transactions with non-existent customers, or with customers who were not really obligated to, and did not, provide the revenue that L&H fraudulently recognized. L&H's long-time auditor, KPMG, had withdrawn its audit reports for the periods 1998, 1999 and the first half of 2000; L&H's audit committee had announced that financial statements for those periods would be restated due to "errors and irregularities"; a Securities and Exchange Commission ("SEC") investigation had commenced, and L&H's senior management had been arrested on charges of criminal fraud in Belgium. Ultimately, in February 2003, L&H consented to entry of judgment in a securities fraud enforcement action brought against it by the SEC in the United States District Court for the District of Columbia. That consent judgment bars L&H from future violations of the federal securities laws.

3.    Korea was a center of the fraud that led to L&H's demise. L&H's wholly-owned Korean subsidiary, whose financial statements were consolidated with L&H's, made an

astonishing — and, as it turned out, utterly fictitious — contribution to L&H's revenues in 1999 and the first half of 2000. L&H Korea accounted for approximately $63 million of L&H's total reported 1999 revenue, up from less than $250,000 in 1998. During the fourth quarter of 1999 alone, L&H booked $46.3 million in revenue in Korea — 42% of the Company's total reported fourth quarter revenue. In the first six months of 2000, Korean revenues jumped to $127 million, nearly half of L&H's total revenues for those quarters. Following exposure of L&H's fraud, all of its revenue in Korea was reversed.

4.     The Korean Banks played a critical role in the fraud in Korea, which was part of a worldwide fraud by L&H management — Jo Lernout, Pol Hauspie, Gaston Bastiaens and Nico Willaert — in concert with other actors in Europe, Asia, and the United States, to inflate L&H revenues. (Lernout, Hauspie, Bastiaens and Willaert, as well as other actors in the fraud, are defendants in litigation being prosecuted by plaintiffs and others in the United States District Court for the District of Massachusetts.) When the fraud began to unravel publicly, L&H's then-CEO, John Duerden, told *The Wall Street Journal* that L&H Korea had been closely controlled by Hauspie, Bastiaens and Willaert. (*Wall Street Journal*, December 7, 2000.)

5.     The Korean Banks' knowing participation in the fraud in Korea was essential to the success of the fraud that harmed the plaintiffs. The Korean Banks lied to KPMG, L&H's outside auditors — in writing, orally and by their conduct. The Korean Banks falsely confirmed the existence of phony receivables that L&H had supposedly factored to the Korean Banks without recourse. Contrary to the Banks' lies to KPMG, those funds were held by the Banks with recourse, in restricted time deposits, and in fact reverted to the Banks when L&H collapsed. This fraud directly resulted in grossly inflated, thoroughly false, L&H revenue and profit figures that were passed on to plaintiffs by L&H after those phony figures had been approved by KPMG based on the Banks' lies. Absent the Korean Banks' deception, *inter alia*, KPMG never would have approved the false financial figures contained and disseminated in L&H's press releases of February 9, 2000, and May 9, 2000, and accompanying SEC filings. Those same false financial

3

figures were orally reaffirmed directly to plaintiffs by KPMG in a telephone conversation on March 22, 2000.

6.    In essence, the primary securities fraud and misconduct committed by the Korean Banks can be summarized graphically as follows:



The Korean Banks' lies to KPMG were both oral and written, the latter taking the form of false, signed confirmations provided by the Banks directly to KPMG. A translated generic version of the false confirmations provided by the Banks to KPMG is annexed as Exhibit A. Actual false confirmations signed and delivered by the Banks to KPMG ("Sandong" in Korea), with English translations, are annexed as Exhibit B. Sample secret side agreements demonstrating the falsity of the confirmations are set forth in ¶¶44-45, *infra*.

7.    The Korean Banks played a crucial role in the underlying fraud, about which they then proceeded to lie to KPMG. In their "factoring" fraud, the Banks factored receivables from L&H's largely illusory Korean customers. They (as well as a fourth, non-defendant bank in Korea, Hana Bank) pretended to pay cash to L&H Korea in exchange for the right to collect receivables from L&H Korea's customers. On their face, these transactions were "without

4

recourse" — *i.e.*, the cash appeared to belong to L&H, L&H's accounts receivable appeared to be reduced, and the Banks appeared to assume the risk of collecting on the receivables. (This is documented in the April 2001 PricewaterhouseCoopers ("PwC") Report on L&H Korea ("PwC Report") at 20.) But in reality, the Banks were unwilling to assume this risk (*id.* at 21), so for their own benefit, they made secret side agreements with L&H Korea under which these transactions were "with recourse." (Chohung apparently used a "secured loan" mechanism, but the effect was the same. (*Id.* at 22, 27).) The cash that supposedly belonged to L&H Korea was locked in restricted time deposits under the Banks' control. (*Id.* at 22)

8.     The Banks signed and delivered to KPMG detailed, fraudulent written confirmations misrepresenting that these funds were in unrestricted accounts of L&H Korea. Additionally, the Banks orally and by their conduct confirmed to KPMG the *bona fides* of these false confirmations.

9.     The Banks knew that KPMG was auditing L&H Korea as part of its global audit of L&H. The Banks knew that L&H was a public company that was traded on NASDAQ. The Banks knew that the purpose of KPMG's activities was to result in public earnings releases and financial statements that would be, and were, widely disseminated in the United States and filed with the SEC. The Banks knew that their fraudulent misrepresentations to KPMG would be, as they were, communicated to investors in the United States in the form of fraudulently inflated L&H revenue and earnings reports, and financial statements audited by KPMG. The Korean Banks' fraud involved at least 16 separate transactions relating to over $60 million of supposed revenues. Over $40 million of this phantom revenue was reported from September 1999 through the first quarter of 2000. Seagate relied on the truthfulness of these false revenue and earnings reports in consummating the Merger of Dragon with L&H in June 2000.

10.     The Korean Banks' second fraud involved misrepresentations about secret "transfer" arrangements through which the Banks funneled L&H's own money back to L&H in the ostensible form of revenue. (PwC Report at 32) It appears that these fraudulent "transfer"

arrangements occurred after June 2000, and thus were not relied on by Seagate in agreeing to and closing the Dragon Merger, but they further evidence the Banks' scienter and participation in the conspiracy to defraud, and they form part of the Banks' pattern of racketeering activity under the Racketeer Influenced and Corrupt Organizations Act ("RICO").

11.　　The purpose of the "transfer" fraud was to falsely demonstrate to KPMG collections by L&H of 10% to 20% on customer accounts, so that L&H could avoid recording a full reserve of the accounts receivable balance. (PwC Report at 4, 28) The Banks extended "loans" to secret "transferees" of L&H Korea's "customers," to whom the customers had covertly transferred their license agreements with L&H Korea. (*Id.* at 4, 32) These "transferees" paid the loan proceeds to the original customers, who in turn paid them to L&H Korea. (*Id.* at 4) This gave the false appearance that the original customers were making payments, while in fact L&H was booking loans it had itself taken. (*Id.*) License agreements involving over $27 million were transferred, generating over $15 million in phony L&H revenues. (*Id.* at 18) The Korean Banks issued falsified bank confirmations to conceal the sham transfer arrangements from KPMG and others.

12.　　In November 2000, L&H Korea cancelled a total of 47 license agreements — 18 of which had been "factored" and 13 of which had been "transferred." (PwC Report at 18) This was done in large part for the benefit of the Banks, which had retained this fraudulently-concealed protection and which would otherwise have been at risk of losing the millions of dollars they held as collateral for these fraudulent arrangements. (*Id.* at 4) In connection with the cancellation of the "transferred" agreements, L&H Korea also paid "penalties" to the transferees and customers "as compensation for the inconvenience of dealing with the auditors." (*Id.* at 4, 32) L&H had recognized over $100 million of revenue related to the 47 cancelled agreements. (*Id.* at 3) When the agreements were cancelled, many millions of dollars held in restricted accounts reverted to the Korean Banks, and L&H Korea was left with approximately $2.3 million in cash, instead of the $97.5 million it purported to have. (*Id.* at 3, 6)

6

13.     Thus, from September 1999 through much of 2000, Hanvit, Shinhan and Chohung actively engaged in securities fraud by making affirmative misrepresentations to KPMG, and thus to L&H investors in the United States, including Seagate, through KPMG concerning scores of millions of dollars of fictitious revenues and assets of L&H. The Banks knowingly and deliberately communicated these material misrepresentations to American investors through L&H's outside auditors at KPMG. The Banks also conspired with L&H (through L&H Korea) to fraudulently inflate L&H financial statements, and substantially assisted L&H in doing so. This common law fraud, aiding-and-abetting fraud and conspiracy encompassed the Banks' active collusion with L&H (through L&H Korea) to fraudulently inflate the financial statements of L&H through (i) the phony "factoring" scheme in which the Banks purported to enter into "without recourse" transactions with L&H Korea — about which they lied to KPMG — while simultaneously entering into secret side agreements (or equivalent arrangements) making it clear that the transactions were "with recourse," and (ii) the collusive "transfer" scheme — about which they also lied to KPMG — in which the Banks lent money that was secretly secured by L&H but went to third parties who funneled it back to L&H, which fraudulently reported it as income. The Banks knew that the fraudulent factoring and transfer agreements they entered into with L&H Korea would have the purpose and effect of distorting the true financial picture of L&H for investors in the United States (such as Seagate), insofar as L&H used consolidated financial reporting practices for the operations of its divisions and subsidiaries, including L&H Korea.

14.     In agreeing to and consummating the Dragon Merger, Seagate relied on the earnings releases of February 9 and May 9, 2000 (and accompanying SEC filings), made by L&H only after the numbers had been screened and approved by L&H. L&H would not have released those numbers without KPMG's approval, and KPMG would not have issued that approval but for, *inter alia*, the fraudulent conduct and lies of the Korean Banks. Seagate also relied on the integrity of the market price of L&H stock, which was massively distorted by the

Korean Banks' fraud, and on KPMG's written and oral assurances — including in the telephonic due diligence meeting of March 22, 2000, among KPMG and plaintiffs' representative — that L&H's financial statements fairly and accurately reflected the condition of L&H, and that there would be no material restatement of the financial figures reported in L&H's publicly-announced earnings release of February 9, 2000. These assurances by KPMG included numerous falsehoods that were the direct, inevitable and intended result of the affirmative misrepresentations of the Korean Banks to KPMG.

