EXHIBIT A

# United States District Court
# District of Massachusetts

HANS A. QUAAK,
ATTILIO PO,
KARL LEIBINGER, on behalf of
      themselves and those similarly situated,
          Plaintiffs,

v.                                  Civil Action No.: 03-11566-PBS

DEXIA, S.A.,
DEXIA BANK BELGIUM
      (formerly known as ARTESIA BANKING
      CORP., SA),
          Defendants.

---

STONINGTON PARTNERS, INC., a Delaware
      Corporation,
STONINGTON CAPITAL
      APPRECIATION 1994 FUND L.P., a Delaware
      Partnership,
STONINGTON HOLDINGS,
      L.L.C., a Delaware limited liability company,
          Plaintiffs,

v.                                  Civil Action No.: 04-10411-PBS

DEXIA, S.A.,
DEXIA BANK BELGIUM
      (formerly known as ARTESIA BANKING
      CORP., SA),
          Defendants.

---

GARY B. FILLER,
LAWRENCE PERLMAN, Trustees of the
    TRA Rights Trust,
        Plaintiffs,

v.                             Civil Action No.: 04-10477-PBS

DEXIA, S.A.,
DEXIA BANK BELGIUM
    (formerly known as ARTESIA BANKING
    CORP., SA),
        Defendants.

---

JANET BAKER,
JAMES BAKER,
JKBAKER LLC,
JMBAKER LLC,
        Plaintiffs,

v.                             Civil Action No.: 04-10501-PBS

DEXIA, S.A.,
DEXIA BANK BELGIUM
    (formerly known as ARTESIA BANKING
    CORP., SA),
        Defendants.

# STIPULATION AND ORDER GOVERNING
# THE TREATMENT OF CONFIDENTIAL INFORMATION

      IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the

parties to the above-captioned actions (the "Action") that, subject to the approval of the

Court, this Stipulation and Proposed Order shall govern the handling of documents and

any deposition testimony, deposition exhibits, interrogatory responses, admissions, and any other information produced or given by a party or non-party in connection with discovery in the Action (such information is hereinafter referred to as "Discovery Material").

1. Discovery Material, or information derived therefrom, shall be used solely for prosecution or defense of the Action (including any appeals) and shall not be used for any other purpose.

2. "Confidential Information" as used herein means trade secrets or other confidential research, development or commercial information entitled to confidential treatment pursuant to Fed. R. Civ. P. 26(c)(7) and personal information protected under Belgian privacy law or any other relevant law. Use of Confidential Information during pretrial proceedings in the Action shall be governed by this Stipulation and Order.

3. All documents produced, given or otherwise disclosed by any party or non-party (hereinafter the "Party" or "Parties"), including documents, responses to document requests, interrogatory answers, answers to requests for admissions and any other document produced pursuant to the Federal Rules of Civil Procedure or Local Rules of this Court, which the producing Party in good faith believes contain Confidential Information, shall be designated as confidential by the producing Party at the time of production by means of a "CONFIDENTIAL" stamp or legend placed on each page containing Confidential Information.

4.     (a) Deposition testimony that counsel for the producing Party providing such testimony, in good faith, believes contains Confidential Information shall

3

be designated as Confidential by counsel making a statement for inclusion in the

deposition transcript and, within ten (10) business days after receipt of the transcript, by

counsel designating by page and line, the Confidential Information contained in the

deposition transcript by means of a "CONFIDENTIAL" stamp or legend. When

Confidential Information is designated in a deposition transcript, the Party making the

designation shall instruct the reporter to imprint the legend "THIS TRANSCRIPT

CONTAINS CONFIDENTIAL INFORMATION" on the cover page of the transcript and

to include, at the front of the transcript, a page identifying all pages and lines designated

CONFIDENTIAL in the transcript.

     (b) Any magnetic media (e.g., videotape or computer disk) containing

portions of a deposition transcript which have been designated Confidential shall be

labeled with a "CONFIDENTIAL" legend.

     5.    (a) At any proceeding before the Court in connection with the Action,

counsel for the parties to the Action may, subject to the rules of evidence, disclose or

refer to Confidential Information, unless otherwise ordered by the Court.

     (b) Counsel may send courtesy copies of documents containing

Confidential Information to the Court so long as the envelope containing such documents

indicates that the envelope contains Confidential Information subject to this Stipulation

and Order.

     6. Confidential Information shall be used solely for purposes of the Action

(including any appeals), unless otherwise agreed to in advance by the producing Party or

ordered by the Court and shall not be used for any business or competitive purpose

whatsoever.

7. Confidential Information may be disclosed or made available by counsel of record for the party to the Action receiving such information to the following "Qualified Persons" as defined herein. For purposes of this Stipulation and Order, "Qualified Persons" means:

> a. the Court (and any appellate court), including court personnel;
>
> b. court reporters;
>
> c. counsel of record to the parties to the Action, including the paralegal, clerical, secretarial, and other persons employed or retained by such counsel;
>
> d. the parties to the Action;
>
> e. entities engaged by counsel of record in the Action to perform photocopying, scanning, database, and other document management services for purposes of the Action; outside photocopying services;
>
> f. experts, advisors or consultants (including their employees and support staff) retained by counsel of record in the Action;
>
> g. potential, anticipated or actual witnesses; and
>
> h. any mediator or arbitrator engaged by the parties to the Action.

8. Prior to the disclosure of Confidential Information to any Qualified Person defined in paragraph 7(f) and 7(g), counsel of record for the party to the Action proposing to make such disclosure shall ensure that a copy of this Stipulation and Order has been delivered to such person, and that its terms have been explained to such person and shall require such person to sign an Undertaking in a form substantially identical to

5

Exhibit A hereto, except that witnesses at depositions and trial may be shown confidential information regardless of whether they have signed Exhibit A. The executed Undertaking shall be maintained by counsel making such disclosure and shall not be discoverable except upon order of the Court for good cause shown.

9. Nothing herein shall preclude the dissemination of documents containing Confidential Information among plaintiffs' counsel and their paralegals, clerical and secretarial employees.

