# EXHIBIT B

## Patrick Egan

**From:**    Jeff.Butler@CliffordChance.com

**Sent:**    Wednesday, August 09, 2006 11:34 AM

**To:**    Patrick Egan

**Cc:**    PRocco@lawssb.com

**Subject:** RE: Quaak v. Dexia

Pat:

We have been working on this, and I can propose the following:

Ferrand:  We are trying to schedule this for September 7-8, but Ferrand is on vacation until August 21 and we cannot confirm those dates until then.  We are not willing to schedule more than 2 days for this deposition.

Van Helleputte:  September 19

De Coen:  September 21-22

Rabaey:  We are still working on this, but the deposition will be no earlier than the week of September 25.  As with Ferrand, we are not willing to schedule more than 2 days for this deposition.

Please confirm that the proposed dates for Ferrand, Van Helleputte and De Coen will work from your end.  I will be in touch later this week or early next week on Rabaey

JB

-----Original Message-----
**From:** Patrick Egan [mailto:pegan@bermanesq.com]
**Sent:** Tuesday, August 08, 2006 2:34 PM
**To:** Butler, Jeff E. (Litigation-NY)
**Cc:** Patrick L. Rocco
**Subject:** Quaak v. Dexia

Jeff:

What is the status of your efforts to obtain potential deposition dates for Rabaey, Ferrand, De Coen and Van Helleputte?
Thank you.

Patrick T. Egan
Berman DeValerio Pease Tabacco Burt & Pucillo
One Liberty Square
Boston, MA 02109
Tel: (617) 542-8300
Fax: (617) 542-1194

**************************************************************************
This electronic mail transmission may contain confidential information and is intended only for the person(s) named. Any use, copying or disclosure by any other person is strictly prohibited. If you have received this transmission in error, please notify the sender via e-mail.

# EXHIBIT C

**Patrick Egan**

| | |
|---|---|
| **From:** | Jeff.Butler@CliffordChance.com |
| **Sent:** | Friday, September 01, 2006 2:35 PM |
| **To:** | Patrick Egan |
| **Cc:** | PRocco@lawssb.com; Avi@blbglaw.com; sdavies@JOSEPHNYC.COM; gcoe@BSFLLP.com; kdyer@BSFLLP.com |
| **Subject:** | RE: Quaak v. Dexia |

Pat:

As I indicated repeatedly during our call on Tuesday, I was not authorized to make a firm proposal on the letters rogatory issues.  We have now concluded that the compromise we discussed will not work from our end.  If plaintiffs are not willing to withdraw their two sets of additional questions, we will file a motion to exclude them from the letters rogatory.

Regarding the depositions of Mr. Rabaey and Mr. Ferrand, we are not willing to schedule these depositions if plaintiffs are going to file a motion to extend the examination period to four days.  If plaintiffs decide to file a motion, we would schedule these depositions only after the motion is decided by the Court.

JB

-----Original Message-----
From: Patrick Egan [mailto:pegan@bermanesq.com]
Sent: Friday, September 01, 2006 11:30 AM
To: Butler, Jeff E. (Litigation-NY)
Cc: Patrick L. Rocco; Avi Josefson; Susan M. Davies; George Coe; Karen Dyer
Subject: RE: Quaak v. Dexia


Jeff:

Thank you for your email concerning your availability.  I believe this email will eliminate a need for call.

First, as to letters rogatory, Plaintiffs agree to Dexia's proposal to submit cross-examination questions on the "supplemental questions" by September 8, with translations by September 13.  Plaintiffs reserve the right to submit redirect questions on the "supplemental questions" by September 15, and agree that Dexia may submit re-cross by September 18.
Plaintiffs further agree that all objections to letters rogatory questions, including objections to form, can be asserted at the time any testimony is offered at trial and that neither party will assert waiver as an argument against any future objections.

