UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANET BAKER and JAMES BAKER, JKBAKER LLC and JMBAKER LLC, Plaintiffs, <br><br> v. <br><br> DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA), Defendants. | **LEAVE TO FILE GRANTED ON OCTOBER 13, 2006** <br><br> **JURY TRIAL DEMANDED** <br><br> No. 04-CV-10501-PBS |

## FIRST AMENDED COMPLAINT

Plaintiffs, Janet Baker, James Baker, JK Baker LLC and JM Baker LLC ("Baker Plaintiffs") by their attorneys, as and for their respective First Amended Complaints, allege the following upon knowledge as to themselves and their own actions. As to all other matters, Baker Plaintiffs' allegations are based upon the investigation of counsel. For the Court's convenience, paragraphs 1-274 of this First Amended Complaint are identical to those same numbered paragraphs in the First Amended Complaint Filed by Gary B. Filler and Lawrence Perlman ("Filler Plaintiffs") in the related action of Filler v. Dexia, S.A., 04-CV-10477-PBS. Baker Plaintiffs and Filler Plaintiffs are referred collectively herein as "Plaintiffs."

### NATURE OF THE ACTION

1.      This action arises out of the massive fraud that was perpetrated at Lernout & Hauspie Speech Products, N.V. ("L&H" or the "Company") and is related to other actions currently pending in this District, including *Filler et al. v. Lernout, et al.*, 02-CV-10302-PBS (the "Filler Action") and *Baker et al. v. Lernout, et al.*, 02-CV-10304-PBS (the "Baker Action"). The principal defendants in both the Filler Action and Baker Action include L&H's senior officers and directors, and other entities and individuals that played significant

roles in the fraudulent scheme Plaintiffs allege. L&H is not a defendant in those actions because it filed for bankruptcy and was subsequently liquidated.

2.      Plaintiffs bring the above-captioned actions against defendant DEXIA BANK BELGIUM ("Dexia") based on newly-discovered evidence demonstrating that Artesia Banking Corporation, S.A., including its predecessors Banque Paribas Belgium and BACOB Bank C.V. (collectively, "Artesia Banking" or the "Bank"), and Artesia Banking's subsidiary, Artesia Securities, S.A. ("Artesia Securities"), were key participants in the fraud perpetrated at L&H. Dexia is liable for its own misconduct, as set forth below. Dexia is also liable for the misconduct in which Artesia Banking and Artesia Securities (the "Artesia Entities") engaged because (a) Dexia is the successor to Artesia Banking; and (b) prior to the time Artesia was merged into Dexia, the Artesia Entities engaged in conduct sufficient to impose liability upon Artesia Banking as a "controlling person" of Artesia Securities. On June 24, 2003, Dexia stated that it had been notified that it was a suspect in the Belgian criminal investigation into L&H because of actions taken by Artesia Banking between 1998 and 2000.

3.      The above-captioned actions seek to recover hundreds of millions of dollars in damages sustained by Plaintiffs when they sold their respective interests in Dragon Systems, Inc. ("Dragon") for artificially inflated, and ultimately worthless, L&H stock. Prior to the sale of Dragon to L&H, Janet and James Baker had owned approximately 51% of the outstanding common stock of Dragon, and Seagate had owned approximately 40%. Seagate and James and Janet Baker (collectively "Dragon Parties") purchased L&H stock in a merger of Dragon into a Massachusetts-based subsidiary of L&H that was consummated only months before public exposure of the fraudulent transactions and accounting practices that

2

had enabled L&H to falsely inflate its revenues by at least 50% since 1997. In 1999 alone, fully 70% of L&H's revenue was fictional and has since been reversed. These fraudulent transactions and practices were the underpinning of a material artificial inflation of the value of the L&H stock the Dragon Parties purchased.

4.    A critical element of the fraud at L&H was a scheme whereby parties related to L&H established, funded and operated sham entities that entered into bogus software licensing arrangements that were intended to, and did, artificially inflate L&H's revenues and profits. The scheme accounted for approximately 10% of L&H's 1998 revenues and approximately 25% of its 1999 revenues.

5.    As was belatedly revealed, L&H could not have accomplished its fraud without the knowing participation of Artesia Banking. In particular, Artesia Banking was instrumental in setting up and financing the so-called Language Development Companies ("LDCs") and Cross-Language Development Companies ("CLDCs"), which L&H completely controlled but which L&H misrepresented to the public and the Dragon Parties as unaffiliated "strategic partners." At the request of L&H, Artesia Banking knowingly provided funds to nominal owners of the LDCs and CLDCs, which the LDCs and CLDCs then paid to L&H in the form of licensing fees, and which L&H booked as revenue. To outside investors, the LDCs and CLDCs appeared to be legitimate customers of L&H that had licensed millions of dollars of L&H software. In reality, however, the LDCs and CLDCs were nothing more than corporate shells utilized by L&H to artificially inflate its revenues, as Artesia Banking knew.

6.    At the time it financed these transactions, Artesia Banking understood that the LDCs and CLDCs were nothing more than corporate fictions, with no real assets or

operations. Indeed, Artesia Banking's own internal "risk evaluation" documents, which are quoted in a confidential May 28, 2001 report (the "Prosecutors' Report") prepared by a panel of experts for prosecutors in Belgium who investigated the L&H fraud (the "Belgian Prosecutors"), summed up the strategic partners as follows: "**In actuality, these companies represent nothing (no activities, no assets)**." (Emphasis supplied). In fact, any research and development ("R&D") work purportedly performed by the LDCs and CLDCs was done by L&H employees. In this way, L&H used the LDCs and CDLCs not only to inflate its revenues but also to move R&D expenses from its books, thereby artificially and fraudulently depressing its reported operating expenses.

7.      Artesia Banking also understood that it was L&H who was ultimately responsible for ensuring that the loans would be repaid. Indeed, after the fraud was revealed, L&H admitted that it had initially financed the operations of the LDCs and CLDCs. Artesia Banking requested that L&H's senior officers, Pol Hauspie ("Hauspie"), Jo Lernout ("Lernout") and Nico Willaert ("Willaert") (collectively, the "Principal Officers") provide personal guarantees for the loans to the LDCs and CLDCs. This presented an enormous problem for L&H, however. Under U.S. Generally Accepted Accounting Principles ("U.S. GAAP"), if the Principal Officers personally guaranteed these loans, the LDCs and CLDCs would be considered "related parties" to L&H, that fact would have to be disclosed on L&H's financial statements, and the sham nature of L&H revenues from those entities would be exposed.

8.      Upon being informed of this problem, Artesia Banking agreed to document the Principal Officers' loan guarantees for the first of the LDC/CLDC loans in secret side agreements, which were a critical component of the fraudulent scheme and a direct violation

of the Bank's own policies.  For subsequent loans, Artesia Banking devised a scheme to conceal the Principal Officers' guarantees as "credit default swaps," which – in contravention of the advice of Artesia Banking's own in-house counsel – would not be referenced in the loan documents and, hence, concealed from L&H's auditors, the U.S. Securities and Exchange Commission ("SEC") and L&H investors.  Artesia Banking modified this component of the scheme for the final LDC/CLDC loan in 1999:  the Bank loaned the money directly to the Principal Officers but concealed the true purpose of the loan and, subsequently – in March 2000 – lied to L&H's auditors about the existence of this loan.  L&H was thus able to record the entire amount of the fictitious license fees funded by Artesia Banking as revenue without making any "related party" disclosures that would have alerted the SEC and L&H investors to the fictitious nature of L&H's revenues.  In total, Artesia Banking made loans worth tens of millions of dollars to L&H-related parties between 1997 and 1999. Artesia Banking knew that all of these amounts were then paid to L&H and fraudulently recorded as revenue.

        9.      Artesia Banking's own internal documents confirm that it knowingly entered into the secret guarantees, credit default swaps and the personal loan to the Principal Officers for the express purpose of allowing L&H to report artificially inflated results in its public filings with the SEC.  For example, Artesia Banking entered into the secret guarantees with the Principal Officers after being informed – by, among others, L&H's lawyers – that under U.S. GAAP L&H could only recognize license fees paid by LDCs/CLDCs as revenue if those entities were "wholly independent of L&H" and if L&H was "not be liable in any manner (directly or through any guarantees, whether written or oral) to repay any bank or other financing to be received by [the LDCs/CLDCs]."  The Bank subsequently replaced the

secret guarantees with credit default swaps only after the Principal Officers indicated that they were no longer prepared to take the risk that the secret guarantees would be discovered. For example, an email from P. Rabaey at Artesia Banking to G. Dauwe and other Artesia Banking employees dated September 21, 1999 states "[t]he private guarantees, however, were not signed by Jo [Lernout], Pol [Hauspie] and Nico [Willaert] **in order to avoid possible problems with the SEC.** We therefore do not have the guarantees, and a solution is sought via credit default swaps." (Emphasis supplied.) Artesia Banking made the loan to finance LDCs/CLDCs directly to the Principal Officers, rather than lending the money to the LDCs/CLDCs with a credit default swap guarantee from the Principal Officers, only after the Bank's Legal Department and Internal Audit Department had learned of, and begun to protest, the Bank's non-disclosure of the prior credit default swaps with the Principal Officers. As Artesia Banking senior manager Alain Probst euphemistically stated at his deposition, the Bank's credit committee did not want to enter into another undisclosed credit default swap with the Principal Officers because of "the discussions between the Credit Risk Legal Affairs and other parties in the Bank."

10.    Apart from funding the LDCs/CLDCs, Artesia Banking also furthered the fraudulent L&H scheme by causing its wholly-owned subsidiary, Artesia Securities, to issue repeated glowing analyst reports concerning L&H's financial performance and prospects. The false positive statements made in those analyst reports were attributable to Artesia Banking because they were made at Artesia Banking's direction and within the scope of Artesia Securities' role as Artesia Banking's agent. Furthermore, by causing its agent, Artesia Securities, to issue those positive reports, Artesia Banking became obligated to disclose to Plaintiffs and other investors the adverse information in Artesia Banking's

possession concerning L&H, including Artesia Banking's role in creating fraudulent revenue for L&H through the ruse of the LDCs/CLDCs that Artesia Banking funded. Artesia Banking did not disclose that material information, however, and the market became aware that the revenue generated by means of the fraudulent scheme in which Artesia Banking participated was the product of fraud only gradually as the L&H fraud was discovered by investors in late 2000.

11.    Among other reasons, Artesia Banking knowingly engaged in the L&H fraudulent scheme was in order to manipulate the market price of L&H securities so that the Bank could sell its own shares of L&H – some of which were obtained by the Bank in return for financing the fraudulent LDCs/CLDCs – at inflated prices and reap substantial profits. According to its own documents, Artesia Banking directly benefited from the fraudulent inflation of the price of L&H securities by selling hundreds of thousands of shares of L&H stock for substantial profits on the following dates:

| Date | # of Shares |
|------|-------------|
| 1996 | 100,588 |
| 1997 | 301,176 |
| 1998 | 255,176 |
| 1999 | 52,000 |

In 2000, Artesia Banking received a profit in excess of $10 million on its sales of a total of 570,472 shares of L&H stock, and entered into such profitable transactions as late as September 26, 2000.

12.    In addition, Artesia Banking also obtained lucrative banking and investment fees from L&H and the Principal Officers in return for its knowing participation in the L&H scheme. Artesia Banking charged substantial interest rates and fees, and frequently obtained

7

equity kickers in the form of L&H stock or warrants, in connection with the loans extended to inflate L&H's reported revenue.

13.     Within months after the Dragon merger closed, the fraud had begun to unravel, and the artificially-inflated price of L&H stock plummeted. The SEC and Belgian Prosecutors commenced investigations into the fraud. L&H announced that as a result of "errors and irregularities," its financial results for 1998 through the first half of 2000 would be restated. L&H's stock was delisted in Europe and the United States. L&H went into bankruptcy and was subsequently liquidated. The Principal Officers and L&H's President and CEO, Gaston Bastiaens ("Bastiaens", and collectively with the Principal Officers, the "Senior Officers"), were arrested on criminal charges relating to the fraud at L&H.

14.     The first suggestion of Artesia Banking's role in the fraudulent scheme alleged herein of which Plaintiffs became aware, or could reasonably have been expected to discover, was Dexia's announcement on June 23, 2003 that the Belgian Prosecutors had notified Dexia that it was a criminal suspect because of actions taken by Artesia Banking in connection with L&H in 1998 through 2000. The U.S. press announced Dexia's indictment the following day. Also on June 24, 2003, an article in *De Financieel Economische Tiqd* (the "*Belgian Financial Times*"), entitled "Artesia Knew [L&H] Was Playing With Fire," reported that, according to the Belgian Prosecutors, Artesia Banking was "an exceptionally important banker to [L&H] involved in just about everything surrounding L&H." Belgian Prosecutors had, unbeknownst to the public, seized records from Artesia Banking in February 2001 that "contained a treasure of information" regarding the L&H fraud. According to the article, these records (which were not available to Plaintiffs or the public) showed that Artesia Banking made multiple loans in 1998 and 1999, totaling more than $30 million,

which were funneled through strategic partners to artificially inflate L&H's revenues.  The article also reported that, according to the Belgian Justice Department, Artesia Banking "knew that the top management of [L&H] was involved in practices that would not be tolerated by the American SEC."  The article stated that Artesia Banking had devised a method for concealing the fact that the Principal Officers had guaranteed the financing of certain LDCs and CLDCs, by disguising the guarantees as "credit default swaps" which were not referenced in the loan documents.

