It is irrelevant that Artesia Bank does <u>not</u> utilize the provided guarantees in which members of L&H's executive committee are involved.... Of crucial importance is the following finding: the provided guarantees (credit default swaps, the pledge of 650,000 L&H shares) in which 3 of the 4 members of L&H's executive committee are involved are a basic condition for granting of the loans to Radial, LIC and to Lernout/Hauspie/N. Willaert (3 members of the L&H executive committee), whereby these financial resources flow to the LDCs and subsequently to L&H for payment of license fees that are booked as revenue just before a quarter or a fiscal year closing. **Because of the financing of license payment (credit default swap, loan to 3 members of the executive committee, pledging L&H shares) we consider the revenue based on the license agreements with the LDCs fictitious.**

(Emphasis supplied).

### D. ARTESIA BANKING'S ROLE IN DIRECTLY MANIPULATING THE PRICE OF L&H SECURITIES

164.    Artesia Banking's efforts to falsely inflate and manipulate the price of L&H's securities went well beyond its participation in the falsification of L&H's financial statements. Indeed, the degree to which Artesia Banking was willing to go to further the illicit purposes of the fraudulent L&H scheme is exemplified by the Bank's conduct concerning a proposed loan of $25 million in March 1999 to L&H affiliated companies. As Artesia Banking knew, that 1999 loan was specifically proposed by the Principal Officers to finance the purchase and sale of L&H stock in order to prop up the market price of L&H securities. In an internal Artesia Banking document recently obtained from Dexia in discovery, Artesia Banking demonstrates not only its willingness to engage in a scheme to manipulate the share price of L&H securities, but also its utter disregard for compliance with U.S. securities laws. In a March 8, 1999 memorandum to the Bank's Management Committee, Bernard Mommens, an officer and in-house legal counsel of Artesia Banking, acknowledged that the express purpose of the proposed $25 million financing was to prop up L&H's share price. In that memorandum, Mommens also acknowledged that at that time Artesia Banking held 500,000 shares of L&H in its own account. With that background, he then examined whether the proposed loan "could be qualified as market manipulation, which

will be sanctioned by means of criminal proceedings." Mommens concluded that the loan was probably illegal under U.S. law:

> [It] appears that US Regulations (article 15 under c of the Exchange Act) are stricter [that EASDAQ] as a broker-dealer will be prohibited from any form of market manipulation or price stabilization. Without being a US jurist, nor having the time to examine the matter under US law, it seems desirable to only conduct the [proposed] sale on the EASDAQ, unless a US law firm confirms us that no issues are expected with the NASDAQ or any other US authorities.

165.    Notwithstanding the clear prohibitions outlined in Mommens' memorandum, Artesia Banking expressed its willingness to engage in the proposed transactions even though it was specifically designed to manipulate L&H's stock price.

166.    Artesia Banking financed stock purchases by another L&H related company, L&H Investment Company N.V. ("LHIC") in furtherance of the fraudulent scheme to falsely inflate the market price of L&H stock. LHIC was an investment fund founded by Hauspie and Lernout in 1998, through which Hauspie and Lernout controlled 7.6% of L&H's stock. Both Hauspie and Lernout sat on the Board of Directors of LHIC. Hauspie and Lernout capitalized LHIC with their own shares of L&H common stock and acted as advisors to LHIC and its investments. The President and Managing Director of LHIC since its inception was Francis Vanderhoydonck, who also served as a director of L&H from May 1999 until his resignation on or about May 15, 2001. Hauspie and Lernout purportedly established LHIC to make long-term strategic investments in companies in the information technology industries such as speech, language, and artificial intelligence. In fact, however, LHIC was used to further the fraudulent scheme of falsely inflating L&H's financials and the price of its securities.

167.    Artesia Banking was LHIC's principal source of financing. Artesia Banking was well aware that although LHIC purported to be an independent entity, the company was controlled by Hauspie and Lernout and that the financing the Bank provided to LHIC would be used to further the goals of the fraudulent scheme. In or about December 1998, Artesia

Banking provided a credit line of $160 million to LHIC, of which Artesia Banking would provide $55 million and the balance would be provided by other banks selected by Artesia Banking in "close consultation with the borrower." The purpose of the credit facility was "to provide funding for future acquisitions by the borrower" and a maximum of $20 million could be used for "general corporate purposes." In April 2000, LHIC and Artesia Banking amended the credit facility to increase the Bank's commitment by $25,000,000. According to Artesia Banking documents, the purpose of this increase was to "finance the exercise price of a call option relating to 1,250,000 shares of common stock of Lernout & Hauspie Speech Products N.V." The April 2000 loan was used by LHIC to purchase L&H stock, which helped to prop up the L&H stock price.

168.    Moreover, the loans Artesia Banking extended to LHIC were directly tied to L&H. Those loans were made at the behest Hauspie and Lernout and were secured by pledges of L&H stock. In fact, a June 2000 Report by Peter Rabaey expressly notes that LHIC's multi-million dollar credit line was "indirectly covered by 200% shares of L&H SP." This significant pledge of collateral gave Artesia Banking still further incentive to partake in the scheme to inflate the value of L&H stock to ensure that the Bank had a means to collect on the LHIC loans.

169.    In July 2000, Artesia Banking again provided financing to prop up the price of L&H stock. Willaert approached Artesia Banking to obtain $25 million in financing so that L&H's CEO Bastiaens could purchase $25 million of L&H stock on the open market. The stated purpose of this transaction was, again, to bolster L&H's share price. Because Artesia Banking itself still had a significant investment in L&H stock, it again expressed its willingness to engage in this manipulative act. In fact, based upon documents recently obtained from Dexia in discovery, it is clear that Artesia Banking's Management Committee approved the $25 million loan to Bastiaens with full knowledge that the purpose of the transaction was to "support" L&H's share price.

170.    After the $25 million Bastiaens loan was approved, the Principal Officers decided to change the transaction, using the money to finance Bastiaens' purchase of L&H shares at a premium from L&H Holding Company rather than on the open market. Inexplicably, Artesia Banking paid the proceeds of that $25 million loan directly to the Principal Officers, rather than to the seller of the L&H shares, L&H Holding Company. Artesia Banking was thus instrumental in allowing the Principal Officers to obtain millions of dollars from the fraudulent scheme to inflate the shares of L&H stock.

### E. ARTESIA BANKING'S USE OF ARTESIA SECURITIES TO FURTHER L&H FRAUD

171.    In furtherance of the fraudulent scheme alleged by Plaintiffs, Artesia Banking also caused its subsidiary, Artesia Securities, to make numerous false representations in analyst reports, and failed to correct those materially misleading representations.

172.    The analyst reports issued by Artesia Securities are no longer publicly available on the databases that typically contain such reports. Thus, Plaintiffs have been unable to locate all of the materially false and misleading analyst reports issued by Artesia Securities at the direction of Artesia Banking during the relevant period. Nevertheless, the limited number of reports produced by Dexia in the course of discovery reveal that Artesia Banking employed Artesia Securities to further the goals of the L&H fraudulent scheme, namely to provide L&H investors with materially false and misleading information concerning L&H's financial performance and prospects, in order to advance the financial interests of Artesia Banking, L&H, and the Principal Officers.

173.    Pursuant to and within the scope of his role as Artesia Banking's agent, Artesia Securities analyst Pierre-Paul Verelst issued one of numerous materially false and misleading reports concerning L&H on May 19, 1999. In that report, Artesia Securities rated L&H a "Buy."

174.    The Artesia Entities' decision to tout L&H and its prospects imposed upon them an obligation to disclose material adverse facts in their possession concerning L&H.

By the time the May 19, 1999 report was issued, Artesia Banking had committed numerous acts in furtherance of the fraudulent scheme to inflate L&H's reported revenue, earnings and other financial results. In particular, Artesia Banking had loaned funds to finance the payment of fraudulent "license fees" to L&H in the total amount of $12 million during the third and fourth quarters of 1998 with the knowledge and intention that L&H would report those fraudulent payments to investors as legitimate revenue. Furthermore, Artesia Banking had devised the use of the fraudulent device of sham credit default swaps executed by the Principal Officers to conceal their guarantee of the loans made to the LDCs from L&H's investors and auditors. Accordingly, the Artesia Entities' uniformly positive reports concerning L&H was materially false and misleading.

175.     Artesia Banking, Artesia Securities and Verelst issued another materially false and misleading report concerning L&H on July 13, 1999. In that report, Verelst issued a "Buy" recommendation with respect to L&H stock. Verelst also commented positively that L&H had secured "several contracts for its (already awarded) breakthrough RealSpeak product." According to the report:

> We consider these examples of recent contracts for the L&H RealSpeak [product] as . . . strong support for our already very positive feeling about Lernout & Hauspie. The fast development of the telephony applications market, in which L&H wants to play an important role, is likely to bring substantial results to the company. Moreover, the strategic alliances with Intel, GTE [and] Motorola, have strengthened the position of L&H in this market.
>
> The persistent sluggishness of the share price is, according to us, not justified given the excellent perspectives of the company. The 2nd quarter results to be published [sic] end of this month may be a positive surprise.
>
> We still firmly recommend BUY. (Emphasis in original).

176.     The July 13, 1999 report was materially false and misleading for the same reasons as the Artesia Entities' May 13, 1999 report. In addition, by the time the July 13, 1999 report was issued, Artesia Banking had deepened its involvement in the L&H fraud by extending a $20 million loan to the Principal Officers in June of 1999 for the agreed purpose

of allowing the Principal Officers to arrange for fraudulent payments to L&H designed to artificially inflate L&H's reported revenues, earnings and other financial results. Again, at the time Artesia Banking agreed to extend that loan, it agreed that it would conceal the loan and its fraudulent purpose from L&H's investors and auditors. Thus, at the time the July 13, 1999 report was issued, the Artesia Entities had an affirmative obligation to disclose to investors the adverse facts concerning the manner in which L&H was producing fraudulent revenues. Instead, the Artesia Entities employed the July 13, 1999 report as another opportunity to further the fraudulent L&H scheme by touting L&H's financial performance and prospects.

