# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-10501-PBS

JAMES BAKER, et al
    Plaintiffs     .

                 .

      v.         .     BOSTON, MASSACHUSETTS
                 .     JUNE 2, 2006

DEXIA, S.A., et al
    Defendants     .

. . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Class Plaintiffs:      Patrick L. Rocco, Esquire
                       Shalov, Stone & Bonner
                       485 Seventh Avenue, Ste. 1000
                       New York, NY  10005
                       (212) 239-4340

                       Glen DeValerio, Esquire
                       Patrick Eagan, Esquire
                       Attorney Allison K. Jones
                       Berman DeValerio Pease
                       One Liberty Square, 8th floor
                       Boston, MA  02109
                       (617) 542-8300

For Baker Plaintiffs:      Attorney Karen C. Dyer
                       Boies, Schiller & Flexner LLP
                       255 South Orange Avenue
                       Suite 905
                       Orlando, FL 32801

For Stonington Plaintiffs:  Steven Singer, Esquire
                       Bernstein, Litowitz, Berger &
                       Grossman, LLP
                       1285 Avenue of the Americas
                       New York, NY  10019

MARYANN V. YOUNG
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

1          MR. ROCCO:  All right.

2          THE COURT:  --that under advisement, Mr. Rocco.

3          MR. ROCCO:  It seemed delaying things is the problem,

4   Judge.

5          THE COURT:  I understand what, I understand--

6          MR. BUTLER:  Thank you, Your Honor.

7          THE COURT:  --but as I say I can't go on.

8          MR. ROCCO:  Understood.

9          THE COURT:  240, 240 we already did.  246, this is

10  the Motion to take Deposition from Dexia Bank Belgium pursuant

11  to 30(b)(6) by plaintiffs.  And I'll hear that.

12          MR. ROCCO:  Your Honor, just to simplify things a bit

13  I think we had agreement in the papers that our first topic of

14  30(b)(6), which is Dexia's trading and L&H securities and also

15  our sixth topic which is the due diligence Dexia performed when

16  it acquired Artesia Bank Incorporation, Dexia agrees that those

17  two topics are appropriate.  We would like to get an order if

18  nothing else today, Judge, that we can proceed on those two

19  topics and then we can talk about the rest, but that's just by

20  way of trying to scope down what's been put before Your Honor.

21  There are eight topics all together in our notice.  We also are

22  waiting to drop the eighth topic, I'm sorry, not the eighth

23  Judge, the seventh topic, which is someone knowledgeable form

24  Dexia regarding business records.  We now feel we have enough

25  on that and we don't need to get that.  So we're knocking out

89

1   number seven and we believe that they've already agreed to one

2   and six.

3          The real issue here, Judge, and you've heard it now

4   in several different facets today is, at every turn we try to

5   get the information that we're entitled to, we get a resistance

6   from Dexia.  When we try to take, you know, the people who we

7   believe have the most knowledge and have management authority

8   they tell us they're not managing agents.  When we try to take

9   the top tier of the company, they say they don't remember,

10  they're not the people to talk to, and we've not gotten our

11  answers to a lot of questions.  And the way the rules tell you

12  to do this is that's when you go to 30(b)(6), you know, at the

13  end of the day, which is where we are now in our discovery

14  phase.  We want answers to questions and we want them on behalf

15  the corporation Dexia.  So we've asked for things, and I'll

16  give you an example, Judge, we've asked for a person

17  knowledgeable of their general policies and procedures

18  regarding credit default swaps.  And this just gives you by the

19  way--

20          THE COURT:  Regarding what, please?

21          MR. ROCCO:  Credit default swaps.  It's the central

22  issue in the lawsuit.  The credit default swap was a financial

23  vehicle that the bank used to hide the fact that Lernout &

24  Hauspie and Willard, the principals of Lernout & Hauspie, were

25  guaranteeing secretly the loans that funded the LDC's.  That's

90

1    the whole crux of our lawsuit.  Now, we've had testimony from

2    various of the senior people that they've allowed us to take

3    testimony from that they were aware of the credit default swaps

4    used on the radial of the LIC and the important loans but none

5    of them have any knowledge of how typically the bank would use

6    credit default swaps.

7        Our theory has always been and our allegations are

8    these credit default swaps were in reality shams and they were

9    in reality guarantees, and they didn't have any of the typical

10   indicia of a credit default swap.  They were just by another

11   name a secret guarantee.  We want to get to the people in the

12   market room of Artesia which is where the senior people told us

13   we should look.  We want to get to someone who has knowledge of

14   how credit default swaps generally were used by the bank so we

15   can obviously contrast and compare.  We can tell the jury, look

16   this is the way they typically do it, but this is the way in

17   this unique, you know, fraudulent situation is our argument,

18   that they did it with respect to the LDC loans.  We have never

19   gotten an iota of testimony on that.  In fact the senior people

20   we've questioned said I'm not the guy to ask, that would be

21   someone from our market room.  The market room guy is not

22   around anymore.  It was Mr. Avance (ph) who's left the company.

23   So we want the company to find us a witness.  Educate the

24   witnesses as they're required to do under 30(b)(6) and have

25   someone speak as to the general policies and procedures during

1    the relevant time period, which is `97 to 2000 roughly I think

2    is what we identified, but the class period, Your Honor, and

3    tell us how the bank conducted those transactions in the normal

4    course not in the unique situation that was done in our case.

5    That's the typical area of inquiry.  They say you're not

6    entitled to it.  You've already asked questions about credit

7    default swaps, you know, tough luck.  And so we've gotten that

8    type of resistance to everything we've asked for.

