# EXHIBIT D

```
 1          THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
 2
   ----------------------------)
 3                             )         ORIGINAL
                               )
 4 HANS A QUAAK, ATTILIO PO    )
   and KARL LEIBINGER, on      )
   behalf of themselves        )  No: 03-CV-11566 (PBS)
 5 and those similarly situated )
                               )
 6          Plaintiffs          )
                               )
 7          v.                  )
                               )
 8 DEXIA, S.A. And DEXIA BANK  )
   BELGIUM (formerly known     )
 9 as ARTESIA BANKING CORP S.A. )
                               )
10          Defendants          )
                               )
11 ----------------------------)
   STONINGTON PARTNERS, INC.,  )
12 a Delaware Corporation,     )
   STONINGTON CAPITAL          )
13 APPRECIATION 1994 FUND LP   )
   a Delaware Partnership      )
14 and STONINGTON HOLDINGS     )
   LLC., A Delaware Limited    )
15 Liability Company           )
                               )
16          Plaintiffs          )  04-CV-10411 (PBS)
                               )
17          v.                  )
                               )
18 DEXIA SA and DEXIA BANK     )
   BELGIUM (formerly known as  )
19 ARTESIA BANKING CORP., SA   )
                               )
20          Defendants          )
                               )
21 ----------------------------)

22

23

24

25
```


ANGLO-AMERICAN
COURT REPORTERS

2

```
 1   GARY B FILLER and LAWRENCE    )
     PERLMAN, trustees of the      )
 2   TRA Rights Trust              )
                                   )
 3            Plaintiffs           )
                                   )
 4              v.                 )
                                   )
 5   DEXIA SA and DEXIA BANK       )
     BELGIUM (formerly known as    )
 6   ARTESIA BANKING CORP SA.,     )
                                   )
 7            Defendants           )
     ------------------------------)
 8   JANET BAKER and JAMES BAKER   )
     JK BAKER LLC and JM BAKER     )
 9   LLC,                          )
                                   )
10            Plaintiffs           )
                                   )
11              v.                 )
     DEXIA SA and DEXIA BANK       )
12   BELGIUM (formerly known as    )
     ARTESIA BANKING CORP., SA     )
13                                 )
              Defendants           )
14   ------------------------------)
15
16
17                  Deposition of:
18                BART FERRAND Vol 1
19             taken at the offices of:
20                 Val & Valdekens
21               18 Rue de L'aurore
               Dageraadstraat, 1000 Brussels
22
23             on Thursday, 19th October 2006
                 commencing at 9.30 am
24
25
```


ANGLO-AMERICAN
COURT REPORTERS

21

1    today as L&H and if we talk about particular

2    individuals I will use their names, is that alright

3    with you?

4        A.    Yes, alright.

5        Q.    Focusing on your earlier employment in the

6    bank from 1991 in Kortrijk, prior to becoming a

7    relationship manager did you have any dealings with L&H

8    at that time?

9        A.    Not so as far as I remember.   I don't think

10   so.

11       Q.    Now just as to your time in Ypres as a

12   relationship manager, which I believe you said started

13   around 94, 1994 I suppose for a few years.   In that

14   position did you have any dealings with L&H?

15       A.    Not that I remember, I don't think so.

16       Q.    Do you know if L&H was a public company at

17   that time?

18       A.    I don't remember exactly when they went

19   public.

20            MR EGAN:    Did you play any role in the

21   initial public offering of L&H?

22       A.    No.

23       Q.    Do you have any knowledge about the Bank's

24   role in any initial public offering for L&H?

25       A.    No.



57

1    A.    Not as far as I remember, I don't think so.

2    Q.    Was LIC a part of the portfolio of speech

3 technology companies that you oversaw as relationship

4 manager?

5    A.    I don't remember exactly, but I suppose it

6 was related to the industry of speech technology.    It

7 is a possibility.

8    Q.    Did you have any meetings with anyone from

9 LIC?

10    A.    Not as far as I remember, I don't think so.

11    Q.    Do you know the owners or directors or

12 officers of LIC?

13    A.    No, not as far as I remember, I don't think

14 so.

15    Q.    Are you familiar with an instrument known as

16 a Credit Default Swop or a CDS?

17    A.    I have seen that term and I have an idea

18 about what it is.

19    Q.    What is CDS?

20    A.    Well, I understand it was a financial

21 instrument by which one party can transfer the default

22 risk on a credit to another party in return for a

23 premium that is paid by the Company who is taking over

24 the default risk.

