# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANET BAKER and JAMES BAKER, JKBAKER LLC and JMBAKER LLC,<br><br>    Plaintiffs,<br><br>    v.<br><br>DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA),<br><br>    Defendants. | Civil Action No.: 04-10501 (PBS) |

## MEMORANDUM OF LAW IN SUPPORT OF DEXIA BANK BELGIUM'S MOTION TO COMPEL ADDITIONAL DEPOSITION TESTIMONY FROM VINCENT LOVE

Peter M. Saparoff (BBO#441740)
Breton Leone-Quick (BBO#655571)
MINTZ LEVIN COHN FERRIS
GLOVSKY & POPEO
One Financial Center
Boston, MA 02111
Tel:   (617) 542-6000
Fax:   (617) 542-2241

James B. Weidner
Jeff E. Butler
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY 10019-6131
Tel:   (212) 878-8000
Fax:   (212) 878-8375

*Counsel for Dexia Bank Belgium*

Defendant Dexia Bank Belgium ("Dexia") respectfully submits this Memorandum of Law and the Declaration of Jeff E. Butler dated April 30, 2007 ("Butler Decl.") in support of its Motion to Compel Additional Deposition Testimony from Vincent Love.

## Introduction

Vincent Love is a certified public accountant retained by Plaintiffs to testify about accounting issues. He has submitted two expert reports, totaling more than 120 pages in length, discussing loan transactions involving Dexia and the accounting principles that purportedly governed the accounting for those transactions by Lernout & Hauspie Speech Products ("L&H"). (*See* Butler Exs. A & B.) Based on the length and breadth of these expert reports, it is obvious that Plaintiffs expect Mr. Love to be a key witness at trial.

Mr. Love's deposition began on March 20, 2007. (Butler Decl. Ex. C.) From the first hour of the deposition, it was clear that Dexia would require more than one day to complete a reasonable examination of Mr. Love. In addition to the fact that Mr. Love offers opinions on virtually every disputed issue in the lawsuit, he gave unusually long and evasive answers during his deposition, requiring extensive follow-up by counsel for Dexia. In one instance, Mr. Love gave an answer that filled more than *16 pages* of transcript. Such responses significantly delayed the progress of the deposition. In fact, counsel for Dexia completed only about one-third of the planned examination of Mr. Love during the first day.

Upon conclusion of the first seven hours, counsel for Dexia immediately requested additional time to complete the deposition. Plaintiffs initially refused this request, but suggested that the parties hold a meet-and-confer at a later date to discuss the issue. The parties held a meet-and-confer on April 10, 2007, but Plaintiffs refused to allow any additional time to examine Mr. Love.

Based on the first day of Mr. Love's testimony, counsel for Dexia have estimated that two additional days will be needed to complete Mr. Love's deposition.[1] This estimate, however, assumes a certain degree of cooperation from the witness. If Mr. Love is as long-winded and evasive as he was during the first day of testimony, even more time may be required to conduct a reasonable examination of this witness. Dexia therefore respectfully requests that the Court order Plaintiffs to produce Mr. Love for additional deposition testimony on a day-to-day basis until Dexia's examination is completed.

## Argument

### I. DEXIA SHOULD BE ALLOWED ADDITIONAL TIME TO COMPLETE THE DEPOSITION OF MR. LOVE.

Although the normal time limit for a deposition under the Federal Rules is seven hours, Rule 30 allows for longer depositions in appropriate circumstances. Rule 30 states: "The court must allow additional time consistent with Rule 26(b)(2) if needed for a fair examination of the deponent or if the deponent or another person, or other circumstances, impedes or delays the examination." FED. R. CIV. P. 30(d)(2). The Advisory Committee Notes for this subsection indicate that additional time is particularly appropriate for an expert witness deposition when such time is needed "for a full exploration of the theories upon which the witness relies." FED. R. CIV. P. 30 advisory committee's note, 2000 Amendment, Subdivision (d).

#### A. Additional Time Is Needed For a Fair Examination of Mr. Love.

Based on the expert reports submitted by Mr. Love, Plaintiffs clearly expect him to be a central witness at trial. Mr. Love has produced two reports. The first is a "Preliminary Expert Witness Report" that is 95 pages in length. (*See* Butler Decl. Ex. A.) In this report, Mr. Love

---

[1] This would result in a total of three days of testimony. A three-day deposition would not be unprecedented in this case. Many of the fact depositions have taken more than one day to complete and, in two cases, the Court allowed a deposition of four days. (See Electronic Order dated October 5, 2006.)

offers his opinions not only on the complex interaction between various provisions of United States Generally Accepted Accounting Principles, but also on virtually every disputed issue of fact in this lawsuit. For example, the report contains lengthy discussions of five different loan transactions involving Dexia, and concludes, among other things, that Dexia employees "were informed" or "were aware" of the accounting principles that applied to these transactions in the United States. (*See, e.g., id.* at 27.) Setting aside the question of whether the "awareness" of Dexia employees is an appropriate subject for expert testimony, the knowledge or intent of Dexia employees is obviously an important issue in this case, and Dexia should be allowed to explore fully any expert testimony on this subject.

