Exhibit A

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HANS A. QUAAK, ATTILIO PO and KARL LEIBINGER, on behalf of themselves and those similarly situated, <br>     Plaintiffs, <br>     v. <br> DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA), <br>     Defendants. | No.: 03-CV-11566 (PBS) |
| STONINGTON PARTNERS, INC., a Delaware Corporation, STONINGTON CAPITAL APPRECIATION 1994 FUND L.P., a Delaware Partnership and STONINGTON HOLDINGS, L.L.C., a Delaware limited liability company, <br>     Plaintiffs, <br>     v. <br> DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA), <br>     Defendants. | No.: 04-CV-10411 (PBS) |
| GARY B. FILLER and LAWRENCE PERLMAN, Trustees of the TRA Rights Trust, <br>     Plaintiffs, <br>     v. <br> DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA), <br>     Defendants. | No.: 04-CV-10477 (PBS) |
| JANET BAKER and JAMES BAKER, JKBAKER LLC and JMBAKER LLC, <br>     Plaintiffs, <br>     v. <br> DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA), <br>     Defendants. | No.: 04-CV-10501 (PBS) |

**Preliminary Expert Witness Report of**
**Vincent J. Love, CPA, CFE**
**January 4, 2007**

**Preliminary Expert Witness Report of**
**Vincent J. Love, CPA, CFE**
**January 4, 2007**

# Table of Contents

Introduction ................................................................................................................. 1
Scope of Engagement .................................................................................................. 4
Summary of Opinions .................................................................................................. 5
Qualifications .............................................................................................................. 6
Work Performed ........................................................................................................... 6
Bases for Opinions ...................................................................................................... 7
The Fraud ..................................................................................................................... 7
    Overview and impact of the fraud on L&H's financial statements ........................... 7
    Fraudulent recording of revenue ............................................................................ 10
    Violations of U.S. GAAP in Connection with the Bank's Financing ...................... 14
    Related Party Relationships ................................................................................... 15
    Economic Substance .............................................................................................. 18
    Subsequent Purchase ............................................................................................ 19
    Materiality .............................................................................................................. 20
    Research and Development .................................................................................... 21
Specific Loans Made by the Bank that Generated Fictitious Revenue ...................... 23
    I. Dictation Consortium, N.V. ................................................................................. 27
        Transaction Requirements ................................................................................ 30
        DC Lacked Economic Substance ...................................................................... 33
        DC Was A Related Party To L&H ...................................................................... 37
        Urgency to Grant Bridge Loan so that L&H Could Reduce Receivables by the end
        of the June 1997 Fiscal Quarter ....................................................................... 38
        Undisclosed Side Letter Personal Guarantees ................................................. 39
        L&H's Direct Role in the Bank's Financing of DC ............................................. 41
        L&H Improperly Recognized More Than $26 Million on Transactions with DC ... 44
    II. Brussels Translation Group, N.V. ...................................................................... 45
        Transaction Requirements ................................................................................ 48
        BTG Lacked Economic Substance .................................................................... 51
        BTG was a Related Party to L&H ...................................................................... 52
        Undisclosed Side Letter Guarantee .................................................................. 53
        L&H Recognized $35 Million of Fictitious Revenue on the BTG Transaction ....... 55
    III. Radial Belgium, N.V. ........................................................................................ 55
        Transaction Requirements ................................................................................ 58
        RADIAL was a Related Party to L&H and the RADIAL Transaction Lacked
        Economic Substance ........................................................................................ 58
        The Bank Disguised the Personal Guarantees on the RADIAL Loan as "Credit
        Default Swaps" .................................................................................................. 61
        Further Evidence of L&H's Direct Involvement in the RADIAL Financing ........... 66

The CDSs Were Not Arm's Length Transactions ..................................................... 67
L&H Improperly Recognized $9 Million on the RADIAL Transactions................. 69
IV. Language Investment Company, N.V. ................................................................. 70
Transaction Requirements ......................................................................................... 73
LIC Was a Related Party to L&H and the LIC Transaction Lacked Economic
Substance ................................................................................................................. 73
The Bank Disguised the Personal Guarantees of L&H's Management as "Credit
Default Swaps" ......................................................................................................... 77
Further Evidence of L&H's Direct Involvement in the LIC Financing.................... 79
L&H Improperly Recognized $12 Million on Transactions With the Greek, Polish,
Hungarian and Czech LDCs Financed by the LIC Loan ......................................... 80
V. Loan to Messrs. Lernout, Hauspie and Willaert ................................................... 81
Transaction Requirements ......................................................................................... 83
LDF and the Principals of L&H Were Related Parties to L&H and the LDF
Transactions Lacked Economic Substance............................................................... 83
KMPG Audit Confirmations Prepared by the Bank ..................................................... 88
Backdating of Loan Payment..................................................................................... 90
Summary of Revenue Recognized.................................................................................. 92
Comparison of Requirements Provided to the Bank vs. the Bank's Actions .................. 93
Summary......................................................................................................................... 94

## EXHIBITS:

1. Qualifications

2. Curriculum Vitae of Vincent J. Love, CPA, CFE

3. Documents Read, Reviewed and Analyzed

4. List of Acronyms Used

5. Fees on Credit Default Swaps

6. Related Party Transactions under International Accounting Standards

7. Analyses Prepared at the Request of Counsel

**Preliminary Expert Witness Report[1]**
**Of**
**Vincent J. Love, CPA, CFE**

# Introduction[2]

Lernout & Hauspie Speech Products, N.V. ("L&H" or the "Company") was a speech recognition software manufacturer based in Belgium whose stock was publicly traded, among others, on the NASDAQ stock exchange in the U.S. As such, the Company was subject to the reporting requirements of the U.S. Securities and Exchange Commission ("SEC") and L&H's financial statements were required to be stated in accordance with U.S. Generally Accepted Accounting Principles ("U.S. GAAP").

During the time period relevant to these cases, L&H's consolidated financial statements and other public disclosures gave the appearance that L&H was a thriving company and industry leader. In reality, however, L&H's reported financial results were materially false and grossly overstated as the result of a massive fraud to falsely inflate the Company's revenues and earnings and thus the market value of the Company's securities. The Company admitted to this massive overstatement of revenue when it released to the public a special report to the audit committee of its board of directors in November 2000.[3]

At the center of this massive fraud was the material inflation of L&H's revenue and earnings that was accomplished through the improper recognition of non-existent revenues from software licensing and service contracts. The Plaintiffs allege that Dexia

---

[1] This expert report is preliminary because fact discovery is not complete. I reserve the right to revise, augment and supplement this report as necessary upon completion of fact discovery.

[2] This section of the report is designed to acquaint the reader with the background surrounding the allegations in the complaints. It is not a statement of stipulated facts, findings of fact, or assumptions of facts used in this report.

[3] This report, dated November 20, 2000, was prepared by the law firms Bryan Cave LLP and Loeff Claeys Verbeke. The report acknowledged various accounting irregularities at L&H and, based upon a limited review of transactions, concluded that up to $277.3 million of revenue included in L&H's financial statements for 1998, 1999 and year to date June 30, 2000 would need to be restated. (LHSP 022086)

Bank Belgium, as successor to Artesia Banking Corporation, S.A. and other banks[4] (collectively referred to herein as the "Bank"), provided L&H with off balance sheet financing that L&H recorded as fictitious revenue on licensing agreements thereby artificially inflating the price of L&H's stock.

The Bank provided L&H with this financing through loans to various shell entities and through loans to L&H's most senior executive officers and controlling shareholders. These shell entities funded by the Bank included various newly formed Language Development Companies ("LDCs") that were purportedly involved in the development of language recognition software for uncommon languages. In reality, however, these entities were shells that had no employees, no customers, no assets and no real business operations and were not independent of L&H. The LDCs were set up for the sole purpose of entering into licensing agreements with L&H so that L&H could improperly recognize revenue on those transactions in violation of U.S. GAAP and remove research and development costs from its financial statements. In fact, many of these entities were only first established on the very same day that L&H purported to have entered into licensing agreements with them. Additionally, most of these transactions took place at the end of L&H's fiscal quarters when the Company had a clear incentive to inflate its financial results to meet its earnings projections.

L&H's recognition of revenue on its transactions with these various shell entities violated U.S. GAAP for at least two reasons: (1) the transactions lacked any real economic substance; and (2) they were funded by parties related to L&H. As discussed below, the evidence I have reviewed indicates that the Bank was aware of both of these issues. Before making any of the loans to the various shell entities discussed in this report, the Bank was informed in writing of the U.S. GAAP requirements that must be followed to allow L&H to recognize revenue on those transactions, including that: (a) L&H was prohibited from having any direct or indirect involvement in the financing of those companies; (b) those companies had to be completely independent from L&H, and (c) the

---

[4] Artesia Banking Corporation is successor to Paribas Bank Belgium ("Paribas") and Bacob Bank ("Bacob"), both of which were involved in a loan to Dictation Consortium, N.V. discussed later in this report.

transactions must be conducted at arm's length under normal economic conditions. Internal Bank documents and the testimony of the Bank's senior management indicate that the Bank was aware of these and other requirements under U.S. GAAP. Notwithstanding those prohibitions, the transactions with the shell entities lacked economic substance and L&H was integrally involved in obtaining these loans from the Bank. L&H provided consideration for some of these loans, and its executive officers and principal shareholders negotiated with the Bank for each of the loans and personally guaranteed their repayment. These personal guarantees were in the form of side letters from L&H's controlling shareholders and executive officers: Jo Lernout ("Mr. Lernout"), Pol Hauspie ("Mr. Hauspie"), Nico Willaert ("Mr. Willaert") and Fernand Cloet ("Mr. Cloet"). None of these guarantees were disclosed in the Bank's loan agreements.

These personal guarantees were the equivalent of guarantees from L&H itself for purposes of determining related parties under U.S. GAAP because the Bank received these guarantees from L&H's controlling shareholders and executive officers. U.S. GAAP defines such individuals as related parties to L&H and the Bank was provided with the U.S. GAAP standards that clearly defined L&H's senior management as such. Nevertheless, the Bank took steps to conceal L&H's senior management's integral and material involvement in the loans. In addition to the undisclosed side letter guarantees, some of the personal guarantees provided by L&H's controlling shareholders were concealed at the Bank's suggestion through a device known as a credit default swap ("CDS"),[5] which under the circumstances, was still a guarantee for purposes of U.S. GAAP.

Like the side letter personal guarantees, the CDSs were not disclosed by the Bank in the loan agreements. Additionally, in certain instances, L&H represented to the Bank that it would purchase the borrower at a subsequent date, thus assuring the Bank that the loan

---

[5] Under normal circumstances, the buyer of a credit default swap receives protection against credit risk, and the seller of the swap guarantees the underlying credit worthiness in exchange for the payment of premiums that reflect this assumption of risk. By entering into a credit default swap, the risk of a loss on default is transferred from the lender to the seller of the swap.

would be repaid. However, as the Bank was informed, this arrangement also precluded L&H from recognizing revenue under U.S. GAAP.

In addition to the loans to shell entities secured by the side letter guarantees and credit default swaps, the Bank in one instance loaned $20 million directly to L&H's controlling shareholders. That financing was in turn improperly converted into revenue recorded by L&H after it was funneled through various shell entities. In the documentation for this loan, the Bank falsely stated the purpose of the loan. The structure of the financing arrangements that the Bank, L&H and its controlling shareholders participated in that related to the shell entities was not disclosed to the public or L&H's independent auditors.

Moreover, in violation of its own procedures, the Bank prematurely credited the repayment of this $20 million personal loan and other loans on December 30, 1999, even though such repayment was not received until several days later in January 2000. This allowed the Bank to falsely confirm to L&H's outside auditors that there were no personal loans to L&H's management outstanding as of year-end 1999. At a minimum, disclosing these financing arrangements would have prevented L&H from recognizing and reporting in its financial statements revenue on the transactions funded by the $20 million loan. It also would have put L&H's auditors on notice to scrutinize the loan and the transactions surrounding its funding.

