# III. Radial Belgium Loan Transaction



**Notes:**

(1) $9 million of revenue recorded, including $3 million of receivables.

(2) To develop Slavic, Farsi, and Bahassa languages.

**Transaction Requirements**

The Bank understood that the U.S. GAAP requirements that applied to DC and BTG also applied to RADIAL.[131] Thus, as with the prior loans, the Bank was aware that L&H could not recognize revenue on a transaction that lacked economic substance, could not be involved directly or indirectly in the financing of RADIAL, and that RADIAL and the LDCs it created and funded needed to be independent entities capable of entering into arm's length transactions with L&H in order for L&H to recognize revenue on the transactions funded by the RADIAL loan. The Bank's loan documents indicate that these GAAP requirements were violated.

**RADIAL was a Related Party to L&H and the RADIAL Transaction Lacked Economic Substance**

A review of the Bank's documents and testimony reveal that RADIAL and the LDCs that it created and funded were related parties to L&H and the transactions they purported to engage in lacked economic substance. It was therefore improper under U.S. GAAP for L&H to recognize revenue on licensing agreements funded by the proceeds of the RADIAL loan as reported in L&H's 1998 financial statements. The Bank's internal loan documents indicate that the Bank proceeded with the loan even though it was aware of these facts. As demonstrated below, the Bank even violated its own procedures to accommodate L&H's desire to complete the RADIAL loan in time to allow L&H to recognize revenue for the end of its September 30, 1998 fiscal quarter.

As evidenced by the Bank's internal memo from P. Faict to the Management Committee dated September 29, 1998, RADIAL requested bridge financing of approximately BEF 215 million (approximately $6.2 million) for, at most, three months pending the incorporation of the Language Development Fund.[132] At the time of this loan application, RADIAL was a new company that had only been in existence for a few months with approximately $72,000 in capital.[133] As set forth below, the Bank approved the loan to

---

[131] Janssens Dep. Tr. #2" page 173, lines 9-25 page 174, lines 1-25.

[132] DBB 037388. According to the Bank's response to Interrogatory No. 14, the loan, through two extensions, was extended until December 15, 1999 and was repaid on or about January 5, 2000.

[133] The Bank stated in an internal memo that RADIAL is a public limited company, incorporated on May 28, 1998 by Mr. Francis Van Deun (who was also a shareholder of BTG) with a capital of BEF 2,500,000 (approximately $72,000). (DBB 037388)

Radial on the very same day it was requested. On the same day that the loan was granted, RADIAL incorporated three new LDCs which in turn immediately paid L&H a license fee that L&H recognized as revenue on September 30, 1998.[134]

Based on the evidence I have seen, RADIAL and the LDCs it created had no real economic purpose other than to allow L&H to record fictitious revenues through the LDCs financed by the Bank's loan to RADIAL. As soon as RADIAL received its loan from the Bank, it transferred the proceeds of that loan immediately to the LDCs, leaving RADIAL with only its original minimal capital. The LDCs were formed on the same day that RADIAL applied for and was granted the loan from the Bank. None of these shell entities had adequate financial resources to conduct any business because as soon as they received funding, they used all of their funds to pay L&H its' licensing fees.[135]

Based on the Bank documents we reviewed, it appears that in the case of the RADIAL LDCs, bank accounts were created to receive the financing provided by the Bank and immediately those funds were transferred to L&H.[136]

At the time the loan was granted, RADIAL had already planned to sell these three LDCs to a Language Development Fund that had not yet been incorporated.[137] Thus, RADIAL remained a shell with no resources to repay the loan to the Bank. The LDCs funded by the RADIAL loan were in the same situation because they paid all of the money they had received from RADIAL to L&H as licensing fees, leaving no funds to operate a legitimate business. The Bank recognized RADIAL's lack of economic substance and its dependence on L&H when it insisted on additional sureties for its loan to RADIAL.[138]

As with most of the loans procured by L&H-related shell entities from the Bank, the RADIAL loan application was submitted on an emergency basis just prior to the end of

---

[134] Exhibit 15 to Mr. Janssens' deposition contains Bank documents setting up bank accounts for the three LDCs in order to receive the Bank funds and then transfer those funds to L&H.
[135] DBB 002544–6; DBB 037436-48
[136] Janssens Exhibit 15.
[137] DBB 037389
[138] DBB 002544-6

L&H's September 30, 1998 fiscal quarter, so that L&H could use the proceeds of the loan to recognize revenue in that quarter.[139] In order to accommodate L&H (one of its most significant clients), the Bank approved the loan to RADIAL on an expedited basis outside of the Bank's normal loan approval process.[140] According to an internal Bank memorandum and testimony, the Bank concluded that RADIAL was not creditworthy in its own right to justify the loan and the Bank thus approved the RADIAL loan contingent upon receiving the personal guarantees of Mr. J. Lernout, Mr. P. Hauspie and Mr. N. Willaert as security for the entire amount of the loan.[141]

The Bank was informed at the outset of the RADIAL loan that the loan's purpose was to fund newly formed LDCs that would then enter into licensing agreements with L&H to generate revenue for L&H.[142] According to an internal Bank memorandum, the "Objective" of the RADIAL transaction was for RADIAL, together with its directors, to incorporate three new companies on September 29, 1998 (the same day as the loan request[143]) as follows:

*The Slavic Development Company N.V.

*The Farsi Development Company N.V.

*The Bahassa Development Company N.V.

The memo further stated:

These companies were incorporated to develop new language pairs and to commercialize with Slavic, Farsi and Bahassa. These companies concluded a license agreement with L&H regarding the "Language Tool" in respect of which they each paid a license fee of USD 2,000 [$2 million]. This development will take place in accordance with the model of the language factory developed by L&H. (Emphasis added.)

---

[139] DBB 037446

[140] Janssens Dep. Tr., page 125, lines 20-25, page 126, lines 1-6.

[141] DBB 037390, Janssens Dep. Tr. #2. page 166, lines 5-25; page 167, lines 1-14.

[142] DBB 002544-6

[143] DBB 037390 indicates that the requested withdrawal date for the Radial loan is also September 29, 1998.

> Radial Belgium N.V. will sell these companies to a Language
> Development Fund, which is yet to be incorporated. This Language
> Development Fund will be incorporated during the course of the last
> quarter.[144]

In internal Bank documents, the Bank consistently treated RADIAL as a related party to
L&H. First as already mentioned, the Bank obtained guarantees from the officers and
principal shareholders of L&H through the CDSs. Second, the fact that the Bank
expeditiously granted a multi-million loan in one day to a newly formed shell entity like
RADIAL, in violation of the Bank's own procedures, was obviously an accommodation
to L&H, its major customer.

This further demonstrates the link between these companies. That link was again
acknowledged in an internal Bank e-mail dated October 21, 1998, noting that Messrs.
Lernout, Hauspie and Willaert should not have to issue a surety on the RADIAL loan
because the RADIAL line is added to the LHIC (L&H Investment Company) line.[145]
(LHIC was a company fully owned by Messrs. Lernout and Hauspie according to the
LHIC Confidential Information Memorandum.) Thus, the Bank recognized the
interrelationship of RADIAL and L&H.

### The Bank Disguised the Personal Guarantees on the RADIAL Loan as "Credit Default Swaps"

As with the personal guarantees on the DC and BTG loans, the guarantees of L&H's
senior management on the RADIAL loan made the transactions funded by that loan
related party transactions. It was therefore improper under U.S. GAAP for L&H to
recognize revenue on the licensing agreements funded by the RADIAL loan in the
manner that such revenue was reported in L&H's financial statements. The Bank's
documents show that, as with the previous loans, the Bank took steps to conceal this
related party relationship by concealing the personal guarantees of Messrs. Lernout,
Hauspie and Willaert. This time, however, instead of using "side letter" guarantees, the
Bank used credit default swaps.

---

[144] DBB 037389
[145] DBB 050285

After the Bank granted the RADIAL loan, Messrs. Lernout, Hauspie and Willaert refused to sign personal guarantees securing the loan because of possible problems with the SEC.[146] Thus, the Bank proposed accepting those personal guarantees in the unprecedented form of credit default swaps, in an attempt to avoid disclosing them in the loan agreements.[147]

The Bank's internal documentation makes it clear that the CDS agreements were mere substitutes for the guarantees from the L&H controlling shareholders that were originally required for the loan. For example, one internal Bank memo notes:

> The C.D.S. have been concluded to avoid some guarantees which the counterparties ( =J. Lernout + P. Hauspie + N. Willaert for the C.D.S. concluded within the framework of credit of Radial Belgium and =J. Lernout + P. Hauspie concluded within the framework of the credit of Language Investment Company) did not want.[148] (Emphasis added.)

Once again, the L&H principals objected to disclosing their identities in the loan agreements even as counterparties to a CDS. In another internal Bank memo, Mr. Rabaey sought to minimize the reference to the CDSs in the loan agreements in a letter he wrote to the head of the Bank's legal department, as follows:

> We consequently request to only make reference in the letter to a reference number of the CDS transaction and not to make reference to the identity of

---

[146] Mr. Rabaey testified as follows regarding not disclosing the RADIAL guarantees in the loan agreement:

    Q: There was one line you said in some document that Messrs. Hauspie, Willaert and Lernout did not want to sign guarantees because of the SEC, do you recall that testimony?
    A: All I can say is that at some point pertaining to the Radial loan that an issue came up under which it was said that there was a problem but the Radial loan had initially been constructed with a guarantee, everybody was in agreement on these guarantees. Subsequently these personal guarantees were never signed and the explanation for this was apparently this was not permitted by the SEC. (Emphasis added.) Rabaey Dep. Tr., page 89, lines 4-7, 9-17.

    An internal e-mail dated October 21, 1998 from Mr. Faict to certain Bank personnel also stated that P. Hauspie and N. Willaert "have a problem" with reporting their sureties in the letter of credit. (DBB 050285)

[147] DBB 038081; In testimony to the BFP, Mr. Janssens stated:

    You ask me if the discussions with the bank at the time were also about the fact that it was not common to include a CDS with private persons. Yes, it was not common. It was certainly one of the very first times that private persons signed a CDS. (DBB 036321)

[148] DBB 037644

the private individuals. Motivation hereto is that the client does not agree to make reference to the identity of the private individuals as in that case a link will be made between the debtor and those private individuals. With regards to the outer world it is not desirable for the client that a direct link will be made. This issue clearly surpasses the fiscal aspect, whereby I mean that the private individuals who concluded the CDS possess sufficient financial means or could possess sufficient financial means which would justify the commitments entered into on the basis of their fiscally known capital or potential capital. (Emphasis added.)[149]

The decision to substitute the CDSs for the personal guarantees and to acquiesce to the clients' insistence to omit any reference to those CDSs in the loan agreements continued to create a dilemma for the Bank, because various experts within the Bank concluded that, as with guarantees, the CDSs must be disclosed in the loan agreements. As shown below, the Bank ultimately acted against the advice of these experts and agreed to conceal the CDS (and thus the related party nature of the transactions funded by RADIAL) by omitting any reference to them in the loan agreements.

The use of CDSs in lieu of personal guarantees and the question about disclosing those CDSs in the Bank's loan agreements arose not only in connection with the RADIAL loan, but also in connection with another of the Bank's L&H-related loans to a shell entity called Language Investment Company, N.V. ("LIC").

As discussed in greater detail in Section IV below, after the RADIAL loan, the Bank funded more shell LDCs through a loan to LIC. As with RADIAL, the Bank also accepted personal guarantees on that loan in the form of credit default swaps, after Messrs. Lernout, Hauspie and Willaert again refused to sign personal guarantees. Although the initial LIC loan came after the initial RADIAL loan, both loans were extended until they were eventually submitted jointly to the Bank's Management Committee for one final extension in September 1999.[150] At that point, the Management Committee, sitting as the Bank's highest Credit Committee, decided to omit any reference to the CDSs in both the RADIAL and LIC loan agreements.

---

[149] DBB 003726

[150] DBB 083414 states "…the Radial Belgium and the Language Investment Company files (both with an expiration date of 6/30/99 and a credit default swap) as well as the credit default swaps need to be extended from 6/30/99 up to 12/15/99 as a result of delays in the final negotiations with the investors."

Although the Management Committee did not consider the issue until September 1999, the Bank had already accepted CDSs on the RADIAL loan prior to that time. This first use of the CDS to guarantee the LIC loan prompted a written objection from the Bank's Internal Audit Department because the RADIAL loan agreement failed to disclose the CDS. On April 21, 1999 (more than five months before the Management Committee formally considered the CDS issue), internal auditor Lieven Gryp wrote to several members of the Bank's Management Committee to inform them that it was a violation of the Bank's procedures to fail to disclose the CDS in the LIC loan agreement. In particular, that memo noted that the CDS on the LIC loan "did not comply with the common procedures" of the Bank because "the concluded credit default swap was still not mentioned in the credit letter dated 12/22/98."[151]

Prior to the Management Committee's decision to omit any reference to the CDSs in the RADIAL and LIC loan agreements, the head of the Bank's legal department, Bernard Mommens, also repeatedly gave his opinion that the CDSs should be specifically referenced in those loan agreements. On May 19, 1999, Mr. Mommens first responded as follows regarding a specific question from Bank personnel about the inclusion of the CDS in the "Radial/LIC" loan agreements:

1.  If the CDS is entered into with a counter-party completely unknown to the borrower and/or if the premium to be paid by the bank is not carried by the client, I do not think ANY mention must be made in the credit letter.

