Exhibit B

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STONINGTON PARTNERS, INC., a Delaware Corporation, STONINGTON CAPITAL APPRECIATION 1994 FUND L.P., a Delaware Partnership and STONINGTON HOLDINGS, L.L.C., a Delaware limited liability company,<br>        Plaintiffs,<br>               v.<br>DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA),<br>        Defendants. | No.: 04-CV-10411 (PBS) |
| GARY B. FILLER and LAWRENCE PERLMAN, Trustees of the TRA Rights Trust,<br>        Plaintiffs,<br>               v.<br>DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA),<br>        Defendants. | No.: 04-CV-10477 (PBS)<br>(consolidated) |
| JANET BAKER and JAMES BAKER, JKBAKER LLC and JMBAKER LLC,<br>        Plaintiffs,<br>               v.<br>DEXIA, S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA),<br>        Defendants. | No.: 04-CV-10501 (PBS)<br>(consolidated) |

**Expert Witness Preliminary Rebuttal Report of**
**Vincent J. Love, CPA, CFE**
**February 16, 2007**

**Expert Witness Preliminary Rebuttal Report of**
**Vincent J. Love, CPA, CFE**
**February 16, 2007**

. **Table of Contents**

Introduction ............................................................................................................. 1

Work Performed ...................................................................................................... 1

Summary of Opinions .............................................................................................. 2

Bases for Opinions .................................................................................................. 3

    Professor LaRue Mischaracterizes the LDCs as SPEs ....................................... 4

    KPMG Told the Bank that L&H Could Not Participate Directly or Indirectly in the
    Financing of the LDCs ........................................................................................ 6

    KPMG's Interpretation of Applicable Accounting and Auditing Principles and
    Standards Was Correct ....................................................................................... 7

    Related Parties and Common Control ................................................................. 8

    Principle of Conservatism .................................................................................. 13

    Professor Gompers' Mischaracterizes the LDCs as RDFOs .............................. 25

Summary ................................................................................................................. 26

**EXHIBITS:**

1. Inapplicable Standards, Rules and Guidelines Discussed in the LaRue Report

2. Additional Documents Read, Reviewed and Analyzed

## Expert Witness Preliminary Rebuttal Report[1]
## Of
## Vincent J. Love, CPA, CFE

### Introduction

I have previously submitted an expert report dated January 4, 2007 (the "Love Report") in this matter. My qualifications and the information upon which my opinions in the Love Report are based, with references to the underlying evidence of the fraud at L&H[2] and the participation in the fraud by the Bank, are included in the Love Report and I will not repeat them in this rebuttal report. I incorporate and reassert all of the information in the Love Report, including my opinions, into this rebuttal report.

This rebuttal report addresses the opinions, and any underlying support, included in the Defendant's Expert Report of Professor David W. LaRue (the "LaRue Report"). This rebuttal report also addresses the opinions in the Report of Defendant's Expert Professor Paul A. Gompers (the "Gompers Report") concerning research and development financing organizations ("RDFOs").

### Work Performed

Subsequent to submitting the Love Report, I and others working under my direction and supervision, read the LaRue Report and the Gompers Report and analyzed the asserted bases for their opinions. We read and analyzed available literature and documents referenced in the LaRue Report and the Gompers Report that were not included in the documents read, reviewed and analyzed in preparing the Love Report.

---

[1] This expert rebuttal report is preliminary because fact discovery is not complete. I reserve the right to revise, augment, and supplement this report as necessary upon completion of fact discovery.

[2] The abbreviations and acronyms for entities, documents and individuals I used in the Love Report I also use in this report, as applicable. Consistent with the original Love Report, I have relied on GAAS as contained in the AICPA Professional Standards and GAAP as contained in the Financial Accounting Standards Board *Original Pronouncements* and *Current Text, Accounting Standards*, during the relevant period.

A listing of the additional documents and literature (those not contained in Amended Exhibit 3 to the Love Report, Exhibit 3 to the LaRue Report and Exhibit 3 to the Gompers Report) that form the basis of the findings in this rebuttal report is included in Exhibit 2 attached hereto.

**Summary of Opinions**

Based on the work performed in connection with this rebuttal report as addressed in the following section of this report, I hold the following opinions to a reasonable degree of professional certainty:

- The LDCs were not legitimate SPEs or RDFOs.

- The accounting for fees paid by these shell entities was simple and clear — no revenue should have been recorded by L&H under any circumstance.

- The Bank was informed that L&H's auditors would consider the LDCs to be related parties to L&H, and would not permit L&H to record revenues from these entities, if L&H were involved directly or indirectly in the financing of the LDCs. In my opinion, KPMG's interpretation of the applicable accounting and auditing standards and principles was correct.

- Assuming *arguendo* that normal auditing procedures as applied to the audit of L&H's financial statements may not have been designed to discover the Bank's participation in the fraud, this assumption is of no consequence. The fraudulent transactions in which the Bank participated with L&H, and the false revenue resulting therefrom, could not and would not have occurred but for the Bank's active participation in structuring and concealing the fraud.

- The Bank misled the auditors who prepared the *Audit Committee Report*. As a result, those auditors were unable to identify the LDCs that received Bank funding as related parties to L&H.

**Bases for Opinions**

The bases for my opinions are structured to address each of Professor LaRue's and Gompers' summary opinions. In addition, my commentary stating the bases of my differences with Professors LaRue and Gompers may be applicable to more than one summary opinion. Consequently, the commentaries should be read as an integrated response to all the summary opinions.

<u>Professor LaRue's Summary Opinion</u>

> Given (1) the uncertainty surrounding the underlying facts and circumstances of the software licensing agreements between L&H and the Language Development Companies ["LDCs"] at the time the license fees were recognized as revenue by L&H, (2) the uncertainty surrounding the nature and extent of the relationship between the LDCs and L&H, and Messrs. Lernout, Hauspie and Willaert, (3) the uncertainty and lack of definitive guidance available under GAAP, and (4) the subjectivity involved in applying GAAP to these arrangements, the fact that the license fees received from the Radial Belgium NV ["Radial"], Language Investment Company NV ["LIC"] and Language Development Fund ["LDF"] LDCs were paid from the proceeds of Artesia loans that were guaranteed by or made to Messrs. Lernout, Hauspie and Willaert did not, in my opinion, make L&H's recognition of these fees as revenue in 1998 and 1999 clearly improper under GAAP.

