Exhibit C

DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No: 04-10411(PBS)

- - - - - - - - - - - - - - - - - - - - - -x

STONINGTON PARTNERS, INC., a Delaware Corporation, STONINGTON CAPITAL APPRECIATION 1994 FUND L.P., a Delaware Partnership and STONINGTON HOLDINGS, L.L.C., a Delaware limited liability company,

Plaintiffs,

v.

DEXIA S.A. and DEXIA BANK BELGIUM (formerly known as ARTESIA BANKING CORP., SA),

Defendants.

- - - - - - - - - - - - - - - - - - - - - -x

March 20, 2007
9:37 a.m.

Videotaped deposition of VINCENT J. LOVE, taken by Dexia Bank Belgium, held at the offices of Clifford Chance, 31 West 52nd Street, New York, New York, before Kathleen Piazza Luongo, a Notary Public of the State of New York.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No: 04-10477(PBS)
(Consolidated with No. 04-10411(PBS))
------------------x
GARY B. FILLER and LAWRENCE PERLMAN,
Trustees of the TRA Rights Trust,

Plaintiffs,

v.

DEXIA, S.A. and DEXIA BANK BELGIUM
(formerly known as ARTESIA BANKING
CORP., SA),

Defendants.

------------------x

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No: 04-10501(PBS)
(Consolidated with No. 04-10411(PBS))
------------------x

JANET BAKER and JAMES BAKER,
JKBAKER LLC and JMBAKER LLC,
Plaintiffs,
v.
DEXIA, S.A. and DEXIA BANK BELGIUM
(formerly known as ARTESIA BANKING
CORP., SA),
Defendants.
------------------x

A P P E A R A N C E S:

BOIES, SCHILLER & FLEXNER LLP
255 South Orange Avenue
Suite 905
Orlando, Florida 32801-3456
Attorneys for Baker Plaintiffs

BY: KAREN DYER, ESQ.
-and-
GARY K. HARRIS, ESQ.

REED SMITH LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, Pennsylvania 19103
Attorneys for Baker Plaintiffs

BY: ALAN K. COTLER, ESQ.

CLIFFORD CHANCE
31 West 52nd Street
New York, New York 10019
Attorneys for Defendant
Dexia Bank Belgium

BY: JEFF E. BUTLER, ESQ.

ALSO PRESENT:

Christopher Martin, Videographer

THE VIDEOGRAPHER: Standby one moment please.

Good morning, we are on the record, today's date is March 20, 2007, the time is 9:37 a.m.

This is the videotaped deposition of Vincent J. Love in the case of Stonington Partners, et al, versus Dexia Bank Belgium, case number 04-CV-10411; consolidated with Filler, et al, versus Dexia, case number 04-CV-10477; consolidated with Baker, et al, versus Dexia, 04-CV-10501. Case filed in the U.S. District Court, District of Massachusetts.

We're at the offices of Clifford Chance, 31 West 52nd Street, New York, New York.

The videographer is Chris Martin and the court reporter is Kathleen Luongo. We're from Veritext Court Reporting in New York City.

At this time will counsel please

introduce themselves for the record.

MR. BUTLER: Jeff Butler, I'm from Clifford Chance, representing Dexia Bank Belgium.

MR. FRISCHKNECHT: Andreas Frischknecht, also from Clifford Chance, also representing Dexia.

MS. DYER: Karen Dyer, Boies, Schiller, representing the Baker Plaintiffs.

MR. COTLER: Alan Cotler from Reed Smith, the Baker Plaintiffs.

MR. HARRIS: Gary Harris, Boies, Schiller & Flexner, representing the Baker Plaintiffs.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

V I N C E N T J. L O V E, called as a witness, having first been duly sworn, was examined and testified as follows:

EXAMINATION BY MR. BUTLER:

Q. Good morning, Mr. Love.

A. Good morning, Mr. Butler.

LOVE

Q. Could you please state your full name and address for the record.

A. Vincent J. Love, my business address is 675 Third Avenue, New York, New York, 10017. My home address is 161 Fairway Drive, Stamford, Connecticut 06903.

Q. And you have been retained in this case by the Plaintiff as a testifying expert; correct?

A. That's correct.

Q. What are your areas of expertise?

A. I'm a Certified Public Accountant, accounting and auditing; I'm a Certified Bank Auditor, which would be banking; and I'm a Certified Fraud Examiner, which would be fraud investigations.

Q. Do you have any other areas of expertise that may be relevant in this case?

A. As relevant to this case, I don't believe so.

LOVE

Q. You mentioned that you are an expert on accounting and auditing. Does that include being an expert on U.S. generally accepted accounting principles?

A. Yes.

Q. Are you an expert on any other non-U.S. accounting principles?

MS. DYER: Objection to form.

A. International accounting principles, promulgated by the IAS.

Q. Do you feel you are qualified as an expert to testify about accounting principles that are utilized outside of the United States?

MS. DYER: Objection to form.

A. In certain circumstances, yes.

Q. You also mentioned that you are an expert on banking; you are a certified banking examiner, did I get that correct?

A. I'm a Certified Bank Auditor.

I am also -- have been a chair of an audit committee of a U.S. national bank and served on the board, of course, of a U.S. national bank as well.

LOVE

Q. Are there opinions in either of the reports that you filed in this case that arise from your expertise as a bank examiner as opposed to from your expertise as an accounting and auditing expert?

A. I think it's an integrated process, because we're talking about banking records, looking at banking documents, we're talking about the application of U.S. GAAP, so that it's sort of an integrated process, it's not one in the same. All three areas we're talking about fraud, so all three areas come into play.

Q. You mentioned we're talking about fraud and you said that you are a Certified Fraud Examiner; is that correct?

A. That's correct.

Q. Do you believe that you are an expert on fraud?

MS. DYER: Objection to form.

A. On -- on, on investigating fraud, yes, and also not only because of the CFE designation but clearly because of

LOVE

the CPA designation, or license, which really deals with accounting and auditing, and that also deals with discovery and investigation of fraud as well.

Q. When you say you're an expert on investigating fraud, what does that mean? What expertise do you have in investigating fraud?

A. Plain, simple English, you investigate the fraud. You get a predicate, there's a fraud that's been committed, you look at the documents, you examine them, you determine where the fraud occurred, how it occurred and look at the amount of the fraud, the cost of the fraud to the company.

Q. You stated that you are a Certified Fraud Examiner; what did you do to become a Certified Fraud Examiner?

A. At the time that I became a Certified Fraud Examiner it was based upon your experience and a recommendation I believe of three attorneys for whom you had worked on fraud investigations; since

LOVE

that time you are required to take an examination besides having experience and the recommendation from attorneys.

Q. Did you take any examination to become a Certified Fraud Examiner?

A. No.

Q. Did you have any special courses that you took to become a Certified Fraud Examiner?

A. No, I've taken courses subsequently, but courses in auditing. You said specified courses to be a Certified Fraud Examiner, there was no you had to pass a certain course to become a Certified Examiner, no, but fraud has always been a part of a CPA's knowledge in accounting for companies.

Q. At the time you became a Certified Fraud Examiner, is it fair to say that anyone who is a CPA and had recommendations from three attorneys could get the designation of Certified Fraud Examiner?

MS. DYER: Objection to form.

LOVE

A. I don't think anyone is the proper qualifier. You did have to have, you know, you could -- I'm trying to recall, it's been quite sometime, they asked for experience, I believe at the time in fraud, so you had to show some experience in it.

CPA designation was a long way there, of course, because of the CPA, since God created CPAs in the last century with the CAs, would be people who would be called in when there was a fraud to examine the books and records.

Q. When you became a CPA, I assume that you had to have some kind of education or some kind of course study that allowed you to become a CPA; is that correct?

A. That's correct.

Q. Did you have to take a test to become a CPA.

A. Yes.

Q. But you didn't have to do anything else in the terms of course work

LOVE

or testing to become a Certified Fraud Examiner; is that fair to say?

MS. DYER: Objection. Objection to form.

A. Let me say that both designations are different, okay? The CPA is a license that's given in about 50, 51 jurisdictions in the United States and its territories, it's given by a political authority, the CFE. The designation is given by the Association of Certified Fraud Examiners when you meet certain qualifications you've got to continue with your education in fraud and you have to report each year to them, and they give courses on fraud examination and the like; and the same with the charter Certified Bank Auditor, that's given out by the Bank Administration Institution, that requires a test, it was a test on accounting and auditing, then accounting and auditing applied specifically in the banking area and bank operations as well; but again, that's given by an organization, it's a

LOVE

designation and not a license, the CPA is the license.

Q. You mentioned the designation given to you by the Bank Administration Institution; is that a U.S. based organization?

A. Yes.

Q. Do you have any designation from any non-U.S. organizations?

A. No.

Q. Do you consider yourself an expert in Belgium banking?

MS. DYER: Objection to form.

A. Let me just say that I know Belgium banking. I've audited -- I've been responsible for the audit of the bank in Belgium, I've audited and been responsible for banks across -- across the globe and I've given bank courses in Germany, Cyprus and Singapore.

So on international banking -- and they're somewhat similar, they're somewhat different, each country has its own regulations -- but I've reviewed bank

LOVE

work in Belgium in Brussels, on a bank operating in Brussels that was consolidated into a bank here in the United States.

Q. What was the name of that bank?

A. American Express International Banking Corporation, the Belgium -- Belgium, which was a separate regulated Belgian bank.

Q. Do you expect to offer opinions at trial about the practices within Belgian banks?

MS. DYER: Objection to form.

A. No, not -- if, you know, if asked and I could answer it I would, but right now I don't see myself answering anything on regulation of Belgium -- any questions on regulation of Belgian banks other than maybe reading what's already in the record.

Q. Do you expect to testify at trial about whether a fraud occurred in this case?

MS. DYER: Objection to form.

LOVE

A. If asked, yes, and I think if you read my report I say that there was massive fraud that occurred here.

Q. I read that in your report.

Do you think you are in a better position than the jury to decide whether a fraud occurred in this case?

MS. DYER: Objection to form.

A. I'm here to assist the jury to come to their conclusions and decision and as a Certified Fraud Examiner and a CPA and a CBE with experience in investigating fraud, and investigating financial fraud, I'm here to assist the trier of fact and that's what I'll do at trial.

Q. Do you think you'll be able to assist the trier of fact by telling them that a fraud occurred in this case?

MS. DYER: Objection to form.

A. I will assist them by telling them about the bank's participation in a fraud that was used to deceive and harm thousands of people.

Q. And it is your testimony as an

LOVE

expert, what you just said, is an expression of your opinion as an expert; is that correct?

MS. DYER: Objection to form. I think it mischaracterizes his testimony.

A. I think it's what I said. I'm going to assist the jury, who will be the trier of fact and the final decision-maker, to understand what occurred and how that is considered fraud and explain the SEC's charges of fraud against the bank, the Belgian regulatory authorities' charge of fraud against the bank, the charges of fraud that came up in the Bryan Cave report and even KPMG in its follow-up report for the regulatory authorities after the fraud was discovered.

Q. Are there any factual issues in this case that you are not prepared to express an opinion about?

MS. DYER: Objection to form.

Do you understand the question?

A. It's a ridiculous question, Mr.

LOVE

Butler, because what facts can come up? I don't know what facts can come up. You can bring up a lot of facts and they can bring up a lot of facts.