### JURISDICTION AND VENUE

15.    This action arises under § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b); SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; RICO, 18 U.S.C. §§ 1962(c)-(d); and common law doctrines of fraud, aiding and abetting fraud and conspiracy.

16.    This Court has subject matter jurisdiction pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa; RICO, 18 U.S.C. § 1964(c), 28 U.S.C. §§ 1331 and 1332; and principles of supplemental jurisdiction, 28 U.S.C. § 1367.

17.    Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, 18 U.S.C. § 1965(a), and 28 U.S.C. §§ 1391(b) and (d).

### PARTIES AND OTHER ACTORS

18.    Plaintiffs Gary B. Filler, a citizen of the State of Utah, and Lawrence Perlman, a citizen of the State of Minnesota (collectively, the "Trustees"), are the former Co-Chairmen of the Board of Seagate. They are currently the Trustees of the TRA Rights Trust, a trust organized under the laws of the State of Delaware (the "Trust"). The Trust is the sole successor in interest to Seagate in respect of any and all claims and causes of action possessed by Seagate arising out of, in connection with, or relating to, Seagate's acquisition or ownership of shares of, or holdings in, L&H. The Trustees have the sole authority to prosecute any claim, action, suit or proceeding against L&H and its affiliates, and any other person or entity, whether at law or in equity, arising

8

out of, in connection with, or relating to Seagate's acquisition or ownership of shares of, or holdings in, L&H (the "Seagate Claims").

19. The Trust was created in connection with Seagate's March 29, 2000 agreement to merge into a subsidiary of Veritas Software Corporation ("Veritas") (a $12 billion merger) and sell its operating assets to Suez Acquisition Company (Cayman) Limited (a $2 billion leveraged buyout) (collectively, the $14 billion "Veritas Transaction"). The Trust was created primarily for the purpose of collecting, managing, investing and distributing to Seagate's former shareholders hundreds of millions of dollars in potential future tax refunds and credits (the "Tax Rights") due Seagate for tax periods prior to the closing of the Veritas Transaction. The name "TRA Rights Trust" itself reflects this purpose ("TRA" stands for "Tax Rights Amounts"). The Trust is a thriving, *bona fide* entity with a corpus at March 2002 of $176 million. The Trustees had, by March 2002, collected nearly $46 million in federal and state Tax Rights and distributed $28.5 million to the former Seagate shareholders. As of March 2003, the Trustees have distributed more than $45 million to the former Seagate shareholders.

20. Plaintiffs have previously commenced litigation asserting Seagate Claims against certain members of L&H management, KPMG and others, in actions now pending in federal court for the District of Massachusetts. The former shareholders of Seagate are the holders of the Tax Rights under the Trust, and they are legally entitled, through the Trust, to the sole and exclusive benefit of any and all proceeds from the Seagate Claims. The former Seagate shareholders are not entitled to seek damages or recover on behalf of Seagate or the Trust. The overwhelming majority of the former Seagate shareholders are American citizens resident in the United States, as are the Trustees. Seagate and Dragon were Delaware corporations. Seagate's principal executive offices were at all material times located in Scotts Valley, California.

21. Defendant Hanvit is Korea's largest commercial bank, a Korean corporation with its principal place of business in Seoul. According to *The Banker* (October 2001), it ranks 24th among the Asia's largest 200 banks. Hanvit has an office at 245 Park Avenue in New York City,

which is supervised by the New York State Banking Department as a "supervised institution/foreign agency." In April, 2001, L&H filed a criminal complaint against Hanvit with the Seoul Prosecutor's Office in connection with fraud at L&H Korea.

22.    Defendant Shinhan is one of Korea's largest banks, a Korean corporation with its principal place of business in Seoul. It is ranked 19th among Asia's largest 200 banks by *The Banker*. Shinhan does business in New York through a branch located at 800 Third Avenue in New York City, which is supervised by the New York State Banking Department as a "supervised institution/foreign branch." In April, 2001, L&H filed a criminal complaint against Shinhan with the Seoul Prosecutor's Office in connection with fraud at L&H Korea.

23.    Defendant Chohung Bank is one of Korea's largest banks, and a Korean corporation with its principal place of business in Seoul. It is ranked 33rd among Asia's largest 200 banks by *The Banker*. It does business in New York through a branch located at 320 Park Avenue in New York City, which is supervised by the New York State Department of Banking as a "supervised institution/foreign branch." In April, 2001, L&H filed a criminal complaint against Chohung with the Seoul Prosecutor's Office in connection with fraud at L&H Korea.

24.    Both Hanvit and Chohung were ordinary, private sector commercial banks until early 1999. At that time, because of financial problems, they received substantial capital infusions from the government. In connection with these capital infusions, the Korean Deposit Insurance Company ("KDIC"), a government agency, acquired a majority ownership interest in each of the two banks on an interim basis. At present, the KDIC's ownership of Hanvit is indirect, through Woori Financial Holding Company ("Woori"). Thus, Hanvit is a temporary, third-tier subsidiary of the Korean government, through the KDIC and Woori. The KDIC presently owns just over 80% of Chohung. Chohung is also a temporary, second-tier subsidiary of the Korean government, as a subsidiary of the KDIC.

25.    From the outset, the KDIC's ownership interest in Hanvit and Chohung was intended to be temporary. On May 10, 2002, *Business Korea* reported that the KDIC would

reduce its stake in Chohung to less than 50% during the first half of 2002, by issuing $500 million in depository receipts. In March 2002, it was reported that the rest of the KDIC's stake in Chohung would be sold by the first half of 2003. On March 25, 2003, *The Korean Herald* reported that the Korean Finance Minister "reaffirmed that there must be no delay in the government's plan to sell its entire 80.04 percent stake in Chohung Bank...." As to Hanvit, the May 10, 2002 *Financial Times* reported that Lehman Brothers has agreed to invest $1 billion in Woori, Hanvit's parent, and that "Woori is earmarked for a stock market listing next month...." The May 9, 2002 *Korean Herald* reported that Woori's IPO was scheduled for May 29-31, 2002. The January 29, 2003 *Daily Deal* reported that: "Woori Finance has developed a reputation for sticking to its privatization plans." It has been reported that all shares of Woori held by the KDIC are to be sold by 2004.

26. Non-defendant L&H is a Belgian corporation, with its principal place of business in Ieper, Belgium, and a headquarters office in Burlington, Massachusetts. Until it was delisted on December 8, 2000, L&H common stock was traded on the NASDAQ. L&H stock also traded on the European analog to NASDAQ, known as EASDAQ, until on or about November 9, 2000. On November 29, 2000, L&H filed for protection from its creditors under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware, and contemporaneously commenced bankruptcy proceedings in Belgium.

27. Non-defendant L&H Holdings USA, Inc. ("L&H USA") is a Delaware corporation, a wholly owned subsidiary of L&H, and the successor corporation to Dragon. On November 29, 2000, L&H USA also filed for protection from its creditors under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware.

28. Non-defendant L&H Korea is a Korean corporation. As a wholly owned subsidiary of L&H, L&H Korea did not separately report its financial results, but instead consolidated them with those of L&H, its publicly traded parent.

11

29.    L&H Korea was managed by John Seo, a.k.a Joo Chul Seo ("Seo"). Seo was the founder of L&H Korea's predecessor, Bumil Information and Communications Co., Ltd. ("Bumil"), which was acquired by L&H in September 1999 for $25 million. In January of 2000, Seo received an accelerated bonus of $25 million cash from L&H because of the fraudulently inflated results of L&H Korea — funds which he promptly indicated he would use to "keep my promise to Korean banks" (*see* ¶43, *infra*). On November 22, 2000, L&H announced that Seo had been suspended as President and General Manager of L&H Korea, removed as a director of L&H Korea, and relieved of all responsibilities. In April 2001, L&H filed a criminal complaint against Seo with the Seoul Prosecutor's Office in connection with fraud at L&H Korea. Seo's whereabouts have been unknown since November 2000.

30.    At all times after L&H's acquisition of Bumil (L&H Korea), Seo acted in concert with L&H senior management and the Korean Banks in the perpetration of the L&H fraud. John Duerden, who replaced Bastiaens as CEO of L&H when the fraud began to unravel publicly, told *The Wall Street Journal* that L&H Korea was closely controlled by senior L&H management — specifically, Hauspie, Bastiaens and Willaert. In a December 7, 2000, article, *The Wall Street Journal* reported that: "Despite being CEO, Mr. Duerden says, 'I never felt like I had control over the Korean operation,' which he adds was 'managed close to the chest' by Mr. Hauspie, Mr. Bastiaens and then-Vice Chairman Nico Willaert."

## THE FRAUDULENT SCHEMES

31.    A crucial component of the fraud at L&H was the inflation of Korean revenues, and this could be, and was, achieved only through the documented, active participation of the Korean Banks. Soon after L&H acquired L&H Korea, L&H began to tout the expansion of L&H revenues due to new Korean customers, including many whose contracts were factored to the Korean Banks. Among other public statements:

12

(a)     On September 13, 1999, L&H announced that it had expanded its Pacific Rim presence by acquiring L&H Korea and emphasized its deployment of L&H technology for "leading Korean companies," including defendant Hanvit.

(b)     In a December 28, 1999 press release, L&H "announced several deals with customers in the telecommunications, enterprise solutions and embedded technologies markets....  The agreements, signed with industry-leading companies in Asia and several companies in Europe, follow recently announced deals in the US."  In the press release, L&H cited "strong demand for its speech and language technologies and solutions in the Asia Pacific region, especially South Korea."  Among the Korean clients it identified were:  Hyundai Securities, Samsung Securities, LG Securities, Daishin Securities, Daewoo Securities, LG Electronics, Intelligent Communications, and SofTech Advantage.