10. When affidavits, briefs, memoranda or other documents containing or disclosing Confidential Information are filed with the Court, they shall be placed in sealed envelopes or other appropriately sealed containers which shall bear the caption of the Action and a notation to the effect that the information contained therein is Confidential and is subject to this Stipulation and Order, and may be examined only in accordance with the terms of the Stipulation and Order.

11. Any Party to the Action to whom Confidential Information is produced or disclosed may object at any time to the "Confidential" designation. The objection shall be made in writing to counsel for the producing Party. Counsel shall confer in good faith in an effort to resolve any dispute concerning such designation. If the objection cannot be resolved by agreement within ten (10) business days of the date of service of the written objection, the designating Party shall move the Court to confirm the "Confidential" designation. Failure to make such motion in a timely fashion shall constitute a waiver of the "CONFIDENTIAL" designation.

12. Counsel for any party to the Action shall not be obligated to challenge the

6

propriety of any Confidential designation. Failure to do so shall not preclude a subsequent challenge to the propriety of such designation.

13. Nothing herein shall prevent any party to the Action who has received Confidential Information pursuant to this Stipulation and Order from producing such Confidential Information in response to a lawful subpoena or other compulsory process; provided that any party receiving such subpoena or process (i) shall as soon as reasonably practical give notice thereof to the producing Party by telephone or facsimile and shall furnish the producing Party with a copy of the subpoena or other compulsory process so as to afford the producing Party a reasonable opportunity to seek a protective order; and (ii) if application for a protective order is made promptly before the return date, shall not produce such Confidential Information prior to receiving a court order or the consent of the producing Party.

14. Compliance with the terms of this Stipulation and Order shall not operate as an admission that any particular document or information is or is not confidential.

15. The entry of this Stipulation and Order does not waive any rights the parties to the Action may have to object on any grounds to the use of any Confidential Information as evidence at any trial or hearing in this Action. Disclosure of any Confidential Information by any person or in any manner not permitted by this Stipulation and Order shall not result in a waiver of or otherwise limit the right of the Parties to enforce the provisions of this Stipulation and Order. Nothing contained herein shall constitute a waiver by any party to the Action of the right to claim that information designated by any Party as Confidential is not, in fact, confidential.

7

16. Nothing contained herein shall operate to prevent any Party to the Action from disclosing its own Confidential Information.

17. Nothing contained herein shall impose any restrictions on the use or disclosure by a Party to the Action of documents or information obtained independently of the discovery proceedings in this Action.

18.      (a) All Confidential Information and all copies thereof shall be destroyed or returned to counsel for the producing Party within ninety (90) days after the conclusion of the Action or Actions to which the recipient of the information is a party, including appeals, except that counsel of record may retain for their files copies of any of their own work product, correspondence, pleadings, briefs and exhibits, any other court filings, deposition transcripts and exhibits, or hearing or other official transcripts and exhibits, which contain Confidential Information.

         (b) Counsel shall continue to be subject to the terms of this Stipulation and Order with regard to any such retained documents.

19. Nothing herein shall affect the producing Party's obligation to show "good cause" for the protection of information under Fed. R. Civ. P. 26(c) in the event there is a dispute with respect to such producing Party's designation of documents or information as confidential.

20. Any party to the Action may apply to the Court for an order modifying this Stipulation and Order, and nothing in this Stipulation and Order shall be deemed to prevent such application. This Stipulation and Order may also be modified with the consent of all parties hereto or may be modified by the Court on its own motion, and

nothing in this Stipulation and Order shall be deemed to prevent such modification.

---

Dated: May 16, 2005 STIPULATED AND AGREED TO BY:

**LEAD PLAINTIFFS HANS A. QUAAK,**
**ATTILIO PO and KARL LEIBINGER**
By their counsel,
/s/ Glen DeValerio
Glen DeValerio, BBO # 122010 (gdevalerio@bermanesq.com)
Jeffrey C. Block, BBO #600747
Patrick T. Egan, BBO # 637477
Nicole R. Starr, BBO #654848
BERMAN DEVALERIO PEASE
TABACCO BURT & PUCILLO
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300


SHALOV STONE & BONNER
Lee S. Shalov
James P. Bonner
Patrick L. Rocco
485 Seventh Avenue, Suite 10000
New York, New York 10018
Telephone: (212) 239-4340


CAULEY BOWMAN CARNEY & WILLIAMS
Curtis L. Bowman,
Allen Carney
11001 Executive Center Drive, Suite 200
P.O. Box 25438
Little Rock, Arkansas 722125438
Telephone: (501) 312-8500

**DEFENDANT DEXIA BANK BELGIUM**
By its counsel,
/s/ Peter Saparoff
Peter Saparoff, BBO # 441740 (psaparoff@mintz.com)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000


CLIFFORD CHANCE US LLP
James B. Weidner
Jeff E. Butler
31 West 52nd Street
New York, NY 10019
Telephone: (212) 878-8000


**PLAINTIFFS STONINGTON PARTNERS,**
**INC., STONINGTON CAPITAL**
**APPRECIATION 1994 FUND L.P. AND**
**STONINGTON HOLDINGS L.L.C.**
By their counsel,
/s/ Richard J. Grahn
Richard J. Grahn, BBO #206620 (rgrahn@lgllp.com)
Charles P. Kindregan, BBO #554947
LOONEY & GROSSMAN LLP
101 Arch Street
Boston, MA 02110
Telephone: (617) 951-2800


BERNSTEIN LITOWITZ BERGER &
GROSSMAN LLP
Max W. Berger
Steven B. Singer
Erik Sandstedt
Javier Bleichmar
Avi Josefson
1285 Avenue of the Americas
New York, NY 10019

Telephone: (212) 554-1400


**PLAINTIFFS GARY B. FILLER and**
**LAWRENCE PERLMAN, Trustees of the**
**TRA Rights Trust**
By their counsel,
/s/ Gregory P. Joseph
Gregory P. Joseph, N.Y. Atty Reg. #1645852
(gjoseph@josephnyc.com)
GREGORY P. JOSEPH LAW OFFICES LLC
Third Avenue, 31st Floor
New York, NY 10022
Telephone: (212) 407-1200