Second, as to the depositions, Plaintiffs have noticed Mr. van Helleputte for two-days, and seek to take Mr. Rabaey and Mr. Ferrand, both of whom need their testimony fully interpreted, for up to four days (which would, effectively be two days in English).  You have indicated that you will consider making van Helleputte available for the evening of September 19, but not on September 20.  As for Messrs. Rabaey and Ferrand, you are only agreeable to make them available on two days, and have yet to propose firm dates.

Plaintiffs are available week of October 9 and will notice Messrs.
Rabaey and Ferrand for the "tentative" dates you propose in or to preserve those dates.
But, Plaintiffs also intend to file a motion with the Court seeking to extend the time for the depositions.

If I have misstated Dexia's position in any way, please let me know immediately.

Patrick T. Egan
Berman DeValerio Pease Tabacco Burt & Pucillo One Liberty Square Boston, MA 02109
Tel: (617) 542-8300
Fax: (617) 542-1194

1

*******************************************************************
This electronic mail transmission may contain confidential information and is intended
only for the person(s) named. Any use, copying or disclosure by any other person is
strictly prohibited. If you have received this transmission in error, please notify the
sender via e-mail.
-----Original Message-----
From: Jeff.Butler@CliffordChance.com
[mailto:Jeff.Butler@CliffordChance.com]
Sent: Thursday, August 31, 2006 5:19 PM
To: Patrick Egan
Subject: Re: Quaak v. Dexia

Pat:  I'm traveling today, but we could talk tomorrow.  JB


-----Original Message-----
From: Patrick Egan
To: Butler, Jeff E. (Litigation-NY)
Sent: Thu Aug 31 15:51:02 2006
Subject: Quaak v. Dexia

Jeff:


Are you available later this afternoon at 4:30 for a very short call about the scheduling
of the depositions?


Patrick T. Egan

Berman DeValerio Pease Tabacco Burt & Pucillo

One Liberty Square

Boston, MA 02109

Tel: (617) 542-8300

Fax: (617) 542-1194


*******************************************************************
This electronic mail transmission may contain confidential information and is intended
only for the person(s) named. Any use, copying or disclosure by any other person is
strictly prohibited. If you have received this transmission in error, please notify the
sender via e-mail.




*******

This message and any attachment are confidential and may be privileged or otherwise
protected from disclosure.  If you are not the intended recipient, please telephone or
email the sender and delete this message and any attachment from your system.  If you are
not the intended recipient you must not copy this message or attachment or disclose the
contents to any other person.

For further information about Clifford Chance please see our website at
http://www.cliffordchance.com or refer to any Clifford Chance office.

# EXHIBIT D



485 SEVENTH AVENUE • SUITE 1000 • NEW YORK • NEW YORK • 10018

TELEPHONE
(212) 239-4340

FAX
(212) 239-4310

September 6, 2006

WEB
WWW.LAWSSB.COM

EMAIL

*Via Electronic & Regular Mail*

Jeff E. Butler, Esq.
Clifford Chance US LLP
31 West 52nd Street
New York, NY 10019-6163

Re:    *Quaak, et al. v. Dexia SA, et al.*, No. 03-Civ-11566 (PBS)
       *Stonington Partners, Inc. v. Dexia, S.A.*, No. 04-CV-10411-PBS
       *Filler v. Dexia, S.A.*, No. 04-CV-10477-PBS
       *Baker v. Dexia, S.A.*, No. 04-CV-10501-PBS

Dear Jeff:

       We write on behalf of all Plaintiffs in the four above-captioned actions against
Dexia Bank Belgium ("Dexia"). Enclosed please find Deposition Notices for Peter
Rabaey and Bart Ferrand on behalf of all Plaintiffs in those actions. In light of your
representation that both Mr. Rabaey and Mr. Ferrand will need full translations of all of
the questions and answers at their depositions, these depositions are being noticed for
four days each. While you previously agreed to produce each of these witnesses only for
two days of examination, you informed us last Friday that Dexia is now unwilling to
produce either of these witnesses for *any* duration if Plaintiffs seek more than two days of
examination. Plaintiffs will not agree in advance of these depositions to artificially limit
the time needed for a fair examination. Moreover, as demonstrated below, we do not
intend to file any motion to extend the examination period because no such motion is
necessary.