15.    Prior to these disclosures in June 2003, and despite diligent investigative efforts by Plaintiffs and their counsel, Plaintiffs were justifiably unaware of the role played by the Artesia Entities in the fraudulent scheme alleged herein.  In part, Plaintiffs' inability to learn of the fraudulent conduct of the Artesia Entities was the result of Artesia Banking's and Dexia's efforts to conceal that conduct, as is alleged in detail in paragraphs 232-236 below.

### JURISDICTION AND VENUE

16.    This action arises under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), and under state law.

17.    This Court has subject matter jurisdiction over this case pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa; 28 U.S.C. §1331; and principles of supplemental jurisdiction, 28 U.S.C. §1367.  Independently, this Court has subject matter jurisdiction as a consequence of the diversity of citizenship of the parties pursuant to 28 U.S.C. §1332.

18.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1391(b).

19.    In connection with the acts alleged in this First Amended Complaint, the Artesia Entities and other participants in the L&H fraudulent scheme directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to, the

mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

## PARTIES AND UNNAMED ACTORS

20.    Plaintiffs Gary B. Filler and Lawrence Perlman (as set forth above, referred to herein as "Filler Plaintiffs") are the former Co-Chairmen of the Board of Seagate and currently the Trustees of the TRA Rights Trust, a trust organized under the laws of the State of Delaware (the "Trust"). The Trust is the sole successor in interest to Seagate for and on behalf of the stockholders of Seagate in respect of any and all claims and causes of action possessed by Seagate arising out of, in connection with, or relating to Seagate's acquisition or ownership of shares of, or holdings in, L&H. Filler Plaintiffs have the sole authority to bring any such claim, action, suit or proceeding against L&H and its affiliates, and/or any of L&H's officers, directors, agents, representatives, and their respective affiliates, and any other person or entity, whether at law or in equity, arising out if, in connection with, or relating to Seagate's acquisition or ownership of shares of, or holdings in, L&H. Pursuant to the merger agreement that gives rise to the claims herein, Seagate received 3,871,489 shares of L&H stock, including 297,120 shares that were placed in escrow. Seagate and Dragon are Delaware corporations. The former shareholders of Seagate who are the beneficiaries of the Trust are legally entitled, through the Trust, to the sole and exclusive benefit of any and all claims arising out of Seagate's ownership of L&H securities. The former Seagate shareholders are not entitled to seek damages or recover on behalf of Seagate or the Trust and do not, and never did, directly hold any of the claims asserted in this action by the Trust. The Trust was created in connection with Seagate's March 29, 2000 agreement to merge into a subsidiary of Veritas Software Corporation (a $12 billion merger) and sell its operating assets to Suez Acquisition Company (Cayman) Limited (a $2 billion leveraged buyout) (collectively, a $14 billion transaction). The Trust was created primarily for the purpose of collecting, managing, investing and distributing to Seagate's former shareholders hundreds of millions of dollars in potential future tax refunds and credits ( "tax rights") due Seagate for

tax periods prior to the closing of the Veritas Transaction. The name "TRA Rights Trust" itself reflects this purpose ("TRA" stands for "Tax Rights Amounts"). The Trust is a thriving, *bona fide* entity with a corpus at March 2002 of $176 million. The Trust had, by March 2002, collected nearly $46 million in federal and state Tax Rights and distributed $28.5 million to the former Seagate shareholders. As of March 2003, the Trust had distributed more than $45 million to the former Seagate shareholders.

21.    Plaintiffs Janet and James Baker are individuals who reside in Newton, Massachusetts and Maitland, Florida and are former owners of approximately 51% of the issued and outstanding stock of Dragon. The JKBaker LLC is a Delaware Limited Liability Company created to hold a portion of the L&H shares purchased by James Baker. The JMBaker LLC is also a Delaware Limited Liability Company; it was created to hold a portion of the L&H shares purchased by Janet Baker. James Baker and Janet Baker hold all economic and beneficial interest in the JKBaker LLC and the JMBaker LLC, respectively. Pursuant to the merger agreement that gives rise to the claims herein, Janet and James Baker received 5,109,713 shares of common stock of L&H, including 392,149 shares that were placed in escrow. (As set forth above, James Baker, Janet Baker, JKBaker LLC and JMBaker LLC are referred to herein as "Baker Plaintiffs.").

22.    Defendant Dexia is a wholly-owned subsidiary of Dexia S.A. and at all relevant times regularly transacted business in the United States through its New York branch and by other means. Dexia has conceded in prior pleadings in these actions that it is subject to personal jurisdiction in the District of Massachusetts for purposes of these actions.

23.    Until in or about July 2001, Artesia Banking was a wholly-owned subsidiary of Acrofin CVBA, a Belgian financial services group. On March 31, 2001, Dexia S.A. announced that it was acquiring Artesia Banking from Acrofin, and that Artesia Banking would be merged into Dexia S.A.'s wholly-owned banking subsidiary Dexia Bank Belgium. That merger was consummated in or about April 2002.

11

24.     Artesia Banking continuously and systematically transacted business in the United States prior to its acquisition by Dexia through its subsidiaries. Artesia Banking's wholly-owned subsidiary Artesia Mortgage Capital Corp. ("Artesia Mortgage"), conducted business in the United States through its headquarters in Delaware and offices at 1180 NW Maple St. Suite 202, Issaqua, Washington 98027. Artesia Mortgage continues to conduct business under the same name although it is now owned by Dexia rather than Artesia Banking, and, since 1996, has closed loans with a principal balance of more than $2 billion.

25.     Artesia Banking also conducted business in the United States prior to its acquisition by Dexia through its wholly-owned subsidiary Artesia North America (headquartered in Delaware), and Artesia Securities, which had offices in New York.

26.     Artesia Banking was a member of the bank lending syndicate that provided $430 million in financing to L&H for the acquisition of Dictaphone Corporation in May 2000. The borrowers of the funds were Dictaphone (of Stratfield, Connecticut), L&H, and the Flanders Language Valley Fund ("FLV Fund"), jointly and severally. In addition, in 1997 Artesia Banking loaned money to an L&H client, Vasco Data Security International ("Vasco"), located in Illinois. Later, in early 1999, Artesia Banking was a lead underwriter in a private placement that provided financing to Vasco.

27.     During the time period prior to July 2001, Artesia Securities was a "societe anonyme" that conducted business primarily in Belgium from its offices in Brussels. Artesia Securities was a wholly-owned subsidiary of Artesia Banking, which also served as the "reference shareholder" of Artesia Securities. A reference shareholder is a shareholder who exercises controlling influence on the manner in which a company is run and which is actively involved in devising the company's business strategy. As set forth in greater detail at paragraphs 195-201 below, by virtue of its status as reference shareholder of Artesia Securities, Artesia Banking exercised absolute control over the operations of Artesia Securities, particularly with respect to Artesia Securities' actions related to the issuance of analyst reports concerning L&H.

28.    In July 2001, Dexia acquired Artesia Banking, the reference shareholder of Artesia Securities.  In February 2002, Artesia Securities changed its name to Dexia Securities Belgium S.A. ("Dexia Securities").  In April 2002, Artesia Banking was merged into Dexia, with Dexia as the surviving entity.

<u>**L&H and its Senior Officers**</u>

29.    L&H was formed in 1987 by Lernout and Hauspie.  Its three core technologies were automatic speech recognition, text-to-text speech conversions, and digital speech compression.  L&H was headquartered in Ieper, Belgium and Burlington, Massachusetts. Until it was delisted on December 8, 2000, L&H common stock was listed on the NASDAQ under the ticker symbol "LHSP" or "LHSEQ."  L&H stock was also traded on the EASDAQ until it was "indefinitely suspended" on or about November 9, 2000.  On November 29, 2000, L&H filed for protection from its creditors under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware, and contemporaneously commenced bankruptcy proceedings in Belgium.  L&H has since been liquidated.

30.    L&H Holdings USA, Inc. ("L&H USA") was a Delaware corporation, a wholly owned subsidiary of L&H, and the successor corporation to Dragon.  L&H USA was party to the Agreement and Plan of Merger with L&H, Dragon, and certain principal stockholders of Dragon (including Janet and James Baker and Seagate) pursuant to which L&H acquired Dragon in exchange for L&H common stock (the "Merger Agreement").  On November 29, 2000, L&H USA filed for protection from its creditors under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Wilmington, Delaware and was subsequently liquidated.

31.    Jo Lernout is a defendant in the Filler and Baker Actions, in which the Court has denied his motions to dismiss claims against him under Sections 10(b) and 20(a) of the Exchange Act and state law claims of common law fraud and aiding and abetting common law fraud.  Lernout was one of the founders of L&H.  Lernout was President of L&H from January, 1994 until February, 1996, Co-Chairman of the L&H Board from October 1996, and

a Managing Director of L&H from 1987, until he resigned those offices on November 9, 2000. Lernout served as a member of the Board of Directors of L&H until his resignation on January 16, 2001. Lernout was forced out of his remaining role as the Chief Technology Officer of L&H at the end of February, 2001. In April 2001, Lernout was arrested in Belgium for criminal charges related to the fraud at L&H. Lernout also served as a director of Flanders Language Valley Fund ("FLV Fund") from 1996 to 1997, and after 1997 continued to "spend a portion of his time on activities relating to the FLV Fund.

32.    Pol Hauspie is a defendant in the Filler and Baker Action, in which the Court has denied his motions to dismiss claims against him under Sections 10(b) and 20(a) of the Exchange Act and state law claims of common law fraud and aiding and abetting common law fraud. Hauspie was one of the founders of L&H. Hauspie was Chairman of L&H from January 1994 until October 1996, Co-Chairman of the L&H Board from 1996, and a Managing Director of L&H from 1987, until he resigned those offices on November 9, 2000. Hauspie resigned his board seat on November 22, 2000. In April 2001, Hauspie was arrested in Belgium for criminal charges related to the fraud at L&H. Hauspie also served as a director of FLV Fund from 1996 to 1997, and after 1997 continued to "spend a portion of his time on activities relating to the FLV Fund.

33.    Gaston Bastiaens is a defendant in the Filler and Baker Actions, in which the Court has denied his motions to dismiss claims against him under Sections 10(b) and 20(a) of the Exchange Act and state law claims of common law fraud and aiding and abetting common law fraud. Bastiaens joined L&H as President in September 1996, and was appointed Chief Executive Officer of L&H in May, 1997. Bastiaens resigned those offices on August 25, 2000, and his board seat on November 9, 2000. In May 2001, Bastiaens was arrested in Massachusetts and extradited to Belgium on criminal charges related to the fraud at L&H.

34.    Nico Willaert is a defendant in the Filler and Baker Actions, in which the Court has denied his motions to dismiss claims against him under Sections 10(b) and 20(a) of

14

the Exchange Act and state law claims of common law fraud and aiding and abetting common law fraud. Willaert joined L&H as a director in 1992 and remained on the Board of Directors until November 22, 2000. Willaert was also a Managing Director of L&H from April 1993, and Co-Vice-Chairman of L&H from January 1994, until he resigned those offices on November 9, 2000. In April 2001, Willaert was arrested in Belgium on criminal charges related to the fraud at L&H.

35.    Carl Dammekens ("Dammekens") is a defendant in the Filler and Baker Actions, in which the Court has granted Plaintiffs' motions for default judgments on claims against him under Sections 10(b) and 20(a) of the Exchange Act and state law claims of common law fraud and aiding and abetting common law fraud. Dammekens joined L&H in 1990 as Corporate Controller, and served as a Senior Vice President of Finance from 1993 and as Acting Chief Financial Officer of L&H from 1996 until his appointment as Chief Financial Officer on July 7, 1999. On November 9, 2000, L&H announced that Dammekens would be replaced as Chief Financial Officer.

## SUBSTANTIVE ALLEGATIONS

36.    In 1995, L&H completed its initial public offering and commenced trading on NASDAQ. From 1987 through 1995, L&H was not profitable and produced only a few million dollars in annual revenues

37.    In the third quarter of 1996, L&H began to expand its business. L&H's sales were reported as quadrupling between 1995 and 1996, and the period following was reported as one of unprecedented growth. In 1997, L&H's total reported revenues increased 220% to $99.4 million from $31 million in 1996. In 1998 L&H claimed that revenues rose 113% to $211.6 million, and by 1999 revenues were claimed to be $344 million. As is alleged in detail herein, that growth in L&H's revenues was fueled by loans from Artesia Banking, which L&H misrepresented as license fees from unaffiliated customers.