177. Artesia Banking, Artesia Securities and Verelst issued another materially false and misleading report concerning L&H on July 29, 1999. In that report, Verelst again issued a "Buy" recommendation with respect to L&H stock. The report also contained a variety of misleading information concerning L&H's financial results. In particular, the report contained the following chart regarding L&H's historical and projected financial results:

| USD '000 | 1998 Q2 | 1999 Q2 | Δ y-o-y | 1998 H1 | 1999 H1 | Δ y-o-y | FY 99 E |
|---|---|---|---|---|---|---|---|
| Revenues Total | 44,991 | 78,015 | + 69% | 80,058 | 146,723 | + 83% | 356,000 |
| Technologies & Solutions | 20,261 | 23,485 | + 15% | 35,682 | 51,211 | + 43% | |
| Applications | 11,373 | 28,984 | + 154% | 19,264 | 51,652 | + 167% | |
| Consulting Services | 13,357 | 20,546 | + 53% | 25,210 | 43,960 | + 74% | |
| Cost of Revenues | 15,175 | 19,297 | + 27% | 27,117 | 40,037 | + 47.6% | |
| Gross Profit | 28,818 | 58,719 | + 90% | 52,939 | 106,687 | + 101% | |
| Gross Margin | 66.3% | 74.6% | | 55.1% | 72.7% | | |
| G & A expenses | 5,139 | 7,953 | + 55% | 9,979 | 18,313 | + 63.5% | |
| M & S expenses | 7,518 | 14,923 | + 98.5% | 12,479 | 27,937 | + 124% | |
| R & D expenses | 6,105 | 10,810 | + 112% | 9,857 | 20,615 | + 109% | |
| EBIT | (17,990) | 15,532 | | (22,937) | 26,471 | | |
| | | | | | | | |
| Net Income | (20,626) | 10,114 | | (21,443) | 22,418 | | 55,000 |
| EPS | -0.15 | 0.17 | | 0.28 | 0.29 | | 0.95 |
| P/E | | | | | | | 34.6 |

178. Verelst also reported that L&H's "[s]ales for the second quarter rose by 69% [year-over-year], the rise being mainly due to the outstanding performances of the Application division (+154%)." In addition, the report stated, "The costs of revenues being

65

under control, the gross margin improved from 66.3% to 74.6% for Q2 and from 66.1% to 72.7% for H1." Verelst also stated that L&H's "R&D expenses rose by 112% [year-over-year] for Q2 and by 109% [year-over-year] for H1."

179.    Verelst summed up his report by stating:

These encouraging results clearly illustrate the healthiness of the company. We estimate the EPS for the full year 1999 at USD 0.95, considering that sales will continue to rise sharply for the Applications division (especially Clinical transcriptions applications or translation) and that the sales for the Technology & Solutions division will register an excellent growth thanks to the RealSpeak product. The management announced that the RealSpeak will be available in German in 99 Q3 and in French, Spanish, Italian and Japanese in 99 Q4. 4 additional languages by quarter will be available. According to us, Marketing and Sales and Research & Development expenses will have to remain high to maintain L&H's market position against the competitors.

We estimate the Price Earnings to Growth Ratio at 0.69 (assuming a CAGR of 50%) and therefore consider the share as undervalued.

We firmly recommend to Buy.

180.    The July 29, 1999 report was materially false and misleading for the same reasons as the May 13, 1999 report and the July 13, 1999 report, as specified in paragraphs 174-176, above. In addition, in reporting upon L&H's future prospects in the July 29, 1999 report, the Artesia Entities fraudulently failed to disclose that L&H would not be able to achieve the revenue and earnings "growth" the Artesia Entities represented L&H would achieve without continuing to employ the fraudulent accounting manipulations that Artesia Banking knowingly facilitated.

181.    Verelst, Artesia Securities and Artesia Banking reiterated their "Buy" recommendation and glowing statements concerning L&H stock in a report issued on September 15, 1999. That report included the following chart that misrepresented L&H's actual financial results and vastly overstated the Company's projected financial results for 1999 and 2000 because those projections assumed that L&H would continue to generate

fraudulent revenue pursuant to the fraudulent scheme in which Artesia Banking and Artesia Securities were knowing participants.

| USD '000 | FY 97 | FY 98 | FY 99 E | FY 00 E | FY 01 E |
|---|---|---|---|---|---|
| Revenues | 99,372 | 211,593 | 349,128 | 523,692 | 785,538 |
| EBIT | (13,221) | (40,037) | 69,825 | 104,738 | 157,107 |
| Net Result* | 20,480 | 37,845 | 56,382 | 83,790 | 125,685 |
| EPS (USD) | 0.53 | 0.69 | 0.95 | 1.41 | 2.12 |

* Before amortization of goodwill

182.    The September 15, 1999 report also positively reported on L&H's acquisition of Bumil Information & Communications Ltd., the entity that became L&H Korea and further aggravated the fraudulent conduct committed by Defendants. Artesia Securities claimed that "[t]he transaction will be 'slightly dilutive' for 1999 and accretive in year 2000."

183.    The report also stated:

According to our own financial projections, EPS should grow following a 4 year[] CAGR of 45.4. As a result, EPS 99 is estimated at USD 0.95, EPS 00 at USD 1.41 and EPS 01 at USD 2.12. Hence, estimated P/E are the following: P/E 99: 38.8, P/E 00: 24.8, P/E 01: 16.5. . . .

The estimated PEG (P/E 99 divided by the 4 years CAGR is 0.81, [which] demonstrates that Lernout & Hauspie is a real bargain!

Until now, the share still suffers from short selling and we can't predict when this will be over. For now, the market therefore does not work as it should do.

Technically speaking, our short term price target is USD 40. Fundamentally speaking, the share is worth USD 43 (using the PEG methodology). We have a 12 month price target of USD 63.45.

We therefore still firmly recommend to BUY. [Emphasis in original].

184.    The September 15, 1999 report was materially false and misleading for the same reasons as the reports previously issued by the Artesia Entities on May 13, 1999, July 13, 1999 and July 29, 1999, as specified in paragraphs 174-176, 180, above.

185.    Artesia Banking, Artesia Securities and Verelst reiterated their uniformly positive statements concerning L&H in a report published on October 8, 1999. That report contained the following materially false and misleading chart concerning L&H's results for 1998 and estimated results for 1999, 2000 and 2001:

| USD '000 | FY 97 | FY 98 | FY 99 E | FY 00 E | FY 01 E |
|---|---|---|---|---|---|
| Revenues | 99,372 | 211,593 | 349,128 | 523,692 | 785,538 |
| EBIT | (13,221) | (40,037) | 69,825 | 104,738 | 157,107 |
| Net Result* | 20,480 | 37,845 | 56,382 | 83,790 | 125,685 |
| EPS (USD) | 0.53 | 0.69 | 0.95 | 1.41 | 2.12 |

* Before amortization of goodwill

186.    In addition, the report contained the following investment summary:

We maintain our financial projections for the years 1999, 2000 and 2001. We estimate the 1999 P/E at 36 and the PEG is estimated at 0.79. We therefore consider Lernout & Hauspie as very cheap relative to its growth potential.

Until now, the share still suffers from short selling and we can't predict when this will be over. There was a new contest of short selling recently organized and L&H remains one of the favourite stock[s] of short sellers.

Our short term (end of the year) target stays at USD 43 and we have had a 12 month price target of USD 63.45. . . .

Once again, we recommend to BUY. (Emphasis in original).

187.    The October 8, 1999 report was materially false and misleading for the same reasons as the reports previously issued by the Artesia Entities on May 13, 1999, July 13, 1999, July 29, 1999 and September 15, 1999, as specified in paragraphs 174-176, 180, above.

188.    Artesia Banking, Artesia Securities and Verelst issued another uniformly positive report concerning L&H on October 28, 1999. The report included the following materially false and misleading chart concerning L&H's reported and projected financial results.

| USD '000 | 98 Q3 | 99 Q3 | 98 Nine Months | 99 Nine Months | FY 99 E | FY 00 E | FY 01 E |
|---|---|---|---|---|---|---|---|
| Total Revenue | 54,850 | 87,473 | 134,918 | 234,198 | 349,128 | 523,692 | 785,538 |
| Gross Profit | 38,930 | 63,503 | 59,889 | 170,188 | | | |
| Gross Margin (%) | 57% | 72.6% | 44.4% | 72.7% | | | |
| G & A expenses | 5,855 | 8,532 | 15,854 | 26,245 | | | |
| M & S expenses | 8,875 | 15,577 | 21,354 | 43,511 | | | |
| R & D expenses | 6,496 | 12,473 | 16,293 | 33,088 | | | |
| Amortization of Goodwill | 3,970 | 8,703 | 9,416 | 23,122 | | | |
| EBIT | (34,640) | 16,827 | (57,576) | 43,296 | 69,825 | 104,739 | 157,107 |
| EBIT Margin | -63% | 19% | -42.7% | 18.5% | 20% | 20% | 20% |
| Net Result | (39,749) | 10,446 | (61,191) | 31,096 | 56,382 | 83,790 | 125,685 |
| EPS (USD) | (0.71) | 0.17 | (1.25) | 0.53 | 0.96 | 1.41 | 2.12 |

189.    The report contained a number of additional positive representations concerning L&H.  For example, Artesia, Artesia Securities and Verelst stated that: (a) L&H "reported strong revenues for its Q3 and nine months ended FY 1999"; (b) "[c]ompared to the same periods of last year, the rise is outstanding as EBIT was then deep in the red (mainly due to write-off of In-Process R&D)"; (c) "we consider L&H as undervalued relative to its growth potential"; and (d) "[w]e definitely stick to our BUY recommendation and stick to our twelve months target of USD 63.45."  The report also emphasized that L&H's quarterly earnings per share of $0.17, which was slightly above the consensus analysts' estimate of $0.155, "gives . . . significant support to our positive opinion about this company."

190.    The October 28, 1999 analyst report was materially false and misleading for the same reasons as the reports previously issued by the Artesia Entities on May 13, 1999, July 13, 1999, July 29, 1999, September 15, 1999 and October 8, 1999, as specified in paragraphs 174-176, 180, above.