9            The other one is, Judge, we have very little

10   information about Dexia's underrating of public or private

11   offerings of Lernout & Hauspie Securities.  We tried to make

12   our way through the documents.  We can't figure it out, so we

13   said give us someone who knows this information because we're

14   entitled to know the depth of your relationship with your

15   partner in fraud, Lernout & Hauspie, find out how you benefited

16   from these deals, whether you were sponsoring their stock when

17   you were selling it et cetera.  So all we ask for is give us

18   someone who can do you this.  They say, no, you know, that's

19   too broad, we don't know what you're talking about.  They want

20   us to identify the private offerings and the public offerings

21   of Lernout & Hauspie stock.  We don't have knowledge of that to

22   the extent they do, Judge, so that's why we want to take a

23   30(b)(6).

24           Next, Judge, we've asked for a person for preparation

25   in issuance of the analyst reports concerning Lernout & Hauspie

1  and its subsidiary--

2          THE COURT:  Well wait a minute, that last thing is it

3  a question of general underwriting policies or the specific

4  underwriting of the stock and the assets that are involved in

5  this case?

6          MR. ROCCO:  Yeah, I'm sorry, Judge, that I'm speaking

7  quickly for the time, but what I meant to make clear was that

8  it is not general policy, Judge.  We want to know what private

9  offerings and public offerings of Lernout & Hauspie Securities

10  that the bank was involved in and have someone describe those

11  transactions for us.

12          THE COURT:  Okay.

13          MR. ROCCO:  So it's actually very specific.  It's not

14  a general policy procedure.

15          Then the next topic is one that really has already

16  been covered, Judge, and you'll probably resolve it with your

17  resolution of the last motion, we want to know the person

18  knowledgeable of the preparation issue into the analyst reports

19  that Artesia Securities issued on Lernout & Hauspie and on

20  other subsidiaries, that they had other subsidiaries that also

21  issued analyst reports on Lernout & Hauspie.  We want to take a

22  person on that.  They claim PSLRA stay for that topic as they

23  claim it only relates to the third amended complaint.  We've

24  already argued that.  I won't waste Your Honor's time on that.

25          And then lastly, I believe I've covered them all

1    besides the compromise.  So those are the topics, Judge.  It's

2    really, you know, in this case it's extraordinary where we

3    don't have access to the non-managing agent witnesses because

4    we can't subpoena them in Belgium, and we've gotten resistances

5    to the highest level of the company.  They won't give them to

6    us.  They filed a motion yesterday they say we can't get the

7    president and the CEO in part because we're allowed to take a

8    30(b)(6).  And then when we try to take a 30(b)(6) we meet

9    resistance here.  And we just want to get to the bottom of the

10   facts, Judge, and we want to stop the delay and that's why

11   we're here.

12          THE COURT:  Okay.  Thank you.

13          MR. BUTLER:  Well, Your Honor, we have indicated to

14   plaintiffs that we're willing to do a second 30(b)(6)

15   deposition, and we're certainly willing to consider reasonable

16   topics.  Mr. Rocco's already identified a couple topics.  We

17   said we'll do it but we want to have resolution on all the

18   other topics.  The one topic that Mr. Rocco didn't mention is

19   the one that is the principal sticking point.  Well there were

20   two.  He's now abandoned one of them, so that's okay, we don't

21   need to talk about that.  But the other topic is the one that

22   seeks a Rule 30(b)(6) deposition on our statute of limitations

23   defense.  Their topic basically wants to - they  basically want

24   a witness from Dexia to come and tell them everything about our

25   defense in the case.  There's no way we can do that really

1    without having outside counsel submit to a deposition and that

2    would clearly invade the work product protection of our trial

3    preparation and we haven't waived

4    that--

5         THE COURT:  Somehow I've heard that argument before.

6         MR. BUTLER:  The only difference, Your Honor, the

7    difference--

8         MR. ROCCO:  I second that argument.

9         THE COURT:  I know you're going to explain the

10   difference to me.

11        MR. BUTLER:  The difference, Your Honor, is we

12   haven't waived work product protection of this case by

13   injecting anything--

14        THE COURT:  I understand.

15        MR. BUTLER:  --the lawyers did into this case.

16        THE COURT:  Just a little levity that's all.

17        MR. BUTLER:  So that's the principal sticking point.

18   If they're willing to set that aside, and the other sticking

19   point are the PSLRA, the request that go to Artesia Securities

20   which really goes hand in hand with the PSLRA question.

21   Without those two sticking points, then I really think we

22   should be able to reach agreement on the others.

23        THE COURT:  Well let me ask this, is it going to be

24   the same person?

25        MR. BUTLER:  I don't know that, Your Honor.  We have

1    to make an assessment and, quite frankly, for some of the

2    requests we still need to do some negotiating because we don't

3    clearly understand exactly what information they're seeking and

4    we need to know that in advance so that we can do what they've

5    requested, which is to prepare a witness with the knowledge

6    that the organization has. And a good example is this request

7    that has to do with offerings. It just says offerings of

8    Lernout & Hauspie, but it doesn't specify any specific

9    offerings, so--

10        THE COURT: How many offerings did you do?

11        MR. BUTLER: I don't even know exactly. I'm only

12    aware of one that we were involved in, but we'd asked that

13    question to the plaintiffs.