25    Q.    At the Bank while you were relationship



58

1  manager at the Bank did you ever work on transactions

2  involving Credit Default Swops?

3       A.   Not as far as I remember.   I don't think so.

4       Q.   Do you recall any Credit Default Swops with

5  individuals at that time?

6       A.   I don't remember.

7       Q.   Was there a particular department at the Bank

8  that handled Credit Default Swops transactions?

9       A.   I don't know.

10      Q.   At some point were you involved in the

11 extension of credit to Radial?

12      A.   I don't remember, it is possible.

13      Q.   I would like to mark Ferrand Exhibit 5.

14 (Marked for identification Ferrand Exhibit 5)

15           Ferrand is BATES stamped DBB 106115 through

16 118.  I ask, sir, if you recognise this document.

17      A.   No, I don't recognise.

18      Q.   If you look at the top of the first page, do

19 you see your name there?

20      A.   Yes, I do.

21      Q.   Is that your handwriting?

22      A.   No.

23      Q.   Do you know whose handwriting it is?

24      A.   No, I don't.

25      Q.   Did you receive this memo on or about April



159

1    last two pages of the document, analyst report on FLV

2    Funds, do you see that reference in the attached

3    report?

4        A.    I do.

5        Q.    Do you know how you obtained that report?

6        A.    No, and I cannot confirm I obtained it.

7        Q.    But you reference it in your memorandum,

8    correct?

9        A.    Yes.

10       Q.    Did you regularly review Artesia Securities

11   analyst reports that were targeted on speech technology

12   companies within your portfolio?

13       A.    I don't remember, I assume if they publish a

14   report on a company involved in speech technology that

15   I did read it, yes.

16       Q.    Do you know if this loan was ever approved?

17       A.    I don't remember, I don't see a decision on

18   it.

19       Q.    Sir, you can put that document aside.  I

20   would like to ask you to mark Ferrand Exhibit 25.

21   (Marked for identification Ferrand Exhibit 25)

22           Ferrand Exhibit 25, sir, do you recognise

23   this document?

24       A.    No, I don't.

25       Q.    It appears to be a fax message from Pierre



160

1    Paul Verelst to you, do you see that?

2        A.    Yes.

3        Q.    Sent on December 1st 1999, do you see that?

4        A.    Yes.

5        Q.    Was that your fax number at the time

6    underneath your name?

7        A.    I don't remember, that is possible, yes.

8        Q.    Who was Pierre Paul Verelst?

9        A.    I read with you he was financial analyst at

10   Artesia Securities.

11       Q.    Did you ever meet with him while working as

12   relationship manager?

13       A.    Not as far as I remember, I don't think so.

14       Q.    Did you have any conversations with him?

15       A.    Not as far as I remember, I don't think so.

16       Q.    Do you know why he was sending you this fax?

17       A.    No, I don't remember.

18       Q.    He faxes over an analysis of L&H by van ING

19   Barings/Vermeulan Reemdonck and Goldman Sachs, do you

20   see that?

21       A.    Yes.

22       Q.    In December 1999 -- strike that.   Could this

23   just have been sent to you as part of regular updates

24   on L&H as part of the speech technology portfolio?

25       A.    I don't remember if something like this fax



161

1   was done on a regular basis.

2        Q.    But it may have been done?

3        A.    I don't remember if it was done on a regular

4   basis.   I don't think so.

5        Q.    Let's mark Ferrand Exhibit 26.

6   (Marked for identification Ferrand Exhibit 26)

7             Which is a two page document DBB 120968

8   through the 69.

9             THE VIDEOGRAPHER:    Off-the-record at 16.35.

10                   (Off-the-record)

11            THE VIDEOGRAPHER:    Starting roll four in the

12  deposition of Bart Ferrand.   Going back on the record

13  at 16.47.

14            MR EGAN:   Mr Ferrand, I put in front of you

15  Ferrand Exhibit 26, do you recognise this document?

16       A.    No, I don't.

17       Q.    On the first page on the from column is that

18  your e-mail address?

19       A.    Yes.

20       Q.    Sent to Geert Dauwe on December 16th 1999; is

21  that correct?

22       A.    Yes.

23       Q.    Did you send it on that date?

24       A.    I suppose I did.

25       Q.    And attached is an XL chart on the second


ANGLO-AMERICAN
COURT REPORTERS

162

1    page, did you prepare that chart?