Mr. Love has also submitted a rebuttal expert report, responding to the expert reports produced by two of Dexia's testifying reports. (*See* Butler Decl. Ex. B.) The rebuttal report is 26 pages in length, and responds to several opinions offered by Dexia's experts. Just as significantly, the rebuttal report is silent on numerous other points made by Dexia's experts, including those that fall squarely within Mr. Love's expertise. Dexia should be allowed to examine Mr. Love thoroughly on his disagreements with Dexia's experts, as well as any areas of agreement between the experts.

In short, the extensive scope Mr. Love's opinions, as set forth in his two reports, alone should justify a deposition of Mr. Love extending beyond the normal seven hours provided by Rule 30.

### B. Mr. Love's Lengthy, Evasive Answers Impeded and Delayed the Examination.

Mr. Love also impeded and delayed the deposition by giving overly lengthy answers, by avoiding the questions posed and by volunteering extraneous information and opinions. Mr. Love has extensive experience as a testifying expert. According to his report, he has

testified as an expert in more than 15 cases in the past four years. (*See* Butler Ex. A, at Ex. 1 pp. 3-4.) Given this level of experience, it is difficult to believe that his lengthy, evasive answers were accidental. Whether intentional or not, this behavior plainly justifies additional deposition time for this key expert witness.

*First*, many of Mr. Love's answers were unusually lengthy. At least 35 of his answers continued for more than a page of the transcript. (*See* Butler Decl Ex. C at 24-25, 29-30, 43-44, 46-47, 55-56, 72-73, 73-74, 78-79, 84-85, 97-98, 116-17, 126-28, 133-35, 143-44, 149-50, 158-59, 160, 162-64, 168-69, 174-76, 187-89, 190-203, 213-214, 257-58, 269-70, 270-71, 274-75, 279-81, 282-83, 286-88, 289-90, 291-92, 299-300, 313-14 & 342-43.) Many other answers filled just under a page of transcript. Mr. Love's longest answer continued for more than *16 pages*, and took up more than half an hour of examination time. (*See id.* at 186-203.) Such lengthy answers wasted valuable time during the deposition, and should alone justify additional examination time.

*Second*, Mr. Love frequently attempted to avoid answering questions posed by counsel for Dexia. In many cases, questions that could have been answered with a simple "yes" or "no" had to be asked repeatedly before obtaining a direct answer. For example, on page 77 of the transcript, Mr. Love was asked whether a report by Bryan Cave contained the same calculation of restated revenue as contained in a chart cited by Mr. Love in his report (marked as Love Exhibit 4). Although this was a simple yes/no question, Mr. Love's answer was, at best, circuitous:

> A.   The Bryan Cave report was prepared at a time that they were unaware of the Dexia Bank involvement in the fraud and they had cautioned in that report – report if there were related party activities here that things would change.

(*See id.* at 77.) It required *ten pages* of follow up questioning and colloquy with counsel before Mr. Love admitted that the Bryan Cave report did not contain the same calculations:

5

> Q.  Sir, I'm not asking for the basis for the numbers, I'm asking about the actual numbers.
> Are the actual numbers in Love Exhibit 4 contained anywhere, to the best of your knowledge, in the Bryan Cave report?
>
> MS. DYER:  Objection, asked and answered.
>
> A.  I gave you my answer to this a number of times.  If you're saying is every single number on here in this format or similar format in the Bryan Cave report, the answer is no, because Bryan Cave did not know of the extent of the fraud perpetrated by the bank that would have increased the number of – increased the amount of fraudulent revenue from what they had determined based upon the assumption that there was no related party activity between L&H and the LDC financing.

(*See id.* at 87.)  Another example begins on page 92 of the transcript.  Mr. Love was asked whether he had any source for the supposed fictitious revenue set forth in a chart in his report, other than the one-page document cited in his report.  His initial answer was completely non-responsive:

> A.  The – the fraud, um, the fraud was a massive fraud.  We looked at all of the aspects of the fraud at other times, um, the numbers that are there essentially come from here.
> So, for the later years, um, this is the source.  When I say – I'm sorry, I'm not being clear – for the years '98, '99 and the first two quarters, this would be the source of that, yes.