In exchange for its participation in making loans on behalf of L&H, the Bank received interest, fees and equity interests in L&H in the form of warrants. These warrants were later converted into shares of L&H stock and sold at significant profits.[6]

## Scope of Engagement

I have been retained by Berman, Devalerio, Pease, Tabacco, Burt & Pucillo; Bernstein, Litowitz, Berger and Grossmann LLP; Boies, Schiller & Flexner LLP; Cauley, Geller,

---

[6] Bank officer Hans DeWeirdt testified that based on an intermediate report, the Bank made a profit of $12 million on sales of L&H stock (Deposition of Hans DeWeirdt, June 14, 2006, page 170, lines 20-25, page 171, lines 1-6).

Bowman & Rudman, LLP; Gregory P. Joseph Law Offices LLC; Reed Smith, LLP; and Shalov, Stone & Bonner LLP on behalf of their clients (collectively the "Plaintiffs") to analyze the fraud and accounting irregularities that occurred at L&H during the years ended December 31, 1997 through 1999 and the first two quarters of 2000, including the Bank's participation, if any.

## Summary of Opinions

Based on the work performed as addressed in the following section of this report, I hold the following opinions to a reasonable degree of professional certainty:

- L&H improperly recognized hundreds of millions of dollars in revenue in violation of U.S. GAAP. This revenue was material to L&H's financial statements.

- The Bank directly participated in financing empty shell entities that resulted in L&H improperly recognizing many millions of dollars of revenue in violation of U.S. GAAP.

- For 1997, 1998 and 1999, these shell entities accounted for 34%, 18.6% and 6.5%, respectively, of L&H's total reported revenue. For 1998 and 1999, these shell entities accounted for 61% and 14%, respectively, of L&H's total fictitious revenue.

- The various shell entities financed by the Bank had no economic substance and did not enter into any legitimate, arm's length transactions. L&H was thus prohibited by U.S. GAAP from recognizing any revenue on transactions with these companies.

- The Bank was expressly and accurately informed of the specific U.S. GAAP provision that required the shell entities to conduct arm's length transactions under normal economic conditions in order for L&H to recognize revenue.

- The Bank was expressly and accurately informed of the specific U.S. GAAP provisions that required the shell entities to be completely independent of L&H, yet the Bank actively participated in structuring and financing transactions to conceal violations of these requirements.

- Under U.S. GAAP, the shell entities were related parties to L&H.

- The Bank, in conjunction with L&H, concealed the related party nature of the financing transactions with the various shell entities.

- The revenue recorded by L&H on the transactions financed by the Bank was material to L&H's financial statements.

- Under U.S. GAAP, none of the revenue recorded by L&H as a result of the Bank's financing of shell entities should have been recorded.

- Included as Exhibit 7 to this report are schedules prepared at the request of Counsel. These schedules reflect (i) adjustments to previously reported operating income as a result of the Bank's financing transactions and certain non-recurring items and (ii) the restatement of operating income based on the restated revenues as discussed in footnote 13 of this report, with the revenue adjustments related to the Bank's financing segregated from the other adjustments. Exhibit 7 indicates the change in operating income after non-recurring items when the revenue related to the Bank financed shell entities is removed. For 1997, operating income after non-recurring items decreases from $22.2 million to $3.3 million, an 85% decrease. For the 1998, operating income after non-recurring items decreases from $41.1 million to $1.9 million, a 95% decrease. For 1999, operating income after non-recurring decreases from $66.3 million to $43.8 million, a 34% decrease.

## Qualifications

I am a Certified Public Accountant licensed in New York, as well as a Certified Fraud Examiner and Certified Bank Auditor. Between 2000 and 2004, I served on the Board of Directors and was the Chair of the Audit Committee of a national bank. As a former partner of a Big Four accounting firm, I have extensive experience auditing public companies and banking institutions, both domestic and international.

Exhibits 1 and 2 to this report contain a more complete discussion of my qualifications and curriculum vitae, respectively.

## Work Performed

I, and others working under my direction, have read a number of the legal filings in this litigation, reviewed certain documents produced by the Bank, including translations of them, read certain reports of Belgium Federal Police interrogations and the deposition

transcripts of all of the Bank's personnel and others deposed, reviewed various SEC filings, read the Belgium Prosecutor's Report Part II dated May 28, 2001, the Bryan Cave LLP - Loeff Claeys Verbeke "Findings and Recommendations to the Audit Committee" report and other investigative reports and reviewed certain KPMG audit working papers produced in the United States and Belgium. A complete listing of documents read, reviewed and analyzed is included as Exhibit 3 to this report.

## Bases for Opinions

The following are the bases for my opinions. The opinions are addressed in the aggregate since there is an interrelationship between all of the issues.

## The Fraud

### Overview and impact of the fraud on L&H's financial statements

The Bank was L&H's main lender throughout the time period relevant to these cases.[7] Similarly, L&H was one of the Bank's most important, profitable and largest customers.[8] As addressed below, numerous Bank documents demonstrate that the Bank was aware that L&H was a public company whose stock was traded on the U.S. NASDAQ exchange and that L&H's financial statements were subject to SEC reporting requirements and U.S. GAAP. Moreover, the Bank routinely reviewed L&H's financial statements as it monitored the financial condition of one of its most significant clients.[9]

For the period 1996 through 2000, L&H's financial statements were false and materially misleading. The recording of fictitious revenue by L&H was so egregious that when the financial statements were prepared for restatement, approximately $365 million of revenue had to be reversed from previously issued financial statements for the 2 ½ years ended June 30, 2000 (constituting over 44% of total revenue during the period).

---

[7] DBB 144032

[8] Deposition of Dirk Bruneel, June 16, 2006, page 37, lines 11-25.

[9] Deposition of Jacques Janssens, April 20, 2006, ("Janssens Dep. Tr.") page 61, lines 10-14 and deposition of Peter Rabaey, October 24, 2006, ("Rabaey Dep. Tr.") page 44, lines 23-25; page 45, lines 1-3.

As a result of the scheme, L&H's independent auditors withdrew their audit report on the Company's 1998 and 1999 financial statements, stating that their prior "clean" opinions[10] on the financial statements "should no longer be relied upon."[11] Once L&H announced its plans to restate it revenue, its shares were suspended from trading on the NASDAQ and EASDAQ exchanges. Thereafter, the Company filed for bankruptcy and was ultimately liquidated.

The impact of L&H's massive overstatement of revenue is demonstrated in the charts and tables below. The first chart shows the annual reported growth of revenue for L&H from 1996 to 1999. (Revenue growth for the six months ended June 30, 2000 was approximately $119 million or 81% compared to the six months ended June 30, 1999.) The chart also indicates what portion of the reported revenue was fictitious.[12]



**L&H Reported and Fictitious Annual Revenues**

---

[10] A clean or unqualified opinion is one that states that the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of the entity in conformity with generally accepted accounting principles. (AICPA Professional Standards Volume 1 as of June 1, 1997, AU §508.10).

[11] Wall Street Journal, November 17, 2000, KPMGUS027170.

[12] KPMGUS008002, KPMGUS077303, L&H 1999 Form 10-K, L&H June 30, 2000 Form 10-Q, FV001735. The fictitious revenue columns for 1996 and 1997 represent the fraudulent revenue recorded by L&H related to Dictation Consortium, N.V. and Brussels Translation Group, N.V. only discussed later in this report. The fictitious revenue columns for 1998 through the second quarter of 2000 represent the restated revenue for all transactions discussed in footnote 13.

A summary of the corrected version of L&H's revenues eliminating the fictitious revenue is presented below:[13]

| Period/Year | Revenue (USD in millions) | | |
| --- | --- | --- | --- |
| | **As Reported** | **After Correction** | **Over-Statement** |
| 1996 | $ 31.0 | $ 23.5 | $ 7.5 |
| 1997 | 99.4 | 65.6 | 33.8 |
| **Sub-total 1996-1997[14]** | **$ 130.4** | **$ 89.1** | **$ 41.3** |
| | | | 31.7% |
| **Restatement Period** | | | |
| 1998 | $ 211.7 | $ 147.6 | $ 64.1 |
| 1999 | 344.2 | 183.2 | 161.0 |
| YTD 6/30/00 | 265.6 | 125.8 | 139.8 |
| **Sub-total 1998-6/30/00** | **$ 821.5** | **$ 456.6** | **$ 364.9** |
| | | | 44.4% |
| **Totals 1996-6/30/00** | **$ 951.9** | **$ 545.7** | **$ 406.2** |
| | | | 42.7% |

---

[13] FV001735. These revenue restatement amounts were presented to the L&H Board of Directors on April 17, 2001. It is our understanding that because of L&H's bankruptcy, restated financial statements were never issued. The "Restatement Period" is defined as the two and one half years ended June 30, 2000 which was the period presented to the L&H Board of Directors. It appears that based on the documents I reviewed, these corrections were appropriate and would have been made had the Company continued to exist.

[14] This period was not included in the restatement discussed in footnote 13 because L&H's internal investigation did not reach back to this time period. However, we determined based upon the available documents and testimony, that under U.S. GAAP, the amounts reflected above for 1996 and 1997 were improperly recorded.

The following table displays the revenue amounts before and after L&H's proposed restatement on a quarterly basis for those periods where quarterly data was available:[15]

| Period | Revenues ($ millions) | | |
| --- | --- | --- | --- |
| | Before proposed restatement | After proposed restatement | Revenue decrease |
| Q1/1998 | $35.1 | $23.4 | $11.7 |
| Q2/1998 | 45.0 | 35.5 | 9.5 |
| Q3/1998 | 54.9 | 39.1 | 15.8 |
| Q4/1998 | 76.7 | 49.6 | 27.1 |
| **Total 1998** | **$211.7** | **$147.6** | **$64.1** |
| | | | |
| Q1/1999 | 70.7 | 50.6 | 20.1 |
| Q2/1999 | 76.0 | 49.8 | 26.2 |
| Q3/1999 | 87.5 | 42.0 | 45.4 |
| Q4/1999 | 110.0 | 40.8 | 69.3 |
| **Total 1999** | **$344.2** | **$183.2** | **$161.0** |
| | | | |
| Q1/2000 | 110.7 | 48.8 | 61.9 |
| Q2/2000 | 154.9 | 77.0 | 77.9 |
| **Year to date 2000** | **$265.6** | **$125.8** | **$139.8** |
| | | | |
| **Totals** | **$ 821.5** | **$ 456.6** | **$364.9** |
| | | | |
| **% of total revenue overstated** | | | **44.4%** |

**Fraudulent recording of revenue**

The massive fraud at L&H involved recording revenues that were either prematurely recorded or wholly fictitious. Most of the improperly recorded revenue was in this latter category. L&H accomplished this fraud by, among other things, entering into licensing and commercialization agreements with shell entities and/or with entities related to L&H that were funded by loans from the Bank resulting in large "licensing fees" being paid to L&H and recorded by L&H as revenue. These shell entities had no real economic substance or independent business purpose and were wholly dependent on L&H for the development work required under the sham license agreement.

---

[15] FV001735

The recording of revenue as a result of the Bank's financing is shown as follows:



Examples of ways L&H was integrally involved in the different loans are as follows: (a) L&H took part in negotiating the loan; (b) the loan was personally guaranteed by L&H's executive officers and principal shareholders; (c) L&H provided consideration for the loan in the form of stock warrants; and (d) L&H sometimes ensured repayment of the loan by acquiring the borrower.

In my experience as an auditor of public companies, a certified fraud examiner and certified bank auditor, this general pattern of converting financing into revenue is indicative of fraud. With L&H, the pattern appeared first in the Dictation Consortium, N.V. ("DC") transaction that L&H presented to the Bank. This deceptive financing structure was used repeatedly in later transactions. While it appears that the Bank and L&H became more cautious regarding written guarantees and the structure of the transaction that they used to book fictitious revenues, additional transactions were

11

completed by L&H and the Bank using the following basic structure patterned on the DC transaction:

1.  An empty shell entity was created.

2.  A revenue generating agreement was signed, whereby the shell entity "pays" L&H a licensing fee, usually just before the end of an L&H financial reporting year or quarter.

3.  L&H's controlling shareholders and executive officers negotiated the terms of a loan from the Bank to the shell entity to finance the payment of licensing fees paid to L&H.

4.  Because the shell entities themselves were not credit-worthy, the Bank obtained personal guarantees (sometimes in the form of credit default swaps) for the debt from L&H's executive officers and controlling shareholders which were never disclosed in the loan agreements.