2.  If one of the previously mentioned conditions is however met, I feel that it should be mentioned.[152]

That May 1999 e-mail was followed up by additional e-mails in June and September 1999 wherein Mr. Mommens reiterated his opinion.[153] Moreover, the September 1999

---

[151]  DBB 098476
[152]  DBB 050484. The controlling shareholders of L&H and RADIAL were known to each other, and therefore, according to in-house counsel, disclosure of the CDS should have been made in the loan agreement. As previously mentioned, RADIAL was incorporated by Mr. Francis Van Deun who was also an initial shareholder in BTG. (DBB 037388)

loan proposals submitted to the Management Board for both the RADIAL and LIC loans reiterate Mr. Mommens' advice, noting: "Our legal department advises to mention the credit default swap in the letter of credit to the client."[154]

Mr. Janssens, the head of the Bank's Credit Department also acknowledged Mr. Mommens' advice in the following testimony:

> Q: Mr. Mommens concluded that the CDS should be referenced in the LIC letter of credit, correct?
>
> A: Yes indeed, as we mentioned several times already.
>
> Q: So the Credit Committee interpreted his advice differently than he himself, correct?
>
> A: The Credit Committee made a decision that was different from Mr. Mommens' opinion.
>
> Q: And because the Credit Committee was acting in a way that was contrary to Mr. Mommens opinion, why didn't it consult the internal audit division for a second opinion?
>
> A: Because it did not seem necessary.[155]

Mr. Janssens' testimony is inconsistent with the fact that, as noted above, the Bank's Internal Audit Department had already informed him and various members of the

---

[153] DBB 106977. See also DBB 003726-7 and DBB 106973 for additional e-mails sent by Mr. Mommens to Mr. Rabaey further reiterating his opinion.

In an e-mail from Mr. Van Tiggel to Mr. Rabaey dated September 16, 1999, it is admitted that there is an economic connection between the issuers of the CDS and the borrower, RADIAL:

From a meeting I had with B. Mommens it appears that the criterion with regards to reference to the CDS in the credit agreement depends on (1) the existence of a clear connection between the borrower and the counterparty of the CDS and (2) charging of the CDS premium to the borrower.

As regards (1), a connection may, from an economic point of view, be considered existent, however, not from a strictly legal point of view (= more or less the point of view of L&H). (Emphasis added.)

[154] DBB 037446 (Radial Loan); DBB 007455 (LIC Loan).

[155] Janssens Dep. Tr. #2, page 218, lines 10-25;  page 219, line 1. Alain Probst, Secretary of the Credit Committee, also testified that "it is obligation for all sureties to be mentioned in the letter confirming the credit and these sureties cannot be subject to any interpretation or hypothesis." (Deposition of Alain Probst, March 14, 2006, page 73, lines 1-4.)

Management Committee in writing that the failure to mention the CDS in the loan agreements was improper.[156]

Even after the RADIAL loan was completed, the Bank acknowledged that it was improper for the Bank to have concealed the existence of the CDSs and not mention them in the loan agreements. In January 2000, an after-the-fact investigation of the RADIAL and LIC loans by the Bank's Internal Audit department concluded that "the Bank lawyers are unanimous: The CDSs should have been mentioned in the letters of understanding sent to borrowers."[157] Despite this acknowledgment, there is no indication in the Bank documents or testing that the Bank took any steps to make such disclosure.

**Further Evidence of L&H's Direct Involvement in the RADIAL Financing**

The Bank's files reveal further evidence of L&H's direct involvement in the RADIAL financing. For example, the Bank blindly accepted L&H's assertion that its internal lawyers had supposedly advised that the CDSs did not need to be disclosed in the loan agreements. We have seen no evidence that the Bank ever saw any written opinion to this effect or even spoke to the unnamed lawyer at L&H, and as noted above, this "advice" was directly contradicted by the advice that the Bank had received from its own internal lawyer and its Internal Auditor. An e-mail from Mr. Rabaey dated September 15, 1999 regarding the L&H controlling shareholders' unwillingness to have the CDS noted in the loan agreements stated:

> Mr. Nico Willaert [L&H's Vice-Chairman] consulted lawyers internally at L&H SP who said that it is not necessary to confirm a CDS in a credit letter. He wishes to remain with this standpoint because L&H SP is only a supplier of the licenses, which is what a third party is. Nico confirms that neither the Radial shares nor the LIC shares shall be purchased by L&H SP; on the contrary, it will be foreign investors (Arabs, Russians, Singaporeans).
> He proposes that the Bank provides as needed for an additional margin of 5% and in this way can realize an extra return.[158] (Emphasis added.)

---

[156] DBB 098476

[157] DBB 083286

[158] DBB 095137 The comment "that neither the Radial shares nor the LIC shares" will be purchased by L&H suggests that the Bank may have previously expected this to occur. As discussed above, such an arrangement to repurchase would violate U.S. GAAP. See section entitled "Subsequent Purchase" above.

This e-mail indicates that L&H's involvement was not only direct, but it was pervasive. In addition to L&H providing legal advice for the structuring and disclosure of security for the RADIAL and LIC loans, L&H also negotiated the terms of that loan and directly offered additional compensation to the Bank for the financing. This direct involvement by L&H in the RADIAL financing was a further violation of the U.S. GAAP provisions that had previously been provided to the Bank which prohibited L&H's direct or indirect involvement in this financing.

### The CDSs Were Not Arm's Length Transactions

Based upon my review of the Bank's loan documentation and testimony, it is my opinion that the CDS agreements that the Bank insisted be executed with the controlling shareholders of L&H were not legitimate arm's length transactions. Rather, they were devices used to circumvent U.S. GAAP. If the CDSs were mentioned in the loan agreement, it would have revealed that RADIAL and LIC were not independent of L&H, thus precluding revenue recognition on any of the transactions financed by those entities. Discussed below are the various internal Bank documents that support this conclusion.

On January 31, 2000, the Bank issued an internal audit report entitled "Treatment of Credit Default Swaps." The report dealt primarily with the Internal Audit Department's view that the CDS should have been disclosed in the loan agreements for Belgian tax reasons. However, the report also stated that "the nature of the CDSs of our concern, and their exceptional character (these are the only agreements of this type executed with physical persons) preclude any income generated from [the CDS premiums] being classified as financial income."[159] (Emphasis added.) Another internal audit report dated January 20, 2000 further concluded that the Bank's failure to document the CDSs in the RADIAL and LIC loan agreements may also have violated Belgian law that prohibits the use of "special mechanisms."[160]

Circulaire D1 97/9 specifies the practices by finance companies and/or investment companies that are considered to be a special mechanism by the Belgian Banking and

---

[159] DBB 083289
[160] DBB 083285

Finance Commission ("BFC"). As a general rule, a practice is considered a special mechanism if it results in fiscal fraud by third parties. The following represents a translation of Circulaire D1-97/9 regarding special mechanisms:

> C. Practices enabling the clients to mislead the tax authorities
>
> § 1. – Non-disclosure of the guarantees in the loan deed
>
> 1. Meaning, the practice whereby a lending institution or investment firm, in the document in which it announces the granting or the increase of a credit or of a loan, does not accurately disclose all guarantees that it actually took into consideration when making its decision to grant or increase the credit or the loan. An accurate disclosure of the guarantees especially includes the registration of the identity of the person who provides the guarantee, the amount of the guarantee as well as its nature.[161] (Emphasis added.)

While we offer no opinion as to whether this Belgian law was violated, it is noteworthy that the Bank's own Internal Audit department had concluded that it likely was.

There is additional evidence to demonstrate that the CDSs were not real financial transactions. For example, a Bank Internal Audit Department memo stated that Messrs. Lernout and Hauspie received a payment of BEF 189,444 as a result of the CDS agreement dated June 30, 1999 (the LIC CDS), although according to a Bank memo, they were supposed to receive BEF 265,833. The memo also stated:

> The nature of the C.D.S. we are working on as well as its exceptional nature (as these are the only agreements of this type concluded with individuals) exclude the possibility of qualifying the revenues generated as financial revenue.[162]

According to this same memo, there was a potential tax problem related to the amounts paid and it was suggested that such amounts be recouped by the Bank after the RADIAL and LIC loans had been repaid to the Bank.[163] The suggestion that the Bank could recoup

---

[161] Circulaire D1 97/9
[162] DBB 126846
[163] Ibid.

fees paid in connection with a CDS is a further indication that the transaction was not at arm's length. No party to a legitimate economic transaction would surrender the premiums it had earned after the transactions had concluded. The indication that the Bank thought Messrs. Lernout, Hauspie and Willaert might be willing to do so here shows that the Bank itself did not treat the CDSs as an arm's length transaction.

There was also evidence that the premiums for the CDSs were not legitimate. A Bank memo entitled "Credit default swaps: Lernout/Hauspie/Willaert" stated:

> RADIAL: Messrs. Lernout/Hauspie/Willaert (H/L/W) are still entitled to a premium of 809,162 BEF which has (wrongly) not been paid out by Artesia.

> LIC: Messrs. Lernout & Hauspie (not Willaert) have already received a portion of the premium, but a supplement of 76,389 still has to be paid out.[164]

The fact that certain premiums were not paid on the CDS agreements again indicates that these transactions were not bona fide arm's length. Normally, the purchaser of a CDS receives a premium as compensation for the risk being incurred.

Likewise the premium rates on the CDSs were suspect. The Bank indicated that the fee for each CDS was 50 basis points.[165] This appears to be an unusually low fee – a further indication that the CDS agreements were not at arm's length. Our analysis of the fees on the CDSs included as Exhibit 5, indicates that the fees, where charged, were approximately 21-23 basis points.

All of these factors taken together support the conclusion that the CDS agreements themselves were not legitimate, arm's length transactions.

### L&H Improperly Recognized $9 Million on the RADIAL Transactions

L&H improperly recognized $9 million of revenue in violation of U.S. GAAP on its purported sales of licenses to the Slavic, Farsi and Bahassa LDCs. That revenue, together

---

[164] DBB 081419
[165] DBB 127255, DBB 127264

with the other revenue recognized from the Bank-financed shell entities, was material to L&H's financial statements in fiscal year 1998. That fictitious revenue flowed from the licensing agreements that L&H entered into with the three shell entities LDCs financed with the proceeds of the RADIAL loan, each of which entered into a $3 million software license agreement with L&H.

## IV. Language Investment Company, N.V.

Key points regarding the loan to Language Investment Company, N.V. ("LIC") loan:

- LIC and the LDCs it created and funded with the Bank's financing lacked economic substance and could not have entered into any arm's length transaction with L&H on which revenue could be recognized under U.S. GAAP.

- LIC and the LDCs it created were related parties to L&H under U.S. GAAP.

- In December, 1998, the Bank loaned approximately $6.4 million to LIC for the purpose of funding four shell LDCs that would pay licensing fees to L&H (purportedly to develop speech recognition software for the Greek, Polish, Hungarian and Czech languages) which fees L&H would recognize as revenue.

- In December, 1998, LIC incorporated 4 shell LDCs which immediately purchased software licenses from L&H using the proceeds of the Bank's loan.

- In March, 1999, the Language Development Fund ("LDF"),[166] lent LIC $6 million in order for the LDCs to pay their obligations to L&H.

- The Bank was informed that to satisfy U.S. GAAP, L&H and LIC had to be completely independent and that L&H could not be directly or indirectly involved in the LIC financing. Despite these prohibitions, the Bank negotiated the terms of the LIC loan with L&H executive officers, who guaranteed repayment of the loan through CDSs.

- Contrary to the advice of the Bank's general counsel and its internal audit department, the Bank accepted the personal guarantees of L&H's principal shareholders and senior executives in the form of a credit default swap that was not disclosed in the LIC loan agreement. These CDSs resulted in

---

[166] The proposed LDF loan and the subsequent $20 million loan to Messrs. Lernout, Hauspie and Willaert are discussed in Section V below.

violations of U.S. GAAP due to the concealment of the related party nature of the transactions.

- The Bank was informed that in order to satisfy U.S. GAAP, L&H could not commit to purchase LIC or the LDCs prior to the end of the term of the licensing agreements, yet the Bank was informed before that time that L&H would purchase some of the LDCs created for this transaction.

- L&H improperly recognized $12 million in revenue in violation of U.S. GAAP in 1998 from the Greek, Polish Hungarian and Czech LDCs that LIC incorporated and funded with the Bank's loan. That revenue, together with the other revenue that resulted from the Bank's financing, was material to L&H's financial statements for 1998.

The Bank's loan to LIC and the use of the proceeds were as follows:

# IV. Language Investment Company Loan Transaction



**Notes**:
(1) $12 million of revenue reported

(2) Consisted of Greek, Polish, Hungarian and Czech

**Transaction Requirements**

The Bank was informed that the purpose of the LIC loan was to finance the payment of $12 million in licensing fees from four LDCs to L&H so that L&H could recognize revenue on those fees.[167] The Bank also understood that the U.S. GAAP requirements that applied to DC, BTG and RADIAL also applied to LIC.[168] Thus, as with the prior loans to L&H-related shell entities, the Bank was aware that L&H could not be involved directly or indirectly in the financing of LIC, and that LIC and the LDCs it created and funded needed to be independent entities capable of entering into arm's length transactions, having economic substance, with L&H in order for L&H to recognize revenue on the transactions funded by the LIC loan. The Bank's loan documents indicate that these U.S. GAAP requirements were violated.