**Commentary**

It is significant that Professor LaRue does not state that L&H's reporting of the license fees paid by the Bank-financed LDCs was proper and appropriate, but instead opines only that they were not clearly improper under GAAP. I disagree with this opinion. The revenue reporting was "clearly improper" because, as explained in the Love Report, (1) the transactions lacked any real economic substance, and (2) the LDCs were funded by parties related to L&H. The accounting and auditing principles and standards applicable to the LDCs were not nebulous and uncertain.[3] Moreover, L&H's auditors' interpretation of these standards and principles was communicated to the Bank in unambiguous terms. The Bank was informed that KPMG would not permit L&H to report revenues from the Bank financed LDCs if L&H were involved, directly or indirectly, in the financing or was liable, directly or indirectly, for repayment of the loans. In my opinion, KPMG's

---

[3] A number of the standards and guidelines discussed in the LaRue Report were not in effect during the relevant time period. These are identified in Exhibit 1 hereto, and will not be further addressed in this Rebuttal Report.

interpretation of the applicable accounting and auditing standards and principles was correct.

**Professor LaRue Mischaracterizes the LDCs as SPEs**

A basic flaw in Professor LaRue's analysis of the L&H LDCs is his equating them to Special Purpose Entities ("SPEs"). While he has referenced two articles on the subject, both of which were written after 2000, he fails to clearly point out that they were discussing the accounting for <u>legitimate entities</u>. One of the articles referenced by Professor LaRue contains examples of legitimate SPEs.[4]

> For example, an airline that needs a fleet of airplanes or a gas company that needs a pipeline can employ SPEs to finance such projects. The off-balance sheet entity will own these assets for the specific use of the sponsors, and use them as collateral to raise cash to finance them.

Also the accounting for legitimate R&D arrangements that may be classified as SPEs in many circumstances, particularly in the pharmaceutical industry, includes additional criteria not discussed in these two articles.

Most often SPEs were, and are still, (although now called variable interest entities) used by business organizations to remove debt and related assets from their financial statements. They can also be used as a financing vehicle for research and development and other purposes if structured properly and there is a transfer of risk to the SPE. The <u>sponsoring organization's involvement with and in the SPE must be fully disclosed.</u>

The LDCs that licensed L&H's software were never represented to be SPEs of L&H. The LDCs were represented by L&H to be entities totally independent of L&H that were investing in the development of speech recognition software for non-mainstream languages using rights to L&H speech recognition technology that the LDCs paid L&H to acquire. According to L&H's public statements, these entities would develop, market

---

[4] Jalal Soroosh and Jack T. Ciesielski, *Accounting for Special Purpose Entities Revised: FASB Interpretation 46(R)*, <u>The CPA Journal</u>, July 2004.

and distribute products. The KPMG investigation report dated January 5, 2001[5] refers to L&H public filings and states:

### V.1.1 The situation as it is shown by all information in our possession

28.  Important turnovers have been achieved with licensees, in particular LDCs. Herewith is usually referred to the LDC's themselves, yet also to the Cross Language Development Companies ("CLDC's") and the so-called I-Companies or I-Agents. L&H considered the LDC's as strategic partners for the development of additional world languages. With the LDC's, license agreements were closed against a non-refundable license fee. *The intention was that LDC's bought a license and that they would do the development themselves (the so-called "franchise concept").* (Emphasis added.)

In an official announcement to the Securities and Exchange Commission, L&H stated as follows:

*"We have entered into strategic relationships to initiate development of speech and language technologies for additional languages, including Bahassa, Russian, Ukrainian, Belarussian, Hungarian, Polish, Czech, Greek, Thai, Tamil, Hindi, Turkish, Vietnamese, Urdu, Malay, Taiwanese, Armenian, Arabic and Arabic dialects. In addition, we have entered into a strategic relationship with a number of cross language development companies which have engaged in the development of new language pairs for machine translation. The new language pairs have as source languages Italian, French, German, Mandarin, Japanese, Russian and Spanish, with the destination languages being Asian languages. We are considering entering into similar agreements for the development of additional languages.*

*Pursuant to these agreements, we have received nonrefundable up-front license fees in connection with the license of our speech technology development tools to strategic partners that are **unaffiliated** with us to develop additional language versions and language pairs for our core speech technology products. Our strategic partners also have rights, subject to our rights described below, to develop, market, and distribute products incorporating the developed technology. In addition to one-time license fees, we have rights to receive royalties based on our partners' net revenues from sales of products incorporating the developed technology. We also have rights to market and distribute products developed by our strategic partners incorporating the developed technology, subject to our obligation to pay royalties to our strategic partners on our net revenues from our sale of such products. Subject to our underlying rights and our*

---

[5] KPMGUS096485 to 096544

5

*rights in jointly developed technology or products, our strategic partners will own the technology and products developed pursuant to these agreements (...)."* (footnote referenced: 20 F documents regarding the fiscal year 1999 (see also the similar descriptions in the 20 F documents regarding the fiscal year 1998.)) (Emphasis added.)

The franchise concept was also explained in that way in the 1 March 1999, 7 April 1999, 28 July 1999 and 27 October 1999 press releases of the Company.

As set forth in detail in the Love Report, the Bank was informed that the purpose of the financing was to enable L&H to record revenue from the licensing fees paid by the LDCs. The Bank also was informed that to achieve this purpose it had to appear – to L&H's auditors, the SEC and the "outer world"[6] – that the LDCs were (1) completely independent of L&H, and (2) engaged in arm's length transactions with L&H. Thus, with the Bank's participation, L&H's involvement with (and control of) the LDCs was concealed.[7] In the case of legitimate SPEs, the sponsor does not seek to purposefully conceal its relationship to the SPE in an attempt to circumvent revenue reporting requirements and SEC regulations.