The facts that are in my report or the documents, the mass of documents that are referenced in there and that exist that relate to the bank's participation in the fraud I'm prepared to testify about.

Q. Is it possible that the jury will conclude that some of the facts in your report are not true, that they will reach different conclusions?

MS. DYER: Objection. It calls for speculation.

MR. BUTLER: I don't think it calls for any speculation.

Q. Is it possible that the jury will reach different factual conclusions than you have reached, Mr. Love?

MS. DYER: Same objection. Calls for speculation.

A. I can't tell you what the jury

LOVE

is going to decide. The jury will hear all of the evidence and make its own decision.

I have come to a conclusion based on the facts that I have seen that the bank is involved very heavily in this fraud, it would never have occurred without the bank's active participation.

Q. And if the jury disagrees with some of the factual assumptions that you have made in reaching your opinions, that would naturally call your opinions into question; correct?

MS. DYER: Objection to form. Calls for speculation.

A. Again, you say would call my opinions, it means that they are not going to rely or decide not to rely on my expert opinions. That's up to the jury to decide one way or the other.

I am going to just simply state what I've seen in the records. The record is full of documents that show that the bank knew that there was a fraud going on

LOVE

and participated in that fraud. The knowledge is in the record.

They deliberately structured the loans so that the participation of the L&H principal shareholders and managers would be hidden from public view; that's what I'm going to testify to and the jury's going to make up its own mind as a jury or any trier of fact will do in any case.

Q. We're going to go into all these transactions in a great deal of detail later, but one which I just want to ask you about, you said that the bank knowingly participated, how can you know what people within the bank were thinking at the time of these transactions?

A. I don't know what they were thinking, I know what they put on paper, and documentary evidence clearly shows they were aware of the fact that L&H was recording income on transactions that they should not have been recording them on, recording them on, and that that was caused by the participation of the

LOVE

principals in L&H in this whole scheme of developing these fraudulent entities that were really phantoms or ghost entities and didn't exist in many cases on paper -- except on paper.

Q. And do you believe you were in a better position than the jury to decide what individuals in the bank were thinking at the time these transactions took place?

MS. DYER: Objection to form.

Hold on. Objection to form. Mischaracterizes his prior testimony as well.

A. Again, you say what they were thinking, okay? I told you that I was saying that based upon the record it establishes that at least the person writing those records in the credit file who were bank employees and officers and the general counsel of the bank knew what was going on in these entities and how the money was being funneled around and through and back into the company as revenue.

LOVE

Q. I understand that you are very convinced that there was a fraud and that my client was responsible for it, sir. My question is do you have any way of knowing what people were thinking back at the time of those transactions?

MS. DYER: Objection. Asked and answered.

A. Counselor, with all due respect, I think I've answered that a number of times. I'll say it again if you want me to say it on the record.

I'm not saying what they were thinking. I'm saying that the record shows that they knew because if in a record you say that you have to do something and hide something so that someone can show revenue, which they would not otherwise be able to show, that is at least documentary support of knowledge on the part of the bank. What they were thinking when they wrote that I don't know, but they wrote it.

Q. Have you ever been admonished by

22

LOVE

a Court not to testify as an expert about what people were thinking?

MS. DYER: Objection to form.

A. There was a Daubert motion in one case but the Court said, and it was Judge Chin as I recall, that Mr. Love never said he was going to testify as to intent and that he -- he ruled against the Daubert motion and stated that counsel would have an opportunity to bring that up as a motion -- as an objection if I was asked any question at trial.

Q. When you say he denied the Daubert motion, he didn't exclude your testimony completely from the case?

A. He didn't exclude any of my testimony from the case. He said I could testify and that if -- and that the counsel, opposing counsel, could object at any time to any of the questions that were asked.

Q. Did he instruct or did he give an indication on his opinion on the matter that you would not be able to testify

23

LOVE

about certain matters?

MS. DYER: Objection to form.

A. Not that I recall.

Q. What is U.S. GAAP?

A. U.S. GAAP is the conventions, rules and procedures that are used in formulating GAAP. U.S. GAAP means it's GAAP, generally accepted accounting principles, as practiced in the United States, and that's the conventions, the rules and the standards, the practice, so to speak, of how people account for economic events on the records -- books and records of a company, summarize them and display them on financial statements or make disclosure and notes to those financial statements.

Q. Are there authoritative sources of U.S. GAAP?

A. There are various levels of sources of U.S. GAAP. Statement on Auditing Standard 69, the meaning of "fairly presents in accordance with generally accepted accounting principles"

24

LOVE

has a hierarchy of GAAP, and there are approximately five levels of GAAP.

Q. Could you tell me what those five levels are?

A. The first level, the highest level, are the pronouncements of the Financial Accounting Standards Board, the opinions of APB's, Accounting Principle Board opinions, and there are a couple of other slowly being outdated authorities; and then as you go down lower and lower in the hierarchy there are different pronouncements or writings by the AICPA, the FASB -- and when I say FASB what I'm saying is Financial Accounting Standards Board, if that's an understanding I can use it, it makes it a lot shorter than having to repeat the words all the time.

Q. Sure.

A. Okay.

The AICPA is the American Institute of Certified Public Accountants and they have a group that will promulgate accounting principles. They are not --

25

LOVE

they're not as high in the hierarchy, of course, as the FASB, which is the highest; and it goes down through various things, including the concepts, financial accounting concepts is a lot lower, there's currently a project to make them a part of GAAP, right now they're not a part of GAAP -- they are a part of GAAP, I'm sorry, but they're not a part of the first level GAAP, and textbooks written by professors, all in here at a lower level, and the issue and the application of GAAP, or generally accepted accounting principles -- again, I'm using an acronym GAAP, G-A-A-P -- is you start at the top and you work your way down to the bottom, you use an analogous GAAP in a situation where there is no GAAP in that situation as well.

Q. Is U.S. GAAP different in some respects from the accounting principles that prevail in Europe?

A. Yes.

MR. BUTLER: Would you mark this

26

LOVE

as the first exhibit.

(Whereupon, the above-mentioned Preliminary Expert Witness Report of Vincent J. Love dated January 4, 2007 was marked Love Exhibit 1 for identification.)

Q. I've marked as Exhibit 1 what I believe is copy of your report in this case.

Can you just confirm that this is a copy of your preliminary expert witness report dated January 4, 2007?

(Witness peruses exhibit.)

A. It appears to be that, yes.

Q. Well, I just want you to have that in front of you in case you need to refer to it.

A. Yes.

Q. I notice you brought some other documents here today. Can you tell me what you brought with you.

A. Sure.

I brought my preliminary report and the -- my rebuttal report. I also

27

LOVE

brought some documents, some that we recently discovered, some that were there all along and that we've looked at in the past, FAS 68, couple of bank documents that are footnoted in my report, and I have the report; I know you're going to be interested in the tabs, I've tabbed certain sections of the report to show me where different things start and end.

I've made cross-referencing in my report to some bullet points that I have to where in the text you discuss that particular point so that the support is all there for that particular point for the purposes of making this as efficient and effective a deposition as possible.

Q. I understand. Well, feel free to refer to either version of your report during the course of the day and to the extent you need to look or find it helpful to look at other documents we will deal with that as it arises.

A. And I'll identify them as I do, yes.

28

LOVE

MR. BUTLER: Let me mark this as the next exhibit.

(Whereupon, the above-mentioned letter dated 2/11/07 with attachment was marked Love Exhibit 2 for identification.)

MR. BUTLER: I've marked as Exhibit 2 a letter dated February 11, 2007 which attaches a document entitled Amended Exhibit 3 to Preliminary Expert Witness report of Vincent J. Love.

Q. Sir, have you seen this attachment, the amendment, the Amended Exhibit 3 before?

A. Yes.

Q. Does this exhibit, in fact, reflect the documents that you considered in preparing your report?

A. Yes.

Q. To the best of your knowledge are there any documents that you considered in preparing your report that are not referenced in this Amended Exhibit

29

LOVE

3?

A. You know, I've looked at a lot of documents. These were the documents that we've identified. A lot of them are specifically relevant to the report but there are others that may be relevant and we're continuing to look at documents.

Very difficult to say. But at the time we prepared this report -- this was prepared by people who worked for me -- it was the documents that we had looked at during the period of time prior to my report.

Q. Were there any other documents, prior to preparing your report, that you considered in reaching the opinions that you expressed in your report?

A. Well, I considered all of U.S. GAAP and any GAAP document, I referred to GAAP documents, I think we've got most of them in here, I just want to be certain that I'm all inclusive, you know, I don't want to leave anything out.

There were -- there were

LOVE

documents that we had were enormous number of documents. My office is full of boxes we call Beacon boxes -- which was the old company that made that box that everyone uses -- boxes of documents that are involved or that were produced.

There's a database that is available to us with documents that were produced in the case.

So there are -- God, I gotta believe that there's at least 100,000, and that may be an understatement in the number of documents that we had available to us; so it's very difficult to say, you know, with my precise -- we try to be as precise as possible to get everything down that we've looked at, certainly everything that we reference in our report is something that we've looked at and relied on.

Q. Is it fair to say that at least you tried to capture all of the significant documents that you used in formulating the opinions in your report in

LOVE

this Amended Exhibit 3?

A. Yes.

MR. BUTLER: Let's mark this as the next exhibit.

(Whereupon, the above-mentioned Expert Witness Preliminary Rebuttal Report of Vincent J. Love dated February 16, 2007 was marked Love Exhibit 3 for identification.)

MR. BUTLER: I've marked as Exhibit 3 what I believe is the rebuttal report that you prepared that is dated February 16, 2007.

Q. Could you just look that over and tell me if that, in fact, is your rebuttal report in this case.

(Witness peruses exhibit.)

A. Yes, it is, as far as I can tell without reading all, but I'm sure that it is, relatively sure.

Q. Do you agree that under U.S. GAAP a company's management is responsible for the accuracy and completeness of the information contained in the company's

LOVE

financial statements?

MS. DYER: Objection to form.

A. Under U.S. generally accepted accounting principles a company's management is responsible for their financial statements.

Q. So in this case L&H's management was responsible for the accuracy and completeness of its financial statements; correct?

MS. DYER: Objection to form.

A. They -- it's their financial statements, they're responsible for making sure that they're complete and accurate. If they don't, because there's been fraud involved, then the financial statements are not complete and accurate and anyone who participated in that fraud participated in those financial statements not being complete and accurate.

Q. Are you expressing the opinion of U.S. GAAP there? Is it U.S. GAAP that says that anyone who participated in a fraud is responsible for it?

LOVE

MS. DYER: Objection to form.

Can you read back the question, please.

If you can understand the question you can answer.

[The requested portion of the record was read.]

MS. DYER: Objection to form.

A. Management is responsible for their financial statements. There are standards on auditing that relate to fraud, there are standards that say that fraud -- that the audit is not designed to discover fraud where there is collusion by third parties or with third parties to perpetrate the fraud.

Now, I don't remember, I just want to clarify something here, we're not talking about U.S. GAAP, generally accepted accounting principles, any more, we're talking about U.S. GAAS, G-A-A-S, generally accepted auditing standards.