(c)     A January 10, 2000 L&H press release reported that "the company also recently announced more than a dozen new contracts with telecommunications developers in Korea and elsewhere in the Pacific Rim and Europe, further readying L&H's Enterprise and Telephony Solutions business group for separate legal entity status.  Contracts were signed ... with Hyundai Securities, Samsung Securities, LG Securities, Daishin Securities, Daewoo Securities, Delfi, GenSoft, EPC Asia and NeoTelecom, among others."  Among the companies listed in this press release was EPC Asia, whose receivables appear to have been factored by Hanvit in the first quarter of 2000.

(d)     In a January 31, 2000 press release, L&H announced that "Hung Chang Co., Ltd. has signed a multi-year agreement under which it will license L&H's speech technologies in multiple languages to develop speaker verification and reservation applications."  In the press release, Bastiaens was quoted as stating that:  "Our ever-increasing successes in the Korean market, particularly within the telecommunications sector, are the result of a very well developed and implemented strategy to build a worldwide enterprise and telephony solutions market presence."  Hung Chang receivables were also factored by Hanvit in the first quarter of 2000.

13

(e)     In a February 9, 2000 press release, L&H showcased fourth quarter 1999 growth in the Pacific Rim area:

> The demand for speech-enabled applications continued to grow in the Pacific Rim and L&H technologies were increasingly popular in the region. South Korea and other PacRim-based developers who plan to build applications employing L&H's RealSpeak, ASR, TTS and dialogue systems solutions include: Hyundai Securities, Samsung Securities, LG Securities, Daishin Securities and Daewoo Securities, EPC Asia, IBCC (International Business Computer Co., Ltd.), NeoTelecom, LG Electronics, Intelligent Communications, Softech Advantage, and SofTel Telecommunications Pte. Limited....

32.     L&H also issued several press releases reporting revenues, that were in fact inflated by, among other things, fraudulent transactions in Korea that were the subject of L&H collusion with Korean Banks in the "factoring" scheme that is detailed below:

(a)     In a February 9, 2000 press release and February 11, 2000 Form 6-K filed with the SEC, L&H announced that for the fourth quarter of 1999, "L&H's total revenues were $110 million, or a 43.5% increase in the reported revenue of $76.7 million for the fourth quarter 1998." Although the figures are unaudited and the documents do not mention KPMG, other documents available to plaintiffs show that KPMG reviewed these figures, and that L&H would not have released them without KPMG's consent (which resulted directly, *inter alia*, from the Korean Banks' lies). As set forth above, in the fourth quarter of 1999, Hanvit and Shinhan "factored" at least $14.3 million, which was over 40% of L&H's $33.3 million increase in revenues for the fourth quarter of 1999 (compared to the four quarter of 1998). In the press release and 6-K, L&H emphasized fourth quarter 1999 growth in the Pacific Rim area, especially Korea. The information in the press release and 6-K was reviewed and relied on by Seagate in performing its due diligence before agreeing to the Dragon Merger.

(b)     False earnings reports continued in L&H's May 9, 2000 press release announcing L&H's financial results for the first quarter of 2000, which were also contained in a May 12, 2000 Form 6-K filed with the SEC. The press release and 6-K state that, "for the first quarter of 2000, L&H's total revenues were $110.7 million, an increase of 57% over reported revenues of,

14

$70.7 million for the first quarter of 1999." These numbers were reviewed, pre-screened and approved by KPMG, and L&H would not have reported them publicly without KPMG's approval (which resulted, *inter alia*, from the Korean Banks' lies). As set forth above, in the first quarter of 2000, the Korean Banks "factored" approximately $26 million, which was well over half of L&H's $40 million increase in revenues for the first quarter of 2000 compared to the first quarter of 1999.

    (c)    On June 30, 2000, L&H filed with the SEC a Form 10-K for 1999 (the "1999 10-K"), containing KPMG's unqualified audit opinion dated April 27, 2000, and Forms 10-Q for the second and third quarter of 1999 and the first quarter of 2000. On August 14, 2000, L&H filed its Form 10-Q for the second quarter of 2000, reflecting that Korean revenues for the first two quarters of 2000 were $127 million, nearly half of L&H's total revenues for those quarters. Of this, approximately $46 million was part of the fraudulent factoring scheme engaged in by the Banks. In 1999, Korean revenues were nearly $63 million, up from less than $250,000 in 1998. Approximately 30% of the 1999 Korean revenues were fictitious sums factored by the Banks. Once again, these numbers would not have been reported by L&H without KPMG's approval, and that approval would not have been forthcoming but for, *inter alia*, the Korean Banks' lies.

    33.    These reports of extraordinary Korean revenues were false. After the fact, on March 2, 2001, Philippe Bodson, L&H's third CEO since August, 2000, stated that: "Korea is a real catastrophe. The situation there is as bad as one could possibly imagine. L&H Korea never really had any sales to speak of." All revenue from Korea was ultimately reversed.

    34.    L&H statements were contained in press releases, which were also filed by L&H in Forms 6-K and other filings with the SEC. All of the L&H press releases cited in this Second Amended Complaint bore a Burlington, Massachusetts, dateline and L&H's NASDAQ ticker symbol, and were widely disseminated in the international and Korean financial press. As bankers to L&H at all material times, and as sophisticated financial institutions, the Korean

Banks knew that such reports would be issued by mail and wire in the United States, and were actually aware of the issuance of such reports.

**The Fraudulent "Factoring" Transactions & Misrepresentations by the Korean Banks**

35.    The fraudulent inflation of L&H's revenues by means of the "factoring" and "transfer" arrangements with the Korean Banks, and the Banks' misrepresentations to Seagate and the American investing public through KPMG, are the subject of the PwC Report, which is incorporated by reference (as are all other documents specifically cited in this pleading).

36.    In November 2000, L&H announced that due to accounting "errors and irregularities," it expected to restate its financial statements for 1998, 1999 and the first half of 2000.  (11/9/00 L&H SEC Form 8-K)  Shortly thereafter, KPMG announced that its unqualified audit reports on L&H's 1998 and 1999 financial statements "should no longer be relied upon." (11/15/00 L&H SEC Form 8-K)  L&H's new management commissioned the PwC Report, which — despite limitations on the availability to PwC of documents and potential interviewees (PwC Report at 2) — describes in considerable detail L&H's dealings with four Korean banks (the three defendants and non-defendant Hana Bank ("Hana")).

37.    In addition to the PwC Report, plaintiffs have been given access to other materials concerning L&H that contain information on the Korean transactions, including a November 2000 report to the L&H Audit Committee (the "Audit Committee Report") by the U.S. law firm Bryan Cave LLP, the Belgian law firm Loeff Claeys Verbeke (now Allen & Overy), and the accounting firm of Arthur Andersen LLP, and an April 2001 report by KPMG (the "KPMG Report").

38.    According to the PwC Report, L&H Korea (denominated "LHK") entered into non-standard sales contracts on which it "had no real expectation of collecting ... within a reasonable time."

16

This ... allowed LHK to meet their sales goal, but created another problem of needing to show cash collections to avoid reversal of the sale and <u>convince the auditors that the sales were legitimate.</u>

<u>LHK then entered into "factoring arrangements" with four local banks [the defendants and Hana] as a solution to their collections and revenue recognition issues.</u> LHK created documents, which were accepted by the banks, to give the appearance that the factoring was "without recourse", which allowed LHK to recognize the full value of the licensing agreements.  <u>In reality, there were "factoring side agreements"</u> which stated LHK was liable for payment and required the use of "restricted" time deposits.  Upon factoring an agreement, the bank deposited the factoring proceeds in a "restricted time deposit" that LHK agreed not to withdraw.  LHK recorded the time deposit (i.e., increased cash) in its accounting records and eliminated the A/R [accounts receivable].  <u>This gave the appearance to the outside world that LHK had a tremendous increase in sales, a large amount of cash, and had collected A/R, but in reality there were little or no payments generated by LHK's customers and the cash from factoring was held by the banks.</u>

(PwC Report at 4; emphasis added)  A source close to L&H described the Korean Banks' control over the supposed proceeds of the sham factoring as follows:  "'L&H Korea agreed to <u>freeze the money the banks gave it in a special bank account and to return the money the minute the banks asked for it back.</u>'"  (*The Wall Street Journal,* April 6, 2001; emphasis added)

39.    The following "Factored Transaction Chart" compiles data currently available to plaintiffs concerning the Banks' factoring fraud from September 1999 through June 2000. Because the PwC Report is based on limited data, there are likely numerous additional entries (*i.e.*, fraudulent transactions) that could be made following discovery.  Plaintiffs believe that, in light of the close banking relationship between L&H Korea and the Banks, discovery is likely to reveal that such fraudulent transactions took place and were contained within L&H financial data publicly reported prior to June 7, 2000.  Knowledge of such additional fraudulent transactions is peculiarly within the knowledge of defendants.  The data below derives primarily from the PwC Report, the Audit Committee Report (which was also limited in scope) and the KPMG Report, and reveals certain transactions commencing in September 1999 that were the subject of false confirmations by the Korean Banks to KPMG.  Those misrepresentations to KPMG were

17

communicated by KPMG orally to Seagate prior to execution of the Merger Agreement, and in

L&H public statements, reviewed by KPMG, both prior to execution of the Merger Agreement,

and during the period between execution of the Merger Agreement and consummation of the

Merger, as set forth below.