KOTIN, CRABTREE & STRONG
Amy C. Mainelli, BBO #657201
One Bowdoin Square
Boston, MA 02114
Telephone: (617) 227-7031


**PLAINTIFFS JANET BAKER, JAMES**
**BAKER, JKBAKER LLC and JMBAKER LLC,**
By their counsel,
/s/ Terrence K. Ankner
Terrence K. Ankner, BBO #552469 (tka@anknerlaw.com)
PARTRIDGE, ANKNER & HORSTMAN LLP
200 Berkeley Street, 16th Floor
Boston, MA 02116
Telephone: (617) 859-9999


BOIES SCHILLER & FLEXNER
Karen C. Dyer
George R. Coe
225 South Orange Avenue, Suite 905
Orlando, Florida 32801
Telephone: (407) 425-7118

11

REED SMITH LLP
Alan K. Cotler
Joan A. Yue
2500 One Liberty Place 1650 Market Street
Philadelphia, PA 10103
Telephone: (215) 851-8100

***STIPULATION APPROVED AND ENTERED AS AN ORDER OF THE COURT***,


*/s/ Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

May 31, 2005.

# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

HANS A. QUAAK, ATTILIO PO
and KARL LEIBINGER, on behalf of
themselves and those similarly situated,
    Plaintiffs,

v.                                Civil Action No.: 03-11566 (PBS)

DEXIA, S.A. and DEXIA BANK BELGIUM
(formerly known as ARTESIA BANKING
CORP., SA),
    Defendants.

---

STONINGTON PARTNERS, INC., a Delaware
Corporation, STONINGTON CAPITAL
APPRECIATION laware limited liability company,
    Plaintiffs,

v.                                Civil Action No.: 04-10411 (PBS)

DEXIA, S.A. and DEXIA BANK BELGIUM
(formerly known as ARTESIA BANKING
CORP., SA),
    Defendants.

---

GARY B. FILLER and LAWRENCE
PERLMAN, Trustees of the TRA Rights Trust,
    Plaintiffs,

v.                                Civil Action No.: 04-10477 (PBS)

DEXIA, S.A. and DEXIA BANK BELGIUM
(formerly known as ARTESIA BANKING
CORP., SA),
    Defendants.

---

14

JANET BAKER and JAMES BAKER,
JKBAKER LLC and JMBAKER LLC,
     Plaintiffs,

v.

DEXIA, S.A. and DEXIA BANK BELGIUM
(formerly known as ARTESIA BANKING
CORP., SA),
     Defendants.

Civil Action No.: 04-10501 (PBS)

EXHIBIT A

AGREEMENT TO BE BOUND BY
CONFIDENTIALITY STIPULATION AND ORDER

1.     My name is _____.(Please print)

2.     I have read, understand and will comply with the terms of the Stipulation and Order

entered in this Action.

3.     I will not use any Confidential Information, as defined in the Stipulation and Order,

for any purpose other than assisting plaintiffs/defendants (circle one) and their counsel

in the preparation and presentation of their case.

4.     I will not in any way disclose, discuss or exhibit any Confidential Information, except

to those persons whom I know are authorized to have access to such Confidential

Information under the terms of the Stipulation and Order.


_____
Signature

DATED: _____.

15

# EXHIBIT B

246

1            Q.  Is this an e-mail you received

2    on or about December 27, 1999 regarding Radial and

3    LIC.

4            A.  Yes, that is correct.

5            Q.  If you could look at the next

6    exhibit number 25 which, for the record, is a

7    document that is labelled 'specialised activities

8    credit office'.  It is a three page document

9    bearing Bates numbers 3541 to 2543 (Handed). Do you

10   recognise that document, sir?

11           A.  Yes.

12           Q.  Is that your handwriting that

13   appears on the front page of exhibit 25?

14           A.  That is correct.

15           Q.  Is that your signature on the

16   bottom of the page?

17           A.  Sorry, it is not my writing,

18   handwriting.

19           Q.  Is the signature your signature,

20   sir?

21           A.  Yes.

22           Q.  Can you tell me what this

23   document is?

24           A.  (Perused document) This is

25   authorisation to credit rating, subject to



247

1   approval, and the benefit of three accounts - one

2   for Radial, one for Language Investment Company and

3   one for Messrs Lernout, Hauspie and Willaert.

4           Q.   And as to all three of those

5   accounts, you credited the repayment prior to the

6   actual receipt of fund by Artesia Bank, is that

7   correct?

8           A.   Yes.

9           Q.   And you did that based on the

10  understanding that it was a request by the client

11  of the bank, is that correct?

12          A.   No.

13          Q.   Why did you do it?

14          A.   Because I had been told that we

15  had received notice from DPS bank in Singapore that

16  it was transferring us the money.

17          Q.   But in fact that notice was

18  untrue, correct?

19          A.   Indeed, as we have already

20  mentioned here.

21          Q.   Who gave you that erroneous

22  information?

23          A.   Mr. Dauwe.

24          Q.   Have you ever got an explanation

25  as to why he provided you with erroneous

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**
Tel: (011 44) 20 7264 2088
Website: www.a-acr.com
Fax: (011 44)  20 7265 1703
E-mail: info@a-acr.com


ANGLO–AMERICAN
COURT REPORTERS

# EXHIBIT C

1    a sensitive issue, as I explained in my previous

2    answer, so it decided not to having its exchanges

3    about the Radial file put into writing, our goal

4    with the regularisation of this file, and the

5    committee then wanted to be able to handle it

6    adequately as usual, and this is the purpose of

7    exhibit Probst 19.

8                    Q.  Is it true that even the

9    repayment, the ultimate repayment, of the Radial

10   loan was not in accordance with the bank normal

11   procedures?

12                   A.  It is that the procedure of

13   repayment subject to collection was not respected.

14                   Q.  Is it true that one of the

15   reasons why the bank did not create a written

16   record regarding the problems with the Radial loan

17   were because the repayment procedures were contrary

18   to the banks internal regulations?

19                   A.  This is untrue, and it is easy

20   to explain why.  We have a regularisation here

21   under our eyes and the repayment occurred

22   afterwards.

23                   Q.  Was the repayment properly

24   documented?