       On September 15, 2005, Plaintiffs originally noticed both of these depositions for
two days with the express provision that they shall continue from day to day until
finished. At that time, we were not aware that these witnesses would testify exclusively
through an interpreter. After you refused to produce these witnesses we moved for an
order compelling their depositions. You unsuccessfully opposed that motion without
ever disputing the duration of either of those depositions. On July 10, 2006, Judge

SHALOV STONE & BONNER LLP

Collings held that these witnesses were "managing agents" of Dexia within the meaning of Rule 30 and ordered Dexia to produce both Mr. Rabaey and Mr. Ferrand for deposition in each of the above-captioned cases.

You have insisted during our meet-and-confer sessions that Plaintiffs in these four separate and voluntarily coordinated actions are entitled only to one 7-hour deposition of Mr. Rabaey and Ferrand.[1]  However, the Federal Rules clearly allow for a 7-hour deposition of each of these witnesses in *each* of these four separate actions. Notably, Judge Collings has never altered these limitations. Moreover, Judge Saris has already expressed her view in the related *In re Lernout & Hauspie Speech Products Securities Litigation* that a four-day limitation on depositions of a party's witnesses is appropriate.

Moreover, because these depositions will be fully translated, the noticed time period of four days is equal to substantially less than a two-day (14-hour) deposition conducted in English.  Thus, these four days of depositions are, in fact, less than half of the total amount of time that Plaintiffs are entitled to in their four respective actions.  This time is necessary for these two witnesses because Plaintiffs must cover Messrs. Rabaey's and Ferrand's extensive involvement in almost every transaction at the heart of the fraud allegations set forth in all of the complaints.  Further, the *Stonington, Filler,* and *Baker* Plaintiffs must also examine those witnesses on their involvement in the Dragon and Dictaphone transactions.

Accordingly, please be advised that we will appear in Belgium on the dates noticed to take these depositions.  If you refuse to produce these witnesses on the dates noticed, or seek to terminate the depositions prematurely, we will move to hold Dexia in contempt of the Court's July 10, 2006 order and will seek all appropriate sanctions up to and including a default judgment.

In addition, we have noticed the deposition of Mr. van Helleputte for two days, on September 19 and 20, 2006.  You have previously indicated that you are not willing to make Mr. van Helleputte available for a second day of questioning.  This is unacceptable. For the reasons set forth above, plaintiffs are clearly entitled under both the Court's

---

[1] By agreeing to two days for each of these depositions you have implied that a fully interpreted deposition for two days equals a one-day deposition taken in English.  This, however, is not the case.  In fact, in this case thus far, fully translated two-day depositions have yielded substantially less testimony than one-day depositions conducted in English. By way of example, Plaintiffs deposed Dexia employee Bernard Mommens in English for one day, resulting in a 352 page transcript.  By comparison, two-day depositions conducted through an interpreter have resulted in much shorter transcripts:  Probst (228 pages total), Piret (264 pages total), Van Reit (221 pages total).  Thus, even if Dexia's erroneous view were correct that Plaintiffs were entitled to only one 7-hour deposition of each witness, the two-day duration that Dexia is willing to agree to does not even satisfy that limitation.

2

SHALOV STONE & BONNER LLP

orders and the Federal Rules of Civil Procedure to at least this amount of time. Accordingly, if Dexia fails to produce Mr. Van Helleputte on the dates Plaintiffs have noticed, or seeks to end his deposition prematurely, Plaintiffs will move to hold Dexia in contempt of the Court's July 10 Order, and will seek all appropriate sanctions.

Finally, as to the letters rogatory issue, we are not willing to withdraw any of the questions submitted and invite you to file your motion. Obviously, in light of our failure to reach a compromise, Plaintiffs will maintain our position that Dexia has waived all objections to the questions submitted by Plaintiffs.