38.    The expansion of L&H's business was also achieved through L&H's practice of acquiring complementary businesses and technologies as a means of supplementing its

own internal development activities. As set forth in more detail in paragraphs 202-205 below, from 1996 onwards, L&H acquired at least 20 such companies, using its own fraudulently inflated stock as currency for over 40% of the acquisitions that took place from 1998 to 2000, including L&H's acquisition of Dragon from Janet and Jim Baker, Seagate and others.

## A. **DRAGON PARTIES' PURCHASE OF L&H SHARES**

39.     On March 27, 2000, L&H, L&H USA, Dragon, and certain of the principal stockholders of Dragon, including Janet and James Baker and Seagate entered into the Merger Agreement pursuant to which L&H acquired Dragon in a stock-for-stock transaction (the "Merger.") Under the terms of the Merger Agreement, the L&H shares acquired by the Dragon Parties were valued at the market price of $54.375 per share.

40.     Pursuant to the Merger Agreement, the Deemed Total Consideration paid for Dragon was the total of $613,879,747 plus any commitment or closing fees paid by Dragon associated with L&H's guarantee and ultimate payoff of an existing line of credit plus Dragon's Net Cash Amount as that term is defined in the Merger Agreement. As part of the Merger consideration, L&H also paid certain professional fees incurred by Dragon in connection with the Merger.

41.     On June 7, 2000, the transactions contemplated by the Merger Agreement were consummated. Janet and Jim Baker acquired 5,109,713 shares of L&H common stock for their interest in Dragon valued at $277,840,644 as of the date of the Merger Agreement and at $220,356,373 as of the date the Merger closed. Seagate acquired 3,871,489 shares of L&H common stock for its interest in Dragon valued at approximately $210,512,214 as of the date of the Merger Agreement and at $166,957,963 as of the date the Merger closed. As a result of the L&H fraudulent scheme, described below and revealed after the consummation of the Merger, the shares of L&H acquired by the Dragon Parties in exchange for their ownership interest in Dragon were and are worthless.

16

**Dragon Parties' Reliance on**
**L&H's Public Disclosures of Record Growth and Revenues**

42.    In agreeing to accept L&H shares in exchange for their interests in Dragon, and in setting the price of Dragon relative to L&H's market price, the Dragon Parties relied on the truth and accuracy of L&H's extensive public disclosures regarding its business and revenues, and on the propriety of its financial statements, including L&H's annual financial statements for 1998 and 1999, many of which the Dragon Parties directly examined and all of which were incorporated in the market price of L&H securities.  These disclosures and assurances portrayed L&H as a technology company whose innovative products were propelling record global revenues.

43.    Every quarter in 1998 and 1999, L&H proclaimed dramatic increases in revenues and attributed them to its scores of "new contracts to license its core technologies."

44.    L&H announced its first quarter 1998 revenues in a press release dated April 28, 1998, attached as an exhibit to a Form 6-K/A dated May 26, 1998: "[f]or the first quarter of 1998, L&H's total revenues were $35.1 million, an increase of 112% over reported revenues of $16.6 million for the first quarter of 1997."  Bastiaens was quoted as attributing L&H's performance to "our tremendous success in securing contracts," which the press release numbered at "a record-breaking 40 contracts."

45.    In a July 28, 1998 press release, filed with the SEC on a Form 6-K dated August 5, 1998 and signed by Bastiaens, L&H announced total second quarter 1998 revenues of "$45 million, an increase of 113% over reported revenues of $21.1 million for the second quarter of 1997."  In that press release, Lernout attributed the results to increased demand for L&H products and "new contract bookings," as did Bastiaens, who stated that "[d]uring Q2 we signed 42 new contracts."

46.    In an October 27, 1998 press release, filed with the SEC on a Form 6-K on October 28, 1998, L&H announced that, "for the third quarter of 1998, L&H's total revenues

were $54.9 million, an increase of 97% over reported revenues of $27.9 million for the third quarter of 1997."

47.     On April 7, 1999, L&H "announced results for the fourth quarter of 1998 of $76 million in revenue, or a 126% increase in the reported revenue of $33.8 million for the fourth quarter 1997."

48.     In L&H's 1998 Annual Report filed with the SEC on Form 20-F and signed by Bastiaens, L&H stated that "for the fiscal year 1998, the company reported total revenue of $211.6 million or an increase of 113% over the reported revenues of $99.4 million for fiscal year 1997."

49.     The L&H 1998 Annual Report to Shareholders, filed with the SEC on a Form 6-K on June 1, 1999, contains a letter to shareholders trumpeting "a year of major milestones.... For the fourth consecutive year, revenues grew by more than 100% over the year before. In fiscal 1998, the company reported total revenues of $211.6 million or an increase of 113 percent over the $99.4 million reported for 1997.... L&H ... signed a record 160 new contracts to license its core technologies."

50.     On May 18, 1999, L&H announced that "for the first quarter of 1999, L&H's total revenues were $70.7 million, an increase of 102% over reported revenues of $35.1 million for the first quarter of 1998. The company attributes the increased revenues to L&H's continued success in expanding the role speech and language technologies play in a broad range of markets and applications."

51.     In a press release dated July 28, 1999, filed with the SEC on a Form 6-K dated August 2, 1999, L&H announced that its second quarter 1999 "total revenues were $76.0 million, an increase of 69% over reported revenues of $45.0 million. L&H's total revenues for the six months ending June 30, 1999 were $146.7 million, an increase of 83% over reported revenues of $80.1 million for the same period in 1998. The company attributes the increased revenues to L&H's continued success in expanding the role speech and language technologies play in a broad range of markets and applications." L&H reported that in the

second quarter, the Technologies and Solutions division "signed 57 new contracts (45 of which were related to core speech technology)."

52.    In a press release dated October 27, 1999, filed with the SEC on a Form 6-K dated November 3, 1999, L&H announced that its third quarter 1999 "total revenues were $87.5 million, an increase of 59% over reported revenues of $54.9 million for the third quarter of 1998. L&H's total revenues for the nine months ended September 30, 1999 were $234.2 million, an increase of 74% over reported revenues of $134.9 million for the same period in 1998."

53.    In a press release dated February 9, 2000, filed with the SEC on a Form 6-K/A dated February 14, 2000, L&H announced that "[f]or the fourth quarter of 1999, L&H's total revenues were $110 million, or a 43.5% increase in the reported revenue of $76.7 million for the fourth quarter of 1998. For the fiscal 1999 [sic], the company reported total revenues of $344 million or an increase of 62.7% over the reported revenues of $211.6 million for 1998." The company attributed growth to the "Technologies and Solutions Division sign[ing] a record of 80 contracts for the quarter." In that press release, Bastiaens stated that "[i]n 1999 we experienced a strong demand for speech and language technologies, applications and solutions, specifically in the Enterprise and Telephony area. This increase was mainly the result of internal growth and created a positive cash flow from operations of $68 million, reflecting the maturity of our operations."

### Dragon Parties' Reliance on L&H's Disclosure of
### License Revenues from Purportedly Unaffiliated "Strategic Partners"

54.    The Dragon Parties also relied on L&H's attribution of significant revenues to what it reported as license fees from unaffiliated "strategic partners" who contracted with L&H to develop its software for specific applications and languages.

55.    In 1996, shortly after Bastiaens arrived at L&H, the company announced that Dictation Consortium NV ("Dictation"), "a private company in which the FLV Fund has an investment," had licensed L&H software in order to develop L&H's continuous automated

speech recognition technology. As of December 31, 1996, FLV Fund and FLV Fund Management together owned 61% of Dictation and Lernout and Hauspie were directors of FLV Fund Management. At the behest of L&H, and in exchange for L&H stock warrants and an excessively high rate of interest, Artesia Banking provided approximately 525 million Belgian francs ("BEF") (equivalent to approximately $15 million) in financing to Dictation. This financing was partly secured by a personal guarantee of the Principal Officers which, in violation of its own lending policies, Artesia Banking agreed to document in a secret side letter rather than in the Bank's official loan documents. Artesia Banking knew that L&H intended to recognize licensing fees received from Dictation as revenue, and also knew that under U.S. accounting rules and stock market regulations, L&H could not recognize such fees as revenue if L&H were "directly or indirectly involved in the financing" of Dictation. Dictation provided L&H with $26.6 million in revenue over the next two years, approximately one quarter of its 1996 sales and 19% of 1997 sales. Since Dictation bore the research and development costs, they did not shrink L&H's bottom line, as they should have. In May 1998, L&H announced that it had obtained the software developed by Dictation by purchasing the company for $26.9 million, most of which represented goodwill and could thus be amortized over seven years.

56.     In 1997, L&H entered into a similar arrangement with a company formed in March 1997, by anonymous venture capitalists, called Brussels Translation Group ("BTG"). According to L&H's 1998 Annual Report on Form 20-F, L&H granted BTG an exclusive license to use L&H speech processing technology and associated data bases to develop an internet translation service. The agreement called for BTG to pay L&H $3.5 million in license fees, plus royalties. In May 1997, the license fee was increased by $1.5 million, and L&H also entered into an agreement to provide BTG with engineering services, under which BTG paid L&H approximately $30 million. Artesia Banking provided BTG with approximately $14 million in financing, again partly secured by a personal guarantee of the Principal Officers which was documented in a secret side letter and not in the Bank's official

loan documents.  Again, Artesia Banking knew that L&H intended to recognize fees received from BTG as revenue, in violation of U.S. accounting rules and stock market regulations.

57.    In June, 1999, L&H acquired BTG for approximately $42 million in cash plus the assumption of BTG's $17 million start-up debt.  As with Dictation, L&H was able to obtain a product without deducting the research and development expense.  Instead L&H was able to record nearly $35 million in revenues and then, when it purchased BTG, L&H capitalized the acquisition price, turning what would normally be an expense into an asset.

58.    Although critics charged that L&H earnings were inflated by the Dictation and BTG transactions because those companies were related to L&H, L&H falsely maintained that, except for the FLV Fund involvement in Dictation, the companies were owned by unaffiliated "private investors" whom L&H refused to identify.

59.    In late 1998 L&H expanded its reliance on the Dictation model, creating 30 start-up companies incorporated in Belgium and Singapore.  Those companies were purportedly funded by unidentified private investors whom L&H insisted were "unaffiliated with us."  In an April 7, 1999 press release, L&H announced among the highlights of fiscal year 1998:

> [L&H began] development of approximately 20 additional exotic languages with its financial and technological partners.  During 1998, contracts were signed for the following languages:  Ukraine, Polish, Czech, Slavic, Bahassa, Greek and Farsi, to support a range of speech technologies.... In order to develop these additional languages within certain time and financial constraints, L&H is working with partners who will undertake the localization and development of these language areas and share the financial rewards.  L&H will license its tools to the partners and will secure the quality of the various applications and languages.

60.    In its 1998 Annual Report on Form 20-F, L&H expanded its description of these transactions:

> Pursuant to these agreements, we have exclusively licensed our speech and language technology development tools to strategic partners that are unaffiliated with us to develop and localize our technology for specified new languages.  Our strategic partners also have exclusive rights ... to develop, market, and distribute products incorporating the developed technology.  In addition to one-time license fees, we have rights to receive

royalties based on our partners' net revenues from sales of products incorporating the developed technology.

(Emphasis supplied.)

61.     Initial license fees paid by these assertedly unaffiliated "strategic partners" accounted for 10% of L&H's claimed 1998 revenue and 25% of claimed 1999 revenue, far in excess of the 3.7% of 1998 revenue that L&H stated, in its 1998 Annual Report on Form 20-F, was provided by "companies funded in part by the FLV Fund," and the 0.3% of 1999 revenues that L&H stated, in its 1999 10-K, were provided by "companies funded in part by the FLV Fund and L&H Investment Co."

62.     L&H underscored the purported legitimacy of its licensing revenues with false public descriptions of a conservative revenue recognition policy.  In notes to its 1997, 1998 and 1999 financial statements, audited by KPMG, L&H stated that:

> The Company recognizes revenue from the sale of its software licenses upon satisfaction of all of the following criteria: signing of the license agreement, shipment of the products, when no contractual terms remain unsatisfied and, if applicable, when a royalty report is received from the customer.  The Company generally receives, on a quarterly basis, royalty reports from each customer who has signed a license contract.  The reports detail the number of units or products that the customer shipped during that period.  The number of units multiplied by the applicable contractual rate per unit is the amount that the Company records as revenue.    Before recording this revenue, the Company determines that all significant obligations have been satisfied and that collection of the receivable is probable. …

> The Company from time to time enters into nonrefundable minimum royalty agreements with customers.  Under these arrangements the Company delivers its technologies or products to the customer contemporaneously with the execution of the agreement.  Revenue from nonrefundable minimum royalty agreements is recognized upon satisfaction of all of the following criteria: signing of the licensing agreement; no additional significant production, modification or customization of the software is required; delivery has occurred; the fee is fixed and determinable, and; collection is probable.  For arrangements that include multiple elements, the fee is allocated to the various elements based on vendor specific objective evidence of fair value.

> In all such cases, the Company only recognizes revenue when collection of the related receivable is probable.