191.    Artesia Banking, Artesia Securities and Verelst issued another uniformly positive report concerning L&H on November 18, 1999.  That report contained the following materially false and misleading chart concerning L&H's reported and projected financial results:

| USD '000 | FY 97 | FY 98 | FY 99 E | FY 00 E | FY 01 E | FY 02 E |
|---|---|---|---|---|---|---|
| Total Revenues | 99,372 | 211,593 | 330,500 | 446,175 | 624,645 | 905,735 |

| Gross Profit | 63,065 | 144,950 | 231,350 | 312,323 | 437,252 | 634,015 |
|---|---|---|---|---|---|---|
| EBIT | -13,221 | -40,037 | 61,143 | 111,544 | 187,394 | 226,434 |
| Net Result | 20,480 | 37,845 | 49,675 | 71,388 | 106,189 | 163,032 |
| EPS (USD) | 0.53 | 0.69 | 0.84 | 1.20 | 1.79 | 2.75 |

192.    In that report, Artesia Banking, Artesia Securities and Verelst also noted that L&H "will create new entities to host their medical applications, their translation services and[,] later on[,] the telecom and related applications. The report also emphasized that "the share is still undervalued relative to its growth potential" and that, "[o]nce again, we confirm our BUY rating and have a 12 months target of USD 55."

193.    The November 18, 1999 analyst report was materially false and misleading for the same reasons as the reports previously issued by the Artesia Entities on May 13, 1999, July 13, 1999, July 29, 1999, September 15, 1999, October 8, 1999 and October 28, 1999, as specified in paragraphs 174-176, 180, above.

194.    The Artesia Entities continued to serve the objectives of the fraudulent scheme described herein during late 1999 and 2000 by issuing glowing reports concerning L&H. On December 28, 1999, for example, the Artesia Entities and Verelst issued a report in which they continued to rate L&H as a "Buy." The Artesia Entities and Verelst also issued a report on January 10, 2000 in which they reiterated their "Buy" recommendation with respect to L&H stock and established a twelve-month price target for L&H shares of $75 (at a time when the stock was trading at $58 per share). The December 28, 1999 and January 10, 2000 analyst reports issued by the Artesia Entities were materially false and misleading for the same reasons as the reports previously issued by the Artesia Entities on May 13, 1999, July 13, 1999, July 29, 1999, September 15, 1999, October 8, 1999, October 28, 1999 and November 18, 1999, as specified in paragraphs 174-176, 180, above. The January 28, 1999 and January 10, 2000 analysts reports were issued by the Artesia Entities

after Artesia Banking had been made aware of L&H's intention to acquire Dragon in

exchange for L&H shares, and after Artesia Banking had agreed to provide financing to L&H

to facilitate the Dragon acquisition.

### Artesia Banking Is Liable for the
### Misrepresentations it Caused Artesia Securities To Make

195.    Artesia Banking is liable for all of the false representations made in the

analyst reports issued by Verelst.  Numerous factors demonstrate that Verelst and Artesia

Securities acted as agent of Artesia Banking in issuing those reports.  At all relevant times,

Artesia Banking owned 100% of the shares of Artesia Securities and was the "reference

shareholder" of Artesia Securities.  Under Belgian law, a reference shareholder is a

shareholder who exercises controlling influence on the manner in which a company is run

and which is actively involved in devising the company's business strategy.  By virtue of its

status as reference shareholder of Artesia Securities, Artesia Banking exercised absolute

control over the operations of Artesia Securities, particularly with respect to Artesia

Securities' actions related to the issuance of analyst reports concerning L&H.

196.    According to internal Artesia Banking documents recently obtained from

Dexia in discovery, Artesia Banking set up Artesia Securities to begin operations in

approximately March 1999.  This was done, in part, to provide analyst coverage and to

market discount notes and warrants for L&H, with whom Artesia Banking already had

extensive dealings.

197.    Artesia Banking maintained complete control over Artesia Securities' day-to-

day operations by installing a member of the Bank's Executive Committee, Rene Avonts, as

the ultimate head of Artesia Securities and by requiring that any significant actions of Artesia

Securities be approved by the Executive Committee of Artesia Banking.

198.    The degree to which Artesia Banking dominated and controlled the day-to-day

activities of Artesia Securities is further demonstrated by the following facts, many of which

were gleaned from documents recently produced by Dexia in discovery:

- Artesia Banking bore a significant amount of the costs of Artesia Securities' operations;

- Artesia Banking set up Artesia Securities' operations in the very same building as Artesia Banking so that it could monitor the activities of Artesia Securities;

- Artesia Banking's Management Committee dictated the investment policies of Artesia Securities;

- The equity activities of Artesia Securities were subject to the policies direction of Artesia Bank's Credit Department;

- During the relevant time period accounts of customers of Artesia Banking were commingled with accounts at Artesia Securities so that Artesia Banking maintained the accounts of customers of both the Bank and Artesia Securities; and

- Artesia Securities used the same branding and logo as Artesia Banking, so that they appeared to be part of a single entity.

199.    The fact that Artesia Banking controlled the conduct of Artesia Securities is also demonstrated by the fact that all employees of the Artesia Entities shared a single integrated computer system.  Thus, Verelst's e-mail address was a general Artesia address (pierre-paul_verelst@artesia. com), not one specific to Artesia Securities.  Likewise, all other Artesia Securities employees shared a common e-mail domain with the employees of Artesia Banking.

200.    Moreover, while Artesia Banking and Artesia Securities purported to have a "Chinese Wall" separating their respective dealings to ensure that Artesia Securities' analyst coverage of public companies such as L&H would not be influenced by Artesia Banking's relationships with such companies, in reality there was no such separation.  To the contrary, Artesia Banking exerted considerable and undue influence over the analyst reports disseminated by Artesia Securities to ensure that the recommendations of Artesia Securities analysts served the purposes of the Bank.  For example, according to an internal Artesia Securities memorandum dated May 7, 1999 from Ch. DelVaux to the Managing Director of

Artesia Banking's Corporate Banking Division, Renee Avonts, and others (a copy of which was recently obtained in discovery), Nadia Van Hove, the manager of Artesia Banking's corporate research department, attended the weekly analyst meetings at Artesia Securities for the purpose of "coordinating efforts" of Artesia Securities' analysts with those of Artesia Banking and to assure that Artesia Securities did not take any position contrary to the Bank's interests. In this way, Artesia Banking entangled itself with the analysts at Artesia Securities to ensure that Artesia Securities would issue falsely positive reports regarding the financial performance of L&H that had the effect of fraudulently inflating the share value of L&H's securities. As noted previously, because at this time Artesia Banking directly held nearly one million shares of L&H stock, while also holding hundreds of thousands of additional shares of L&H stock as collateral on L&H related loans, Artesia Banking had a powerful motive to ensure that Artesia Securities issued falsely positive reports on the value of L&H stock.

201.    The fact that Artesia Securities and Verelst acted as agents of Artesia Banking in issuing positive reports concerning L&H is also demonstrated by the fact that, in order to secure additional banking business of L&H and various L&H related customers, Artesia Banking promised those customers that it would cause Artesia Securities to "cover" those customers' stock as an analyst. Artesia Banking hoped to secure and maintain L&H's lucrative banking and investment banking business by providing L&H and the Principal Officers with a means for communicating positive information concerning L&H's operations and prospects to investors through a supposedly neutral outlet.

## F. ARTESIA BANKING'S KNOWLEDGE OF L&H'S ACQUISITION STRATEGY

202.    At all material times, Artesia Banking knew of L&H's aggressive strategy of acquiring companies and technology using L&H shares as consideration. By no later than April 1997 – before it had made any of the loans to Dictation, BTG, Radial, LIC, and the Principal Officers – Artesia Banking knew that:

- in September 1996, L&H had acquired the Belgian translation service company Mendez in exchange for a combination of cash and a bond **mandatorily convertible into L&H common stock** upon maturity,

- between November 1996 and March 1997, L&H had acquired the Spanish company Lexitrans and the German company Translingua, each in exchange for a combination of cash and a bond **mandatorily convertible into L&H common stock** upon maturity,

- in April 1997, L&H had entered into an agreement to acquire substantially all of Lay up, a leader in machine translation technology, in exchange for $10 million in cash and **$15 million in L&H common stock**, and

- in April 1997, L&H had entered into an agreement to acquire Trappist, a leading developer of dictation software, in exchange for a combination of cash (80%) and **L&H common stock (20% of the acquisition price)**.

By no later than June 1997 Artesia Banking also knew that:

- in April 1997, L&H had entered into an agreement to acquire Kurzweil, a leading developer of dictation software and products, in exchange for a combination of cash (80%) and **L&H shares (20% of the acquisition price),**

- in May 1997, L&H had acquired the German company GMS for a combination of cash, a bond, **L&H shares and L&H warrants**, and

- **L&H intended to continue to pursue this strategy of acquiring complementary business and technologies**.

By no later than July 1997 Artesia Banking also knew that:

- in June 1997, L&H had agreed to acquire Kurzweil Applied Intelligence, a company active in the field of speech technology, in exchange for $40.7 million in cash and **L&H shares purportedly worth $13.3 million**.

203.    At a meeting on July 7, 1997, Artesia Banking's Management Committee considered L&H's acquisition strategy, specifically including L&H's acquisitions of Mendez, Lexitrans, Translingua, Kurzweil and GMS, and was informed that L&H's

acquisitions since the fourth quarter of 1996 were "<u>for the greater part financed by an</u> <u>issuance of new [L&H] shares</u>."  (Emphasis supplied.)

> 204.  By no later than September 1997, Artesia Banking also knew that:

- in June 1997, L&H had acquired the text-to-speech technology of Centigram in exchange **for 180,050 shares of L&H common stock purportedly valued at $5.2 million.**

By no later than April 1998, Artesia Banking also knew that:

- L&H had entered into an agreement to acquire the linguistic components division of U.S. company INSO Inc., in exchange for a combination of cash (50%) and **L&H shares (50% of the acquisition price)**.