14        THE COURT: How many did your clients say you did?

15        MR. BUTLER: We haven't asked that question, Your

16    Honor. I mean we've talked about it but we haven't gotten to

17    the bottom of the complete list. I'm aware of one offering

18    that we were involved in during the timeframe that is relevant

19    here. And if all they want to do is hear kind of generally -

20    then the question arises, well what do you want to know about

21    that offering. And I haven't received an answer to that

22    question and so it's very hard to prepare a witness or even

23    identify the right witness without having some sense of the

24    kinds of questions they want to ask. If all they want to ask

25    is, did you do an offering? Yes, we did an offering. Well

1   that's easy, but I need to know if that's the scope of the

2   30(b)(6).  If they want to ask about--

3           THE COURT:  No, I'm sure they want to ask a little

4   bit more about the offerings.

5           MR. BUTLER:  I think so.  But I don't exactly know

6   what the limits of the questioning are, so it's impossible or

7   very difficult anyway to prepare a witness.

8           THE COURT:  But don't you think before you have this

9   discussion you ought to identify the offerings that your client

10  was involved in with Lernout & Hauspie?  Wouldn't that be a

11  logical first step?

12          MR. BUTLER:  For us, Your Honor?

13          THE COURT:  Yeah.

14          MR. BUTLER:  We haven't been asked the question.

15  Would we guess, yes.

16          THE COURT:  No, no, no.  They want to do a 30(b)(6)

17  deposition with respect to offerings with respect to Lernout &

18  Hauspie, so then you're trying to argue against them having

19  that 30(b)(6) deposition.  Don't you think in order to

20  determine what you'd have to produce in response to that or

21  whether it's burdensome or--

22          MR. BUTLER:  Your Honor, we'd be happy--

23          THE COURT:  --anything else you would ask the

24  question is how many offerings there are?

25          MR. BUTLER:  We would be happy to answer that

1    question.  We'd be happy to identify the offerings.  As I
2    said, the question wasn't asked and really the sticking points
3    of the other things I was talking about.  I don't think this--
4           THE COURT:  Where would you expect it to be asked?
5           MR. BUTLER:  I would expect Mr. Rocco in our meet and
6    confer to ask the question or to send me a letter saying could
7    you identify--
8           THE COURT:  Yeah but if he asks you the question
9    you're going to say I don't know.  I'm saying it--
10          MR. BUTLER:  You're right, Your Honor.
11          THE COURT:  --you know, Mr. Rocco, I'm just saying
12   that this is something I think--
13          MR. BUTLER:  I agree, Your Honor.
14          THE COURT:  --that in preparatory you should--
15          MR. ROCCO:  Yes.
16          MR. BUTLER:  I agree.
17          THE COURT:  --find out.  Okay.
18          MR. ROCCO:  All right.
19          THE COURT:  Let me just ask, Mr. Rocco - did you
20   finish, Mr. Butler?  I'm sorry, I don't mean to interrupt you.
21          MR. BUTLER:  Yes, I believe that's all.
22          THE COURT:  All right.
23          MR. BUTLER:  I mean, the fundamental point here is as
24   long as we can get rid of these sticking points, I think we
25   should be able to negotiate discovery.

1          THE COURT:  You say the really sticking point is

2    this, well outside of the PLRA and the Artesia Securities

3    there's this topic about the defense, the statute of

4    limitations defense.

5          MR. BUTLER:  That's correct.

6          THE COURT:  And, Mr. Rocco, you didn't mention that

7    so tell me about that.

8          MR. ROCCO:  No, Your Honor, it was an extreme

9    oversight cause it is very important to us.  We actually did

10   try the more conventional way of getting this information.

11   They have a permanent defense of statute of limitations.  We

12   asked them in interrogatories to identify the facts that Dexia

13   contends placed plaintiffs on notice that they had a valid

14   claim for violation of Section 10(b) and the 34 Act.  And what

15   we got in return from them, Judge, is just a mere

16   identification of any public announcement that Dexia financed

17   anything at Lernout & Hauspie.  That clearly doesn't meet the

18   standard.  We're entitled to know.

19         They have a claim they want to put on before a jury

20   that says we should have known by an objective test that the

21   facts were out there that Dexia committed fraud and that

22   support our claim, meaning scienter and damages and motive and

23   all the things you need tom prove a claim, and they've given us

24   nothing on that, Judge, and we're entitled – it needn't be a

25   lawyer.  They're telling you they would like to select a lawyer

1   for that but the corporation that asserted the affirmative

2   defense they can pick anybody and educate them on what their

3   defense is going to be and tell them what we expect to see at

4   trial, which is we want to know what you claim are the

5   objective data that was out there that would allow a reasonable

6   investor to have brought a claim saying you committed fraud

7   prior to August 2001.  It's pretty simple.

8           THE COURT:  And in response to the interrogatory they

9   said what?

10          MR. ROCCO:  All they told us in that, Judge, was they

11  gave us any public disclosure of the fact that Artesia funded,

12  that Artesia lended money to Lernout & Hauspie, Artesia lended

13  money to dictation consortium.  None of it has to do with

14  whether there was scienter or the indicia of fraud that would

15  allow us to make a claim.  And what they have to show

16  ultimately to prevail on a statute of limitations is that we

17  could have articulated a claim prior to August 2001.  And we're

18  saying, what was available?  How possibly could we have done

19  that?  And they've never told us how we could have done that

20  objectively.  And that's ultimately their burden on the statute

21  of limitations defense because we want to ask somebody what do

22  you plan to do?  You have an affirmative defense here, you have

23  a burden, and you got to show something and we would like to

24  know so we can defend ourselves what you claim a reasonable

25  investor would have, take notice of that would have supported a

1    claim, not include notice, not all the other things we talked

2    about, but a claim that Dexia committed fraud.  They've given

3    us absolutely nothing.  So that's why we want this deposition.