2        A.    I suppose I did, yes.

3        Q.    And this is overview of the bank's warrants

4    in L&H; is that correct?

5        A.    I read the position from Artesia in stocks

6    Lernout & Hauspie Speech Products.

7        Q.    Do you know why you were preparing this on or

8    about December 16th 99?

9        A.    I don't remember.

10       Q.    Do you know if Mr Dauwe requested the

11   information?

12       A.    I don't remember.

13       Q.    Did you generally follow Artesia's position

14   in L&H sureties?

15       A.    Not as far as I remember.

16       Q.    Do you know if Artesia was trading in L&H

17   stock while you were a relationship manager for the L&H

18   account?

19       A.    I don't remember that I was aware of that.

20       Q.    Did you have any responsibility for following

21   the trading?

22           THE VIDEOGRAPHER:    Can we stop, we have a

23   technical problem?    (Short Pause).

24           MR EGAN:    Did you have responsibility for

25   tracking the bank's trading in the accounts -- strike



163

1    that.    Did you have any responsibility for the Bank

2    trading in any of the Securities of any of your

3    portfolio clients?

4         A.    No, I didn't.

5         Q.    Would you be advised of any such transactions

6    when they occurred?

7         A.    I don't remember, I assume not.

8         Q.    Do you know where you obtained the

9    information that went into this chart?

10        A.    No, I don't remember.

11        Q.    I would like to mark Ferrand Exhibit 27.

12    (Marked for identification Ferrand Exhibit 27)

13             Sir, do you recognise the Exhibit marked as

14    Ferrand Exhibit 27?

15        A.    No, I don't remember.

16        Q.    Does this appear to be a fax sent to you from

17    Artesia Services on May 8th 2000?

18        A.    Yes, it seems to be.

19        Q.    Who is Anne Francoise Pirard?

20        A.    I don't know.

21        Q.    What was Artesia Services?

22        A.    I think it was the department or company,

23    I don't remember exactly, who have Back Office

24    operations where Back Office operations were executed.

25        Q.    If you look at the second page it seems to be


ANGLO-AMERICAN
COURT REPORTERS

164

1     a chart of L&H stock prices on particular weeks?

2            A.    Yes.

3            Q.    In late March through April 2000, do you see

4     that?

5            A.    Yes.

6            Q.    Do you know why, did you request this

7     information from Artesia Services?

8            A.    I don't remember.

9            Q.    Do you know if you received it?

10           A.    Pardon?

11           Q.    Do you know whether you received it?

12           A.    No, I don't remember.

13           Q.    Did you receive regular updates on L&H's

14    stock price?

15           A.    As far as I remember no.

16           Q.    Did you follow L&H's stock price at the time

17    you were relationship manager for the accounts?

18           A.    Not in particular, no.

19           Q.    Prior to moving to Structured Finance did you

20    have, and apart from the fax we saw earlier did you

21    have any dealings with Artesia Securities while you

22    were relationship manager?

23           A.    As far as I remember no.   I don't believe

24    so.

25           Q.    Did you ever consult with anyone at Artesia



1    Securities?

2        A.    I never did.

3        Q.    I would like to mark Ferrand Exhibit 28, DBB

4    027588 through 596.

5    (Marked for identification Ferrand Exhibit 28)

6            Sir, focusing mainly on the third page, BATES

7    stamped 027590 through the end, 596, do you recognise

8    this document?

9        A.    No, I don't.

10        Q.    Are you familiar with a company named

11    Document Management Partners?

12        A.    I am not familiar with it, I see it was a

13    potential clients mentioned in this credit proposition.

14        Q.    And you were the commercial contact on this

15    credit application?

16        A.    I assume I was, yes.

17        Q.    And that is your name at the top?

18        A.    That is my name.

19        Q.    On the first page of this document on page

20    027590?