(*See id.* at 92).  After the question was repeated four more times, Mr. Love finally answered on page 95 of the transcript:

> Q.  Sir, I'm just going back to my original question.  My question is are you aware, as you sit here today, of any other documents that tie out those exact numbers for 1998, 1999 and the first two quarters of 2000 that you cite in this chart?
>
> MS. DYER:  Objection.  Asked and answered.
>
> A.  Not that, as I sit here today right now, without all of these documents in front of me and everything else, no, I think the answer is I know of nothing else right now.

(*See id.* at 95.) A third example begins on page 241. Mr. Love was asked whether there is any reference to related party transactions or research and development arrangements in a memo he cites in his report. His initial response to this yes/no question was virtually incomprehensible:

> A.  The R&D current text talks about the ability to repay and none of it coming back to the other parties or back to the party. This has got to go back to the letter that Mr. Faict has transmitted to the Flemish Government; okay?

(*Id.* at 241-242.) After the question was repeatedly rephrased, Mr. Love finally answered in the negative on page 246 of the transcript:

> Q.  Sir, is there anything in this memo that you cited that refers to related party transactions or research and development arrangements. If so, please point me to the text that you're referring to.
>
> MS. DYER: Objection to the form. Asked and answered.
>
> A.  These are all issues that relate to related party transactions that are included in here.
>     The contact between the parties, the artificial character of the structuring dealing with them, it's all taken into consideration in determining whether or not there's a related party.
>     You can't parse out little pieces. It doesn't say related party in here. It doesn't say – well, it may say R&D arrangement, no, no, it doesn't – but these are the issues that would relate to both of those.

(*Id.* at 245-246.) Many other examples of Mr. Love's attempts to avoid providing direct answers to simple questions could be cited. These evasions provide ample justification for additional deposition time under Rule 30.

*Third*, even when Mr. Love provided a direct answer to a question, he often volunteered additional, non-responsive observations that clouded the record and wasted valuable time. Some of these answers rambled on to discuss, among other things, Mr. Love's opinion that there was "fraud perpetrated by . . . L&H and Dexia," that bank employees "were aware of what they were doing" and even compared Dexia to a "serial killer." (*See id.* at 72-73, 116-17 & 174-75.) The following question and answer provides an illustrative example:

7

> Q. So isn't it possible, sir, that things were said orally to people within the bank about the meaning of these documents and you're not aware of those conversations?
>
> MS. DYER: Objection. Objection to form.
>
> A. I cannot possibly be aware of any conversation that's not documentation in the credit file.
> I would expect, as a banker, that that be documented in those credit files, specifically because those credit files are showing that they're doing what they need to do to allow L&H to take something into revenue when they know who the guarantors of the loan are.
> There's nothing unclear about that.
> They know that Lernout & Hauspie and Bastiens and Willaert are involved. They know that. It's throughout the bank's records that they see that.
> And they know that they can't connect them up with this borrowing. They know, and the bank records – the bank credit files show clearly, to any banker reading it, that the whole basis of this loan is not an LDC that's a phantom company that doesn't sometimes exist as of date they gave the loan that hasn't done anything, that's not the basis of giving the loan.
> The basis of giving the loan is the guarantee of the people that they think have the financial strength. Those people are clearly related partners to L&H and they hide that fact. That's what I'm going to testify to.

(*See* Butler Decl. Ex. C at 148-150.) Such lengthy and convoluted answers plainly delayed the progress of the examination, and also justify additional time to examine Mr. Love.[2]

---

[2] The behavior of Plaintiffs' counsel also delayed the examination. Counsel for Plaintiffs made repeated "speaking" objections, some of which led to extended colloquies that wasted valuable time. (*See id.* at 45, 121-22, 174, 226-27, 330 & 334-38.)

**Conclusion**

For all the foregoing reasons, Dexia's Motion to Compel Additional Deposition Testimony from Vincent Love should be granted. Dexia should be permitted to continue its examination of Mr. Love from day to day until completed.

Dated: April 30, 2007

        Respectfully submitted,

        MINTZ LEVIN COHN FERRIS
        GLOVSKY & POPEO


        By:   /s/  Breton Leone-Quick
            Peter M. Saparoff (BBO#441740)
            Breton Leone-Quick (BBO#655571)

        One Financial Center
        Boston, MA 02111
        Tel:   (617) 542-6000
        Fax:   (617) 542-2241

        James B. Weidner
        Jeff E. Butler
        CLIFFORD CHANCE US LLP
        31 West 52nd Street
        New York, NY 10019-6131
        Tel:   (212) 878-8000
        Fax:   (212) 878-8375

        *Counsel for Dexia Bank Belgium*


**Certificate of Service**

I, Breton Leone-Quick, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on April 30, 2007.

  /s/  Breton Leone-Quick                       Dated:  April 30, 2007