5.  The Bank lent the shell entity money, earning significant compensation (interest, fees and warrants at no cost[16]).

6.  The shell entity funneled the money to L&H purportedly in the form of software license fees.

7.  Fictitious revenues from those purported licensing fees were recorded and reported in the L&H financial statements.

A significant part of the fraud at L&H involved license agreements with these newly formed shell entities called LDCs, Cross Language Development Companies ("CLDCs") and Intelligent Agent Companies ("IACs").[17] These were often entities under common ownership which signed license agreements with L&H on or near the last day of the calendar quarter and just after the formation of the shell entities. The purported purpose of these entities and the related license agreements was to sell to investors the right to use L&H basic programming to develop voice recognition and text to speech capabilities in languages not being developed by L&H.

---

[16] Per KPMG-B-028134, the Bank, in an audit confirmation, replied to KPMG that L&H had an obligation to "hand over" to them 100,000 warrants for free. DBB 005176 also states there will be an award to the Bank by L&H of no-cost warrants. DBB 080307 states that there will be a purchase price to the Bank for the warrants which are to be paid by promissory note. However, we saw no evidence of a promissory note for such warrants.

[17] Bryan Cave Report, LHSP 022114-128; LHSP 022143-6.

Beginning in approximately September, 1998 through the end of 1999, approximately 30 LDCs, CLDCs and IACs were formed. Key factors relating to most of these entities were as follows:

- They lacked economic substance.

- The shell entities were never staffed or structured to independently develop the language tools, nor were they structured to be an operating enterprise.

- Many of the LDCs and IACs addresses were the same and they had no real place of business.[18]

- There was little or no funding independent of the loans by the Bank negotiated by the L&H majority shareholders.

- Agreements supporting the transactions with these entities were entered into on, or near, the last day of the respective calendar quarter to allow L&H to recognize revenue in time for the close of such quarters.

The fraudulent recognition of revenue relating to the shell LDCs, CLDCs and IACs (all of which were similar type companies) totaled $110,500,000. A summary of this fictitious revenue recorded, by quarter in 1998 and 1999, is as follows:[19]

---

[18] Many of the LDCs had the same address. According to the Bryan Cave report, there were 17 LDCs with the same Singapore address, 4 LDCs shared a similar Korea address and 4 LDCs had the same Belgium address. (LHSP 022129-39)

[19] LHSP 022069-160. In Q3 1999, $4.5 million was included above for an entity called 411.com, which purchased a license agreement from L&H.

| | | | ($ in millions) | |
|---|---|---|---|---|
| | L&H Revenue | | L&H Income (Loss) before Income Taxes and Minority Interests | |
| Period | Fraudulent Revenue Recorded | % of Total Revenue | With LDC Revenue | Without LDC Revenue |
| Q1/1998 | $0.0 | | | |
| Q2/1998 | 0.0 | | | |
| Q3/1998 | 9.0 | | | |
| Q4/1998 | 12.0 | | | |
| **Total 1998** | **$ 21.0** | **9.9%** | **$(45.2)** | **$(66.2)** |
| | | | | |
| Q1/1999 | $22.0 | | | |
| Q2/1999 | 19.0 | | | |
| Q3/1999 | 32.5 | | | |
| Q4/1999 | 16.0 | | | |
| **Total 1999** | **$ 89.5** | **26%** | **$73.4** | **$(16.1)** |
| | | | | |
| **Grand Total** | **$110.5** | | | |

Since there do not appear to be any legitimate expenses associated with these contracts, each dollar of revenue created a dollar of income before income taxes. The LDC, CLDC and IAC revenue represented approximately 10% and 26%, respectively, of the total 1998 and 1999 consolidated revenue reported by L&H in each of those years. The impact on income (loss) before income taxes and minority interests of such revenue was a reduction of a loss by 32% in 1998 and transforming a loss of $16.1 million into a profit of $73.4 million in 1999. This fictitious revenue had an even more dramatic impact on L&H's operating income as demonstrated in the chart in Exhibit 7 to this report.

### Violations of U.S. GAAP in Connection with the Bank's Financing

The recognition of revenue from each of the transactions financed by the loans that the Bank granted to DC, Brussels Translation Group, N.V. ("BTG"), Radial Belgium, N.V. ("RADIAL"), Language Investment Company ("LIC") and the individual principal shareholders of the Company violated various U.S. GAAP provisions. The following three sections outline the various U.S. GAAP provisions that precluded L&H from recognizing revenue on these transactions that were financed by the Bank. As shown below, the Bank received various written communications from L&H that correctly outlined the most important of these various U.S. GAAP requirements. Moreover,

according to the testimony of one of the Bank's senior managers, the Bank was aware that such U.S. GAAP provisions applied to each of these transactions.[20]

**Related Party Relationships**

Statement of Financial Accounting Standards No. 68 entitled Research and Development Arrangements ("FAS 68"), dictates how an enterprise should account for an arrangement, such as the LDCs, through which research and development is funded by other parties. FAS 68 states:

> If the enterprise is obligated to repay any of the funds provided by the other parties regardless of the outcome of the research and development, the enterprise shall estimate and recognize that liability.[21] (Emphasis added.)

> To conclude that a liability does not exist, the transfer of the financial risk involved with research and development from the enterprise to the other parties must be substantive and genuine. To the extent that the enterprise is committed to repay any of the funds provided by the other parties regardless of the outcome of the research and development, all or part of the risk has not been transferred.[22] (Emphasis added.)

FAS 68 lists the following example in which the enterprise is committed to repay:

> The enterprise guarantees, or has a contractual commitment that assures, repayment of the funds provided by the other parties regardless of the outcome of the research and development.[23]

The Bank was specifically informed of these requirements prior to its first loan to an L&H-related shell entity. In particular, L&H's Chief Financial Officer ("CFO") faxed the requirements of FAS 68 to Patrick Faict ("Mr. Faict") in the Bank's Structured Credits Department on September 20, 1996. The summary of Research and Development Arrangements that Mr. Faict received clearly stated the requirements of FAS 68.[24]

---

[20] Janssens Dep. Tr. page 76, lines 19-25; page 77, lines 1-4; page 107, lines 19-25; page 108, lines 1-2; Deposition of Jacques Janssens, April 21, 2006, ("Janssens Dep. Tr. #2") page 173, lines 9-25; page 174, lines 1-25; page 204, lines 3-10.

[21] Financial Accounting Standards Board, *Original Pronouncements, Accounting Standards* as of June 1, 1997, Statement of Financial Accounting Standards No. 68, Research and Development Arrangements, paragraph 5, p. 670.

[22] Ibid, paragraph 6, p. 670.

[23] Ibid.

[24] DBB 006800

Mr. Faict was also informed that the executive officers and controlling shareholders of L&H were related parties under U.S. GAAP. The fax he received regarding related parties set forth in detail the U.S. GAAP criteria for related party transactions and clearly defined principal owners of the enterprise and its management, such as Messrs. Lernout, Hauspie and Willaert, as related parties to that enterprise.[25] Notably, these U.S. GAAP requirements are substantially similar to the definitions of related party transactions contained in international generally accepted accounting principles.[26] Thus, these international accounting principles also provided notice to the Bank that the purchase of software licenses from L&H resulting from the financing provided, were in fact, related party transactions.

In the fax Mr. Faict received from L&H's CFO, the following guideline was specifically highlighted:

> If the enterprise is obligated to repay any of the funds provided by the other parties regardless of the outcome of the research and development, the enterprise shall estimate and recognize that liability.[27]

Additionally, the following excerpt was also specifically highlighted for Mr. Faict:

> Examples of conditions leading to the presumption that the enterprise will repay the other parties include the following:

---

[25] DBB 006799

The accounting literature defines a related party as:

Affiliates of the enterprise; entities for which investments are accounted for by the equity method by the enterprise; trusts for the benefit of employees, such as pension and profit-sharing trusts that are managed by or under the trusteeship of management; principal owners of the enterprise; its management; members of the immediate families of principal owners of the enterprise and its management; and other parties with which the enterprise may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests. Another party also is a related party if it can significantly influence the management or operating policies of the transacting parties or if it has an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interest. (Emphasis added.) (Financial Accounting Standards Board, *Current Text, Accounting Standards* as of June 1, 1997, Section R36.406).

[26] See Exhibit 6 attached hereto.
[27] DBB 074972

> <u>A significant related party relationship between the enterprise and the parties funding the research and development exists at the time the enterprise enters into the arrangement.</u>[28] (Emphasis added.)

The Bank was expressly informed of other applicable U.S. GAAP provisions in faxes from L&H's CFO, from letters from L&H's auditors, KPMG Belgium ("KPMG"), and from L&H's outside counsel, Brown Rudnick Freed & Gesmer ("BRF&G").[29] The head of the Bank's credit department testified that the Bank was aware that there were U.S. GAAP prohibitions that applied to all of the DC, BTG, RADIAL and LIC transactions.[30]

In particular, the Bank was told that L&H needed to be completely independent of the financings provided. Accordingly, L&H, including its controlling shareholders and its executive officers, could not provide guarantees for the loans or be directly or indirectly involved in any other way with the financing provided.[31] However, not only were guarantees provided by the L&H executive officers and controlling shareholders, but the same individuals also negotiated the terms of the loans and promised that L&H would find additional investors to repay the loans or L&H itself would acquire the borrower.

Because of the related party relationship between L&H and its controlling shareholders and executive officers, the personal guarantees of those controlling L&H shareholders and executive officers were the equivalent of guarantees directly from L&H itself. Additionally, as the Bank was informed, L&H executive officers determined the contractual arrangements for the shell entities that were used to purchase the software development contracts from L&H.

Statement of Financial Accounting Standards No. 57 ("FAS 57") establishes the requirements for related party disclosures. The fax sent by Mr. Dammekens to Mr. Faict summarized the accounting literature regarding related parties, which included the

---

[28] DBB 074973
[29] DBB 007192-3, DBB 005217-8, DBB 128966-8.
[30] Janssens Dep. Tr. page 76, lines 19-25; page 77, lines 1-4; page 107, lines 19-25; page 108, lines 1-2; Janssens Dep. Tr. #2, page 173, lines 9-25; page 174, lines 1-25; page 204, lines 3-10.
[31] DBB 007192-3, DBB 005217-8, DBB 128966-8

relevant portions of FAS 57. The summary in the fax sent to Mr. Faict included the following:

> Financial statements shall include disclosures of material related party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business. The nature of certain common control relationships shall be disclosed if the nature of those relationships could significantly affect the reporting enterprise.[32]

FAS 68 also discusses the concept of arm's length transactions:

> Although transactions between related parties commonly occur in the normal course of business, the conditions of competitive free-market dealings between independent parties may not exist. Accordingly, the enterprise might be influenced by considerations other than those that would exist in arm's length transactions with unrelated parties. This is particularly true if the related parties can directly or indirectly influence the enterprise's decision whether or not to acquire the results of the research and development.[33]

The American Institute of Certified Public Accountants stated the following regarding related parties:

> An undisclosed related party is a powerful tool in the hands of an unscrupulous person. Related parties, such as controlled entities, principal stockholders or management can execute transactions that improperly inflate earnings by masking their economic substance or distort results through lack of disclosure, or can even defraud the company by transferring funds to conduit related parties and ultimately to perpetrators.[34] (Emphasis added.)

**Economic Substance**

The letters that the Bank received from L&H's advisors also specifically informed the Bank that the transactions financed by the Bank on which L&H would recognize revenue must have the characteristics of an "arm's length" contract between independent

---

[32] DBB 074968-074973

[33] Financial Accounting Standards Board, Original Pronouncements, Accounting Standards as of June 1, 1997, Statement of Financial Accounting Standards No. 68, Research and Development Arrangements, paragraph 32, page 675.

[34] Accounting and Auditing for Related Party Transactions, A Toolkit for Accountants and Auditors, prepared by the staff of the American Institute of Certified Public Accountants, page 5.