## LIC Was a Related Party to L&H and the LIC Transaction Lacked Economic Substance

It is my opinion, based upon a review of the Bank's documents and testimony, that LIC and the LDCs that it created and funded with the Bank's financing were related parties to L&H and the transactions they purported to engage in lacked economic substance. It was therefore improper under U.S. GAAP for L&H to recognize revenue on the licensing agreements funded by the proceeds of the LIC loan as reported in L&H's 1998 financial statements.

LIC applied to the Bank for financing during December 1998.[169] In an internal Bank credit proposal memorandum, LIC is noted to be an investment company, exclusively in the domain of speech technology. The shareholders are stated to be West-Flemish investors grouped around the insurance broker Willem Hardeman, who was also a signatory to contracts for DC, a copy of such a contract was in the Bank's files.[170] The objective noted in the memo is that "these investors wish to invest in projects that are not

---

[167] DBB 125649

[168] Janssens Dep. Tr., page 204, lines 3-10. Also DBB 036804 refers to LIC as a special purpose company similar to DC and BTG.

[169] According to the Bank's Interrogatory Response No. 14, the initial term of the loan was through June 30, 1999, but was extended until December 15, 1999. The loan was repaid on or about January 5, 2000.

[170] DBB 006794

mature yet regarding speech technology (comparable to projects such as Dictation Consortium, Belgian[171] translation group…).”[172]

This same memo under item #3 entitled “Objective Lernout & Hauspie (LHSP)” stated:

> Strategic decision to expand the further development of the speech technology in respect of less current languages and attract parties interested in respect thereof. The more current languages will be developed in-house by the large software manufacturers.[173]

The memo summarized the three LDCs incorporated by RADIAL and stated that the LIC group of investors is also interested in this project. Additionally the memo acknowledged that L&H was the real party behind this transaction, stating:

> LHSP offers these investors the possibility to collaborate, under condition of a quick decision on a commitment of $12 million.

The $12 million of financing represented the contemplated fee of $3 million that LHSP would receive from each of the four new LDCs LIC planned to incorporate before the end of L&H’s next quarter ending December 31, 1998.[174] Those LDCs were purportedly for the development of the following languages: Greek, Polish, Hungarian and Czech.[175]

The Bank’s memo further acknowledges that LIC did not have the financial means to repay the multi-million loan it would receive from the Bank, so the Bank was relying on L&H to find new investors to repay the loan. Specifically, the memo notes that LIC wanted to enter into a temporary bridge credit that had the following “Possibilities [for] repayment”:

> 1. Flemish investors→engagement of various business individuals from the region: names are known to Nico Willaert (LHSP), however, are not communicated for reasons of confidentiality.

---

[171] Appears to be a typographical error in the document; it appears that this word should be “Brussels.”
[172] DBB 002861
[173] Ibid.
[174] DBB 002861-2
[175] Ibid.

2. <u>USA investment funds</u> mentioned here above:[176] incorporation in December '98. Collection liquidities will immediately start → subsequent investment in the four incorporated companies.

3. <u>Sale to LHSP</u>: <u>agreement to sell shares to LHSP within a period of 2 years</u>. Strategy in respect thereof is known to the directors of LHSP (Fernand Cloet, Pol Hauspie,...) [177] (Emphasis added.)

In item 1 above, it appears unusual that the investors cannot be made known to the Bank for reasons of their confidentiality. If the investors' names are not known to the Bank, the Bank cannot evaluate them as a source of repayment. Again, this indicates that the Bank was relying on L&H to ensure repayment.

Furthermore, in item 2, there is no mention of the identity of the American investors who purportedly have $100 million to invest in this LDC project. Without knowing their identities, the Bank could not have evaluated the ability of these "new" American investors to repay the loan. Again, the Bank was relying on L&H to ensure repayment.

As noted in item 3 above, it also appears that the sale of the LDCs to L&H had already been pre-arranged. As the Bank was previously informed, such an agreement violates the U.S. GAAP provision regarding revenue recognition when a subsequent purchase of the customer is contemplated.

Other Bank documents indicate that, as with the earlier transactions, the Bank was aware that these new LDCs were also shell entities that lacked economic substance. For example, in assessing the risk on the LIC loan, the Bank's credit proposal notes:

> Repayment of the credits loaned by Artesia to the holding company (=LIC) is completely dependent on finding investors, which is difficult to attach a set time schedule. <u>The subsidiary companies (=language</u>

---

[176] This refers to a section in the Bank's memo which states "a USA investment fund to be incorporated will contribute, in light of these specific projects, an amount of USD 100,000 [$100 million]. These investors are known. They already keep their funds available, pending the incorporation of the funds anticipated on 6/30/99."(DBB 002862)

[177] DBB 002862

development companies) themselves will generate seemingly no business as long as there are no investors.[178] (Emphasis added.)

In the same memo, the Bank stated:

> Currently those companies are not introducing anything (no business, no goodwill). This will change as soon as investors are biting.

The memo concludes by stating that Messrs. Lernout and Hauspie's mission last week with regard to potential investors was quite successful. This further demonstrates that the LDCs were shell entities and it was the responsibility of L&H to find investors.

There is also a striking similarity between LIC and the prior transactions in that, in each instance, all of the LDCs are incorporated at the end of an L&H fiscal quarter and the license fees are paid on that date. This was important to L&H as revenue could not have been recognized if the fee had not been paid prior to the quarter end. Again, with the LIC loan, the Bank continued the pattern of financing transactions that resulted in the recording of revenue by L&H right at quarter end.

The typical urgency of the financings provided by the Bank to L&H-related shell companies was noted in a September 22, 1999 memo from Mr. Rabaey which stated:

> I can only observe that…the same problems reoccur again and again as far as the various files regarding L&H are concerned and that we…are confronted with these very urgent withdrawal, credit documentation and associated papers only partly or not at all signed and everlasting regularization afterwards.[179]

The Minutes of the Credit Committee also demonstrate a definite link between the LIC financing and L&H. In approving the LIC loan, the minutes of December 17, 1998, state:

> Overall commitment to the voice technology sector is very high. The committee agrees on the condition that the loan is extended within the

---

[178] DBB 007456
[179] DBB 003657

context of the L&H lines and that the latter guarantees repayment upon maturity. The proposed guarantees are accepted.[180]

Thus, the Credit Committee's initial requirement that the loan be guaranteed by L&H, was modified to personal guarantees by L&H's management and ultimately accepted in the form of credit default swaps dated December 29, 1998, between the Bank and L&H's principals, Messrs. Lernout, Hauspie and Willaert, with LIC and successors as the referenced entity.[181]

### The Bank Disguised the Personal Guarantees of L&H's Management as "Credit Default Swaps"

As with the RADIAL loan, the Bank insisted upon personal guarantees from the principals of L&H, which they refused to sign because they were unwilling to disclose their guarantees in the loan agreements.[182] (The Bank initially sought a guarantee for the LIC loan from L&H.)[183] Accordingly, the Bank again resorted to credit default swaps to avoid disclosing these guarantees.[184] The details of those CDSs are discussed below.

As noted in more detail in the section entitled *The Bank Disguised the Personal Guarantees on the RADIAL loan as "Credit Default Swaps"* above, the Bank acted against its own policies and the advice of its internal lawyers and auditors in concealing the CDSs in the LIC and RADIAL loan agreements. In the case of the LIC loan, the Bank's efforts to conceal these guarantees were even more extensive.

Although the Bank received credit default swaps from the principals of L&H as a guarantee for the LIC loan, the Bank did not mention these guarantees in responding to an L&H internal audit request sent by Loeff Claeys Verbeke regarding LIC, which asked:

---

[180] DBB 002536
[181] DBB 096213-20
[182] DBB 007455, DBB 037437.
In the BFP questioning of Mr. Philippe Steverlynck, Manger, Corporate Banking, he stated that it was L&H's Vice-Chairman Mr. Willaert who requested that the guarantees for the LIC loan be identical to the RADIAL loan. (DBB 036588)
[183] DBB 002536
[184] The LIC loan was delinquent and was extended on two occasions because repayment was not timely made. (DBB 007452-60) For each of these extensions, the Bank entered into a CDS with the principals of L&H. (DBB 007461-3)

> ...for a declaration from Artesia Bank, which shows that our partnership was allowed a credit facility of 220,000,000 BEF in August 1998 and that no bank guarantees were given from L&H.[185]

The Bank's response to this audit request was as follows:

> On December 22, 1998, a credit facility of 220,000,000 BEF was granted by ARTESIA BANK NV. To N.V. LANGUAGE INVESTMENT COMPANY, for this credit no bank guarantees were given by L&H.[186]

A common theme for the DC, BTG, RADIAL and LIC loans were that the guarantors did not want to be identified in the loan documents so that L&H could improperly recognize revenue on transactions that were financed by these loans. The Bank repeatedly complied with this request as illustrated in the testimony of Mr. Janssens, where he stated that for all of the above loan transactions (DC, BTG, RADIAL, and LIC), Messrs. Lernout, Hauspie and Willaert refused to sign the guarantee or CDS unless it was omitted from the loan documentation.

> Q: Sir, on the Dictation loan, Mr. Lernout and Mr. Hauspie and Mr. Willaert refused to sign the personal guarantee unless it was done in a side letter and not disclosed in the letter of credit, correct?
>
> A: Correct, yes.
>
> Q: And the same for Brussels Translation Group, again Mr. Lernout, Mr. Hauspie and Mr. Willaert refused to sign personal guarantees unless it was done in a side letter and not documented in a letter of credit for that loan, correct?
>
> A: Yes, probably for Dictation.
>
> Q: Again, sir with the Radial loan, when it came to offering a credit default swap, Mr. Lernout and Mr. Hauspie and Mr. Willaert refused to sign such a credit default swap agreement unless it was not referenced in the letter of credit, correct?

---

[185] DBB 002795
[186] DBB 002805

A: That is correct.

Q: And once again with the Language Investment Company, Mr. Lernout, Mr. Hauspie and Mr. Willaert refused to sign a credit default swap providing a guarantee for that loan unless it was-unless a reference to that credit default swap was omitted from the letter of credit for that loan, correct?

A: That is correct.[187]

By failing to disclose the CDS in the LIC loan agreements and in the audit confirmation to LIC, the Bank concealed L&H's role in the LIC financing and the related party relationship between those two companies. Had that relationship been revealed, L&H could not have recognized the revenue financed by the LIC loan in its 1998 financial statements.

Furthermore, Messrs. Hauspie and Willaert provided a confirmation to KPMG stating that none of the investors in the LDCs were related to L&H.[188] Similar to the Bank confirmation above, this confirmation did not mention the CDSs provided by Messrs. Lernout, Hauspie and Willaert to guarantee the LDC financing. Messrs. Lernout, Hauspie and Willaert also provided confirmations to BRF&G in connection with KPMG's inquiries, stating that they were not aware that any of the investors in the LDCs are affiliates (as the term is defined under Rule 144 of the SEC)[189] of L&H or any director or executive officer of L&H.[190] Again, the role of Messrs. Lernout, Hauspie and Willaert in the LDF financing was not disclosed.

**Further Evidence of L&H's Direct Involvement in the LIC Financing**

In addition to promising to find new investors so that LIC could repay the loan, the Bank's loan files indicate that L&H was directly involved in the LIC financing in other ways. For example, L&H's Vice-Chairman negotiated the terms of both the LIC and

---

[187] Janssens Dep. Tr., page 70, lines 7-25; page 71, lines 1-9.

[188] KPMG-B-004160

[189] The confirmation stated "I understand that as defined under Rule 144, the term affiliate means a person, that is directly, or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such other persons (KMPG-B-004177).

[190] KPMG-B-004177-9

RADIAL loans.[191] Moreover, in reviewing the Bank documents, there is no indication that the Bank negotiated with anyone representing LIC or RADIAL regarding the terms of those loans. The involvement of L&H personnel was also very prevalent regarding the other financing granted to the other shell entities that purported to be "special purpose entities" (i.e., DC, BTG). Accordingly, this was further evidence that LIC, RADIAL and the other shell entities were not independent entities, but were in fact controlled and/or operated by L&H and its senior officers.

To further illustrate the involvement of L&H, there is an e-mail to Peter Rabaey dated July 28, 1999 regarding LIC which highlighted Mr. Willaert's continued involvement in the LIC financing:

- Today I contacted Willem Hardeman. He has discussed the situation with Nico Willaert and will provide us with the following signed documents in a few days...

- Peter, at the moment Nico Willaert is on leave (probably until August 9). Should the documents not come back quickly, I think we should (after consultation with Nico Willaert and/or Willem Hardeman)...[192]

As with the DC and BTG transactions, in the case of LIC, various Bank documents demonstrated that the Bank was aware of L&H's pervasive involvement in the LIC financing in direct contravention of the U.S. GAAP requirements that L&H and LIC must be completely independent. The involvement of Mr. Willaert, the guarantees received from the principals of L&H and the contemplated purchase of the LDCs by L&H at the outset of the loan, all demonstrated that L&H and LIC were not independent of each other as required in order for L&H to recognize revenue from LIC subsidiaries.