The risks associated with the LDCs language development project were not transferred to the LDCs. As detailed in the Love Report, L&H's controlling shareholders and executive officers guaranteed the repayment of the financing that was used to pay the license fees, and the Bank was informed that L&H would acquire certain LDCs, in the event that outside investors could not be found. The LDCs lacked this characteristic of a legitimate SPE.[8]

## KPMG Told the Bank that L&H Could Not Participate Directly or Indirectly in the Financing of the LDCs

As far as the Bank was concerned, there was no uncertainty about the facts and the accounting surrounding the LDCs and L&H recording the fees as revenue. The Bank,

---

[6] DBB 003726
[7] Professor LaRue's observation (at ¶106) that he has not seen any evidence of influence by L&H or its senior executives over the LDCs is inconsistent with the notion that the LDCs were L&H SPEs.
[8] Because the LDCs were not SPEs, Professor LaRue's lengthy discussion of accounting for SPEs (in Section 3 of his report), has no application to the fraudulent scheme in which the Bank participated and is not addressed in this Rebuttal Report.

based on the documents in its files and its officers' sworn testimony as detailed in the Love Report, was informed how KPMG, L&H's auditors, would view the Bank-financed LDCs if L&H and/or its senior management was involved in financing the LDCs. KPMG's interpretation of the accounting requirements for reporting of revenue was clearly described in documents given to the Bank. The Bank's financing did not comply with KPMG's instructions that L&H could not be involved, directly or indirectly, in any financing and that L&H could not be made liable, directly or indirectly, or as a guarantor, for the repayment of the LDC financing because L&H's controlling shareholders/executive officers were involved in negotiating, guaranteeing repayment of, and, in one instance, providing additional consideration for the loans. The Bank also was informed that L&H intended to report the fees payable under the licensing agreements as revenue. All of this was spelled out clearly and definitively for the Bank.

**KPMG's Interpretation of Applicable Accounting and Auditing Principles and Standards Was Correct**

I disagree with Professor LaRue's statement that the applicable GAAP requirements for the reporting of revenues from the LDCs were subjective and unclear. As explained in the Love Report, FAS 68 dictates how an enterprise should account for research and development arrangements funded by other parties:

> Even though the written agreements or contracts under the arrangement do not require the enterprise to repay any of the funds provided by the other parties, surrounding conditions might indicate that the enterprise is likely to bear the risk of failure of the research and development. If those conditions suggest that it is probable[9] that the enterprise will repay any of the funds regardless of the outcome of the research and development, there is a presumption that the enterprise has an obligation to repay the other parties. That presumption can be overcome only by substantial evidence to the contrary.[10]

---

[9] Probable is used here consistent with its use in FASB Statement No. 5, Accounting for Contingencies, to mean that repayment is likely (FAS 68, footnote 1).

[10] FAS 68, ¶7

If a significant related party relationship between the enterprises and the parties funding the research and development exists at the time the enterprise enters into the arrangement, there is a presumption that the enterprise will repay the other parties.[11]

To the extent that the enterprise is committed to repay any of the funds, all or part of the risk has not been transferred. As stated in the Love Report, because of the related party relationship between L&H, its controlling shareholders and the LDCs, the personal guarantees of those controlling shareholders was the equivalent of guarantees from L&H itself. Accordingly, under FAS 68, the license payments received by L&H from the LDCs should have been reported by L&H as liabilities.

### Related Parties and Common Control

Professor LaRue avers that the LDCs were not related parties and under common control with L&H, but states that he cannot exclude the possibility that L&H and the LDCs "may have been considered by some accountants to be related parties under the more nebulous standards that require an assessment of the nature and extent of the 'influence' that L&H and/or Messrs. Lernout, Hauspie and Willaert may have had over the RADIAL LDCs and/or LIC LDCs." (LaRue Report at ¶106). In fact, the Bank's own documents make clear KPMG's view that the LDCs had to be considered related parties if L&H's controlling shareholders and/or executives were involved in the Bank's financing. KPMG's interpretation of the standards is correct and in my experience few, if any, experienced, practicing CPAs would agree with Professor LaRue's conclusion on this point.

Practicing accountants are aware of the ramifications of common control and influence over related enterprises. The concept is far from nebulous and goes to the heart of principles based accounting, which requires accountants and auditors to apply professional, reasoned judgment to the actual conditions surrounding the underlying transaction, i.e., apply representational faithfulness in recording the economic event. Outside the classroom, the practicing accountant and auditor is often faced with situations

---

[11]  Ibid., ¶8c

where they must use reasoned professional judgment to determine how to account for, and audit, an economic event. This is a common circumstance in practice.

One way to analyze all of the characteristics surrounding an issue is to prepare a visual depiction of what is occurring. Page 12 includes a diagram of the pervasive influence Messrs. Lernout, Hauspie and Willaert had on L&H, RADIAL, LIC and LDF.

Control has always been known by practicing accountants to sometimes exist outside of the voting stock of an enterprise, particularly when private enterprises are involved. This is evident from the definitions of "affiliate" and "control" in FAS 57 (Related Party Disclosures) quoted in the LaRue Report at ¶44. These definitions are helpful when analyzing the chart on page 12:

> **Affiliate**: A party that, directly <u>or indirectly</u> through one or more intermediaries, controls, is controlled by, or is <u>under common control with</u> the enterprise. (Emphasis added.)

> **Control**: The possession, direct or indirect, of <u>the power to direct or cause the direction of the management and policies</u> of an enterprise through ownership, by contract, or otherwise. (Emphasis added.)

KPMG appropriately considered the above definitions in setting its conditions for revenue recognition. In the case of the Bank-financed LDCs, the same controlling shareholders of L&H negotiated the loans, provided hidden guarantees without which the loans would not have been made, and acted for both sides in drafting the license agreements. The LDCs never had any operations or employees.