Q. So my question is specifically to U.S. GAAP, sir, is there anything in

34

LOVE

U.S. GAAP that indicates that anyone other than the company's management is responsible for the financial statements of the company?

MS. DYER: Objection to form. Objection, calls for a legal conclusion.

A. I'm sorry.

MR. BUTLER: Excuse me. How does that call for a legal conclusion? I asked him expressly about U.S. GAAP.

MS. DYER: You are asking for an interpretation of GAAP in the context of a legal question.

How are you using the term "responsible"?

MR. BUTLER: Is this witness not an expert on U.S. GAAP?

MS. DYER: This witness is not an expert on legal issues and I believe your question seeks a legal answer.

MR. BUTLER: Fair enough. Let me clarify.

35

LOVE

CONTINUED EXAMINATION BY MR. BUTLER:

Q. I'm not asking for a legal opinion, sir, I'm asking based on your understanding of U.S. GAAP is there anything in U.S. GAAP that indicates that anyone other than the management of a company is responsible for the accuracy of information in the financial statements?

MS. DYER: Same objection.

A. I was going to clarify my earlier answers because we had -- I was answering for GAAS and not GAAP. GAAP is simply, as I defined it before, the convention, rules, practices, procedures that are used to record economic events in the financial statements.

GAAP does not address responsibility for financial statements, GAAS addresses responsibility for financial statements. That's capital G-A-A-S.

Q. So let me ask the same question under GAAS. Under GAAS who is responsible for the accuracy and completeness of

36

LOVE

financial statements?

MS. DYER: Same objection.

A. The answer would be the same as it was before under GAAP because I had -- I'm sorry, I apologize, I was thinking GAAS when you said GAAP.

Q. I understand, I confuse them myself. So let me just make sure the record is clear.

Under GAAS it's your understanding that a company's management is responsible for the accuracy and completeness of the company's financial statements; correct?

MS. DYER: Objection. Objection to form.

A. To the extent -- they are, but to the extent that anyone assisted them in perpetrating a fraud, they would be responsible for the fraud that's contained those financial statements.

Q. Are you referring to a specific provision of GAAS when you say that to the extent anyone participated in the fraud

37

LOVE

they would be responsible for the fraud?

A. It doesn't say it in those words.

Q. Does it say it anywhere, sir?

MS. DYER: Hold on, let him finish. Mr. Love, you didn't appear to finish.

A. What it states in there is that the auditor's design of -- the auditor is responsible for auditing those financial statements and auditing those financial statements the auditor can be interfered with by a third party to make those financial statements appear to conform to GAAP when they don't, and the audit is not designed to find that type of fraud when there's a third party that's involved in perpetrating the fraud.

Q. Does the provision that you just cited say anything about whether the third party is responsible for the fraud?

MS. DYER: Objection. Asked and answered.

Q. Because I mean --

LOVE

MS. DYER: Objection to form.

Q. You can answer the question, sir, but you've testified now that third parties are responsible for the fraud and I just want to know if there's any basis for that under U.S. GAAP or GAAS.

A. I --

MS. DYER: Hold on. Hold on. Can you read that question back, because I'm not sure if it's Mr. Butler testifying or if he's asking a question. Go ahead.

[The requested portion of the record was read.]

MS. DYER: Objection to form.

A. I think I answered that, under U.S. GAAS it's clear that participation of a third party in a fraud can circumvent and interfere with the auditor and would contribute to misleading financial statements. In that event that third party, because you need that third -- that third party in there is really essential in many instances to circumventing and

LOVE

interfering with the auditor, and in plain, simple English that third party is then going to be responsible.

Q. What provision of GAAS are you referring to?

MS. DYER: Objection. Asked and answered.

A. If you get me a GAAS book in here, and I think it's in section 100 -- and I don't try to remember cites to sections -- where it talks about fraud.

Q. Please feel free to reference your report.

A. I didn't bring -- I didn't bring -- you asked me a question that's not in my report, counselor, now you're telling me to refer to my report?

Q. I'm telling you you should feel free, sir, to look at your report if it would be helpful to you; but if there is nothing in your report about it then I guess it wouldn't be helpful.

A. You asked me a question about an issue that's not in my report. In order

LOVE

to answer your question I had to refer to U.S. GAAS, and I said to you that U.S. GAAS states that fraud can occur when third parties participate in that fraud and that that interferes with the auditor in filling their responsibilities under the standards and then it's plain, simple English, not stated that way in there, but that who is responsible for the fraud, both the company and the third party that assisted them in perpetrating the fraud.

Q. So your opinion, sir, as an expert on GAAS is that GAAS says that third parties may be responsible for the accuracy and completeness of a company's financial statements; is that your testimony?

MS. DYER: Objection. Asked and answered. Mischaracterizes his testimony.

A. Let's go back to all of them again because I've said it to you before.

Q. Sir, please just answer my question.

LOVE

A. I'm trying to answer your question.

MS. DYER: Hold on, Mr. Butler, don't interrupt witness.

MR. BUTLER: I think this witness is trying to evade my question so I have to interrupt. I'm asking him a simple question and I'm getting the run-around here and we are not going to do this all day.

MS. DYER: We are going to do this all day. I think that you don't like the answers and so you continue to ask the same question again and again and you're going to get the same answer and the witness is going to be permitted to finish his answer and you are not going to interrupt, and if you do it's going to be a very long day; but this is how it's going to proceed, Mr. Butler, not any other way.

MR. BUTLER: Let me say, sir, I apologize if I've interrupted you but I don't feel you are answering my

42

LOVE

question and I'm entitled to ask it as many times as I need to to get a strait answer.

Let's have my original question read back.

MS. DYER: Mr. Butler, I can only assume a "straight answer" means giving an answer you want, because I think Mr. Love has given you a straight an answer as anyone can provide to your question.

MR. BUTLER: We have a difference of opinion on that.

MS. DYER: Well, we do, and Mr. Love is here to testify so he's going to be the one who ultimately answers the question in the manner he wants to.

CONTINUED EXAMINATION BY MR. BUTLER:

Q. My question, sir, if I remember it correctly, and I'll just repeat it, is it your opinion as an expert on U.S. GAAP, sorry, that U.S. GAAS, that U.S. GAAS says that a third party may be responsible for

43

LOVE

the accuracy and completeness of a company's financial statements?

MS. DYER: Objection. Asked and answered.

A. We'll forget the GAAP/GAAS problem, it occurs all the time. If I catch it I'll say something about it. I'll try and help.

What I'm telling you is that there's a definitive statement within GAAS that says management is responsible for its financial statements. The auditor is responsible for auditing those financial statements.

What I'm also saying, that there's standards in GAAP that says that the auditor may not find fraud, if it exists, if there's third party collusion in the -- in the falsification of financial statements, and I'm saying that it's plain -- it's a plain, simple interpretation, that if someone is interfering with the audit and the auditor's examination in order to give an

44

LOVE

opinion on those financial statements and the financial statements are false and the auditor does, then the responsibility for those financial statements, in my mind, is with the parties who perpetrated the fraud, whether they be management itself alone or people who corroborate -- collaborate with management in making or designing an effective fraud scheme.

Now, it doesn't say those words in the standards, but it's in the standard on the, um, on the ability of the auditor to determine whether fraud exists is in there, as is the statement that management is responsible for the financial statements.

Q. Under GAAS is a company's outside auditor responsible in any way for the accuracy and completeness of a company's financial statements?

MS. DYER: Objection to form.

A. I think I've answered that in the answers to the other questions, because I did give you both sides of it,

45

LOVE

and I did say that the auditors responsible for auditing the financial statements.

Q. Under GAAS is the auditor basically absolved of responsibility for a fraud if it occurs?

MS. DYER: Objection to form. Do you even understand the question?

THE WITNESS: Well, it may be a legal conclusion.

MR. BUTLER: Well, Karen, he'll tell me, this man is an experienced testifying expert, I'm sure he'll tell me if he doesn't answer a question, he doesn't need you to tell him not to understand a question.

Q. Sir, did you understand the question?

MS. DYER: Can you reread the question.

[The requested portion of the record was read.]

MS. DYER: Objection to form.

Q. Do you understand my question,

LOVE

sir?

A. I understand the question.

I think -- I don't want to touch on any legal opinion because generally, you know, these types of things, failures of companies that lead to litigation are going to be decided eventually in a legal forum, so there is a legal issue at stake -- however, however, there are certain instances where the standards clearly say that the intervention of third parties or of false documents, fabricated documents, if they exist and they interfere with the audit, the auditor could perform his audit in accordance with generally accepted auditing standards -- and when I say "generally accepted" in GAAP, unless we distinguish, we understand that we're taking about U.S. standards rather than European standards or standards in a particular company, okay -- that the auditor -- the audits can fail because there's been interference with the auditor, the auditor's not responsible if

LOVE

that occurs, as long as the auditor has followed the GAAS standards.

Q. Is it fair to say that one of the jobs of an auditor is to render an opinion as to whether the financial statements of the company are fairly presented in accordance with GAAP?

A. Consistently applied.

Q. Is that a yes, plus consistently applied?

A. I'm just -- there's a consistency in application of GAAP in financial statements in the auditor's report, but may I hear the question again?

[The requested portion of the record was read.]

A. If he's -- one of the jobs, I mean, the auditor can have a lot of jobs, and a lot of the auditing firms do a lot more than auditing -- if the retention was to perform an audit in accordance with GAAS and report on the financial statements they report on the financial statements, that's what they're there to

LOVE

do.

Q. And to do that I assume that outside auditors have to have access to accurate information about transactions that the company's engaged in; is that fair to say?

MS. DYER: Objection to form.

A. He has to have access, or she has to have access, to the books and records of the company and all the supporting documentation that's available to support the entries that are made in the books and records.

It's the way that you're saying it sometimes I think is sort of narrow, you know, accurate, there could be an error in there that could have no effect on the financial statements or no material effect on the financial statements.

Q. And under GAAS is it correct to say that management is responsible for providing accurate information about its books and records and transactions that it's entered to its outside auditors?

LOVE

MS. DYER: Objection to form.

A. Well, it's more than that, I mean, you know, management is supposed to give you access to the books and records, you then confirm, you have third parties involved that will reply to you and tell you whether something is accurate or not, and so that it's more than only management; for an audit to work you have to have third parties that are being honest as well.

Q. I understand that's your opinion, sir, but I'm asking specifically --

A. No, it's not my opinion, you didn't ask me -- I'm sorry, I interrupted and I should not have done that.

Q. Whether it's your opinion or not, whatever you just said, what I'm really asking about is what GAAS says, and does GAAS say that management is responsible for providing accurate information to its outside auditors?

MS. DYER: Objection, asked and

LOVE

answered. The last question answered that and that was no, it includes other people, and you didn't misspeak, the question was asked in that way previously, Mr. Butler.

MR. BUTLER: Karen, you're not testifying here. Mr. Love can answer these questions, these are about his areas of expertise. He did not say no, at least -- I may have misheard your response.

Q. So is the answer no, that GAAS doesn't say that management is responsible for providing accurate information to its outside auditors?

MS. DYER: Objection. Mischaracterizes the prior testimony.

A. GAAS says much more than that.

Q. But, sir, can you answer my question.

A. You are interrupting me.

MS. DYER: Mr. Butler, please stop interrupting.