## FACTORED TRANSACTION CHART

| | Customer Name | Bank | Date Factored | Sale Date | Sales Amount USD | Cancel. Date |
|---|---|---|---|---|---|---|
| 1 | Frontier Group | Hanvit | 6/30/00 | 06/22/00 | 8,000,000 | 11/14/00 |
| 2 | EOP/EOP Co. Ltd. | Hanvit | 3/31/00 | 03/30/00 | 6,800,000 | 11/14/00 |
| 3 | Digital Wave, Inc. | Chohung | 3/31/00 | 03/30/00 | 1,000,000 | 11/14/00 |
| 4 | Interlution Co. Ltd. | Hanvit | 6/30/00 | 06/26/00 | 6,000,000 | 11/14/00 |
| 5 | Dreamsaver | Hanvit | 6/30/00 | 06/30/00 | 3,000,000 | 11/14/00 |
| 6 | Voice Tech | | 3/31/00 | 03/23/00 | 7,300,000 | 11/15/00 |
| 7 | NEO | | 2Q00 | 06/30/00 | 3,000,000 | 11/15/00 |
| 8 | MT Tech Co., Ltd | Chohung | 3/31/00 | 03/30/00 | 1,200,000 | 11/15/00 |
| 9 | F&F Securetek Co., Ltd. | Hanvit | 6/30/00 | 06/27/00 | 800,000 | 11/14/00 |
| 10 | Hi World | Chohung | 1Q00 | 03/31/00 | 4,000,000 | 11/16/00 |
| 11 | Hi World | | 1Q00 | 03/29/00 | 5,000,000 | 11/16/00 |
| 12 | ART Lab | Hanvit | 3/31/00 | 02/29/00 | 700,000 | 11/14/00 |
| 13 | ART Lab | Hanvit | 3/31/00 | 02/29/00 | 300,000 | 11/14/00 |
| 14 | ART Lab | Hana | 6/30/00 | 03/31/00 | 40,000 | 11/14/00 |
| 15 | ART Lab | Hana | 6/30/00 | 03/31/00 | 7,200,000 | 11/14/00 |
| 16 | International Business Computer Co. | Shinhan | 3Q99 or 4Q99 | 09/30/99 | 4,000,000 | 11/16/00 |
| 17 | Hi World | Shinhan | 4Q99 | 12/08/99 | 8,000,000 | 11/16/00 |
| 18 | Voice Tech | Hanvit | 4Q99 | 12/15/99 | 6,300,000 | 11/14/00 |
| | TOTAL | | | | $72,640,000 | |

40.    To the extent revealed in the PwC Report, the Korean Banks' participation in the

scheme can be summarized as follows:

(a)    Hanvit entered into phony factoring agreements dated September 30, 1999, December 27, 1999 and June 30, 2000. They were apparently without recourse but were accompanied by secret side letters providing for recourse by Hanvit to L&H Korea restricted time deposits. (PwC Report at 20, 22, 26)  Hanvit factored eight licensing agreements generating $29,705,503 in apparent revenue to L&H from accounts receivable. (Id. 18, 25) In September 2000, Hanvit's arrangements with respect to six of these licensing agreements, representing $27.5 million, were converted into a supposed personal loan from Seo, in a furtive effort to avoid

detection. (*Id.* at 20) However, although the payment "obligation" shifted from L&H Korea's purported customers to Seo, the substance of the arrangements did not change:  Hanvit continued to control the funds that were "collateral" for the "loan." (*Id.* at 20) This "restructuring" occurred at Hanvit's request, because it was "nervous" as a result of recent "negative press coverage" related to L&H and "concerned about the non-recourse provisions" in its factoring agreements. (*Id.* at 20) It occurred after — and likely as a result of — KPMG's commencement in August 2000 of a special audit of L&H Korea's financial statements for the first six months of the year.

(b)    The factoring with <u>Shinhan involved three licensing agreements generating $19,706,022 of fraudulent revenues</u> from accounts receivable. (PwC Report at 18, 25) Shinhan used a "discounted note agreement" that was ostensibly "without recourse," along with a secret side agreement making it with recourse. (*Id.* at 27) The arrangements with Shinhan, including the use of restricted time deposits, were "effectively ... the same as the other factoring arrangements." (*Id.* at 22, 27) These arrangements were the result of discussions between top executives of L&H Korea (John Seo and Henry Oh) and representatives of Shinhan, in or around September 1999. (*Id.* at 21; KPMG Report at 41-42)

(c)    <u>Chohung used a phony "secured loan agreement" that generated $8,144,446</u> from accounts receivable relating to four licensing agreements. (PwC Report at 18, 22, 25, 27) On its face, the arrangement was "without recourse," but the supposed proceeds of the receivables were held by Chohung in restricted time deposits, as "collateral" for the "loan." (*Id.* at 22, 27) Again, the effect was the same as under the arrangements with the other Korean Banks. Chohung told PwC it never signed a factoring agreement with L&H Korea (*id.* at 27), but it listed millions of dollars of supposedly without recourse "factoring transaction[s]" in a confirmation to KPMG. (Exhibit B at LHK 005113)

41.    Thus, a total of $57.5 million of apparent cash was generated by the Korean Banks, as shown in the PwC Report (at 18, 25) and reflected in the Factored Transaction Chart.

42.    The amounts of illusory license revenue factored by the Korean Banks — in just the limited number of phony transactions that have been documented to date — can be broken down by time period as follows, based on information available to date:

    (a)    <u>From September 1999 through the end of 1999, approximately $18 million</u>: $12 million by Shinhan and $6 million by Hanvit.

    (b)    <u>During the first quarter of 2000, approximately $26 million</u>: $8 million by Hanvit, $6 million by Chohung, and between $4.7 million and $7.7 million or more by Shinhan.

    (c)    <u>During the second quarter of 2000, approximately $21 million</u>: $18 million by Hanvit and $3 million by either Shinhan or Chohung.

43.    The phony factoring scheme contributed to Seo receiving a $25 million bonus in January of 2000 — which was used to pay the Korean Banks (thus highlighting one aspect of the Banks' motive to defraud). The Seo bonus was to be paid based on the performance of L&H Korea through 2001. (Audit Committee Report, Korea Supporting Documentation at LHS00392) However, as a result of the factoring fraud, the performance of the Korean operations as of the end of 1999 <u>appeared</u> to be so excellent that payment of the bonus was accelerated. (*Id.*) In a February 3, 2000 "thank you" email to L&H's three top executives, Seo suggested that the $25 million would allow him to reward the Banks for their "help" to L&H:

> Thanks for your great assistance extended to me. I well received the remitted amount of 25 million USD. <u>With your prompt action, I could keep my promise to Korean banks and those banks will rely on L&H Korea and will help us much better than before.</u>

(Audit Committee Report, Korea Supporting Documentation at LHS 00397; emphasis added) The Korean Banks' active participation in the frauds — their sham factoring and transfer arrangements, their falsified audit confirmations and their lies to KPMG — was essential to the success of the scheme.

## The Secret Side Agreements and Account Restrictions by the Korean Banks

44.    When questioned by PwC in or about February 2001, the loan officer at Hanvit who was responsible for L&H Korea (Seok-joon Park) lied to PwC about the factoring agreements. He stated that all of them were without recourse, that L&H Korea provided no collateral for them, and that none of L&H Korea's time deposits at Hanvit were restricted. (PwC

Report at 26) All these statements were false, as demonstrated by, among other things, the example of an L&H Korea "side agreement" with Hanvit that is included in the PwC Report. This continued lying further evidences Hanvit's participation in the conspiracy to defraud, its scienter, and the duration of the pattern of deceit and racketeering. As translated in the PwC Report from Korean, the secret side agreement in fact read as follows:

> I (we) promise to adhere following clauses in obtaining accounts receivable loan pursuant to factoring agreement with [Hanvit], and submit this confirmation letter.
>
> 1. I (we) promise to take recourse responsibility under this confirmation, although the bank waived recourse right even in cases that transferred accounts receivable is defaulted or possible to be defaulted when the bank purchased accounts receivable without recourse and I (we) obtained a account receivable loan.
>
> 2. Upon account receivable loan is allowed, I shall deposit the loan proceeds, sign a separate pledge agreement and adhere this agreement.
>
> 3. Pursuant to the above clause, I (we) will not raise any objection when the deposit is used to offset against account receivable loan when this loan is overdue.
>
> To [Hanvit]

(*Id.* at 84, emphasis added) The Hanvit loan officer also lied to PwC in stating that Hanvit was paid in full by L&H Korea's customers. In fact, L&H Korea time deposits reverted to Hanvit when the underlying license agreements were cancelled in November 2000. (*Id.* at 4, 26)

45.    The Shinhan side agreement included in the PwC Report is substantially similar, directly negating the statement in the "discounted note agreement" between Shinhan and L&H Korea that the agreement was "without recourse." (PwC Report at 84) As translated in the PwC Report from Korean, the side agreement reads as follows:

> I (we) promise to adhere following clauses in factoring note receivable without recourse pursuant to factoring agreement dated December 31, 1999 with [Shinhan] (the "Bank"), and submit this confirmation letter.
>
> 1. Although the signed factoring agreements have been without recourse, I (we) promise to take recourse responsibility under this confirmation in the event that the transferred note receivable is defaulted.

2.  Upon proceeds from factored note receivable is received, I (we) shall <u>deposit the amount as agreed by the Bank and us, sign a separate pledge agreement</u> and adhere to that agreement.

3.  Pursuant to the above clause, I (we) will not raise any objection when the deposit is used to offset against factored note receivable, when this notes receivable is defaulted.

(*Id.* at 23; emphasis added)

46.     These side agreements did not benefit L&H in any way, but rather, were solely for the benefit of the Banks — who lied about their existence to KPMG — to protect the Banks from any exposure to the risk that the supposedly factored receivables would not be collectible. All three Banks created restricted time deposits to hold funds that supposedly belonged to L&H Korea under the Banks' control. (PwC Report at 22) These also were solely for the benefit of the Banks, and did not benefit L&H Korea in any way, and were also the subject of the Banks' deception of KPMG. Representatives of Shinhan and Chohung also misrepresented the "recourse" nature of these transactions in the course of the PwC investigation. (*Id.* at 27) This continued lying further evidences Shinhan's and Chohung's participation in the conspiracy to defraud, their scienter, and the duration of the pattern of deceit and racketeering

**<u>The False Confirmations by the Korean Banks</u>**

47.     Despite the constraints on the "proceeds" of the "factoring" transactions imposed by the side agreements, by the pledging of the funds as collateral to the Banks, and by the placement of the funds in restricted time deposits, the Banks signed confirmations to KPMG falsely representing that the funds were the unrestricted property of L&H Korea. (PwC Report at 22) <u>These false confirmations were signed by the Banks' loan officers.</u> (*Id.* at 22)

48.     According to the PwC Report (at 22), while the false audit confirmations were prepared by L&H Korea, <u>they were signed by the Banks who physically provided them to</u> KPMG:

> [L&H Korea's former General Manager of Finance and Accounting] and a
> [KPMG] representative then went to the banks to obtain the loan officers'
> signatures.... The banks signed these confirmations.