25                   A.  Yes, we received the necessary

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**
Tel: (011 44) 20 7264 2088          Fax: (011 44)  20 7265 1703
Website: www.a-acr.com               E-mail: info@a-acr.com


ANGLO-AMERICAN
COURT REPORTERS

EXHIBIT D

*II 67b*

| | |
|---|---|
| **FEDERAL POLICE**<br>**Judicial Service District of Ypres**<br><br>**YPRES**<br><br><br>Police | COURT OF APPEAL – GHENT<br><br>JUNE 3, 2004 |

| | |
|---|---|
| | Indicator no.: 476/03 |
| D'Hondtstraat 23  -  YPRES | **PRO JUSTITIA** |

| | | | |
|---|---|---|---|
| Tel.: 057/21-73-21    Fax: 057/21-67-60 | | | |
| Report no. **543/04** | | Dept.: LH | |

| | |
|---|---|
| Date: **05/28/04**     Exam     Appendix: | Not. no.: **IE.71.98.000464/2000** |
| On the account of/regarding:<br>- LERNOUT & HAUSPIE SPEECH PRODUCTS NV<br>  FLANDERS LANGUAGE VALLEY 50<br>  YPRES (SINT-JAN)<br>- LERNOUT JOZEF (04/27/48)<br>  SCHACHTEWEIDESTRAAT 17<br>  YPRES (ZILLEBEKE)<br>  (et al.) | **SUBSEQUENT OFFICIAL REPORT**<br><br>By virtue of the order from:<br>Chamber President-Examining Magistrate Henri<br>HEIMANS in Ghent |
| | Date: 06/05/03          file no.: |
| By virtue of the complaint of/Prejudiced person: | Sent to:<br>Chamber President – Examining Magistrate Henri<br>HEIMANS in YPRES. *06/02/04*<br><br>The Judicial director<br>[signature] |
| Subject:<br>hearing (Geert DAUWE (20M $ transaction) | Excerpt(s): |
| | |
| Fact(s):<br>-Infringement of the legislation regarding corporations and trading companies | |

CONFIDENTIAL                    DBB 036129

*543*                          *IIG1D*

**Report no.: /2004**

| Federal Police |
| --- |



| Central service for the prevention of Economic and Financial Delinquency |
| --- |

| Investigation Cell LERNOUT & HAUSPIE |
| --- |

On Friday, May 28, two thousand and four, at 10 AM.

We, **DE RAEDT Danny**,

Chief Inspector, Officer of the Judicial Police, Assistant-Officer of the Prosecutor, of the Central Office for the Prevention of Economic and Financial Delinquency (CDGEFID) in Brussels, are interrogating in the offices of the CDGEFID in Brussels, Notelaarsstraat 111, supported by the commissioner VAN DAELE Karen:

> **D A U W E Geert**,
>
> further identified earlier,

who declares the following:

"I take note of the fact that:

- I can request, for all questions I'm asked and all answers I give, to be recorded in the used wordings;
- I can request that a certain investigation is conducted or a certain cross-examination is held;
- I can use all documents in my possession and can possibly add it to the file;
- my statements can be used as evidence in a court of law.

**Question**: With regard to the 20 million dollar loan of the type "roll over" to Pol HAUSPIE, Jo LERNOUT and Nico WILLAERT dd. 06.25.99 with expiration date of 10.10.99, the investigation shows that this loan was not paid back on the expiration date and was then converted to a loan of the type "straight loan" with the new expiration date of 12.31.99.

Can you confirm this?

**Answer**: I noticed this when reviewing and reading the official reports of the interrogation and investigation pursuant to the insight I was granted.

**Question:** Who made the decision to replace the roll over credit, which had expired without being refunded, by a straight loan?

**Answer**: It definitely was not me. I do not know who made that decision.

Page 1

CONFIDENTIAL                    DBB 036130

Report no.: /2004

| Federal Police |
| --- |



Central service for the prevention of Economic and Financial Delinquency

Investigation Cell
LERNOUT & HAUSPIE

**Question**: Mr. JANSSENS Jacques brings up the following matter in his statement (official report 527/03 dd. 05.26.03): *"I'm not completely sure about that. I don't remember but I think that the decision was made by DAUWE and myself. In my mind, it was an administrative decision which came down to changing the expiration date."*

Is it correct to say that you made that decision together with Mr. JANSSENS?

**Answer**: I do not remember if JANSSENS contacted me in this regard. If JANSSENS did discuss this me, he would definitely, as he always did, recorded the fact that this change was allowed after discussing it with me. This mention of approval for the conversion from roll-over to straight loan should have been listed on the booking documents or on another document.

**Question**: Since the modalities in the '*new*' "straight loan" as regards redemptions, expiration date have been changed compared to the roll-over loan, didn't the credit board have to make a decision in this matter?

**Answer**: Normally, this needed to be formally decided by a credit board. As answer to your question why this didn't happen, I refer to the statement of JANSSENS on the hand in which he says that the conversion in his mind only implied an administrative matter which came down to moving the expiration date. On the other hand, I refer in this respect to the statement of Mr. SAVEREYS (official report 513/03) in which he claims that *"the cause can also be found with the credit secretariat given the fact that the ratification is a pure administrative matter which is not always regarded as a top priority in daily practice in the banks."* I want to demonstrate that it is my assumption, given that this conversion was seen as an administrative conversion, that the ratification never took place afterwards and, in other words, no formal decision was made by the credit board.

**Question**: In this regard, Mr. Jacques JANSSENS states the following (official report 527/03 dd. 05.26.03): *"I think there was no formal decision made in the credit board, but the latter was verbally informed about the changed situation and the promised reimbursements. I believe that the credit board was informed about this change and the reimbursement promises by Geert DAUWE. I'm not sure who informed Geert*

CONFIDENTIAL

DBB 036131

543                          IIG1D

| | |
|---|---|
| Federal Police | |



Central service for the
prevention of Economic
and Financial
Delinquency

Investigation Cell
LERNOUT & HAUSPIE

**Report no.: /2004**

*DAUWE that the reimbursement would take place. It was the client*
*without a doubt but I'm not sure which one of the three."*

Did you notify the credit board regarding this new situation?