Sincerely,

Patrick L. Rocco

[Enclosure]

cc:     Peter M. Saparoff, Esq. (via electronic mail)
        Patrick Egan, Esq. (via electronic mail)
        Susan M. Davies, Esq. (via electronic mail)
        Karen C. Dyer, Esq. (via electronic mail)
        Steven Singer, Esq.  (via electronic mail)

3

# EXHIBIT E

# C L I F F O R D
# C H A N C E

**CLIFFORD CHANCE US LLP**

31 WEST 52ND STREET
NEW YORK NY 10019 6131

TEL +1 212 878 8000
FAX +1 212 878 8375
www.cliffordchance.com


**Jeff E. Butler**

DIRECT TEL  212-878-8205
DIRECT FAX  212-878-8375
jeff.butler@cliffordchance.com

September 11, 2006

VIA FACSIMILE

Patrick L. Rocco, Esq.
Shalov Stone & Bonner LLP
485 Seventh Avenue, Suite 1000
New York, NY 10018

Re:     *Quaak v. Dexia Bank Belgium*
        *Stonington v. Dexia Bank Belgium*
        *Filler v. Dexia Bank Belgium*
        *Baker v. Dexia Bank Belgium*

Dear Pat:

This responds to your letter dated September 6, 2006, concerning the depositions of Joris Van Helleputte, Bart Ferrand and Peter Rabaey.

With respect to Mr. Van Helleputte, I am surprised at your insistence that Plaintiffs are entitled to two full days of examination on September 19 and 20. Consistent with Plaintiffs' initial deposition notice, we have scheduled a one-day deposition for Mr. Van Helleputte on September 19. Mr. Van Helleputte is not even available on September 20. Moreover, the normal rule is that permission from the Court is needed to take a deposition of more than one day. *See* Fed. R. Civ. P. 30(d)(2). As we expect Mr. Van Helleputte to testify in English, there is no reason to depart from the normal rule.

Your observation that there are four sets of Plaintiffs in this litigation is irrelevant. Plaintiffs have jointly noticed each of the depositions in this case, and have coordinated their examinations of all other Dexia witnesses in the past by appointing one person to be the lead examiner. There is no reason why Plaintiffs should now be allowed to conduct separate, consecutive examinations of Mr. Van Helleputte.

In addition, Plaintiffs have not raised this issue in a timely manner. By letter dated July 14, 2006, we offered to schedule Mr. Van Helleputte for a one-day deposition on August 11, 2006. At Plaintiffs' request, we subsequently agreed to postpone that deposition, but nothing was said about any need for two days of examination. On August 9, 2006, we proposed to schedule his deposition for September 19, 2006. Once again, no objection to a one-day deposition was raised until we received your amended deposition notice, more than

NYB 1536667.1

CLIFFORD CHANCE US LLP

**C L I F F O R D**

**C H A N C E**

Patrick L. Rocco, Esq.                                          Page 2
September 11, 2006

two weeks later, listing September 19-20 as the dates for the deposition. We immediately informed you by e-mail that Mr. Van Helleputte had been offered for one day, not two. More time passed before you finally confirmed, less than two weeks before the proposed deposition, that Plaintiffs are seeking two days of testimony. Having failed to raise this issue in a timely manner, it is unreasonable for Plaintiffs to insist on two days of testimony from Mr. Van Helleputte.

For all of these reasons, we expect Plaintiffs to go forward with a one-day deposition of Mr. Van Helleputte on September 19, 2006. This is consistent with the Federal Rules and with Plaintiffs' original deposition notice, which was the subject of the Court's order on July 10, 2006. As previously indicated, we would be willing to continue the deposition later than usual on the 19th, if reasonably necessary to complete the deposition.

Regarding the depositions of Mr. Ferrand and Mr. Rabaey, we are not willing to schedule four days for each of these witnesses, and it is impossible to schedule any dates for these depositions while their duration is still subject to dispute. Please let me know if you would be willing to reconsider your position. Otherwise, I think we have reached an impasse on this issue.

Sincerely,

Jeff E. Butler

cc:    Patrick Egan, Esq.
        Susan Davis, Esq.
        Steven B. Singer, Esq.
        Karen C. Dyer, Esq.
        Alan Cotler, Esq.
        Peter M. Saparoff, Esq.