63.    These disclosures were also false. As detailed below, investigators have discovered, and L&H has confirmed, that its "strategic partners" were in fact shell start-up ventures established by parties related to L&H, including defendants FLV Fund, S.A.I.L. Trust V.Z.W. ("S.A.I.L. Trust"), Lernout & Hauspie Investment Company ("LHIC"), Radial Belgium, N.V. ("Radial"), Language Investment Co. ("LIC") and Language Development Fund ("LDF") as a means of funding research and development off the books, and that the hefty "license fees" from those "customers" recorded by L&H were a sham.

64.    Moreover, as further detailed below, the ventures were funded by tens of millions of dollars in loans made by Artesia Banking that were secretly guaranteed by, or made to, the Principal Officers. Artesia Banking's non-public internal documents demonstrate that it made the loans with full knowledge that the "strategic partners" were shams, that the proceeds of the loans would be funneled back to L&H, that L&H would – and did – falsely describe the loan proceeds in its financial statements as "license fees" from "unaffiliated entities," that such reporting violated U.S. GAAP, and that the sole purpose of the secret guarantees and the loan to the Principal Officers was to enable L&H to evade the reporting requirements of the SEC. Indeed, it was Artesia Banking who conceived a structure for the Principal Officers' guarantees – credit default swaps – that would permit L&H to maintain secrecy and thereby accomplish its fraud.

### Dragon Parties' Reliance on L&H's Audited Financial Statements

65.    In each of its Annual Reports for 1998 and 1999, filed with the SEC, L&H stated that its financial statements were prepared in accordance with U.S. GAAP. L&H's auditors, Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren and KPMG LLP (collectively "KPMG") issued unqualified reports on their audits of L&H's 1997, 1998 and 1999 financial statements and consented to the inclusion of those reports in L&H's SEC filings.

66.    An auditor is supposed to give an "unqualified opinion" or "clean opinion" only when no significant limitations affect the performance of the auditor and when the evidence obtained in the audit discloses no material deficiencies in the financial statement

and or unusual circumstances that affect the auditor's report.  American Institute of Certified

Public Accountants (AICPA), "Understanding Audits and the Auditor's Report — A Guide

for Financial Statement Users," 2nd ed., 1996, at 15.

      67.     On April 9, 1999, KPMG reported on L&H's 1998 financial statements,

stating:

> We have conducted our audits in accordance with generally accepted auditing standards
> in the United States.  Those standards require that we plan and perform the audit to obtain
> reasonable assurance about whether the financial statements are free of material
> misstatement.  An audit includes examining, on a test basis, evidence supporting the
> amounts and disclosures in the financial statements.  An audit also includes assessing the
> accounting principles used and significant estimates made by management, as well as
> evaluating the overall financial statement presentation.   We believe that our audits
> provide a reasonable basis for our opinion.
>
> In our opinion, the consolidated financial statements referred to above present fairly, in
> all material respects, the financial position of Lernout & Hauspie Speech Products N.V.
> and subsidiaries as of [the relevant time period], and the results of their operations and
> their cash flows for each of the years in the three-year period ended [on December 31 of
> the fiscal year], in conformity with generally accepted accounting principles in the United
> States.

      68.     KPMG consented to the inclusion of their 1998 Audit Report in L&H's

Annual Report on Form 20-F filed with the SEC on June 30, 1999.  On January 6, 2000,

KPMG also consented to the incorporation by reference of their 1998 Audit Report in

Registration Statements filed by L&H with the SEC on Form F-3 on January 7, 2000.  That

Registration Statement was provided to the Dragon Parties as "L&H's latest public filing" in

the course of the Dragon Parties' due diligence in connection with the Merger.

      69.     The Merger Agreement specifically warranted that all of L&H's SEC filings

since January 1998, including its 1998 Annual Report complied with U.S. GAAP and did not

contain any untrue statements of material fact or any material omissions.

**Dragon Parties' Reliance On False Oral Representations by L&H Senior Officers**

70.     In addition to L&H representations in press releases and public filings, the Dragon Parties relied upon specific oral representations by the Senior Officers, Dammekens, and KPMG confirming the accuracy of L&H's public disclosures.

71.     On several occasions during negotiation of L&H's purchase of Dragon, Bastiaens told Ellen Chamberlain, a Seagate employee acting as interim Chief Financial Officer of Dragon, and Janet Baker, the Chairman of Dragon's Board, that L&H's projections were on target for the first and second quarters of 2000. Bastiaens made those statements at meetings at the Boston, Mass., offices of Cowen & Co., L&H's investment bankers in connection with the Merger, in February and March 2000.

72.     From December 13 to 15, 1999, Ms. Chamberlain and Ms. Baker met with Lernout and Hauspie in Belgium, where Ms. Chamberlain expressed concern that the FLV Fund was funding the start-up companies that were providing substantial percentages of L&H's software licensing revenues. Both Lernout and Hauspie assured Ms. Chamberlain and Ms. Baker that: (a) they had no financial interest in any of the start-up companies; (b) any licensing of L&H software by those start-up entities was the result of arms-length negotiation; and (c) even though they were both on the board of the FLV Fund, they were not active in its decision-making.

73.     On or about March 22, 2000, approximately one week before the Merger Agreement was executed, Dammekens participated in a conference call during which Ms. Chamberlain, in the presence of other Dragon representatives who participated in this call, questioned him about the basis for his comfort with L&H's revenue recognition. Dammekens stated that he was comfortable with L&H's disclosures of revenue because he and his team reviewed all L&H contracts before financial results were released, including the fiscal year 1999 results that had been released in January 2000.

74.     During the course of due diligence prefatory to the Merger, Ms. Chamberlain and Ms. Baker had repeatedly asked to speak with KPMG, and were told that they could not

because KPMG's audit of L&H's 1999 financial statements had not been completed. Ms. Chamberlain was finally able to question representatives of KPMG during the March 22, 2000 conference call, in which those representatives participated. The KPMG personnel who participated in the call knew that the purpose of the call was to provide information to the Dragon Parties and their representatives as an important part of the Dragon Parties' due diligence with respect to the Merger.

75.    During the March 22, 2000 conference call, a KPMG partner told representatives of the Dragon Parties, including Ms. Chamberlain, among other things, that: (a) KPMG expected to sign off on their audit of L&H's 1999 financial statements in two to three weeks; (b) The only open audit issues were "a couple of revenue issues" in Korea regarding one or two customers, but nothing that would cause an adjustment; a "couple" of contract confirmations had not yet been received; and KPMG had yet to complete minor tests of L&H's capitalization of its R&D expense, such as checking timesheets of engineers who had billed time to certain projects; (c) In the course of the 1999 audit, no adjustments had been booked by the auditors; (d) KPMG did not at that time anticipate any material adjustment of L&H's 1999 financial statements; and (e) KPMG was "comfortable" with L&H's revenue recognition.

### Dragon Parties' Reliance on KPMG's Unqualified Opinion for 1999

76.    On April 27, 2000, KPMG issued their unqualified report on L&H's 1999 financial statements, confirming KPMG's oral representations, on March 22, 2000, that their audit had uncovered no material errors or improprieties in the unaudited financial statements issued in January:

> We have audited the accompanying consolidated balance sheets of Lernout & Hauspie Speech Products N.V. and subsidiaries (the Company) as of December 31, 1998 and December 31, 1999, and their related consolidated statements of operations, shareholders' equity, cash flows and comprehensive income (loss) for each of the years in the three-year period ended December 31, 1999....
>                 *       *       *

26

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Lernout & Hauspie Speech Products N.V. and subsidiaries as of December 31, 1998 and December 31, 1999 and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1999, in conformity with generally accepted accounting principles in the United States.

77.    The Dragon Parties were entitled to terminate the Merger Agreement prior to closing if it became apparent that any of L&H's SEC filings since January 1998, including its 1998 Annual Report and the unaudited financial statements for 1999 that were released prior to execution of the Merger Agreement, were materially misstated:

a.    The Merger Agreement included L&H's representations and warranties that: (i) all of L&H's filings with the SEC since January, 1998, did not contain any untrue statement of material fact or any material omission; (ii) all financial statements included in L&H's SEC filings complied in all material respects with SEC accounting requirements and published rules and regulations, and were prepared in accordance with U.S. GAAP; and (iii) L&H's unaudited consolidated financial statements for the year ended December 31, 1999 were prepared in accordance with U.S. GAAP and "fairly present in all material respects the consolidated financial position of [L&H] as of the date thereof."

b.    Section 9.1 of the Merger Agreement allowed the Dragon Parties to terminate the Agreement at any time prior to closing "if there has been a breach of any representation [or] warranty … which causes the conditions set forth in section 7.3(a) … to be incapable of being satisfied"

c.    Section 7.3(a) of the Merger Agreement provided that "representations and warranties of [L&H] shall be true and correct in all material respects as of the closing date."

78.    Had KPMG not given an unqualified opinion stating that L&H's 1999 financial statements were prepared in accordance with U.S. GAAP, or had they otherwise qualified their report on L&H's 1999 financial statements, this would have communicated to

the Dragon Parties that L&H's unaudited financial statements for the year ended December 31, 1999 were not prepared in accordance with U.S. GAAP and the Merger would not have been consummated.

### Dragon Parties' Reliance on the Integrity of the Market for L&H Securities

79.    Among the factors the Dragon Parties considered in setting the price for their interests in Dragon, which L&H paid for in L&H stock, was the market price of L&H stock. At all relevant times, the market for L&H stock was efficient because L&H common stock met the requirements for listing, and was listed and actively traded on the NASDAQ and the EASDAQ, which were automated and highly efficient markets.

80.    As a regulated issuer, L&H filed periodic public reports with the SEC. L&H also regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

81.    The market for L&H stock promptly digested current information regarding L&H from the publicly-available sources described above and reflected such information in the price of L&H stock.

82.    Consequently, at all relevant times – including the time the Dragon Parties were negotiating the price they would accept in L&H stock, the time the Dragon Parties executed the Merger Agreement, and the time the Merger was consummated – the price of L&H stock was fraudulently inflated by misrepresentations and non-disclosures.

### B. THE FRAUD AT L&H

83.    Within months after the Dragon Merger closed, L&H's "record" growth was revealed to be a complete sham. By the end of May 2001, less than a year after the Merger closed, U.S. and European regulators had commenced investigations into the fraud at L&H, L&H stock had been delisted in Europe and the U.S., L&H was in bankruptcy, and the Senior Officers had been arrested on various criminal charges relating to fraud at L&H. The L&H

stock, valued at nearly $500 million when the Dragon Parties agreed to accept it in exchange for their stakes in Dragon, was utterly worthless.

84.     Until its acquisition of Dictaphone Corporation in May, 2000, L&H had been able to file information with the SEC as a foreign private issuer subject to less detailed disclosure requirements than those applied to U.S. entities. Shortly after the Dragon Merger was consummated, on June 30, 2000, L&H filed a Form 10-K, which included financial statements for fiscal year 1999 audited by KPMG, and also filed a Form 10-Q, which included unaudited financial statements for the first quarter of fiscal year 2000, both of which contained, for the first time in an SEC filing by L&H, the geographic breakdown of sales required by the SEC in filings by U.S. companies.

85.     The filings purported to reveal that out of 1999 revenue of $344.2 million, Korea contributed $62.9 million and Singapore contributed $80.3 million (collectively, over 41% of total L&H revenues), up from combined revenues of less than $300,000 in 1998.

86.     After the June 30, 2000 Form 10-Q was filed, reporters from *The Wall Street Journal* commenced an investigation into L&H's customers in Singapore and Korea. *The Wall Street Journal* began reporting the results of this investigation in an article published on August 8, 2000. The article disclosed that many of the companies that L&H had identified as Korean customers had denied that they did business with L&H.

87.     Although L&H attempted to deny these allegations and claimed that all Korean revenues were accurate, on August 15, 2000, *The Wall Street Journal* reported that L&H had commissioned a mid-year interim audit of the company by KPMG. The goal of the audit was to "allay concerns about the financial results of [L&H's] South Korean division."

88.     On August 25, 2000, L&H announced that Bastiaens had resigned from his position as president and CEO of L&H. Bastiaens was replaced by John Duerden, the former CEO of Dictaphone Corporation. Bastiaens remained a director of L&H.

89.     On September 20, 2000, the L&H Board of Directors authorized its Audit Committee to "conduct such inquiries as it deemed appropriate into certain accounting and

other practices of the Company that were the subject of a formal investigation being conducted by the [SEC]," according to a report provided to the Audit Committee two months later, on November 20, 2000 (the "Audit Committee Report"), by the advisors retained by the audit committee: the U.S. law firm Bryan Cave LLP, the Belgian law firm Loeff Claeys Verbeke, and the accounting firm of Arthur Andersen LLP (the "Audit Committee Advisors").

90.     On September 22, 2000, *The Wall Street Journal* reported that the SEC had commenced an investigation into L&H's accounting practices in January 2000. In fact, on or about January 24, 2000, the SEC had issued a request for documents to L&H, which focused on L&H's revenue recognition practices and, in particular, on the Company's contracts and relationships with its so-called "strategic partners." Subsequently, the SEC raised the status of the investigation to "formal."