Moreover, Artesia Banking assisted L&H to complete the acquisition of INSO Inc. by providing a standby letter of credit in the amount of $9.5 million.  By no later than August 1998, Artesia Banking also knew that:

- L&H had entered into an agreement to acquire the German company Heitmann International in exchange for **a note convertible to L&H shares**.

Again Artesia Banking assisted L&H, by providing the sellers of Heitmann International with a $15 million bank guarantee in connection with this acquisition.  By no later than May 1999, Artesia Banking also knew that:

- in March 1998, L&H had acquired Applications Technology Inc. in exchange for $8.3 million and **L&H shares purportedly valued at $2 million**, and

- in September 1998, L&H had acquired Globalink, Inc., a developer and provider of translation software and translation services, **in exchange for 1,520,603 L&H shares**.

> 205.  Given Artesia Banking's knowledge of L&H's extensive history of using its own shares to purchase competing companies and technologies, it is evident that at all material times the Bank knew that the investors whom L&H intended to deceive, and did in fact deceive, through its false financial statements and the fraudulently inflated price of its

shares included investors acquiring new L&H shares from L&H in non-market transactions. Artesia Banking also should reasonably have foreseen that such non-market investors would rely on, and be deceived by, L&H's false financial statements and inflated stock price, and would suffer losses as a result.

## G.  ARTESIA BANKING'S ROLE IN FINANCING L&H'S ACQUISITION OF DRAGON

206.    L&H approached Artesia Banking for financing for the acquisition of Dragon sometime in November 1999.  On December 8, 1999, Artesia Banking agreed in principle to provide $65 million to L&H to partially finance the Dragon acquisition, on condition that, among other things, the Bank's outstanding loans to Radial, LIC, and the $20 million personal loan to the Principal Officers – all of which the Bank knew had been used to fraudulently inflate L&H's revenues – would first be repaid.  According to the analysis of Artesia Banking's Specialized Activities Credit Office, financing L&H's acquisition of Dragon in exchange for repayment of the LDC-related loans would reduce Artesia Banking's risk: "we extend credit to Lernout & Hauspie Speech Products (listed), which is better in terms of risk than credit to an investment company (LIC and Radial Belgium)."  Other banks and investors, including Mercator, were to provide L&H with an additional $235 million for the Dragon acquisition, with the balance of the purchase price to be paid in L&H stock in accordance with L&H's well-established strategy for financing acquisitions.

207.    From the outset of the negotiations to acquire Dragon, L&H intended that at least part of the consideration to be paid for Dragon would be L&H shares.  Artesia Banking knew this when it agreed in principle, on December 8, 1999, to provide L&H with financing for the acquisition.  Artesia Banking, therefore, also knew that in entering into the transaction

with L&H, the owners of Dragon would be relying upon L&H's fraudulent 1998 and 1999

financial statements and on the artificially inflated market price for L&H shares.

208.    From December 8, 1999 through until approximately April 25, 2000, Artesia

Banking was committed to financing L&H's acquisition of Dragon, and believed that it

would be financing that transaction.  During this same period, Artesia Bank was actively

engaged in furthering the fraudulent L&H scheme.  As alleged in detail above, (1)  on or

about December 30, 1999, the Bank falsified its own books to make it appear that the loans

to Radial, LIC and the $20 million loan to the Principal Officers had been repaid in 1999,

even though they were not repaid until January 5, 2000; (2) in January 2000, the Bank

ignored, and took no action in response to, Internal Audit Reports that opined that the Bank

had violated Belgian banking regulations by failing to disclose the credit default swaps in the

Radial and LIC loan documents; (3) on March 17, 2000, the Bank lied to L&H's auditors

about the fact that it had made a $20 million loan to the Principal Officers in 1999 that was

still outstanding as of December 31, 1999; and (4) between January and April 2000, the Bank

evaded Belgian tax laws that would have required the Principal Officers to disclose the

Radial and LIC credit default swaps in their tax filings.  All of these actions were taken by

Artesia Banking in furtherance of the fraudulent scheme and to ensure that L&H's auditors,

the SEC and L&H investors would not discover the fraudulent nature of L&H's 1998 and

1999 revenues from the LDCs.

209.    Ultimately, L&H negotiated to acquire Dragon in exchange for 10,011,236

L&H shares plus payment of certain of Dragon's professional fees incurred in connection

with the transaction and repayment of Dragon's indebtedness to Fleet Bank of Boston.  The

loan proposal thus did not proceed in the form agreed to in principle by Artesia Banking on

December 8, 1999.  Instead, having entered into agreements to acquire both Dragon and Dictaphone Corporation in exchange for L&H shares, L&H sought financing from a syndicate of European banks, including Artesia Banking, for the purpose of refinancing the existing indebtedness of Dictaphone and for the "general corporate purposes" of L&H.  To date, Plaintiffs have been unable to determine whether such "general corporate purposes" were intended to include L&H's transaction costs in connection with the acquisition of Dragon.  However, internal Artesia Banking documents, including documents post-dating the consummation of the Dragon and Dictaphone acquisitions, indicate that in Artesia Banking's view the purpose of this loan was to facilitate L&H's acquisitions of both Dragon and Dictaphone.

210.    In April 2000, the members of the bank syndicate gave final approval to an agreement to provide L&H with a $430 million credit facility (the "Club Deal").  As a co-arranger of the Club Deal, Artesia Banking provided $50 million of this financing.  Artesia Banking's documents show that on April 25, 2000, Artesia Banking's Executive Committee approved the Bank's participation in the Club Deal **knowing that L&H intended to acquire Dragon in exchange for L&H shares**.  The Bank's credit proposal for the Club Deal states: **"The acquisition price [for Dragon] is paid via a stock swap, for which LHSP issues 5.65 million new shares** (7% of the total number of shares after issue).  **The buyers [i.e. the Dragon Parties] assume the risk of fluctuations in the value of the LHSP shares that they receive**."  (Emphases supplied.)  Thus Artesia Banking knew that the owners of Dragon were "buyers" of L&H shares and, as such, would be relying upon L&H's fraudulent financial statements, and on the artificially inflated market price for L&H shares.  Indeed, Artesia Banking's Executive Committee knew that the L&H shares being bought by the

owners of Dragon were valued at "the price on the stock exchange at the time of the agreement in principle [i.e. the Merger Agreement]."

211.    Artesia Banking was aware of the Dragon Merger Agreement, which contained L&H's representations and warranties concerning the accuracy of its 1998 and 1999 annual financial statements described above at paragraphs 77. The loan agreement for the Club Deal, to which Artesia Banking is a signatory, references the fact that Dragon "is expected to merge with and into L&H Holdings USA, Inc., a Delaware corporation, pursuant to a merger **as agreed in the Agreement and Plan of Merger between the Borrower, L&H Holdings USA, Inc. and Dragon Systems, Inc. dated March 27, 2000** and pursuant to which L&H Holdings USA, Inc. will be the surviving entity." (Emphasis added.) As a co-arranger of the Club Deal, Artesia Banking likely had access to a copy of the Merger Agreement. Significantly, the Club Deal loan agreement also lists various existing mortgages and encumbrances on Dragon's assets as being among the encumbrances that are permitted on the Borrower's assets.

212.    Although the primary purpose of the Club Deal was to refinance the indebtedness of Dictaphone, one tranche of the loan was also "for the general corporate purposes of the Borrower." As previously noted, Artesia Banking viewed its $50 million participation in the Club Deal as facilitating L&H's acquisitions of both Dragon and Dictaphone. Artesia Banking's internal documents indicate that the Bank considered its participation in the Club Deal to be a further development of its agreement in principle, dated December 8, 1999, to partially finance L&H's acquisition of Dragon. The credit proposal for the Club Deal references the prior December 8, 1999 decision of the Bank's credit committee, and includes descriptions of both the proposed Dragon and Dictaphone

acquisitions. Artesia Banking's Executive Committee based its decision to participate in the Club Deal on, among other things, analysis of historical financial information for Dragon, and of pro forma balance sheets and projections for the combined L&H/Dragon/Dictaphone entity. Moreover, as noted above, Artesia Banking's internal documents repeatedly describe the Club Deal as facilitating L&H's acquisitions of both Dragon and Dictaphone. For example, a May 19, 2000 report informs Artesia Banking's Management Committee that the Bank will be participating for "50 million USD as co-arranger in a 430 million USD Syndicated Credit Facility **for the LBO's of Dragon & Dictaphone**." (Emphasis supplied.) A December 2000 memorandum to Artesia Banking's Board of Directors states: "In the context of the takeover of Dictaphone and Dragon and the refinancing of the financial debts of Dictaphone, Artesia participated for an amount of 50 million USD in a club deal of 430 million USD in May 2000. . . . **The actual takeover of Dragon and Dictaphone, which took place on 5/5/2000, occurred via a share swap; the syndicated credit essentially was for the refinancing of the existing credits of the target companies**." (Emphasis supplied.) A memorandum to Artesia Banking's Audit Committee dated August 29, 2003 states that the Club Deal "was granted in anticipation of the **acquisition of Dictaphone and Dragon, two U.S. competitors**." (Emphasis supplied.)

213.    Artesia Banking knew that L&H would require approximately $10 million in cash to pay for the transaction costs of its acquisition of Dragon. Those costs included repayment of Dragon's existing loan and line of credit with Fleet National Bank, as well as payments to Dragon's legal advisors (approximately $750,000) and investment banker (approximately $5 million.) To date, Plaintiffs have been unable to determine the source of the cash that L&H used to pay these and other transaction costs of the Merger.

## H. ARTESIA ENTITIES CAUSED PLAINTIFFS' LOSSES

214.    As described herein, the Artesia Entities participated in a fraudulent scheme and course of conduct that deceived the Dragon Parties, made and caused to be made a series of false statements and failed to disclose various material information concerning L&H.

215.    At all material times, the fraudulent scheme and deceptive conduct described herein and the misrepresentations made by L&H, the Artesia Entities and other participants pursuant to that fraudulent scheme had the effect, inter alia, of either inflating the market price of L&H securities or of maintaining the price of those securities at values those securities would not have traded at had the truth concerning the Company's operations been disclosed to investors. Likewise, at all material times, the Artesia Entities' material misrepresentations and omissions and other acts in furtherance of the scheme to defraud alleged herein had the effect of maintaining the prices of L&H's securities at levels at which those securities would not have traded had the truth concerning the Company's operations been disclosed to investors.