4    That can be, frankly, Judge, a non-lawyer.  It can be anybody

5    that they want to put up.  And it doesn't have to be someone

6    who was in the loop of the communications with counsel for

7    Clifford Chance.  They can put up an in-house lawyer who won't,

8    you know, have to give up work product and the like.  It will

9    just be what proofs do you intend to put on and it's time for

10   us to know that when we're at the end of discovery.

11           MR. BUTLER:  Your Honor, if I could, well, if

12   Mr. Rocco is finished I'd like to respond briefly.  We

13   responded to their interrogatory about this.  They think we

14   don't have enough in our interrogatory response to win this

15   point, but that's an ultimate question for trial.  We still

16   have provided the information and the interrogatory that

17   they've requested.  And I'd note that they've never complained

18   that our response was inadequate.

19           THE COURT:  Are you willing an order to issue to the

20   court that your interrogatory response contains all the facts

21   that you're going to offer at trial on the issue?

22           MR. BUTLER:  No, that wasn't the question that was

23   posed in the interrogatory.  The interrogatory asked for

24   information that first would have put a reasonable person on

25   notice of the claims and we responded by saying, I don't

1  remember exactly what we said, but we responded with a

2  lengthy response with information about what public information

3  was out there that we think would have been sufficient and

4  would have allowed a plaintiff like these plaintiffs to file

5  the complaint that they actually filed.  We didn't, you know,

6  and that's the response to that interrogatory.  I mean the only

7  kind of information that we could have provided is public

8  information because under the objective test that's the only

9  thing that could have put a reasonable investor on notice.  So

10 it shouldn't be a complaint of plaintiffs that we've only

11 pointed to public information.

12         THE COURT:  Let me ask this, has this — this motion

13 was just filed the end of May, is the text of that

14 interrogatory in response contained in the papers?

15         MR. ROCCO:  Yes, Judge, it's in Ms. Davies--

16         THE COURT:  Okay.

17         MR. ROCCO:  --I believe it's the, is it your own--

18         THE COURT:  No, I just want to know if it's there.

19         MS. DAVIES:  Yes.

20         THE COURT:  The original affidavit, declaration?

21         MS. DAVIES:  Yep, in support of--

22         MR. ROCCO:  It is, Your Honor.

23         THE COURT:  That's all I wanted to know.

24         MR. ROCCO:  And just there's some irony, Judge, you

25 see today I sit up when they were talking about why they needed

1  our work product, we made a representation to the Court and

2  we've made it several times that we will stand on the documents

3  we produced and we've given them everything we intend to rely

4  on to prove our diligent investigation.  Mr. Butler's not

5  willing to make that representation.  Yet he won't let us talk

6  a 30(b)(6) deposition on the topic.  I think that's

7  dispositive, Judge.

8       THE COURT:  Take it under advisement.

9       MR. ROCCO:  Thank you.

10      THE COURT:  Now, before we get to the scheduling

11  order issue, are there any motions that are, that I haven't

12  covered that are peculiar to any of the other cases?  I think

13  there are and I just want to make sure I hear them.

14      MS. DAVIES:  Your Honor, I believe there is only one.

15      THE COURT:  And in which--

16      MS. DAVIES:  And that is in the Filler case.  It is a

17  Motion filed by Ellen Chamberlain, Donald White and Stephen

18  Lusso for a Protective Order.

19      THE COURT:  Okay.  Let me just - the Filler case is

20  what number, please?  It's not 11566.  It's either 10411, 10477

21  or 107--

22      MS. DAVIES:  It's 10477.

23      THE COURT:  Okay.  Let me just make sure I have the -

24  there it is.

25      MR. ROCCO:  It's docket 92 we believe, Your Honor,

# EXHIBIT B

MR JORIS VAN HELLEPUTTE                    1

```
 1          THE UNITED STATES DISTRICT COURT

 2        FOR THE DISTRICT OF MASSACHUSETTS

 3
                                    ORIGINAL
 4

 5

 6     - - - - - - - - - - - - - - - - - )
                                         )
       HANS A QUAAK, ATTILIO PO and      )
 7     KARL LEIBINGER, on behalf of themselves )
       and those similarly situated,     )
 8                                       )
                            Plaintiffs,  )No:
 9                                       )03-CV-11566(PBS)
           v.                            )
10                                       )
                                         )
11     DEXIA, S.A. and DEXIA BANK BELGIUM )
       (formerly known as ARTESIA BANKING )
12     CORP., S.A.,                      )
                                         )
13                          Defendants.  )
       ----------------------------------
14     STONINGTON PARTNERS, INC., a Delaware )
       Corporation, STONINGTON CAPITAL  )
15     APPRECIATION 1994 FUND L.P., a Delaware )
       Partnership, and STONINGTON HOLDINGS )
16     L.L.C., a Delaware Limited Liability )
       Company,                          )
17                                       )No:
                            Plaintiffs,  )04-CV-10411(PBS)
18                                       )
           v.                            )
19                                       )
       DEXIA, S.A. and DEXIA BANK BELGIUM )
20     (formerly known as ARTESIA BANKING )
       CORP., S.A.),                     )
21                          Defendants.  )
                                         )
22     - - - - - - - - - - - - - - - - - )

23

24

25
```