21        A.    Yes.

22        Q.    Do you know if this loan was ever approved?

23        A.    I don't remember, I don't remember.

24        Q.    Do you know if Document Management Partners

25    was part of the Speech Products language portfolio you



# EXHIBIT E

PETER RABAEY Vol 1                                    1

```
 1              THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2
       ------------------------------)
 3                                    )         ORIGINAL
       HANS A QUAAK, ATTILIO PO       )
 4     and KARL LEIBINGER, on         )
       behalf of themselves           )    No: 03-CV-11566  (PBS)
 5     and those similarly situated   )
                                      )
 6                 Plaintiffs         )
                                      )
 7                    v.              )
                                      )
 8     DEXIA, S.A. And DEXIA BANK     )
       BELGIUM (formerly known        )
 9     as ARTESIA BANKING CORP S.A.   )
                                      )
10                 Defendants         )
                                      )
11     ------------------------------)
       STONINGTON PARTNERS, INC.,     )
12     a Delaware Corporation,        )
       STONINGTON CAPITAL             )
13     APPRECIATION 1994 FUND LP      )
       a Delaware Partnership         )
14     and STONINGTON HOLDINGS        )
       LLC., A Delaware Limited       )
15     Liability Company              )
                                      )
16                 Plaintiffs         )    04-CV-10411  (PBS)
                                      )
17                    v.              )
                                      )
18     DEXIA SA and DEXIA BANK        )
       BELGIUM (formerly known as     )
19     ARTESIA BANKING CORP., SA      )
                                      )
20                 Defendants         )
                                      )
21     ------------------------------)

22

23

24

25
```



2

```
 1  GARY B FILLER and LAWRENCE       )
    PERLMAN, trustees of the         )
 2  TRA Rights Trust                 )
                                     )
 3          Plaintiffs               )
                                     )
 4              v.                   )
                                     )
 5  DEXIA SA and DEXIA BANK          )
    BELGIUM (formerly known as       )
 6  ARTESIA BANKING CORP SA.,        )
                                     )
 7          Defendants               )
    -----------------------------)
 8  JANET BAKER and JAMES BAKER      )
    JK BAKER LLC and JM BAKER        )
 9  LLC,                             )
                                     )
10          Plaintiffs               )
                                     )
11              v.                   )
    DEXIA SA and DEXIA BANK          )
12  BELGIUM (formerly known as       )
    ARTESIA BANKING CORP., SA        )
13                                   )
            Defendants               )
14  -----------------------------)

15

16

17              Deposition of:

18          PETER RABAEY Vol 1

19      taken at the offices of:
            Val & Valdekens

20          18 Rue de L'aurore
    Dageraadstraat, 1000 Brussels

21

22      on Tuesday, 24th October 2006
           commencing at 10.00 am

23

24

25
```

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**

Tel: (011 44) 20 7264 2088          Fax: (011 44) 20 7265 1703
Website: www.a-acr.com              E-mail: info@a-acr.com



ANGLO-AMERICAN
COURT REPORTERS

1    A.    I worked at head office not one of the branch

2    offices, at head office.

3    Q.    Was there a particular department you worked

4    in during that time period?

5    A.    I worked at the credit secretariat

6    specialised activity it was called which had been a

7    unit, a department just newly established at the time.

8    Q.    What was your title during that period of

9    time?

10    A.    That was still unchanged.

11    Q.    So you were still senior credit analyst; is

12    that correct?

13    A.    Yes, that is right.

14    Q.    What does specialised activities mean?

15    A.    I used to work in Corporate Banking and now

16    the specialisation involved real estate case files,

17    take over credits, syndicated loans, Club Deals, export

18    financing, shipping financing.    I think those were the

19    principal categories.

20    Q.    Were the transactions that came under the

21    title of specialised activities more complicated than

22    the transactions you dealt with in corporate?

23    A.    Yes, they were a lot more complex.

24    Q.    When you say take over credits what do you

25    mean?

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**
Tel: (011 44) 20 7264 2088          Fax: (011 44) 20 7265 1703
Website: www.a-acr.com              E-mail: info@a-acr.com

ANGLO–AMERICAN
COURT REPORTERS

1  the area of Specialised Credits and structured finance?

2      A.   In part he relied on my experience yes, but

3  he also relied on his own sense of understanding of

4  things.

5      Q.   Mr Van Tiggel has testified under oath in

6  these proceedings that in the 1999 timeframe you were

7  the Bank's most experienced credit analyst in the area

8  of structured finance, do you agree with that

9  statement?

10     A.   If you want to qualify just one and a half

11  years of working at a newly established department in

12  which the head was new and everything was new, then

13  I think just one and a half years may be overreaching

14  it a bit to qualify me as the most senior, most

15  experienced analyst in the Bank.

16     Q.   Do you know anyone in your department at that

17  time in the 1999 timeframe who had more experience than

18  you in the area of structured finance, on the credit

19  side?