18

companies under normal economic conditions.[35] The accounting literature in Statement of Financial Accounting Standards No. 48, *Revenue Recognition When Right of Return Exists*, ("FAS 48") discusses the concept of economic substance. FAS 48, addressing the conditions precedent to recording revenue, states: "The buyer acquiring the product for resale has economic substance apart from that provided by the seller." To clarify "economic substance," FAS 48 further states:

> This condition relates primarily to buyers that exist "on paper," that is buyers that have little or no physical facilities or employees.[36]

The underlying concept that the counterparty to a transaction must have economic substance to participate in a valid economic event that can be recorded in the accounts of the parties is a basic premise in accounting. The shell entities financed by the Bank did not have economic substance. Therefore, as the Bank was aware, transactions between L&H and these shell entities could not properly be included within L&H's publicly disclosed financial statements.

### Subsequent Purchase

Prior to its first loan to DC, the Bank was informed that under U.S. GAAP, the subsequent acquisition of a customer, if contemplated at the time of the transaction, would preclude any revenue recognition related to transactions with that customer.[37] Notwithstanding these prohibitions, as discussed in greater detail below, the Bank financed transactions for DC and BTG where L&H recorded revenue in one year from each of these customers only to purchase these customers in a subsequent year. In the case of BTG, the Bank was informed that L&H was committed to repurchase BTG *before* the Bank committed all of its financing to BTG.

In the fax Mr. Faict received from L&H's CFO, the following U.S. GAAP guideline was emphasized:

---

[35] See chart on page 31.

[36] Ibid, Statement of Financial Accounting Standards No. 48, Revenue Recognition When Right of Return Exist, paragraph 6, page 480.

[37] BRF&G advised the Bank that any option that L&H has to repurchase the licensed technology or market the developed products must be arm's length and that DC must bear the risk that L&H may choose not to exercise any of these options.

> Even though written agreements or contracts under the arrangement do not require the enterprise to repay any of the funds provided by the other parties, surrounding conditions might indicate that the enterprise is likely to bear the risk of failure of the research and development. If those conditions suggest that it is probable that the enterprise will repay any of the funds regardless of the outcome of the research and development, there is a presumption that the enterprise has an obligation to repay the other parties. That presumption can be overcome only by substantial evidence to the contrary.[38] (Emphasis added.)

The Wiley 1999 GAAP manual discusses a similar arrangement regarding the subsequent purchase of a franchisor and franchisee. The manual states:

> [T]he franchisor may have an option to reacquire the location. Accounting for the initial revenue should consider the probability of exercise of the option. If the expectation at the time of the agreement is that the option is likely to be exercised, the entire franchise fee should be deferred and not recognized as income.[39] (Emphasis added.)

Even though L&H and the shell entities did not have a franchisor/franchisee relationship, the concept that the contemplation of a subsequent purchase precludes the recognition of revenue is applicable.

**Materiality**

Staff Accounting Bulletin #99 ("SAB 99") issued by the SEC states:

> This staff accounting bulletin expresses the views of the staff that exclusive reliance on certain qualitative benchmarks to assess materiality in preparing the financial statements and performing audits of those financial statements is inappropriate; misstatements are not immaterial simply because they fall beneath a numerical threshold.[40]

The SEC further stated that exclusive reliance on any numerical threshold or percentage has no basis in the accounting literature or the law.

In its Statement of Financial Accounting Concepts No. 2, the Financial Accounting Standards Board stated the following regarding materiality:

---

[38] DBB 074973

[39] Patrick R. Delaney et al., Wiley GAAP 99, John Wiley & Sons, Inc., New York, 1999, page 295.

[40] SEC Staff Accounting Bulletin: No. 99-Materilaity, August 12, 1999.

> The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.[41]

SAB 99 further states that "as a result of the interaction of quantitative and qualitative considerations in materiality judgments, misstatements of relatively small amounts that come to the auditor's attention could have a material effect on the financial statements."[42]

SAB 99 includes the following considerations that "may well render material a quantitatively small misstatement of a financial statement:"[43]

- Whether the misstatement masks a change in earnings or other trends.

- Whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise.

- Whether the misstatement changes a loss into income or vice versa.

The above principles provide the basis for my opinions and conclusions set forth in other sections of this report that the fictitious revenue recognized by L&H was material to its financial statements in the respective years discussed.

## Research and Development

Under U.S. GAAP, research and development costs are to be expensed as incurred.[44] Specifically with regard to accounting for the costs of computer software to be sold, leased or otherwise marketed, the accounting standards state:

> All costs incurred to establish the technological feasibility of a computer software product to be sold, leased, or otherwise marketed are research

---

[41] Financial Accounting Standards Board, Original Pronouncements, Accounting Standards as of June 1, 1996, Statement of Financial Accounting Concepts No. 2, Qualitative Characteristics of Accounting Information, paragraph 132.
[42] SEC Staff Accounting Bulletin: No. 99-Materiality, August 12, 1999.
[43] Ibid.
[44] Financial Accounting Standards Board, *Current Text, Accounting Standards* as of June 1, 1997, Section R50.

and development costs. Those costs shall be charged to expense when incurred.[45]

By using shell entities to "purchase" licensing rights to develop dictation or language-related software from L&H and by concealing the extensive relationship between those companies and L&H, L&H was able to improperly record the license fees received from those companies as revenue in violation of U.S. GAAP. Under this scheme, the amount loaned by the Bank to the shell entities improperly became instant revenue to L&H. If the funds had been borrowed directly by L&H, L&H could not have recognized any revenue on these transactions and would have had to expense the research and development costs as they were incurred.

L&H subsequently purchased two of the shell entities that it used to create fictitious revenue, namely DC and BTG. L&H thus acquired the technology the shell entities allegedly paid L&H to develop. Accordingly, L&H was able to record income on the license fees paid to them and then upon the subsequent purchase of the entity, either record a one-time charge for acquired "In-process Research and Development" ("IPR&D") or amortize the purchased technology (recorded as goodwill) over many years. That is, they were able to record revenue immediately and defer and amortize[46] the expense well out into the future to avoid a negative impact on earnings.

To further substantiate the improper accounting by L&H, according to Software Industry Accounting:

> The evaluation of whether there is a liability to repay does not end with considering only explicit contractual obligations. It is also necessary to evaluate whether circumstances other than explicit contractual terms result in a substantive liability to repay. The passage of risk must be substantive and genuine.[47]

---

[45] Financial Accounting Standards Board, *Original Pronouncements, Accounting Standards* as of June 1, 1997, Statement of Financial Accounting Standards No. 86, "Accounting for the Costs of Computer Software to Be Sold, Leased or Otherwise Marketed."

[46] "Amortize" means to write-off or expense the cost of an asset over a period of years.

[47] Joseph M. Morris, Software Industry Accounting, 2nd ed., John Wiley & Sons, Inc. New York, 2001, p. 8-4.

The text continues by giving examples of conditions indicative of the existence of a substantive obligation to repay. Included in those examples are the following:

> The enterprise has indicated an intent to repay all or a portion of the funds provided regardless of the outcome of the research and development.

> A significant related party relationship between the enterprise and the parties funding the research and development exists at the time the enterprise enters into the arrangement.[48]

## Specific Loans Made by the Bank that Generated Fictitious Revenue[49]

During the years 1997-1999 the Bank financed a number of shell entities that were related parties to L&H because of the extensive role played by L&H and its principal shareholders and senior officers in creating and financing these companies. The L&H principal shareholders and senior officers were integrally involved in obtaining financing from the Bank for the shell entities in order for L&H to recognize revenue on their respective licensing agreements. The Bank also loaned funds to L&H's senior officers to finance additional shell entities. The significant loans are summarized below.

---

[48] Ibid.

[49] In addition to the loans noted, per the L&H 1999 Form 10-K, the borrowing capacity provided by the Bank directly to L&H was $32.4 and $20.7 million respectively, as of December 31, 1998 and 1999. Of these amounts, $13.0 and $3.1 million respectively, was utilized as of the above dates. Additionally, during December, 1998, the Bank entered into a $55 million credit facility with LHIC, an affiliated entity, and acted as agent and arranged for the balance of the facility ($105 million) (DBB 067592). During, April, 2000, the Bank granted a $25 million temporary increase in its term commitment to LHIC to finance the call option relating to 1,250,000 shares of L&H common stock (DBB 029536). Also, during 2000, the Bank loaned Mr. Bastiaens, President and Chief Executive Officer of L&H, $25 million to finance the purchase of L&H shares (DBB 095227-31).

<u>Summary of Dexia Bank Loan Transactions</u>

| Loan | Date | Borrower | Loan Amount[50] | | Purpose of Loan |
|---|---|---|---|---|---|
| | | | *BEF* | *USD* | |
| I. | 8/97 | Dictation Consortium | 600,000,000[51] | $16,400,000 | License agreement with L&H |
| II. | 3/98 | Brussels Translation Group | 603,455,000 | $17,000,000 [52] | License agreement with L&H |
| III. | 9/98 | Radial Belgium | 214,980,300 | $ 6,200,000 | Fund LDCs in order to pay license agreements with L&H |
| IV. | 12/98 | Language Investment Company | 220,000,000 | $ 6,400,000 | Fund LDCs in order to pay license agreements with L&H |
| V. | 6/99 | Messrs. Lernout, Hauspie & Willaert | | $20,000,000 | Funds loaned to LDF which funded LDCs, which then paid license fees to L&H |
| | | Total | | $66,000,000 | |

---

[50] Loan amounts have been shown in the currency recorded in the Bank's documents. Where a U.S. dollar ("USD") amount was not shown in the Bank's documents, a conversion from Belgian Francs ("BEF") to USD was calculated based on the exchange rate at the date of the loan.

[51] This loan was originally BEF 450,000,000 and was subsequently increased to BEF 600 million or $16.4 million (LHSP 015530).

[52] This loan was originally for $14 million and was subsequently increased by $3 million per the Bank's second amended response to Interrogatory No. 14.

### Characteristics of Bank Lending Relationship

- The Bank treated all of the loans it made to the various shell entities as one joint credit risk, even though these shell entities were purportedly separate entities.[53]

- L&H executive officers and controlling shareholders negotiated with the Bank for the loans to the shell entities.

- The Bank was informed that L&H would use the proceeds of the loans to recognize revenue.

- The Bank provided false and misleading information (a) to L&H's auditors regarding its loans to L&H's senior officers, and (b) in the case of the DC loan, to the Flemish Government.

- The Bank was informed that certain loans would be used to allow L&H to generate financial results that would support the L&H stock value.

- Except for the loan to L&H's senior officers, the loans were, in whole or in part, secretly guaranteed by L&H's controlling shareholders and executive officers, either directly using personal guarantees in the form of side letters or through credit default swaps, neither of which were disclosed in the loan agreements.

- Certain loans were supported by L&H's commitment to repurchase certain of the shell-entity borrowers.

The chart on the next page is a visual depiction of the loans made by the Bank used to improperly inflate L&H's reported revenue. Because the Bank's financing was an integral part of the depicted transactions, the chart also identifies the total revenue which L&H publicly reported with regard to each transaction.

---

[53] In a memo entitled "Our risk regarding the Lernout & Hauspie group SPEECH AND LANGUAGE TECHNOLOGY," the Bank aggregated the loans to L&H, DC, LHIC, RADIAL, LIC, Messrs. Lernout, Hauspie and Willaert, and Gaston Bastiaens in measuring its risks. Although some of the above loans have been paid at the date of this memo (September 18, 2000), they were still listed, which indicates that the Bank had considered all of these loans as being made to the L&H Group (DBB 129694-5). Also see DBB 007408 and DBB 007452 for similar examples where the Bank aggregated the loans to the L&H groups.

# <u>Summary of Loan Transactions</u>



## *I. Dictation Consortium, N.V.*

Summary of key points regarding the loan to Dictation Consortium, N.V. ("DC"):

- DC was a related party to L&H under U.S. GAAP because of L&H's extensive involvement in the creation, running and financing of DC.

- DC lacked economic substance and could not have entered into any arm's length transactions with L&H on which revenue could be recognized under U.S. GAAP.

- The Bank initially loaned DC approximately $12.3 million in August 1997, subsequently increased to $16.4 million in January 1998.

- The Bank was informed that the purpose of the DC loan was to fund licensing agreements on which L&H would recognize revenue.

- The Bank was aware that DC was a shell entity controlled by L&H and the DC structure was in the words of the Bank "artificial."

- The Bank did not seek to determine who the actual owners of DC were.