### L&H Improperly Recognized $12 Million on Transactions With the Greek, Polish, Hungarian and Czech LDCs Financed by the LIC Loan

L&H improperly recognized $12 million of revenue in violation of U.S. GAAP on its purported sales of licenses to the Greek, Polish, Hungarian and Czech LDCs. That revenue, together with the other revenue that resulted from the Bank's financing, was

---

[191] Mr. Willaert is referred to in a Bank memo regarding the LIC and RADIAL loan extensions as the "external negotiator" for the loans. (DBB 083415)

[192] DBB 002674

material to L&H's financial statements in fiscal year 1998. That fictitious revenue flowed from the licensing agreements that L&H entered into with the four shell entities LDCs financed with the proceeds of the LIC loan, each of which entered into a $3 million software licensing agreement with L&H.

## V. Loan to Messrs. Lernout, Hauspie and Willaert

Key points regarding the loan to Messrs. Lernout, Hauspie and Willaert:

- On June 21, 1999, the Bank received an application for a $20 million loan to the recently formed shell entity Language Development Fund ("LDF"), the purpose of which was to fund various shell LDCs to enable them to pay license fees to L&H. That application was inexplicably canceled.

- On the same day that the LDF loan was canceled, the Bank converted that loan application to an application for a $20 million personal loan by Messrs. Lernout, Hauspie and Willaert, which the Bank approved on that same day.

- The Bank was informed that the purpose of the personal loan was to fund six LDF-created LDCs to provide $16 million in license fees to L&H before June 30, 1999. However, the loan agreement inaccurately states that the purpose of the loan "can be used solely for financing your [Lernout's, Hauspie's and Willaert's] professional activities"[193] with no mention of funding LDCs.

- Messrs. Lernout, Hauspie and Willaert transferred the $20 million they received from the Bank to Tony Snauwert, the principal of a Singaporean entity called Velstra. Velstra transferred a total of $14,832,500 to five LDF-owned LDCs (Urdu LDC, Taiwanese LDC, Vietnamese LDC, Malay LDC, 411.com) that purchased $20.5 million in licenses from L&H.

- LDF reported $16 million in revenue from the Urdu, Taiwanese, Vietnamese and Malay LDCs in the second quarter of 1999 and $4.5 million of revenue from 411.com in the third quarter of 1999.

- L&H improperly reported $20.5 million in revenue in violation of U.S. GAAP in 1999 from transactions with the Urdu, Taiwanese, Vietnamese and Malay LDCs and 411.com. That revenue was material to L&H's 1999 financial statements.

The loan to Messrs. Lernout, Hauspie and Willaert and the use of the proceeds were as follows:

---

[193] DBB 101880

# VI. Messrs. Lernout, Hauspie and Willaert/
# Language Development Fund Loan Transaction



**Notes**:
(1) L&H reported $16 million of revenue at 6/30/99 and $4.5 million at 9/30/99 from sale of software licenses

82

Initially, Lernout Hauspie and Willaert had submitted a loan application to the Bank for LDF. This request was withdrawn for reasons I have been unable to determine from the documents and testimony I have reviewed and a loan for a similar amount ($20 million) was granted personally to Messrs. Lernout, Hauspie and Willaert. The collateral for this loan was 650,000 shares of L&H stock.[194]

**Transaction Requirements**

The Bank was informed that the purpose of this $20 million loan to the principals of L&H was to finance the payment of $16 million in licensing fees from various LDF-owned LDCs to L&H so that L&H could recognize revenue on those fees before June 30, 1999.[195] The Bank also understood that the U.S. GAAP requirements that applied to L&H's recognition of revenue from DC, BTG and RADIAL and LIC also applied to this $20 million loan.[196] Thus, as with the prior loans, the Bank was aware that L&H could not be involved directly or indirectly in the financing of the LDF-owned LDCs. Those LDCs needed to be independent entities capable of entering into arm's length transactions with L&H in order for L&H to properly recognize revenue on the transactions funded by the $20 million loan. The Bank's loan documents indicate knowledge that these U.S GAAP requirements were once again violated.

**LDF and the Principals of L&H Were Related Parties to L&H and the LDF Transactions Lacked Economic Substance**

A review of the Bank's documents and testimony reveal that the LDF-created LDCs were related parties to L&H and the transactions they purported to engage in with L&H lacked economic substance. It was therefore improper under U.S. GAAP for L&H to recognize revenue on licensing agreements funded by the proceeds of the $20 million personal loan as reported in L&H's 1999 financial statements. The Bank's internal loan documents indicate that the Bank proceeded with the loan even though it was aware of these facts.

According to the Bank's documents, "LDF is a special purpose company formed in March of 1999 with a share capital of 72,260[,000] BEF (approximately $1.9 million), of

---

[194] DBB 003643
[195] DBB 003648
[196] Janssens Dep. Tr., page 204, lines 3-10. Also DBB 036804 refers to LIC as a special purpose company similar to DC and BTG.

which 97% was underwritten by Mercator Noordstar, which also granted a loan of 10,000 USD [$10 million]. The purpose of LDF is the development of speech and language technology in several less common languages."[197]

The memo further acknowledged the economic links between LDF, L&H and BTG:

> LDF is now requesting a credit line of 20,000 USD [$20 million]. This is being linked to the repayment in full of our current outstanding risk with Brussels Translation Group ("BTG") of 17,000 USD [$17 million] for 6/30/99 and a decrease of the commercial credit lines to Lernout & Hauspie Speech products "LHS" of 7,500 USD [$7.5 million] in order to limit our total credit portfolio in speech and language technology. (Emphasis added.)[198]

The memo goes on to explain that the proposed LDF structure was the same as the previous loans to DC, BTG and LIC, and was designed to get L&H's R&D expenses off of the Company's financial statements:

> The goal is to develop 30 less common languages. LHS's own calculations show, by the way, that a language is profitable if at least 200,000 people use the technology in various applications…
>
> LHS does not do the R&D for these languages itself, but has that done in various special purpose companies (cf. processes implemented at Dictation Consortium, BTG, LIC). Those companies purchase from LHS a license to use software development kits and tool kits that enable the implementation of speech and language technology in the various languages. The system offers LHS two benefits:
>
> 1) R&D is done outside their own profit and loss structure.
>
> 2) The royalties received can be posted directly as turnover [revenue].[199] (Emphasis added.)

According to the June 25, 1999 Central Credit Committee #1 Minutes, the file on LDF was cancelled and a loan proposal for the same amount and purpose was hastily prepared and submitted on behalf of Messrs. Lernout, Hauspie and Willaert on the same day.[200] A

---

[197] DBB 036775
[198] Ibid.
[199] Ibid.
[200] DBB 003643; Deposition of Peter Rabaey, Vol. 3, October 26, 2006, pages 59-62.

later Bank memo states that the funds being disbursed to Messrs. Lernout, Hauspie and Willaert would be loaned immediately to LDF.[201]

The Bank's memo further stated:

> After completion of the R&D stage, these special purpose companies will be repurchased by LHS who will then further commercialize the languages (only a moral commitment.)[202]
>
> LDF, as umbrella holding, is already now 100% shareholder of three Language Development Companies: Tamil LDC, Hindu LDC and Thai LDC. From LDF's company capital and from the loan from Mercator-Noordstar, 6,000 USD [$6 million] were directed to these different LDCs, which in Q1 1999, bought licenses from LHS with these and 6,000 USD [$6 million] was lent to LIC (also for payment of licenses.)
>
> By 6/30/99, another 6 new LDCs will be established. These LDCs must pay 16,000 USD [$16 million] in license fees by 6/30/99 to LHS.
>
> The borrower [Messrs. Lernout, Hauspie and Willaert] lends these funds to LDF, which in turn grants a loan to the new LDCs who buy the licenses with it.
>
> As LHS books the license sale as turnover [revenue], it is essential under the US-GAAP that there is complete independence between LDF and LHS. Consequently, LHS itself cannot be in any way a party implied in an agreement concerning repayment of the requested financing.[203] (Emphasis added.)

As evidenced above, the Bank was aware that the funds being lent to Messrs. Lernout, Hauspie and Willaert were going to be reported as revenue by L&H.[204] Furthermore, the fact that the LDCs had to pay L&H the license fees by June 30, 1999 demonstrates that, as with the Bank's other loans, there was an urgency to record this revenue prior to the close of L&H's fiscal quarter. In the conclusion of the Bank's memo under the caption "Purpose of the credit" it states:

---

[201] DBB 003647.

[202] DBB 003647

[203] DBB 003648

[204] Per a Bank memo, DBB 036805, it stated that "the proposed transaction [loan to LDF] is comparable to a number of earlier financed projects (BTG, LIC)."

> Bridging credit for capitalization of Language Development Fund, which lends funds to its subsidiaries for payment of license fees by Subsidiaries to LHSP.[205]

In the Bank's June 21, 1999 memo concerning the operations of LDF, it stated under item #4, "R&D risks":

> L&H SP does not want to carry these risks on its own balance sheet. Not until when the R&D phase is over and the marketing opportunities are in view will there be the real chance that L&H SP will buy back those LDCs, as is currently happening with BTG.[206]

The above quote from the Bank's memo demonstrates that not only did the Bank have knowledge that the funds it was lending were being used to circumvent accounting rules and record revenues improperly, but that the transactions lacked economic substance in that L&H would be buying back the very companies that were the source of its revenues.

The Bank's documents reflect that Messrs. Lernout, Hauspie and Willaert immediately transferred the proceeds of the $20 million loan, not to LDF, but to the account of Tony Snauwert, the principal of a Singaporean entity called Velstra Pte Ltd. ("Velstra").[207] According to the L&H Analysis Report issued by Albert Craeynest, Ieper Task Force, Belgium Office of Criminal Analysis, dated January 20, 2004 ("L&H Analysis Report"), Mr. Snauwert transferred the proceeds of the $20 million loan as follows: $3,166,500 to each of the Urdu LDC, Taiwanese LDC, Vietnamese LDC, Malay LDC, and $2,166,500 to 411.com.[208] LDF also owned 411.com.[209] Similar to the other shell entities, 411.com was an undercapitalized LDC, with capital of approximately $59,000.[210] The official address of 411.com was listed as Shenton Way 5, 12-05 UIC Building, 06888 Singapore, the same official address for numerous other LDF-owned LDCs (specifically Hindi, Thai,

---

[205] DBB 003649
[206] DBB 036780
[207] DBB 114886
[208] L&H Analysis Report, page 66
[209] KPMG-B-036483
[210] KPMG-B-035807

Tamil, Shangra, Vanesto, Vaciena and Rodeon)[211] and where, according to *The Wall Street Journal*, there was no evidence of any business operations.[212]

In the second quarter of 1999, the Urdu, Taiwanese, Vietnamese and Malay LDCs each purchased a license from L&H. L&H reported a total of $16 million in revenue from these four licenses. In the third quarter of 1999, 411.com purchased a license agreement from L&H, for which L&H reported $4.5 million of revenue.[213]

In the March 21, 2001 interrogation of Mr. Steverlynck by the BFP, the following questions were asked and answers given:

> Q: Did Artesia Banking Corporation not notice, on the basis of this report (credit proposal), that the credit would by quasi-integrally used for pumping up the revenues of L&H in the short run, as the LDCs yet to be incorporated, had to use almost all of the money to acquire the L&H licenses? It literally reads: These LDCs shall pay a license fee of $16,000,000 to LHS before 6/30/99? (Emphasis added).

> A: Willaert assured us that the investors were ready to invest in these LDCs. L&H only needed this bridging loan to start the incorporation of the LDCs and the new investors would soon thereafter take over everything. Given this situation, we did not have the feeling we were cooperating with something that with hindsight would raise doubts. We were only accelerating what was already planned.

> Q: Then why could the bank or L&H not wait for the new investors to really show up, ready to invest? In this respect it is also true that number 4 "Conclusion" of this report mentions: "there is no confirmation in writing yet about the participation of new investors." Then why is Artesia Banking Corporation prepared to extend a credit for such an amount, knowing that it would enable L&H to substantially increase their turnover [revenue]? (Emphasis added.)

> A: We did not wait with extending this credit because Willaert told us that waiting for the new investors to effectively participate would reduce the technological advantage to L&H. To him it was a matter of life and death for L&H to be up and running with the languages to be

---

[211] BRY0010477-87, KPMG-B-035807
[212] Money Trail: SEC Probe Focuses On Asian Revenues of Belgian Tech Firm, *The Wall Street Journal*, September 22, 2000
[213] KPMG-B-012480

established (LDCs) as soon as possible. With hindsight it may be easy to argue that Artesia Banking Corporation maybe cooperated with the fictitious creation of revenue at L&H, but at the time, we were not aware of it.[214] (Emphasis added.)

In regard to the urgency of the transaction, Mr. Peter Rabaey testified as follows:

> Q: This credit proposal was June 25th 1999, do you recall that the client wanted the money from the loan by June 28th 1999?
>
> A: I see that this is something that apparently I included in my recommendations, it effectively says this transaction is to go ahead on Monday in order for everything to be readied on the accounting side of things before June 30th 1999 conclusion of the second quarter of 1999, Q2. You are right to say that apparently this L&H been urgent then (sic).[215]

## KMPG Audit Confirmations Prepared by the Bank

In 1999, L&H's auditors KPMG sent the Bank a request for audit confirmation that specifically asked the Bank to identify any personal loans associated with L&H that were outstanding as of the year end 1999. In March 2000, the Bank responded to that audit confirmation request, but did not disclose the $20 million personal loan given to Messrs. Lernout, Hauspie & Willaert, even though the loan was funded during June 1999 and was still outstanding at year end 1999.