Professor LaRue states in ¶106 of his report that he has not personally seen any evidence of <u>influence</u> by L&H or its senior executives over the Radial LDCs and/or LIC LDCs, "but it is possible that such evidence will emerge at trial." Professor LaRue also states in ¶58 of his report that he relied on "certain assumptions about the specific transactions at issue" in forming his opinion, that he made no independent investigation to confirm the accuracy of the assumptions he was asked to make, but that he simply reviewed documents that confirmed or supported many (he does not say all) of the assumptions he

uses as the bases of his opinions. However, even the limited amount of evidence that Professor LaRue has reviewed contradicts his conclusion. For example, Professor LaRue reviewed the Bank's Credit Proposal to extend the term of the LIC loan through December 15, 1999.[12] That document reflects L&H's influence over LIC as follows:

(1) Nico Willaert, L&H's Managing Director and Vice-Chairman, is described as LIC's "external negotiator" for the loan;

(2) the Credit Committee's approval of the initial loan on December 17, 1998 was granted on condition that "the credit is granted in the framework of the L&H lines and the latter guarantees reimbursement on maturity;" and

(3) the extended loan is to be secured by credit default swaps of Jo Lernout—co-founder, Co-Chairman and Chief Technology Officer of L&H, and Pol Hauspie—co-founder, Co-Chairman and Managing Director of L&H.

Other evidence of L&H's pervasive influence over the LDCs is detailed in the Love Report and will not be repeated here. Both RADIAL and LIC were able to receive multi-million dollar loans, despite their relatively small amount of capital, because the Bank viewed L&H as the borrower, and was looking to L&H's principals, or acquisition of the LDC by L&H, as the source for repayment.

In ¶115 of his report, Professor LaRue states that it seems clear that the $20 million loan to the controlling shareholders of L&H—which was used to fund LDF-owned Urdu, Taiwanese, Vietnamese and Malay LDCs—would not, in and of itself, make L&H and these LDCs "related parties" under FAS 57 because FAS 57 does not include "creditors" in its definition of "related parties." Professor LaRue is wrong in his observation since control is a criterion and he fails to mention the extent of the influence that these particular "creditors" exercised over the LDF-owned LDCs, demonstrated by the facts that:

---

[12] DDB 007452-7460

10

(1) as of June 25, 1999 these LDCs had not been incorporated, but Messrs. Lernout, Hauspie and Willaert were able to inform the Bank that these LDCs would pay $16 million in license fees to L&H by June 30, 1999; and

(2) "creditor" Nico Willaert was negotiating on behalf of L&H with potential investors who would provide capital to these LDCs and thus repay the $20 million loan.[13]

According to the KPMG-Belgium Audit Manual,[14] "parties are considered to be related if one party has the ability to:"

- Control the other party; or
- Exercise significant influence over the other party in making financial and operating decisions.

Control has always been known by practicing accountants to sometimes exist outside of the voting stock of an enterprise, particularly when private enterprises are involved. In this instance, the evidence included in all of the reports and investigations surrounding L&H supports the position that the LDCs were vehicles used by the L&H major shareholders and senior management to fraudulently record non-existent revenue in the L&H financial statements and artificially increase L&H's net income. Accordingly, control is not limited to ownership, but includes situations such as the relationship the L&H major shareholders had with the LDCs.

---

[13] DBB 003643-3649
[14] KPMG-B-000809

11

# CONTROL



*Principle of Conservatism*

In contrast to Professor LaRue, I do not view the accounting treatment of the payments made to L&H by the Bank-financed LDCs to be unclear or uncertain. However, had there been any uncertainty, application of the accounting principle of conservatism would support KPMG's view that L&H could not report payments from the LDCs as revenue. Conservatism is a well-recognized principle in accounting. Statement of the Accounting Principles Board No. 4, *Basic Concepts and Accounting Principles Underlying Financial Statements of Business Enterprises*, ("APB 4") issued in October 1970 defines conservatism as follows:

> The uncertainties that surround the preparation of financial statements are reflected in a general tendency toward early recognition of unfavorable events and minimization of the amount of net assets and net income. (¶35)

Further,

> Frequently, assets and liabilities are measured in a context of significant uncertainties. Historically, managers, investors, and accountants have generally preferred that possible errors in measurement be in the direction of understatement rather than overstatement of net income and net assets. This has led to the convention of conservatism... [¶171].

FASB Statement of Accounting Concepts No. 2, *Qualitative Characteristics of Accounting Information*, issued in May 1980 ("CON 2") in its Glossary of Terms similarly defines conservatism as:

> A prudent reaction to uncertainty to try to ensure that uncertainty and risks inherent in business situations are adequately considered.

In summary, the LDCs were not legitimate SPEs. KPMG's interpretation of the accounting and auditing standards and principles applicable to payments received from the LDCs by L&H was correct. Because of the pervasive influence by L&H's controlling shareholders/executive officers over the financial and operational decisions of the LDCs, including their role as negotiators and guarantors of the Bank's financing, it was clearly improper under GAAP for L&H to report fees from the LDCs as revenue.

13

Professor LaRue's Summary Opinion

Since the *Audit Committee Report* determined that revenue recognition was improper under GAAP without reaching a conclusion as to whether the LDCs or their investors were related parties to L&H, it is clear that this issue was not a reason for the *Audit Committee Report*'s determination that revenue recognition was improper under GAAP. Further, since the *Audit Committee Report* made no mention of the Artesia loans (in the case of the LHW Personal Loan) or of the guarantees or CDS (in the case of the RADIAL and LIC Loans) by Messrs. Lernout, Hauspie, and Willaert, it is clear that these loans and guarantees were not a reason for the *Audit Committee Report*'s determination that revenue recognition was improper under GAAP.

**Commentary**

The *Audit Committee Report* was prepared early in the investigative process surrounding the massive fraud at L&H. The Report contains express caveats related to the limited nature of its work and findings. The Report noted the possibility that license fees paid by LDCs would have to be booked as liabilities of L&H should the company be unable to confirm that the LDCs were funded by independent investors:

> If the investors are related parties, the relevant accounting literature presumes that the related party investors will be repaid and the funded amounts are recognized as a liability. (Emphasis added.)

And, further down the page the Report states:

> We believe the funded research and development approach is most consistent with the evidence and the ultimate accounting treatment would be dependent on the ability of the Company to confirm the independence of the investors and the lack of other understandings. (Emphasis added.)