LOVE

MR. BUTLER: I'm asking a yes or no question.

MS. DYER: No, you're not asking a yes or no question.

MR. BUTLER: You answered the question but he didn't, you answered for Mr. Love; I need it from Mr. Love.

MS. DYER: He's answering the question so don't interrupt him as he's answering the question. If you don't like the answer you can do whatever you want but you need to let him get the answer out.

MR. BUTLER: Let me just reask the question to get a clear record.

CONTINUED EXAMINATION BY MR. BUTLER:

Q. Sir, does U.S. GAAS state -- I don't care whether it says anything else, I know it says a lot of things -- but does it state, yes or no, that management is responsible for providing accurate information to its outside auditors?

MS. DYER: Objection to form.

A. I too want to get the record

LOVE

straight and clear so it cannot be used or abused in any way, and when you parse out one responsibility rather than another, you ask a question that's not totally susceptible to a yes or no answer.

There are a lot of people who are responsible for giving information to an auditor. Management is one of them. If you believe that management is not giving you accurate and all the information, you have a problem and cannot do your audit.

One way you determine whether management is giving you all and accurate information is to get third party confirmation in many areas where third parties are involved in the transaction.

Q. Sir, I'm asking you a simple question about what GAAS says.

Is there a provision of GAAS that says that management is responsible for providing accurate information to its outside auditors?

MS. DYER: Objection. Asked and

LOVE

answered twice

A. I'll answer it as many times as you want me to answer, it stays the same. Yes, but there are other people who are involved. A yes or no answer is gonna have a muddled answer and not a clear answer as to what GAAP calls for or GAAS calls for.

Q. Sir, thank you for answering my question that time around. Let me just tell you, you can always feel free to explain your answers, and I'll try not to interrupt you but I would appreciate if I ask a yes or no question you try to answer yes or no and then provide your explanation afterwards.

A. I will try but often you can't answer a lot of questions yes or no because it's misleading to answer them yes or no, and the last thing I want to do is to mislead you or anyone else as to what my testimony is in this case.

Q. Again, feel free to provide as much explanation as necessary, but I have

LOVE

another yes or no question for you.

Is there no provision of GAAS that says that anyone other than management is responsible for providing accurate information to the outside auditors of a company?

MS. DYER: Objection. Asked and answered.

A. In the part of the standards on competent evidence, evidence is valued -- is evaluated based upon its source.

One Of the first or highest level would be something you could observe or count yourself, like inventory. Very close to that is third party confirmation of particulars related to a transaction or an account balance.

There's a reliance by the auditor because of the competence -- the supposed competence of that type of evidence, of auditing evidence, that the third party is being honest and has rendered an honest answer to your confirmation or your request for

LOVE

information.

Q. Sir, is there -- are you aware of any specific provision of GAAS that indicates that anyone other than management is responsible for providing accurate information to the company's auditors?

MS. DYER: Objection to form. Objection, asked and answered.

A. You know, I don't know, Mr. Butler, how I can help you with this one because you don't seem to like the fact that auditors rely on and have to rely on confirmation from third parties, they rely on that.

The third party should be responsible and answer those confirmations honestly, if they don't they're interfering with the auditor's ability to determine whether or not the financial statements are stated in accordance with generally accepted accounting principles, so consequently reading into what's in those standards, because the standards

LOVE

even in GAAS are just the standards, there's the practice that goes along with that and the practice is a part of GAAS.

GAAS doesn't give the actual procedures all the time, it gives you the guidelines. There are a few instances where they give you actual procedures, but overall they give you guidance in conducting your audit.

Q. And my question, sir, is in that written guidance that is part of GAAS -- I'm not asking about practice, I'm asking about the written guidance -- let me finish my question -- is there anything in that written guidance that says that anyone other than management is responsible for giving accurate information to the company's outside auditors?

MS. DYER: Objection to form. Objection, asked and answered.

A. Since it's important to you and to everyone that we get this right, you used the word at the beginning about

LOVE

written GAAS or something? Was that -- Can I have the beginning again?

MS. DYER: Yes, why don't you reread the question.

A. Because I have now lost the beginning of that sentence which was wrong, because you're really expanding on the area that you want to be discussed.

MS. DYER: Could you reread the question, please.

[The requested portion of the record was read.]

A. Written guidance and GAAS, and GAAS is a lot like anything else, like the accounting where you have the actual standards, statement on auditing standards, and then you have a lot written -- a lot of literature written by auditors based upon experience, based upon interpretations that are out in the public domain that in order to look at -- each one of the major firms have their own courses that they give to their people on the application of GAAS -- and in there

LOVE

that's part of the guidance that you receive as an auditor.

So you're asking a very broad question and I'm saying with that broad question it's in there somewhere, I'm sure.

Q. Okay, sir, let me break it down for you, I think that will be helpful.

You said there are actual statements of standards under GAAS. Is there anything in the actual statements of standards under GAAS that says that anyone other than management is responsible for providing accurate information to outside auditors?

MS. DYER: Objection to form. Asked and answered.

A. Statement on Auditing Standards is what you refer to them on U.S. GAAS -- well, the wording that you want specifically is not in there. The word -- the reference to third party confirmations and the competency of that information as information that the auditor relies on

LOVE

clearly implies that you anticipate that third party not lying to you.

Q. Under the actual statements of standards under U.S. GAAS, is there anything that indicates that a company's principal outside banker is responsible for the financial statements of a company?

MS. DYER: Objection to form.

A. You have to assume that that outside banker is not involved in a fraud with the company, so there would be nothing in the standards.

If that outside bank was involved in the fraud they would be responsible for the fraud that's in those financial statements, and that's a reason, a judgment, I believe, of any individual, they know it's false, they know it's in there, they know the statements have been disseminated to the public.

Q. My question, sir, was again about these actual statements of standards under U.S. GAAS, and my question is, is there anything in those actual standards

LOVE

that says a company's outside banker is responsible for the company's financial statements?

MS. DYER: Objection to form.

A. The standards are not meant to cover every situation that you run into, Counsel, you use the standards in practice.

You asked me a question about whether they would be responsible for the financial statements. They're not responsible, the company is, until they make themselves responsible by working with the company to falsify the financial statements.

Q. Sir --

A. If they don't do that, then you're right, then -- then the standards say that the company is responsible.

Those standards are written for companies that are responsible and do prepare honest financial statements. If -- you can't take those standards and put in every permutation of what can happen to

LOVE

make those financial statements false from an outside party.

Q. Sir, I understand that not every permutation is in the standards, but I am entitled to ask you about what the standards say. And my question is is there anything in the written standards that says an outside banker is responsible for the accuracy and completeness of a company's financial statements?

MS. DYER: Objection. Asked and answered three times now.

A. It's misleading to say that you need those words. Those words in there, those exact words -- let me finish -- I try to let you finish your questions, I know I'm supposed to, let me finish my answer -- those actual words, okay, that you want are not in there, but to say that with a yes or no answer is misleading because it's saying it implies that the outside third party that is involved in the fraud is not responsible for the fraud in the financial statements.

LOVE

Q. In your experience what role does a company's principal outside banker play in preparing a company's financial statements?

MS. DYER: Objection to form.

A. Financial statements will be prepared by the company in the company's accounting personnel.

MR. BUTLER: Could I hear that answer again, please.

[The requested portion of the record was read.]

THE WITNESS: And, and the company's financial personnel. I'm sorry.

Q. So is it your answer, sir, that in your experience a principal outside banker does not play any role in the preparation of a company's financial statements?

MS. DYER: Objection to form.

A. That's correct, in the preparation of the financial statements, yes.

LOVE

Q. Sir, I would like to refer you to pages 9 and 10 of your initial report, and you have some charts showing the impact of a proposed restatement on the revenue of Lernout & Hauspie; where did you get your information on this proposed restatement?

A. If you look there's a footnote reference to footnote 13, and it references FV001735 and says, These revenue restatement amounts were presented to the L&H Board of Directors on April 17, 2001. It is our understanding that because of L&H's bankruptcy, restated financial statements were never issued. The restatement period -- and there's quotes around restatement period -- is defined as the two and a half years ending June 30, 200 -- 2000 which was the period presented to the L&H Board of Directors. It appears that based on documents I reviewed, these corrections were appropriate and would have been made had the company continued to exist.

LOVE

Q. So is this a source that you relied upon for this information?

A. Yes.

Q. Did you rely on any other source for this information?

A. Well, for all the information that's in here, for the first part of it for the years '96 and '97, if you look it's referenced to a Footnote 14 that reads "This period was not included in the restatement discussed in footnote 13 because L&H's internal investigation did not reach back to this time period. However, we determined based upon the available documents and testimony that under U.S. GAAP the amounts reflected for 1996 and 1997 were improperly recorded."

Q. Let me rephrase my question, sir.

For the years 1998 and 1999 and 2000 are you aware of any other source for the information that you have represented on these two pages?

A. Right now, you know, with the

LOVE

documents that I have out there, if there's another source there may be, but I don't know, we used this source as our reference.

MR. BUTLER: Please mark this as the next exhibit.

(Whereupon, the above-mentioned document bearing Bates number FV001735 was marked Love Exhibit 4 for identification.)

Q. Sir, I've handed you a document which I've marked as Exhibit 4 bearing Bates number FV001735.

Is this the document that you cite for the information provided on pages 9 and 10?

A. Yes.

Q. What is this chart?

A. It's a breakdown of restatement by entity, draft document for management discussions purposes only, and it shows the Revenue before restatement, L&H, NV LDCs, Other, Asia, Korea, U.S., Revenue after restatement, Dollar change in the

restatement, percentage change, and it's for first, second, third and fourth quarter of 1998; first, second, third and fourth quarter of 1999; and the first and second quarter of 2000.

Q. Were you just reading that information from this document?

MS. DYER: Objection to form.

A. The document speaks for itself. Yes, I read it from the document.

Q. Do you have any independent understanding of what this document is, aside from what you read on the page?

MS. DYER: Objection to form.

A. It was a document that was in discovery and it was a document that was presented to the L&H's Board of Directors on April 17, 2001.

Q. Who produced the document in discovery?

A. I don't know who produced it in discovery. It's in discovery, it's in the hundreds of thousands of documents that we received.

Q. But this is the one document you relied on to determine how much of L&H's revenue should be restated; correct?

A. This is the document we relied on, yes.

Q. Do you know who prepared this document?

A. No.

Q. Do you know what methodologies they used to prepare this document?

MS. DYER: Objection to form.

A. No.

Q. Did you do anything to verify the accuracy of the figures contained in this chart?

A. Those figures relate to the LDCs that are at issue here. We -- we looked at other documents for those amounts, to see that those amounts -- we were satisfied that those amounts -- that those amounts were correct.

This is also a document that was used in the ordinary course of business, because it was presented to the Board of

Directors, so we're using the business records of the company, and that's the basis of our use for it.

Q. You say this was a business record of the company that was prepared in the ordinary course of business; do you know who prepared this document?

A. I don't know who prepared it. I don't know the name of the person who prepared it. It was presented to the Board of Directors.

It's a business record used in the ordinary course of the business -- of conducting business by L&H, and it was L&H, after the fraud that was discovered and it was then by people -- let me just try to get -- yeah, who were outside of the fraudulent transactions who were reporting to the Board on what they found.