(Emphasis added.) By their conduct, and orally, the Banks confirmed the *bona fides* of these

fraudulent documents in giving them to KPMG.

49.     As an example of the confirmations signed by the Banks, the PwC Report

includes a KPMG audit form, translated from Korean, containing information on L&H Korea's

accounts at Hanvit. (PwC Report at 88, 90, 92, 94) A retyped, generic version of this document

(the "Bank Confirmation") is attached to this Amended Complaint as Exhibit A. The Banks

knew that the confirmations were intended for the specific purpose of providing information to

be used by KPMG in auditing L&H's financial statements and disclosures, and thus for the

purpose of public disclosure to investors in the United States and abroad.

50.     By the plain terms of the Bank Confirmations, the Banks were expressly

responsible for verifying, correcting and supplementing the information set forth in the responses

on this form:

- The first instruction on each page states that information supplied by the customer/requester is to be "verified" by the Bank.

- If any information differs from the Bank's records, or contains any errors, the Bank is to correct it.

- If there is missing information, the Bank is to add it.

- The penultimate instruction on the fourth page states that the Bank representative who finalizes the confirmation should put his stamp or "chop" on each page.

Consequently, the Banks — and the individual Bank representatives who signed the

confirmations — knew that they bore ultimate responsibility for the contents of the confirmation.

51.     Most importantly, the first page of the Bank Confirmation includes a column (7)

headed: "Restrictions and other" that requires information as to any restrictions on any account.

The instructions provide that "The column (7) should be filled out if the accounts have been

23

provided as collateral for loans. The related information should be provided in this column."
(Emphasis added.) The Bank must also identify the collateral for any loan to L&H Korea (page
2, column 16), and provide the details of any and all collateral obtained from L&H Korea,
including its "purpose" (page 2, section 4, columns 17-22).

    52.    Thus, when these columns were left blank — as they were in the Hanvit example
included in the PwC Report — and the confirmation was signed, the chops were applied, and the
completed document was returned to KPMG, that constituted an affirmative representation by
the signing Bank that there were no restrictions on the accounts, and that no L&H Korea
accounts or other assets were being held as collateral by the Banks. These were affirmative
misrepresentations to KPMG to support a clean audit opinion on financial statements that
included the funds in these accounts as revenues and assets, which would have been precluded if
the Banks had told the truth in the confirmations.

    53.    In explaining how the fraudulent factoring scheme (among other things) led to
KPMG signing off on L&H's inflated 1999 financial statements, the KPMG Report (translated
from the Dutch) states that "former confirmations by the Company (at least from L&H Korea),
and by customers and banks are deceptive." (KPMG Report at 45) Regardless of KPMG's
recklessness or intentional blindness in failing to ascertain that the confirmations from the Banks
were false, KPMG in fact relied on the Banks' false confirmations. The Banks' confirmations
were affirmative misrepresentations by the Banks that were communicated to KPMG. KPMG in
fact relied on the Banks' false confirmations in approving L&H's earnings releases of February 9
and May 9, 2000 (and accompanying Form 6-K filings with the SEC) and as part of KPMG's
audit of L&H 1999 financial statements, which was complete when KPMG issued an unqualified
report on those statements on April 27, 2000, nearly six weeks before the Merger was
consummated. KPMG also in fact relied on the Korean Banks' false confirmations in orally
confirming to plaintiffs, in a telephonic due diligence discussion on March 22, 2000, the material
accuracy of L&H's 1999 financial results as reflected in the February 9, 2000 earnings release.

24

**Korean Bank Misrepresentations Communicated to Seagate**

54.    The extraordinary, inflated Korean revenues represented by the fraudulently factored transactions would not have been communicated to Seagate and the investing public without the imprimatur of L&H's auditor, and that imprimatur would not have issued but for, *inter alia*, the Korean Banks' fraud.

55.    **February 9 & May 9, 2000, Earnings Releases.** Robert McLamb, a senior U.S. partner of KPMG who was intimately involved in the L&H engagement from at least 1996, was specifically charged with responsibility for ensuring that L&H's financial statements complied with U.S. GAAP. Another senior member of the KPMG team responsible for the L&H engagement was William Van Aerde of KPMG's Belgium office. These and other KPMG representatives were present at L&H at the end of each quarter during 1998 and 1999 for the purpose of "signing off" on L&H's quarterly and annual financial results before they were announced to the investing public.

56.    In an April 25, 2001 letter to the L&H Board of directors, Jo Lernout described KPMG's extensive involvement in L&H's operations and accounting:

> ...KPMG was closely involved in the processing of the figures in the interim accounts at the end of each quarter; as a consultant, it provided advice and assistance to the financial and accounts department of Lernout & Hauspie Speech Products. KPMG consultants came to the company each quarter to help the accounts department of Lernout & Hauspie Speech Products N.V. to prepare the interim accounts.***
>
> And that applies even more to Korea, where KPMG was also the auditor for L&H Korea. As far as Korea was concerned, the trust placed in KPMG was possibly even greater....

57.    By letter to the L&H Board dated the same day, Pol Hauspie emphasized that L&H "has consulted extensively with KPMG on all practical and fundamental aspects, certainly when those had or could have had some incidence on the results ... and this in order to be able to adequately report. *** [A] large team of KPMG-staff members in Seoul was supposed to do all necessary profound audits and report on every anomaly that was discovered."

58.    McLamb revised L&H press releases disseminating unaudited quarterly results, changing or deleting entries. The February 9, 2000 press release announcing L&H's financial results for the fourth quarter and year ended December 31, 1999 was sent both to Van Aerde and McLamb for review and comment before it was issued. Email among KPMG and L&H personnel, as well as Lernout's letter to the Board, make it clear that the press release could not be issued without KPMG's express consent. For example, a January 31, 2000 email from Van Aerde to Carl Dammekens (L&H's CFO), Bastiaens and McLamb set forth "a list of urgent items to be followed up by the company in order for us to be able to give our consent for the [February 9] press release."

59.    Internal KPMG email reveals that KPMG specifically examined the Voice Tech transaction factored by Hanvit in the fourth quarter of 1999, and also the Hi World and International Business Computer transactions factored by Shinhan in the fourth quarter of 1999. In October, 1999, Oh Bum Kwon, a senior KPMG Korea auditor, exchanged emails with McLamb, Van Aerde and others regarding a "critical revenue recognition issue" with respect to transactions with International Business Computer and another customer, VoiceTek, which appears to have been resolved by representations regarding factoring. In a December 21, 1999 email, Van Aerde informs McLamb that "7 million USD relating to Voice Tek have been paid (factored). The remaining 4 million USD with respect to IBC are expected to be paid by January 4, 2000." A January 25, 2000 email to Van Aerde and McLamb from a KPMG Belgium manager , reflects KPMG attention to the factoring agreements for transactions with HI World and NEO, and two other customers -- Digital Sei-Young and EPC: "We do miss the factoring agreement (asked of KPMG Korea for a translation but still to be obtained)."

60.    Prior to signing the Merger Agreement, Seagate specifically relied on the unaudited financial information contained in the February 9, 2000, press release that had been released only with the approval of KPMG. Prior to closing the Merger, Seagate also specifically relied on the unaudited financial information contained in L&H's May 9, 2000, press release.

61.    **March 22, 2000, Due Diligence Discussion with KPMG.**  Moreover, in a conference call on March 22, 2000, prior to signing the Merger Agreement, and as part of the due diligence preceding the Merger, Seagate representatives specifically inquired of KPMG about the financial information contained in the February 9, 2000 L&H press release, and in particular about the Korean revenues represented in it.

62.    On March 22, 2000, one week prior to the date the Merger Agreement was signed, Ellen Chamberlain, a Seagate employee acting as interim Chief Financial Officer of Dragon, participated in a conference call with a senior American and Belgian KPMG auditors who are believed by plaintiffs to be McLamb and Stephan Huysmans, a KPMG Belgium manager. The KPMG personnel who participated in the call knew that the purpose of the call was to provide information to Seagate representatives as an important part of Seagate's due diligence with respect to the Merger.

63.    During the March 22, 2000 conference call, the American KPMG partner told Ms. Chamberlain, among other things:

(a)    KPMG expected to sign off on its audit of L&H's 1999 financial statements in two to three weeks.

(b)    KPMG did not at that time anticipate any material adjustment of L&H's 1999 financial results.

(c)    The only open audit issues were:  (i) "a couple of revenue issues" in Korea regarding one or two customers, but nothing that would cause an adjustment; (ii) a "couple" of contract confirmations had not yet been received; and (iii)  KPMG had yet to complete minor tests of L&H's capitalization of its R&D expense, such as checking timesheets of engineers who had billed time to certain projects.

(d)    In the course of the 1999 audit, no adjustments had been booked by the auditors.

64.    In reviewing the financial information contained in the February 9, 2000, press release, and in questioning KPMG about it prior to signing the Merger Agreement, Seagate

expressly sought and received assurances from KPMG that L&H's Korean revenues were genuine. In providing those assurances, KPMG was, *inter alia*, communicating the disinformation it had received from the Korean Banks.

## The "Transfers" and Other Continuing Fraudulent Activity by the Korean Banks

65. On August 8, 2000, *The Wall Street Journal* published an article, based on its own inquiries to supposed L&H Korea customers, raising serious questions about the extent of L&H's actual revenues from Korean operations. The article reported, among other things, that "some companies L&H has identified as Korean customers say they do no business at all with L&H. Others say their purchases have been smaller than L&H says."

66. On or about August 13, 2000, in response to these and other press reports, L&H commissioned a special mid-year audit by KPMG to examine issues with respect to Korea.