**Answer**: I did not inform the credit board because I was not aware
of the change.

I want to clearly state that this would have been taken down if
would have done that.

My assumption is that the party in charge of commercial affairs,
being STEVERLINCK and LUST or Bart FERRAND, determined
that the roll-over credit expired, then contacted the credit
department whether in writing or not with the question what to do
and/or formulated the proposal to extend the roll-over to 12.31.99.
It is then up to the credit department to create a proposal and
present it to the credit board. It is possible that the people in the
credit department judged that it was essentially an administrative
conversion and no formal decision was made on it.

**Question**: Despite the fact that it was perhaps perceived as an
administrative extension, it still remains a fact that the expiration
date of the roll-over was not observed and the questions remains
for the bank whether the refund of the straight loan should be
observed on the expiration date. Who provided the information
about how and when the client would pay back?

**Answer**: I suspect that this information could have come from the
commercial office in Kortrijk or that this info went directly from
the client to the KGA. I don't remember getting information from
the client regarding this matter, nor that I forwarded this
information to the KGA.

I want to clearly state that the declaration of JANSSENS regarding
my role with respect to the conversion from roll-over to straight
loan is very vague and evasive and that I was neither the client, nor
the party performing these actions.

CONFIDENTIAL                    DBB 036132

543                          IIG1D
**Report no.: /2004**

| Federal Police |
| --- |



Central service for the
prevention of Economic
and Financial
Delinquency

Investigation Cell
LERNOUT & HAUSPIE

**Question**: The investigation showed that the credits of Radial NV, LIC NV and the personal loan of Pol HAUSPIE, Jo LERNOUT, Nico WILLAERT were paid back on 12.30.99 "under normal preservation". Did you make the decision to do the credit entries as early as 12.30.99?

**Answer**: No.

**Question**: Mr. JANSSENS stated the following in this regard:
*"The credits in the account have been authorized by me given the fact that the authorization by a member of the Board of Directors or by myself was necessary for these amounts. In principle, the decision to reimburse these three loans "subject to collection" was made by DAUWE and myself."*

Did you principally approved these credit entries yes or no? On what basis did you make this principal decision?

**Answer**: I want to say that JANSSENS adds the following in his statement *"I don't remember anymore whether there was a direct consultation with DAUWE or by an intermediary of MINJAUW."* Besides, I don't know who MINJAUW is. Again I state that if JANSSENS and I had discussed this, he would have mentioned it on the booking document.

**Question**: I present you again with the following: Swift report, dd. 12.30.99, created by SEAH Amelia (DBS Bank) to your attention, which just confirms that the DBS Bank will receive the amount of 36 million USD on 1.4.00 at the expense of Velstra Pte. You still believe that you did not see this report?

**Answer**: Yes, that's what I believe. I was always asked about a mailing report in earlier interrogations always where it is now a SWIFT-report.

**Question**: Statements of for instance Karel VAN RIET (official report 512/03 dd. 05.09.03) and Jacques JANSSENS bring up the fact that this must have been the report on the basis of which the bank principally approved the credit entries of the accounts Radial/LIC/Pol HAUSPIE  Jo LERNOUT  Nico WILLAERT. However, they do say that this report is solely a confirmation of an incoming payment of 36 million USD at the DBS Bank at the expense of

CONFIDENTIAL                    DBB 036133

545

IIGHB

Report no.: /2004

| |
|---|
| Federal Police |
|  |
| Central service for the prevention of Economic and Financial Delinquency |
| Investigation Cell LERNOUT & HAUSPIE |

Velstra Pte and that this report does not give any indication at all that Velstra Pte will transfer this money to the Artesia Banking Corporation and that it must serve as payment of the three aforementioned loans. They both refer to you as being the person who has the background information in this regard, given the fact that this report was put to your attention. Jacques JANSSENS states the following:

> *"It is the first time that I see this document (...)*
> *I did not know the last story about this transfer at all,*
> *nor the details or the reasons for which Velstra Pte will*
> *receive these funds.*
> ***Question****: How did you know that Velstra Pte was going*
> *to transfer $31 million to Artesia Banking Corporation?*
> *For what reason?*
> ***Answer****: I don't know.*
> *(...) Given the fact that the message of the DBS Bank*
> *was addressed to Mr. DAUWE, I assume that this is the*
> *person who has the answers to these questions. In any*
> *event, Mr. DAUWE has not given me any information on*
> *this subject."*

I request that you urgently state who told you that the money would go the account of Velstra Pte at the DBS Bank, would be transferred by Velstra Pte to the Artesia Banking Corporation and would be used for the refunding of the three said loans, whereby I would like to draw your attention once more to the fact that you were the recipient of this swift-report and the investigation and various statements demonstrate that you were the only person within the Artesia Banking Corporation who had this information.

**Answer**: I know Velstra Pte but not her business manager, Tony SNAUWAERT. I found this all out from reading the dossier. Persuasive documents show that the KGA was very much aware of the refunding of these credits. There was even contact with Nico WILLAERT in this regard. This is evident from various emails in the persuasive documents.

I also quote the email of Piet CORDONNIER dd. 12.15.99 in which I was not one of the recipients and which clearly shows that the KGA was informed about an announced refund of the credits.

CONFIDENTIAL          DBB 036134

Report no.: /2004

| Federal Police |
| :---: |



| Central service for the prevention of Economic and Financial Delinquency |
| :---: |

| Investigation Cell LERNOUT & HAUSPIE |
| :---: |

I also refer to the email of CORDONNIER dd. 12.27.99 which shows again that the KGA received information directly from the client about the refund.

The email dd. 12.9.99 of Tom DEWISPELAERE to various people but not to me, mentions at the bottom "the PAI-problem, possibly, Geert DAUWE would need to be informed". I don't know myself what a PAI-problem is. If this would have been an essential problem for the interests of the bank, I would have solved the problem. That was my role.

**Question**: If you maintain that it was the KGA that actually had all relevant information with regard to the refund, how do you explain that an employee of the Singapore DBS-Bank knows your name and puts this SWIFT-REPORT to your attention.