# EXHIBIT F

# Mini Transcript and Word Index To the Deposition of

# JACQUES JANSSENS
## Vol 2
### April 21, 2006

## In the case:

## Quaak et al
## Vs.
## Dexia et al

## Taken in
## Brussels, Belgium

Reporting supplied by
Anglo-American Court Reporters Ltd
London England
Tel: + 44 (0) 207 264 2088
Email: info@a-acr.com

Jacques Janssens    Vol 2    21st April, 2006

SHEET 34    PAGE 259

**259**

1 proposed by Artesia Securities?
2    A. Artesia Securities was not
3 presenting requests for loan for unlisted
4 companies, they were proposing holdings in unlisted
5 companies.
6    Q. And did the Credit Committee of
7 Artesia Bank have the authority to reject the
8 proposal that Artesia Securities would require
9 certain unlisted companies as securities?
10    A. Yes.
11    Q. Were accounts of Artesia Bank
12 and Artesia Securities maintained in the same
13 place?
14    MR. BUTLER: Objection to form.
15    A. I am not competent to answer
16 this question. I do not know.
17    MR. ROCCO: Do you know who would
18 know the answer to that question?
19    A. No.
20    MR. BUTLER: It is after 5.30. We
21 are going to wrap it up.
22    MR. ROCCO: I will do my best.
23    MR. BUTLER: Well, we are going to
24 stop right now unless you have a couple of
25 questions left.

PAGE 260

**260**

1    MR. ROCCO: Well, when I finish this
2 line of inquiry.
3    MR. BUTLER: How long is it going on
4 to take?
5    MR. ROCCO: Five or ten minutes.
6    MR. BUTLER: No; I told you 5.30.
7    MR. ROCCO: You are refusing to
8 continue this deposition?
9    MR. BUTLER: This deposition has gone
10 on for two full days.
11    MR. ROCCO: Yes, but with an
12 interpreter it is not a lot of time. Mr. Janssens,
13 for better or for worse was involved with every
14 transaction that is at issue in this litigation. I
15 think he is the first witness that was so involved.
16    MR. BUTLER: But you knew all that
17 when you started the deposition and when you
18 noticed it for two days.
19    MR. ROCCO: I don't think we have
20 been tap dancing here. I think the record will
21 reflect that we made and honest effort to get
22 everything done when I'm finished, but if you are
23 calling it off...
24    MR. BUTLER: Will you be finished in
25 five or ten minutes?

PAGE 261

**261**

1    MR. ROCCO: I don't believe I will
2 be.
3    MR. BUTLER: So you will take the
4 same position whether we stop now or whether we
5 stop ten minutes from now.
6    MR. ROCCO: I think I can be done in
7 a couple of hours, but not ten minutes.
8    MR. BUTLER: Let's go off the record.
9    (Off the record 17.34 - 17.35)
10    MR. BUTLER: Let me just try to state
11 for the record what we talked about, and Pat you
12 can tell me if any of it is incorrect. We have -
13 well, we expected this deposition to go on for two
14 days; it has now been two full days. Mr. Rocco
15 tells me that he still has quite a bit of
16 questioning left, but I am ending his portion of
17 the deposition at this point. I do have a short
18 amount of redirect for this witness based on
19 questions previously asked. I am going to ask those
20 questions and get my answers for the record. I
21 have offered Mr. Rocco a short opportunity to
22 re-cross, and perhaps you should just state your
23 position on that at this time.
24    MR. ROCCO: Sure. Obviously I object
25 to the termination of this deposition before I am

PAGE 262

**262**

1 done with my questioning. On that basis I object
2 to you doing any redirect until I am done with my
3 questioning. But if you are going to ask redirect
4 questions, I certainly will object to their
5 admissibility if I am not given a chance to
6 re-cross. I would also like at this point, without
7 knowing what questions you are going to ask, I
8 would like a standing objection to any leading
9 questions that you might pose. That will save me
10 from having to object on that form.
11    MR. BUTLER: I agree with that and I
12 understand that you are reserving all rights to
13 object to my questions, or certainly to the
14 admissibility of any of the answers.
15 Cross-examined by MR. BUTLER.
16    Q. Mr. Janssens, I am just going to
17 ask you a few questions in the hope of clarifying
18 some matters that we've discussed in the past two
19 days, is that okay?
20    A. Yes.
21    Q. Do you have any formal training
22 in accounting?
23    A. No; I have university training
24 in management and applied economics, and at
25 university I had a few accounting courses, but that