91.     On September 22 and 26, 2000, *The Wall Street Journal* also raised significant additional questions about L&H's revenue, specifically about 30 Singapore and Belgian start-up companies that accounted for nearly all of L&H's Asian revenues reported in 1998 and 1999. The articles also raised concerns that the FLV Fund had financial connections to eight start-ups with close links to L&H, and that those start-ups accounted for a large portion of L&H's 1998 and 1999 revenues. One of the transactions questioned involved the eight Singapore start-ups which were initially funded by the FLV Fund without any disclosures relating to their nature as related-party transactions.

92.     On September 26, 2000, *The Wall Street Journal* reported that the Brussels-based EASDAQ stock exchange had launched a formal investigation into L&H. On the same date, Bloomberg News reported that the EASDAQ would also investigate the FLV Fund.

93.     On October 18, 2000, *The Wall Street Journal* reported that L&H was refusing to provide the SEC with the names of the investors behind the thirty corporate customers that were the focus of the SEC investigation, and who accounted for approximately 25% of the Company's 1999 revenues and 10% of its 1998 revenues. While

L&H admitted that it had helped start the 30 companies and initially financed their operations, the Company maintained that the firms were owned by independent investors interested in developing new applications for L&H speech software.  L&H released new details about the operations of 17 of the 30 companies, which revealed that these companies had no real corporate existence whatsoever, and certainly no economic substance apart from L&H.  Of these 17 companies, none had any direct employees.  Seven companies were relying on L&H employees to do work for them and had agreed to repay L&H for its services.  The other 10 had not started developing software, though they had paid hefty licensing fees to L&H.  According to *The Wall Street Journal*, the 30 companies were all registered at just a few common addresses in Belgium and Singapore, and many had common officers and nominee shareholders.

94.    On November 9, 2000, L&H "provided an update on the status of the mid-year audit of the Company that it had commissioned last August and of the ongoing audit committee inquiry" and announced that "[a]s a result of errors and irregularities identified in the audit committee inquiry, the Company expects to restate its financial statements for the periods 1998, 1999 and for the first half of 2000."  L&H's announcement of "accounting irregularities" was, in accounting terms, tantamount to an admission of fraud.  Statement of Auditing Standards No. 53 issued by the American Institute of Certified Public Accountants defines "irregularities" as "intentional misstatements or omissions" in financial statements, meaning that there was fraud in their preparation.

95.    That day, the NASDAQ suspended trading in L&H shares.  Just before the suspension, L&H shares were changing hands at $3.525, more than 95% below the record high of $72.50 they reached in March 2000, when the company claimed a market capitalization of more than $10 billion.  The slide wiped out more than $9 billion of the company's stock market value.

96.     On November 17, 2000, *The Wall Street Journal* reported that L&H's independent auditors, KPMG, had withdrawn their audit report on L&H's 1998 and 1999 financial statements, stating that their prior audit opinions "should no longer be relied upon."

97.     On November 21, 2000, *The Wall Street Journal* reported that the EASDAQ had suspended trading in the FLV Fund. The article described the FLV Fund as an investment vehicle over which Lernout and Hauspie "exercise considerable influence," with "a history of investing in L&H customers, typically small companies that pay license fees to L&H."

98.     On November 29, 2000, L&H filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the District of Delaware. According to a November 30, 2000 *Wall Street Journal* article, the decision to file for bankruptcy protection came after L&H executives discovered that $100 million in cash was missing from the Company's South Korean unit.

99.     On December 14, 2000, *The Wall Street Journal* reported on the thirty "strategic partners" that comprised a significant portion of L&H's revenues, revealing that Belgian insurance company Mercator & Noordstar, N.V. ("Mercator") was the ultimate owner of 16 of the 30 start-ups and that the FLV Fund had funded, at least in part, approximately 8 of the remaining 14.

100.    On January 5, 2001, the Associated Press reported that the Belgian judge presiding over L&H's Belgium bankruptcy proceeding acknowledged that there is "no doubt there was fraud" at L&H.

101.    In late April of 2001, South Korean authorities began investigating allegations against the Korean Banks, as well as certain former L&H Korea employees.

102.    On or about April 27, 2001, the Principal Officers were arrested in Belgium and charged with forgery and stock manipulation. On May 26, 2001, Bastiaens was arrested by United States officials in Winchester, Massachusetts, in response to a Belgian warrant.

Bastiaens was subsequently extradited to Belgium, where he has been charged with fraud, insider trading, stock market manipulation, and accounting law violations.

### The "Strategic Partner" Fraud

103.    On December 19, 2000, L&H publicly revealed the findings of the Audit Committee Report, which had previously been presented to the L&H Board of Directors on November 20, 2000. The Audit Committee Report concluded, in part, that: (a) L&H had improperly recorded as much as $277 million in revenue during 1998, 1999 and the first half of 2000; (b) the Company should reverse all of its Korean revenues recorded during 1999 and 2000, amounting to approximately $182 million; and (c) software license revenues from twenty-four of the thirty "strategic partners" were doing nothing more than funding L&H's research and development through related-party transactions.

104.    With respect to license revenues from "strategic partners," i.e., the LDCs and CLDCs, the Audit Committee Advisors concluded that revenue from 24 of the 30 new companies was incorrectly booked. The report concluded that the companies were not buying software licenses, but were actually paying L&H employees to develop future products, in effect funding the Company's own R&D needs. The Audit Committee Report recommended, at a minimum, reversing approximately $83 million in licensing revenue, and stated that if the investors are related parties, as the evidence suggests, the funded amounts should be recognized as a liability:

> It appears, based on our review, that the original LDC concept involved the sale of rights and tools to an independent third party and the separate use of those tools by the third party to develop L&H compatible products in a particular language. The wording of the contracts corroborate this concept. However, it also appears that shortly after the first few LDC contracts were signed, L&H personnel realized that the LDC investors were primarily financial investors and L&H would have to provide more services to the LDCs than they originally thought. Eventually, L&H assumed responsibility for the development work for a contemplated additional fee. Although it appears to us that, by December 1998 L&H and the LDCs knew that L&H would be performing some or all of the services or development work for the LDCs, future contracts were not changed to reflect that understanding. Except for Turkish and Farsi, contracts reflecting that the LDCs would pay L&H for the services or development work were not executed until

33

November 3, 2000. To our knowledge, except for Turkish and Farsi, the LDCs have not yet been invoiced for the development work performed to date.

*     *     *

We believe, based on our review of certain internal documents and outside marketing material and limited discussions with the investors or their representatives, that the investors anticipated, in substance, that they were buying the future rights to a product (language) to be developed by L&H and thus were effectively funding the Company's research and development efforts to build that language.

If the investors are not related parties, accounting for such transactions would require deferral of all the revenues and recognition over the development period.... If the investors are related parties, the relevant accounting literature presumes that the related party investors will be repaid and the funded amounts are recognized as a liability.

105.    In fact, the investors were related parties, and what L&H recognized as license revenue should not merely have been deferred, it should have been stated as a liability. Although the Audit Committee report redacted the names of the investors it did manage to discover and connect to L&H, news reports revealed those names and their affiliations with L&H.

106.    A September 22, 2000 *Wall Street Journal* article revealed that eight of the shell start-ups were funded by defendant FLV Fund, which is audited by KPMG. According to a November 6, *Wall Street Journal* article, another four were organized as subsidiaries of LIC, whose chief executive officer, Willem Hardeman, sat on the Board of the FLV Fund. And a December 14, 2000 *Wall Street Journal* article revealed that another sixteen were owned by Mercator, whose chairman, Louis Verbeke was a name partner in the law firm that acted as L&H's main counsel and as an Audit Committee Advisor — Loeff Claeys Verbeke. Mr. Verbeke and Mercator separately held stakes in L&H. Mercator also owned 6.9% of L&H Holding Co., a vehicle through which Lernout and Hauspie controlled L&H. L&H's financial statements and other disclosures misleadingly omitted these relationships. Indeed, as previously set forth, L&H affirmatively and falsely represented that these "licensees" were "unaffiliated customers" and that 1998 and 1999 revenues from companies funded by the FLV Fund were *de minimis*.

34

107.    In June 2003, it was further revealed that the LDCs/CLDCs were funded by tens of millions of dollars in loans made by Artesia Banking and secretly guaranteed by the Principal Officers.

108.    In essence, L&H represented to the public and the Dragon Parties that the LDCs and CLDCs were unaffiliated entities who were paying L&H tens of millions of dollars in licensing fees for the right to develop L&H software for use with specific languages. The contracts gave L&H an option to acquire the strategic partner and the developed product. Thus, it appeared that unaffiliated parties were providing substantial revenue to L&H and were also bearing the cost and the risk of developing software.

109.    In reality, the LDCs and CLDCs were uncreditworthy start-up shells with no funds to pay the license fees and no resources to perform the research and development work contemplated by the contracts they signed with L&H. Instead, L&H and its employees performed the development work, bearing all the research and development costs.

110.    The scheme operated to inflate L&H's stock price in two ways. First, the license fees reported as revenue were in fact the proceeds of loans guaranteed by, or made to, the Principal Officers. Thus, a multi-million liability was reported as profit. Second, L&H did not report its research and development costs as an expense, which would immediately have reduced earnings. Instead, in the case of Dictation and BTG, L&H exercised its options to purchase the entities and their finished products and then capitalized the majority of the purchase price as goodwill. L&H was then able to amortize the cost of these capitalized assets over an extended period of time.

111.    The SEC requires publicly-traded companies to present their financial statements in accordance with U.S. GAAP. 17 C.F.R. §210.4-01(a)(1). That regulation states that financial statements filed with the SEC that are not prepared in conformity with U.S. GAAP "will be presumed to be misleading, despite footnote or other disclosures, unless the Commission has otherwise provided."

112.    L&H's accounting constituted flagrant violation of U.S. GAAP in several ways.  Statement of Financial Accounting Standard (SFAS) No. 68, *Research and Development Arrangements* requires that "[t]he financial reporting of an enterprise that is party to a research and development arrangement should represent faithfully what it purports to represent and should not subordinate substance to form."

113.    At a minimum, under SFAS No. 68, and under SOP 97-2, L&H was required to account for the arrangement as a long-term construction contract and defer recognition of revenues from the start-up shells over the development period.  SFAS No. 68 provides that:

> An enterprise shall determine the nature of the obligation it incurs when it enters into an arrangement with other parties who fund its research and development.
>
> *                *                *
>
> To the extent that the financial risk associated with the research and development has been transferred because repayment of any of the funds provided by the other parties depends solely on the results of the research and development having future economic benefit, the enterprise shall account for its obligation as a contract to perform research and development for others.

SFAS No. 68 ¶¶4, 10.  SOP 97-2, which "provides guidance on when revenue should be recognized and in what amounts for licensing, selling, leasing, or otherwise marketing computer software" states that:

> If an arrangement to deliver software or a software system, either alone or together with other products or services, requires significant production, modification, or customization of software, the entire arrangement should be accounted for in conformity with Accounting Research Bulletin (ARB) No. 45, Long-Term Construction-Type Contracts....

SOP 97-2 ¶7.

114.    Even if the licenses had not required contract accounting, under SOP 97-2, L&H should not have recognized revenue from them because the licensee's absence of resources made it clear that collectibility was not probable.  SOP 97-2 does not permit revenue to be recognized until "Collectibility is probable."

115.   In addition, since the start-up shells were related parties, the funds should have been treated as liabilities:

> If the enterprise is obligated to repay any of the funds provided by the other parties regardless of the outcome of the research and development, the enterprise shall estimate and recognize that liability.  This requirement applies whether the enterprise may settle the liability by paying cash, by issuing securities or by some other means.

AS § R55.103.

116.   L&H's treatment of the start-up shells also violated SFAS No. 57, *Related Party Disclosures*, which requires "disclosures of material related party transactions" including:

a.     The nature of the relationship(s) involved.

b.     A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements.

c.     The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period.

d.     Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

AS § R36.102.

117.   Notes to L&H financial statements for 1997, 1998, and 1999 contain long lists of "related parties" accompanied by none of the detail required by SFAS No. 57.  Moreover, the connections to related parties revealed by the Audit Committee Report demonstrate that L&H affirmatively misrepresented the amount of revenue it recognized from the start-up shells that provided 10% of L&H's 1998 revenue and 25% of its 1999 revenue.  In its 1998 Annual Report on Form 20-F, L&H stated that only 3.7% of its 1998 revenue was provided by "companies funded in part by the FLV Fund."  In Notes to its 1999 financial statements,

L&H stated that 0.3% of 1999 revenues were provided by "companies funded in part by the FLV Fund and L&H Investment Co."

## C. **ARTESIA BANKING'S PARTICIPATION IN THE LDC/CLDC FRAUD**
### **Artesia Banking's Loan to Dictation Consortium**

118.    The groundwork for the LDC/CLDC element of the L&H fraud was laid in the early days of L&H's existence as a public company. In 1996, L&H formed a shell company, Dictation, to develop software for L&H. L&H then turned to friends as "outside" investors to fund Dictation. As a result of L&H's efforts, on December 31, 1996, FLV Fund and FLV Management purchased a total of 61% of Dictation. In 1997, this stake was reduced to 43%. On December 7, 2000, *The Wall Street Journal* reported that the remaining unnamed private investors in Dictation "were companies incorporated in the secrecy and tax havens of Luxembourg and the British Virgin Islands, their owners undisclosed." In December 1996, L&H entered into a very profitable licensing agreement with Dictation. Pursuant to this agreement, Dictation provided L&H with a $26.6 million "licensing fee," a payment that constituted 25% of L&H's 1996 sales, and 19% of L&H's 1997 sales.