216.    The truth as described herein – including that a substantial portion of L&H's revenue was false, that the LDCs were in fact shams, that they were propped up with loans made by Artesia Banking and guaranteed by the Principal Officers with sham credit default swaps, and that the LDCs were used to generate a substantial portion of L&H's phony revenue – was not known to, and through the exercise of reasonable diligence could not have been known to, the Dragon Parties.

217.    The fraudulent course of conduct in which Artesia Banking engaged, including the false and misleading statements made by Artesia Securities for which Artesia Banking is responsible, caused L&H securities to trade at prices significantly in excess of the

actual value of those securities.  In reliance on the integrity of the market in which the

fraudulent scheme was directed and in which the false and misleading statements were made,

the Dragon Parties agreed to accept 8,981,202 shares of L&H common stock in exchange for

their combined interests in Dragon.  Under the terms of the Merger Agreement, the L&H

stock that the Dragon Parties were to receive was valued as of the date of the Merger

Agreement, at $54.375 per share.  On June 7, 2000, the date on which the Dragon Merger

closed, L&H stock closed at $43.125 per share.  Those prices were attained only because the

fraudulent scheme and devices employed by Artesia Banking, including the false and

misleading statements made by Artesia Securities for which Artesia Banking is responsible,

allowed L&H to generate false revenue and conceal the true nature of the Company's

financial condition.

218.    When the market learned information about the fraudulent scheme in which

the Artesia Entities were integral participants and learned information that was inconsistent

with the disclosures made by the Artesia Entities and pursuant to that fraudulent scheme, the

price of L&H securities declined dramatically in value.  When *The Wall Street Journal* began

to question the legitimacy of L&H's Korean customer base in an article published on August

8, 2000, investors also began to question whether the revenues generated by L&H through

the use of the LDCs and CLDCs were legitimate and whether L&H was employing

transactions with related parties to unlawfully improve the Company's financial results.

Thus, as a result of investor concerns regarding the legitimacy of the revenue generated by

L&H, including the revenue generated by means of what was later admitted to be the

fraudulent LDC transactions engineered by Artesia Banking, L&H stock price dropped by

19.4% (or $7.17/ share) from $36.99 to $29.81 on August 8, 2000 and by an additional

10.3% (or $3.06/share) on August 9, 2000, to close at $26.75.

219.    L&H stock recovered somewhat in the ensuing weeks, but dropped by 13.3%,

to close at $30.06, when Bastiaens was forced to resign as the Company's CEO on August

25, 2000. That move caused investors to grow increasingly nervous concerning the

legitimacy of L&H's previously reported revenue, including the revenue generated by means

of the fraudulent LDC transactions engineered by Artesia Banking.

220.    L&H stock continued its decline on September 20, 2000 and September 21,

2000, when L&H announced that the SEC would be investigating the Company's financial

statements. Because of investor concerns that the SEC investigation would result in a

downward revision of L&H's reported results, including a revision related to the fraudulent

LDC transactions engineered by Artesia Banking, L&H stock fell by 14.1% on September

20, 2000 and by 28.8% on September 21, 2000, to close at $15.13.

221.    On September 27, 2000, these concerns were further aggravated, leading to a

30.4% decline in the price of L&H stock, to $9.75. That decline followed L&H's

announcement that it expected that its third quarter revenues and earnings would fall short of

the range the Company had previously conditioned investors to expect. That announcement

caused investors to question whether the past announcements made by L&H concerning its

financial performance were also inflated, a fear that was later shown to be legitimate when

the fraudulent nature of the LDC transactions engineered by Artesia Banking and the phony

revenue derived from those transactions was revealed.

222.    The downward trend in L&H's stock price continued on October 18, 2000,

when L&H stock fell from $9.75 to $8.44, and on October 19, 2000, when L&H stock further

declined by 10.4%, to $7.56. Those declines followed L&H's announcement that it would refuse to disclose to the SEC the identities of the investors in the LDCs that had produced substantial fraudulent "revenue" for L&H (including the investors in the fraudulent LDC transactions engineered by Artesia Banking). That announcement again caused investors to question the legitimacy of the revenue L&H generated by means of transactions with the LDCs, including the fraudulent transactions in which Artesia Banking played an integral role.

223.    The legitimacy of the revenue produced by L&H pursuant to the fraudulent scheme in which Artesia Banking participated was again called into question on October 26, 2000, when *The Wall Street Journal* reported that L&H's claim that it received $3 million in payments from four Belgian companies in late 1998 was not supported by financial statements filed by those entities with Belgian regulators. Because of investor concern regarding the legitimacy of the LDC transactions, including the fraudulent LDC transactions engineered by Artesia Banking, L&H stock fell by 35.4%, to $5.13 per share.

224.    On November 9, 2000, L&H announced that it would have to restate its financial results for 1998, 1999 and the first half of 2000 as a result of the improper manner in which L&H accounted for its transactions with the LDCs and CLDCs and its Korean operations. Trading in L&H stock did not commence again until December 8, 2000, at which time L&H stock fell 77.5%, to $1.40. Again, the fraudulent nature of L&H's transactions with the LDCs, including the fraudulent transactions engineered by Artesia Banking, was the cause of that decline in L&H stock. Because L&H was unable to produce revenue and earnings growth without recording that fraudulent revenue, investors drove the price of L&H stock down severely.

225. In addition to the foregoing, Artesia Banking's actions also caused Plaintiffs' losses because, in the absence of the fraudulent transactions engineered by Artesia Banking, L&H securities would never have attained the prices at which they traded in March and June 2000. Indeed, L&H stock traded at substantial multiples of L&H's revenue and earnings based upon investors' perception that L&H was a "growth" stock. Had L&H and Artesia Banking not employed their fraudulent scheme, L&H would not have been able to report the substantial revenue and earnings growth that fueled L&H's stock price, and the price would have been substantially lower.

226. The materially false and misleading analyst reports issued by Artesia Securities at the direction of Artesia Banking were also a contributing factor to the losses suffered by Plaintiffs. Those reports contributed to investors' perception that L&H was a legitimate company that was producing substantial revenue and earnings growth. The fact that a large, seemingly reputable bank such as Artesia Securities consistently touted L&H's financial performance and prospects significantly enhanced L&H's profile among investors and thereby played a significant role in increasing and maintaining the market prices of L&H securities.

227. Thus, the Artesia Entities' conduct and the materially false and misleading representations made pursuant to the fraudulent scheme in which they knowingly participated resulted in the Dragon Parties purchasing L&H securities at prices significantly in excess of the actual value of those securities. The Dragon Parties would not have exchanged their interests in Dragon for L&H common stock had they been aware of the true facts concerning the Company's business operations and prospects.

228. Had either of the Artesia Entities disclosed – as they were obligated to do – their role in the L&H fraud prior to the execution of the Merger Agreement or the closing of the Dragon Merger, the market prices of L&H securities would have fallen to the levels at which they traded immediately prior to the suspension of trading on November 9, 2000. Thus, the fraudulent conduct of the Artesia Entities was a substantial contributing cause of Plaintiffs' losses.

229. The secret guarantees and sham credit default swaps were integral components of the fraudulent devices and scheme used to finance the LDCs that provided fictitious revenue to L&H. By employing the secret guarantees and sham credit default swaps, Artesia Banking prevented L&H's auditors from detecting the fraudulent scheme and devices when the auditors conducted their year-end audits of L&H's financial statements for 1998 and 1999. Had Artesia Banking disclosed these secret guarantees and credit default swaps, the purpose of the $20 million loan to the Principal Officers, or Artesia Banking's role in the fraudulent scheme that Plaintiffs have alleged, L&H's auditors would not have certified L&H's financial statements for 1998 and 1999. Without those certifications, L&H's false financials would not have been disseminated in the market, the scheme would not have succeeded in falsely inflating the market price of L&H's securities and Plaintiffs not have suffered any losses. Moreover, the Dragon Parties were entitled to terminate – and would have terminated – the Merger Agreement if L&H's auditors had not certified L&H's financial statements for 1999. Accordingly, Artesia Banking's actions caused the losses suffered by Plaintiffs.

230. Additionally, by engaging in the fraudulent scheme and employing deceptive devices to fund sham LDCs to provide phony revenue to L&H, Artesia Banking concealed

the true dire state of L&H's financial condition and the true risks inherent in L&H's ability to generate revenues to continue as a going concern. Eventually, these concealed risks materialized, directly causing the Company's bankruptcy, which completely wiped out the market value of L&H's securities, rendering them worthless. It was foreseeable to Artesia Banking that the realization of the financial risks that they concealed through their fraudulent acts would ultimately cause (a) the steep decline in the market price of L&H's securities, and (b) the L&H's ensuing bankruptcy, which resulted in the total decimation of the value of the Company's securities. Thus, Artesia Banking may be held accountable for the Dragon Parties' losses.

231.   Accordingly, the material misrepresentations, omissions, acts, practices, devices and fraudulent schemes alleged herein were the proximate causes of the damages sustained by the Dragon Parties in connection with their purchases of the Company's common stock.

## I. ARTESIA BANKING SUCCESSFULLY CONCEALS ITS ROLE IN L&H FRAUD

232.   Artesia Banking took significant affirmative steps to cover up its role in the fraud at L&H after the various investigations of that fraud began in November 2000. Artesia Banking provided false and misleading information to the investigators hired by L&H's Audit Committee to determine the scope of the Company's accounting irregularities. Loeff Claeys Verbeke, one of the law firms charged with that investigation and co-author of the Audit Committee Report, sought information concerning L&H's possible role in securing financing for LIC. On November 24, 2000, Artesia Banking sent a letter to LIC, the entire substance of which was:

> In response to your question asked by Mrs. LEMMENS of the law firm Loeff Claeys Verbeke in the context of the internal audits within L&HSP, we can confirm the following:

>On December 22, 1998, a credit facility was granted to N.V. LANGUAGE
>INVESTMENT COMPANY by ARTESIA BANK N.V.; **L&H did not submit
>any bank guarantees for this credit**.