ANGLO-AMERICAN COURT REPORTERS LTD
LONDON, ENGLAND
Tel: (011 44) 20 7264 2088        Fax: (011 44) 20 7265 1703
Website: www.a-acr.com            E-mail: info@a-acr.com

ANGLO-AMERICAN
COURT REPORTERS

2

```
 1

 2   - - - - - - - - - - - - - - - - - - -
     GARY B. FILLER and LAWRENCE PERLMAN,    )
 3   Trustees of the TRA Rights  Trust,      )
                                             )
 4                        Plaintiffs,      )No:
                                           )04-CV-10477(PBS)
 5        v.                                )
                                           )
 6   DEXIA, S.A. and DEXIA BANK BELGIUM     )
     (formerly known as ARTESIA BANKING     )
 7   CORP., S.A.),                          )
                                           )
 8                        Defendants.       )
 9   JANET BAKER and JAMES BAKER, JK BAKER  )
     LLC., and JM BAKER LLC.,               )
10                                          )
                                           )No:
11                        Plaintiffs,      )04-CV-10501(PBS)
                                           )
12        v.                                )
                                           )
13   DEXIA S.A. And DEXIA BANK BELGIUM      )
     (formerly known as ARTESIA BANKING     )
14   CORP., S.A.),                          )
                                           )
15                        Defendants.       )
     - - - - - - - - - - - - - - - - - - -
16

17

18   Deposition of MR JORIS VAN HELLEPUTTE
     held at the offices
19   Marx Van Ranst Vermeersch & Partners
     Tervurenlaan 270 Avenue de Tervueren
20   150 Brussels, Belgium at 9.13 a.m.
     on Tuesday, September 19, 2006
21   before Leah Willersdorf, ABIVR

22

23

24

25
```

ANGLO-AMERICAN COURT REPORTERS LTD
LONDON, ENGLAND

Tel: (011 44) 20 7264 2088          Fax: (011 44)  20 7265 1703
Website: www.a-acr.com              E-mail: info@a-acr.com


ANGLO-AMERICAN
COURT REPORTERS

15

```
 1        A.    Not more than the documents, than the content
 2   of the documents itself.
 3        Q.    What is your current position?
 4        A.    I am Head of the Credit Department in
 5   Amsterdam at Artesia Nederland.
 6        Q.    What is the relationship of
 7   Artesia Netherlands to Dexia SA?
 8        A.    It is a subsidiary.
 9        Q.    Is there any direct corporate relationship
10   between Artesia Netherlands and Dexia Bank Belgium?
11             MISS KODNER: Objection.
12             THE WITNESS: Can you clarify what you mean by
13   that?
14             MR EGAN: Sure.
15   BY MR EGAN:
16        Q.    Is there any relationship -- is
17   Artesia Netherlands in any way a subsidiary of
18   Dexia Bank Belgium?
19        A.    Yes.
20        Q.    Prior to working for Artesia Netherlands, did
21   you work for Structured Finance at Artesia Bank?
22        A.    Yes.
23        Q.    Did you hold that position from roughly
24   1998 through 2001?
25        A.    Yes.
```

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**
Tel: (011 44) 20 7264 2088          Fax: (011 44)  20 7265 1703
Website: www.a-acr.com                E-mail: info@a-acr.com



ANGLO–AMERICAN
COURT REPORTERS

65

1  letter went out on or about January 12, 1998?

2      A.   I have no recollection of the letter, so...

3      Q.   You can put that aside. Sir, earlier this

4  morning, when discussing Dictation Consortium you

5  discussed different profitability proposals for the

6  bank. Do you recall the bank receiving L&H warrants in

7  connection with the Dictation Consortium loan?

8      A.   I don't.

9      Q.   Do you recall the bank receiving warrants in

10 connection with any loan related to L&H?

11     A.   I know the bank had warrants, but I don't

12 know why.

13     Q.   Were you at all responsible for any analysis

14 related to warrants received by the bank?

15         MISS KODNER: Objection.

16         THE WITNESS: It is unlikely as I would expect

17 that to be more like an investment-type,

18 investment bank or investment banking department type

19 of issue.

20 BY MR EGAN:

21     Q.   In the period of around 1997, do you recall

22 ever doing any analysis as to the value of warrants?

23     A.   I don't remember.

24     Q.   I would like to show you what has been marked

25 as Van Hellepute Exhibit 7, a document Bates-stamped



72

1    equity kicker increase from 60,000 to 100,000 warrants;
2    do you see that?
3        A.    Yes.
4        Q.    And if you turn the page, under
5    2.2.3 "Upfront Fee", there is a reference to replacing
6    an upfront three percent commission with an equity
7    kicker of 8,000 warrants; do you see that?
8        A.    Could you repeat that, please?
9        Q.    Under 2.2.2, there is a discussion of
10    replacing a three percent upfront commission with an
11    equity kicker of 8,000 warrants.
12        A.    It appears like that, yes.
13        Q.    And then at 2.2.3, there is a reference to
14    equity kicker regarding Dictation Consortium,
15    referencing an additional 25,000 warrants; do you see
16    that?
17        A.    Yes.
18        Q.    Again, do you recall any conversations with
19    Mr De Coen around this time about any warrants being
20    issued with the Dictation loan?
21        A.    I don't.
22        Q.    Do you recall if you were still active with
23    the Dictation file in June of 1997?
24        A.    I think I would have been, yes.
25        Q.    Mr Van Helleputte, in 1997, did Paribas act



73

1   as an underwriter in a public offering by

2   Lernout & Hauspie?

3        A.    I don't recall.

4        Q.    Did you ever work on any equity deals related

5   to L&H?