20     A.   You need to understand that you need to

21  understand a department such as specialised activities

22  works together with a department such as structured

23  finance and at structured finance there were people who

24  had a far greater degree of experience that we were

25  able to call on.



```
 1        Q.    But am I right that the Structured Finance
 2   department does not do the credit analysis on a loan
 3   proposal?
 4        A.    That is not entirely correct.  Well, as
 5   I just said not quite as you put it, in part they will
 6   analyse a project especially in terms of repayment
 7   capacity on the part of the borrower and they do that
 8   in line with their own methods and their own
 9   understandings.
10        Q.    I am going to return to my previous question
11   because I don't believe I got an answer.    Do you
12   dispute Mr Van Tiggel's testimony in this case that in
13   1999 you were the Bank's most experienced credit
14   analyst in the area of structured finance?
15        A.    I really need to be very careful in how I put
16   it.   It really is very much a matter of fine nuance,
17   for example, someone like Mr Joris Van Helleputte who
18   ultimately went to structured finance was someone who
19   had a greater degree of experience than I did at the
20   time.
21        Q.    Yes, I understand. I need an answer to my
22   question and I need a yes or no.  Do you dispute Mr Van
23   Tiggel's claim that in 1999 you were the Bank's most
24   experienced credit analyst in the area of structured
25   finance?
```



1    A.    Well, if you consider just one and a half

2    years of experience as a credit analyst in the absence

3    of anyone else or anyone better then the answer is yes.

4    Q.    And you are unable to answer my question yes

5    or no; is that correct?

6    A.    I think I ultimately ended up answering yes

7    to your question but I did nuance.

8    Q.    The answer is yes you dispute Mr Van

9    Helleputte's claim; is that correct?

10    A.    Then I will have understood your question.

11    Q.    You have understood it or misunderstood?

12    A.    Misunderstood.

13    Q.    Let me repeat my question.  I will ask it a

14    different way.   Do you agree with Mr Van Tiggel's

15    sworn testimony in this case that in the 1999 timeframe

16    you were the Bank's most experienced credit analyst in

17    the area of structured finance?

18    A.    If insofar as you consider one and a half to

19    two years experience in a newly created department with

20    new activities, if you consider that to be sufficient

21    experience then, yes, I would agree to that statement.

22    Q.    Mr Van Tiggel also testified that he would

23    routinely not review your credit analysis during his

24    supervision of you and rather that analysis would go

25    directly to the Credit Committee, do you understand



1    that to be correct?

2        A.    Mr Van Tiggel was given copies of credit

3    proposals and the way he saw fit to acquit himself of

4    his duties as head of that department obviously is

5    entirely for his account.

6        Q.    But in any event he entrusted you to do the

7    gathering of information and the preparation of the

8    credit analysis for reports given to the Credit

9    Committee during this 1999 timeframe; is that correct?

10       A.    The same as my colleagues, the credit analyst

11   is a credit analyst on which he relied on.

12       Q.    And in turn the Credit Committee during this

13   time period in 1999 would have to also rely on your

14   credit analysis to make a determination as to whether

15   or not to extend a loan; is that correct?

16           MR WEIDNER:    I object to form.  Go ahead,

17   you can answer.   I think the advice I put forward was

18   non committal, I believe the Credit Committee was able

19   to arrive at its own opinion and it was the case that

20   -- it was sometimes the case that the Credit Committee

21   arrived at decisions which were not in line with my

22   recommendation.

23       Q.    Understood.  That is not my question.   My

24   question was in reaching their decision the Credit

25   Committee would have to rely on the facts and analysis



1  that you gathered in making the loan proposal to that

2  Committee, correct?

3        MR WEIDNER:    I object to the form.

4      A.    No, that is not correct in the sense that

5  there is a memo from a commercial person which would be

6  the corporate banker, so the Credit Committee has two

7  recommendations, two records, two documents to fall

8  back on.

9        MR ROCCO:    Did the commercial presentation

10  involve the credit analysis?

11      A.    The commercial person would certainly put

12  forward his ideas about the financial analysis but in

13  broad lines whereas the credit analyst would obviously

14  go into far greater detail.

15      Q.    In so far as the detailed credit analysis

16  that was prepared by the credit analyst assigned to a

17  particular loan, those details were provided

18  exclusively by the credit analyst to the Credit

19  Committee, correct?

20      A.    Obviously the Credit Committee has to rely on

21  factual details that are presented as part of the

22  credit analysis but it is the commercial persons that

23  actually supply these factual details.