- The Bank received several written instructions from L&H's advisors that under U.S. GAAP L&H needed to be completely independent of the transaction in order to record revenue.

- The Bank dealt extensively with L&H personnel to negotiate the DC loan, despite the U.S. GAAP provisions that prohibited L&H's involvement in the financing.

- The Bank was instructed in writing that L&H could not be liable directly or indirectly for the loan to DC and could not be involved directly or indirectly in such financing.

- The controlling shareholders and executive officers of L&H secretly guaranteed $4.5 million of the DC loan.

- L&H was directly involved in the DC financing by granting stock warrants to the Bank as consideration for the loan.

- The Bank's financing did not comply with the written legal and accounting advice provided to it by L&H's advisors regarding the U.S. GAAP requirements that DC remain completely independent from L&H.

- Against its own policy, the Bank did not reflect these loan guarantees in the DC file and did not advise the Flemish Government, which guaranteed 75% of the DC financing, that these guarantees existed.

- During the years 1997 through 1998, L&H improperly recorded approximately $19 million of revenue from DC in violation of U.S. GAAP. Such revenue was material to L&H's financial statements.

- L&H acquired DC in June, 1998 for approximately $43 million.

# I. Dictation Consortium Loan Transaction



Notes:
(1) Agreements consisted of:
 - $5 million license fee
 - $21.7 million development fee over 18 months

(2) The Bank's response to Interrogatory No.13, states that the Bank
received L&H warrants, but could not determine which portion of
the warrants were granted in connection with this loan.

(3) Loan was subsequently increased to 600 million BEF ($16.4 million).

29

The DC loan involved both Bacob Bank N.V. and Bank Paribas Belgium, which merged in 1998 to become Artesia Bank. Both of these banks were predecessors of Dexia Bank Belgium.

The Bank's loan to DC and the use of the loan proceeds were as follows:

The Bank initially loaned DC approximately $12.3 million (BEF 450,000,000 divided equally between Paribas and Bacob) to support the software license agreement with L&H, which required an up-front $5 million license fee and a $21.7 million development fee to be paid as the work progressed over 18 months.[54]

Per a letter dated February 16, 1998, from Mr. Geert Costers, Lessius Management Consulting N.V. (the project manager for DC), the Bank loans were increased from BEF 225 million to BEF 300 million (for each Paribas and Bacob) "to allow Dictation Consortium to fulfill its obligation towards Lernout & Hauspie Speech products."[55]

Based on the evidence I have seen, DC had no real economic purpose other than to allow L&H to record fictitious revenues. DC was formed concurrently with the agreement to purchase the software license and its related development.[56] The aggregate of DC's capital and the Bank's financing represented only enough funds for DC to pay their obligations to L&H. In fact, the increase in the DC loan from BEF 225 million to BEF 300 million appears to have been required by DC to pay value added tax ("VAT") on the license with L&H. This suggests that DC did not have adequate working capital to function as a legitimate business.[57]

**Transaction Requirements**
Prior to granting the DC loan, the Bank was advised that L&H intended to recognize the licensing payments from DC that would be funded by the loan as revenue and was informed in writing by L&H's outside experts, U.S. legal counsel BRF&G and L&H's

---

[54] DBB 004476; revenue amounts obtained from L&H's SEC filings.
[55] LHSP 015530. According to the Bank's response to Interrogatory #14, the actual disbursement on the subsequent loan from each bank was BEF 74,000,000.
[56] DBB 075007
[57] The Bank had a pledge on any recoverable VAT reimbursements. (DBB 108881)

outside auditors KPMG, of the transaction guidelines that needed to be followed for L&H to record revenue under U.S. GAAP from supposed special purpose entities like DC. The following chart reflects the revenue recognition requirements excerpted from letters provided to the Bank by BRF&G and KPMG, which accurately set forth the U.S. GAAP requirements to recognize revenue for this transaction:[58]

| BRF&G | KPMG |
|---|---|
| A. The transaction must have the characteristic of an arm's length development contract between independent companies in order to ensure that the transaction will not be recharacterized as a financing transaction | A. This transaction must be seen to be a purely commercial transaction that has arisen between independent and free parties under normal economic conditions (the "arm's length" principle) so that the transaction certainly cannot be reclassified as a loan under U.S. GAAP. |
| B. To be recognized as revenue, the payments must be nonrefundable | B. It is also necessary that this compensation can be regarded as final and that there be no recovery clauses associated with the payments. |
| C. In order to meet these tests, we have been advised by KPMG, L&H's accountants, that the transaction must at a minimum have the following characteristics: | C. This transaction must have at least the following characteristics: |
| 1. The financing of DC must be wholly independent of L&H | 1. L&H is in no way involved, neither directly nor indirectly in the financing of DC. |
| 2. L&H may not be liable in any manner (directly or through any guarantees) to repay any bank or other financing to be received by DC. | 2. L&H shall never be made liable, neither directly nor indirectly, nor as a guarantor, for the repayment of the financing that should be granted to DC. |
| 3. L&H may not enter into any agreements or understandings that would result in repayment of all or part of DC debt. | 3. L&H will never be able to be a party to any agreement that has as its purpose the repayment, even in part, of the financing debts of DC. |
| 4. DC may not have an option to require L&H to repurchase the licensed and developed technology, or otherwise repay the research and development payments received. | 4. DC shall not have the possibility to sell back to L&H the developed technology or to insist on recovery of any research and development payments it made. |
| 5. Any option that L&H has to repurchase the licensed technology or market the developed products must be arm's length. DC must bear the risk that L&H may choose not to exercise any of these options. | 5. If L&H has the possibility to buy back the technology developed by DC, that must take place under normal economic market conditions. DC must bear the risk that L&H would prefer not to exercise any repurchase option. |

As previously mentioned, L&H's CFO sent a fax dated September 20, 1996 to Mr. Faict at the Bank containing the U.S. accounting rules regarding "Related Parties and Research

---

[58] DBB 007192-3, DBB 005217-8, DBB 128966-8

and Development Arrangements.[59] This fax accurately informed Mr. Faict that no repayment obligation could exist between DC and L&H if L&H is going to record the fees received from DC as revenue. Otherwise, the DC transaction would have to be recorded as a liability on L&H's books.

A fax from Mr. Faict to the Flemish Government, dated December 13, 1996, stated:

> Upon request of Mr. Paul Hauspie you'll hereby find enclosed the advice of an American law firm in respect of the requirements that need to be imposed within the framework of the US-GAAP regulations so that the fees paid to Lernout & Hauspie Speech Products N.V. by Dictation Consortium N.V. in this operation will have the character of R&D fees.[60]

The fax included the BRF&G letter excerpted on the previous chart which further stated, in part:

> It is important to L&H that the fees be characterized as a research and development fee for purposes of United States generally accepted accounting principles such that L&H will be able to include the fee in income when paid.
>
> As we have discussed, the mere naming of the fee as a research and development fee and the performance by L&H of research and development work is not sufficient, in and of itself, to result in the recognition of the fee as revenue by L&H. To be recognized as revenue, the payments must be nonrefundable. Similarly, the transaction must have the characteristic of an arm's length development contract between independent companies in order to ensure that the transaction will not be re-characterized as a financing transaction. If the transaction was characterized as a financing transaction, the $25 million in funding would be treated as the proceeds of a loan that is not included in L&H's income. (Emphasis added.)

The BRF&G letter additionally listed the minimum characteristics of the transaction's structure including that L&H is to be wholly independent of DC.[61] In addition to explaining the applicable U.S. GAAP provisions, this letter also made it clear that the primary purpose of the DC loan was to generate revenue for L&H through the financing of licensing fees from DC.[62]

---

[59] DBB 006796-801
[60] DBB 007190
[61] DBB 007192-3
[62] This was also confirmed in the Janssens Dep. Tr., page 62, lines 11-18.

As noted above, the KPMG and BRF&G letters, together with the faxes from L&H's CFO, included all of the applicable U.S. GAAP requirements that had to be satisfied in order for L&H to recognize revenue on the proceeds of the DC loan funded by the Bank. Thus, the Bank was fully informed of these accounting requirements prior to granting the DC loan. Additionally, the Bank was informed what constituted related parties under U.S. GAAP.

**DC Lacked Economic Substance**

The Bank also recognized that DC was itself a shell entity and that the transaction with DC lacked economic substance. The Bank was specifically informed, in writing, that L&H could not recognize revenue on the licensing agreements funded by the Bank's financing to DC, if DC was not capable of entering into the type of "arm's length" transaction required by U.S. GAAP.[63] The following excerpt from an internal Bank memo from Bernard Mommens, the Bank's lead in-house legal counsel ("Mr. Mommens"), to Mr. Faict dated May 14, 1997 indicates that the Bank was well aware that the DC transaction lacked economic substance:

> As yet, I would like to mention that I do not understand why the financing has to go by Dictation Consortium NV (DC) that received a license from L&HSP for a technology with the right to further develop it. DC then contracts out to L&HSP that also receives a commercialization order from DC. As compensation for receiving mentioned license, DC must pay a "consent fee" (i.e. 150 Mio BEF) to L&HSP, and the last mentioned has right to 50% of the net sales revenue. In addition, DC must pay a compensation to L&HSP in the case of every intermediate delivery that together adds up to 750 Mio BEF.[64]
>
> While reading the draft of the "Memorandum of the Flemish Government" written by Loeff, Claeys & Verbeke, <u>the artificial character of the structure emerges.</u> It has to be mentioned that Memorandum was presented to us as "legal opinion" including with regards to securities. However, this Memorandum does not comply with this. That is why the impression rises that L&HSP and the law firm want to pass the risks of the

---

[63] DBB 007192-3, DBB 005217-8, DBB 128966-8
[64] DBB 074667

33

contracts' analysis and the securities to be taken to Paribas. Do we accept this?[65] (Emphasis added.)

In point #5, entitled "Securities" of this same memo, Mr. Mommens further stated:

> Based on the documents we have received <u>we have to determine that DC is an empty company without contact with customers, and even without any commercial activity. No company exists and for this reason, it is not possible to take a warranty on the company.</u>[66] (Emphasis added.)

There were other concerns from the Bank's legal department regarding the economic substance and legitimacy of the DC transaction that remained unanswered in the Bank's loan files. A December 27, 1996 memo from Mr. Audiart, Legal Department of the Bank, to Mr. Faict stated:

> While reading the file we are slightly surprised about the fact that DICTATION applies for this kind of credit with so few assets and objectives. <u>We do not understand the economic goal that the parties strive to accomplish by means of these actions. To us it seems that only LERNOUT & HAUSPIE is developing and commercializing the software.</u> A valid security would be a pledge on the receivables of DICTATION toward LERNOUT & HAUSPIE. However as DICTATION appears to be a 100%[67] branch of LERNOUT & HAUSPIE, in the event of (financial) difficulties, at one or the other, the value of such pledge will be random. By means of such pledge we do, however, obtain a certain level of control on the activity. (Emphasis added.)

Mr. Audiart concluded his memo with a section entitled "DECISION" by writing "We advise to question the clients regarding the correct objectives of their structure."[68] We did not see any evidence in the Bank's documents of Mr. Audiart's recommendation being pursued by the Bank.

---

[65] Ibid.

[66] DBB 074671-2

Mr. Mommens further stated in another memo:

> With respect to these securities the attention needs to be drawn to the fact that <u>DC, whose trade fund will be pledged to us, in fact has no customers nor, on the basis of the existing agreements (namely the exclusive license to commercialize in favor of LHSP) will it acquire any in the future.</u> (Emphasis added.) DBB 074666

[67] In the original un-translated document, the word "wrong" was hand written near this phrase.

[68] DBB 078722

In a memo dated in early 1997 (related to a Management Committee meeting on December 8, 1996), Mr. Faict paraphrased the BRF&G November 1996 letter and stated:

This file will be presented again as:

POLITICAL GAMES SQUEEZE
It is important to L&H that the fees for the development of dictation software may, under the American accounting principles (US GAAP), be characterized as R&D fees and consequently may be booked as income. To have the fees for the development acknowledged as income for L&H, the payments need to be:

- non- repayable

- the transaction needs to have the characteristics of a development agreement between independent companies (arm's length principle), so that it would not be considered a financing operation. In the event the transaction would be qualified as a financing operation, the USD 25 million would not qualify as income for L&H.[69] (Emphasis added.)