It is important for auditors to search for related party relationships. U.S. generally accepted auditing standards state that "during the course of his audit, the auditor should be aware of the possible existence of material related party transactions that could affect the financial statements and of common ownership or management control relationships…"[216] The auditing standards further state that the auditor should be aware of the possibility of transactions with related parties that may have been motivated solely, or in large measure, by conditions similar to the following, both of which appear to be applicable to L&H:

---

[214] DBB 036580
[215] Deposition of Peter Rabaey, October 26, 2006, page 57, lines 17-25; page 58, line 1.
[216] AICPA Professional Standards, Volume 1, U.S. Auditing Standards, AU §334.04

- An urgent desire for a continued favorable earnings record in the hope of supporting the price of the company's stock.

- An overly optimistic earnings forecast.[217]

The confirmation KPMG forwarded to the Bank is consistent with auditing procedures to evaluate possible related party transactions, in that it appears to be designed to identify personal loans associated with L&H

Internal Bank documents and the testimony of the Bank's senior management indicate that the Bank made false entries on its books and records to make it appear that the personal loan was repaid by December 31, 1999.[218] However, in reality, the loan was not repaid until January 5, 2000 and therefore it should have been disclosed in the Bank's response to KPMG's request.[219] (U.S. GAAP and normal banking practice would preclude the loan being removed from the Bank's books prior to the actual repayment date). The personal loan was repaid by Velstra. As noted below, the proceeds from the $20 million loan were used to allow L&H to improperly recognize revenue on various licensing agreements with shell LDCs. By concealing the existence of this loan from L&H's auditors, the Bank prevented them from reviewing this loan transaction and the improper underlying transactions funded by the loan.

The following chart summarizes the Bank's responses to certain significant questions asked by KPMG:

---

[217]  Ibid, AU §334.06

[218]  Janssens Dep. Tr. #2, pages 248-250 and exhibits 25-27 document the false entries made by the Bank indicating the loan repayment as of December 31, 1999.

[219]  Janssens Dep. Tr. #2, page 170, lines 8-13, indicates that in regards to the Radial loan which was included in the January 5, 2000 repayment, "the procedure of repayment subject to collection was not respected." In fact, the Bank charged interest on the loan through January 5, 2000, demonstrating that it had not, in fact, been repaid as of December 31, 1999. See Ferrand Exhibit 17 which indicates the interest charged through January 5, 2000.

**Bank Responses to KPMG Audit Requests**[220]

| KPMG Request | Response | | |
|---|---|---|---|
| Excerpts of information requested: | 1997–Paribas | 1998–Artesia | 1999–Artesia |
| **1. Loans and financing** | | | |
| • **the nature (personal loans, financing…)** | | | |
| • amount still due | | | |
| • last expiration date | NIL | NIL | NIL |
| • duration | | | |
| • special modalities | | | |
| 2. Securities and guarantees | | | |
| • All securities and guarantees the company has provided or received for its own behalf or by third parties on behalf of the company | This section of the confirmation could not be located. | No mention of guarantees provided by L&H controlling shareholders and executive officers in response to this request. | |
| • Various securities and guarantees, mentioning the respective amounts and, where applicable, the special modalities. | | | |

**Backdating of Loan Payment**

The BFP asked Mr. Janssens, the head of the bank's Credit Department why Artesia Banking Corporation reflected the loans as being paid on December 30, 1999 (since funds were not received until several days later). He responded:

> I suppose that it was on the request of the client that the repayment was made on 12/30/99. [221] (Emphasis added.)

Mr. Janssen was also asked about the premature recording of the funds received repaying the Bank and testified as follows:

---

[220] DBB 081851, KPMG-B-028126-36, DBB 080956-62. Although the $20 million loan to the L&H officers was only outstanding at December 31, 1999, at the end of 1998 and 1997 there were outstanding guarantees from the L&H majority stockholders and executive officers. The Bank was aware that these individuals were related parties as promulgated by U.S. GAAP and therefore should have disclosed such guarantees to KPMG. We could not locate the audit confirmation requests for 1997 and 1998; however we noted that the 1994 request (DBB 068755) was equivalent to the 1999 request. Accordingly, we have assumed that the 1997 and 1998 audit requests would be similar.

[221] DBB 036332

Q: Is it true that even the repayment, the ultimate repayment, of the Radial loan was not in accordance with the bank normal procedures?

A: It is that the procedure of repayment subject to collection was not respected.[222]

Q: Isn't it true that the bank prematurely recognized the repayment of the Radial loan?

A: It is correct, and on the basis of erroneous information.[223]

Mr. Axel Miller, currently Chairman of the Board of Directors of the Bank, testified as follows regarding the premature recording of the loan repayment:

Q: Can you give me an example where it would be proper for the Bank to credit the repayment of a loan before the money was actually received?

A: There may be a number of circumstances that you can imagine, but I am not in the daily banking practice so I don't see why I should get into that exercise with you.

Q: Well, can you give me an example, as you sit here today, of one?

A: No, I cannot think of an example.[224]

---

[222] Janssens Dep. Tr. #2, page 170, lines 8-13.
[223] Ibid, page 171, lines 3-7.
[224] Deposition of Axel Miller, December 6, 2006, page 163, lines 15-24.

## Summary of Revenue Recognized

A summary of revenue recognized by year on fictitious transactions for which the Bank provided financing is as follows:

**Summary of Revenue Recognized[225] ($ in millions)**

| Company | 1997 | 1998 | 1999 | Total |
|---|---|---|---|---|
| DC[226] | $18.9 | $ 0.3 | | $ 19.2 |
| BTG[227] | 14.9 | 18.0 | $ 2.0 | 34.9 |
| LIC owned LDCs[228] | | 12.0 | | 12.0 |
| RADIAL owned LDCs[229] | | 9.0 | | 9.0 |
| LDF owned LDCs[230] | | | 20.5 | 20.5 |
| Total revenue recognized | $33.8 | $ 39.3 | $22.5 | $95.6 |
| Total L&H revenues | $99.4 | $211.6 | $344.2 | |
| % of total reported revenue | 34% | 18.6% | 6.5% | |
| % of total fictitious revenue | | 61% | 14% | |

If the revenue derived from the entities that were financed by the Bank's financing is removed from L&H's income (loss) before income taxes and minority interest in each of the years, the results would be as follows:

---

[225] KPMGUS034283, KPMGUS008002, KPMGUS008013

[226] In 1997, the Bank provided approximately $16.4 million of financing to DC. L&H, as a result of its transactions with DC, reported a total of $26.7 million of revenue for the years 1996 through 1998. (L&H recorded $7.5 million of revenue in 1996.)

[227] In 1998, the Bank provided approximately $17 million of financing to BTG. L&H, as a result of its transactions with BTG, reported a total of $34.9 million of revenue for the years 1997 through 1999.

[228] In 1998, the Bank provided approximately $6.2 million of financing to LIC. The Bank was informed that LIC was going to fund four LDCs-Greek, Hungarian, Polish and Czech, which were each going to purchase a $3 million license from L&H, for a total of $12 million of reported revenue.

[229] In 1998, the Bank provided approximately $6.4 million of financing to RADIAL. The Bank was informed that RADIAL was going to fund three LDCs-Farsi, Slavic and Bahassa, which each purchased a $3 million license agreement from L&H for a total of $9 million of revenue.

[230] In 1999, the Bank provided $20 million of financing to Messrs. Lernout, Hauspie and Willaert for the purpose of funding LDCs owned by LDF. As the Bank was informed, four of the LDCs owned by LDF were going to purchase $16 million of software licenses from L&H in the second quarter of 1999. LDF also owned an LDC called 411.com, which purchased a license agreement from L&H in the third quarter of 1999 for $4.5 million, using proceeds of the $20 million to Messrs. Lernout, Hauspie and Willaert.

| Description | ($ in millions) | | |
| --- | --- | --- | --- |
| | 1997 | 1998 | 1999 |
| Income (loss) before income taxes and minority interests | $(14.7) | $(45.2) | $73.4 |
| Less: revenue recognized above | (33.8) | (39.3) | (22.5) |
| Restated results | $(48.5) | $(84.5) | $50.9 |
| **% difference from reported results** | **230%** | **87%** | **31%** |

Removing the revenue from the income (loss) before income taxes and minority interests is proper as the revenues were fictitious. Any expenses incurred by L&H in connection with these transactions would most likely have been incurred regardless, in the normal course of their business, as part of the normal development work.

As demonstrated above, the effect of removing the fictitious revenue generated by the Bank financed shell entities from the income (loss) before income taxes and minority interest is significant. These entities provided significant fictitious revenues to L&H from 1997 through 1999. These revenues were of such significance as to make the L&H consolidated financial statements materially misleading.

## Comparison of Requirements Provided to the Bank vs. the Bank's Actions

A comparison of the requirements for U.S. GAAP recognition of revenue that BRF&G and KPMG provided to the Bank compared to the Bank's actions is summarized below:

| BRF&G | KPMG | Bank |
| --- | --- | --- |
| - Transaction must be arm's length/independent | - Transaction must be arm's length/independent | • **Negotiated directly with L&H, not shell SPE borrower** |
| - Nonrefundable | - No compensation recovery | • **Bank was aware of L&H's intentions to acquire shell SPE borrower, where applicable** |
| - Important to L&H to book as revenue | - Important to L&H to book as revenue | • **Complied with L&H's requests for secrecy** |

| | | |
|---|---|---|
| - L&H to be wholly independent of financing | - L&H not to be involved in financing | • **L&H involved in negotiating loans, provided additional compensation (fees, warrants)** |
| - L&H can not be liable directly or indirectly to repay any Bank debt | - L&H can not be liable directly or indirectly or guarantee the loan | • **Bank asked for personal guarantees from controlling shareholders** |
| - L&H can not enter into agreements to repay SPEs debt | - L&H can not agree to repay SPE debt | • **Bank had hidden guarantees from L&H controlling shareholders** |
| - SPE can not require L&H to repay R&D fees | - SPE can not have possibility of R&D expense recovery | • **Bank was aware that L&H and shell SPEs were related/controlled and in certain instances, Bank was aware L&H would acquire SPE** |
| - SPE must bear risk of L&H not exercising any options to repurchase licensed technology | - SPE must bear risk of L&H not exercising any repurchase options | |

## Summary

The Bank was well aware that the revenues being recognized by L&H were fabricated through the financing the Bank provided. The loans in many instances were made to shell entities which immediately turned around and purported to purchase software licenses from L&H. These licenses resulted in material amounts of revenue for L&H. The Bank provided financing in many instances despite its own in-house legal counsel questioning the economic substance of the transaction. Furthermore, the Bank was aware that L&H was itself structuring the loans to these shell entities as evidenced by the shareholder guarantees, credit default swaps, involvement of L&H officers' in negotiating these loans, and compensation provided by L&H as consideration for the loans. To conceal these improper actions, the Bank omitted from the loan documents any reference to the guarantees it received from L&H controlling shareholders – which initially were in the form of direct personal guarantees and then later changed to credit default swaps. The Bank also entered into side letters designed to hide the fact that L&H's controlling shareholders had guaranteed the loans.

The fraudulent revenue recorded by L&H from the shell entities discussed above could not have occurred without the Bank's participation.

The fraud to artificially inflate L&H's reported revenue was pervasive. Approximately 44%, or $365 million, of the L&H consolidated revenue had to be reversed for the period January 1, 1998 through June 30, 2000. Further, L&H ultimately admitted that it had to reverse and restate all of the revenue the Company booked in 1998 and 1999 that was attributable to the LDCs. The magnitude of this restatement is a clear indication of the enormity of the fraud. The restated L&H consolidated financial statements were never issued and L&H filed for bankruptcy on November 29, 2000. The Company was subsequently liquidated.

****

My total fee will depend on the hours expended by myself and anyone working for me and under my direction. My fee for this work is $625 an hour plus out-of-pocket expenses. Other professionals working for me are charged at lower rates depending on their experience. Payment of my fee and expenses is not contingent upon the final resolution of this matter.

Vincent J. Love, CPA, CFE

January 4, 2007

# Exhibit 1

## Qualifications

I am a Certified Public Accountant in New York, Ohio (not currently registered) and Connecticut as well as a Certified Fraud Examiner and Certified Bank Auditor (a designation conferred by the Bank Administration Institute requiring bank auditing experience and the successful completion of a two-day test that includes a section on bank operations). I have over 39 years of experience providing auditing, financial consulting and other similar types of financial services to all types of business entities ranging in size from small closely held companies to large multinational companies. Since 1976, in addition to providing solutions to complex financial and operating problems, I have helped attorneys and their clients understand and explain the technical issues and damages in complex business litigation.

I have extensive experience working specifically with banks both domestically and internationally for over 30 years. In 1975 and 1976, I chaired the New York State Society of Certified Public Accountant's Committee on Banks and Savings Institutions Accounting and Auditing. Between 1989 and 1991, I served on the Association of Certified Fraud Examiners' Financial Institutions Committee. I have audited and consulted with financial institutions ranging in size from initial start-up banks to large multi-national banking institutions with subsidiaries and branches around the world. In addition to extensive domestic banking experience, I have audited and consulted with banks, and read, reviewed and analyzed, bank regulatory financial and examination reports for the United Kingdom, Germany, Japan, France, Lebanon, Jordan, Thailand, Greece, Italy, Singapore, India, Pakistan, Bangladesh, Venezuela, Bolivia, Argentina, Belgium, Lichtenstein, and Turkey.

Between 2000 and 2004, I served on the Board of Directors and was the Chair of the Audit Committee of The Park Avenue Bank, N.A. This closely-held, U.S. nationally chartered financial institution concentrated on U.S. dollar lending to companies in Turkey, Eastern Europe and South America.