However, the preparers of the *Audit Committee Report*, the law firms Bryan Cave LLP and Loeff Claeys Verbeke assisted by the accounting firm Arthur Andersen LLP, did not discover L&H's involvement in the funding of the LDCs, in part because the Bank provided them with misleading information. As stated in the Love Report, although the Bank received credit default swaps from L&H's controlling shareholders as a guarantee for the LIC loan, the Bank did not mention these guarantees in responding to a request for information by Loeff Claeys Verbeke regarding LIC, which asked:

14

...for a declaration from Artesia Bank, which shows that [LIC] was allowed a credit facility of 220,000,000 BEF in August 1998 and that no bank guarantees were given from L&H.[15]

The Bank's response to this audit request was as follows:

On December 22, 1998, a credit facility of 220,000,000 BEF was granted by ARTESIA BANK NV. To N.V. LANGUAGE INVESTMENT COMPANY, for this credit no bank guarantees were given by L&H.[16]

The Bank did not disclose that the LIC loan was guaranteed by two CDSs, even though the Bank's internal documents reflect that the Bank viewed the CDSs as equivalent to loan guarantees.[17] Thus, the Bank concealed from the Audit Committee advisors the involvement of Messrs. Lernout, Hauspie and Willaert in financing the LDCs.

Professor LaRue's Summary Opinion

I have seen no evidence that the documentation for the $6 million loan from Artesia to Radial ["Radial Loan"], the $6 million loan from Artesia to LIC ["LIC Loan"], or the $20 million loan from Artesia to Messrs. Lernout, Hauspie and Willaert in their personal capacities ["LWH Personal Loan"] was ever reviewed by L&H's auditor, KPMG, in connection with its reviews or audits of L&H's financial statements from the third quarter of 1998 to the second quarter of 2000. If these loan documents were never reviewed by KPMG, it follows that KPMG was not misled by Artesia's failure to include in them references to the Credit Default Swap ["CDS"] agreements that were ultimately entered into by Messrs. Lernout, Hauspie and Willaert. Furthermore, there was no reason to expect that this loan documentation, or any other funding documentation, would have been reviewed by KPMG, as typical auditing procedures would not have called for such a review. Therefore, the lack of reference to the CDS (or guarantees) from the loan documents would not be expected to allow, and in fact, does not appear to have allowed, L&H to fraudulently record the LDCs' revenues (without being noticed by KPMG) as alleged by Plaintiffs.

---

[15] DBB 002795
[16] DBB 002805
[17] DBB 098487, DBB 098501, DBB 082392-93

**Commentary**

GAAS acknowledges that a properly planned and executed GAAS audit cannot give the auditor absolute assurance that material misstatements in financial reports will be detected because, for one thing, fraudulent activity is often concealed or masked, including through collusion and/or falsified documentation.[18] In this case, KPMG did not have the opportunity to discover the fraudulent nature of the Bank-financed LDCs since there was collusion between the Bank and L&H, and loan documents were falsified by the Bank. I disagree with Professor LaRue's conclusion that the Bank's conduct did not enable L&H to mislead its auditors.

Based on our review of the evidence in this case, we have identified three respects in which the Bank's conduct directly impacted L&H audits. First, if the Bank had not approved the loan applications on an expedited basis so that LDCs could make payments to L&H before the end of financial reporting periods, KPMG would have conducted collectibility procedures that would have resulted in greater scrutiny of the financial condition of the LDCs. Second, if the Bank's loan documents had disclosed the personal guarantees provided for the loans to Dictation Consortium, N.V. ("DC") and Brussels Translation Group, N.V. ("BTG") by L&H's controlling shareholders, KPMG would have become aware during its 1999 audit that it had been misled by L&H management concerning the financing of DC and BTG. Third, if the Bank had not provided a misleading confirmation to KPMG in connection with the 1999 audit, KPMG would have become aware of the $20 million personal loan to the L&H controlling shareholders that funded the LDF LDCs.

*Confirmation of Collectibility*

Typical audit procedures include verifying the collectibility of the type of fees at issue here if they are not substantially collected during the period being audited or in the period from that time until the auditor's report is dated. These verification of collectibility procedures in the circumstances in this case would have called for the review by KPMG of the LDCs' ability to pay the fees, including an examination of the LDCs' records. The

---

[18]   AICPA Professional Standards, U.S. Auditing Standards, as of June 1, 2000, AU §316.10.

Bank's loans and the timing of the funding thus gave the illusion of substance to the LDCs and the license transactions. As a result and because a substantial portion of the license fees were received by L&H upon contract signing, KPMG would not have raised a concern about collectibility of those fees.

Four criteria must be met for revenue recognition under GAAP:

- Persuasive evidence of an arrangement exists.
- Delivery has occurred.
- The vendor's fee is fixed or determinable.
- Collectibility is probable.

It is the fourth criterion that is being ignored by Professor LaRue. These four legs for revenue recognition are included in the accounting literature in a number of places: 1) Accounting Research Bulletin No. 43, Chapter 1A, ¶1; 2) APB Opinion No. 10, ¶12; 3) Statement of Position 97-2 Software Revenue Recognition, ¶.08, and 4) SEC Staff Accounting Bulletin No. 101; and 5) AICPA, Audit Issues in Revenue Recognition page 13. In addition, the importance of the receipt of cash is further highlighted in FASB Statement of Financial Accounting Concepts No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, ("CON 5"), ¶84(g) that states:

> If collectibility of assets received for product or services, or other assets is doubtful, revenues and gains may be recognized on the basis of cash received.

The cash from the Bank loans and the timing of their receipt by L&H was crucial to the fraud. If a substantial portion of the license fee had not been paid at or close to the transaction date, the receivable for the fee would have been questioned by KPMG and additional procedures would have been performed by KPMG including, if they chose to, looking at the LDC's records, including records identifying the source of funding for the fee payments. The evidence in this case reflects the critical role played by L&H's timely

receipt of cash payments from the LDCs. The KPMG partner,[19] Robert McLamb, in his testimony before the SEC on May 23, 2001, is asked the following question and gives the following answer:

Q. Did you talk with anyone at the meeting about verifying or ascertaining the probability of collection from these newly-formed entities [LDCs]?