Now, I don't know who prepares a whole set of financial statements. I know the company you're telling me is responsible for it, but there could be tens and twenties of people preparing it.

You look at the records that are maintained in the ordinary course of business, and I said that's what we did with this.

Q. Sir, you indicated I think in your answer that this was prepared by people who were not involved in the fraud; is that what you said?

A. It's my belief that they're not involved. It's too far after the date, um, they may have been. They may have been retained, you know, you retain people sometimes, you know they were involved. So they may, they may have been.

But I see no problem with that. They put together this and I'm able to tell the numbers are right on here, some of the numbers are right that I can directly look at. We've looked at some of the Asian, the Korean numbers, the U.S. number in other documents.

Did I audit this? No, I didn't audit it. I don't intend to audit. I don't think that's my purpose. This was a

LOVE

document presented to the company in the ordinary course of business.

Q. Sir, I believe you read at the top it says, quote, "Draft document - for management discussion purposes only"; do you see that?

A. That's right. It went to the Audit Committee of the Board of Directors.

Q. Do you know whether a final version of this chart was ever prepared?

A. No, if it's in the documents -- if you give me the number I'll go look at it and if it's any different I'll determine what caused the difference and if it's more reliable I'll use that instead of this.

Q. You said that you performed some procedures to verify the accuracy of some of these numbers, I think you referenced to the lines --

A. We didn't perform specific procedures, but going through our work we could see where some of the numbers came from.

LOVE

Q. So that was my question. Which numbers were you able to see where they came from based on procedures that you did perform?

A. Let me go through, you know, the report, because there are a lot of places in the report. It was basically the LDC line is one area where we can do that.

This is -- this is the overall fraud that was perpetrated rather than the fraud that occurred at the company at that time.

Page 14 of the report really breaks down the two years and the LDCs in those two years.

Q. Sir, are you saying that page 14 has the same numbers?

A. If you look at 9 and 12 and 21 from '98 --

MS. DYER: You are reading from page 14?

THE WITNESS: Well, on both pages, if you look at the LDC line on both pages.

LOVE

Q. Those are two of the numbers that you are able to verify?

A. Right. Well, then you do 22, and then there's a 19, which is different because when you get into '99, I believe we have some of the Asian fraud that was patterned on the way they committed the fraud in Europe creeping in, so there are differences as well there, because '99 the fraud, and this, because this is I believe the total fraud we're talking about, and this whole fraud began in one place and then blossomed out into the rest of the world and Europe and a lot of the pattern that was designed in Europe was used in Asia, so this is the total, okay?

So we had other LDCs coming in, we had other items coming into play from outside of Europe, and we're just talking in this report about Dexia's participation in designing that fraud that was a pattern for the remainder of the LDC type of fraud that was -- that occurred.

I have to get down into the

LOVE

specifics, and of course, like I said, '98 is right because that's where it all occurred in one place.

In the later years it does have the European in there, so that -- it does have the Asian fraud in there so that would not be in my report 'cause I only focus on the -- since this was a case against Dexia -- the fraud that was perpetrated with the design that was created by L&H and Dexia and had Dexia lend loans involved in it.

Q. Okay. You say your -- your investigation and your project here only focused on the fraud that Dexia was involved in; is that what you just said?

A. In the overall fraud that comes from a number of different places, and there was work that we did by reviewing documents in different places or from that. We look at the Bryan Cave report that said there was fraud. We saw the fraud that they were talking about and the numbers that were in there.

74

LOVE

We looked at KPMG when they came in and did a study or an examination that they had to do on the Belgian regulatory law of the fraud and the fraud that occurred.

We looked at -- we had access to the Belgian authorities that indicted the bank for fraud.

We looked at the SEC charges against Dexia to see what they were talking about what occurred.

So a lot of that comes into play in the overall fraud that you're talking about. A lot of that comes into play here in this report. But when you get down to the items that we specifically analyzed, we specifically analyzed all of those instances where Dexia was involved with the principals of L&H in perpetrating the fraud, so that it does have an overall character to it, particularly up front in the report, but as you go back into the report it's specific to the early fraud that occurred that occurred with L&H's

75

LOVE

principals and the bank.

Q. Going back to this Exhibit 4, so we talked about three numbers that you said that tied out with some of the work that you did, the nine million figure for the LDCs for Q3 1998; the 12 million figure for Q4 1999; and the 22 million figure for Q1 1999?

A. That's correct.

Q. Did I understand that correctly?

Are there any other numbers on this chart that tied out to the work that you actually performed?

A. For this report, no.

Q. Do you know whose handwriting is on this page?

A. No.

Q. You say -- you may have read this to me earlier as you were reading this footnote -- but you say in footnote 13, quote, "It appears that based on the documents I reviewed, these corrections were appropriate and would have been made had the company continued to exist."

76

LOVE

What is your basis for believing that these corrections reflected in Love Exhibit 4 were appropriate and would have been made?

A. Well, there was, again, you know, the Bryan Cave report, which didn't have all the fraud in it but had fraud in it that they had found in it.

There was the Belgian police report that we looked at that talked about the fraud and the numbers that were involved.

We had previously looked at the Korean fraud, the Singapore fraud and the numbers and the magnitude of the numbers gave us no cause to believe otherwise.

As I said earlier, Counsel, I want to tell you, I didn't audit this, okay? This is a record that's used in the ordinary course of business that we have used here to determine the amount of restatement that would have occurred based upon what we know at this point in time without conducting an audit, just with

77

LOVE

conducting an investigation.

Q. You mentioned the Bryan Cave report. Did that Bryan Cave report contain figures that tie out with the figures on this chart?

MS. DYER: Objection to form.

A. The Bryan Cave report was prepared at a time that they were unaware of the Dexia Bank involvement in the fraud and they had cautioned in that report -- report if there were related party activities here that things would change.

Q. So the answer is no?

A. No, the answer is not no. And please, I'll try not to interrupt you -- and I know I do it from time to time -- I asked you not to interrupt me.

But from reading the Bryan Cave report we can determine by what Bryan Cave knew at the time and what they didn't know at the time that these numbers were reasonable.

Q. My question, sir, is were there numbers in the Bryan Cave report that

LOVE

mirrored the numbers in this exhibit?

MS. DYER: Objection to form.

Q. Can you answer that question yes or no?

MS. DYER: Objection to form. Objection, asked and answered.

A. I said that the Bryan Cave report was written at a time when they were unaware of the Dexia involvement in the fraud and Dexia lied to them at one point in time as well by omission in not telling them about the involvement of the related parties, so that they didn't know that the Dexia fraud was there, they did it -- an accounting analysis as if parts of this revenue may be taken into income and part deferred and not taken in. They did not have all of the facts at the time they did it.

But in looking at what they had in that report and knowing what happened afterwards, we were able to use that report to give us comfort that had they known this it would have been -- this

LOVE

would have been the amounts.

The Bryan Cave report also talked about the Asian amounts that were out there that were huge amounts. That gave us comfort in understanding the numbers, the work we had done in the Korea -- in the Korea and in Singapore types of fraud, or fraud that would have occurred, gave us also that the comfort that the magnitude of the numbers that were in here were reasonable.

Again, I did not audit this statement. I did not intend to audit it. I do not represent it as being audited.

Q. Are you finished, sir?

A. Yes.

MR. BUTLER: I move to strike that last answer as nonresponsive.

Q. Sir, I'm asking a simple question. Does the Bryan Cave report contain figures that reflect the figures that are contained in Love Exhibit 4?

A. Yes.

MS. DYER: Objection.

LOVE

A. They do because they contain parts of the figures that are in there, so they are contained within this document either separately or in the aggregate, but more they're aggregated with other fraud that they were unaware of.

Q. Why didn't you cite those provisions in your report?

A. What provisions?

MS. DYER: Objection to form.

Q. The provisions that you just referenced that support the numbers that are reflected in this chart.

MS. DYER: Objection to form.

A. What provisions?

Q. The provisions of the Bryan Cave report that you just referenced, sir.

MS. DYER: Is your question assuming that the Bryan Cave report is not cited in here?

MR. BUTLER: Look, I'll ask the questions here, Karen.

Q. Sir, you just referred to the provisions of the Bryan Cave report. You

LOVE

said the answer is yes, there are parts of the Bryan Cave report that reflect these numbers. My question, sir, is why didn't you cite them when you were providing the support for these charts on page 9 and 10 of your report?

MS. DYER: Objection to form.

THE VIDEOGRAPHER: We're just about out of tape, Counsel.

MR. BUTLER: I'll withdraw the question for now and we will go off the record to change the tape.

THE VIDEOGRAPHER: We're off the record. This is the end of tape one. The time is 10:58.

(Whereupon, a brief recess was taken).

THE VIDEOGRAPHER: We're back on the record. The time is 11:09. This is the beginning of tape two.

CONTINUED EXAMINATION BY MR. BUTLER:

Q. Sir, I'm not sure where we left off when we took the break, but let me just ask the question I thought I ended

LOVE

with again.

Are there any provisions in the Bryan Cave report that you've referenced that reflect the numbers that are contained in Love Exhibit 4?

A. Yeah, and I thought I had answered that question.

I said we looked at the Bryan Cave report, we knew they didn't have all the information but what we had in there gave us comfort that the numbers that we were getting here were reasonably correct, along with not only the Bryan Cave report but the KPMG report and the other work that we had done on this continuing fraud throughout the world, so that, you know, we saw nothing in these numbers that led us to believe that they were materially misstated in any way.

But we didn't do -- I didn't do an audit, I didn't go down and verify and tie in every number, you know; but we did look at it to see if it was reasonable to accept, it was a record used in the

LOVE

ordinary course of business, we wanted to do whatever we felt was necessary so that we can reasonably accept it, and we did.

Q. Sir, I'm asking you a very specific question. I don't care about the other reports, I'm going to ask you about each of them.

I'm asking you about the Bryan Cave report that you referenced. Are these actual numbers reflected in the Bryan Cave report?

MS. DYER: Objection, asked and answered four times now.

A. I thought I gave you an answer.

Q. No, sir, you did not.

Are these actual numbers contained in the Bryan Cave report. You said that it was consistent, is what you said. You said they were consistent, and my question, sir, is are the actual numbers there or is it just that they are consistent with the Bryan Cave report?

MS. DYER: Objection, asked answer answered.

LOVE

A. The first part of your question was that I didn't give you an answer. I gave you an answer, you didn't like the answer, and that's fine, you can ask me again.

What I did say answers your question though, and clearly answers your question and doesn't mislead in any way.

I said that we used the Bryan Cave report to verify not the authenticity of this but I used the Bryan Cave report -- they reported on a lot of the same transactions that we had noticed, we had, they didn't have a lot, but we used the Bryan Cave report to gain some degree of comfort that we were going in the right direction looking at the wrong -- the right numbers, and I've also told you that the Bryan Cave numbers may be in here where they came to the same conclusion as we did having more information than Bryan Cave had.

I think that was -- to give a yes or a no would be to say I didn't rely

LOVE

on it, no, that's not true, I did rely on the Bryan Cave report to a certain extent, as I did on the other reports.

Q. Sir, that's not my question. My only question, and I think it's a very simple one, is are these actual numbers that are reflected in Love Exhibit 4 contained anywhere in the Bryan Cave report?