67. The fraudulent factoring by the Korean Banks had continued through June of 2000, with approximately $21 million of receivables factored during the second quarter of 2000. However, there was still a need to demonstrate actual collections of receivables from customers. During September 2000, in connection with the mid-year audit, KPMG questioned the collectibility of the Korean accounts receivable, and indicated to L&H Korea that "collections between 10% and 20 % of the accounts receivable balance would be sufficient to avoid having to record a full reserve of the A/R balance." (PwC Report at 28) This led to the September 2000 "transfer" fraud described above. (*Id.* at 4, 28, 31-2)

68. Like the supposed factoring transactions, the supposed loans to the transferees of L&H's customers were secured by funds held in restricted L&H Korea accounts at the Korean Banks. Further evidencing their fraudulent intent, the Banks misrepresented the restricted nature of these funds in their October audit confirmations to KPMG, copies of which are attached as Exhibit B. The October audit confirmations were intended by the Banks to cover and misrepresent their role in the fraudulent factoring and transfer arrangements. These demonstrate

28

the Banks' continuing scienter, participation in the fraudulent conspiracy, and duration of the pattern of deception and racketeering activity.

69.   On September 20, 2000, the L&H Board of Directors had authorized its Audit Committee to conduct inquiries into certain accounting and other practices that were the subject of a recently initiated formal investigation by the SEC. (Audit Committee Report at 1) The Audit Committee issued its report on November 20, 2000, stating that it was "unable to reach any conclusions with respect to the issues in Korea" because of lack of access to information. (*Id.* at 12-13) As a matter of "greatest concern," the Audit Committee noted L&H's "inability to withdraw what we are told is over $100 million from L&H Korean [*sic*] bank accounts." (*Id.* at 13) However, by this time, as set forth in the PwC Report, numerous license agreements had been cancelled by L&H Korea on November 14 and 16, 2000, so that millions of dollars in restricted funds had reverted to the Korean Banks. (PwC Report at 4, 6)

70.   The fraudulent acts of the Korean Banks continued into February of 2001, with false statements made by the Banks' representatives to PwC in connection with the PwC investigation, as set forth above and in the PwC Report. This is a tacit concession of culpability and further evidence of intent to deceive.

## SEAGATE'S RELIANCE ON THE KOREAN BANKS' MISREPRESENTATIONS

71.   The Korean Banks' misrepresentations concerning L&H's revenues and assets between September 1999 and June 2000 were relied on by Seagate in entering into and consummating the Dragon Merger. Although the Banks did not communicate this material misinformation directly to Seagate, they nonetheless ensured that it would reach Seagate and other American investors in L&H stock through KPMG, as well as through L&H. KPMG served as a conduit for the Korean Banks, through oral and written communications between KPMG and Seagate in due diligence preceding the Dragon Merger (including the telephonic meeting between KPMG and Seagate representatives on March 22, 2000), and through the false confirmations reflected and incorporated in KPMG's approval of the February 9, 2000 and

May 9, 2000 L&H earnings releases (and accompanying SEC filings), and through KPMG's certification of L&H's audited 1999 financial statements. L&H communicated the Korean Banks' misrepresentations to Seagate orally and in writing, through, among other things, L&H's press releases and SEC filings announcing its earnings for the fourth quarter of 1999 and the first quarter of 2000, and fraudulent representations in the Merger Agreement described below. L&H would not have done so without KPMG's approval, and KPMG's approval would not have been forthcoming but for, *inter alia*, the Korean Banks' deception of KPMG.

72.    On March 27, 2000, L&H, L&H USA, Dragon, Seagate and other principal stockholders of Dragon entered into the Merger Agreement under which L&H would (as it later did) acquire Dragon for L&H shares in the stock-for-stock Dragon Merger. The Merger Agreement contains, among other things, the following false representations by L&H, on which Seagate relied:

(a)    Since January 1, 1998, L&H has made all SEC filings required under the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.*, and the Exchange Act. None of these filings, including those made after the date of the Merger Agreement, contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. (Merger Agreement § 4.4a)

(b)    L&H's financial statements, as they appear in its SEC filings, including those made after the date of the Merger Agreement, comply in all materials respects with the accounting requirements and rules and regulations of the SEC; are prepared in accordance with U.S. Generally Accepted Accounting Principles ("GAAP") (except, in the case of unaudited statements, as permitted by SEC Form 6-K) applied on a consistent basis; fairly present in all material respects L&H's consolidated financial position and consolidated results of operations and cash flows; and are consistent in all material respects with L&H's books and records. (Merger Agreement § 4.4b)

(c)    L&H's unaudited financial statements for the year ended December 31, 1999 (the "1999 Unaudited Financials"), which had been previously provided to Seagate, were in accordance with GAAP; fairly presented L&H's financial condition and results of operations and cash flows in all

material respects; and were consistent in all material respects with L&H's books and records. (Merger Agreement § 4.4c)

(d)     Except as disclosed in L&H's SEC filings (including those made after the date of the Merger Agreement), the 1999 Unaudited Financials, or L&H's press releases, L&H has no material undisclosed liabilities that are required to be disclosed therein. (Merger Agreement § 4.5)

(e)     Except as disclosed in the SEC filings (including those made after the date of the Merger Agreement) or in L&H's press releases, there has not been, since September 30, 1999, any material adverse change in L&H's financial condition or any material change in L&H's accounting methods. (Merger Agreement § 4.6)

(f)     None of the information to be provided by L&H for inclusion or incorporation by reference in any private placement memorandum, proxy materials or registration statement in connection with the Merger will contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. (Merger Agreement § 4.7)

The Korean Banks' fraud directly inflated the financial data thus falsely represented by L&H to be true. The false data would not have appeared, as it did, in L&H's earnings releases, SEC filings and or financial statements without KPMG's approval, and KPMG's approval would not have been forthcoming but for, *inter alia*, the Korean Banks' deception of KPMG.

73.     Section 7.3(a) of the Merger Agreement provides that "representations and warranties of [L&H] shall be true and correct in all material respects as of the closing date." Seagate specifically relied on L&H's false earnings release of May 9, 2000 and accompanying SEC filing in closing the Merger in June 2000.

74.     Beginning in 1999 and continuing into June 2000, when the Dragon Merger was consummated, Seagate conducted due diligence concerning the financial condition and prospects of L&H. This due diligence included, among other things, engaging Arthur Andersen LLP and Goldman Sachs & Co. to review and analyze L&H's financial information, press releases and public filings; review and analysis by Seagate representatives of L&H's financial information,

31

press releases and public filings; and oral and written communications from, and meetings with, representatives of L&H, its investment banker (S.G. Cowen), and KPMG.

75.    On April 27, 2000, KPMG issued its unqualified report on L&H's audited 1999 financial statements, confirming its March 22, 2000 oral representations that there were no material errors or improprieties in the 1999 Unaudited Financials.

76.    On or about May 25, 2000, Seagate signed an amendment to the Merger Agreement (the "May Amendment") which provided, among other things, that (1) the exchange ratio governing how much L&H stock Seagate and other Dragon shareholders would get for each of share of Dragon stock would be adjusted to take account of L&H's two-for-one stock split (announced in L&H's February 2000 press release and 6-K concerning its fourth quarter 1999 results); (2) if the L&H shares to be issued to Seagate and others in the Dragon Merger (the "Merger Shares") were exempt from registration under the Securities Act, L&H would, within 15 business days after the closing of the Merger, file a registration statement on SEC Form S-3 (or similar form) for a continuous public offering of the Merger Shares; and (3) Seagate agreed to convert a $5 million note from Dragon into Dragon common shares (which would then be exchanged for L&H shares in the Merger). The May Amendment was signed after, and in reliance on, the May 9, 2000 press release and related Form 6-K announcing L&H's first quarter 2000 financial results.

77.    Seagate would not have agreed to the May Amendment or agreed to close the Merger if it had known that L&H's February 9, 2000 earnings release (and accompanying SEC filing), May 9, 2000 earnings release (and accompanying SEC filing), and KPMG's April 27, 2000 unqualified audit report on L&H's 1999 financials reflected and incorporated material misrepresentations by the Banks to KPMG.

78.    On June 7, 2000, simultaneously with the closing of the Merger, the parties to the Merger Agreement entered into a registration rights agreement (the "Registration Rights Agreement") to enable Seagate and the other former Dragon shareholders to sell their Merger

Shares pursuant to a Form S-3 to be filed by L&H, as contemplated by the May Amendment (the "Form S-3"). The Form S-3, which was publicly filed by L&H with the SEC on June 30, 2000, includes KPMG's consent to the incorporation by reference of KPMG's April 27, 2000 unqualified opinion on L&H's audited 1999 financial statements. The Form S-3 expressly incorporates L&H's audited 1999 financial statements "in reliance on" KPMG's audit report, "and upon the authority of said firm as experts in accounting and auditing." (Form S-3 at 25)

79.    Seagate would not have entered into the Registration Rights Agreement or closed the Dragon Merger on June 7, 2000 if it had known that L&H's February 9, 2000 earnings release (and accompanying SEC filing), May 9, 2000 earnings release (and accompanying SEC filing), and KPMG's April 27, 2000 unqualified audit report on L&H's 1999 financials reflected and incorporated material misrepresentations by the Banks to KPMG. Nor would Seagate have done so without the KPMG audit report that was incorporated in the S-3 and the 1999 10-K, since the Merger Shares could not be registered without it. It was essential to Seagate and the other principal shareholders of Dragon that KPMG's clean opinion continue in effect, because (i) they would never have agreed to exchange their shares in Dragon, a vibrant American company, for shares in L&H, a Belgian company, absent the oral and written assurances of KPMG, and (ii) they had agreed to substantial waiting periods before the sale of their Merger Shares. (Form S-3 at 5)

## Reliance on the Integrity of the Fraudulently Inflated Market for L&H Stock

80.    Seagate relied on the integrity of the market for L&H common stock — a market that was artificially inflated by the Korean Banks' fraud. Among the most important factors Seagate considered in setting the price for its Dragon holdings, which L&H paid for in L&H stock, was the market price of L&H common stock.

81.    At all relevant times, the market for L&H stock was efficient because L&H common stock met the requirements for listing, and was listed and actively traded on NASDAQ and EASDAQ, which were automated and highly efficient markets. As a regulated issuer, L&H

filed periodic public reports with the SEC. L&H also regularly communicated with public investors in the United States via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar media. The market for L&H stock promptly digested current information regarding L&H from the publicly available sources described above and reflected such information in the price of L&H stock.