**Answer**: I have already racked my brains over this. I assume that, upon reading all interrogations and by getting to know the person of Nico WILLAERT better, that he probably gave a show to the bank in order to obtain this SWIFT-report at 5.29 PM, supposing that it was very important for him to obtain this report and that he said "send it to DAUWE".

**Question**: Given the fact that Nico WILLAERT maintained primarily contact with the office of Kortrijk and the headquarters, why he wouldn't address the SWIFT-report to for instance CORDONNIER or RABAEY, but actually did to you?

**Answer**: I presume that he announced my name because my name as member of the Board could immediately be verified by the DBS bank, which was not the case for the other names.

**Question**: When JANSSENS was asked whether he made the decision back then to pay back the loans "under regular reservation" without knowing the background, being the intervention of Velstra Pte and the commitment of Velstra Pte to transfer 36 million USD to Artesia Banking Corporation to redeem the three loans, he answers the following:

> **"Response**: I believe that during the consultation with Mr. DAUWE I was told that the funds for the reimbursement of the three credits were announced in favor of Artesia Banking

Page 6

CONFIDENTIAL                    DBB 036135

IIGHD

Report no.: /2004

| |
|---|
| **Federal Police** |
|  |
| Central service for the prevention of Economic and Financial Delinquency |
| Investigation Cell LERNOUT & HAUSPIE |

> *Corporation by DBS. In other words, this information was different from the content of the SWIFT-report."*

Doesn't this point to the fact that you actually knew the background and intervention of Velstra Pte and knew in advance what Velstra Pte was going to do with the money?

**Answer**: I maintain that me and JANSSENS had no discussion in this regard and that I did not tell him that the funds were coming.

**Question**: With regard to the question why the bank did not wait to pay back the three loans "under normal reservation" until 01.05.00 when the funds were in fact available within the Artesia Banking Corporation, JANSSENS supposes that it was the client who asked to execute the refund before 12.31.99 and he suspects that you can clarify this.

Was it indeed a question of the client to pay back the loans before the year's end? Who did the question come from?

**Answer**: I cannot give any clarification on this topic. I assume that KGA, particularly Mr. CORDONNIER, can provide that information. I want to clearly state my role with regard to the refund.

> I refer to the email dd. 12.14.99 of CORDONNIER to Geert DAUWE (cc. Rabaey and Van Tiggel): *"Given the very "unfortunate" formulation in the confirmation of the CDS, the gentlemen HAUSPIE, WILLAERT and LERNOUT need to be spoken to <u>TOMORROW</u> (!) and tomorrow only in order to protect our rights. Given the sensitivity that surrounds this dossier, we would like to propose to you to notify the gentlemen by phone about the Credit Event Notices.*
> *Hence, the telephone conversation will be the only proof of announcement of a credit event notice."*

I want to show with this email that I contacted the client upon explicit request of KGA and to protect the interests of the bank, given the possible problems due to the unfortunate confirmation of the CDS. I called Pol HAUSPIE and told him that the credit event notices would follow and that the credits

Page 7

CONFIDENTIAL                    DBB 036136

| Federal Police |
| --- |
|  |
| Central service for the prevention of Economic and Financial Delinquency |
| Investigation Cell LERNOUT & HAUSPIE |

Report no.: /2004

had to be paid back on the expiration date. Pol HAUSPIE asked me to reassure VAN DEUN by telling him that his credit (credit Radial) would be refunded.

It is evident from the interrogations that the gentlemen had gathered enough money to pay back the loan (Harout KHATCHADOURIAN and 100 million USD from Koreans). This is probably the reason why there was no pressure on the bank to pay back the loans before 12.31.99.

I take note of the fact that I can receive a free copy of the official report of my interrogation. I answer positively to this and find out from you that, pursuant to a decision of the examining magistrate, the issuance thereof is postponed by three months. I take note that I can request a copy of the current official report of the interrogation after this period of time."

The interrogation was terminated on 05.28.2004 at 12.30 PM.

Read, approved and signed.

[signature]

**Whereof deed.**

[signature]

Page 8

CONFIDENTIAL                    DBB 036137

*II.G.I.D.*

Official report no.: 543/2004 dd. 05/28/04

French sections on page 2:
… Mr. JANSSENS Jacques brings up the following matter in his statement: « I'm not completely sure about that. I don't remember but I think that the decision was made by DAUWE and myself. In my mind, it was an administrative decision which came down to changing the expiration date.»

End of the page:
…/… « I think there was no formal decision made in the credit board, but the latter was verbally informed about the changed situation and the promised reimbursements. I believe that the credit board was informed about this change and the reimbursement promises by Geert DAUWE. I'm not sure who informed Geert DAUWE about it that… »

Page 3:

…/… the reimbursement would take place. It was the client without a doubt but I'm not sure which one of the three »

Page 4:
… Mr. JANSSENS: « The credits in the account have been authorized by me given the fact that the authorization by a member of the Board of Directors or by myself was necessary for these amounts. In principle, the decision to reimburse these three loans "subject to collection" was made by DAUWE and myself. »

…adds that: « I don't remember anymore whether there was a direct consultation with DAUWE or by an intermediary of MINJAUW »

Page 5:

Jacques JANSSENS states the following: « It is the first time that I see this document (…)
I did not know the last story about this transfer at all, nor the details or the reasons for which Velstra Pte will receive these funds.
**Question**: *How did you know that Velstra Pte was going to transfer $31 million to Artesia Banking Corporation? For what reason?*
**Answer:** I don't know.
(…) Given the fact that the message of the DBS Bank was addressed to Mr. DAUWE, I assume that this is the person who has the answers to these questions. In any event, Mr. DAUWE has not given me any information on this subject. »

End of page 6 and beginning of page 7:
« **Answer**: I believe that during the consultation with Mr. DAUWE I was told that the funds for the reimbursement of the three credits were announced in favor of Artesia Banking Corporation by DBS. In other words, this information was different from the content of the SWIFT-report. »

For certified translation
Ghislain DEWEERDT
Certified Translator & Interpreter
[signature]

CONFIDENTIAL                DBB 036138

EXHIBIT E

Piet CORDONNIER
12/14/99 6:13:16 pm

To:        Geert DAUWE/NPBB@NPBB
Cc:        Patrick VAN TIGGEL/NPBB@NPBB, Peter RABAEY/NPBB@NPBB
Subject:   LIC/Radial

Dear Mr. Dauwe,

Letters must be sent to both debtors on the one side, and to Messrs. Hauspie, Lernout and Willaert on the other, which respectively
-it is established that the loan was not repaid on 12/15/99 (verified early in the morning) and the immediate and complete repayment of all outstanding amounts is demanded; and
-the intervention based on the credit default swap is obligatory.