Jacques Janssens          Vol 2          21st April, 2006

PAGE 263

263

1    is what my training in accounting is limited to.
2            Q. When did you attend university?
3            A. In the 1960's.
4            Q. Can you describe for me in any
5    more detail the nature of the accounting courses
6    that you took at university?
7            A. There was one on general
8    accounting principles, one with the application of
9    those to the Belgian accounting plan, and there was
10   also one on industrial accounting; and all this is
11   on Mr. Mr. Van Broeckhoven's statements in 97.
12   Sorry, I don't remember much more.
13           Q. Do you recall any course work at
14   university concerning United States accounting
15   principles?
16           A. I am certain I didn't have any.
17           Q. Apart from the work that you did
18   at university in the 1960's, have you had any other
19   formal training in accounting?
20           A. No.
21           Q. Have you ever worked as an
22   accountant?
23           A. No.
24           Q. During the course of your
25   employment at Paribas and Artesia, did you consider

PAGE 264

264

1    it to be part of your job to give accounting
2    advice?
3            A. No, not accounting advice.
4            Q. And were you ever asked, during
5    the course of your employment at Paribas and
6    Artesia, to provide accounting advice?
7            A. No.
8            Q. Regarding the Dictation
9    consortium loans, you were shown documents by Mr.
10   Rocco indicating that Lernout and Hauspie intended
11   to recognise revenue from sales to Dictation
12   Consortium, do you recall that?
13           A. Yes.
14           Q. Did you personally have an
15   opinion, at the time of the Dictation Consortium
16   loan, as to whether it was proper or improper,
17   under US accounting principles, for Lernout and
18   Hauspie to recognise revenue from sales to
19   Dictation Consortium?
20           A. My opinion was based on the
21   statements that were made in the different files,
22   statements, that came from inside and outside
23   sources, but I did not have what you would call
24   personal opinion.
25           Q. With respect to the Brussels

PAGE 265

265

1    Translation Group loan, you were shown some
2    documents indicating that Lernout and Hauspie
3    intended to recognise revenue from sales to that
4    entity, do you recall that?
5            A. Yes.
6            Q. Just as I asked before, did you
7    personally have an opinion at the time of the
8    Brussels Translation group loans as to whether it
9    was proper or improper, under US accounting
10   principles, for Lernout and Hauspie to recognise
11   revenue from sales to the Brussels Translation
12   group?
13           A. No, it is the same answer as for
14   the previous question; I didn't have a personal
15   opinion.
16           Q. With respect to the loan to
17   Language Investment Company at the end of 1998, I
18   believe we had some discussion during the course of
19   today and yesterday that Lernout and Hauspie
20   intended to recognise revenue from sales to
21   language development companies that received funds
22   from the Language Investment Company. Do you recall
23   having those discussions?
24           A. Yes.
25           Q. Once again, did you personally

PAGE 266

266

1    have an opinion at the time the Language Investment
2    Company loan was approved as to whether it was
3    proper or improper, under US accounting principles,
4    for Lernout and Hauspie to recognise revenue from
5    sales to those language development companies?
6            A. No.
7            MR. BUTLER: Those are all the
8    questions I have at this time. Pat, would you like
9    to reconsider taking the opportunity to re-cross at
10   this time?
11           MR. ROCCO: I would like some
12   re-cross, but I want to reserve my original
13   objection. I have some more substantive things to
14   go into. I understand you don't want me to do that,
15   but I will use my chance to re-cross. As to that, I
16   will cover maybe issues you have just raised.  Go
17   off the record for a second, I would like to find
18   an exhibit.
19       (Off the record 17.48 - 17.52)
20   Re-examined by MR. ROCCO.
21           Q. Mr. Janssens, in circumstances
22   during the course of your duties with Artesia Bank,
23   when you were faced with an issue that was beyond
24   your personal ability, would you rely on the advice
25   of experts to guide you?