119.    At the behest of L&H, Artesia Banking provided financing that was instrumental to the Dictation project and in so doing took its first steps to join in the fraudulent scheme to falsely inflate the revenues of L&H.

120.    According to internal Artesia Banking documents obtained from Dexia in discovery, it was during the negotiations for the Dictation financing (sometime in 1996) that Artesia Banking first learned – from L&H's lawyers and auditors – that under U.S. accounting rules L&H could not recognize any revenue on deals with third parties such as Dictation unless Dictation and its financing were kept absolutely independent of L&H. In

particular, L&H provided an accounting opinion to Artesia Banking in 1996, which the Bank

documented in its loan files.  That opinion stated:

> 'At your request, we herewith wish to provide a brief commentary concerning the loan agreement that will be concluded with your bank for the 'DICTATION CONSORTIUM' project. . . LERNOUT & HAUSPIE SPEECH PRODUCTS, N.V. is a company whose shares are listed on the NASDAQ exchange in the USA and ... the **particular reporting requirements under US standards are applicable (the US GAAP and FASB standards)**. Should LERNOUT & HAUSPIE SPEECH PRODUCTS NV be a related party in any way to this loan agreement, under these regulations, this would be a related party transaction and then under FAS 57 be subject to special reporting requirements and regulations. . . .  **It is especially important that LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. can book [the 750 million BEF to be paid by Dictation] as revenue . . .** It seems to us that **under the governing regulations in the United States, this transaction must have at least the following characteristics**:
>
> **(1) LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. is in no way involved, neither directly nor indirectly, in the financing of DICTATION CONSORTIUM NV**;
>
> **(2) LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. shall never be made liable, neither directly nor indirectly, nor as a guarantor, for the repayment of the financing that should be granted to DICTATION CONSORTIUM N.V. . . .**
>
> **(3) DICTATION CONSORTIUM N.V. shall not have the possibility to sell back to LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. the developed technology or to insist on recovery of any research and development payments it made. . . .**
>
> (Emphasis supplied).

121.    In June 1997, L&H's U.S. lawyers provided Artesia Banking with similarly

detailed information concerning L&H's intention to recognize payments from Dictation as

revenue, and the U.S. regulations applicable to L&H's financial statements, including the

following:

> L&H and Dictation Consortium have signed a development agreement whereby Dictation Consortium has engaged L&H to

develop dictation products on behalf of Dictation Consortium for a research and development fee of BEF 750 million…. **It is important to L&H that the fee be characterized as a research and development fee for purposes of United States generally accepted accounting principles (US GAAP), such that L&H will be able to include the fee in income when paid…. [T]he transaction must have the characteristics of an arm's length development contract between independent companies in order to ensure that the transaction will not be recharacterized as a financing transaction. If the transaction were characterized as a financing transaction, the BEF 750 million in funding would be treated as the proceeds of a loan that is not includible in L&H's income. In order to meet these tests the transaction must at a minimum have the following characteristics: 1. The financing of Dictation Consortium must be wholly independent of L&H.**

**2. L&H may not be liable in any manner (directly or through any guarantees, whether written or oral) to repay any bank or other financing to be received by Dictation Consortium….**

**3. Dictation Consortium may not have an option to require L&H to repurchase the licenses and developed technology, or otherwise repay the research and development payments received.**

**4. Any option that L&H has to repurchase the licensed technology or market the developed products must be arm's length. Dictation Consortium must bear the risk that L&H may choose not to exercise any of those options.**

(Emphasis supplied.)

122.    From the outset, Artesia Banking knew that the revenue-recognition requirements carefully outlined by L&H's auditors and lawyers could not be satisfied by the agreement between L&H and Dictation. Dictation was merely a shell entity created by L&H that was not independent from L&H. Notes in Artesia Banking's loan files dated May 14, 1997 confirm that the Bank was well aware of the "artificial" structure of Dictation, noting that "Dictation Consortium is an empty company, without clients, without contact with clients, actually without any commercial activity that was incorporated with an eye on the NASDAQ listing." Thus, Artesia Banking knew that Dictation and L&H were not "independent companies" engaged in an "arm's length development contract" as required by

U.S. GAAP.  Moreover, Artesia Banking knew that its loan to Dictation was not "wholly independent of L&H."  To the contrary, it was L&H – and not any representative of Dictation – that first approached Artesia Banking about financing the Dictation project, and that negotiated the terms of the financing with Artesia Banking.  In addition, L&H provided Artesia Banking with $500,000 worth of free L&H warrants as "additional compensation" for making the loan to Dictation.  Thus, Artesia Banking knew that L&H was "involved … directly" in the financing of Dictation.  Further, as demonstrated by its conduct, Artesia Banking knew that the guarantee provided by the Principal Officers constituted an "indirect" involvement by L&H in the Dictation financing:  for this reason, Artesia Banking agreed that the guarantee could be concluded in a secret side letter and would not be disclosed in the Dictation loan documents.  Finally, Artesia Banking knew that L&H had secretly committed to acquire Dictation, thus effectively giving Dictation the right to require L&H to repurchase the licensed and developed technology.  For all of the above reasons, including Artesia Banking's own conduct in entering into secret guarantees with the Principal Officers, Artesia Banking knew that L&H's recognition of payments from Dictation as revenue would violate U.S. accounting rules.

123.    In or about June 1997, Artesia Banking made a bridge loan of $4.5 million to Dictation in anticipation of approval of a loan of 450 million BEF (approximately $12.6 million).  The bridge loan was secretly guaranteed by the Principal Officers and Fernand Cloet.  An internal Artesia Banking memorandum dated June 19, 1997 from Mr. I. De Coen to Mr. Janssens confirms Artesia Banking's understanding that the Principal Officers' guarantee was a violation of U.S. accounting rules that had to be concealed from L&H's auditors, the SEC and L&H investors:

> As a guarantee, a security pledge has been requested from the four referenced-shareholders of L&H: Jo Lernout, Paul Hauspie, Fernand Cloet, Nico Willaert. **These security pledges must be agreed to in a side letter. The security pledges may not be recorded in the loan agreement**...Advice: Approved, given the resources of the four people pledging. (Emphasis supplied.)

Artesia Banking's failure to record this guarantee in the Dictation loan documents also violated Belgian banking regulations, and the Bank's own policy, requiring reporting all securities in the loan agreement. In August-September 1997, Artesia Banking agreed to provide Dictation with a rollover credit in the amount of 500 million BEF (approximately $14 million). The loan agreement for this financing also violated Artesia Banking's own policy by not reflecting the Principal Officers' guarantee. By accepting the secret side letter guarantee, and not disclosing it in the Dictation loan documentation, Artesia Banking enabled L&H to improperly recognize revenue on L&H's licensing transactions with Dictation.

124.    Between December 1996 and early 1998, Dictation "developed" L&H's core speech recognition software, purportedly bearing the research and development costs. However, Dictation did not actually perform any of the work to develop the software. Rather, L&H employees wrote Dictation's business plan and did the software work under contract, as Lernout later acknowledged.

125.    Once the development was completed, L&H had the option to purchase Dictation. Indeed, according to an internal Artesia Banking document, L&H had made a commitment to repurchase Dictation, which the Bank document characterized as "moral support." In May of 1998, L&H purchased Dictation for $40 million, resulting in a significant gain to Dictation's investors, including FLV Fund. In effect, L&H purchased the software it created at a significant premium. Then, L&H booked the goodwill associated

with the purchase as an asset and amortized the transaction costs over a period of years,

rather than recording the research and development expenses as current expenses.

### Artesia Banking's Loan to Brussels Translation Group

126.    Bolstered by the success of the Dictation arrangement, in May of 1997, L&H

and Artesia Banking entered a similar relationship with Brussels Translation Group NV

("BTG"). On March 13, 1997, BTG was established as a limited liability company in

Belgium, "primarily engaged to acquire, develop, commercialize and license machine

translation software." Artesia Banking was a key factor in the creation of BTG. The Bank

provided the initial financing to allow BTG to operate, lending a total of $22.9 million to

BTG with the intent that L&H would find external investors to repay the loan. L&H never

disclosed the owners of BTG, and a December 7, 2000 *Wall Street Journal* article was only

able to trace ownership "through a Luxembourg company to two entities based in the

Channel Islands, but no further." Artesia Banking recognized that BTG lacked the financial

resources and technical capability necessary to develop L&H's software but, nevertheless,

pursuant to the fraudulent scheme alleged herein, Artesia Banking loaned funds to BTG so

that the money could be passed off to investors as legitimate licensing fees paid to L&H.

127.    In March of 1997, BTG entered a software development and

commercialization agreement with L&H, under which L&H agreed to provide engineering

services for the development of machine translation for L&H's iTranslator. L&H also

licensed certain software to BTG. The agreement called for BTG to pay L&H $3.5 million in

license fees, plus royalties, which was increased to $5 million in May 1997. L&H also

entered into an agreement to provide BTG with engineering services, under which BTG paid

L&H approximately $30 million.

128.    As with Dictation, Artesia Banking again provided the financing that allowed

L&H's deal with BTG deal to be consummated.  According to documents obtained from

Dexia in discovery, during the negotiations for the financing of BTG in late 1997 and early

1998, Artesia Banking was once again clearly informed that L&H intended to recognize

payments from BTG as revenue, and that under U.S. accounting rules L&H could not

recognize such payments as revenue unless BTG and its financing were kept absolutely

independent of L&H.  The credit proposal for a $14 million rollover credit for BTG –

prepared by Artesia Banking personnel and submitted to Artesia Banking's Management

Committee on March 31, 1998 – reflects the advice previously given to the Bank by L&H's

professionals in connection with the financing of Dictation:

> US-GAAP restricts the possible structuring of the operation. This
> operation has two benefits for L&H:
> 1. the loan for the financing of the development costs is granted to
> a third party, that is BTG, and will consequently not affect the
> balance sheet of L&H;
> 2. the compensation for development costs which BTG will pay to
> L&H will constitute company income for L&H.
> **To realize these benefits it is essential under US GAAP that the
> transaction between BTG and L&H needs to be considered as
> a mere commercial transaction taking place between
> independent and free parties under normal economic
> circumstances**. Taking the stock exchange quotation of L&H on
> the NASDAQ into consideration, the US GAAP regulations will
> need to be applied in a stringent manner which will be monitored
> strictly by the American Securities and Exchange Commission.
> Concretely, the transaction, in accordance with the applicable
> regulations, needs to evidence the following characteristics (in
> conformity with a letter from KPMG within the framework of the
> similar Dictation project):
> - **L&H will in no manner whatsoever be involved,
>   directly or indirectly, in the financing of BTG;**
> - **L&H may never be held liable, directly or indirectly,
>   nor by means of a guarantee, with regards to the
>   repayment of the financing which would be granted to
>   BTG....**

- BTG will not have the possibility to impose the buy back of the developed technology....
- In the event L&H has the possibility to buy back the developed technology from BTG this will need to take place in normal economic market circumstances....."
(Emphasis supplied.)

129.    The $14 million rollover credit to BTG was secretly guaranteed by the Principal Officers.  This guarantee was documented in a side letter and, in violation of Belgian banking regulations and Artesia Banking's own policies, was not reflected in the loan agreement with BTG.  Artesia Banking recognized that the Principal Officers' guarantee constituted an indirect involvement by L&H in the financing of BTG, and therefore agreed to accept the secret side letter guarantee, and to not disclose the guarantee in the BTG loan documentation, thereby concealing the guarantee from L&H's auditors, the SEC and L&H investors, and allowing L&H to improperly recognize revenue on L&H's licensing transactions with BTG.

130.    In June 1999, at the end of the contract and pursuant to its prior commitment to do so, L&H purchased BTG for $59 million.  The purchase consideration consisted of a cash payment of approximately $42.3 million and the assumption of approximately $17 million of debt.  The purchase price exceeded the fair value of the net assets acquired, and was allocated to goodwill or other intangible assets.  Thus, as was true of the Dictation transaction, L&H was able to utilize BTG to develop products so that L&H did not have to immediately recognize the R&D expenses, as would have been required had L&H developed the products itself.  When it purchased BTG, L&H capitalized the acquisition price, turning what would normally be an expense into an asset.  Furthermore, L&H's transactions with BTG allowed L&H to record nearly $35 million in revenues from 1997 through 1999.

131.    From 1997 though 1999, L&H incurred $9 million in expenses to develop the

BTG software.  The net result of this transaction was therefore that L&H paid BTG

approximately $50 million more than BTG had spent to acquire software that L&H

developed.  Thus, it is clear that the sole purpose of the BTG transaction was to inflate

L&H's reported financial results.