(Emphasis supplied.)  As previously alleged, Artesia Banking's internal documents reflect that

the Bank viewed the Principal Officers' guarantees of the LDC loans as equivalent to a guarantee

by L&H.  Under the circumstances, the Bank's failure to mention the credit default swaps

executed by the Principal Officers as substitutes for a guarantee of the LIC loan was intentionally

misleading.  Artesia Banking omitted any reference to the credit default swap guarantees in order

to conceal from Loeff Claeys Verbeke the Bank's critical role in the L&H fraud.  As a result, the

Audit Committee Report makes no mention of Artesia's role in the fraud.  Likewise, none of the

*Wall Street Journal* articles that initially suggested that L&H was engaged in fraudulent

activities mentioned any role played by Artesia Banking, although those articles revealed the

fraudulent nature of L&H's transactions with the LDCs in which Artesia Banking was an integral

participant.

233.    In November 2000, the CBF (the agency responsible for supervising and

regulating Belgian banks) sought information from Artesia Banking concerning its

relationship with L&H and "companies of the L&H group".  Artesia Banking documents

obtained in discovery reflect that, within the Bank, Dictation, BTG, Radial and LIC were

consistently referred to as part of the "L&H Group."  However, Artesia Banking's responses

to the CBF's request for information did not include any information about the loans to these

companies.  The CBF also requested that Artesia Banking's Internal Audit Department

undertake an evaluation of the Bank's compliance with "legislation and ethical regulations"

in connection with "credits directly allocated to companies of the L&H group."  As far as

Plaintiffs have been able to ascertain, Artesia Banking conducted no such evaluation of the

loans to Dictation, BTG, Radial and LIC.  Moreover, Artesia Banking did not inform the

CBF about the negative findings its Internal Audit Department had made previously, in

January 2000, concerning the Bank's failure to disclose the credit default swaps in the Radial

and LIC loan documents, and failure to comply with tax regulations applicable to credit

default premiums. (*See* paragraphs 151, 152, above.) Artesia Banking withheld this information from the CBF in order to conceal its role in the L&H fraud.

234.    Artesia Banking also made false public statements in order to conceal its role in the L&H fraud. On or about March 16, 2001, the Belgian newspaper *L'Echo* published a story about the criminal investigation into L&H entitled: "L&H: The Courts Have Heard From a Director of Artesia." The article reported that Geert Dauwe, at that time a director of Artesia Banking, had been interviewed by the Belgian Prosecutors as part of the investigation. The article quotes an Artesia Banking spokesperson as stating: "The police invited Mr. Dauwe to respond to questions regarding the L&H case. **Nobody else from the bank has been interrogated**." (Emphasis supplied.) This statement was false and misleading when made and designed to conceal Artesia Banking's substantial role in the fraudulent L&H scheme. In fact, contrary to the statement by Artesia Banking's spokesperson and unbeknownst to Plaintiffs and the public, as of the date of the article the Belgian Prosecutors had interrogated at least five other present or former officers, directors, or managers of Artesia Banking in connection with the L&H criminal investigation. Some of these Artesia Banking personnel had been interrogated on multiple occasions.

235.    Notwithstanding Artesia Banking's substantial role in the L&H fraudulent scheme, while actively pursuing claims in the L&H bankruptcy proceedings in both the U.S. and in Belgium, Dexia falsely portrayed itself as a legitimate creditor victimized by L&H and allegedly entitled to priority over other creditors of the Company. In fact, on or about April 17, 2001, Dexia was awarded 44 million Euro from the Commercial Court in Belgium, and thereafter continued to proceed with claims as a "victim" in the bankruptcy proceedings. Had the Court been aware of Artesia Banking's role in the fraudulent scheme as described herein, Dexia would likely not have been awarded any money from the L&H bankruptcy estate.

236.    As a consequence of the successful efforts of Artesia Banking and Dexia to conceal Artesia Banking's role in the L&H fraud, Plaintiffs did not discover, and had no

reason to suspect, that role until the article was published in *The Belgian Financial Times* on June 24, 2003. Prior to that time, despite diligent efforts by Plaintiffs and counsel, Plaintiffs were unaware of Artesia Banking's role in the fraud at L&H.

## FIRST CLAIM FOR RELIEF

## VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5

237.    Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

238.    This Count is asserted against Dexia for violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 as promulgated thereunder.

239.    Dexia, as acquirer of the Artesia Entities, is liable to Plaintiffs for the Artesia Entities' wrongful conduct, as set forth herein.

240.    Dexia and the Artesia Entities, singly and in concert with L&H, the Senior Officers and Dammekens engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon the Dragon Parties. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to enable L&H to falsely inflate its financial results, to falsely inflate the price of L&H stock, and to induce the Dragon Parties to exchange their shares of Dragon for the common stock of L&H at an artificially inflated price.

241.    The Artesia Entities engaged in acts, practices, and a course of business and employed devices, schemes, and artifices to defraud which operated as a fraud on the Dragon Parties. In particular, pursuant to the scheme alleged herein, Artesia Banking provided millions of dollars to shell companies that it intended to be utilized to artificially inflate L&H's reported financial results. Without the Artesia Entities' knowing participation in the fraudulent scheme that Plaintiffs allege herein, L&H and the Senior Officers could not have perpetrated that fraud. The Artesia Entities knowingly, or in reckless disregard for the truth,

engaged in these acts, practices, and course of business and employed devices, schemes, and artifices to defraud.

242.    As a result of the dissemination of the false and misleading statements set forth above and the Artesia Entities' knowing participation in the fraudulent scheme Plaintiffs allege, the market price of L&H securities was artificially inflated and the Dragon Parties were induced to purchase the common stock of L&H, and to purchase it at an artificially inflated price.  In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by the Artesia Entities, the Dragon Parties relied, to their detriment, on the integrity of the market price of the stock, and the false and misleading statements made directly by L&H to the Dragon Parties and their representatives.  Had the Dragon Parties known the truth, they would not have entered into the Dragon Merger and purchased L&H common stock at inflated prices.

243.    Artesia Banking's scienter is demonstrated by its own internal documents that demonstrate, set forth above, *inter alia*, that:

a.    Artesia Banking knew that its $6 million loan to Radial would be, and was, used to fund three LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no assets, operations or employees and no purpose other than to create fictitious revenue for L&H,

b.    Artesia Banking knew that its approximately $6 million loan to LIC would be, and was, used to fund four LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no assets, operations or employees and no purpose other than to create fictitious revenue for L&H,

c.    Artesia Banking knew that the LDCs were not independent of L&H but were rather controlled by L&H,

d.    Artesia Banking knew that L&H would, and did, recognize the fictitious revenues received from the LDCs in violation of U.S. GAAP and in such a

way that L&H's financial statements for 1998 and 1999 were materially misleading,

    e.   Artesia Banking knew that the sham credit default swaps it used to obtain guarantees from the Principal Officers for the Radial and LIC loans were intended to conceal from L&H's auditors, the SEC and the L&H investors that the LDCs were related to L&H,.

    f.   Artesia Banking knew that if the Principal Officers were mentioned in the Radial and LIC loan documents as guarantors of the loans, and if the purpose of the $20 million personal loan to the Principal Officers were accurately reflected in the loan documents for that loan, L&H would have to disclose that the LDCs were related parties and that its financial statements for 1998 and 1999 were materially misstated.

244.    The Dragon Parties suffered substantial damages as a direct and proximate result of the wrongs committed by the Artesia Entities in an amount to be proven at trial, but not less than $450,000,000.

245.    By reason of the foregoing, the Artesia Entities directly violated § 10(b) of the 1934 Act and Rule 10b-5, as promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made material misrepresentations of fact and failed to disclose material facts necessary in order to make their statements, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Dragon Parties in connection with their purchase of shares of the common stock of L&H in exchange for shares of Dragon.

## SECOND CLAIM FOR RELIEF

## VIOLATION OF § 20(A) OF THE EXCHANGE ACT

246.    Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

247.    This Count is brought against Dexia in its role as the successor to Artesia Banking.

248.    Dexia, as the acquirer of the Artesia Entities, is liable to Plaintiffs for the Artesia Entities' wrongful conduct, as set forth herein.

249.    As is particularized above, at all material times, Artesia Banking was a "controlling person" of Artesia Securities within the meaning of § 20(a) of the Exchange Act.

250.    Artesia Banking qualified as a "controlling person" because it had the power to cause Artesia Securities to engage in the unlawful conduct complained of herein and because Artesia Banking did, in fact, cause Artesia Securities to issue the materially false and misleading analyst reports Plaintiffs describe above.

251.    Because Artesia Banking was a "controlling person" of Artesia Securities, which has committed violations of Section 10(b) of the Exchange Act by issuing materially false and misleading analyst reports concerning L&H, Artesia Banking is secondarily liable for those primary violations pursuant to Section 20(a) of the Exchange Act.

252.    By virtue of its acquisition of Artesia Banking and its liabilities, Dexia is liable to Plaintiffs for Artesia Banking's violations of § 20(a) of the Exchange Act.


### THIRD CLAIM FOR RELIEF

### CONSPIRACY TO COMMIT COMMON LAW FRAUD

253.    Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

254.    This Count is brought against Dexia in its role as the successor to Artesia Banking.

255.    Dexia, as acquirer of the Artesia Entities, is liable to Plaintiffs for the Artesia Entities' wrongful conduct.

256.    At all times relevant to this complaint, L&H and the Senior Officers were perpetrating a fraud against the Dragon Parties, as set forth above.  These parties made all of the materially false and misleading statements identified above, knowing that the Dragon Parties and other investors in L&H would rely on those statements in connection with their purchases of L&H stock.  In addition, L&H falsely represented to the Dragon Parties and their representatives, among other things, that its 1998 and 1999 financial statements, upon which the Dragon Parties relied in approving the Dragon Merger, were prepared in conformity with U.S. GAAP.  Ultimately, L&H was forced to admit that these statements were false and to announce its intention to restate its financial results for 1998, 1999 and the first two quarters of 2000.