6        A.    Insofar as I recall, I didn't.

7        Q.    Okay. Do you ever recall doing any

8   underwriting work in this time period of '97/'98?

9        A.    I don't.

10            MR EGAN: Okay. I would like to mark

11  Van Helleputte Exhibit 9.

12            (Van Helleputte Exhibit No. 9 marked)

13            MR EGAN: Van Helleputte Exhibit 9 is a

14  document Bates-stamped DBB-076164 through 165.

15  BY MR EGAN:

16       Q.    Sir, do you recognize this document?

17       A.    It is a document which I have signed, yes.

18       Q.    Did you draft this document?

19       A.    Given the reference, it is likely, yes.

20       Q.    Did you draft it on or about

21  September 11, 1997?

22       A.    That is likely, yes.

23       Q.    Okay. Do you know the law firm referenced,

24  Testa, Hurwitz & Thiebault? Was that firm representing

25  the bank?



1    people in Amsterdam, but personally I don't recall.

2        Q.    What were the withholding issues you

3    referenced?

4        A.    "Withholding tax" means that if a US borrower

5    pays interest on a loan -- well, it is my

6    understanding. I am not like a fiscal expert, but my

7    understanding is that, at that time, if a US borrower

8    pays interest on a loan to a Belgian bank, that there

9    was a deduction of withholding tax which would mean

10   that either the return of the bank on the loan would be

11   negative or that the borrower would have to gross up

12   his interest payments.

13       Q.    Did you talk to anyone else other than

14   Mr Rabaey concerning the Bastiaens loan?

15       A.    Not that I remember.

16       Q.    And you did not discuss the purpose of the

17   loan with Mr Rabaey?

18       A.    Not that I remember.

19       Q.    Sir, have you ever heard of a company known

20   as Radial NV (R-A-D-I-A-L)?

21       A.    I have heard of the name but I don't know

22   anything about it.

23       Q.    While at the bank, were you involved in any

24   aspect of a loan to Radial?

25       A.    Not that I remember.



128

1      Q.    Do you have any information of a loan to

2  Radial?

3      A.    No.

4      Q.    How about a company known as

5  Language Investment Company or LIC; do you recognize

6  that name?

7      A.    I don't.

8      Q.    Were you involved in any aspect of any loan

9  to LIC?

10     A.    Not that I remember.

11     Q.    Do you have any information about LIC?

12     A.    No.

13     Q.    Okay. Prior to 2001, while working at the

14  bank, did you have any dealings with Artesia

15  Securities?

16     A.    What do you mean "dealings"? It was a --

17  well, it was a separate -- I think it was a separate

18  subsidiary within the Dexia Group.

19     Q.    Did you work at all with anyone from

20  Artesia Securities?

21     A.    I think there may have been files where we

22  worked with the people from Investment Banking or there

23  may be files where we consulted each other.

24     Q.    What -----

25     A.    I have no specific recollections of that.

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**
Tel: (011 44) 20 7264 2088          Fax: (011 44) 20 7265 1703
Website: www.a-acr.com              E-mail: info@a-acr.com



129

1      Q.    Okay. As far as people from Investment
2  Banking, what would you consult with them about?
3      A.    Like a traditional request would have been
4  like if Investment Banking had an interesting lead for
5  like an IPO order or whatever, then they themselves
6  wouldn't make credit applications.  So like, it would
7  have happened that they would come to Structured
8  Finance and ask whether we were interested in providing
9  a bridge loan leading up to an IPO, that sort of thing.
10     Q.    A bridge loan to Artesia Securities?
11     A.    No, no, no, to the client who is preparing
12  an IPO.
13     Q.    To the client. So the client of
14  Artesia Securities would be coming to the bank for a
15  loan in the time period prior to an IPO?
16     A.    All I am saying is like this is -- like, this
17  was the business done of Investment Banking and it may
18  well have been through discussions to us in that type
19  of file.
20     Q.    Did you have any dealings with any analysts
21  at Artesia Securities?
22     A.    Not other than normal colleague
23  relationships.
24     Q.    Did you ever discuss Lernout & Hauspie with
25  anyone at Artesia Securities?

ANGLO-AMERICAN COURT REPORTERS LTD
LONDON, ENGLAND
Tel: (011 44) 20 7264 2088          Fax: (011 44)  20 7265 1703
Website: www.a-acr.com              E-mail: info@a-acr.com

ANGLO-AMERICAN
COURT REPORTERS

1    A.    Not that I recall.

2    Q.    Okay.

3        MR EGAN: Why don't we take a break for a

4    moment, if that is all right.

5        THE WITNESS: Thank you.

6        THE VIDEOGRAPHER: Going off the record.

7            (Off the record at 12.32 p.m.)

8        (Back on the record at 12.32 p.m.)

9        THE VIDEOGRAPHER: Starting Roll 3 in the

10   deposition of Joris Van Helleputte. Going back on the

11   record.

12       MR EGAN: Mr Van Helleputte, at this time I am

13   going to allow my co-counsel to ask questions,

14   reserving the right to continue my examination later,

15   if necessary. But thank you for your time.

16       THE WITNESS: You are welcome.

17           DIRECT EXAMINATION:

18   BY MR JOSEFSON:

19   Q.    Good afternoon, Mr Van Helleputte. My name is

20   Avi Josefson.

21   A.    Mmm-hmm.

22   Q.    Are you familiar with a loan that the bank

23   provided in connection with Lernout & Hauspie's

24   acquisition of Dictaphone Corporation?