24      Q.    So as a credit analyst you wouldn't get,

25  wouldn't gather your own factual details regarding a



42

1  loan?

2      A.    It would usually the be commercial person who

3  would send us the balance sheets and annual statement

4  of accounts together with his comment.

5      Q.    And from there you would do the analysis of

6  those accounts and statements?

7      A.    That's right, yes.

8      Q.    Is it fair to say that the Credit Committee

9  itself would not undertake that analysis but instead

10 would rely on your analysis of those financial

11 statements?

12     A.    Well, the Credit Committee would rely on the

13 financial analysis made by myself but in addition to

14 that they have also got their own opinion.

15     Q.    And in your job as a senior credit analyst

16 you would, I assume, attempt to be as accurate and as

17 complete as possible in making your presentation to the

18 Credit Committees; is that right?

19     A.    That would certainly be our endeavour, if the

20 time was obviously available to us within the time

21 limits.

22     Q.    In this timeframe of 1999 did you as part of

23 your duties as senior credit analyst have direct

24 communications with clients of the bank?

25     A.    Sometimes on occasion but that really would

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**

Tel: (011 44) 20 7264 2088          Fax: (011 44)  20 7265 1703
Website: www.a-acr.com              E-mail: info@a-acr.com



ANGLO-AMERICAN
COURT REPORTERS

# EXHIBIT F

PETER RABAEY Vol 2                    1

```
 1        THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS
 2
      ------------------------------)
 3                                   )      ORIGINAL
      HANS A QUAAK, ATTILIO PO       )
 4    and KARL LEIBINGER, on         )
      behalf of themselves           )   No: 03-CV-11566 (PBS)
 5    and those similarly situated   )
                                     )
 6             Plaintiffs            )
                                     )
 7               v.                  )
                                     )
 8    DEXIA, S.A. And DEXIA BANK     )
      BELGIUM (formerly known        )
 9    as ARTESIA BANKING CORP S.A.   )
                                     )
10            Defendants             )
                                     )
11    ------------------------------)
      STONINGTON PARTNERS, INC.,     )
12    a Delaware Corporation,        )
      STONINGTON CAPITAL             )
13    APPRECIATION 1994 FUND LP      )
      a Delaware Partnership         )
14    and STONINGTON HOLDINGS        )
      LLC., A Delaware Limited       )
15    Liability Company              )
                                     )
16            Plaintiffs             )   04-CV-10411 (PBS)
                                     )
17               v.                  )
                                     )
18    DEXIA SA and DEXIA BANK        )
      BELGIUM (formerly known as     )
19    ARTESIA BANKING CORP., SA      )
                                     )
20            Defendants             )
                                     )
21    ------------------------------)
22
23
24
25
```

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**

Tel: (011 44) 20 7264 2088          Fax: (011 44) 20 7265 1703
Website: www.a-acr.com              E-mail: info@a-acr.com



ANGLO-AMERICAN
COURT REPORTERS

2

```
 1   GARY B FILLER and LAWRENCE      )
     PERLMAN, trustees of the        )
 2   TRA Rights Trust                )
                                     )
 3           Plaintiffs              )
                                     )
 4              v.                   )
                                     )
 5   DEXIA SA and DEXIA BANK         )
     BELGIUM (formerly known as      )
 6   ARTESIA BANKING CORP SA.,       )
                                     )
 7           Defendants              )
     ----------------------------)
 8   JANET BAKER and JAMES BAKER     )
     JK BAKER LLC and JM BAKER       )
 9   LLC,                            )
                                     )
10           Plaintiffs              )
                                     )
11              v.                   )
     DEXIA SA and DEXIA BANK         )
12   BELGIUM (formerly known as      )
     ARTESIA BANKING CORP., SA       )
13                                   )
             Defendants              )
14   ----------------------------)

15

16

17                     Deposition of:

18                  PETER RABAEY Vol 2

19                 taken at the offices of:
                      Val & Valdekens

20                   18 Rue de L'aurore
                 Dageraadstraat, 1000 Brussels

21

22              on Wednesday, 25th October 2006
                   commencing at 10.00 am

23

24

25
```

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**

Tel: (011 44) 20 7264 2088          Fax: (011 44)  20 7265 1703
Website: www.a-acr.com              E-mail: info@a-acr.com



ANGLO–AMERICAN
COURT REPORTERS

64

1  any reference to credit insurance because ultimately

2  this credit proposal hinges on Credit Default Swaps as

3  the instrument, I really have endeavoured to base

4  myself on the opinion put forward by Mr Ben Mommens who

5  was the head of the Legal Department and whose opinion

6  I valued most even though there were other opinions

7  doing the rounds that were contrary to his.