A Bank memo dated June 13, 1997 by Messrs. Steverlynck and Van Helleputte of the Bank's Credit Department stated under section 3.1 (where they quoted Mr. Mommens) titled General Comments: "The 'DC' construction is artificial."[70] Under section 6 of their memo titled "Advice," they further stated:

The 'dictation software' project is both technically and commercially a project of L&H. (Emphasis added.) So as regards content we are financing an L&H project. With the splitting off to DC, because of problems with the American law, we lose our right of recourse against L&H (emphasis in original) without DC offering us any possibility for compensation.[71]

The memo further continued:

As a consequence we are of the opinion that the option should be researched as to the degree to which a security can be obtained from L&H for the part which is not guaranteed by the Flemish Region. Possibly as an alternative, more distinct result commitments on this security can be

---

[69] DBB 108860
[70] DBB 006814
[71] Ibid. A June 2, 1997 memo to members of the Bank's Management Committee also noted: "the [DC] project is economically and in fact, entirely supported by L&H." (DBB 005206)

> requested from L&H, and this both in technical and commercial areas of the matter.
>
> As a consequence we are of the opinion that a number of legal problems must be looked into (as cited by Mommens and Audiart) as well as the opportunity from the verbal commitment by P. Hauspie.[72] (Emphasis added.)

Because the Bank recognized that DC was a shell entity that lacked sufficient resources to justify the multi-million dollar loan granted by the Bank, the Bank sought security for the loan first from L&H and later through the personal guarantees of L&H's principal shareholders and senior management. In a Bank memo to the Management Committee dated June 19, 1997, Mr. De Coen discussed a DC bridge loan of USD 4.5 million,[73] and shareholder guarantees:

> As security a guarantee of the following 4 preferential shareholders of L&H is requested:
>
> - Jo Lernout
> - Paul Hauspie
> - Fernand Cloet
> - Nico Willaert
>
> This guarantee needs to be agreed upon by means of a side letter. The guarantee may not be mentioned in our credit agreement.[74] (Emphasis added.)

This and the other side letter guarantees provided by L&H's principals are discussed in greater detail in the Section "Undisclosed Side Letter Personal Guarantees" below. In my experience as a former auditor of public companies, a certified fraud examiner and a certified bank auditor, I have learned that side letters such as these are indicia of fraud because they conceal material terms of the loan agreements and prevent anyone looking at the loan agreements from learning the complete terms of the agreements. Such measures of concealment are always a red flag that a fraud might be occurring.

---

[72] DBB 006817

[73] The "bridge loan" was made on June 24, 1997 and was to be part of the total loan to be disbursed on September 30, 1997. (DBB 074685)

[74] DBB 074685

All of the foregoing internal Bank documents demonstrate that, as the Bank was aware: (a) DC was a shell entity with no economic substance and therefore incapable of entering into the "arm's length" business transactions with L&H; and (b) L&H could not properly recognize revenue on the licensing agreements between DC and L&H that were financed by the Bank.

**DC Was A Related Party To L&H**

After L&H informed the Bank of its intention to incorporate DC, DC was incorporated on September 30, 1996[75] by FLV, an entity related to L&H. The Bank's knowledge that both FLV and DC were related to L&H is seen in the evidence presented below. Because DC was a related party to L&H, it was also a violation of U.S. GAAP for L&H to recognize revenue on the licensing agreements with DC as reflected in the Company's financial statements for 1996, 1997 and 1998.

In an August 5, 1996 memo to the Bank's Management Committee, Mr. Faict stated in section 4.1:

> L&HSP N.V., who will develop the "Speech-to-Text Dictation" software, intends to incorporate Dictation Consortium N.V. to commercialize the software. In connection herewith L&HSP found a number of private investors (the families involved in the start-up of L&H SP) willing to participate in the "dictation initiative" and to bring in a capital of 450 million (that is 50% of the total amount or 900 million to be invested). For the remaining 50% of the amount to be financed, the Flemish government and banks are approached with the objective of finding formulas to obtain the other 450 million [BEF].[76] (Emphasis in original)

Mr. De Coen stated in an internal Bank memo dated June 16, 1997:

> As a result of the American accounting principles and the stock exchange legislation (revenue recognition) Lernout & Hauspie Speech Products N.V. (L&H) cannot personally enter into the credit. To resolve this issue L&H, Flanders Language Valley Fund (FLVF), and a number of private investors, in particular two Luxembourg companies Syllabus and Cevennes, prepared to participate in this "dictation project", incorporated the company Dictation Consortium N.V. (DC). A license agreement and a

---

[75] DBB 075007
[76] DBB 034550

development and commercialization agreement were conducted by and between L&H and DC.[77] (Emphasis added.)

It was clear from the foregoing that both FLV and DC were related to L&H. The initial loan to DC was presented to the Bank by L&H, L&H announced its intention to create DC for the purpose of receiving the Bank's financing and L&H found the other investors to support DC. Moreover, as discussed below, L&H's principal shareholders and senior officers secretly guaranteed the financing DC received from the Bank, further demonstrating the lack of DC's independence from L&H. As for FLV, L&H's 1997-1999 financial statements disclosed FLV as a related party to L&H.[78] The Bank also recognized that related party relationship in an internal Bank memorandum as follows:

> FLV was, under the impulse of Mr. Lernout and Mr. Hauspie, incorporated on December 22, 1995 with the purpose of providing risk capital to starting and growing companies within the sector of language and speech technology as well as promoting the establishment of these companies in the Ieper [Belgium] region.[79]

**Urgency to Grant Bridge Loan so that L&H Could Reduce Receivables by the end of the June 1997 Fiscal Quarter**

Consistent with other financing transactions to be discussed later in this report, there was almost always an urgency to conclude the financing by the end of an L&H fiscal quarter. In most cases, the urgency was a result of L&H wanting to record the revenue in its upcoming quarterly results. In the DC transaction, the Bank recognized that the money was needed to pay down L&H's receivables before the quarter's end to avoid a negative reaction to L&H's stock on the NASDAQ exchange as evidenced below.

Mr. De Coen stated in his June 19, 1997 memo to the Bank's Management Board:

> Following the fact that the realization of the file took more time than expected it was impossible to conclude the Regional Guarantee before 6/30/1997.

---

[77] DBB 075006-7

[78] The L&H financial statements identified revenues from DC and other customers as coming from companies partially owed by L&H, FLV Fund, FLV Foundation and/or LHIC and from certain other related parties. However, the relationship between DC and L&H and L&H's extensive involvement in the financing of the shell companies was not disclosed. It was also not disclosed that DC was a shell company that lacked the economic substance to enter into an arm's length transaction with L&H.

[79] DBB 005547

L&H has claim toward Dictation Consortium as a result of the delivery of a Milestone for a total amount of USD [$4.5 million].

The Short Sellers in particular pay precise attention to the ratio of the outstanding receivables in the quarterly reporting (now as of 6/30/1997) for the NASDAQ. Even a small increase will be interpreted as a negative evolution of the quality of the receivables portfolio and could consequently have an immediate negative impact on the stock exchange price.

It is consequently important that the outstanding receivable will be paid before 6/30/1997.[80] (Emphasis added.)

The foregoing indicates that the Bank was providing financing to the shell entity DC for the express purpose of allowing L&H to meet market expectations. Based on a review of the DC agreement with L&H,[81] these receivables appear to have been recorded in March, 1997 and prior. The Bank's financing allowed the payment of these receivables, thus legitimizing the revenue recorded. Had financing not been provided to pay this receivable, the ratios using accounts receivable would have been adversely affected. Without payment, a reserve would be required for bad debts which would negate the previously recorded revenue. Additionally, KPMG would most likely have questioned the realization of the receivable. (Notably, at this time, the Bank itself also had holdings in L&H common stock and warrants and therefore stood to benefit from any positive effect those announced results would have on L&H's share price.)

**Undisclosed Side Letter Personal Guarantees**
After being informed of the express U.S. GAAP prohibition that L&H could have no direct or indirect involvement in the DC financing to properly recognize revenue from the DC licensing agreements, the Bank violated that prohibition by agreeing to accept personal guarantees from the principals of L&H and to comply with the guarantors' request to document those guarantees in a side letter that was not disclosed in the DC

---

[80] DBB 074686
[81] DBB 004039-54

loan agreement.[82] According to the loan files we reviewed, the Bank proceeded with the transaction without questioning the motives for L&H's request. [83]

The DC loan amount was guaranteed up to 75% of its value by the Government of the Flemish Region. In response to the Flemish government's request for confirmation that DC would be completely independent from L&H,[84] the Bank sent a letter to the Flemish Government dated June 23, 1997 titled "Bank declaration for the benefit of the Flemish Government" and signed by Paribas and Bacob, which stated, in part:

> We always considered the proposed transaction as a "non-recourse" project financing.
>
> The "non–recourse" nature of the loan may be found in the fact that Lernout and Hauspie Speech Products N.V. ("L&H") is not providing securities with regard to the financing allocated to Dictation Consortium N.V. and may neither be obligated to buy back the developed Dictation Software nor to pay back the already paid research and development fees, without prejudice to the possibility of Dictation Consortium N.V. to, however, invoke the common rules applicable with regards to contractual liability.[85]

Despite the fact that the Bank was informed prior to this time that it would receive the personal guarantees from the four major shareholders of L&H, the Bank made no mention of these guarantees in its letter to the Flemish Government.

In their December 7, 2000 report, the Bank's Internal Audit Department criticized the Bank's failure to document the personal guarantees in the DC loan agreement as an "extraordinary transaction."[86] It also appears that the failure to disclose the guarantees in

---

[82] DBB 074685. Mr. Jacques Janssens, former Head of the Bank's Credit Department, confirmed the existence of these side letter personal guarantees, noting that they were not documented in the loan file "probably at the request of the personal guarantors." Janssens Dep. Tr., page 65, lines 10-25; page 66, lines 1-10.

[83] The guarantee issued by the four L&H controlling shareholders, Messrs. Lernout, Hauspie, Willaert and Cloet is evidenced by a Surety Bond dated June 24, 1997 whereby $4.5 million now and in the future for DC is jointly and severally guaranteed. (DBB 039333) The DC loan agreement made no mention of this bond.

[84] DBB 006802-3

[85] DBB 031068

[86] DBB 098651

the loan agreement was contrary to the normal operating procedure for the Bank as evidenced by Mr. De Coen's testimony:

> Q: Typically are guarantees referenced in Credit Agreements?
>
> A: Yes.
>
> Q: Apart from Dictation Consortium, were you involved in any loan where a guarantor requested that they be excluded from a Credit Agreement?
>
> A: I don't recall that.[87]

Similar testimony was obtained from Mr. Van Helleputte, Credit Analyst:

> Q: Have you ever used a side letter guarantee?
>
> A: That is a difficult question. Not that I can immediately recall.[88]

Mr. Janssens testified that the net worth of Messrs. Lernout, Hauspie and Willaert was based primarily on their holdings of L&H stock.[89]


**L&H's Direct Role in the Bank's Financing of DC**

L&H was directly involved in the DC loan in at least two respects, as discussed below. This involvement violated U.S. GAAP and precluded L&H from recognizing revenue as it did in its 1996, 1997 and 1998 financial statements on the licensing agreements between DC and L&H that were financed by the Bank.


The Bank's documents reflect that both Paribas and Bacob each received 25,000 warrants from L&H in connection with the DC transaction.[90] In the memo from Mr. De Coen above, the following was stated regarding the warrants:

---

[87] Deposition of Ivan De Coen, September 21, 2006, ("De Coen Dep. Tr.") page 74, line 22-24; page 75, lines 4-7.

[88] Deposition of Joris Van Helleputte, September 19, 2006, ("Helleputte Dep. Tr.") page 50, lines 23-25. Mr. Helleputte also testified on page 50, lines 13-16, that in his personal opinion, "if any security were to be in a separate letter, that I would look into the reasons why."

[89] Janssens Dep. Tr. #2, page 140, lines 18-25; page 141, line 1.

[90] In response to Interrogatory No. 13, the Bank stated that Bacob and Paribas each received warrants to purchase 266,000 shares of L&H common stock and that a portion of these may have been granted as consideration for the DC loan.