I also have extensive experience on investigating the causes of operational and lending losses at bank's including, during the mid 1970's, American Express International Bank and the foreign banking division of the Chase Manhattan Bank. I have also reviewed banking operations as part of examinations of banks and read and analyzed bank regulatory reports from as early as 1972. I have has also authored Arthur Young's international banking course manual and spoke on bank operations and auditing in many international locations and for the New York State Society of Certified Public Accountants and the Northeast Chapter of the Bank Administration.

I am a frequent lecturer and panelist on business, accounting and auditing issues, particularly as they relate to the practice of law. In prior years, I have been a moderator and lecturer in a course given for the Federal Judicial Center and National Judicial College titled *Financial Statements in the Courtroom*. I, currently, serve on the Board of Editors for the *CPA Journal* and have authored a number of published articles, commentaries, book reviews and papers as well as a book, *Understanding and Using Financial Data — an Ernst & Young Guide for Lawyers*, first edition, published in 1992 and supplemented in 1994. I am also an acknowledged technical reviewer of the *Miller GAAS Guide*.

I am a member of the Board of Directors of Quality Systems, Inc. (NASDAQ — QSII) and serve on its Audit (Chair 2006 – 2007), Compensation (Chair 2005 – 2006), Nominating and Transaction Committees. I am an honorary member of the Executive Committee of the Board of Directors of the American Arbitration Association (AAA) and serve on the AAA budget committee. I am a member of Counsel, the American Institute of Certified Public Accountants' governing board. I recently served as a Vice President and on the New York State Society of CPAs (NYSSCPA) Board of Directors and its Executive Committee. I currently serve on the NYSSCPA Quality Enhancement Policy Committee.

I am a member of the New York Commercial Panel of the AAA, and an arbitrator for the New York Mercantile Exchange where I also serve as a member of the Appeals Committee. A current copy of my curriculum vitae is attached as Exhibit 2 to this report.

In the last four years I have given testimony in deposition or at trial in the following cases:

- Saudi Basic Industries Corporation v. Mobil Yanbu Petrochemical Company, Inc. and Exxon Chemical Arabia, Inc. — Superior Court of the State of Delaware in and for New Castle County, C.A. No. 00C-07-161-JRJ.

- Richard O. Berner, on behalf of the Berners; Aundyr Trust Company Limited, as Trustee of the Ronald Levinsohn Trust, Claimants, against Erik Postnieks; Parametric Capital Management LLC, Respondents in an arbitration under the rules of, and administered by, the American Arbitration Association, Case No.13 Y 169 02230 1.

- Morton Levine, Trustee for the Estate of Larry C. Johnson v. Howard Comart, Ross Koppel, and Richard Scott. — US District Court, Southern District of New York, Case No. 98 Civ. 8329 (TPG).

- Bruce R. Kalish, Claimant, against Interboro Holdings, Inc. and Educational Video Conferencing, Inc. a/k/a EVCI Career Colleges — JAMS/Endispute, Arb. No. 1420011265.

- Mephrology Associates, et al. v. Marque Millennium Group, Ltd, et al. — Supreme Court of the State of New York, County of New York, Index No. 01-604724.

- BMO Nesbitt Burns, Inc., et al., Claimant, against Double Play Company, et ano., Respondent, in an arbitration under the rules of, and administered by, the American Arbitration Association, Case No.50 T 180 00387 02.

- Everett Capital, Claimant, against Solomon Smith Barney Inc. n/k/a Smith Barney, Respondent, before the National Association of Securities Dealers, Inc. NASD Case No. 03-05965.

- Hale House Center, Inc., et al. v. Michael Lee & Company — Supreme Court of the State of New York, County of New York, Index No. 602600/02.

- Barry Evans, et al. v. Winston & Strawn, et al. — Supreme Court of the State of New York, County of New York, IAS Part 3, Index No. 604798/2001.

- Bernard Hopkins, Jr., Claimant, against Don King/Don King Productions, Inc., Respondents, in an arbitration under the rules of, and administered by, the American Arbitration Association, Case No.13 Y 140 00557 04

- Michael Trent Reznor v. J. Artist Management, Inc. et al. — US District Court, Southern District of New York, Case No. 04 Civ. 3808 (JSR).

- Alec Sharp, et al. v. PriceWaterhouseCoopers, LLP d/b/a Price Waterhouse, LLP — US District Court, District of Connecticut, Civil Action No. 3:02 CV 1572 (MRK).

- In the Matter of Gregory M. Dearlove, CPA — Before the Securities and Exchange Commission, File No. 3-12064.

- IMG Worldwide, Inc., Claimant, against Casey Close, Respondent, in an arbitration under the rules of, and administered by, the American Arbitration Association, Case No. 53 166 00251 06.

- Creative Waste Management, Inc. v. Capitol Environmental Services, Inc. et al. — US District Court, Southern District of New York, Case No. 04 Civ. 9581 (WCC).

- Alimentation Couche-Tard Inc., Claimant against ConocoPhillips Company, Respondent, in an arbitration under the rules of, and administered by, the American Arbitration Association, Case No. 50 180 T 00016 06.

# Exhibit 2

# Kramer Love & Cutler, LLP <span style="float:right">Exhibit 2</span>

## VINCENT J. LOVE

**Education:**

- City College of New York, 1959-1963, BBA—Accounting
- Williams College Executive Program, 1974
- Received in excess of 40 hours of accounting, tax or related business continuing professional education credits per year since 1967.

**Employment:**

- Manufacturers Hanover Trust Company, September 1963 to February 1964
- United States Army, March 1964 to April 1967, attained rank of Captain
- Ernst & Young (and its predecessor firms), May 1967 to May 1994 (Partner 1979)
- Kramer Love & Cutler, LLP (and its predecessor firm), June 1994 to present

**Professional Designations:**

- Certified Public Accountant: New York (1970) Ohio (1979) Connecticut (1994)
- Certified Bank Auditor (1982)
- Certified Fraud Examiner (1989)

**Professional Organizations:**

- American Institute of Certified Public Accountants (AICPA)
- New York State Society of Certified Public Accountants (NYSSCPA)
- Ohio State Society of Certified Public Accountants
- Association of Certified Fraud Examiners (ACFE)
- American Arbitration Association
- Panel of Arbitrators:
  — American Arbitration Association (Commercial Panel)
  — National Futures Association
  — New York Mercantile Exchange (Member of Appeals Committee-1997-Present)

**Board Memberships:**

- Member of the Board of Directors, Quality Systems, Inc. (NASDAQ) (2004-Present)
  Member of the Audit Committee (2004-Present; Chair 2006)
  Chair of the Nominating Committee (2004/5)
  Chair of the Compensation Committee (2005)

Member of the Transaction Committees (2005/6)
- Member of the Board of Directors, The Park Avenue Bank N.A., (2000-2004)
  Chair, Audit Committee (2000-2004)
- Member of the Board of Directors of the American Arbitration Association (1991-2003)
  Chair — Audit Committee (2003), member (1991-1995 and 2002-2004)
  Treasurer — 1991-1995
  Member — Executive Committee (1991-1995); honorary member (1995-Present)
  Member — Budget, Finance and Organization Committee (1991-1995, 1997-Present)
  Member — Panels Relationship Committee (1996-1999)
  Member — Governance Committee (2001)
- Member of the Board of Directors and Chair of the Audit Committee of Banco de Préstamos National Bank (In Organization) (1996-1997)

**Professional Committee Memberships (Since 1990):**

- Member, AICPA Council (governing body) (2004-Present)
- Member, AICPA Business Valuation and Forensic and Litigation Services Executive Committee (2004-Present)
- Member, NYSSCPA Quality Enhancement Policy Committee (2004-Present)
- Member of the Editorial Board of the *CPAJournal* (1999-Present)
- Vice President, NYSSCPA (2003 - 2004)
- Member of the Board of Directors of the NYSSCPA (2000 – 2004)
  Member, Executive Committee of the Board (2002-2004)
- Chair, NYSSCPA Task Force on Public Accountability (2002)
- Chair of the NYSSCPA Mediation and Arbitration Committee (2002)
  Vice Chair (2001-2002)
- Member, NYSSCPA Committee on Financial Accounting Standards (2000-2003)
- Member of the Executive Board of the Manhattan/Bronx Chapter of the NYSSCPA (2001-2002)
- Chair, NYSSCPA Committee on Auditing Standards and Procedures (1998-2000)
  Member, (1995-1998)
- Chairman, NYSSCPA Committee on Professional Ethics (1995-1998)
  Chairman — Technical Standards Subcommittee (1993-1995)
  Member, (1991 - 1995)
- Member, AICPA Relations with the Judiciary Subcommittee (1995-1998)
- Member, AICPA Litigation Services Subcommittee (1992-1995)
- Member, ACFE, Financial Institutions Committee (1989-1991)
- Member of the Staff to the Superintendent's Advisory Committee (NYS) on the Supervision of Transnational Banking Institutions (1991-1992)
- Member, NYSSCPA Committee on Arbitration and Mediation (1990)
- Member, NYSSCPA Committee on Litigation Support (1987-1990)

2

**Instructor/Lecturer/Panelist:**

Mr. Love acted as an instructor, lecturer, or panelist, over the last ten years in the following educational programs:

| Title | Sponsor | Year |
|---|---|---|
| Professional Ethics Update | Foundation for Accounting Education (NYSSCPA) | 1995, 1996 &1997 |
| Accountant's Liability and Defenses | NYSSCPA | 1996 |
| Financial Statements in the Courtroom | The National Judicial College | 1996, 2001 & 2002 |
| What Every Successful Lawyer Needs to Know About Accounting | Practising Law Institute | 1995 & 1996 |
| Figuring Out The Deal — Using Financial Information to Your Clients' Advantage | Practising Law Institute | 1996 & 1997 |
| Attestation/Consulting Standards for Fraud Engagements | AICPA National Conference on Fraud | 1996 |
| Financial Statements in the Courtroom | Federal Judicial Center | 1997,1998, 1999 & 2000 |
| Accounting and Finance for Lawyers | Practising Law Institute | 1997 |
| Contrasting the CPA's Role in Arbitration, Mediation and Litigation | AICPA National Advanced Litigation Services Conference | 1997 |
| Management of a Litigation Services Practice | Florida Institute of Certified Public Accountants | 1997 |
| Basics of Accounting & Finance | Practising Law Institute | 1998, 1999 & 2000 |
| Ethics Update | NYSSCPA | 1998 |
| Accounting Disclosure Issues (Revenue Recognition) | American Bar Association (Committee on Federal Regulation of Securities) | 1998 |

| Title | Sponsor | Year |
|---|---|---|
| Review of Current Audit Risks | NYSSCPA | 1999 |
| Professional Ethics | NYSSCPA | 1999 |
| Expert Testimony and the Federal Rules of Evidence | NYSSCPA | 1999 |
| Review of Current Audit Risks | NYSSCPA | 2000 |
| Do's and Don'ts after Daubert and Kumho Tire | NYSSCPA | 2000 |
| Notes to Financial Statements, Financial Statement Analyses | The Association of the Bar of the City of New York | 2001 & 2004 |
| Cash Flow Statements, Financial Fraud, Time Value of Money and Estimates in Financial Reporting | Fordham University School of Law | 2002 |
| Accounting for Lawyers | The Association of the Bar of the City of New York | 2002 |
| AICPA Proposed Exposure Draft | NYSSCPA's | 2002 |
| Insulating the Audit Committee from Exposure | American Conference Institute | 2002 |
| Corporate Governance | Coastal Fairfield County Chapter, Institute of Management Accountants | 2002 |
| ABCs of Financial Statement Analysis | The Association of the Bar of the City of New York | 2002 & 2003 |
| Judgment and Estimates in the Preparation of Financial Statements | Fordham University School of Law | 2003 |
| Accountants' Liability 2003 | The Regional Bar Assoc., Inc. Stamford, CT | 2003 |
| Accounting for Lawyers/Notes to Financial Statements | The Association of the Bar of the City of New York | 2003 |
| Financial Fraud | Financial Executives International | 2003 |
| Sarbanes/Oxley Act, Financial & Accounting Implementation Strategies | The Association of the Bar of the City of New York | 2003 |

4

| Title | Sponsor | Year |
|-------|---------|------|
| Expert Reports Under Rule 26 | AICPA | 2003 |
| Ethics Annual Update | NYSSCPA | 2003, through 2006 |
| The New Ethics Environment: Practical Issues for Valuation & Litigation Practitioners | AICPA - Webcast | 2004 |
| Finding & Analyzing Financial Data | The Association of the Bar of the City of New York | 2004 |
| Current Issues in Accounting Litigation | The Association of the Bar of the City of New York | 2005 |
| Fraud | National Association of Black Accountants, Inc. | 2005 |
| The Audit Process | ALI-ABA | 2006 |
| Current Issues in Accounting Litigation | New York City Bar | 2006 |

Additionally, Mr. Love has developed and/or taught numerous seminars over the years on accounting, auditing, reporting and other related topics. He frequently serves on panels, or as a speaker, at professional organizations' educational conferences.

Mr. Love has been a guest on CNBC, Bloomberg TV and CBS MarketWatch (webcast) discussing regulation of the accounting profession in the aftermath of the Enron bankruptcy. He has also been a guest on the NewsHour with Jim Lehrer to discuss the financial reporting of Halliburton during the period when Vice President Cheney was its Chairman. Mr. Love has also appeared on BBC and NY 1, and was interviewed for Bloomberg Radio, on issues related to the Sarbanes-Oxley Act.