A. My recollection is that, as we had in the past, we told them that we would need to see evidence of collectability. My recollection is that they stated that a significant portion of the license fee will be paid at or around the date of signing of the contract.[20]

And, continuing:

Q. So you're speaking - - when you used "we" in your answer, you were speaking on behalf of KPMG as an entity- --

A. No. KPMG Belgium needed to perform procedures to satisfy itself with proof of collectability.

Q. Okay.

A. And as part of my file review process, if I had ever become aware of start-up entities, I would ascertain - - or new license agreements that I wasn't familiar with the entities, I would often times ask KPMG Belgium what type of procedures they performed to ascertain proof of collectability.[21]

Q. And the revenue implications were what?

A. If it's an up-front license agreement, there's no remaining obligations, product has been delivered, it's non-refundable, that revenue recognition at the time of delivery, meeting all of those criteria, would be appropriate under the literature.

Q. And collection is probable?

A. Collection is probable, yes.

---

[19] Robert McLamb was the audit partner and file reviewer responsible for reviewing the L&H files for compliance with U.S. GAAP. KPMG LLP policy required a file review if an audit opinion of a foreign entity was going to be filed with the SEC. (Robert McLamb testimony to the SEC, January 19, 2001, page 212, lines 21-25).
[20] Robert McLamb, SEC testimony, May 23, 2001, page 518, lines 3-10
[21] Ibid., page 518, lines 18-21

Q. And then revenue recognition—

A. Yes.

Q. —is appropriate?

A. Yes.[22]

Mr. McLamb's views regarding revenue recognition, which would have been the policy followed by the L&H auditors, were stated in a KPMG internal memo as follows: "According to Bob McLamb, until cash is received there is strong evidence to doubt collectibility at the time of shipment thus precluding recognition of revenue."[23] As detailed in the Love Report, there also was almost always an urgency for the Bank to fund the LDCs by the end of an L&H fiscal quarter or year-end.

*Nondisclosure of Guarantees and Consideration in DC and BTG Loan Agreements*

As part of its audit of L&H's December 31, 1999 financial statements, KPMG performed additional procedures to confirm representations by L&H management (primarily Messrs. Hauspie and Willaert) that the LDCs that purchased L&H licensing agreements during 1999 were independent from L&H.[24] As part of those procedures, KPMG reviewed the financial statements of the companies acquired by L&H, which would appear to have included DC and BTG.[25] The financial statements of DC and BTG were audited by Ernst & Young ("E&Y"). Based on the materiality of the amounts of the Bank's loans to DC and BTG, as part of its audits of these entities E&Y should have reviewed DC's and BTG's loan agreements and confirmed with the Bank the amounts and terms of the loans.

Had the personal guarantees by L&H's controlling shareholders and senior management been specified in the loan documents — rather than hidden in side letters — that information would have been available to E&Y. In addition, had it been disclosed in the DC loan documents, E&Y would have seen that L&H had provided consideration for the

---

[22]  Ibid., page 537, line 20-page 538, line 6
[23]  KPMG-B-042586
[24]  KPMG-B-004141-44
[25]  KPMG-B-004143

loan in the form of warrants to purchase shares of L&H stock.[26] Given the importance of the contractual relationships between L&H and DC and BTG, E&Y would have considered that these facts required disclosure in DC and BTG's financial statements. This disclosure would have put KPMG, who appears to have reviewed the E&Y audited financial statements, on notice during its 1999 audit that, directly contrary to KPMG's specific advice, L&H was involved in the financing of DC and BTG. Discovery of management's blatant misrepresentation of this magnitude would have resulted in KPMG conducting substantial additional procedures to determine if KPMG could, in fact, issue a report.

> "If a representation made by management is contradicted by other audit evidence, the auditor should investigate the circumstances and consider the reliability of the representation made. Based on the circumstances, the auditor should consider whether his or her reliance on management's representations relating to other aspects of the financial statements is appropriate and justified."[27]

These additional procedures in this area alone would include confirming the independence of the respective LDCs from L&H, and looking at each of the respective LDC's records, which would have included the Bank's loan agreements. KPMG may also have sought confirmation directly from the Bank regarding the financing arrangements of the LDCs. However, because the personal guarantees were not disclosed in the loan agreements, in turn they were not disclosed in the audited financial statements of DC and BTG, and the information was not available for KPMG to consider.[28]

_Misleading Confirmation Regarding $20 Million Personal Loan_

In ¶144 of his report, Professor LaRue states that KPMG sent annual confirmation letters to the Bank, but that the letters only requested "specific information on bank accounts, etc. held by L&H itself." This is not accurate. In question 2 of the 1999 confirmation

---

[26]  DBB 076221 states that the Bank was offered an additional 25,000 warrants on L&H as a risk compensation on file NV Dictation Consortium. In response to Interrogatory 13, the Bank did not deny that there were warrants granted as consideration for the DC loan.

[27]  AICPA Professional Standards, Vol. 1, U.S. Auditing Standards, as of June 1, 2000, AU §333.04.

[28]  Financial statements, Dictation Consortium, NV, years ended December 31, 1996 and 1997, BRY0001692-1702; Financial statements, Brussels Translation Group, NV, years ended December 31, 1997 and 1998, KPMGUS035276-86.

request cited by Professor LaRue, KPMG inquires as to "Loans and financing," specifically:

- The nature (<u>personal loans</u>, financing, investment credit, mortgage loan)
- The amount still due
- <u>Special modalities</u> (Emphasis added.)

As stated in the Love Report, the confirmation KPMG forwarded to the Bank is consistent with auditing procedures typically employed to evaluate possible related party transactions, in that it appears to be designed to identify personal loans to principals and executives associated with L&H. If the Bank had responded truthfully to KPMG's 1999 confirmation letter, KPMG would have become aware of the $20 million loan to L&H's controlling shareholders; and would have conducted additional procedures to determine the use of those funds, including review of the loan agreement. Even had KPMG done so, however, it may have been misled because the loan agreement did not accurately describe the purpose of the loan. Although the Bank granted the $20 million loan for the specific purpose of funding the LDCs so that they could pay license fees to L&H, the loan agreement stated that the purpose of the loan "can be used solely for financing your [Lernout's, Hauspie's and Willaert's] professional activities"[29] with no mention of funding the LDCs.

At ¶133 of his report, Professor LaRue states:

> As an initial matter, there is no GAAP requirement regarding the form or content of a loan document or a letter of credit. Nor is there any requirement under GAAP that a CDS be mentioned in a loan document or letter of credit. The application of GAAP to these types of transactions is based on an evaluation of the form and substance of these arrangements.