MS. DYER: Objection. Asked and answered for the fifth time.

Q. Do you understand my question?

A. I understand your question. You don't understand my answer.

Q. Can you give me an answer? Can you give me an answer to the question?

MS. DYER: Mr. Butler, please stop badgering the witness. He just said he understood the question and you didn't understand the answer to the question.

You asked it four times, you've asked it now for the fifth time, Mr. Butler.

LOVE

Don't harass the witness, don't badger him and don't cut him off. If you want to hear the same answer again we can do this, but it's on your clock.

Q. Sir, I'll ask the question again and I'll continue to ask it until I get an answer.

Are these numbers that are reflected in love Exhibit 4 actually contained anywhere in the Bryan Cave report that you've referenced in your answers?

MS. DYER: Objection. Asked and answered, I believe it may be the sixth time now.

A. The basis for some of these numbers were -- was in the Bryan Cave report. The understanding of the transactions -- that the number of transactions that were involved and when, what year they occurred in was part of a lot of information that we looked at to be comfortable with these numbers.

LOVE

Q. Sir, I'm not asking for the basis for the numbers, I'm asking about the actual numbers.

Are the actual numbers in Love Exhibit 4 contained anywhere, to the best of your knowledge, in the Bryan Cave report?

MS. DYER: Objection, asked and answered.

A. I gave you my answer to this a number of times. If you're saying is every single number on here in this format or similar format in the Bryan Cave report the answer is no, because Bryan Cave did not know of the extent of the fraud perpetrated by the bank that would have increased the number of -- increased the amount of fraudulent revenue from what they had determined based upon the assumption that there was no related party activity between L&H and the LDC financing.

Q. Thank you.

You mentioned previously that a

LOVE

Belgian police report was also one of the sources that you believe is consistent with this chart in Love Exhibit 4. Can you tell me what you were referring to?

A. There was a report done by the prosecutor in Belgium that talked about the fraud, how it occurred, talked about the different companies that were involved and these ghost companies or shadow companies, shell companies I know is a word that has been used at times by different people for these entities. There was information in there.

We used that information to verify what we had done and that gave us more comfort on the numbers that were sitting in this report, not the precise number but the fact that the fraud was a massive fraud and it occurred in these particular -- in this particular style by the bank.

Q. So did I hear you correctly, sir, that the precise numbers that are reflected in here are not, to the best of

LOVE

your knowledge, in the report prepared by the prosecutors in Belgium?

A. The precise numbers no, but my last answer stands as to how that -- that report was used.

Q. You also referenced, I believe, a KPMG report as one of the sources that is consistent with this document; what were you referring to?

A. There was a report prepared by KPMG, I think it was issued in November or December of 2000, it was issued they said under some sort of regulatory provision that they had to comply with to examine what went on and what the fraud was.

They mentioned some of the fraud, and again it's the same way like anything else, all of that leads you to believe that the magnitude of the fraud and the numbers in here are reasonably correct, not exactly, not precisely, but reasonably, there is a reasonable basis for relying on this.

Q. Just to clarify your answer I

just want to confirm that the specific numbers that are reflected in Love Exhibit 4 are not necessarily contained in that KPMG report; is that correct?

MS. DYER: Objection to form.

A. You know, I'd have to look at report itself. I don't think the exact numbers are in there but, you know, in giving that answer I'm giving it as I'm sitting here today, and there's a load of documents all over, including that report, that reflected on what happened here, and as I'm sitting here I don't think, because they, again, didn't know the extent of the fraud as well.

Q. If you turn to page 8 of your report, you have chart on this page showing reported and fictitious revenue for various years in the first two quarters of 2000; do you see that?

A. Yes.

Q. Is this document, Love Exhibit 4, which is FV1735, the source for your information about the fictitious revenue

that's reflected in this chart?

A. Well, it says '66 and '67 -- so '66 and, I'm sorry, '96 and '67 [sic], I wish it was '66 and '67, I'd be a lot younger now, represent the fraudulent revenue recorded by L&H related to Dictation Consortium and Brussels Translation Group, and that's only discussed in the report later on.

The fictitious revenues for '98 and 2000 represent the restated revenue for all transactions discussed in footnote 13, which relates back to this document (indicating).

Q. I'm sorry, I made the same mistake again. I should have asked is the source for the fictitious revenue in 1998, 1999 and the first two quarters of 2000 this document which is FV1735?

A. Yes.

Q. Do you have any other source for your information about fictitious revenue in 1998, 1999 and 2000 for Lernout & Hauspie as a whole?

A. Right.

MS. DYER: Objection to form.

A. The -- the fraud, um, the fraud was a massive fraud. We looked at all of the aspects of the fraud at other times, um, the numbers that are there essentially come from here.

So for the later years, um, this is the source. When I say -- I'm sorry, I'm not being clear -- for the years '98, '99 and the first two quarters, this would be the source of that, yes.

Q. And my question, sir, is there any other source that you used for the fictitious revenue for Lernout & Hauspie as whole?

MS. DYER: Objection to form.

A. I don't want to mislead. Look, we just didn't take this blindly and put it in here. We had seen the amount of fraud that was committed in Korea with the Korean banks, we had seen the amount of fraud that was committed in Singapore with the LDCs and LCCDSs and everything else,

all the acronyms that were in there.

We had known the numbers and the magnitude of the numbers of them while we are preparing this, so it's not blindly just preparing it on this, but we did take the specific numbers from this report for that chart.

Q. And I'm asking really about the specific numbers. I understand the other stuff, but did you have any other source of information for the specific numbers that are reflected in this chart for 1998, 1999 and the first two quarters of 2000?

MS. DYER: Objection to form. Asked and answered.

A. That's right, I'm having trouble with the question only from the point of view or the perspective that I don't want to be -- I don't want to mislead anyone to think that we didn't do other things in other areas to come up with numbers and those numbers that were generally in -- in correspondence with these numbers.

We used the numbers from this

LOVE

report, but we did a lot of work with a lot of documents on this fraud and -- and we felt comfortable with the numbers that we had in here.

Q. I understand that you felt comfortable with them, sir, but my question is did you have any other source for the specific numbers for 1998, 1999 and the first two quarters of 2000 that you cite in this chart?

A. As I sit here now, the report states that we did it with this document. That's my recollection, but then again, you know, there are other areas that we looked at. We looked at a lot of numbers and a lot of documents and over a long period of time and I may not remember everything that we did that went into satisfying yourselves that these numbers were okay so that these numbers were okay.

But these numbers are the numbers that I used in that chart (indicating). I'm sorry, I'm not being clear because let me -- the numbers that

LOVE

are on or the amounts that are on the Bates numbered document FV001735 are being used in the chart or to prepare the chart that's on page 8 of my preliminary report.

Q. Sir, just going back to my original question. My question is are you aware, as you sit here today, of any other documents that tie out those exact numbers for 1998, 1999 and the first two quarters of 2000 that you cite in this chart?

MS. DYER: Objection. Asked and answered.

A. Not that, as I sit here today right now, without all of these documents in front of me and everything else, no, I think the answer is I know of nothing else right now.

Q. If you turn to Exhibit 7A of your report, which I believe is the very last page, or maybe there are some exhibits afterwards, but it's Exhibit 7A.

MS. DYER: It's the last page.

Q. It doesn't look like we're on the same page. It's the one that looks

LOVE

like this (indicating.)

A. 7A? Okay, yes, yes.

MS. DYER: Can you see it there or would you like --

THE WITNESS: Yes, I have it.

Q. It appears to me that this Exhibit 7A is a chart reporting to summarize the impact that the Dexia-related transactions, among other transactions, had on L&H's revenue; is that -- is that accurate?

A. Yes.

Q. And you list this document we've been talking about, FV1735, as one of the sources for the information contained in this chart; do you see that?

A. Yes.

Q. The only other document that you cite is LHSP 22159; do you see that?

A. Yes.

MR. BUTLER: Let's mark this as the next exhibit.

(Whereupon, the above-mentioned document bearing Bates number

LOVE

LHSP22159 was marked Love Exhibit 5 for identification.)

MR. BUTLER: I've marked as Exhibit 5 a document that bears the Bates number on one corner LHSP22159.

Q. Sir, is this the document that you reference as one of your sources for Exhibit 7A?

A. Yes.

Q. What is this document?

A. It's a document that Bryan Cave had and it's called attorney work product, it's a silly title, but it's Attorney Work Product Privilege Bryan Cave LLP, is the title, and it says "Re Lernout Hauspie Speech Products.

It shows the revenue in U.S. dollars, in millions of U.S. dollars. It has a breakdown by LDC, XLDC, IA, then it puts Korea in there, then it talks about, you know, this is a Bryan Cave document, the LDC, XLDC, IA and Korea total number.

So it's from Bryan Cave's papers that -- this is one of the documents I was

LOVE

saying that, you know, Bryan Cave report, the numbers weren't exact, but the numbers are important, if you look at the top number in -- if you look along the top number at least for total revenue, you can see the total revenue corresponds with the revenue that's on Exhibit 4, and it's why I had problems with answering the question before because they're probably other documents as well that tie in in some respect to the numbers, not the exact number, this is in millions, this gets you down to the actual thousands of numbers. So some of the things that are in here are -- are in Exhibit 4.

Q. Do you know who prepared this chart, Love Exhibit 5?

A. Who precisely prepared it? The individual?

Q. Do you know anything about who prepared this document?

A. It comes from Bryan Cave's documents. It's Bryan Cave's work product. I don't know who prepared it.

LOVE

Q. Who is Bryan Cave?

A. It's a law firm here in New York that conducted an investigation that -- at request of the Board of Directors of Lernout & Hauspie and they used Arthur Andersen as their accounting experts.

Q. Do you know anything about the methodology that was used by Bryan Cave to prepare this chart?

A. The methodology from the chart is somewhat obvious. They took the total revenue, um, they took the LDC revenue that they thought was wrong, they took the revenue from the different types of these shell entities, different titles that they had, the alphabet titles, and broke it out from what they had, what they knew at the time when they were issuing their report.

Q. Do you know how they went about determining whether the revenue was wrong?

A. Well, in some instances they went through an analysis of it not knowing the involvement of the related parties and Dexia's participation at that time.

LOVE

They went through it with what they knew at the time against, most of it against SOP 97-2, and determined whether or not the revenues should have been recorded and should have been deferred.

Q. Sir, do you know that for a fact or are you speculating about what they might have done?

MS. DYER: Objection to form.

A. Look, if you read their report you can see it's in the report. If you give me the report I'll point to the report where they say what they're doing and what guidance they're using to come up with the numbers.

Q. How did you use this document to prepare your Exhibit 7A?

A. Well, it agrees with the top numbers in it, um --

Q. By "the top numbers" you mean the reported revenue?

A. Yes, so we know the total revenues numbers, yeah, so we know the total revenue number is correct that we're

LOVE

stating, that we're working with.

On some of the other numbers it's just to determine that there is a correlation between those numbers and the numbers that are here to a certain extent, not completely.

Q. Well, I see a correlation for Q3 and Q4, they're the same numbers we talked about before, the nine million and the 12 million, are any other numbers that appear to correlate with your Exhibit 7A or with the other source that you cite, FV1735?