82.     Consequently, at all relevant times, the price of L&H stock was fraudulently inflated by the Korean Banks' misrepresentations, to plaintiffs' severe prejudice.

83.     On June 7, 2000, when the transactions contemplated by the Merger Agreement were consummated, Seagate acquired 3,871,489 shares of L&H common stock. On that date, L&H stock was valued in the market at $43.125 per share. Thus, Seagate purchased L&H shares for an interest in Dragon valued at approximately $166,957,963. However, as a consequence of the fraud perpetrated by the Korean Banks, revealed after the closing of the Dragon Merger, Seagate's holdings of L&H shares were and are virtually worthless.

**The Korean Banks Directly and Foreseeably Harmed Seagate**

84.     The Korean Banks affirmatively misrepresented material financial facts concerning L&H to KPMG and, through KPMG, to Seagate and the American investing public, by means of interstate mail and wire disclosures predictably and actually disseminated and filed with the SEC. The Korean Banks also conspired with and substantially assisted and enabled L&H to misrepresent its revenues, income, assets and overall business success, by means of interstate mail and wire, to Seagate and the American investing public, both directly and through L&H's agents, including KPMG. Seagate was a direct and foreseeable recipient of these fraudulent communications and relied on them in multiple ways. Among other things, Seagate relied on the integrity of L&H's inflated financial statements; Seagate relied on the integrity of

34

the inflated market price of L&H common stock; and Seagate relied on the written and oral misrepresentations of L&H and its representatives, including KPMG. As bankers to L&H, the Korean Banks regularly received L&H's financial statements and press reports, so they knew that the fraud they were perpetrating with L&H was working, and that L&H's financial statements were materially distorted as a direct result of their misrepresentations. As bankers to L&H, the Korean Banks were aware of the Dragon Merger from no later than on or about the date that the Merger was publicly announced in March 2000 through and including the closing of the Merger in June 2000. As a result, the Banks knew or recklessly disregarded that Seagate was actually relying on L&H's fraudulent financial statements and fraudulently inflated stock price.

### FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS FOR VIOLATION OF § 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5

85.    Plaintiffs repeat and reallege ¶¶1 through 84 as though fully set forth herein.

86.    In violation of § 10(b) of the Exchange Act and SEC Rule 10b-5, the defendants, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course and scheme of fraudulent conduct to fraudulently overstate the revenues, income and assets of L&H and thereby to artificially inflate the price of L&H common stock and to conceal L&H's true financial condition. Defendants made affirmative misrepresentations and employed devices, schemes and artifices to defraud while in possession of material, adverse, non-public information; they engaged in acts, practices, and a course of conduct that included the manipulation of the price of L&H stock; and they made, and participated in the making of, untrue and misleading statements of material fact and omitted to state material facts necessary in order to make the statements not misleading. Among other things, the defendants intentionally fostered mistaken beliefs — concerning scores of millions of dollars of phony L&H revenue and earnings — that were incorporated into L&H's earnings releases and SEC filings.

35

    (d)    Hanvit Bank's restructuring of $27.5 million in factoring agreements as a personal loan to John Seo when the fraud at L&H began to appear in the press because Hanvit was afraid that the secret "recourse" terms of its factoring agreements would not withstand public scrutiny.

    (e)    PwC's conclusion that the factoring scheme, the transfer scheme and the deception of auditors were deliberate.

    (f)    KPMG's assertion that confirmations received from the Banks during audits of L&H financial statements were "deceptive" and "falsified."

    (g)    As bankers to L&H, and as sophisticated financial institutions, the defendants regularly received L&H's financial statements and actually knew that the fraud they were perpetrating with L&H was working and that L&H's financial statements were materially and fraudulently inflated as a direct result.

    (h)    As bankers to L&H, the Korean Banks were actually aware of the Dragon Merger from no later than on or about the date that the Merger was publicly announced in March 2000 through and including the closing of the Merger in June 2000. As a result, as sophisticated financial institutions, the Banks knew or recklessly disregarded that Seagate was actually relying on L&H's fraudulent financial statements and fraudulently inflated stock price.

    (i)    Financial incentives to commit fraud, including the continuation of profitable banking relationships between the Korean Banks and L&H, and the $25 million performance bonus illegitimately claimed and received by the head of L&H Korea, Mr. Seo, so that Mr. Seo could "keep my promise to Korean banks" — *i.e.*, to repay them.

90.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs suffered substantial damage in connection with the sale of their Dragon holdings for L&H stock.

91.    By reason of the foregoing, defendants are jointly and severally liable to plaintiffs for the aforesaid damages, in an amount to be proven at trial but no less than $150,806,377.62.

## SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
## FOR VIOLATION OF SECTION 1962(c) OF RICO

92.    Plaintiffs repeat and reallege ¶¶1-91 as though fully set forth herein.

37

93.    **Person.**  At all times relevant hereto, each of the plaintiffs and each of the defendants was an individual or entity capable of holding a legal or beneficial interest in property and therefore constituted a "person" within the meaning of 18 U.S.C. § 1961(3).

94.    **Enterprise.**  At all times relevant hereto, each of the Korean Banks pursued its fraudulent schemes through, and was party to, an association-in-fact "enterprise" with L&H Korea within the meaning of RICO, 18 U.S.C. § 1961, *et seq.*:

- **Hanvit/L&H Korea Enterprise.**  The contractual banking relationship between L&H Korea and Hanvit, including the factoring, "transfer" and secret side agreements, lawful and unlawful, detailed herein, formed an association-in-fact between Hanvit and L&H Korea;

- **Shinhan/L&H Korea Enterprise.**  The contractual banking relationship between L&H Korea and Shinhan, including the factoring, "transfer" and secret side agreements, lawful and unlawful, detailed herein, formed an association-in-fact between Shinhan and L&H Korea; and

- **Chohung/L&H Korea Enterprise.**  The contractual banking relationship between L&H Korea and Chohung, including the "transfer," "secured loan" and other secret agreements, lawful and unlawful, detailed herein, formed an association-in-fact between Chohung and L&H Korea.

Each of these enterprises has "structural continuity" — *i.e.*, the associations between L&H Korea and the Banks would exist even if the racketeering activity were discontinued or removed from consideration. Each defendant had a lawful, contractual banking relationship with L&H Korea, which was distinct from the unlawful factoring and transfer agreements into which they entered.

95.    **Operation or Management.**  As set forth above, in violation of 18 U.S.C. § 1962(c), each of the defendants conducted or participated, either directly or indirectly, in the conduct of its respective association-in-fact enterprise's affairs through the pattern of racketeering activity described above.  Specifically, each of Hanvit, Shinhan and Chohung participated in its respective association-in-fact enterprise's affairs by, *inter alia,* (i) structuring and entering into secret, illegal transactions; (ii) furnishing and retaining control over the funds that were at the heart of the enterprise's illicit activity; (iii) acting as principals in the fraudulent

38

factoring transactions, factoring receivables, issuing false confirmations and affirmatively misrepresenting the transactions to plaintiffs and the U.S. investing public through KPMG; and (iv) acting as principals in the fraudulent transfer transactions, issuing false confirmations and affirmatively misrepresenting the transactions to plaintiffs and the U.S. investing public through KPMG — all of which caused the fraudulent inflation of L&H's revenue and consequent collapse of L&H.

96.    **Effect on Commerce.** The activities of each of these association-in-fact enterprises affected interstate and foreign commerce by, among other things, directly and immediately affecting the contents of L&H's financial statements, including the revenues, income and assets reflected therein, and the price of L&H stock traded on NASDAQ and EASDAQ. Among other effects on interstate and foreign commerce, the fraudulent acts alleged herein artificially inflated the price of L&H stock, resulting in the subsequent loss of essentially all of L&H's $10 billion market capitalization.

97.    **Securities Carve-Out (§ 1964(c)).** If the Court finds that the defendants' fraudulent conduct is actionable as securities fraud, as alleged in Count I, no RICO liability will lie under 18 U.S.C. § 1964(c). Alternatively, however, if the Court finds that the defendants' conduct is not actionable as securities fraud as alleged in Count I, then the following predicate acts do not fall within the proscription of "conduct that would have been actionable as fraud in the purchase or sale of securities" in 18 U.S.C. § 1964(c).

98.    **Pattern.** Each of the defendants committed multiple acts, between at least September 1999 and November 2000, chargeable as "racketeering activity" as defined in 18 U.S.C. § 1961(1) (hence, closed-ended continuity). In light of the fact that each of the Korean Banks engaged in a similar pattern of racketeering activity, as did non-defendant Hana Bank, it is a reasonable inference that such fraudulent acts represent a regular course of business for the defendants and for major Korean banks (hence, open-ended continuity). Defendants' predicate acts of racketeering activity constituted a pattern of racketeering activity, as defined in § 1961(5)

of RICO. Each act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including plaintiffs. The duration of the pattern extended from at least September 1999 to at least November 2000. The defendants were also engaging in and facilitating the thoroughly corrupt usual course of business of L&H in Korea.