"Due to an extremely "unfortunate" formulation in the confirmation of the credit default swap, Messrs. Hauspie, Lernout and Willaert must address this tomorrow (!) and only tomorrow in order not to lose our rights under this swap; accordingly we cannot wait until the expected repayment date (12/24/99)."

Given the sensitivity surrounding this dossier, may we suggest that you inform the gentlemen by telephone of the Credit Event Notice which they will receive over the course of the day. No fax number is recorded in the confirmation and we may assume that these gentlemen will not (be able to) personally sign for receipt. The telephone conversation can therefore be the only proof of the Credit Event Notice communication...

Legal financial markets has been informed of the situation.
Global Credit Risk has been asked to draw up the letters.

Awaiting further information.

Piet CORDONNIER

CONFIDENTIAL        DBB     050204

# EXHIBIT F

Piet CORDONNIER

December 15, 1999, 5:09:20 PM

To:       Philippe STEVERLYNCK/NPBB@NPBB, Bart FERRAND. Patrick FAICT/NPBB@NPBB,
          Krist LUST/NPBB@NPBB, Antoon BAERT/NPBB@NPBB
cc:       Peter RABAEY/NPBB@NPBB
Subject:  LIC/Radial Credit Default Swap

Dear Colleagues,

1) In order to safeguard our legal rights, the Credit Event Notices under the Credit Default Swaps were
faxed today to Mr. Lernout, Mr. Hauspie and Mr. Willaert.
The necessary informal contacts were/are laid via Mr. Dauwe with these gentlemen.
2) Registered letters (by which nonpayment at the expiration date of December 15, 1999 is enacted) are
being sent yet today to Radial and LIC.
Can we count on the fact that the commercial people will inform their clients of the registered letter they
should be expecting?

As you probably already know, it was orally confirmed that the credits will be repaid on December 24,
1999.

Greetings,

Piet CORDONNIER

**CONFIDENTIAL**              **DBB**        **003712**

EXHIBIT G



Piet CORDONNIER

12/27/1999

To:      Geert DAUWE/NPBB@NPBB, Bart FERRAND/NPBB@NPBB, Patrick FAICT/NPBB@NPBB, Krist
          LUST/NPBB@NPBB, Antoon BAERT/NPBB@NPBB

cc:      Francois SAVERYS/NPBB@NPBB, Jacques JANSSENS/NPBB@NPBB, Peter
          RABAEY /NPBB@NPBB, Patrick VAN TIGGEL/NPBB@NPBB

Subject:   Radial & LIC

Gentlemen,

I received a telephone call from Nico Willaert.  On Wednesday, December 29, 1999, an (adequate) amount of USD should become available in an account at a bank in Singapore to repay the loans for L1C and Radial. He will still forward to me the coordinates for the person to be contacted there.

Could the commercial contact persons let me know the correct payment instructions?

As for the private credit, he still needs more time ("just a few weeks") to repay the loan by means of selling shares.

I will keep you informed.

Piet CORDONNIER

**CONFIDENTIAL**         **DBB**     038067

EXHIBIT H

62

1   I have an economics background, I am not a legal

2   specialist so that is not my domain of competence.

3        Q.    You were responsible for supervising the

4   individuals who prepared loan documentation within your

5   group working in the Specialised Loan Department?

6            MS KODNER:    Objection to form.

7        A.    Can you repeat?

8            MR JOSEFSON:    I was asking whether you were

9   responsible for supervising individuals such as

10  Mr Cordonnier, for example, who were responsible for

11  preparing loan documentation within your group for the

12  Specialised Loan Department?

13       A.    I was responsible for the Department as a

14  whole.   I didn't have specific operational controls to

15  make of individual loans or documentation documents,

16  no.

17       Q.    Was there someone else you relied upon who

18  had experience in loan documentation?

19       A.    No, as I said there Piet Cordonnier was the

20  legal specialist in our department, so I had no legal

21  expertise to control him, so.

22       Q.    Did you rely therefore on Mr Cordonnier and

23  his legal experience to accurately and appropriately

24  prepare the loan documentation?

25       A.    Yes.

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**
Tel: (011 44) 20 7264 2088        Fax: (011 44)  20 7265 1703
Website: www.a-acr.com            E-mail: info@a-acr.com



ANGLO–AMERICAN
COURT REPORTERS

63

1    Q.   Were there other resources available to

2 answer questions or resolve specific issues relating

3 loan documentation within your group?

4    A.   Within the group I think that Piet Cordonnier

5 was the only legal specialist but there was also the

6 general Legal Department who was accessible for

7 specific issues and issues related to loans and loan

8 documentation, so if Piet Cordonnier had questions

9 relating to documentation or law in general he could

10 always get in touch with the Legal Department.

11    Q.   And he did not need to involve you in the

12 event that he contacted the Legal Department for an

13 opinion or advice in connection with loan documentation

14 or other issues?

15    A.   There was part of his operational activity as

16 a member of the Loan Department.

17    Q.   Did Mr Rabaey have any responsibility for

18 loan documentation?

19    A.   I would say that he as an analyst, as every

20 analyst has to ensure that the credit decision which is

21 taken by the Credit Committee is put into the credit

22 confirmation, so it is team work between the legal

23 specialist and the credit analyst because in a credit

24 confirmation you can also have financial issues to be

25 taken into the documentation, so it is team work so.