Jacques Janssens        Vol 2        21st April, 2006

SHEET 35    PAGE 267

267

1          A. If I was faced with a
2    significant problem, I would have to do it.
3          Q. You had access to lawyers if you
4    needed legal advice, correct, sir?
5          A. That is correct.
6          Q. You had access to accountants if
7    you needed accounting advice, correct?
8          MR. BUTLER: Objection to form.
9          A. No, not automatically access.
10          MR. ROCCO: I did not ask whether you
11    had automatic access. If you needed to, sir, you
12    could consult an expert accountant if it involved
13    an important matter for the bank, is that correct?
14          MR. BUTLER: Objection to form.
15          A. It is a very theoretical
16    question. If I had an accounting problem, it would
17    have been in bank accounting, and I cannot really
18    see, if a client had an accounting problem, it was
19    not really part of my functions to find him a
20    solution.
21          Q. In the case of Dictation and the
22    other loans we considered, the bank was provided
23    with expert accounting advice from the client,
24    isn't that correct?
25          MR. BUTLER: Objection to form.

PAGE 268

268

1          A. I do not know if - I do not know
2    if it received from a customer; not only from a
3    customer in my opinion.
4          Q. Sir, you would agree with me
5    that KPMG are world renowned experts in accounting,
6    is that correct?
7          A. Yes.
8          Q. And KPMG informed the bank that,
9    in order for Lernout and Hauspie to recognise
10    revenue on the transactions that were being funded
11    by the bank, Lernout and Hauspie (the company)
12    could not be involved, directly or indirectly, with
13    the financing of Dictation Consortium, correct?
14          A. That is correct.
15          Q. And, sir, you do not need an
16    accounting degree to understand what that means, do
17    you?
18          MR. BUTLER: Objection to form.
19          A. I do not know.
20          MR. ROCCO: Sir, KPMG also informed
21    the bank that, in order for Lernout and Hauspie to
22    recognise revenue on the transactions we have been
23    discussing, that the company Lernout and Hauspie
24    could not be directly or indirectly involved, or
25    via security be involved, for the repayment of the

PAGE 269

269

1    financing that would be granted to companies such
2    as Dictation Consortium NV, am I correct?
3          A. I can see the connection here.
4    I have already explained that we considered there
5    was no link in the transactions of the bank. There
6    was - there were contracts between client and the
7    supplier, and it was logical for us to be financing
8    client/supplier transaction. We considered there
9    was no link.
10          Q. And, sir, you had access-
11    withdrawn. And there was nothing stopping you from
12    speaking to KPMG if you had any doubt as to what
13    was meant by the accounting advice that was
14    provided to the bank, is that correct?
15          MR. BUTLER: Objection to form.
16          A. I did not have a doubt about the
17    meaning of what was said.
18          MR. ROCCO: Did you have access to
19    accountants on your staff in the credit risk
20    department?
21          A. Yes.
22          Q. Where they available to give you
23    accounting advice if you needed it?
24          A. Yes, but they were not
25    specialised in US accounting.

PAGE 270

270

1          Q. Sir, did Artesia Bank generally
2    attempt to avoid loaning funds to companies that
3    did not comply with applicable revenue recognition
4    rules?
5          A. Our policy was indeed not to
6    grant loans to companies that did not comply with
7    their legal obligations, in as much as we were able
8    to be aware that they did not comply with their
9    legal obligations.
10          MR. ROCCO: Jeff, I reserve my right
11    to finish my questioning of Mr. Janssens but, as to
12    the limited issue of cross on your redirect, I am
13    through.
14          MR. BUTLER: Okay. I have no further
15    questions.
16          (The deposition concluded at 18.03)
17    --------------------------------
18
19
20
21
22
23
24
25