<strong><u>"Dictation Consortium … on steroids"</u></strong>

132.    Following the Dictation and BTG transactions, Artesia Banking and L&H

expanded their fraudulent scheme into what ultimately would be described by *The Wall*

*Street Journal* as "Dictation Consortium-type structure … but on steroids."  Instead of

creating one shell company (like Dictation or BTG) to funnel fictitious revenue to L&H,

L&H created a series of holding companies financed by Artesia Banking.  These holding

companies, in turn, were used to finance multiple LDCs, which allowed L&H to book even

more fictitious revenue.

<strong><u>Artesia Banking's Loan to Radial<br>Guaranteed by Sham Credit Default Swaps</u></strong>

133.    One such holding company was Radial Belgium N.V. ("Radial").  On

September 29, 1998 – one day before the end of L&H's 1998 third quarter – Artesia Banking

financed the establishment of three LDCs the Slavic Development Company N.V., Farsi

Development Company N.V., and Bahassa Development Company N.V., which were

purportedly supposed to develop speech recognition products in Slavic, Farsi and Bahassa

(an Indonesian dialect) respectively.  Specifically, on September 29, 1998, Artesia Banking

loaned $6 million to Radial, which in turn wired $2 million directly to the accounts of each of

these LDCs, which had been incorporated only that day.  Then, either later on September 29,

1998 or on September 30, 1998, the LDCs transferred every penny of the Artesia Banking

financing they had received to L&H, and L&H then booked the $6 million as revenue.  It is

indicative of the wholly fraudulent nature of these revenues that the LDCs transferred all of

46

their capital to L&H on the same day they were established, leaving them no assets whatsoever. In fact, none of these LDCs had bona fide offices or any operations that would have enabled them to develop speech recognition products. The "revenue" attributable to these sham LDCs established by Artesia Banking accounted for approximately 11% of the "record" $54.9 million in revenue that L&H reported for the third quarter of 1998, for a material percentage of the Company's "record net profits of $12.1 million."

134.    Internal Artesia Banking documents reflect that the Bank recognized from the outset that it was involved in establishing LDCs that were mere shell companies located at one address. In an email dated September 21, 1999, from P. Rabaey at Artesia Banking to G. Dauwe and other Artesia Banking employees, Rabaey stated:

> **Our loan ... was used for the establishment of 3 Language Development Companies: Slavic, Farsi and Bahassa**. Starting capital per company: $2 million. The 3 companies bought first of all software licenses from [L&H]. The objective is to repay our loan to Radial Belgium by attracting investors and to further increase the capital per Language Development company. (Emphasis supplied.)

Another Artesia Banking document quoted in the Prosecutor's Report states:

> [On September 29, 1998, Artesia advances loan to Radial] by way of a bridge financing **for the establishment of** the following language development companies THE SLAVIC DEVELOPMENT COMPANY N.V., THE FARSI DEVELOPMENT COMPANY N.V., and THE BAHASSA DEVELOPMENT COMPANY N.V., **all based at 2370 Arendonk, Schoolstraat 1A**, in anticipation of the establishment of the Language Development Fund and the sign-up of investors. (Emphasis supplied.)

135.    Artesia Banking also knew that these LDCs would not generate any real revenue to repay the loans, and that L&H intended to seek new investors who would act as a new source of funds. As P. Rabaey stated in a September 21, 1999 email: "The objective is to repay our loan to Radial Belgium by attracting investors and to further increase the capital per Language Development Company." Another internal Artesia Banking document quoted in the Prosecutor's Report states:

The repayment of loans granted by Artesia to the holding company (=Radial Belgium) is totally dependent on whether investors can be found, which is very difficult to tie with a set time schedule. The subsidiaries (language development companies) themselves deploy almost no activities as long as there are no investors…. In actuality these companies represent nothing (no activities, no assets).

136.    Recognizing that Radial and the LDCs were sham entities, with no ability to repay the financing, Artesia Banking insisted that the loan to Radial be guaranteed by the Principal Officers. However, based on its previous experience with the Dictation and BTG loans, Artesia Banking knew that the Principal Officers would have to conceal their role as guarantors from L&H's auditors, the SEC and L&H investors because it constituted indirect involvement by L&H in the financing of purportedly independent LDCs. However, this time around, the Principal Officers were unwilling even to sign guarantees contained in side letters. According to the September 21, 1999 e-mail from P. Rabaey to G. Dauwe, the Principal Officers refused to sign private guarantees "**so as to avoid possible problems with the SEC**. We have therefore no security and look for a solution via credit default swaps." (Emphasis supplied).

137.    Artesia Banking knew that it was highly unusual for an individual to participate as a counterparty to a credit default swap, and proposed the use of credit default swaps in connection with the Radial loan (and subsequently in connection with a loan to LIC, described below) solely to accomplish the deception of L&H's auditors, the SEC and L&H's shareholders. An internal Artesia Banking memorandum entitled "Direction Internal Audit" from J.P. Cloes and F. Dankelman to K. Claessens and others, dated January 31, 2000, notes that the credit default swaps executed by the Principal Officers had "special characteristics (they are the only contracts of this type concluded with natural persons)."

138.    The sham nature of the credit default swaps that Artesia Banking entered into with the Principal Officers is further confirmed by the fact that they were not supported by any consideration. In the case of a real credit default swap, the sellers of the swap – in this case the Principal Officers – receive a premium in exchange for the credit protection (i.e.

guarantee) provided to the buyer of the swap – in this case Artesia Banking.  Internal Artesia Banking documents indicate that the Bank never paid any premiums to the Principal Officers for the credit default swaps used to guarantee the Radial loan, and only paid them a portion of the premiums they were supposed to receive for the credit default swaps used to guarantee the LIC loan.  Moreover, as explained in paragraph 153 below, Artesia Banking and the Principal Officers ultimately agreed that no premiums were owed for any of the credit default swaps, and the Principal Officers repaid the Bank the premiums they had received for the LIC credit default swaps.  The sham nature of these credit default swaps is further evidenced by the fact that, as noted in an April 21, 1999 memorandum prepared by the Bank's Internal Audit Department, they were concluded in violation of the Bank's own procedures for the execution, processing, and reporting of credit default swaps.

139.    Artesia Banking's internal documents leave no doubt that, as reflected in a February 10, 2000 interoffice memorandum sent by Claude Piret, "the aim of these transactions [the credit default swaps with the Principal Officers] was to protect [the Bank] from any risk of non-repayment of the credits and **was an alternative to a joint guaranty**." (Emphasis supplied).  Artesia Banking's Geert Dauwe put the matter even more bluntly in his February 14, 2000 interoffice memorandum: "the credit default swaps were concluded in **order to get around the guarantees** that the other parties (= J. Lernout + P. Hauspie + N. Willaert…) did not wish to provide." (Emphasis supplied).  Artesia Banking chose to disguise the Principal Officers' loan guarantees as sham credit default swaps because it believed these instruments would be easier to hide than guarantees reflected in side letters.  Thus, Artesia Banking's sole reason for structuring the Principal Officers' guarantees as sham credit default swaps was to further the fraudulent scheme by concealing the relationship between L&H and the strategic partners, which concealment the Bank knew would render L&H's financial statements misleading in violation of auditing standards and applicable law.

140.    No reference to the Principal Officers' guarantee or the credit default swaps
appears in the loan agreement between Artesia Banking and Radial, or in any of the
documents referred to therein.  As explained in detail below, Artesia Banking's failure to
disclose the credit default swaps in the Radial loan documents was contrary to the advice of
the Bank's in-house lawyers, and constituted a violation of Belgian banking regulations and
the Bank's own policies.

### Artesia Banking's Loan to LIC
### Guaranteed by Sham Credit Default Swaps

141.    After setting up Radial to manufacture revenues for L&H in the third quarter
of 1998, L&H and Artesia Banking replicated this scheme in the fourth quarter.  The name of
the holding company this time was Language Investment Co. ("LIC").  Artesia Banking
made a loan on December 22, 1998 to LIC in the amount of 220 million BEF (approximately
$6 million).  LIC then sent these funds in four installments of $1.5 million to four separate
LDCs:  the Greek, Hungarian, Polish and Czech development companies.  These LDCs then
immediately paid to L&H as "licensing fees" all of the funds provided by Artesia Banking
through LIC so that L&H could book this approximately $6 million as "revenue" prior to
year-end.

142.    The internal Artesia Banking credit proposal for the LIC loan makes explicit
that the loan to LIC – to establish companies that would provide revenue to L&H – was a
continuation of the fraudulent scheme in which Artesia Banking had provided financing to
Dictation, BTG and Radial.  The credit proposal, prepared for the consideration of the Bank's
credit committee, states that the LIC project is "comparable to projects such as Dictation
Consortium, Belgian [sic] Translation Group, …" and that the "working method" was
already applied in the case of Radial.

143.    Artesia Banking knew that the Greek, Hungarian, Polish and Czech LDCs
lacked the financial resources and technical knowledge necessary to develop L&H's software
for use with additional languages.  In fact, an internal Artesia Banking document quoted in

the Prosecutor's Report makes clear that Artesia Banking knew that the proceeds of its loan would be used immediately by these newly formed LDCs to pay for licensing fees to L&H, leaving the LDCs with no capital to perform their contractual obligation to develop L&H software for use with other languages. One internal document noted that the amounts financed by Artesia Banking would provide the "**start-up capital**" for the four LDCs and "these amounts are used in each case as partial payment to [L&H] for the up-front fee of US$3,000 [meaning $3 million]. The balance of the capital underwritten by LIC NV ... is to be paid in full in the course of the first half of 1999. LIC NV will do everything possible to find the necessary funds for this purpose." (Emphasis supplied.)

144.    As had been the case with Radial, Artesia Banking insisted that repayment of the loan to LIC be guaranteed by L&H. Internal Artesia Banking documents reflect that the Bank viewed a guarantee by the Principal Officers as equivalent to a guarantee by L&H itself and, thus, that the Principal Officers' involvement in the financing of LIC was equivalent to involvement by L&H for purposes of U.S. accounting rules. The minutes of Artesia Banking's credit committee reflecting approval of the LIC loan proposal on December 17, 1998 state: "The committee agrees on the condition that the loan is extended within the context of the L&H lines [of credit] and that the latter [i.e. L&H] guarantees repayment upon maturity." A December 29, 1998 e-mail from Artesia Banking's Jan Van der Ven regarding the LIC loan states: "Approval to start with operation now. The credit default swap with L&H will take effect on 1/4/99." In fact, the credit default swap entered into on January 4, 1999, was between Artesia Banking and the Principal Officers.

145.    The initial loan agreement between Artesia Banking and LIC, dated December 22, 1998, made no reference to the Principal Officers' guarantee or a credit default swap.

146.    Subsequently, on or about June 17, 1999, Artesia Banking and LIC entered into an amendment of the December 22, 1998 LIC loan agreement. The amendment stated that "henceforth" – that is, from the date of the amendment – the loan would be guaranteed by "Credit Swap Transaction number 001/PR/AV/001 closed with our Bank." In furtherance

51

of the fraudulent scheme, the amendment did not disclose the fact that the Principal Officers were the counterparties to the swap, because – as explained in a June 15, 1999 e-mail by P. Rabaey – "then the link between the debtor [LIC] and these private persons [the Principal Officers] could be made. For the client [L&H], it is not desirable that there is a direct link known to the outside world."

147.    Artesia Banking's Internal Audit Department subsequently concluded that the June 17, 1999 amendment to the LIC loan agreement "contradict[ed] the truth" because it stated that the loan would "henceforth" be guaranteed by a credit default swap when, in fact, the loan had been guaranteed by a default swap from the time it was first granted, more than six months earlier. The January 30, 2000 audit report concluded that: "[i]f the reference to 'henceforth' was made knowingly, it would involve a false declaration, with all the legal consequences that such could entail."

### Artesia Banking's Continuing Efforts in 1999 and 2000 to Conceal the Fraudulent Nature of the Radial and LIC Loans

148.    Throughout 1999 and 2000, Artesia Banking engaged in additional conduct designed to ensure that the fraudulent nature of the Radial and LIC loans would remain concealed from L&H's auditors, the SEC and L&H investors, and thereby to ensure that L&H could continue to report fraudulently inflated revenues for 1998 and 1999. Indeed, as alleged below, during this period Artesia Banking (1) entered into additional credit default swaps with the Principal Officers to guarantee the still-outstanding Radial and LIC loans; (2) deliberately and intentionally failed to disclose the existence of these guarantees in the Radial and LIC loan documents that were generated during this period, in direct contravention of the advice of the Bank's Legal Department; (3) ignored, and took no action in response to, Internal Audit Reports that opined that the Bank had violated Belgian banking regulations by failing to disclose the credit default swaps in the Radial and LIC loan documents; and (4) evaded Belgian tax laws that would have required the Principal Officers to disclose the credit default swaps in their tax filings.