257.    Artesia Banking conspired with L&H and the Senior Officers to defraud L&H's auditors, the SEC and L&H investors, including the Dragon Parties.  Among other things, as detailed above, Artesia Banking agreed to lend millions of dollars to L&H-controlled entities and to conceal from L&H's auditors, the SEC and L&H investors the fact that the Principal Officers were guarantors of the loans.  Artesia Banking also agreed to lend $20 million to the Principal Officers to be used to pay license fees to L&H, and to conceal from L&H's auditors, the SEC and L&H investors the true purpose of this loan.  Indeed, in furtherance of the conspiracy, Artesia Banking ultimately concealed from L&H's auditors the very existence of this loan.  Artesia Banking knew that the loaned funds would be paid to L&H as licensing fees, and that L&H intended to, and did, recognize these licensing fees as revenue in violation of U.S. GAAP.  Artesia Banking knowingly enabled L&H to recognize the entire amount of the loans as revenue, in blatant violation of U.S. GAAP, and to misrepresent such amounts in its public statements detailed above.

258.    In furtherance of the conspiracy, Artesia Banking committed tortious acts, including but not limited to:

a.  On or about September 29, 1998, Artesia Banking entered into a loan agreement with Radial, for a $6 million loan that was to be used to finance LDCs that would pay license fees to L&H, which fees L&H would recognize as revenue in its 1998 financial statements in violation of U.S. accounting and financial reporting rules.  In violation of Belgian banking regulations, this loan agreement, and a subsequent agreement extending the term of the loan, made no reference to the fact that the loan was guaranteed by a credit default swap with the Principal Officers.

b.  On or about December 22, 1998, Artesia Banking entered into a loan agreement with LIC for a loan of approximately $6 million that was to be used to finance LDCs that would pay license fees to L&H, which fees L&H would recognize as revenue in its 1998 financial statements in violation of U.S accounting and financial reporting rules.  In violation of Belgian banking regulations, this loan agreement, and a subsequent agreement extending the term of the loan, made no reference to the fact that the loan was guaranteed by a credit default swap with the Principal Officers.

c.  On or about June 19, 1999, Artesia Banking entered into an amendment to the December 22, 1998 LIC loan agreement.  This amendment falsely stated that "henceforth" the LIC loan would be guaranteed by a credit default swap.  In fact, the LIC loan had been guaranteed by a credit default swap since inception.

d.  On or about June 25, 1999, Artesia Banking granted a $20 million personal line of credit to the Principal Officers to be used to make payments to L&H, through LDF and the LDCs, in the form of licensing fees, which fees L&H would recognize as revenue in its 1999 financial statements in violation of U.S. accounting and financial reporting rules.  Artesia Banking's loan

agreement for this loan deliberately misrepresented the purpose of the loan as being for the Principal Officers' "professional activities."

e. On or about December 30, 1999, Artesia Banking falsified its books by making entries reflecting that the loans to Radial, LIC and the Principal Officers had been repaid. In fact, these loans were not repaid until January 5, 2000.

f. On or about March 17, 2000, Artesia Banking falsely stated to L&H's auditors that on December 31, 1999, the Bank had no personal loans outstanding to L&H officers. In fact the $20 million personal line of credit to the Principal Officers was outstanding on that date.

g. In or about March or April 2000, Artesia Banking agreed to nullify the credit default swaps that had been used to guarantee the Radial and LIC loans, in order to evade Belgian tax regulations which would have required the Principal Officers to disclose the credit default swaps in their tax filings.

259.   Artesia Banking committed this misconduct intentionally, with full knowledge of the fraud being perpetrated at L&H, and in furtherance of the common objective of misrepresenting L&H's financial results. Specifically, Artesia Banking's internal documents, as set forth above, demonstrate that, *inter alia*:

a. Artesia Banking knew that its $6 million loan to Radial would be, and was, used to fund three LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no assets, operations or employees and no purpose other than to create fictitious revenue for L&H,

b. Artesia Banking knew that its approximately $6 million loan to LIC would be, and was, used to fund four LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no assets, operations or employees, and no purpose other than to create fictitious revenue for L&H,

   c.  Artesia Banking knew that the LDCs were not independent of L&H but were rather controlled by L&H,

   d.  Artesia Banking knew that L&H would, and did, recognize the fictitious revenues received from the LDCs in violation of U.S. GAAP and in such a way that L&H's 1998 and 1999 financial statements were materially misleading,

   e.  Artesia Banking knew that the sham credit default swaps it used to obtain guarantees from the Principal Officers for the Radial and LIC loans were intended to conceal from L&H's auditors, the SEC and L&H investors that the LDCs were related to L&H,

   f.  Artesia Banking knew that if the Principal Officers were mentioned in the Radial and LIC loan documents as guarantors of the loans, and if the purpose of the $20 million personal loan to the Principal Officers were accurately reflected in the loan documents for that loan, L&H would have to disclose that the LDCs were related parties and that its financial statements for 1998 and 1999 were materially misstated.

260.    At all material times, Artesia Banking knew of L&H's extensive history of using its own shares to purchase competing companies and technologies. Therefore, Artesia Banking knew that the investors whom L&H intended to deceive, and did in fact deceive, through its false financial statements and fraudulently inflated share price, included investors acquiring new L&H shares from L&H in such non-market transactions. Artesia Banking ought reasonably to have foreseen that such non-market investors would rely on, and be deceived by L&H's false financial statements and inflated stock price, and would suffer losses as a result.

261.    By no later than December 3, 1999 – when Artesia Banking was still an active participant in the conspiracy alleged herein – Artesia Banking knew of L&H's intention to acquire Dragon using L&H shares as at least part of the acquisition consideration. Therefore,

by no later than December 3, 1999, Artesia Banking knew that L&H intended to deceive the shareholders of Dragon, and ought reasonably to have foreseen that the shareholders of Dragon would rely on, and be deceived by, L&H's false financial statements and inflated stock price, and would suffer losses as a result.

262.    Artesia Banking remained a participant in the fraud alleged herein at least through July 2000, when it granted the loan to Bastiaens for the purpose of propping up L&H's stock price.

263.    The Dragon Parties relied upon, inter alia, L&H's 1998 and 1999 financial statements, and the market price of L&H stock, in entering into the Merger. The Dragon Parties suffered substantial damages as a direct and proximate result of the wrongs committed by the Artesia Entities in an amount to be proven at trial, but not less than $450,000,000.

## FOURTH CLAIM FOR RELIEF

### AIDING AND ABETTING COMMON LAW FRAUD

264.    Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

265.    This Count is asserted against Dexia in its role as successor to Artesia Banking.

266.    Dexia, as acquirer of the Artesia Entities is liable to Plaintiffs for the Artesia Entities' wrongful conduct.

267.    At all times relevant to this complaint, L&H and the Senior Officers were perpetrating a fraud against the Dragon Parties, as set forth above. These parties made all of the materially false and misleading statements identified above, knowing that the Dragon Parties and other investors in L&H would rely on those statements in connection with their purchases of L&H stock. In addition, L&H falsely represented to the Dragon Parties and their representatives, among other things, that its 1998 and 1999 financial statements, upon

which the Dragon Parties relied in approving the Dragon Merger, were prepared in conformity with U.S. GAAP. Ultimately, L&H was forced to admit that these statements were false and to announce its intent to restate its financial results for 1998, 1999 and the first two quarters of 2000.

268.     Artesia Banking substantially assisted L&H and the Senior Officers in perpetrating the fraudulent scheme. Among other things, as detailed above, Artesia Banking agreed to lend millions of dollars to L&H-controlled entities and to conceal from L&H's auditors, the SEC and L&H investors the fact that the Principal Officers were guarantors of the loans. Artesia Banking also agreed to lend $20 million to the Principal Officers to be used to pay license fees to L&H, and to conceal from L&H's auditors, the SEC and L&H investors the true purpose of this loan. Indeed, in furtherance of the fraudulent scheme, Artesia Banking ultimately concealed from L&H's auditors the very existence of this loan. Artesia Banking knew that the loaned funds would be paid to L&H as licensing fees, and that L&H intended to, and did, recognize these licensing fees as revenue in violation of U.S. GAAP. Artesia Banking knowingly and substantially assisted L&H to recognize the entire amount of these loans as revenue, in blatant violation of U.S. GAAP, and to misrepresent such amounts in its public statements as detailed above.

269.     Among other acts of substantial assistance by Artesia Banking were the following:

> a.   On or about September 29, 1998, Artesia Banking entered into a loan agreement with Radial, for a $6 million loan that was to be used to finance LDCs that would pay license fees to L&H, which fees L&H would recognize as revenue in its 1998 financial statements in violation of U.S. accounting and financial reporting rules. In violation of Belgian banking regulations, this loan agreement, and a subsequent agreement extending the term of the loan, made no reference to the fact that the loan was guaranteed by a credit default swap with the Principal Officers.

b.  On or about December 22, 1998, Artesia Banking entered into a loan agreement with LIC for a loan of approximately $6 million that was to be used to finance LDCs that would pay license fees to L&H, which fees L&H would recognize as revenue in its 1998 financial statements in violation of U.S. accounting and financial reporting rules.  In violation of Belgian banking regulations, this loan agreement, and a subsequent agreement extending the term of the loan, made no reference to the fact that the loan was guaranteed by a credit default swap with the Principal Officers.

c.  On or about June 19, 1999, Artesia Banking entered into an amendment to the December 22, 1998 LIC loan agreement.  This amendment falsely stated that "henceforth" the LIC loan would be guaranteed by a credit default swap.  In fact, the LIC loan had been guaranteed by a credit default swap since inception.

d.  On or about June 25, 1999, Artesia Banking granted a $20 million personal line of credit to the Principal Officers to be used to make payments to L&H through LDF and the LDCs in the form of licensing fees, which fees L&H would recognize as revenue in its 1999 financial statements in violation of U.S. accounting and financial reporting rules.  Artesia Banking's loan agreement for this loan deliberately misrepresented the purpose of the loan as being for the Principal Officers' "professional activities."

e.  On or about December 30, 1999, Artesia Banking falsified its books by making entries reflecting that the loans to Radial, LIC and the Principal Officers had been repaid.  In fact, these loans were not repaid until January 5, 2000.

f.  On or about March 17, 2000, Artesia Banking falsely stated to L&H's auditors that on December 31, 1999, the Bank had no personal loans outstanding to

L&H officers.  In fact, the $20 million personal line of credit to the Principal Officers was outstanding on that date.

g.  In or about March or April 2000, Artesia Banking agreed to nullify the credit default swaps that had been used to guarantee the Radial and LIC loans, in order to evade Belgian tax regulations which would have required the Principal Officers to disclose the credit default swaps in their tax filings.