25   A.    I am.


ANGLO-AMERICAN
COURT REPORTERS

# EXHIBIT C

MR IVAN DE COEN                                    1

```
 1          THE UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF MASSACHUSETTS

 3                                    ORIGINAL

 4

 5

 6   - - - - - - - - - - - - - - - - - - )
                                         )
 7   HANS A QUAAK, ATTILIO PO and        )
     KARL LEIBINGER, on behalf of themselves )
 8   and those similarly situated,       )
                                         )
 9                        Plaintiffs,    )No:
                                         )03-CV-11566(PBS)
10          v.                           )
                                         )
11   DEXIA, S.A. and DEXIA BANK BELGIUM  )
     (formerly known as ARTESIA BANKING  )
12   CORP., S.A.,                        )
                                         )
13                        Defendants.    )
     ------------------------------------
14   STONINGTON PARTNERS, INC., a Delaware )
     Corporation, STONINGTON CAPITAL     )
15   APPRECIATION 1994 FUND L.P., a Delaware )
     Partnership, and STONINGTON HOLDINGS )
16   L.L.C., a Delaware Limited Liability )
     Company,                            )
17                                       )No:
                          Plaintiffs,    )04-CV-10411(PBS)
18                                       )
            v.                           )
19                                       )
     DEXIA, S.A. and DEXIA BANK BELGIUM  )
20   (formerly known as ARTESIA BANKING  )
     CORP., S.A.),                       )
21                        Defendants.    )
                                         )
22   - - - - - - - - - - - - - - - - - - )

23

24

25
```



MR IVAN DE COEN                                            2

```
 1

 2    - - - - - - - - - - - - - - - - - - - - - -
      GARY B. FILLER and LAWRENCE PERLMAN,        )
 3    Trustees of the TRA Rights  Trust,          )
                                                  )
 4                            Plaintiffs,         )No:
                                                  )04-CV-10477(PBS)
 5         v.                                      )
                                                  )
 6    DEXIA, S.A. and DEXIA BANK BELGIUM          )
      (formerly known as ARTESIA BANKING          )
 7    CORP., S.A.),                                )
                                                  )
 8                            Defendants.          )
      ─────────────────────────────────────────
 9    JANET BAKER and JAMES BAKER, JK BAKER       )
      LLC., and JM BAKER LLC.,                    )
10                                                )
                                                  )No:
11                            Plaintiffs,         )04-CV-10501(PBS)
                                                  )
12         v.                                      )
                                                  )
13    DEXIA S.A. And DEXIA BANK BELGIUM           )
      (formerly known as ARTESIA BANKING          )
14    CORP., S.A.),                                )
                                                  )
15                            Defendants.          )
      - - - - - - - - - - - - - - - - - - - - - -
16

17

18    Deposition of MR IVAN DE COEN
      held at the offices
19    Marx Van Ranst Vermeersch & Partners
      Tervurenlaan 270 Avenue de Tervueren
20    150 Brussels, Belgium at 8.58 a.m.
      on Thursday, September 21, 2006
21    before Leah Willersdorf, ABIVR

22

23

24

25
```

ANGLO-AMERICAN COURT REPORTERS LTD
LONDON, ENGLAND
Tel: (011 44) 20 7264 2088          Fax: (011 44)  20 7265 1703
Website: www.a-acr.com              E-mail: info@a-acr.com

ANGLO~AMERICAN
COURT REPORTERS

1          THE WITNESS: (Through the interpreter) It was

2     a branch of Rabo.

3     BY MR EGAN:

4          Q.     Since starting as the Head of Dexia Factors,

5     since 11th December 1998 forward, did you work at all

6     with the company Lernout & Hauspie?

7          A.     No.

8          Q.     And you are familiar with the company

9     Lernout & Hauspie, I take it?

10         A.     Obviously, yes. Everybody in Belgium knows of

11    Lernout & Hauspie.

12         Q.     Today when I refer to the

13    company "Lernout & Hauspie Speech Products", I will

14    refer to them as "L&H"; is that all right with you?

15         A.     Yes.

16         Q.     And feel free to do the same. Okay. Prior to

17    starting with Dexia Factors, what was your position at

18    the bank?

19         A.     Up until 1998, I was Head of

20    Structured Finance.

21         Q.     When did you become Head of

22    Structured Finance?

23         A.     The end, late 1996.

24         Q.     What did Structured Finance do in late '96

25    through 1998?



16

A.    It was a technical commercial department, the purpose of which was to set up montages ["assemblies" quite literally] of financings which had as their purpose -- which were more complicated than any regular form of finance.

Q.    What were your responsibilities as Head of Structured Finance?

A.    My task was primarily to make this type of credits more accessible.

THE INTERPRETER: Could you repeat the second part of your answer, please?

THE WITNESS: And by rendering them more accessible, what I mean is for these products to be more used, to make them more commercializable, better saleable, ie. towards customers.

BY MR EGAN:

Q.    Did you focus at all on credit analysis as Head of Structured Finance?

A.    That too. That was one of my duties.

Q.    And did you also focus on commercial matters?

A.    We were required to look into the whole. The technical analysis, as such, was conducted by the Credit Secretariat.

Q.    Prior to when you became Head of Structured Finance, what was your role at the bank?

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**
Tel: (011 44) 20 7264 2088          Fax: (011 44)  20 7265 1703
Website: www.a-acr.com                    E-mail: info@a-acr.com

ANGLO~AMERICAN
COURT REPORTERS

1   strike that.