8      Q.    Were you aware of any discussion at the time

9  you prepared Probst 19 about whether a CDS would be

10  considered a financial instrument and therefore may not

11  need to be disclosed in a loan agreement?

12      A.    I have no concrete recollection of any such

13  discussions.   There were various opinions on the Credit

14  Default Swaps doing the rounds at the time.   It is very

15  difficult for me to see clear in this because I work in

16  Corporate Banking, be it on the credit side of

17  Corporate Banking, but Credit Default Swap really is a

18  product of the market, so it is quite alien from me, it

19  is a product by the market room, dealer room, sorry.

20      Q.    But in any event there is no mention in this

21  Probst 19, the loan proposal that went to the Credit

22  Committee of any comparison between a Credit Default

23  Swap and a financial instrument, am I right?

24      A.    You are entirely right in saying that no

25  comparison was made in this document, I based myself



EXHIBIT G

PETER RABAEY Vol 3                    1

```
 1        THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
 2
     ----------------------------)         ORIGINAL
 3                               )
     HANS A QUAAK, ATTILIO PO    )
 4   and KARL LEIBINGER, on      )
     behalf of themselves        ) No: 03-CV-11566 (PBS)
 5   and those similarly situated )
                                 )
 6             Plaintiffs        )
                                 )
 7               v.              )
                                 )
 8   DEXIA, S.A. And DEXIA BANK  )
     BELGIUM (formerly known     )
 9   as ARTESIA BANKING CORP S.A. )
                                 )
10             Defendants        )
                                 )
11   ----------------------------)
     STONINGTON PARTNERS, INC.,  )
12   a Delaware Corporation,     )
     STONINGTON CAPITAL          )
13   APPRECIATION 1994 FUND LP   )
     a Delaware Partnership      )
14   and STONINGTON HOLDINGS     )
     LLC., A Delaware Limited    )
15   Liability Company           )
                                 )
16             Plaintiffs        )  04-CV-10411 (PBS)
                                 )
17               v.              )
                                 )
18   DEXIA SA and DEXIA BANK     )
     BELGIUM (formerly known as  )
19   ARTESIA BANKING CORP., SA   )
                                 )
20             Defendants        )
                                 )
21   ----------------------------)
22
23
24
25
```

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**
Tel: (011 44) 20 7264 2088          Fax: (011 44)  20 7265 1703
Website: www.a-acr.com               E-mail: info@a-acr.com

ANGLO-AMERICAN
COURT REPORTERS

2

```
 1  GARY B FILLER and LAWRENCE      )
    PERLMAN, trustees of the        )
 2  TRA Rights Trust                )
                                    )
 3          Plaintiffs              )
                                    )
 4              v.                  )
                                    )
 5  DEXIA SA and DEXIA BANK         )
    BELGIUM (formerly known as      )
 6  ARTESIA BANKING CORP SA.,       )
                                    )
 7          Defendants              )
    ----------------------------)
 8  JANET BAKER and JAMES BAKER     )
    JK BAKER LLC and JM BAKER       )
 9  LLC,                            )
                                    )
10          Plaintiffs              )
                                    )
11              v.                  )
    DEXIA SA and DEXIA BANK         )
12  BELGIUM (formerly known as      )
    ARTESIA BANKING CORP., SA       )
                                    )
13          Defendants              )
    ----------------------------)
14
```

Deposition of:

PETER RABAEY Vol 3

taken at the offices of:
Val & Valdekens

18 Rue de L'aurore
Dageraadstraat, 1000 Brussels

on Thursday, 26th October 2006
commencing at 10.00 am

ANGLO-AMERICAN COURT REPORTERS LTD
LONDON, ENGLAND
Tel: (011 44) 20 7264 2088        Fax: (011 44)  20 7265 1703
Website: www.a-acr.com            E-mail: info@a-acr.com