> As a risk compensation on file NV Dictation Consortium we were offered additional 25,000 warrants on L&H at a stock exchange rate of 6/23/1997. The pursuing period is five years. [91]

Mr. De Coen estimated that the capital gain to the Bacob Bank would be $312,500, assuming an average annual increase of $5 per share and the sale of these shares after 2 ½ years.[92] Thus, the total capital gain to the Bank (both Bacob and Paribas) would be $625,000.

Related directly to the above bank memorandum is a fax sent by Mr. Cordonnier to L&H's CFO, dated June 19, 1997 wherein he stated in item #2 entitled "BEF 225 million credit to Dictation Consortium:"

> As agreed with P. Hauspie, the Banks will be given an additional return in view of the related economic and financial interest of L&H. The award of no-cost warrants with an intrinsic value of US $300,000 may be considered as an alternative option.
>
> The latter issue is of utmost importance, because the credit will be withdrawn very shortly and the agreements must be finalized by Monday at the latest. [93] (Emphasis in original).

In a fax from Mr. De Coen to Mr. Cordonnier, the Bank's desire for additional compensation from L&H is highlighted:

> With regard to the additional returns in order to make up for the less favorable conditions for the DC credit, BACOB is more inclined towards the allocation of additional warrants by L&HSP rather than having a spread on the draw-down/placement under the USD 8.5 million credit, which would of course be IN ADDITION to the previously agreed replacement of the 3% up-front commission on this credit by an equivalent amount of warrants.[94]

Mr. De Coen testified as follows:

---

[91] DBB 076221
[92] Ibid.
[93] DBB 005176
[94] DBB 074705

Q: You asked for an equity kicker in connection with the Dictation loan, correct?

A: Yes.

Q: And I believe you testified earlier, a point of contact was Mr. Hauspie?

A: Yes.[95]

The Bank's second amended response to Interrogatory No. 13 regarding warrants granted in connection with the DC loan states:

> In June 1998, Bacob and Paribas each received warrants to purchase 200,000 shares of the Common Stock of L&H at an exercise price of $8.63 per share and warrants to purchase 66,000 of the Common Stock of L&H at an exercise price of $12.50 per share. <u>A portion of these may have been granted as consideration for the Dictation Consortium loan.</u> After a reasonable investigation, Dexia has been unable to determine which portion of the warrants were granted in connection with this loan.[96] (Emphasis added.)

L&H also appeared to pay other fees to the Bank in connection with the DC loan. One type of fee was classified as "shivering money" which Mr. De Coen stated in his deposition to be additional compensation for taking additional risk.[97]

In addition to the above-mentioned consideration paid by L&H, there is further evidence ✆ of L&H's direct involvement in the DC financing. In his memorandum of June 16, 1997 to the Management Committee regarding the DC loan, Mr. De Coen concluded by stating:

> With regard to the profitability, <u>a verbal agreement was reached with Mr. Paul Hauspie</u>, whereby <u>an additional profitability could be generated by means of L&H.</u> (Emphasis added.) Namely, L&H will, during a period of

---

[95] De Coen Dep. Tr., page 94, lines 15-20.

[96] Dexia Bank Belgium's Second Amended Responses and Objections to Class Plaintiffs' Sixth Set of Interrogatories, response to Interrogatory No. 13, pages 6-7.

[97] In the deposition of Ivan De Coen, he states that an alternative translation might be "comfort money." page 61, lines 13-15. On page 43, lines 6-10, Mr. De Coen uses the term "danger money." See also DBB 068504, which states that the "shivering money" related to a fee which L&H would pay in installments from 1996 up to and including 2000 regardless of the new future credit risks or of the credit to DC and also regardless of the later allocation of subscription warrants.

> 3 years, withdraw an amount of USD 5,000 [$5 million] from its standby
> credit line of USD 8,500. These USD 5,000 will then be placed on deposit.
> The consequently realized spread of +/- 300 BP [basis points] adds a
> profitability of 225 BP to the DC file.[98] (Emphasis in original).

This agreement and the various other considerations offered and paid by L&H for the DC
loan clearly indicate L&H's direct involvement in the financing of DC in violation of
U.S. GAAP.

Statements by the Bank's management reveal that at the time of the DC loan, the Bank's
management recognized that the consideration provided by L&H may have violated the
U.S. GAAP provisions requiring that DC remain completely independent of L&H. For
example, in Mr. Van Helleputte's interrogation by the BFP, he was asked about the
previously mentioned memo from Mr. De Coen addressed to the Executive Committee
dated June 16, 1997 wherein he wrote about a verbal agreement for L&H to deposit with
the Bank USD 5 million of a USD 8.5 million standby line of credit to create more
income on the DC transaction. Mr. Helleputte responded:

> Yes. I inferred from this memorandum that there was a verbal accord. I
> did not discuss this with DE COEN Ivan. When I emphasized that the
> opportunity ought to be investigated, I meant to indicate that it should be
> looked into whether in the context of the DC-LHSP structure it was wise
> to ask a fee from LHSP. In other words, it should be investigated whether
> this undermined the independence of DC.[99]

Based on the documents we reviewed, this concern for an investigation appears to have
been ignored.

**L&H Improperly Recognized More Than $26 Million on Transactions with DC**
L&H was able to improperly recognize $26.7 million of revenue in violation of U.S.
GAAP as a result of its transactions with DC. That revenue was material to L&H's
financial statements. The agreement between L&H and DC provided that an up-front
license fee of $5 million be paid to L&H. In addition, DC also agreed to pay non-

---

[98] DBB 075012
[99] DBB 036702

44

refundable development fees over 18 months of approximately $21.7 million.[100] According to the 1997 Form 20-F filed by L&H with the SEC, sales to DC were $7.5 million in 1996 and $18.9 million in 1997.[101] L&H reported total revenue of approximately $31 million in 1996 and approximately $99.4 million in 1997. Accordingly, revenue recognized in 1996 and 1997 from the DC transaction accounted for 24% and 19%, respectively, of L&H's annual consolidated revenue for those years.

## II. Brussels Translation Group, N.V.

Key points regarding the loan to Brussels Translation Group, N.V. ("BTG"):

- BTG was a related party to L&H under U.S. GAAP.

- BTG lacked economic substance and could not have entered into any arm's length transactions with L&H on which revenue could be recognized under U.S. GAAP.

- The Bank loaned BTG $14 million in March 1998 and in December, 1998 increased the amount of the loan by $3 million.

- The Bank was informed that the purpose of the BTG loan was to fund licensing agreements on which L&H would recognize revenue.

- Bank documents indicate that the Bank was aware that the BTG transaction was similar to DC in that BTG was a shell entity that was not independent of L&H and was designed to allow L&H to recognize revenue from the proceeds of the Bank's financing.

- The Bank ignored the advice of its own and L&H's experts and advisors regarding the U.S. GAAP requirements that applied to L&H and L&H's recognition of revenue derived from the proceeds of the Bank's loan to BTG.

- The Bank was informed that to satisfy U.S. GAAP, L&H had to be completely independent of the transaction and L&H could not be directly or indirectly involved in BTG's financing. Despite these prohibitions, the Bank negotiated the BTG loan directly with L&H.

- In violation of U.S. GAAP, L&H's controlling shareholders and executive officers guaranteed approximately $13 million of the BTG

---

[100] DBB 004476; revenue amounts obtained from L&H's SEC filings.
[101] KPMGUS034283

loan, and the Bank agreed to reflect that guarantee in a side letter which was not disclosed in the BTG loan agreement.

- The Bank was informed that in order to satisfy U.S. GAAP L&H could not commit to purchase BTG prior to the end of the term of the licensing agreement, yet the Bank granted the BTG loan only after the Bank was informed that L&H would later acquire BTG, thereby ensuring repayment of the loan.

- During the years 1997 through 1999, L&H improperly recorded approximately $35 million of revenue in violation of U.S. GAAP. The revenue recorded related to BTG was material to L&H's financial statements.

- L&H acquired BTG in June, 1999 for approximately $58 million. The loan was repaid in July, 1999.

The Bank's loan to BTG and the use of the proceeds is summarized in the following chart:

# II. Brussels Translation Group Loan Transaction



**Notes:**
(1) Consisted of:
- $5 million consent fee
- $30 million development fee

(2) Loan was subsequently increased by $3 million.

BTG received a $14 million loan from the Bank during the first quarter of 1998 and an additional $3 million in December, 1998. Identical to the DC loan transaction, the BTG transaction (i) allowed L&H to improperly record revenue through the Bank's financing and (ii) failed to disclose the controlling shareholders' guarantees.

According to an internal Bank memo from P. Faict to the Managing Committee dated September 19, 1997, BTG was a "special purpose company" founded by Cevennes SA (a 30% shareholder of DC) and Van Deun Consult NV on March 13, 1997.[102] The memo further stated:

> BTG has contracted Lernout and Hauspie Speech Products NV to develop and commercialize automatic machine translation systems (Machine Translation Software) which will allow texts on the Internet/intranet to be searched in the language of the user and received translated (up to 85% accuracy). Development costs are estimated at +/- BEF 1.1 billion (BEF 600,000[,000] in capital and 500,000[,000] in bank financing).[103]

The Bank's memo stated that all of the capital and financing would go towards the development of the machine translation system. There was no mention in the Bank documents that indicated that the Bank reviewed the funding of BTG's operating expenses or other cash needs. There was also very little mention in the Bank documents of the source of the start up capital or the background of the BTG shareholders.

**Transaction Requirements**

Consistent with the DC transaction, the Bank was informed of the various U.S. GAAP requirements that had to be followed to allow L&H to recognize revenue on the software licensing agreements with BTG, including the requirements that BTG be completely independent of L&H, that L&H could have no direct or indirect involvement in BTG's financing and that the BTG transaction must be an arm's length transaction between two independent parties under normal economic conditions. In a follow-up internal Bank memo from J. Van Helleputte, credit analyst, the independence of L&H is stressed in

---

[102] DBB 038280
[103] Ibid.

item #2.1 entitled "Impossibility of having the entirety of our risks covered by L&H under US GAAP."

> We can state that this credit is being used to finance the Machine Translation project within L&H. On account of reasons intrinsic to the NASDAQ/EASDAQ listing of L&H, the financing of the entire project was classified into the "Special Purpose Vehicle" Brussels Translation Group NV. As a result that transaction can be viewed merely as a commercial transaction that came about between independent and unassociated parties under normal economic circumstances, such that this transaction certainly should not be classifiable as a loan under US GAAP. In view of the public nature of the NV L&H, the US GAAP rules must be implemented in a very stringent manner and the SEC will monitor this very closely.
>
> For this it is appropriate that L&H stay out of the loan transaction completely, so that it can post [record] the funds needed for this project as revenues as well. According to the prevailing rules in terms of stock exchange authorities, the transaction must meet the following characteristics (Cf. letter from KPMG as part of the Dictation project). (Emphasis added.)[104]

To further illustrate that the Bank was fully informed of L&H's intentions to use BTG as a device to obtain financing and concurrently record revenue, Mr. Jacques Janssens, who was head of credit for Paribas Bank ("Mr. Janssens") testified:

> Q: Is it true that the financing that was to be provided by the bank was going to be used to pay Lernout and Hauspie those licensing fees by Brussels Translation Group?
>
> A: Yes, that is correct.
>
> Q: Is it true that the bank was informed that Lernout and Hauspie would recognize as revenue the monies it received form Brussels Translation Group for the development of the software that was being licensed.
>
> A: The question you are asking close to the ones that were asked for Dictation; it is true that it is quite a similar situation.[105]

---

[104] DBB 038286, Cf. letter from KPMG as part of the Dictation project appears to be a reference to the KPMG letter discussed in the DC section of this report.

[105] Janssens Dep. Tr., page 105, lines 12-17; page 108, lines 11-18.