In November 1999, Mr. Love testified before the New York State Assembly Committee on Higher Education on issues related to the practice of public accounting, in February 2002, before the New York State Senate Committee on Higher Education and in May 2002 at the Public Meeting of the State Education Department, Office of Professions, State Board of Public Accountancy.

**Publications:**

The following are articles, a book and book reviews authored since 1994:

- Understanding and Using Financial Data—An Ernst & Young Guide for Attorneys, John Wiley & Sons (1992 - Supplemented 1994)

- "Accounting for Contingencies," Accounting for Lawyers, Practising Law Institute (1994)

- "Commentary — CPAs get new tool to use in disputes with clients," Accounting Today, May 2, 1994

- "Financial Reporting Update," Accounting for Lawyers — Using Financial Data in Legal Practice, Practising Law Institute (1994)

- "The Balance Sheet: Inventory" Accounting for Lawyers — Using Financial Data in Your Legal Practice, Practising Law Institute (1995)

- "Alternative Dispute Resolution: The Pros and Cons*," CPA Expert, Summer 1996

- "Using ADR Clauses in Consulting Services Engagement Letters*," CPA Management Consultant, Summer 1996

- "Notes to the Financial Statements," Accounting and Finance for Lawyers, Practicing Law Institute (1997)

- "Notes to the Financial Statements," Basic Accounting & Finance, What Every Practicing Lawyer Needs to Know, Practicing Law Institute (1998)
- "The CPA as Arbitrator," The CPA Journal, 9/98

- "Federal Rules of Evidence and the Financial Professional*," CPA Journal, 1/99

- "Update on the Preclusion of Financial Experts under Daubert*," CPA Journal 7/99

- "Sources of Financial and Operating Information," Basic Accounting & Finance, What Every Practicing Lawyer Needs to Know, Practicing Law Institute (1999)

- Accounting for Lawyers: Introduction (2002 only), Notes to Financial Statements, Financial Statement Analysis; Association of the Bar of the City of New York (2001, 2002)

- Book Review — review of "Practitioner's Guide to Audit Sampling" by Dan M. Guy, Douglas R. Carmichael and O. Ray Whittington — The CPA Journal, 11/98

- Book Review — review of "Wiley's Student GAAS Guide" by Dan M. Guy and Douglas R. Carmichael — The CPA Journal, 6/99

- Book Review — review of "Montgomery's Auditing, 12th Edition, Continuing Professional Education Edition" by Vincent M. O'Reilly, Barry N. Winogard, James S. Gerson and Henry R. Jaenicke— The CPA Journal, 2/00

- Book Review — review of "The Audit Committee Handbook, 3rd Edition" by Louis Braiotta, Jr. — The CPA Journal, 5/00

- Book Review — review of "Accounting Irregularities and Financial Fraud" Michael R. Young, Esq., principal author and editor — The CPA Journal, 7/00

- Book Review — review of "The Auditor's Field SAS Guide" by Dan M. Guy and Douglas R. Carmichael — The CPA Journal, 12/00

- Book Review — review of "Effective Expert Testimony" by David M. Malone and Paul J. Zwier — CPA Journal, 4/01

- Book Review — review of "The CPA's Guide to Professional Ethics" by Dan M. Guy, Douglas R. Carmichael and Linda A. Lach — CPA Journal, 5/01

- Book Review — review of "*Expert Rules,* 2nd edition" by David M. Malone and Paul J. Zwier — CPA Journal, 1/02

- Book Review — review of "Ethics for CPAs" by Dan M. Guy, Douglas R. Carmichael and Linda A. Lach — CPA Journal, 12/03

- Book Review — review of "The Audit Committee Handbook, 4th Edition" by Louis Braiotta, Jr. — CPA Journal, 11/04

- Book Review — review of "Forensic Accounting and Fraud Investigation for Non-Experts" by Howard Silverstone and Michael Sheetz — CPA Journal, 8/05

**Pre-issuance Review**
- Pre-issuance review of Chapter 5, "Electronic Commerce Internal Control Assurance Services" in *Miller, 2000 Electronic Commerce Assurance Services, Electronic Workpapers and Reference Guide*

- Pre-issuance content review of *Miller, GAAS Guide*, CCH (previously, Aspen Publishers, Inc.), 2001 issue (reviewed in 2000) to 2005 issue, 2007 issue (reviewed in 2006)

- Pre-issuance content review of *Miller, Not-For-Profit Reporting*, CCH, 2005 issue (reviewed in 2004)

- Pre-issuance content review of *Miller, Not-For-Profit Organization Audits with Single Audits*, CCH, 2005-2006 and 2006-2007 issues

\* Co-authored/edited.

**Exhibit 3**

## Documents Read, Reviewed and/or Analyzed

### Court Pleadings

1. Complaint in United States District Court District of Massachusetts, Jury Trial Demanded, Janet Baker, and James Baker, JKBaker LLC and JMBaker LLC, Plaintiffs, v. Dexia, S.A., Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.), Defendants, dated March 11, 2004

2. Complaint in United States District Court District of Massachusetts, Jury Trial Demanded, Stonington Partners, Inc., a Delaware Corporation, Stonington Capital Appreciation 1994 Fund L.P., a Delaware Partnership and Stonington Holdings, L.L.C., a Delaware limited liability company, Plaintiffs, v. Dexia, S.A. and Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.), Defendants, Civil Action No. 04-10411PBS, dated March 1, 2004

3. Complaint in United States District Court of Massachusetts, Jury Trial Demanded, Gary B. Filler and Lawrence Perlman, Trustees of the TRA Rights Trust, Plaintiffs v. Dexia, S.A. and Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.), Defendants, Civil Action No. 04-10477-PBS, dated March 8, 2004

4. United States District Court of Massachusetts, Hans A. Quaak, Attilio Po and Karl Leibinger, on behalf of themselves and those similarly situated, Plaintiffs, v. Dexia, S.A., Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.) Defendants, Defendant Dexia S.A.'s Motion To Dismiss, Civil Action No. 03-CIV-11566 (PBS), dated April 2, 2004

5. United States District Court of Massachusetts, Hans A. Quaak, Attilio Po and Karl Leibinger, on behalf of themselves and those similarly situated, Plaintiffs, v. Dexia, S.A., Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.) Defendants, Memorandum Of Law In Support Of Defendants Dexia S.A.'s And Dexia Bank Belgium's Motion To Dismiss The Second Amended Class Action Complaint, Civil Action No. 03-CIV-11566 (PBS), dated April 2, 2004

6. United States District Court of Massachusetts, Hans A. Quaak, Attilio Po and Karl Leibinger, on behalf of themselves and those similarly situated, Plaintiffs, v. Dexia, S.A., Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.) Defendants, Answer, Civil Action No. 03-CIV-11566 (PBS), dated March 24, 2005

7. United States District Court District of Massachusetts, Stonington Partners, Inc., a Delaware Corporation, Stonington Capital Appreciation 1994 Fund L.P., a Delaware Partnership and Stonington Holdings, L.L.C., a Delaware limited liability company, Plaintiffs, v. Dexia, S.A. and Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.), Defendants, Answer Civil Action No. 04-10411(PBS), dated March 24, 2005

8. United States District Court of Massachusetts, Gary B. Filler and Lawrence Perlman, Trustees of the TRA Rights Trust, Plaintiffs, v. Dexia, S.A. and Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.), Defendants, Answer, Civil Action No. 04-10477-PBS, dated March 24, 2005

9. United States District Court of Massachusetts, Janet Baker and James Baker, JKBaker LLC and JMBaker LLC, Plaintiffs, v. Dexia, S.A. and Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.), Defendants, Answer Civil Action No. 04-10501(PBS), dated March 24, 2005

10. United States District Court of Massachusetts, Hans A. Quaak, Attilio Po and Karl Leibinger, on behalf of themselves and those similarly situated, Plaintiffs, v. Dexia, S.A., Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.) Defendants, Dexia Bank Belgium's Amended Responses And Objections To Lead Plaintiffs' First Set of Interrogatories, Civil Action No. 03-CIV-11566 (PBS), dated September 30, 2005

11. United States District Court of Massachusetts, Hans A. Quaak, Attilio Po and Karl Leibinger, on behalf of themselves and those similarly situated, Plaintiffs, v. Dexia, S.A., Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.) Defendants, Dexia Bank Belgium's Amended Responses And Objections To Lead Plaintiffs' Second Set of Interrogatories, Civil Action No. 03-CIV-11566 (PBS), dated October 31, 2005

12. United States District Court of Massachusetts, Hans A. Quaak, Attilio Po and Karl Leibinger, on behalf of themselves and those similarly situated, Plaintiffs, v. Dexia, S.A., Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.) Defendants, Dexia S.A.'s Renewed Motion To Dismiss The Second Amended Class Action Complaint, Civil Action No. 03-CIV-11566 (PBS), dated January 13, 2006

13. United States District Court of Massachusetts, Hans A. Quaak, Attilio Po and Karl Leibinger, on behalf of themselves and those similarly situated, Plaintiffs, v. Dexia, S.A., Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.) Defendants, Memorandum Of Law In Support Of Dexia S.A.'s Renewed Motion To Dismiss The Second Amended Class Action Complaint, Civil Action No. 03-CIV-11566 (PBS), dated January 13, 2006

14. United States District Court of Massachusetts, Hans A. Quaak, Attilio Po and Karl Leibinger, on behalf of themselves and those similarly situated, Plaintiffs, v. Dexia, S.A., Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.) Defendants, Dexia Bank Belgium's Amended Responses And Objections To Lead Plaintiffs' Third Set of Interrogatories, Civil Action No. 03-CIV-11566 (PBS), dated January 18, 2006

15. United States District Court of Massachusetts, Hans A. Quaak, Attilio Po and Karl Leibinger, on behalf of themselves and those similarly situated, Plaintiffs, v.

2

Dexia, S.A., Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.) Defendants, Dexia Bank Belgium's Amended Responses And Objections To Lead Plaintiffs' Fourth Set of Interrogatories, Civil Action No. 03-CIV-11566 (PBS), dated February 8, 2006

16. United States District Court of Massachusetts, Jury Trial Demanded, Hans A. Quaak, Attilio Po and Karl Leibinger, on behalf of themselves and those similarly situated, Plaintiffs, v. Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.), Defendant, Civil Action No. 03-CIV-11566(PBS) dated February 16, 2006

17. United States District Court of Massachusetts, Hans A. Quaak, Attilio Po and Karl Leibinger, on behalf of themselves and those similarly situated, Plaintiffs, v. Dexia, S.A., Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.) Defendants, Dexia Bank Belgium's Amended Responses And Objections To Lead Plaintiffs' Fourth Set of Interrogatories, Civil Action No. 03-CIV-11566 (PBS), dated February 8, 2006

18. United States District Court of Massachusetts, Hans A. Quaak, Attilio Po and Karl Leibinger, on behalf of themselves and those similarly situated, Plaintiffs, v. Dexia, S.A., Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.) Defendants, Dexia Bank Belgium's Amended Responses And Objections To Lead Plaintiffs' Fifth Set of Interrogatories, Civil Action No. 03-CIV-11566 (PBS), dated March 29, 2006

19. United States District Court of Massachusetts, Hans A. Quaak, Attilio Po and Karl Leibinger, on behalf of themselves and those similarly situated, Plaintiffs, v. Dexia, S.A., Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.) Defendants, Dexia Bank Belgium's Motion To Dismiss The Third Amended Class Action Complaint, Civil Action No. 03-CIV-11566 (PBS), dated April 27, 2006

20. United States District Court of Massachusetts, Hans A. Quaak, Attilio Po and Karl Leibinger, on behalf of themselves and those similarly situated, Plaintiffs, v. Dexia, S.A., Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.) Defendants, Memorandum Of Law In Support Of Dexia's Motion To Dismiss The Third Amended Complaint, Civil Action No. 03-11566 (PBS), dated April 27, 2006

21. United States District Court of Massachusetts, Hans A. Quaak, et. al., Plaintiffs v. Dexia S.A., and Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.), Defendants, Dexia Bank Belgium's Responses And Objections To Plaintiffs' First Requests For Admissions And Supplemental Interrogatories, dated June 16, 2006

22. United States District Court of Massachusetts, Hans A. Quaak, et. al., Plaintiffs v. Dexia S.A., and Dexia Bank Belgium (formerly known as Artesia Banking Corp.,

3

S.A.), Defendants, Dexia Bank Belgium's Responses and Objections to Class Plaintiffs' Fifth Set of Interrogatories, dated March 29, 2006

23. United States District Court of Massachusetts, Hans A. Quaak, Attilio Po and Karl Leibinger, on behalf of themselves and those similarly situated, Plaintiffs, v. Dexia, S.A., Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.) Defendants, Dexia Bank Belgium's Amended Responses And Objections To Class Plaintiffs' First Request for Admissions and Supplemental Interrogatories, Civil Action No. 03-CIV-11566 (PBS), dated July 17, 2006

24. Amended Complaint in United States District Court District of Massachusetts, Jury Trial Demanded, Janet Baker, and James Baker, JKBaker LLC and JMBaker LLC, Plaintiffs, v. Dexia, S.A., Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.), Defendants, dated September 15, 2006