This is an absurd statement. There is no GAAP related to the form and content of any business transaction because an accountant determines how the transaction should be reflected on the books and records of the enterprise and displayed and described in its financial statements based on the underlying documentation and unique circumstances of each situation. In the Love Report, I address the Bank's suppression of the guarantees

---

[29] DBB 101880

21

that the Bank officers considered a necessary part of the lending agreement. Professor LaRue also ignores the Bank's in-house counsel's evaluation of this issue. Disclosures of guarantees or loans, either through personal guarantees or CDSs, based on the findings of the Bank's internal auditors, are required by Belgium banking statute (Circulaire D1-97/9). A violation of a law could cause the recording of a contingent liability depending on the possible consequences of the violation. This suppression of information was a part of the fraud.

Professor LaRue states that the application of GAAP to the forgoing types of transactions is based on the evaluation of the form and substance of these arrangements, but the FASB Statement of Concepts No. 2, Qualitative Characteristics of Accounting Information ("CON 2") states that representational faithfulness is the measure to use to determine how to account for an economic event. This is one of the concepts or standards that Professor LaRue claims to be "nebulous." Despite Professor LaRue's attempt to create confusion, this standard is clear, particularly as it applies here. CON 2 addresses representational faithfulness and substance over form as follows:

> 63. **Representational faithfulness** is correspondence or agreement between a measure or description and the phenomenon it purports to represent. In accounting, the phenomena to be represented are economic resources and obligations and the transactions and events that change those resources and obligations. [Footnote reference omitted.]

> 160. Substance over form is an idea that also has its proponents, but it is not included because it would be redundant. The quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form. Substance over form is, in any case, a rather vague idea that defies precise definition.

The information concerning the guarantees, CDSs and other representations surrounding the funding of the amounts loaned by the Bank to the LDCs are an integral part of the data needed to determine the representational faithfulness of the accounting for the license fees.

In ¶137 of his report, Professor LaRue states that "As is typical among professional auditing firms, KPMG performed a set of well-defined procedures in its audits and reviews of L&H's financial statements in order to determine the proper accounting treatment of L&H's software revenues." He gives no source for this ipse dixit statement. His C.V. does not show any audit experience whatsoever. As a practitioner, I find his statement incredible. The Bank interfered with the audit by concealing the true nature of the borrowing. In my experience, the Bank's fraud would have prevented the most diligent auditor from determining the true nature of these transactions and properly designing auditing procedures.

### Professor LaRue's Summary Opinion

Lastly, in reviewing Plaintiff's allegations concerning revenue overstatements associated with the Artesia-related loan transactions in conjunction with the other revenue overstatements Plaintiffs have alleged, I conclude that the license revenues that L&H reported from its receipt of cash from the Artesia-related loan transactions represent a small percentage of the overall alleged revenue overstatements, and that Artesia was only one of many parties involved in these loan transactions.

### Commentary

I disagree with Professor LaRue's conclusion that the license revenues that L&H reported from Bank-financed LDCs represent a small percentage of the overall alleged revenue overstatements. In the Love Report, I demonstrated that the percentage of total revenue reported by L&H from the Bank-financed entities for the years 1997, 1998 and 1999 was 34%, 18.6% and 6.5%, respectively. The percentage of total fictitious revenue reported by L&H from the Bank-funded entities for 1998 and 1999 was 61% and 14%, respectively. These are not small percentages of revenue and are clearly material to the L&H financial statements.[30]

I disagree with Professor LaRue's statement that the Bank was only one of the many parties "involved" in these loan transactions. The numerous LDCs that were funded by the transactions were not parties to the transactions and were, in any event, shell entities.

---

[30] Footnotes 226-230 of the Love Report discuss the amount of revenue recorded by each of the Bank-financed entities. As stated in the Love Report, the fraudulent revenue recorded by L&H could not have occurred without the Bank's participation.

The only parties who participated in structuring, financing and documenting the loans in such a way as to conceal the role of L&H's controlling shareholders/managers were the Bank, the L&H controlling shareholders, and the nominal borrowers (who were controlled by L&H's controlling shareholders).

Professor LaRue's Summary Opinion

> From a review of L&H's public financial statements and/or press releases, it would not have been possible for a shareholder, creditor, or other interested party to determine if or when some or all of the amounts received by L&H from the Radial LDCs, LIC LDCs, and LDF LDCs had been recognized by L&H as revenue.

**Commentary**

What Professor LaRue is commenting on in his summary conclusion is the effectiveness of the concealment of the fraud. Concealment is an integral part of a successful fraud. Disguised as legitimate transactions, L&H was able to include the fees from these LDCs as revenue and then hide from public view the fact that they were related parties. Had the fees from these LDCs been recorded in accordance with U.S. GAAP, L&H's revenue would have been materially less. Professor LaRue appears to be complimenting L&H and the Bank for their ability to construct a fraud scheme that obscured the involvement of L&H. Moreover, as explained in the Love Report, the Bank was informed – in most instances by Nico Willaert – of the amounts and timing of revenue that L&H planned to report.[31]

The Bank was not limited to the information available from public sources. The underlying facts show that the Bank was aware that L&H was recording the LDC fees as revenue even though L&H was intimately involved in the financing and structuring of the loan transaction. Based on the facts detailed in the Love Report, the Bank had all of the information to know that L&H had prepared and distributed fraudulent financial statements.

---

[31]  DBB 002861 indicates that the 3 RADIAL LDCs will pay L&H $3 million each and the 4 LIC LDCs will pay L&H $3 million each in licensing fees.

**Professor Gompers' Mischaracterizes the LDCs as RDFOs**

Professor Gompers' Summary Opinions

A research and development financing organization (RDFO) is a commonly used business entity--often taking the legal form of a limited partnership, corporation, or joint venture--created by a sponsoring firm to support the research and development of a specific product. RDFO financing can be used by the sponsoring firm in lieu of issuing debt or common equity, and provides many benefits over traditional debt or equity financing. To begin supporting the research and development, it is not unusual for an RDFO to employ bridge financing while it awaits permanent financing from equity investors.