A. LDCs non-Dexia related for, let's say, the third quarter.

Q. Sir, where are you reading from?

A. Oh, I'm sorry, if you go to --

MS. DYER: Chart 7A.

A. Have we marked that? No.

So it's chart 7A, look under third quarter, look down under LDCs, non-Dexia related 35 -- 23 five, 23,500,000.

Q. This is Q3 1999?

A. Yeah, yeah. I'm sorry, I said

LOVE

yeah. I'm sorry about that.

No, three, two, one total -- no, I think it was the same as I said before. We used the Bryan Cave numbers. We were happy with the top numbers, we were happy with the beginning numbers, and I'm trying to see if there -- I can't recall if there are any other correlations that we had.

Again, Bryan Cave was in here early in this fraud and this report was done at the request of the Audit Committee of Lernout & Hauspie and had to be done quickly. They didn't have all of the data, so some of the numbers here may not equate to the numbers in the report. Usually they would be less than those numbers but I -- as I sit here now, it's gonna take some time to go through, but clearly we looked at these numbers when we were doing the report. The top line number agrees.

Q. The top line number meaning the report of revenue?

A. Total revenue number. The total

LOVE

revenue number.

Q. Sir, let me ask the question this way. Is there any information that's contained in Love Exhibit 5 that is not also contained in Love Exhibit 4?

MS. DYER: Objection to form.

MR. BUTLER: Let me withdraw the question and ask it in a slightly different way.

Q. Did you use Love Exhibit 5 to obtain any information for Exhibit 7A that was not contained in Love Exhibit 4?

MS. DYER: Same objection.

A. Look, Love -- give me that again on the numbers?

MS. DYER: Can you reread the question. Can you reread the question, if you would, please.

[The requested portion of the record was read.]

A. No.

Q. If you look at Exhibit 7A now -- I think you can set that Love Exhibit 5 aside for now -- remove the paperwork from

LOVE

your -- from in front of you.

If you look at Exhibit 7A, you have a line that's labeled "Subtotal of adjustments"; does that line reflect the total amount of overstated revenue at L&H for each quarter?

A. Yes.

Q. And that line appears to correspond precisely to the line in Love Exhibit 4 that's labeled "Dollar change"; is that correct?

A. It should. Let me go back to Love Exhibit 4. Whoops, I have to get the right year. A subtotal into dollar change, that's correct.

Q. So was -- was FV1735 your source for this line in Exhibit 7A that's labeled "Subtotal of adjustments"?

A. I think we went over this before, you know, this is based upon -- this being Exhibit 7A I'm looking at -- is based upon the information in Bates number FV001735.

Q. Right, and I'm asking --

LOVE

A. Well, it's the same, I mean --

Q. Sir, my question is simply is that, not all of the information -- let me ask the question this way -- sir, is all of the information contained in Exhibit 7A contained in FV1735?

MS. DYER: Objection to form.

A. No.

Q. So my question, sir, I'm trying to determine what information came from 7A as opposed to from other sources. So my question is did the line "Subtotal of adjustments," did the information in that line come from FV1735?

A. I said yes, for ninety -- '97 is not on Love Exhibit 4. So '97, the year '97 is in 7A, so if it's not on four it couldn't be the -- the four couldn't be the source for 7A.

Q. Okay. So just to make the record clear, the Love Exhibit 4 is the source for the "Subtotal of adjustments" line in Exhibit 7A starting with 1998 and continuing to the end; correct?

LOVE

A. That's correct.

Q. Did you have any other source for that total information or was Love Exhibit 4 your only source for that information?

MS. DYER: Objection to form.

A. We're going to get into the realm about that. You know, there's other information that we looked at. I mean, we took it from here basically -- and here being Love Exhibit 4 -- and that is the same number that's here and this was the source of it.

We also -- I went through a long discussion about the other work that we did that made us comfortable with this document. So that there could be other sources that feed into it, but the actual, when you look at it, at both of these documents, it's obvious that one comes from the other or the information in one is in the other.

Q. And, sir, I'm asking just about the preparation of this particular chart.

LOVE

In preparing this particular chart, Exhibit 7A, did you use Love Exhibit 4 as your source of the information in the "Subtotal of adjustments" line?

MS. DYER: Objection to form. Asked and answered.

A. People working for me -- when I say "me," you realize that I'm not doing this all myself, that I've got people working for me, staff people would be putting numbers together into charts and everything else -- and the answer is that, that basically is, is gonna be how it flows.

Q. Who on your staff prepared this chart?

MS. DYER: Objection to form.

A. Which chart?

Q. Sorry, Exhibit 7A.

Who on your staff prepared Exhibit 7A?

A. Norman Roth is my most senior person who worked with me on this. There are other people in the office who may

LOVE

have worked for him in preparing this. I presume it comes from Mr. Roth to me, okay, but he may have had other people working on that chart.

Q. And do you know, as you sit here today, whether Mr. Roth used Love Exhibit 4, for the -- for the "Subtotal adjustments" line that's in Exhibit 7A?

A. Mr. Roth is responsible for that report and he has his notes at the bottom of that report as to where it comes from, the source. So the source is FV001735, which is Exhibit 4, that's where it comes from.

Q. My question, sir, is do you know whether Mr. Roth used this document as his source when he prepared this?

MS. DYER: Objection to form. Asked and answered.

A. I think I answered the question. It's quite obvious, Counsel, if you look at it, on the bottom of Exhibit 7A it says "Source, FV001735, LHSP022159, adjusted for the revenue L&H recorded from the

LOVE

shell companies during the period Dexia provided financing."

Q. Sir, I'm not asking you what's obvious from reading the document, I'm asking you what you know, and please keep in mind that you're under oath.

Do you know whether Mr. Roth used as his source for this line in Exhibit 7A the "Dollar change" line from Love Exhibit 4?

MS. DYER: Objection to form.

A. Counselor, I do know I'm under oath, you don't have to tell me I'm under oath here, because I took the oath at the beginning and I'm trying to be as truthful as possible, and any insinuation that I'm not or any threat to me to answer the way you want it answered is misguided.

I am trying to answer these questions as best I can.

I know that Norman Roth does his work well. I review his work and he says he took it from this document, I know then that he's taken it from this document.

LOVE

Q. I take it it's fair to say that Mr. Roth would know for sure whether he -- how he prepared this exhibit?

MS. DYER: Objection to form.

Q. Is that true?

A. It's quite obvious that that's true, but he's given the source on the document. The documents will speak for itself. It gives its source. We try to do that as an established practice in our business.

He says that it came from this document, that he's adjusted out the Dexia portion of it to show the Dexia portion in there, as he says at the end of there, and that's what -- that's what was done. That's the work that I supervised.

I've got competent people who work for me. They don't lie to me, or they wouldn't be working for me.

Q. I understand all that, sir, but what I'm trying to find out is are you going to be able to answer detailed questions about how this chart was

LOVE

prepared?

MS. DYER: I believe, Mr. Butler, he has been answering detailed questions about how this chart was prepared for about an hour.

Q. Could you answer my question, sir?

A. I just told you how the chart was prepared.

Q. Do you know whether Mr. Roth had any source other than Love Exhibit 4 for the information that's in the "Subtotal of adjustments" line in Exhibit 7A beginning with 1998?

MS. DYER: Objection to form.

A. Mr. Roth, just as I, looked at documents, and we've looked at a lot of documents on this massive fraud that occurred with the pattern that was established in Europe around the world, so, you know, to say that it's just one thing, you look, you understand the magnitude of it, you identify a magnitude in a certain area and so that gives you

LOVE

some sort of verification or reliability to believe that the document that we have here, which is Exhibit 4, was reasonable and correct -- or reasonably correct -- and that's the document that was used in here with the caveat that he has broken out the part of that that was specifically -- because the whole thing relates to the fraud as it began in Europe -- but specifically to the Dictation loans and Dictation-related -- I'm sorry, the Dexia loans and the Dexia-related fraud.

Q. How did Mr. Roth calculate the information that's contained in the Dictation Consortium line of Exhibit 7A?

MS. DYER: Objection to form.

A. From Dictation Consortium records.

Q. Do you know which records he used?

A. I think most of it is all right in our report.

Q. So was Mr. Roth using the

LOVE

information in your --

A. No, look, we wrote the report, in that we have information on all of the activities of the different companies that were getting Dexia loans that had hid the true nature of the transaction.

Those were are shown separately. We talk about each one of those loans in the body of our report, and then there is references to documents that show the participation in the fraud, and that is what is shown as the quantitative effect of simply those, the earlier frauds, the pattern for fraud that was going to be used in the future.

Q. So is it fair to say for this line on Dictation Consortium I can look elsewhere in the body of the report for an explanation on how these figures were correct?

A. There will be numbers in there, yes.

Q. Do you have the same understanding for the Brussels Translation

114

LOVE

Group line, are the bases for these numbers described elsewhere in your report?

A. Yes.

Q. Okay, how about the LDCs Dexia related line, is the basis for the numbers contained in this chart contained earlier in the body of your report?

A. In various places in the report, yeah. You have to get each one of them that were involved and take the numbers and see what the flow-through of revenue was that was caused by -- directly caused by the loans from Dexia to the LDCs, which were used to fabricate the revenue.

Q. Okay, how about the line that's labeled "LDCs non-Dexia related," can I look somewhere earlier in the body of your report to find out how Mr. Roth found the numbers that are contained in Exhibit 7A for that line?

MS. DYER: Objection to form.

A. It's not on the body of the report.

115

LOVE

Q. Do you know how Mr. Roth arrived at these numbers?

A. From the other information we developed based upon the fraud in LDC and CLDCs and LDCs across the world, other than those that were Dexia loans; but the same pattern of fraud constantly was used in the first place, being used continually throughout.

Q. Do you know which specific documents Mr. Roth used to -- to obtain these numbers in that line, "LDCs non-Dexia related"?

A. Part of the hundreds of thousands of documents we have access to in the database and in our office.

Q. Are they listed anywhere in your report or in any exhibit to your report? Is there any way to find that information?

A. All the documents we reviewed are listed in the exhibit to -- in the exhibits to our report.

Q. So can you point me, as you sit here today, to any of the documents that

116

LOVE

support the numbers that are in this line of Exhibit 7A?

A. I can't do that right now as I sit here today, but I could do that if you would like me to do that. But as I sit here today I don't have all these documents.

There are thousands of documents that are involved, as I said, hundreds of thousands of documents, Mr. Butler, that are involved in this case.

Q. Sir, there are not hundreds of thousands of documents listed in your Amended Exhibit 3?

A. There are tens of thousands, I bet, of documents there. I haven't read them all, I'm sorry, I haven't read, gone through the listing in there; but there are a lot of documents in there and in those documents would be documents that discuss the frauds -- well, first of all, Exhibit 3, you're right, Exhibit 3 may be directly related to the fraud that we discuss in this preliminary report and not

117

LOVE

the entire report, the fraud in the company.

There are other documents we have in our possession that are documents that are related to Singapore and Korea and we have, and I believe throughout, the documents are there, I can go back and get the documents.

We're not right now in our report addressing those other frauds. The frauds we're addressing are the frauds up at the beginning. Stop the serial killer after the first killing and you don't have a serial killer.

These were the most important frauds in this fraudulent scheme, this worldwide fraudulent scheme.