99. **Racketeering Activity.** Each of the defendants committed multiple acts, between September 1999 and November 2000, chargeable as (i) mail fraud under 18 U.S.C. § 1341, (ii) wire fraud under 18 U.S.C. § 1343, and (iii) if the Court does not find primary securities liability, aiding-and-abetting securities fraud, each of which constitute "racketeering activity" as defined in 18 U.S.C. § 1961(1). Those acts included entering into, concealing and affirmatively misrepresenting the factoring side agreements and equivalent arrangements, and entering into, concealing and affirmatively misrepresenting the "transfer" arrangements, with the knowledge and intent that such concealment would cause L&H's revenues, income and assets to be materially overstated, and that such material misrepresentation of L&H's financial statements would be communicated to the SEC and to L&H shareholders and public investors in the United States, including Seagate, by means of mail and wire. The precise dates on which defendants communicated each of their affirmative misrepresentations to KPMG as a means of disseminating the false information detailed herein are not stated in the PwC Report and are peculiarly within the knowledge of defendants. The dates on which such false information was communicated, by means of interstate mail and wire, to plaintiffs, include, among others: (a) December 28, 1999, the date of an L&H press release, disseminated worldwide, falsely detailing L&H business in Korea; (b) the January 31, 2000 press release, disseminated worldwide, falsely detailing L&H business in Korea; (c) the February 9, 2000 press release (and accompanying Form 6-K filing with the SEC), disseminated worldwide, falsely detailing L&H's fourth quarter 1999 financial results; (d) the March 22, 2000 conference call in which KPMG representatives communicated defendants' misrepresentations about L&H's financial statements

and L&H Korea to plaintiffs' representatives in connection with negotiation of the Dragon

Merger; (e) the May 9, 2000 press release (and accompanying Form 6-K filing with the SEC),

disseminated worldwide, falsely detailing L&H's first quarter 2000 results; (f) L&H's Form 10-

Q for the first quarter of 2000, filed with the SEC on June 30, 2000; and (g) L&H's 1999 audited

financial statements, finalized on or about April 27, 2000 and included in L&H's Form 10-K for

1999, filed with the SEC on June 30, 2000.

100.    **Mens Rea.**  Each of the defendants possessed the requisite criminal intent to

commit the aforesaid acts of mail and wire fraud, and aiding and abetting securities fraud, as is

evidenced by, among other things, their affirmative misrepresentations to KPMG and PwC; the

covert nature and substantive terms of their secret side agreements and equivalent arrangements,

which had no legitimate business purpose and had no effect other than to permit L&H to book

millions of fictitious dollars in revenues, income and assets that each of the defendants knew

would be, and was, included in financial statements filed with the SEC and disseminated to the

public worldwide.  *See also* ¶¶88-89, *supra*.

101.    As a direct and proximate result of defendants' violations of 18 U.S.C. § 1962(c),

plaintiffs have suffered substantial damage to business and property in connection with their

exchange of their interest in Dragon for L&H stock.

102.    By reason of the foregoing, defendants are jointly and severally liable to plaintiffs

for the aforesaid actual damages to business and property, in an amount to be proven at trial but

no less than $150,806,377.62, which are to be trebled pursuant to 18 U.S.C. § 1964(c).  Plaintiffs

are also entitled to recover the costs of bringing this suit and attorneys' fees.

## THIRD CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
## FOR VIOLATION OF SECTION 1962(d) OF RICO

103.    Plaintiffs repeat and reallege ¶¶1 through 102 as though fully set forth herein.

104.    During a period extending from at least September 1999 to at least November

2000, the Banks, in violation of 18 U.S.C. § 1962(d) conspired to violate § 1962(c) of RICO.

105.    The object of the conspiracy was to artificially inflate the financial statements of L&H, and thus the price of L&H common stock, by fraudulently misrepresenting the revenues of L&H Korea. The overt acts taken in furtherance of the conspiracy included the factoring and transfer arrangements detailed above.

106.    Each defendant agreed to the commission of predicate acts as set forth above. Each defendant knew that the acts in which it participated and of which it was actually aware were part of a pattern of racketeering activity with management of L&H Korea. Each defendant actually knew that the financial statements of L&H were fraudulently inflated and that the price of L&H stock was fraudulently inflated as a result. Each defendant actually knew of the Dragon Merger well in advance of its closing in June 2000.

107.    As a direct and proximate result of defendants' violations of 18 U.S.C. § 1962(d), plaintiffs have suffered substantial damage in connection with their exchange of their interest in Dragon for L&H stock.

108.    By reason of the foregoing, defendants are jointly and severally liable to plaintiffs for the aforesaid actual damages to business and property, in an amount to be proven at trial but no less than $150,806,377.62, which are to be trebled pursuant to 18 U.S.C.§1964(c). Plaintiffs are also entitled to recover the costs of bringing this suit and attorneys' fees.

## FOURTH CLAIM FOR RELIEF AGAINST
## ALL DEFENDANTS FOR COMMON LAW FRAUD

109.    Plaintiffs repeat and reallege ¶¶1 through 108 as though fully set forth herein.

110.    All defendants intentionally misrepresented their transactions with L&H Korea by, *inter alia*, describing their factoring transactions as "without recourse" when secret side agreements and equivalent arrangements clearly made the factoring "with recourse."

111.    All defendants intended by their actions to permit L&H to fraudulently overstate its revenues, income and assets and thereby to inflate the stock price of L&H, causing plaintiffs, among others, to purchase L&H stock at prices inflated by their fraud.

112.    In reliance on, among other things, the fraudulently inflated L&H financial statements directly and immediately produced by defendants' misrepresentations, Seagate entered into, executed and fully performed the Merger Agreement, to its detriment.

113.    As a result of defendants' fraudulent conduct, plaintiffs have sustained damages in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
## FOR AIDING AND ABETTING COMMON LAW FRAUD

114.    Plaintiffs repeat and reallege ¶¶1 through 113 as though fully set forth herein.

115.    As set forth above, L&H intentionally misrepresented its revenues, income and assets, by material amounts, in its financial statements, press releases and public statements, including, among other things, its filings with the SEC. Those misrepresentations were intended to and did have the effect of fraudulently inflating L&H's financial statements and common stock price, specifically including the price of the L&H stock that L&H exchanged for Seagate's interest in Dragon.

116.    Each defendant knew that L&H was a publicly held company that traded on NASDAQ and EASDAQ and was required to publicly disclose its financial statements and file reports on its financial condition with, among others, the SEC. Defendants knew that their fraudulent relationships with L&H as set forth above, including the factoring arrangements with L&H Korea, had the effect of rendering fictitious L&H Korea's publicly reported revenues and constituted a fraud on the market for L&H shares. Defendants knew that the fraud they were perpetrating with L&H had the actual effect of fraudulently inflating L&H's financial statements and common stock trading price.

117.    Each defendant knowingly or recklessly rendered substantial assistance to L&H Korea's fraudulent scheme by entering into, concealing and enforcing secret agreements that transformed L&H Korea's time deposits, held by the Banks and publicly represented as L&H

43

Korea assets, into collateral for secret arrangements that eventually reverted to the Banks, precipitating the collapse of L&H and its common stock price.

118.    Plaintiffs have been harmed by the defendants' aiding and abetting the fraud by L&H Korea, and have sustained damages in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF AGAINST
## ALL DEFENDANTS FOR CONSPIRACY TO DEFRAUD

119.    Plaintiffs repeat and reallege ¶¶1-118 as though fully set forth herein.

120.    L&H intentionally and materially misrepresented its financial results in various private and public communications, including (a) the 1999 Unaudited Financials and other information provided by L&H to Seagate during the negotiation of the Merger Agreement and leading up to the closing of the Merger, and (b) L&H's press releases and filings with the SEC concerning its financial results for all periods preceding the closing of the Dragon Merger. These misrepresentations were intended to and had the effect of causing Seagate and other buyers of L&H stock to believe that the value of the stock was vastly higher than it actually was.

121.    Each of the Korean Banks knowingly and intentionally conspired and agreed with L&H through L&H Korea in this fraud as reflected by, among other things, discussions in or around September 1999 between L&H Korea executives John Seo and Henry Oh, and representatives of each of the Banks. During these discussions, a scheme was devised to create false documentation that would give the appearance that the Banks were factoring L&H receivables "without recourse," when in reality these transactions were "with recourse." L&H's Korean operations were directly controlled from L&H headquarters, under the personal supervision and control of Hauspie, Bastiaens and Willaert. *See* ¶30, *supra*.

122.    The Korean Banks' culpable conduct in furtherance of this fraudulent conspiracy included, among other things set forth above:

44

(a) Participating in the fraudulent documentation of the supposed factoring transactions through two sets of documents: a false "without recourse" set, designed to be seen by outside auditors, and a secret set reflecting the true "with recourse" nature of the transactions; and

(b) Issuing confirmations that falsely represented to L&H's auditors that funds in certain accounts in L&H Korea's name were unrestricted, when in fact the accounts were restricted and the Banks had complete control over the funds.

123.    This conspiracy enabled L&H to give the appearance to the outside world that it had tremendously increased sales, a large amount of cash, and significant collections of accounts receivable. In reality, there were hardly any payments from L&H Korea's customers, and the cash from the supposed factoring transactions belonged to the Korean Banks.

124.    Each of the Korean Banks knew and intended that the secret provisions of their factoring arrangements with L&H Korea and fraudulent confirmations to auditors would render L&H Korea's reported results of operations illusory. In addition, each of the Banks knew that L&H used consolidated financial reporting practices for the operations of its divisions and subsidiaries, including L&H Korea, and the Banks knew L&H's stock price would be inflated as a result of the illusory L&H Korea income, and that the inflation of L&H's stock price would cause injury to anyone relying on the integrity of the L&H's stock price in connection with their securities transactions (such as Seagate).

125.    As a result of the Korean Banks' knowing and intentional participation in the foregoing conspiracy, Seagate sustained damages in an amount to be proven at trial.

**WHEREFORE**, plaintiffs demand judgment as follows:

(c) Awarding plaintiffs damages in an amount to be determined at trial against all defendants, jointly and severally, for Seagate's purchases of L&H shares, as well as reimbursement for any liabilities and expenses incurred as a result of the impact of the fraud on Seagate's sales of L&H shares or otherwise;

(d) Pursuant to 18 U.S.C.§1964(c) and (d), awarding plaintiffs treble the amount of all damages to business and property, determined at trial, for

Seagate's purchases of L&H shares and any impact of the fraud on Seagate's sales of L&H shares or otherwise;

(e)     Awarding plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(f)     Awarding such other, further or different relief as the Court may deem just and proper.

Dated:  March 31, 2003

GREGORY P. JOSEPH LAW OFFICES LLC

By: _____

Gregory P. Joseph (GJ-4208)
Pamela Jarvis (PJ-9058)
Honey L. Kober (HK-8380)
Sandra M. Lipsman (SL-4590)
805 Third Avenue, 31st Floor
New York, New York  10022
(212) 407-1200
Fax: (212) 407-1280

*Attorneys for Plaintiffs*

539086

46