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**
Tel: (011 44) 20 7264 2088    Fax: (011 44)  20 7265 1703
Website: www.a-acr.com    E-mail: info@a-acr.com

ANGLO-AMERICAN
COURT REPORTERS

64

1    Q.   So was it Mr Rabaey's responsibility to

2   verify that loan documentation by Mr Cordonnier

3   accurately reflected the decision of the Credit

4   Committee in the proposed terms of the credit?

5       MS KODNER:   Objection to form.

6    A.   I would say it is a shared responsibility of

7   the legal, of the legal specialist and the analyst to

8   ensure that the decision is put into a contract.

9       MR JOSEFSON:   Did Mr Rabaey have any legal

10  training that you are aware of?

11   A.   I don't know, I have no idea.

12   Q.   Are you aware of any issue relating to the

13  loan documentation for the Radial or LIC loans?

14      MS KODNER:   Objection to form.

15   A.   As I said before I was never involved

16  practically or operationally in the loan approval or

17  documentation process.   The only information I have is

18  from mails I have here before me and at that time it

19  was very sporadic and fragmented as well.

20      MR JOSEFSON:   Were you aware that Mr Rabaey

21  sought an opinion from the Legal Department at Dexia or

22  the Bank relating the LIC and Radial loans, the

23  documentation?

24   A.   Am I aware?

25      MS KODNER:   Objection.

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**
Tel: (011 44) 20 7264 2088          Fax: (011 44)  20 7265 1703
Website: www.a-acr.com              E-mail: info@a-acr.com



ANGLO–AMERICAN
COURT REPORTERS

EXHIBIT I

112

1 loans, but this is, in this context I cannot say if it

2 was accurate to say it like that but if I read the word

3 unfortunate I don't think it was the intention to

4 formulate it like that, but I just have to interpret

5 what it says.

6          MR JOSEFSON:    We need to change the tape.

7          THE VIDEOGRAPHER:    Off-the-record at 12.50.

8

9                (Off-the-record).

10

11

12          THE VIDEOGRAPHER:    Starting roll three in

13 the deposition of Patrick Van Tiggel.    Back on the

14 record at 12.52 pm.

15          MR JOSEFSON:    Before we broke briefly we

16 were looking at the document marked Van Tiggel Exhibit

17 6, and I am trying to put on the record what while we

18 were on the break the Interpreter in the room clarified

19 that the passage we are discussing says "extremely

20 unfortunate" or "very unfortunate", we were focusing on

21 the word "unfortunate" initially in the next paragraph,

22 given the sensitivity surrounding this file am I

23 correct there?

24          THE INTERPRETER:    That is correct, yes.

25          MR JOSEFSON:    Do you have an understanding



113

1    of what is meant by the sensitivity surrounding the

2    file in this e-mail?

3         A.    I don't know, I would have to guess.    I

4    don't know.

5         Q.    Do you have any idea what is meant by the

6    reference to sensitivity surrounding the file?

7         A.    The only thing I could say is that it perhaps

8    could refer to the paragraph before that the Bank only

9    had the opportunity to make an appeal on the Credit

10   Default Swop on the specific and the day after it

11   legally couldn't do it any more, so I could feel that

12   this is the sensitivity of the file which is referred

13   to.    I really don't know.

14        Q.    Are you aware of other loans on which you

15   have had experience and in which the Bank had only a

16   single day to enforce its right under a surety

17   connected to the loan?

18        A.    No.

19             MR JOSEFSON:    If you want to break now for

20   lunch that's fine.

21             THE VIDEOGRAPHER:    Off-the-record at 12.54

22   pm.

23

24             (The Luncheon Adjournment)

25

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**
Tel: (011 44) 20 7264 2088          Fax: (011 44)  20 7265 1703
Website: www.a-acr.com    •          E-mail: info@a-acr.com

ANGLO–AMERICAN
COURT REPORTERS

EXHIBIT J

122

1    of the repayment of the Radial or LIC loans?

2         A.    No.

3         Q.    Do you know why those loans were being paid

4    back by an account in Singapore?

5         A.    I have no idea.

6         Q.    Do you recall any discussions concerning the

7    involvement of a Singapore bank or any Singapore

8    entities in the Radial or LIC loans?

9         A.    No, totally not.

10        Q.    Do you know whether Lernout & Hauspie Speech

11   Products had any activities or involvement in

12   Singapore?

13        A.    My knowledge of the file at that time and

14   even now didn't permit me to have an opinion on this.

15   I really cannot say what is the contents and the

16   meaning of this mail.

17        Q.    This is an e-mail from Mr Cordonnier to

18   yourself and others and he opens by saying that he

19   received a telephone call from Mr Willaert.    Then the

20   remainder of the e-mail reports on that conversation?

21        A.    Yes.

22        Q.    At this point was Mr Cordonnier handling

23   himself discussions with Mr Willaert concerning

24   repayment of the LIC and Radial loans?

25        A.    I don't know, I cannot answer, but it was a

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**

Tel: (011 44) 20 7264 2088                 Fax: (011 44)  20 7265 1703
Website: www.a-acr.com                     E-mail: info@a-acr.com


ANGLO-AMERICAN
COURT REPORTERS

123

1   loan as I understand it in the phase of reimbursements

2   of repayment, so it is not unusual that somebody of the

3   Loan Department tries to find out or get in contact

4   with the commercial relationship manager or client to

5   find out about repayment.   So for me it is not strange

6   or unusual seeing this.

7       Q.   You earlier described Mr Cordonnier's role as

8   primarily involved with loan documentation, is it

9   unusual you would be handling issues of repayment of a

10  loan past its due by date?

11      MS KODNER:   Objection to form.

12      A.   He was a member of the Loan Department and he

13  took care of everything which is -- legal issues of

14  loans.   As I understand it there was a link with some

15  legal issues and the repayment of this loan, so I can

16  imagine that Piet Cordonnier at that time was involved

17  in the discussions, the repayment with Geert Dauwe.

18      Q.   So his activity was more expansive than

19  preparing or assisting with loan documentation; is that

20  correct?

21      A.   He was a legal specialist active in Loan

22  Departments, his main function was loan, everything to

23  do with the legal framework of loans.   So this type of

24  activities don't seem extraordinary to me, no.

25      Q.   If we can mark as the next Exhibit Van Tiggel