149.    The loan to Radial, granted by Artesia Banking on September 29, 1998, was scheduled to be repaid by December 21, 1998, and the credit default swap that secured this loan had an expiration date of June 30, 1999.  The Radial loan was not timely repaid and, in furtherance of the fraudulent scheme, on or about June 30, 1999, Artesia Banking entered into a second credit default swap with the Principal Officers to guarantee the still-outstanding Radial loan.  This second Radial credit default swap had an expiration date of December 15, 1999.

150.    The LIC loan, granted by Artesia Banking on December 22, 1998, was scheduled to be repaid by June 30, 1999, and the credit default swap that secured this loan expired on the same date.  The LIC loan was not timely repaid and, in furtherance of the fraudulent scheme, on or about June 30, 1999, Artesia Banking entered into a second credit default swap with the Principal Officers to guarantee the still-outstanding LIC loan.  This second LIC credit default swap had an expiration date of December 15, 1999.

151.    On September 20, 1999, Artesia Banking's credit committee, comprised of senior management of the Bank, considered extending the terms of the Radial and LIC loans until December 15, 1999, the date on which the credit default swaps guaranteeing these loans were scheduled to expire.  Among the information presented to, and considered by, the credit committee was the advice of Artesia Banking's Legal Department that the loan documents must mention the fact that the loans were guaranteed by credit default swaps.  The credit committee approved the extension of the terms of the Radial and LIC loans until December 15, 1999 and, in direct contravention of the advice of the Bank's Legal Department and in furtherance of the fraudulent scheme, the credit committee determined "that the CDS will not be expressly repeated in the credit offers."  In October 1999, Artesia Banking entered into agreements with Radial and LIC extending their respective loans until December 15, 1999. These agreements made no reference to the guarantees of the Principal Officers or the credit default swaps.

152.    On January 20, 2000, Artesia Banking's Internal Audit Department reported to the Chairman of Artesia Banking's Management Committee, Dirk Bruneel, that the Bank's failure to mention the credit default swaps in any of the Radial loan documents, and in the December 22, 1998 and October 26, 1999 LIC loan agreements created "a risk that Banque Artesia will be accused of having engaged in a special mechanism," that is, failure to disclose the existence of a guarantee in violation of regulations promulgated by the Belgian Banking and Finance Commission ("CBF"), the agency responsible for supervising Belgian banks. The January 20, 2000 audit report noted that "Bank lawyers are unanimous: The CDS should have been mentioned in the letters of understanding sent to borrowers" and concluded that the credit committee that authorized the non-disclosure of the Radial and LIC credit default swaps did not have authority to waive this regulation. At the time of this audit report, as alleged more fully in paragraphs 205-207 below, Artesia Banking knew of L&H's intention to acquire Dragon in exchange for L&H stock. Artesia Banking took no action in response to these audit findings.

153.    In January 2000, the Bank's Internal Audit Department notified the Bank's senior management of the Bank's failure to comply with certain laws applicable to the Radial and LIC credit default swaps. In a January 31, 2000 memorandum to, among others, Claude Piret and Geert Dauwe – both members of the Bank's Management Committee – auditor Jean-Paul Cloes pointed out that (a) under the terms of the credit default swap agreements with the Principal Officers, Artesia Banking still owed the Principal Officers premiums totaling 809,162 BEF for the Radial credit default swap and 76,389 BEF for the LIC credit default swap; and (b) under Belgian tax laws, Artesia Banking, as payer, was obliged to establish a "281.50 file" reflecting the Principal Officers' receipt of these taxable commissions. Artesia Banking's senior management knew that if the Principal Officers were to declare the premiums received on the credit default swaps as taxable income, their connection to Radial and LIC – and the fraudulent inflation of L&H's 1999 revenues – would be revealed. In furtherance of the fraudulent scheme and in order to avoid disclosure of the

credit default swaps in the Principal Officers' tax filings due in March/April 2000, Artesia Banking proposed that the credit default swaps – which had already expired – be nullified. As far as Plaintiffs have been able to determine to date, sometime in March or April of 2000, Artesia Banking and the Principal Officers agreed that the Bank would not pay the credit default swap premiums it still owed to the Principal Officers, and the Principal Officers would repay to the Bank the premiums they had received in connection with the LIC credit default swap. In this way, Artesia Bank furthered the fraudulent scheme by, once again, preventing the disclosure of the Principal Officers' connection to Radial and LIC. Artesia Banking took this action at a time when it knew that (1) KPMG had not yet certified L&H's 1999 financial statements, and (2) L&H intended to acquire Dragon in exchange for L&H stock.

**Artesia Banking's 1999 Loan to the Principal Officers
for the Use of the Language Development Fund**

154.    Artesia Banking expanded its participation in the fraudulent L&H scheme in 1999. On March 31, 1999, L&H set up the LDF and transferred $12 million that same day to the bank accounts of seven LDCs at Artesia Banking. The Greek, Czech, Hungarian and Polish Development Companies received $1.5 million each, and the Tamil, Thai and Hindi Development Companies received $2 million each. This time, the $12 million came from Mercator in the form of a $2 million capital contribution and a $10 million loan to LDF. All of these funds appeared in L&H's 1999 financial statements as revenue.

155.    Internal Artesia Banking documents quoted in the Prosecutor's Report leave no question that Artesia Banking knew that these LDCs were shell entities created by L&H. A fax dated March 1999 from Ph. Depecker at L&H to Artesia Banking states:

> The following companies are to be established, for which I need an account number:    Thai Language Development Company N.V., Hindi Language Development Company N.V., and Tamil Language Development Company N.V.

The representative-director of these companies is in each case Mr. Tony Snauwaert, and the company seat will be 9900 Eekloo, Stationstraat 83. Could you get me three account numbers as soon as possible?

156.    In the second quarter of 1999, L&H requested that LDF receive a $20 million loan from Artesia Banking. Artesia Banking's internal documents relating to the LDF loan application reveal that the Bank was fully aware that the purpose of the LDF loan was the same as the fraudulent purpose for the loans to Radial and LIC. Specifically, according to an internal email from Artesia Banking's B. Ferrand, dated June 21, 1999:

> LDF as overarching holding company is now 100% shareholder in 3 Language Development Companies ("LDC"): Tamil DC, Hindi DC, and Thai DC. [Six million dollars] of capital stock and the Mercator-Noordstar loan was channeled to these various LDCs which used it to buy licenses from [L&H] in the first quarter of 1999.
> ***
> In view of the fact that [L&H] books the sale of licenses as revenue, it is essential under GAAP rules that LDF be totally independent from [L&H]. Therefore, [L&H] cannot under any circumstances be a party involved in an agreement whose subject is the repayment of the requested financing.
> ***
> The system offers [L&H] two advantages: 1) the R&D takes place outside their own profit and loss structure; 2) the royalties received can be booked immediately as revenue.

Another internal document from Artesia Banking's credit file quoted in the Prosecutor's Report noted: "Purpose of the [LDF] loan: bridge loan to capitalize subsidiaries of borrower for payment of license fees by subsidiaries to [L&H]."

157.    A credit proposal for a $20 million loan to LDF to be guaranteed by a credit default swap with the Principal Officers was presented to Artesia Banking's credit committee on June 25, 1999. According to the deposition testimony of Alain Probst, the credit committee did not consider that proposal because questions had been raised within the Bank concerning the need to disclose credit default swaps in loan documents. In other words, the members of Artesia Banking's senior management who comprised the credit committee were no longer certain that disguising the Principal Officers' guarantees as sham credit default swaps would be an effective way to conceal the Principal Officers' connection to the

borrower, thereby enabling L&H to recognize the borrowed funds as revenue. Thus, the credit committee's minutes reflect a decision by the committee to withdraw the $20 million LDF loan application and to instead make the loan directly to the Principal Officers: "In its [i.e. LDC loan application's] stead and place agreement (to be ratified) for a loan of the same amount owed severally and jointly by Messrs. Jo Lernout, P. Hauspie, and Nico Willaert." This time, however, Artesia Banking demanded that the Principal Officers pledge 650,000 registered shares of L&H as collateral for the loan.

158.    Although Artesia Banking's internal documents reflect the Bank's knowledge that the $20 million loan to the Principal Officers would "be lent immediately to the Language Development Fund, N. V. ('LDF')," which in turn would use the funds "to capitalize subsidiaries … for payment of license fees by subsidiaries to [L&H]," the June 25, 1999 loan agreement between the Bank and the Principal Officers misleadingly states that the purpose of the loan is "be used exclusively for financing of [the Principal Officers'] professional activities." Thus, in furtherance of the fraudulent scheme, the Bank deliberately concealed the true purpose of the $20 million loan in the documents provided to the Principal Officers.

159.    The vast majority of the $20 million was used, as Artesia Banking had anticipated, to fund six new LDCs (Malay, Vietnamese, and four other Indian languages not specified at the time), and this money was ultimately booked as revenue on L&H's 1999 financial statements. L&H did not reveal the source of the funds received by these LDCs in L&Hs Form 10-Q for the quarter ended June 30, 1999, or in its SEC Form 10K for the year ended December 31, 1999.

160.    The $20 million loan to the Principal Officers, which was scheduled to be repaid on October 10, 1999, was not timely repaid. In September, Willaert had assured Artesia Banking's Bart Ferrand that "all loans made by Artesia within the framework of the establishment of the Language Development Companies will be repaid for sure around December 31, 1999 (Radial [$6 million], LIC [$6 million] and Lernout/Hauspie/Willaert

[$20 million])." Although none of these loans was repaid until January 5, 2000, Artesia

Banking's books falsely reflect that all of them, including the $20 million personal loan to

the Principal Officers, were repaid on December 30, 1999.

      161.    Even after the $20 million loan to the Principal Officers had been repaid,

Artesia Banking took additional steps to conceal the fraudulent purpose of this loan from

L&H's auditors during their audit of L&H's 1999 annual financial statements. On or about

March 17, 2000, Artesia Banking provided a written attestation to L&H's auditors, KPMG,

which falsely stated that on December 31, 1999, the Bank had no personal loans outstanding

to L&H officers. The Bank made this false statement to L&H's auditors at a time when the

Bank knew that (1) the auditors had not yet certified L&H's 1999 financial results, which

included fraudulent revenues received from the LDCs owned by LDF and financed by the

Bank, and (2) L&H intended to acquire Dragon in exchange for L&H stock. The Bank made

this false statement to L&H's auditors in furtherance of the scheme to defraud L&H's

auditors, the SEC and L&H investors.

      162.    In summary, beginning in 1997 and continuing until at least March/April

2000, Artesia Banking knowingly participated in a fraudulent scheme in which funds

guaranteed by, and in one instance loaned directly to, the Principal Officers were utilized by

L&H to enter into sham transactions that fraudulently inflated the Company's revenues and

earnings. Artesia Banking recognized and intended at the time it extended loans to finance

the inflation of L&H's revenues and earnings that L&H would repeatedly make false

representations that those revenues were legitimate and properly recognized in compliance

with US GAAP. It was integral to the fraudulent scheme in which Artesia Banking

knowingly participated that all participants in the scheme – including Artesia Banking –

would continually conceal from L&H's auditors, the SEC and L&H investors the fraudulent

nature of Artesia Banking's conduct and the Principal Officers' connection to the LDCs, and

Artesia Banking did so. During the period after Artesia Banking became aware of L&H's

intention to acquire Dragon in exchange for L&H shares, the Bank took the following steps

to keep the fraudulent scheme concealed: (1) The Bank ignored, and took no action in response to, Internal Audit Reports that opined that the Bank had violated Belgian banking regulations by failing to disclose the credit default swaps in the Radial and LIC loan documents; (2) The Bank evaded Belgian tax laws that would have required the Principal Officers to disclose the Radial and LIC credit default swaps in their tax filings; (3) The Bank falsified its own books to make it appear that the loans to Radial, LIC and the $20 million loan to the Principal Officers had been repaid in 1999, even though they were not repaid until January 5, 2000; and (4) The Bank lied to L&H's auditors about the existence of the $20 million loan to the Principal Officers.

### Belgian Prosecutors Conclude That Artesia Banking Knowingly Participated in the L&H Fraud by Funding LDCs and Using CDSs

163.     On the basis of internal documents obtained from Artesia Banking, a panel of experts retained by the Belgian Prosecutors concluded that Artesia Banking intentionally participated in the L&H fraud. Their conclusions are damning:

Evaluation of the Financing

Three of the four members of L&H's executive committee [the Principal Officers] are negotiating credit default swaps with Artesia Bank for the loans to Radial, LIC and LDF (loan to LDF not approved). These loans are guaranteed by members of L&H's executive committee via credit default swaps for paying license fees to L&H (booked as revenue). The loan denied to LDF was approved for an identical amount to the three members of L&H's executive committee and also used for paying license fees to L&H (booked as revenue).

These loans were concluded at great urgency and just before the quarterly closing of accounts at L&H. Decisions had to be made always "on the double," which only can be explained by the approaching quarterly or yearly closings.

The choice of credit default swaps as financial guarantee is inspired by the intention of not having to report this sort of financial guarantee on the letter of credit of the borrower and so as to avoid possible problems with the US SEC. **The efforts of the members of L&H's executive committee to prevent that the credit default swaps appear on the letter of credit show that there was an awareness that this could lead to problems with revenue recognition and related parties**. ***