270.    At all times relevant to this complaint, Artesia Banking knew of the fraud being perpetrated by L&H on its auditors, the SEC and investors.  Specifically, as set forth in internal Artesia Banking documents described above:

a.  Artesia Banking knew that its $6 million loan to Radial would be, and was, used to fund three LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no assets, operations or employees, and no purpose other than to create fictitious revenue for L&H,

b.  Artesia Banking  knew that its approximately $6 million loan to LIC would be, and was, used to fund four LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no assets, operations or employees, and no purpose other than to create fictitious revenue for L&H,

c.  Artesia Banking knew that the LDCs were not independent of L&H but were rather controlled by L&H,

d.  Artesia Banking knew that L&H would, and did, recognize the fictitious revenues received from the LDCs in violation of U.S. GAAP and in such a way that L&H's 1998 and 1999 financial statements were materially misleading,

e.  Artesia Banking knew that the sham credit default swaps it used to obtain guarantees from the Principal Officers for the Radial and LIC loans were intended to conceal from L&H's auditors, the SEC and L&H investors that the LDCs were related to L&H,

f.   Artesia Banking knew that if the Principal Officers were included on the Radial and LIC loan documents as guarantors of the loans, and if the purpose of the $20 million personal loan to the Principal Officers were accurately reflected in the loan documents for that loan, L&H would have to disclose that the LDCs were related parties and that its financial statements for 1998 and 1999 were materially misstated.

271.   At all material times, Artesia Banking knew of L&H's extensive history of using its own shares to purchase competing companies and technologies. Therefore, Artesia Banking knew that the investors whom L&H intended to deceive, and did in fact deceive, through its false financial statements and fraudulently inflated share price, included investors acquiring new L&H shares in transactions with the Company. Artesia Banking ought reasonably to have foreseen that such non-market investors would rely on , and be deceived by, L&H's false financial statements and inflated stock price, and would suffer losses as a result.

272.   By no later than December 3, 1999 – when Artesia Banking was actively and substantially assisting L&H and the Senior Officers in the fraud – Artesia Banking knew of L&H's intention to acquire Dragon using L&H shares as at least part of the acquisition consideration. Therefore, by no later than December 3, 1999, Artesia Banking knew that L&H intended to deceive the shareholders of Dragon, and ought reasonably to have foreseen that the shareholders of Dragon would rely on, and be deceived by, L&H's false financial statements and inflated stock price, and would suffer losses as a result.

273.   Artesia Banking continued to substantially assist in the fraud alleged herein at least through July 2000, when it granted the loan to Bastiaens for the purpose of propping up L&H's stock price.

274.   The Dragon Parties relied upon, inter alia, L&H's 1998 and 1999 financial statements, and the market price of L&H stock, in entering into the Merger. The Dragon Parties suffered substantial damages as a direct and proximate result of the wrongs

102

committed by the Artesia Entities in an amount to be proven at trial, but not less than $450,000,000.

### FIFTH CLAIM FOR RELIEF

### COMMON LAW FRAUD

275.     Plaintiffs repeat and reallege each of the foregoing paragraphs as though fully set forth herein.

276.     As set forth above, Artesia Banking intentionally misrepresented and/or concealed their transactions with L&H, going so far as to falsify its own records and misrepresent the status of certain loans to L&H's auditors, which misrepresentations were incorporated into L&H's financial statements on which the Baker Plaintiffs relied in agreeing to acquire L&H shares.

277.     Artesia Banking intended by its actions to permit L&H to fraudulently overstate its revenues, income and assets and thereby to inflate the price of the common stock of L&H, causing plaintiffs, among others, to purchase L&H common stock at prices inflated by their fraud.

278.     Artesia Banking's knowledge of the fraud is evidenced by, among other things:

    a.    Artesia Banking knew that its $6 million loan to Radial would be, and was, used to fund three LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no assets, operations or employees, and no purpose other than to create fictitious revenue for L&H,

    b.    Artesia Banking knew that its approximately $6 million loan to LIC would be, and was, used to fund four LDCs that would pay the $6 million to L&H, and that the LDCs were shell corporations with no assets, operations or employees, and no purpose other than to create fictitious revenue for L&H,

c.  Artesia Banking knew that the LDCs were not independent of L&H but were rather controlled by L&H,

d.  Artesia Banking knew that L&H would, and did, recognize the fictitious revenues received from the LDCs in violation of U.S. GAAP and in such a way that L&H's 1998 and 1999 financial statements were materially misleading,

e.  Artesia Banking knew that the sham credit default swaps it used to obtain guarantees from the Principal Officers for the Radial and LIC loans were intended to conceal from L&H's auditors, the SEC and L&H investors that the LDCs were related to L&H,

f.  Artesia Banking knew that if the Principal Officers were included on the Radial and LIC loan documents as guarantors of the loans, and if the purpose of the $20 million personal loan to the Principal Officers were accurately reflected in the loan documents for that loan, L&H would have to disclose that the LDCs were related parties and that its financial statements for 1998 and 1999 were materially misstated.

279.  Artesia Banking's intent to perpetrate the fraud and words and actions taken in furtherance of the fraud include, but are not necessarily limited to:

a.  On or about September 29, 1998, Artesia Banking entered into a loan agreement with Radial, for a $6 million loan that was to be used to finance LDCs that would pay license fees to L&H, which fees L&H would recognize as revenue in its 1998 financial statements in violation of U.S. accounting and financial reporting rules.  In violation of Belgian banking regulations, this loan agreement, and a subsequent agreement extending the term of the loan, made no reference to the fact that the loan was guaranteed by a credit default swap with the Principal Officers.

b.  On or about December 22, 1998, Artesia Banking entered into a loan agreement with LIC for a loan of approximately $6 million that was to be used to finance LDCs that would pay license fees to L&H, which fees L&H would recognize as revenue in its 1998 financial statements in violation of U.S. accounting and financial reporting rules.  In violation of Belgian banking regulations, this loan agreement, and a subsequent agreement extending the term of the loan, made no reference to the fact that the loan was guaranteed by a credit default swap with the Principal Officers.

c.  On or about June 19, 1999, Artesia Banking entered into an amendment to the December 22, 1998 LIC loan agreement.  This amendment falsely stated that "henceforth" the LIC loan would be guaranteed by a credit default swap.  In fact, the LIC loan had been guaranteed by a credit default swap since inception.

d.  On or about June 25, 1999, Artesia Banking granted a $20 million personal line of credit to the Principal Officers to be used to make payments to L&H through LDF and the LDCs in the form of licensing fees, which fees L&H would recognize as revenue in its 1999 financial statements in violation of U.S. accounting and financial reporting rules.  Artesia Banking's loan agreement for this loan deliberately misrepresented the purpose of the loan as being for the Principal Officers' "professional activities."

e.  On or about December 30, 1999, Artesia Banking falsified its books by making entries reflecting that the loans to Radial, LIC and the Principal Officers had been repaid.  In fact, these loans were not repaid until January 5, 2000.

f.  On or about March 17, 2000, Artesia Banking falsely stated to L&H's auditors that on December 31, 1999, the Bank had no personal loans outstanding to

L&H officers. In fact, the $20 million personal line of credit to the Principal Officers was outstanding on that date.

g. In or about March or April 2000, Artesia Banking agreed to nullify the credit default swaps that had been used to guarantee the Radial and LIC loans, in order to evade Belgian tax regulations which would have required the Principal Officers to disclose the credit default swaps in their tax filings.

280. In reliance on the fraudulently inflated L&H financial statements and common stock price directly and immediately produced by Artesia Banking's actions, misrepresentations and omissions, the Baker Plaintiffs entered into, executed and fully performed the Merger Agreement, to their detriment.

281. As a result of this fraudulent conduct, the Baker Plaintiffs have suffered harm and sustained damages in an amount to be proven at trial and Dexia by acquiring Artesia Banking, is liable to the Plaintiffs for Artesia Banking's wrongful conduct as set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Awarding Plaintiffs all compensatory damages suffered as a result of the wrongful conduct of the Artesia Entities in an amount to be determined at trial, including lost profits and consequential and incidental damages;

B. Awarding Plaintiffs punitive damages in an amount to be determined at trial;

C. Awarding Plaintiffs pre-judgment and post-judgment interest;

D. Awarding Plaintiffs their costs and expenses incurred in this action, including fees for plaintiffs' attorneys and experts;

E. Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder, including attaching,

106

impounding, imposing a constructive trust upon or otherwise restricting the proceeds of

defendant's trading activities or their other assets so as to assure that plaintiffs have an effective

remedy; and

       F.  Granting such other and further relief as the Court may deem just and proper.

Dated:  September 15, 2006

                                 JANET BAKER, JAMES BAKER, JKBAKER LLC
and JMBAKER LLC,
By their attorneys,


               /s/ Terence K. Ankner
Terence K. Ankner, BBO #552469
(tka@anknerlaw.com)
PARTRIDGE, ANKNER & HORSTMAN LLP
200 Berkeley Street, 16th Floor
Boston, MA 02116
Telephone:  (617) 859-9999

BOIES SCHILLER & FLEXNER
Karen C. Dyer
George R. Coe
225 South Orange Avenue, Suite 905
Orlando, Florida  32801
Telephone:  (407) 425-7118

REED SMITH LLP
Alan K. Cotler
Joan A. Yue
2500 One Liberty Place 1650 Market Street
Philadelphia, PA 10103
Telephone:  (215) 851-8100