2        Why were you receiving updates on

3   Lernout & Hauspie through 2000?

4        A.   I did not receive them.

5        Q.   You did not receive these?

6        A.   They got sent to my former address, but

7   I have never seen these documents.

8        Q.   You have never seen them before?

9        A.   It wasn't for me.  It was no longer my

10  responsibility and my area of responsibility.

11       Q.   Prior to moving to Artesia Factors, did you

12  get investor alerts for any other clients of the bank?

13       A.   No.

14       Q.   Okay. You can put that aside, thank you. Sir,

15  have you ever heard of the company Radial NV?

16       A.   No.

17       Q.   Were you involved in any aspect of any loan

18  to a company named Radial?

19       A.   No.

20       Q.   Do you have any information about any loan to

21  a company named Radial?

22       A.   No.

23       Q.   Are you familiar with a company named

24  Language Investment Company or LIC?

25       A.   No.



149

1        Q.    Were you involved in any aspect of any loan

2    to Language Investment Company or LIC?

3        A.    No.

4        Q.    Did you have any information about any loan

5    to Language Investment Company or LIC?

6        A.    No.

7        Q.    Have you ever heard of a company known as

8    Language Development Fund or LDF?

9        A.    (In person) No.

10       Q.    Were you involved in any aspect of any loan

11   to LDF?

12       A.    No.

13       Q.    Do you have any information about any loan

14   to LDF?

15       A.    (In person) No.

16       Q.    Do you know if Artesia granted a loan in 2000

17   -- strike that.

18             Do you know if Artesia granted a direct loan

19   for $20 million to Mr Lernout, Mr Hauspie and

20   Mr Willaert?

21       A.    (In person) I don't know.

22       Q.    Were you involved in any loan directly to

23   Mr Lernout, Mr Hauspie or Mr Willaert?

24       A.    (In person) No.

25       Q.    Do you have any information about any loan

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**

Tel: (011 44) 20 7264 2088    Fax: (011 44)  20 7265 1703
Website: www.a-acr.com    E-mail: info@a-acr.com


ANGLO-AMERICAN
COURT REPORTERS

151

1    Q.    Let me just, for the record -- do you know

2    anything about the financing, the bank's financing of

3    L&H's acquisition of Dictaphone?

4    A.    No, not at all.

5    Q.    Have you ever heard of a company known as

6    Dragon Systems?

7    A.    Through the Press, yes.

8    Q.    Were you involved in any aspect of any loan

9    by the bank to L&H in connection with an acquisition of

10   Dragon Systems?

11   A.    No.

12   Q.    Do you have any information about any loan

13   from the bank to L&H in connection with an acquisition

14   of Dragon Systems?

15   A.    No, no.

16   Q.    Prior to joining Artesia Factors, did you

17   have any dealings with Artesia Securities?

18   A.    No.

19   Q.    Earlier we saw e-mails forwarded to you that

20   included a person from Artesia Securities; is that

21   correct?

22   A.    Etienne Deklippel was Head of Sales as

23   opposed to in Artesia Securities. I don't remember

24   exactly.

25          THE INTERPRETER: Sorry. Just for the record,



152

1   what is his surname?

2            THE WITNESS: (In person) Etienne, Etienne.

3            THE INTERPRETER: Deklippel.

4            THE WITNESS: He is on the -----

5            THE INTERPRETER: He is listed there, okay.

6   BY MR EGAN:

7       Q.   Apart from those e-mails, did you have any

8   dealings with Artesia Securities in that time period?

9            (The question was translated)

10           THE INTERPRETER: He is asking about the

11  word "dealings".

12           THE WITNESS: How do you mean dealings?

13  BY MR EGAN:

14      Q.   Did you perform any -- strike that.

15           While working for Structured Credits, did you

16  have occasion to meet with individuals from

17  Artesia Securities concerning bank business?

18      A.   Not exactly.

19      Q.   Did you have any interactions with anyone

20  from Artesia Securities in that time period?

21      A.   I know Etienne Deklippel works there, but

22  that's about it.

23      Q.   Okay. How about once you joined

24  Artesia Factors, did you have any dealings with

25  Artesia Securities?

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**

Tel: (011 44) 20 7264 2088              Fax: (011 44)  20 7265 1703
Website: www.a-acr.com                  E-mail: info@a-acr.com



153

1     A.     No. I know Etienne Deklippel because formerly

2    Etienne Deklippel was Head of Sales at the bank. That's

3    how I know him.

4     Q.     While at Structured Credits, did you have any

5    bonus or compensation tied to loans?

6          THE INTERPRETER: I am not sure if

7    I understand the question myself.

8          MR EGAN: Let me rephrase it.

9    BY MR EGAN:

10     Q.     While at Structured Credits, did any part of

11    your compensation from the bank depend on loan

12    transactions?

13     A.     No.

14     Q.     Okay. Sir, you are aware that there is a

15    Belgian investigation ongoing into the collapse of

16    Lernout & Hauspie; is that correct?

17     A.     Yes, obviously I have been questioned.

18     Q.     And you have been questioned by the

19    Federal Police; is that correct?

20     A.     Yes.

21     Q.     Do you recall on how many occasions you were

22    questioned?

23     A.     I notice that there were three reports.

24     Q.     Okay.

25          MR EGAN: I would like to mark as De Coen

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**

Tel: (011 44) 20 7264 2088          Fax: (011 44)  20 7265 1703
Website: www.a-acr.com          E-mail: info@a-acr.com