92

```
 1        Q.    Were Mr Ferrand and Mr Cordonnier during this
 2   time period of July 200 following the market
 3   performance of Lernout & Hauspie stock?
 4             MR BUTLER:    Objection to form.
 5        A.    I can't really comment on that, I don't know,
 6   they were working on the file at the time but I don't
 7   really know.
 8             MR ROCCO:    Was there any Artesia entity
 9   during this time period, 2000, that was following the
10   Lernout & Hauspie stock on the market?
11             MR BUTLER:    Objection to form.
12        A.    What do you mean by Artesia entity?
13             MR ROCCO:    A subsidiary or related company
14   to the Artesia group?
15        A.    I think Artesia Securities followed up on the
16   Stock Exchange quotation.
17        Q.    Did you ever consult with anybody at Artesia
18   Securities at any time to talk about the prospects of
19   Lernout & Hauspie Speech Products market value?
20        A.    I worked with Bart Ferrand and Piet
21   Cordonnier and the way I approached my file that was
22   before me was from a credit technical perspective which
23   is different from what a Stock Exchange analyst would
24   do.    So that's my answer.
25        Q.    So how is the prospect for earnings for
```

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**
Tel: (011 44) 20 7264 2088          Fax: (011 44)  20 7265 1703
Website: www.a-acr.com              E-mail: info@a-acr.com


ANGLO-AMERICAN
COURT REPORTERS

1    Q.    Do you know whether they got that same

2  approval for that first LIC Credit Default Swap?

3    A.    I have no recollection of that.

4    Q.    Do you know if they got that same approval

5  for the SEC Radial Credit Default Swap?

6    A.    I only know that I took the file to the

7  Credit Committee but with regard to procedures for the

8  Credit Default Swap I have no recollection

9  whatsoever.   It is not my scope of activities, I am

10  sorry I can't answer that.

11    Q.    Understood, I have to ask my questions,

12  though.   Do you know whether anyone took the second

13  LIC Credit Default Swap for approval to the Risk

14  Management and Control Department before entering into

15  that CDS?

16    A.    I don't remember that.  What I do remember is

17  the CDSs in this case were cosigned -- I found,

18  I established, I saw that these Credit Default Swaps

19  had been cosigned by people at Risk Management so they

20  were aware of this.

21    Q.    Did you know it was the policy of the Bank

22  that a Credit Default Swap counterparty should have no

23  strong correlation between itself and the underlying

24  loan transaction that the CDS applied to?

25              MR BUTLER:    Objection to form.



158

A.    I was unfamiliar with any such guidelines,

these are guidelines pertaining to market risks and I

was not aware of them

(Marked for identification Rabaey Exhibit 20)

MR ROCCO:    Mr Rabaey, I show you what is

marked as Rabaey Exhibit 20, a document entitled

policy, policy credit derivatives with a date on the

top of February 11th 99 and a date at the bottom of

last update February 18th 1999 bearing BATES numbers

DBB 127553 to 127570, and if you can take a moment to

look at the document.    My question for you, sir, is

have you ever seen this document before.

A.    No, I am totally unfamiliar with this

document.

Q.    It is fair to say you didn't consult this

document during the work you did on the LIC or the

Radial loans?

A.    Yes, it is correct to say I wasn't aware that

this document even existed.

Q.    You mentioned that you had no experience with

Credit Default Swaps prior to your introduction to the

Radial and LIC files, correct?

A.    As far as I remember I never encountered any

such Credit Default Swap documents, five pages in

length, no.



1    Q.    When you were confronted with the CDS on the

2  Radial and LIC files did you do anything to educate

3  yourself on the Credit Default Swap process?

4    A.    Well, again, this Credit Default Swaps

5  pertain to the scope of activities of market risk.

6  Just keeping track of what goes on in my own field of

7  activity is a very demanding task in its own right so

8  I didn't specifically focus on this.

9    Q.    My question is not whether you focused on it

10 or not.    Once you were faced with having to deal with

11 a Credit Default Swap on the Radial and LIC files did

12 you make any attempt to educate yourself about CDS

13 transactions?

14   A.    At the time in the material sense I certainly

15 didn't have the time and no one came forward to offer

16 me the opportunity to educate myself.

17   Q.    Did you rely on the expertise of any one else

18 at the Bank for their expertise on the Credit Default

19 Swaps during your time dealing with the LIC and Radial

20 loan?

21   A.    Well, at the time my boss was Jan Van Der Ven

22 and obviously he was the person, first person I would

23 have turned to and rely on.    In addition I also relied

24 on a number of people who had the document, the actual

25 basic models, so with a great deal of effort and trial