Mr. Janssens further testified about the guarantees for the BTG loan as follows:

> Q: Is it true that the bank was informed that Lernout and Hauspie could not be liable directly or indirectly, or by means of a guarantee, with respect to the repayment of the financing of the BTG loan?
>
> A: Yes, that is correct.[106]

There is evidence indicating that the Bank was aware of the benefits to L&H of structuring the loan so that BTG was the borrower as opposed to lending the money directly to L&H. In an internal Bank memorandum, Item #3 entitled "US GAAP RESTRICT THE POSSIBLE STRUCTURINGS OF THE OPERATION," it stated:

> The operation has two benefits for L&H:
>
> 1. the loan for the financing of the development costs is granted to a third party, that is BTG, and will consequently not affect the balance sheet of L&H.
>
> 2. the compensation for development costs, which BTG will pay to L&H, will constitute company income to L&H.
>
> To realize these benefits, it is essential under US GAAP that the transaction between BTG and L&H be considered as a mere commercial transaction taking place between independent and free parties under normal economic circumstances.
>
> By taking the stock exchange quotation of L&H on the Nasdaq into consideration, the US GAAP regulations will need to be applied in a stringent manner, which will be monitored strictly by the American Securities and Exchange Commission.
>
> Concretely, the transaction, in accordance with the applicable regulations, needs to show the following characteristics (in conformity with a letter from KPMG within the framework of a similar Dictation project.)[107] (Emphasis added.)

Item #3 of the Bank's memo concluded with the following:

---

[106] Ibid, page 108, lines 3-10.
[107] DBB 038307

> In the event L&H obtains control of BTG, the development compensation, which has already been paid during the course of the same financial year, may no longer be booked as turnover [revenue] of L&H.[108]

As with the DC transaction, the Bank's internal documents demonstrate that the Bank was aware that BTG would serve as a vehicle to allow L&H to accomplish off balance sheet financing and at the same time, record significant revenues. As shown below, those documents also indicate that the Bank was informed that the BTG transactions violated various principles of U.S. GAAP.

**BTG Lacked Economic Substance**

The Bank recognized that the BTG transaction lacked economic substance and BTG did not have the resources to repay the loan it received from the Bank. A Bank memo dated March 27, 1998 to the Management Committee listed BTG under the caption "Companies of which the repayment capacity depends on the Lernout & Hauspie Group."[109] Moreover, the head of the Bank's Credit Department testified that BTG did not have the financial resources to justify the loan from the Bank, which caused the Bank to look for outside guarantees.[110]

In a later memo, the Bank stated that its commercial risk "is contractually covered. In the event the commercialization fails, the repayment of the credit allocated to BTG will in first place be guaranteed by the 'minimum sales performance standards,' which L&H needs to accomplish as of 1999."[111]

In that same memo, under a section entitled "Solution coverage for our risk" it stated:

> As a solution for the coverage of our risk put and call options would be established by and between Artesia, BTG and Mr. N. Willaert, Mr. P. Hauspie and Mr. J Lernout. Meanwhile it was also considered to remove the risk from our books by means of a "default swap". These solutions are currently assessed by the Specialized Credit Activities department.[112]

---

[108] Ibid.
[109] DBB 004087
[110] Janssens Dep. Tr., page 107, lines 11-18, page 108, lines 18-22.
[111] DBB 038270
[112] Ibid.

A memo to the Management Committee from Mr. Faict stated under the caption "Impossibility of having the entirety of our risks covered by L&H under US GAAP:"

> On account of reasons intrinsic to the NASDAQ/EASDAQ listing of L&H, the financing of the entire project was classified into the "Special Purpose Vehicle" Brussels Translation Group NV. As a result, that transaction <u>must be able to be viewed</u> merely as a commercial transaction that came about between independent and unassociated parties under normal economic circumstances, such that this transaction certainly shall not be reclassifiable as a loan under US GAAP.[113] (Emphasis added.)

Had the Bank considered the transaction between BTG and L&H to be truly at arm's length, there would have not been a need to document the transaction in the above manner.

Based on the evidence we reviewed, the Bank only discussed covering its credit risk by means of guarantees from the L&H majority shareholders, further acknowledging that BTG could not repay the loan through any of its own normal economic activity.

**BTG was a Related Party to L&H**

Because BTG was a related party to L&H, it was a violation of U.S. GAAP for L&H to recognize revenue on the licensing agreements with BTG as reflected in the Company's financial statements for the years 1997, 1998 and 1999. Various Bank documents confirm that the Bank was aware of this prohibited related-party relationship.

For example, among other things, the Bank was informed that the transactions between L&H and BTG had to remain totally independent and L&H could have no plans to repurchase the entity. There were several obvious violations of these U.S. GAAP requirements evidenced in the Bank's documents.

First, as with the DC transaction, secret side letter guarantees for the BTG loan were obtained from the controlling shareholders of L&H.[114] Second, the Bank was informed at the time that the loan was granted that L&H would be acquiring BTG, thus eliminating

---

[113] DBB 038286
[114] Janssens Dep. Tr. page 109, lines 19-24.

any independence between L&H and BTG. A Bank memo dated September 19, 1997 from P. Faict to the Management Committee, stated:

> A buy back option, <u>which also ensures the repayment of the credit on account of BTG,</u> was agreed upon by and between parties.[115] (Emphasis added.)

A later internal Bank memorandum dated December 30, 1998 to two of the Bank's senior officers reiterated this lack of independence between BTG and L&H, noting under a section marked "Confidential" that "BTG will be acquired by L&H before the end of March. The credits [loan] will be repaid by BTG at that time."[116] The Bank went on to extend an additional $3 million to BTG knowing that the funds for the repayment of the BTG loan would come from L&H when it purchased BTG.

### Undisclosed Side Letter Guarantee

Messrs. Hauspie, Lernout and Willaert had initially personally guaranteed the BTG loan up to $3,150,000 in a Deed of Guarantee dated March 31, 1998.[117] This represented approximately 75% of the amount of the loan drawn down through March 31, 1998.[118] The Bank requested an amended personal guarantee of Messrs. Lernout, Hauspie, Willaert and Cloet to increase the amount up to $6.6 million when the Brussels regional guarantee did not materialize.[119] This additional guarantee is evidenced by the Deed of Guarantee executed on June 19, 1998.[120] The $6.6 million guarantee represented 75% of the total of the amount of the loan drawn down through the second quarter of 1998.

---

[115] DBB 075034. This document also discusses the sales results to be achieved by the sale of the product being developed, of which L&H was to be integrally involved, and states "To a large extent these minimum results move the repayment risk for this financing to L&H."

[116] DBB 038270. BTG was actually acquired in June, 1999.

[117] DBB 039346-7

[118] DBB 004086

[119] According to a bank memo (DDB 038269), the Government of the Brussels Region agreed to provide a guarantee for 75% of the BTG loan, but the contractual parties chose not to utilize the regional guarantee.

[120] DBB 039354-5

On or about December 30, 1998, the credit line to BTG was increased by $3 million. This increase in credit was personally guaranteed by Messrs. Lernout, Hauspie, Willaert and Cloet.[121]

At L&H's request, the Bank documented all of these guarantees in side letters. None of the guarantees were disclosed in the BTG loan agreement.[122] In addition, L&H had guaranteed BTG $19.5 million of income after complete delivery of the Machine Translation Software.[123] The guarantees of the majority L&H shareholders, together with the guaranteed income amount, assured the Bank of repayment directly and indirectly through L&H. Because of these links, it was a violation of U.S. GAAP for L&H to recognize revenue on the proceeds of the BTG financing provided by the Bank.

The personal guarantees of the L&H shareholders were not included in the Bank's loan agreement with BTG because this would have precluded L&H from recognizing revenue on the fees paid by BTG under U.S. GAAP. Mr. Janssens testified:

> Q:  And is it also true that the Brussels Translation Group transaction was similar to the Dictation transaction, in that there were limitations placed on Lernout and Hauspie's role in any financing, so that Lernout and Hauspie could recognize revenue on its dealings with Brussels Translation Group?
>
> A:  Yes, that is why, that's right, there was a similarity.
>
> Q:  Is it true that the bank was informed that Lernout and Hauspie could not be liable directly or indirectly, or by means of a guarantee, with respect to the repayment of the financing of the BTG loan?
>
> A:  Yes, that is correct.[124]

---

[121] Bank's second amended response to Interrogatory No. 14.

[122] Mr. Janssens testified that the personal guarantees provided by Messrs. Lernout, Hauspie and Willaert were documented in a side letter. (Janssens Dep. Tr., page 109, lines 19-24).

[123] DBB 004082

[124] Janssens Dep. Tr. page 107, lines 19-25; page 108, lines 1-10.

**L&H Recognized $35 Million of Fictitious Revenue on the BTG Transaction**

L&H was able to improperly recognize $34.9 million of revenue as a result of the BTG transaction. The agreement between L&H and BTG provided that BTG paid an up-front consent fee of $5 million to L&H.[125] In addition, BTG also agreed to pay non-refundable engineering fees up to an aggregate of $30 million for the development of the Machine Translation Software based on certain milestones being achieved.[126]

As with many of the other loans granted by the Bank to shell entities, the BTG loan was drawn down on an "emergency basis" just before the close of a number of L&H's fiscal quarters to allow L&H to report the revenue derived from those loans in time for the close of each such quarter. For example, BTG drew down the loan on an "emergency basis" just before the quarters ending June 30, 1998, September 30, 1998 and December 31, 1998.[127]

According to the 1998 Form 20-F filed by L&H with the SEC, sales to BTG accounted for approximately 15% of 1997 and 9% of 1998 total revenue.[128] Total revenue recorded by L&H in 1997 and 1998 was approximately $99.4 and $211.6 million.[129] Accordingly, revenue improperly recognized from the BTG transaction was approximately $15 million and $18 million, in 1997 and 1998, respectively. The revenue related to BTG was material to L&H's financial statements.

## III. Radial Belgium, N.V.

Key points regarding the loan to Radial Belgium, N.V. ("RADIAL"):

- L&H and the Bank used the basic DC transaction structure for RADIAL, but expanded on it by creating more than one shell entity to generate fictitious revenue for L&H.

- RADIAL and the LDCs it created and funded with the Bank's financing lacked economic substance and could not have entered into any arm's length

---

[125] DBB 004268
[126] DBB 004295
[127] DBB 038268-270; Janssens Dep. Tr., pages 115-117.
[128] KPMGUS008013
[129] KPMGUS008002

transactions with L&H on which revenue could be recognized under U.S. GAAP.

- RADIAL and the LDCs it created and funded were related parties to L&H under U.S. GAAP.

- The Bank loaned RADIAL $6.2 million in September 1998 for the purpose of funding 3 shell LDCs that would pay a total of $9 million ($3 million each) in licensing fees to L&H (purportedly for the development of speech recognition software for the Slavic, Farsi and Bahassa languages), which fees L&H would recognize as revenue.

- RADIAL incorporated 3 shell LDCs on the same day it received the loan. Those LDCs were also related parties to L&H under U.S. GAAP. Those LDCs immediately purchased $9 million of software licenses from L&H with the proceeds of the Bank's loan to RADIAL just prior to the close of L&H's fiscal quarter ending September, 1998.

- The Bank was instructed that L&H was to be completely independent and not to be directly or indirectly involved in the RADIAL financing in accordance with U.S. GAAP.

- Contrary to the advice of the Bank's general counsel and its internal audit department, the Bank accepted personal guarantees from L&H's controlling shareholders and senior management in the form of credit default swaps which were not disclosed in the RADIAL loan agreement. These CDSs resulted in violations of U.S. GAAP due to the concealment of the related party nature of these transactions.

- In violation of U.S. GAAP, L&H was directly involved in the RADIAL financing as L&H's executive officers negotiated the loan terms with the Bank, guaranteed the repayment of the loan (through CDSs) and offered additional compensation to the Bank for the loan.

- In violation of U.S. GAAP, L&H improperly recognized $9 million in revenue from the Slavic, Farsi and Bahassa LDCs that RADIAL incorporated and funded with the Bank's loan.[130] That revenue, together with other revenue recognized from the Bank-financed shell entities, was material to L&H's financial statements for fiscal year 1998.

The Bank's loan to RADIAL and the use of the proceeds were as follows:

---

[130] Although the Bank provided Radial with only $6.2 million, Radial used that money to make payments towards $9 million worth of software licensing agreements. L&H recorded revenue of $9 million and a receivable for the balance of the amount due. It appears that the Bank's loan to RADIAL provided the false impression that RADIAL was creditworthy and that the receivables were collectible.