25. Amended Complaint United States District Court District of Massachusetts, Jury Trial Demanded, Stonington Partners, Inc., a Delaware Corporation, Stonington Capital Appreciation 1994 Fund L.P., a Delaware Partnership and Stonington Holdings, L.L.C., a Delaware limited liability company, Plaintiffs, v. Dexia, S.A. and Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.), Defendants, Civil Action No. 04-10411PBS, dated September 15, 2006

26. Amended Complaint in United States District Court of Massachusetts, Jury Trial Demanded, Gary B. Filler and Lawrence Perlman, Trustees of the TRA Rights Trust, Plaintiffs v. Dexia, S.A. and Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.), Defendants, Civil Action No. 04-10477-PBS, dated September 15, 2006

27. United States District Court of Massachusetts, Hans A. Quaak, Attilio Po and Karl Leibinger, on behalf of themselves and those similarly situated, Plaintiffs, v. Dexia, S.A., Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.) Defendants, Dexia Bank Belgium's Amended Responses And Objections To Lead Plaintiffs' Sixth Set of Interrogatories, Civil Action No. 03-CIV-11566 (PBS), dated October 3, 2006

28. United States District Court of Massachusetts, Hans A. Quaak, Attilio Po and Karl Leibinger, on behalf of themselves and those similarly situated, Plaintiffs, v. Dexia, S.A., Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.) Defendants, Dexia Bank Belgium's Second Amended Responses And Objections To Lead Plaintiffs' Sixth Set of Interrogatories, Civil Action No. 03-CIV-11566 (PBS), dated November 17, 2006

**Documents Produced in Discovery**

1. Documents produced by Dexia Bank Belgium

2. Documents produced by Lernout & Hauspie Speech Products, N.V.

4

2. Documents produced by KPMG United States

3. Documents produced by KPMG-Belgium

4. Documents produced by Bryan Cave

5. Document produced by Francis Vanderhoydonck

**Depositions**

1. Antoon Baert, including exhibits 1–9, May 24, 2006

2. James Baker, including exhibits 1–13, May 26, 2006

3. Janet Baker, including exhibits 1–4, May 24, 2006

4. Dirk Bruneel, including exhibits 1–14, June 16, 2006

5. Ivan De Coen, including exhibits 1-19, September 21, 2006

6. Stefaan Decraene, including exhibits 1-48, December 1, 2006

7. Han DeWeirdt, including exhibits 1–19, June 14, 2006

8. Bart Ferrand, including exhibits 1-49, October 19 & 20, 2006

9. Gary B. Filler, including exhibits 1–12, May 8, 2006

10. Albert J. Fitzgibbons, July 13, 2004

11. Pol Hauspie, including exhibits 1–36, November 8, 2004

12. Jacques Janssens, including exhibits 1-28, April 20, 2006

13. Bernard Lamiroy, including exhibits 1–2, October 18, 2005

14. Axel Miller, including Exhibits 1-7, December 6, 2006

15. Bernard Mommens, including exhibits 1–35, April 19, 2006

16. Claude Piret, including exhibits 1–31, March 16 & 17, 2006

17. Alain Probst, including exhibits 1–26, March 14, 2006

18. Peter Rabaey, Volumes 1-4, including exhibits 1-24, October 24-26, 2006

19. Francoise Saverys, including exhibits 1–42, April 25, 2006

20. John D. Shagoury, Vol. 1, April 6, 2004

21. Scott M. Shaw, including exhibits 1–15, July 29, 2004

22. Phillippe Steverlynck, including exhibits 1-35, April 27 & 28, 2006

23. Francis Vanderhoydonck, including exhibits 1–35, September 28 & 29, 2004

24. Joris Van Helleputte, including exhibits 1-43, September 19, 2006

25. Karl Van Reit, including exhibits 1–59, March 17 & April 24, 2006

26. Patrick Van Tiggel, including exhibits 1-6, May 23, 2006

## Other Documents

1. NV Lernout & Hauspie Speech Products Investigation Into The Turnover Achieved In Language Development Companies Revenue Recognition Consolidation And Related Party Issues Part II, dated May 28, 2001, from Criminal File IE.71B.98.464/00 of the Ieper Federal Police, Belgium

2. Report of the civil co-operative company with limited liability KMPG Auditors as ordered by the Court of Commerce of Ieper (B) by judgment on January 5, 2001 Lernout & Hauspie Speech Products N.V.

3. Various SEC filings by L&H from 1996 through 2000

4. Various press articles concerning L&H

5. Lernout & Hauspie Speech Products N.V. "Findings and Recommendations to the Audit Committee by Bryan Cave LLP and Loeff Claeys Verbeke," November 20, 2000

6. Expert Report of Charles R. Drott, CPA, CFA dated November 29, 2004, filed in re Lernout & Hauspie Securities Litigation, D. Mass. Civil Action No. 00-11589 (PBS)

7. CBF Circular D1 97/9 of December 18, 1997

8. PV No. 330/02, Aanwr. No. 50/02 dated February 26, 2002 from Criminal File IE.71B.98.464/00 of the Ieper Federal Police, Belgium (Violations of Law in Connection with Companies and Trading Companies)

9. PV No. 23/04, Aanwr. No. 772/03 dated January 12, 2004 from Criminal File IE.71B.98.464/00 of the Ieper Federal Police, Belgium (Analysis of BTG Credit File)

10. Ieper Task Force L&H, L&H Analysis Report LDC-CLDC-IAC dated January 20, 2004 from Criminal File IE.71B.98.464/00 of the Ieper Federal Police, Belgium

11. English translations of various documents listed above

**Exhibit 4**

## Acronyms Used

| | |
|---|---|
| Bacob | Bacob Bank |
| Bank | Dexia Bank Belgium, as successor to Artesia Banking Corporation, S.A. |
| BEF | Belgian francs |
| BFC | Belgium Banking and Finance Commission |
| BFP | Belgium Federal Police |
| BRF&G | Brown Rudnick Freed & Gesmer, L&H's U.S. legal counsel |
| BTG | Brussels Translation Group, N.V. |
| CDS | Credit Default Swap |
| CLDC | Cross Language Development Company |
| Company | Lernout & Hauspie Speech Products, N.V. |
| DC | Dictation Consortium, N.V. |
| FAS 68 | Statement of Financial Accounting Standards No. 68, Research and Development Arrangements |
| FLV | Flanders Language Valley Fund |
| IAC | Intelligent Agent Company |
| IPR&D | In-process research and development |
| KPMG | KPMG Belgium, L&H's independent accountants |
| L&H | Lernout & Hauspie Speech Products, N.V. |
| LDC | Language Development Company |
| LDF | Language Development Fund |
| LHIC | L&H Investment Company |
| LIC | Language Investment Company, N.V. |
| Paribas | Paribas Bank Belgium |
| Radial | Radial Belgium, N.V. |
| SEC | Securities and Exchange Commission |
| SPE | Special purpose entity |
| U.S. GAAP | United States generally accepted accounting principles |
| USD | U.S. dollar |
| VAT | Value added tax |

**Exhibit 5**

Exhibit 5

## Fees On Credit Default Swaps

| | Trade Date | Borrower | Loan Amount | Paid Fees | Unpaid Fees | Total | % of fee paid for CDS to loan amount |
|---|---|---|---|---|---|---|---|
| 1. | 10/2/98 | RADIAL | $ 214,980,300 | | $ 809,162 | $ 809,162 | 0% |
| 2. | 12/29/98 | LIC | 220,000,000 | $ 470,555 | 76,389 | 546,944 | 0.21% |
| 3. | 6/30/99 | RADIAL | 214,980,300 | 501,620 | | 501,620 | 0.23% |
| 4. | 6/30/99 | LIC | 220,000,000 | 513,334 | | 513,334 | 0.23% |
| | | | | $ 1,485,509 | $ 885,551 | $ 2,371,060 | |

Source: Dexia Bank Belgium's amended responses and objections to class plaintiffs' sixth set of interrogatories.

**Exhibit 6**

## Related Party Transactions under International Accounting Standards

The U.S. GAAP requirements regarding related party transactions are substantially similar to those used under International Accounting standards, sometimes called "International GAAP." According to the International Accounting Standards, related party relationships can be described as: [1]

a) Enterprises that directly, or indirectly through one or more intermediaries, control, or are controlled by, or are under common control with, the reporting enterprise. (This includes holding companies, subsidiaries and fellow subsidiaries);

b) Associates. (An associate is defined as an enterprise in which the investor has significant influence and which is neither a subsidiary nor a joint venture of the investor). [2]

c) Individuals owning, directly, or indirectly, an interest in the voting power of the reporting enterprise that gives them significant influence over the enterprise, and close members of the family of any such individual;

d) Key management personnel, that is, those persons having authority and responsibility for planning, directing and controlling the activities of the reporting enterprise, including directors and officers of companies and close members of the families of such individuals; and

e) Enterprises in which a substantial interest in the voting power is owned, directly or indirectly, by any person described in (c) or (d) above or over which such a person is able to exercise significant influence. This includes enterprises owned by directors or major shareholders of the reporting enterprise and enterprises that have a member of key management in common with the reporting enterprise.

The international accounting standards additionally state that in considering each possible relationship, attention is directed to the substance of the relationship and not merely the legal form.

---

[1] AICPA Professional Standards, Volume 2, as of June 1, 1997, AC§9024.03.
[2] Ibid, AC§9028.03.

**Exhibit 7**

Exhibit 7

**Adjustments to Operating Income**

|  | 1997 | 1998 | 1999 |
|---|---|---|---|
|  | Prior to restatement |  |  |
| Operating income (loss) | $ (33,552) | $ (43,742) | $ 66,281 |
| Adjustments for non-recurring items: |  |  |  |
| Transition expense | 695 | 1,821 |  |
| Goodwill write-off |  | 3,704 |  |
| IPR&D adjustment | 55,100 | 79,373 | - |
| Operating income after non-recurring items | 22,243 | 41,156 | 66,281 |
| Shell company revenue adjustment | (18,900) | (39,300) | (22,500) |
| Operating income after non-recurring items and shell company revenue adjustment | $ 3,343 | $ 1,856 | $ 43,781 |
|  |  |  |  |
| Revenue as reported | $ 99,371 | $211,592 | $344,237 |
| Shell company revenue adjustment | (18,900) | (39,300) | (22,500) |
| Revenue after shell company revenue adjustment | $ 80,471 | $172,292 | $321,737 |
|  |  |  |  |
| Operating Margin |  |  |  |
| After adjustment for non-recurring items | 22.4% | 19.5% | 19.3% |
| After adjustments for non-recurring items and shell company related revenue | 4.2% | 1.1% | 13.6% |

Source: KPMGUS034255, KPMGUS008002, L&H 1999 Form 10-K

Exhibit 7A

## Restatement of Operating Income
($ 000's)

| | Year 1997 | 1998 Q1 | Q2 | Q3 | Q4 | Year 1998 | 1999 Q1 | Q2 | Q3 | Q4 | Year 1999 | 2000 Q1 | Q2 | YTD 6/30/00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue as originally reported | $ 99,371 | $ 35,086 | $ 44,991 | $ 54,860 | $ 76,675 | $ 211,592 | $ 70,708 | $ 76,015 | $ 87,473 | $ 110,041 | $ 344,237 | $ 110,694 | $ 154,907 | $ 265,601 |
| Operating income (loss) | $ (13,919) | $ (4,947) | $ (17,990) | $ (34,640) | $ 13,835 | $ (43,742) | $ 10,939 | $ 15,530 | $ 16,827 | $ 22,865 | $ 66,281 | $ 26,722 | $ (16,936) | $ 10,786 |
| Reversal of revenue: | | | | | | | | | | | | | | |
| Dictation Consortium: Dexia related | (18,900) | (300) | | | | (300) | (2,000) | | | | (2,000) | | | |
| Brussels Translation Group[1]: Dexia related | | (4,500) | (4,500) | (4,500) | (4,500) | (18,000) | | | | | | | | |
| LDCs: Dexia related | | | | (9,000) | (12,000) | (21,000) | | (16,000) | (4,500) | | (20,500) | | | |
| Sub-total: Dexia related | (18,900) | (4,800) | (4,500) | (13,500) | (16,500) | (39,300) | (2,000) | (16,000) | (4,500) | | (22,500) | | | |
| LDCs: non-Dexia related | | (6,874) | (4,978) | (2,239) | (10,613) | (24,704) | (22,000) | (7,500) | (23,500) | (16,000) | (69,000) | (61,874) | (77,860) | (139,734) |
| Other | | | | | | | 3,891 | (2,715) | (17,438) | (53,292) | (69,554) | | | |
| Sub-total of adjustments | (18,900) | (11,674) | (9,478) | (15,739) | (27,113) | (64,004) | (20,109) | (26,215) | (45,438) | (69,292) | (161,054) | (61,874) | (77,860) | (139,734) |
| Restated operating income (loss) | $ (32,819) | $ (16,621) | $ (27,468) | $ (50,379) | $ (13,278) | $ (107,746) | $ (9,170) | $ (10,685) | $ (28,611) | $ (46,307) | $ (94,773) | $ (35,152) | $ (93,796) | $ (128,948) |
| % difference | 136% | 236% | 53% | 45% | -196% | 146% | -184% | -169% | -270% | -301% | -243% | -232% | 469% | -1296% |

[1] For purposes of this analysis, the $18 million of Brussels Translation Group revenue recorded in 1998 has been allocated evenly amongst the quarters. $18 million, adjusted for the revenue L&H recorded from the shell companies during the period Dexia provided financing.

Source: FV001736, LHSP 022159.