The Language Development Companies (LDCs) managed by Radial and Language Investment Company were similar in structure and terms to the RDFOs that have been used by biotechnology and high-tech firms in the 1980s and 1990s. Like other RDFOs, these LDCs did not have their own employees and instead contracted with the sponsoring firm, Lernout & Hauspie, to perform the research. These RDFOs served a financial purpose, enabling Lernout & Hauspie to raise research and development capital from outside investors.

**Commentary**

RDFOs, as that term is used by Professor Gompers refer to a type, or subset of SPEs and the literature to which Professor Gompers cites uses the term SPEs. As set forth above, the L&H LDCs, including the RADIAL and LIC LDCs, were not SPEs/RDFOs. Thus, Professor Gompers' fundamental predicate is flawed.

Moreover, Professor Gompers is not qualified to give opinions on the accounting for any structure used to create an SPE or RDFO. The accounting will be based on the underlying structure and applying the concept of representational faithfulness. Where, as here, the risk has not been transferred from the sponsoring firm to the SPE/RDFO, then no matter how clever a structure is used, the relationship between the SPE/RDFO and the sponsoring entity should be accurately disclosed. Revenue from transactions with the SPE/RDFO will in all probability not be recognized in the accounts of the sponsoring enterprise.

25

**Summary**

Both Professors LaRue and Gompers state that SPEs or RDFOs have been used in many situations as a means of financing. This is absolutely correct. What both professors fail to mention is that their examples represent legitimate transactions between independent parties negotiating on an arm's-length basis. The LDCs were not legitimate entities. The LDCs were established to perpetuate a fraud and accordingly, revenue from those entities should not have been recorded. The Bank's financing of these entities gave them financial "substance," and as a result, misled the L&H auditors about the collectibilty of those revenues. Otherwise, the auditors would have extended their audit procedures of the LDCs. The opinions contained in the LaRue Report and in ¶5-6 of the Gompers Report are not supported by relevant and competent evidence. Further, the LaRue report includes inaccurate and misleading applications of professional accounting and auditing standards, certain of which were effective after the date of the loan transactions.

As stated in the Love Report, the Bank was well aware that the revenues being recognized by L&H were fabricated as a result of the financing provided by the Bank. The fraudulent revenue recorded by L&H from the various shell entities was material and could not have occurred without the Bank's participation in structuring the loans and concealing their true nature.

Vincent J. Love, CPA, CFE
February 16, 2007

**EXHIBIT 1**

Exhibit 1

## Inapplicable Standards, Rules and Guidelines Discussed in the LaRue Report

Some of the confusion surrounding the GAAP issues that Professor LaRue mentions in his summary opinion (and the GAAS issues) may be of Professor LaRue's own making. For instance:

- In ¶20 of his report, Professor LaRue cites GAAS (AU§316.12, *Consideration of Fraud in a Financial Statement Audit*) that was effective for audits of financial statements for periods beginning on or after December 15, 2002, long after the transactions and report in this case. This is in direct contradiction to his footnote 2 were he states that all references to and discussions of GAAS are to U.S. GAAS in effect during 1998 through July 2000. This is also a very important standard, and a major flaw in the LaRue Report, because this standard deals with the subject matter at hand, fraud.

- In ¶24 of his report, Professor LaRue refers to AU § 316.79. There was no such paragraph in the GAAS standards during the relevant period.

- In ¶48 of his report, Professor LaRue refers to an SEC proposed rule dated January 27, 2006 that would significantly modify the disclosures of related party transactions. This proposed rule is several years after the relevant period.

- In ¶56 of his report, Professor LaRue refers to the AICPA guidelines for auditing transactions with SPEs, noting that it was issued after the second quarter of 2000, but fails to mention that because the Bank provided the financing to the LDCs, L&H was able to demonstrate to KPMG that the revenue recorded was collected. In the case of DC, the Bank provided the financing to satisfy a previously receivable amount. Accordingly, KPMG did not question the validity of the SPE.

  If not for the Bank's financing, contracts entered into with the SPEs would have been recorded as receivables. These receivables would have been evaluated by KPMG for collectibility. Referring to the same AICPA guidelines that Professor LaRue cites, auditors are advised to:

  > …consider conducting further procedures with respect to the books and records of the SPE, particularly focusing on whether the requisite outside investment in the SPE existed at the time of the transaction and continues to exist in subsequent periods. If the auditor is not allowed to confirm that generally accepted accounting principles has been followed, either through testing of the SPE's accounting records or through confirmation with other investors, auditors, or other third

1

Exhibit 1

parties, the auditor should consider whether there is a scope limitation.[1]

Had KPMG performed additional audit procedures regarding the SPEs in conjunction with the evaluation of collectibility and had reviewed the SPEs' records and confirmed with their auditors, it is likely that the fraudulent nature of the LDCs would have been detected.

- In ¶81 of his report, Professor LaRue refers to three AICPA Technical Practice Aids regarding software revenue recognition. Although all of these references were issued after the relevant period, they support the proposition that the receipt of cash is essential in the revenue recognition process. Such receipt by L&H, as a result of the Bank's financing, misled KPMG in their evaluation of revenue recognition.

---

[1] Accounting and Auditing for Related Parties and Related Party Transactions, a Toolkit for Accountants and Auditors, Prepared by the staff of the American Institute of Certified Public Accountants, page 29.

2

**EXHIBIT 2**

Exhibit 2

## Additional Documents Read, Reviewed and Analyzed

**Professional Publications**
1. AICPA, "Audit Issues in Revenue Recognition," 1999.

2. AICPA Technical Practice Aids during the relevant period.

3. SEC Handbook, Rules and Forms for Financial Statements and Related Disclosures, as of December 1999.

4. AICPA Professional Standards, Volume 1, U.S. Auditing Standards during the relevant period.

5. Financial Accounting Standards Board, *Current Text, Accounting Standards* during the relevant period.

6. Financial Accounting Standards Board, *Original Pronouncements, Accounting Standards* during the relevant period.

**Other Documents**
BRY0001692-1702
DBB04141-44
KPMG-B-042586
KPMGUS035276-86
KPMGUS096485-544

**Depositions**
1. Testimony of Robert McLamb, Securities and Exchange Commission, January 19, 2001, KPMGUS109320-370.

2. Testimony of Robert McLamb, Securities and Exchange Commission, May 23, 2001, KPMGUS109394-443