Q. Sir, my question is are you aware, as you sit here today, of the documents that support the numbers that are in this line of Exhibit 7A?

MS. DYER: Objection. Asked and answered.

A. I'm trying to answer that

118

LOVE

question. I'm trying to tell you that there are a lot of documents that we have that relate to the other fraud.

Q. My question, sir, is --

A. That they are not a part of, itself, the heart of our report.

Do I have those documents sitting with me now? No. There are documents supporting those numbers. There's -- you don't like 100,000, so say tens of thousands of documents, and in those documents there's studies of the frauds that were -- that occurred in different places.

Q. Well, sir, if you can't tell me what those documents are, who could?

MS. DYER: Objection to form.

A. I don't think anyone could without a lot of preparation to go back now and find those documents, not a lot of preparation but at least to call out the documents we used from all of the documents we have.

I could tell you if I had the

119

LOVE

work that underlied this, the detailed work, but I give detailed work to people who are under my control and who I supervise.

Q. And would those people be able to tell me what the basis for these numbers are?

MS. DYER: Objection to form.

A. The basis of the numbers are the fraud that was committed in these different places around the world.

Q. Sir, --

A. I don't understand.

Q. Isn't it correct to say that there are specific documents, there are specific documents that led Mr. Roth or others on your team to decide what the numbers in LDCs non-Dexia related line of Exhibit 7A are? Isn't that true, there are some documents that support this line, this line didn't come out of thin air?

MS. DYER: Is that your testimony, Mr. Butler, or is that a question?

120

LOVE

MR. BUTLER: My question --

MS. DYER: Because all you do, of course, is subtract the one number from other and you get it. So I'm trying to figure out, is it your question whether there is a specific document that has the number that's shown as LDCs non-Dexia related Other?

Q. I think that's very clear that's my question.

My question, sir, is are there documents -- are you aware or is anyone within your organization aware of specific documents that tie out those numbers, because I want to try to understand how this chart, which you decided to include in your report, was prepared.

MS. DYER: Other than the documents that are identified here?

MR. BUTLER: Other than the documents that are identified, that's right.

MS. DYER: I'm going to object to form to the extent your question

121

LOVE

assumes that those documents don't.

MR. BUTLER: Well, Karen, thank you for trying to suggest an answer to the witness.

Q. Mr. Love, do you think these numbers are contained in FV1735?

A. Excuse me?

Q. Well, your counsel has just suggested to you that the answer to the question is that these numbers in the LDCs non-Dexia related line are contained in Love Exhibit 4. Do you believe that your counsel is right about that?

MS. DYER: You are mischaracterizing what I suggested.

What I suggested is that if you took the numbers where it says "Dictation Consortium; Dexia related Brussels Translation Group; Dexia related LDCs; Dexia related subtotal, then subtracted those, you would do that. So don't mischaracterize my objection. Please don't mischaracterize my objection.

122

LOVE

MR. BUTLER: It is totally improper for you to coach the witness by suggesting how he could do a calculation -- don't interrupt me -- so I object to your coaching this witness to suggest to him how he could go about calculating an exhibit to his expert report that he allegedly was involved in preparing.

MS. DYER: You, under the auspices of mischaracterizing my objection, sought to ask him a misleading question and sought to suggest that I had made a statement which was not accurate.

MR. BUTLER: If you think I'm asking him a misleading question I would appreciate it if you would object to the form and leave it at that.

MS. DYER: I did.

CONTINUED EXAMINATION BY MR. BUTLER:

Q. Sir, can you answer my question. Is it true that the information in the

123

LOVE

LDCs non-Dexia related line of Exhibit 7A was derived from FV1735, which is also Love Exhibit 4?

A. I'm just trying to line things up.

What's done in 7A, they just parsed out what's been in Love Exhibit 4 based upon what we knew about Dictation Consortium, Brussels Translation Group, um, and we knew what that piece of it is and there are other pieces that are included in the total, and other pieces are included in 4, um, so it's just for the most part it appears to be parsing all of that out.

Q. I'm not sure I understand, sir.

Can you tell me how the figures in Love Exhibit 7A, the line LDCs non-Dexia related were derived from Love Exhibit 4?

A. Well, if you have the Dexia -- the Dexia related ones that we discuss in the report and you have the total, reducing the -- deducting the Dexia from

124

LOVE

the total dollar change gives you what's left in the other categories.

Q. Sir, are you referring to the "Other" line of Exhibit 7A or the LDCs non-Dexia related line?

A. The total of the two.

Q. Well, I'm a little confused about your answer but let me ask you about the "Other" line, maybe it will be easier.

Do you know how the "Other" line of this document was calculated?

A. Okay. We got to the bottom line. We got to the deduction of -- of Dictation, because we have dictation up front. We -- if we know and we've proven out the total of the Dexia related items, then the remaining amount has got to come from the "Other" item or the Asia percent item.

It can be parsed out between the two, because we know Dexia -- and we know Dexia's correct 'cause we looked at Dexia in this particular report, we looked at all of Dexia's work and we saw where Dexia

125

LOVE

was involved in the fraud -- and now we're coming in and seeing what happens at other places in the world, and that's the "Other" line and the LDC lines for those different places.

Q. Well, sir, let me just focus your attention on the "Other" line in the year 1998. I note that that "Other" line contains a lot of -- it's a more detailed number than a lot of the other numbers. Most of these numbers are in the hundred thousands and that line is in the thousands.

Do you know how you or Mr. Roth were able to calculate the "Other" line with such a high degree of precision?

A. Say this again?

Q. In 1998 --

A. Total?

Q. How were you able to calculate the "Other" line with a higher degree of precision than any of the other calculations that you gave?

A. Because the "Other" line is a

LOVE

deduction of what's left over from the total based upon what we had identified.

Q. I think I understand now.

Is it your testimony, sir, that what you did to prepare this, at least for 1998, was to take the total amount of overstated revenue from Lernout & Hauspie and subtract what you regarded as the Dexia and the non-Dexia LDC portion, I guess there isn't any there, and what's left over is the "Other" line?

A. Yes.

Q. Is that the way this was calculated?

A. Yes.

Q. Okay. And is the same true for 1999, the "Other" line is just reflecting what is left over when you subtract what you say Dexia and the LDCs were responsible from the total restatement that comes from Love Exhibit 4?

MS. DYER: Objection to form.

Do you understand the question?

A. '88 [sic] we're clear on, we're

LOVE

up to '89 [sic], revenue line is there. They took out 22, roughly, for the LDC and they put it into the "Other" line going across.

Our line on LDCs non-Dexia related for '99 is $7 million less than the LDC non-Dexia or Asia LDCs on 1999.

The rest would go into the fraud other, which would be the Korean fraud and the U.S. fraud.

So roughly, as I sit here now, I can see that there is a correlation, but that we knew the numbers on Dexia so we used those numbers to come up with the 22, 5 for Dexia, and then the others are taking the remaining balances on the Asia LDCs, the Korean fraud and the U.S. fraud, putting the two together; and there is a $7 million difference in the LDC non-Dexia related, one million is included in our numbers above for the Dexia related, so when we went through -- and this report would have come after the people who prepared this report (indicating), we have

LOVE

a million dollars more above in that line than they have -- and the rest falls into the two numbers that make up the difference between the Dexia and the 161 total which ties in here.

So we had later information, that later information was used to adjust the Dexia related LDCs and they undoubtedly have characterized it, the people who did Exhibit 4, a little differently than we did, and we parsed it out and came down to the same number that they have as a restatement, but the numbers -- the number in "Other" has got to be a number that's a difference between the two.

Q. So just to make sure that I understand it, we look at a specific quarter, Q4 of 1998, just as an example. If I understand that the way these numbers were calculated is that basically you started with the total amount of the restatement, which was about $27 million, and then you subtracted from what -- what

LOVE

you believe came from Dictation Consortium, 4.5 million, and the Dexia related LDCs, 12 million, for a total of 16.5 million, and what's left over is 10.6 million that went into the "Other" line?

A. Category, yes.

Q. Did is that correct?

If you go over to Q1 of 1999, I'm a little confused about what's happening here. Because if you start with a total restatement of about $20.1 million from Love Exhibit 4 and it looks like you subtracted from that two million for Brussels Translation Group, two million for Dexia related LDCs, 22 million for the non-Dexia related LDCs but you actually came up with a bigger restatement than is reflected in Love Exhibit 4; correct?

MS. DYER: Objection to form.

A. Say this again. The restatement --

Q. The total restatement --

A. Is the same --

Q. The total restatement from Love

LOVE

Exhibit 4 is 20.1 million; correct?
A. Oh, we're looking at the first exhibit, right.
Q. And if you look in Q1 of 1999 this chart indicates that the restated revenue associated with BTG, the Dexia related LDCs and the non-Dexia related LDCs amounts to $26 million; correct?
A. Yes.
Q. So you concluded that the restatement in Q1 1999 was greater than what is reflected in Love Exhibit 4; correct?
A. Yes.
Q. And the way that you made that tie out --
A. Whoa, whoa, wait a minute. Wait a minute. When I said yes I didn't mean to say yes, let me go back, because I have to hear what you said again. That yes was too quick. Go ahead and say it again.
Q. My question is did you conclude that the restatement -- that the overstated revenue in the first quarter of

LOVE

1999 was $26 million, which is actually greater than what is reflected in Love Exhibit 4 for the same quarter?
MS. DYER: Objection to form.
A. No, I think we concluded that the overstatement in revenue in both reports is 20 million, 109.
Q. But, sir, don't the numbers that you have as overstated revenue for the first quarter of 1999 --
A. Right.
Q. -- for Brussels Translation Group it's two million; correct?
A. That's correct.
Q. For LDCs Dexia related it's -- oh, I'm sorry, maybe I'm reading it incorrectly -- it comes to 24 million, because I'm counting the total twice. So two million for Brussels Translation Group; right?
A. Right.
Q. 22 million for LDCs non-Dexia related; correct?
A. Right.

LOVE

Q. The total of those two numbers is 24 million; correct?
A. Right.
Q. So you believe that the amount of overstated revenue, according to this chart, you believe that the amount of overstated revenue for Q1 1999 was $24 million; correct?
MS. DYER: Objection to form.
A. No, we believe it was 20 million, 109. In both we've used 20 million, 109.
Q. Sir --
A. This is, this is -- look, Exhibit 4 is what they made their restatement for. We went through and were able to determine certain amounts of either from here or from our work with the Dexia specific frauds, and the difference then, you know, between ours and theirs, we both were not -- we're not disagreeing that the fraud isn't 20 million, 109 at this point, all we're saying is that this is what we identify and the difference has

LOVE

got to be somewhere else.
So that three million 891 that got you -- has you concerned, is really an adjustment to that $22 million number, and there is an adjustment here in the second quarter to that $22 million number in total, but the number at the bottom is right. We know the number at the -- for Dexia --
Q. Sir, I'm having trouble understanding. You know the number at the bottom is right, so 20.1 million is the amount of overstated revenue; correct?
A. Correct.
Q. So didn't you just add $3,891,000 to this chart to adjust the fact that your information about BTG and the non-Dexia related LDCs actually came to $24 million and didn't match up with the conclusion you're trying to reach?
MS. DYER: Objection to form.
A. We determined that the Dexia number was right. We looked at their LDC number that they showed on there. We put