LOVE

that in and then they made some sort of adjustment somewhere to here.

We know that Dexia is right. We take Exhibit 4 and to the extent that's a business-produced document we're saying okay, here's what the Board was told the restatement was going to be, at this particular point in time. What do we know, take that away from the information that's coming in here, just to show the -- we know what the Dexia-related amount is, that gives us -- that gives us the Dexia-related amount, the rest has got to be in the "Other" area, "Other" areas, that's the number that comes out below and the restated income is as it is here.

For restated income this is the report that was used (indicating). For Dexia our report was used. For some of the numbers that came in here this was the number that was used (indicating).

Now, we don't know that this number -- we do know that we're relying on this number, they're saying that this is

LOVE

correct, that these were the people who were in there with the numbers contemporaneously at the time, so we're willing to accept a $4 million, maybe issue at some point in time, that that number maybe should be in the 22, that's the only other number it can be in, but that's fine. I mean, that's not what we're doing this for. We're simply doing this to show how Dexia -- Dexia's numbers fit with the total numbers that were in Exhibit 4 for the restatement.

Q. And the way that you made Dexia's numbers fit with Exhibit 4 was by using this "Other" category that you just calculated by either adding or subtracting a number from the total in Love Exhibit 4; correct?

MS. DYER: Objection to form.

A. Yes.

Q. You said something a little while ago about serial killers; do you remember that?

A. Sure.

LOVE

Q. What were you talking about?

A. It's just an analogy to a fraud. When you have fraud, and most frauds start small at the beginning and they continue each year and they grow, and if you stop the fraud at the beginning the fraud that occurs afterwards doesn't occur. If you don't stop the fraud at the beginning it continues in the general pattern to grow and continue.

If you stop a killer or catch a killer initially, and that person is a serial killer, he's not going to be a serial killer if he's stopped after the first one. If he's second or third it's gonna stop the killings in the fourth or fifth instance if that is, in fact, the person he killed.

So it's just a simple analogy in a fraud, that if you nip it in the bud at the beginning all the rest that comes after doesn't occur.

Q. I'm just curious about the analogy, I mean, you don't in any other

LOVE

way think that overstating revenue in a financial statement is analogous to killing people, do you? It's just that there's a series that has to be stopped?

A. I gotta tell you it really hurts people when you have a fraud like this. It really hurts people, because some people have their retirement money locked into these companies. People who worked at these companies didn't have a place to work after all this happened.

There were people that are hurt very badly. No one was killed. I don't know, maybe someone did commit suicide because they didn't have the money they thought they could use to live on the rest of their lives, it was gone, it was dissipated, so I don't know.

I think the analogy is fine. I'm not saying that there's a killer here, I'm saying that when you nip something in the bud it doesn't happen in the future.

Q. Sir, do you believe that the Baker Plaintiffs who hired you are in any

LOVE

danger of going hungry or committing suicide over this?

MS. DYER: Objection to form.

A. I didn't say anything about the Baker people. I said about all of the people who were hurt by this fraud, that's what I spoke to, not the Bakers.

Q. Are you planning to testify at trial about the people who were hurt by what you characterize as a fraud?

MS. DYER: Objection to form.

A. What I characterize -- well, first of all, let me say that I am not the only person characterizing this as a fraud. Bryan Cave in its report characterized it as a fraud. KPMG in its report characterized it as a fraud. Your client's been indicted in Belgium because of what went on here and what is -- what the Belgium authorities considered a fraud and the SEC considered it a fraud and had a statement of charges against your client, or against L&H, that it was a fraud that occurred at the time.

LOVE

Q. Sir, my question is do you expect to testify at trial about the suffering of the victims of what you are characterizing as a fraud?

MS. DYER: Objection to form.

A. I am not going to testify about the victims of the fraud. I am not the only one characterizing this as a massive fraud.

Q. I understand that. Okay, thank you for answering my question.

Are you going to testify about the fact that the bank is subject to criminal proceedings in Belgium?

MS. DYER: Objection to form.

A. I don't know what you mean, if I'm asked the question am I aware of the fact that the bank was indicted for fraud in Belgium and there's no objection and I can answer it, I'd say yes, I am aware of it.

Q. And -- well, fair enough.

On this chart, going back to Exhibit 7A, you say specifically with the

LOVE

Brussels Translation Group you say that $18 million of revenue -- sorry, let me point it to you -- in footnote one of this chart you say that $18 million of Brussels Translation Group revenue recorded in 1998 has been allocated amongst the four quarters.

Do you know if that's how L&H actually recognized revenue from the Brussels Translation Group transaction?

A. No, that's why we allocated it.

Q. So you don't know one way or the other exactly how much revenue Lernout & Hauspie recognized in each of the four quarters in 1998; correct?

A. We know the total for the year, yes, but not the individual amounts in each of the quarters.

Q. Your report --

A. And that's why it's specified in here, so no one's mislead by it.

Q. Your report states that certain employees of Artesia Bank were specifically informed about U.S. GAAP

LOVE

requirements; correct?

A. Yes.

Q. Do you know whether the employees who received that information understood it?

MS. DYER: Objection to form.

A. Well, they certainly understood it enough to take and have side letters relating to the guarantees. They did understand it enough to develop the CDS, the Credit Default Swap, and I'll use CDS for that, when there was a problem with the guarantees in order to mask the relationship of these related parties of L&H in this transaction.

They understood it enough to act that way, so I don't understand. They did understand it. They did understand it and they said that in there, that in order to recognize revenue they cannot put the names of these individuals in the loan agreement, they gotta get them outside the loan agreement so no one sees it when they look at the loan agreement.

142

LOVE

Q. Do you expect to testify at trial, sir, an expert on what people within the bank understood at the time of these various transactions?

MS. DYER: Objection to form.

A. I'm going to testify -- I'm going to testify about the documents that relate to what the bank did, the credit file documents and how they relate to what the bank did to mask the fraud that was perpetrated.

I don't know if that answers your question. But it's in the documents, it's clear, they did it, they did it with intent and purpose, as you can see, from the document, from the documents. It's documentary evidence that I'm testifying on. The trier of fact will make up their own mind.

Q. Let me ask the question this way. The kinds of answers that you have given to me today about the intent and the understanding of Artesia employees, those are the same type of answers that you

143

LOVE

expect to give at trial?

MS. DYER: Objection to form. Mischaracterizes what he stated.

Hold on. You asked him about intent and he has made clear he's not testifying to what people are thinking, he's not testifying as to things beyond the documents.

So your question seriously misleads and mischaracterizes, and it's incomprehensible anyway, that are these the kind of things he's going to testify to.

Q. Sir, do you understand my question?

A. Let me hear the question back.

Q. My question, sir, is the kinds of answers that you are giving to me about participation in a fraud and intent and understanding, are these the same kind of answers that you expect to give at trial?

MS. DYER: Same objection.

A. Not intent. The documents show that a fraud was committed. The

144

LOVE

documents, the individuals, the individual lending officers say that they are going to -- they cannot put the names of the individuals in the loan, they are gonna put it in a side agreement outside of the loan so it looks as if there is no relationship between the LDCs financing and the money that's going over as revenue to L&H and any L&H-related individual and L&H itself.

It's in the record. I'm going to testify as to what's in the record and what it shows, and to me as a fraud examiner it shows a mass -- fraud was discovered -- was concealed, the concealment of the fraud itself is directly attributable to what Dexia did.

I mean, they had the side letters, they took them, their internal auditor, their counsel was against side letters and side agreements, and, as it comes out in some of the other things, it was against Belgian banking regulations as well to have these side agreements.

145

LOVE

Q. And your view is that must have been intentional; correct?

MS. DYER: Objection to form.

A. My view is that's what the record shows, okay?

Q. Don't you think it is up to the jury to show what the record shows?

MS. DYER: Objection to form. Calls for a legal conclusion.

A. I will, as an expert, will assist the jury. I, as an expert on fraud, will point out those documents and how they feed into the fraud and how the people were involved.

The jury will make up its own mind. I'm not here to make up the jury's mind, but I'm here to assist the jury.

Q. And the way you are going to do that is just by pointing to documents and telling them what conclusions to reach from those documents; correct?

MS. DYER: Objection to form. That mischaracterizes his prior testimony.

LOVE

A. I'm going to point out all of the documents that are in here and I'm going to say as a fraud examiner this is the way the fraud occurred. The fraud doesn't occur if it gets the light of day.

They'll make up their mind whether or not there's intent.

I'll show that they wrote on these the documents what they were going to do, specifically what they were going to do, so that L&H will be able to take the money that's coming through a financing supported by these parties related to L&H and funnel it into L&H as revenue, as fraudulent revenue. That's what I'm going to testify to, Counselor.

Q. And you are going to testify about that just based on the selection of documents that you have reviewed in this case; correct?

MS. DYER: Objection to form.

A. Before I testify there will be additional testimony given by other people. The jury will hear that

LOVE

testimony, as you know -- you know what a trial is -- they'll hear it.

I will testify as to what I found, the documents that I have, basically -- and -- and unless new documents come to light, the documents that are in here or any documents we may discuss today, any document that comes up at trial I guess I could be shown, you could show me a document.

I'm going to testify as to what the document says in the development and pattern of fraud.

The intent is going to be up to them. The decision as to whether fraud occurred, even though I may believe fraud has occurred, I know fraud has occurred, they, the jury, are going to decide.

Q. Okay, sir, I think understand now.

You said in your report, as you mentioned before, that certain employees of Artesia Bank were specifically informed about U.S. GAAP requirements.

LOVE

Do you think that U.S. GAAP requirements are so clear and easy to understand that anyone who reads a short statement about them can apply them to a specific transaction?

MS. DYER: Objection to form.

A. I believe that Dexia people got precise instructions about what could not occur. They didn't interpret anything.

There's no interpretation here. There's no judgment here.

They were told certain things by KPMG, by the attorneys for L&H. They were given some documents. They don't have to interpret the documents when you're being told. There's no interpretation here at all.

Q. Sir, do you know what they were told when they were given those documents?

MS. DYER: Objection to form.

A. I only know what's in the documents themselves and I see what their action is after it occurs.

Q. So isn't it possible, sir, that

LOVE

things were said orally to people within the bank about the meaning of these documents and you're not aware of those conversations?

A. I'm not aware --

MS. DYER: Objection. Objection to form.

A. I cannot possibly be aware of any conversation that's not documentation in the credit file.

I would expect, as a banker, that that be documented in those credit files, specifically because those credit files are showing that they're doing what they need to do to allow L&H to take something into revenue when they know who the guarantors of the loan are.

There's nothing unclear about that.

They know that Lernout & Hauspie and Bastiens and Willaert are involved. They know that. It's throughout the bank's records that they see that.

And they know that they can't

LOVE

connect them up with this borrowing. They know, and the bank records -- the bank credit files show clearly, to any banker reading it, that the whole basis of this loan is not an LDC that's a phantom company that doesn't sometimes exist as of date they gave the loan that hasn't done anything, that's not the basis of giving the loan.

The basis of giving the loan is the guarantee of the people that they think have the financial strength. Those people are clearly related partners to L&H and they hide that fact. That's what I'm going to testify to.

MR. BUTLER: Could you read my original question, please.

[The requested portion of the record was read.]

Q. You answered the question, sir.

Just one last question before we take a break for the tape.

You mentioned that as a banker you would expect something. Have you ever

LOVE

worked as a banker, sir?

A. Yes, but a long time ago, and I wouldn't bring it up as a part of my credentials, I was a banker, I was an internal auditor in a bank between the time I graduated college and the time I went to serve three years, one month and nine days in the Army, for about a six-month period I was an internal auditor at Manufacturers Hanover Trust Company; but I've also audited banks for over 37 years, I've been an auditor of banks for over 37 years, and I've been on the Board of Directors and chaired the audit committee of a bank.

I know what credit looks like. I taught credit overseas in Europe, credit analysis overseas in Europe, in the Middle East, but we did in nicely in Larnaca on Cyprus rather than in the Middle East, and we did it in Singapore, okay? So I know what credit files look like, I've looked at credit files around the world.

Q. And you feel you are qualified

LOVE

to testify as an expert about what should be included in a credit file in a Belgian bank; correct?

MS. DYER: Objection to form.

Q. Is that your testimony?

A. My testimony is I'm qualified to testify to what should be -- to testify what should be in a credit file so as not to mislead the reader of the credit file.

MR. BUTLER: Let's take a break, probably a good time to break for lunch, if that's okay with you, or we can continue a little longer and take lunch, it's fine with me.

THE VIDEOGRAPHER: Off the record. The time is 12:30. This is the end of tape two.

(Whereupon, a brief recess was taken).

THE VIDEOGRAPHER: We're back on the record. The time is 12:40. This is the beginning of tape three.

MR. BUTLER: Let's mark this as the next exhibit.

LOVE

(Whereupon, the above-mentioned document bearing Bates numbers DBB6796 through 6801 was marked Love Exhibit 6 for identification.)

MR. BUTLER: I've marked as Exhibit 6 a document bearing Bates numbers DBB6796 through 6801.

CONTINUED EXAMINATION BY MR. BUTLER:

Q. Sir, have you seen this document before?

A. Yes.

Q. And you referenced this document at the bottom of page 15 of your report in footnote 24. Can you just confirm that?

A. Yes.

Q. But also in the body of page 15 at the bottom you refer to a fax from L&H's Chief Financial Officer to a person named Patrick Faict; do you see that?

A. Yes.

Q. And is this the fax that you're referring to in your report on page 15?

A. Yes.

Q. And you also refer to that fax

LOVE

on page 16?

A. Yes.

Q. And continuing on pages 17 and 18, are you still referring to the same fax when you refer to a fax from L&H's CFO or a fax to Mr. Faict?

A. I just want to look at it. Yeah, that generally would be correct if we're talking about this particular fax and I haven't introduced any -- any other fax at this point in time or any other document at this point in time, but let me take a look. In the fax, okay.

Wait a minute. In the fax Mr. Faict received from L&H the following guideline was specifically highlighted: "If the enterprise is obligated to repay any of the funds provided by the other parties regardless of the outcome of the research and development, the enterprise shall estimate and recognize a liability."

That is referring to a DBB074970. It's not in the package you gave me.

LOVE

Is there another fax or is there more to this package? But it doesn't look like there would have been.

Q. That's a good question, sir.

MR. BUTLER: Let me mark this as the next exhibit.

(Whereupon, the above-mentioned document bearing Bates numbers DBB74968 to 4973 was marked Love Exhibit 7 for identification.)

MR. BUTLER: I've marked as Exhibit 7 a document bearing Bates numbers DBB74968 to 73.

Q. Sir, is this the same fax that I just handed you as Love Exhibit 6?

(Witness peruses exhibit.)

A. Yes, yes, yes.

Q. So these are just two different versions of the same document or two different copies of the same document with different Bates numbers on them; right?

A. Yes.

Q. And sometimes in your report you refer to one set of Bates numbers and

LOVE

sometimes to the other; is that fair to say?

A. That could be correct, yeah. That undoubtedly is because it happened here.

Q. So my question, sir, is when you refer to a fax to Mr. Faict on pages 15, 16, 17, 18, 19 and maybe even 20 of your report, are you always referring to this same fax?

A. Well, I have to look at each of the references to see that that's correct. I just want to be sure. Okay.

(Witness peruses exhibits.)

A. What page did you go up to, Mr. Butler?

Q. Either 19 or 20. Looks like you continue to quote it on page 20 at the top.

A. Yes, through that, through that area when I talk about and attribute something to the fax that Mr. Faict, Faict?

Q. I say Faict but I've never met

LOVE

him, I don't know how he pronounces his name.

A. Faict, I'll take that pronunciation.

Received. It is to these two documents which are the same, these two exhibits, that being Exhibit 6 and Exhibit 7.

Q. Since they are the same let's set aside Exhibit 7 and focus on Exhibit 6.

The first page is just a cover page with some writing in Dutch on it, but the second to the last page appears to be some document that describes some U.S. GAAP.

Can you tell me what that attachment is or what these attachments are?

MS. DYER: You are referring to 06800 and 801?

A. No, I'm referring to DBB6797 through 801.

MS. DYER: Okay, I thought you

LOVE

said second to the last page.

A. Second page to the last page, I think is what you meant? That's how I heard it.

Q. Correct.

A. The first one R-36, related parties, this is -- the FASB publishes documents on GAAP. They're promulgations of GAAP, which is at the, you know, highest level of GAAP.

They do it in two ways. They do one what they call current text, which means that it's more -- it includes all the current changes to the text and it flows well for the reader who's looking for GAAP at that particular date, what is GAAP at that particular date.

They come out on June 1st, I believe, of every year.

They also publish a second set of books that is the original pronouncements. The original pronouncements also are adjusted each year, but they do that through some, you know, coloring,

LOVE

highlighting changes that were made since the original text came out, particularly where that portion of the original pronouncement isn't effective any more or it has been changed by an intervening promulgation of GAAP.

So in R36, when you're looking in the index you go to R, then R36 is "Related Parties," because there will be a number of different Rs, as you see for R55, which is the second piece of this, which is "Research and Development Arrangements."

So these come from the current text and 19 -- well, one has a copyright, copyright is 1996, that would be as of June 1, 1996.

Q. If you look on page DBB6797 where the beginning of R36 "Related Parties," it says underneath "R36 Sources" and refers to it looks like three documents, ARB 43, FASB Statement 57 and FASB Statement 109. What are those sources that are referenced here?

LOVE

A. Those are other promulgated or -- the FASB, where it says FASB Statement 57 and Statement 109, there may be -- I said this was the current text, okay? Those statements were statements that the FASB made subsequent to the related party statement that may -- that will have, um, will have clarifi -- not clarification, they may be in a particular area and they will make changes to the original, I said, remember when I said there was original pronouncements? To the original pronouncements or they may say something in addition to that. So it's updating the GAAP in the related party area and that's why you have that reference to FASB Statement 57 and FASB Statement 109.

ARB 43, that was around even before I was in the profession. It's Accounting Research Bulletin 43. It's one of the basic books, foundational books in accounting, but slowly but surely it's being outdated and incorporated into other pronouncements.

LOVE

Q. You used the term "original pronouncements." Are these sources referenced here some of the original pronouncements?

A. They are -- they are all, all three, would be original pronouncements, yes, and you'll find all three in those source books coming from the FASB.

Q. And did I understand you correctly that this current text document would be summarizing and perhaps updating those original pronouncements?

A. Well, it updates the original --

MS. DYER: Objection to form but you can go ahead.

A. It updates the original pronouncement here for related parties, what we have here. This is the related party accounting at this particular point in time, and it says its sources are these two statements and ARB 43.

As a matter of fact I happen to have it here -- I hate to remember numbers -- but 57 may be related parties,

162

LOVE

I don't know, um, so that that's the source of the current text here.

Q. If a person wanted to get a complete understanding of the GAAP relating to related parties, would it be sufficient just to read over this current text document or would you also have to go back and look at the original pronouncements that are cited here?

MS. DYER: Objection to form.

A. You should be able to look at the original -- the -- what's cited here or what's here in the current text, um, at highest level. There may be other levels of authority that are outside of these what we call the most authoritative levels, the FASB's pronouncements.

Q. So if I wanted to get a complete understanding of related party transactions, what other documents besides this would I need to look at to get that understanding?

MS. DYER: Objection to form.

A. You'd have to look at all of the

163

LOVE

documents, all of the GAAP.

You may, you know, there's a second thing on here, like R&D, research and development arrangements, where they'll talk about related parties in there.

It doesn't -- it doesn't change the GAAP, but, you know, if you look at 8C, they have it as 106C here, it's 8C in the original pronouncement, okay, and it says a significant related party relationship between the enterprise and the parties funding the research and development exists at the time the enterprise enters into the arrangement, and if you look above that's a presumption that the enterprise will repay the other parties, and that's one of the things that would not allow you to not record an expense for a disbursement related to a related party transaction.

If you look at 105, you know, you read through on each one of these, 104, 105 and then 106 gives you examples

164

LOVE

of what would upset the apple cart.

Q. Sir, my question was simply whether you would have to look at documents other than this to get a complete understanding of the subject.

MS. DYER: Objection to form.

A. I was giving you an example of where the related party -- I'm sorry, because they were attached together -- an example of where the related party issue or pronouncement would be, I guess, used and this is the related party, this tells you who the related party is up on top.

So, you know, you would look here, but you may look at other documents as well; but this is one of the primary places that you would look.

Q. And would you give the same answer for the second of these documents, the R55 Research and Development Arrangements, is it fair to say to get a complete understanding of the research and development arrangements and the GAAP that applies to those arrangements this

165

LOVE

document would be a good starting place but you might also look to other sources?

MS. DYER: Objection to form.

A. Yes, you may, but that is where -- this is -- this is the highest level of pronouncement, because it's coming from the FASB.

Q. Do you know why the CFO of Lernout & Hauspie was sending this fax to somebody at Paribas?

MS. DYER: I'm going to object to form.

A. Tell them it's the information on related parties, and the rest is in Dutch or Flemish, or whatever. So it's obvious you can see that he's, you know, it's the information concerning related parties.

Q. Sir, once again, I'm not asking you to tell me what you think is obvious from reading documents, I'm asking if you know --

A. Exactly --

Q. -- why the CFO was sending this

LOVE

document to someone at Paribas.

MS. DYER: Objection to form.

A. You know, I may not know what was in his mind, but this was the time that there were discussions about the DC -- and I'll use "DC" for Dictation Consortium Group, if that's okay, and I'll use "BTG" for the Brussels Translation Group, or Belgium Translation Group --

Q. Brussels Translation Group.

A. Brussels, okay.

Q. I'll understand those abbreviations, sir.

A. This is about the time that they were discussing how these things -- how these relationships, how they should structure this movement of funds and the loans into L&H so L&H could record them as revenue.

This is in -- this was looks like 3/20/96, so it's towards the end of the first quarter in 1996.

There's other documents -- there's a lot of other documents that went

LOVE

over to the bank. There are a lot of other documents with specific restrictions that were also sent to the bank at various times, including a letter from the partner at KPMG in Brussels that relate to the same particular issue.

So that's all, I'm just putting it in context. It's something that went to the bank to inform them of the U.S. GAAP related party and R&D provisions that L&H had to comply with.

Q. Is it possible that the CFO sent this to Paribas Bank because he wanted to show Paribas that the structure of the proposed transaction complied with U.S. GAAP?

MS. DYER: Objection to form.

A. From the documents that I've read, and I've seen the bank's documents and the credit files, it was helping them structure it so that they would leave out the related party aspect of the loan so that they could record it as income.

Q. Whatever --

LOVE

A. I'm sorry. When you get this document along with the other documents that the bank received over a period of time and you're specifically told no judgment, you don't have to go back and understand the GAAP that's in here, they tell you, no related party activity at all, otherwise L&H is not going to allow us to take this in as revenue, then they do the side letters so that there's no apparent involvement of the L&H management and major shareholders in the transaction that's funding the revenue coming into L&H; so if you look at it in context with everything that's there rather than one piece at a time, it's telling them what they have to do, what their problem is, why we can't have this in here and you are saying okay, you don't want that in because you want revenue even though you're not supposed to have revenue, so we'll take it out, we'll take it out and put it in a guarantee that's a side letter, in context; but this is why a lot

LOVE

of these documents were going over.

Q. Sir, my question is I think you already testified that you don't know what was in the minds of these people when these documents were going back and forth; even despite the answer that you just gave do you still believe that you don't know what people were thinking at the time?

MS. DYER: Objection to form.

A. I don't know what is in anyone's mind, only a mind reader can tell you that, if they can, if there's any such person; but you can see from the documents in the record, at least, what is happening.

I don't know what's in the person's mind when he says let's use a side agreement, okay, because Mr. Willaert I guess who was doing most of the negotiating here on these loans said you can't mention us in here, and they give them documents like this to show them what the -- I don't know what it is. I can just say what was there.

LOVE

Q. Sir, do you believe that Lernout & Hauspie was providing this to people at Paribas Bank in order to show them that L&H was not complying with U.S. GAAP?

MS. DYER: Objection to form.

A. I'm sorry, was not complying?

MS. DYER: Can you read the question back.

[The requested portion of the record was read.]

MS. DYER: Objection to form.

A. You know, you asked me before if I was a mind reader and I said I can't read minds but I can look at the documents that they got and what they did, how they acted on it, because that's documented.

So how would I know that they're sending it to them to comply that they're not complying with GAAP when they say in the records that in order to get the revenue, which they're not supposed to get if it's a related party involvement, were going to take the related parties and push them off into a side agreement so people

LOVE

can't see them.

Q. Sir, let me ask the question this way. You say you are an expert in investigating fraud; correct?

A. Yes.

Q. And you have the opinion, I believe, that the management of Lernout & Hauspie was involved in a fraud here; is that fair to say, among other people but the management was certainly in on it; right?

MS. DYER: Objection to form.

A. They're participants in the fraud, of course, that's -- that's also known and it's also in all of those documents I've mentioned before.

Q. So in your experience as a fraud investigator, is it usually the case that people who are involved in a fraud go around telling other people about their fraud?

A. No, they --

MS. DYER: Objection to form.

A. No, they usually tell the

LOVE

confederates what they have to do or show them why they have to do something to hide what they're doing.

You know, fraud doesn't work if it sees the open light of day and sunshine, okay? Fraud's gotta be concealed to work, and to work well.

So they need a collaborator on the concealment. And that's what I see here, as a fraud investigator, and it's a classic fraud with the side agreement to keep people from really knowing what's going on.

Q. Sir, is it your testimony that you interpret this fax sending some provisions of U.S. GAAP to an employee of Paribas as an effort to conceal something about the fraud?

MS. DYER: Objection.

Q. Is that what you said?

MS. DYER: Objection. Mischaracterizes his testimony and Objection to form.

A. I said that there are a lot of

LOVE

documents, this isn't the only one these people received at the bank, the credit people received at the bank. There are documentation in their credit files, okay, that says it, that says everything that's in here explicitly.

No judgment, no if it does or if it doesn't do, and they say they want to get it into revenue and we can't get it into revenue unless it's a stand-alone type of transaction, and there's no related party issues involved here, so what they do then is they agree -- you're shaking your head, Counsel.

Q. I'm marveling, sir, but continue.

A. What they do is they work with the company to conceal the relationship of the guarantors of the loan with the loan so it's not apparent to people.

Q. I think you told me before that you are not aware of any of the oral conversations that occurred around this time?

174

LOVE

MS. DYER: Whoa. You're suggesting there are oral conversations? Are you testifying as to oral conversations?

MR. BUTLER: I don't understand your objection, Karen.

MS. DYER: There is no record that there were any oral conversations here.

MR. BUTLER: That's not true. That's not true. And I guarantee there will be testimony at trial that there were oral conversations about this, there were meetings, there has been testimony about meetings to discuss this.

Q. My question, sir, is didn't you tell me earlier that you are not aware of any oral conversations that occurred surrounding these transactions?

MS. DYER: I going to object to form to the extent that you are seeking to suggest that there were.

A. As I said in answer to the

175

LOVE

question the first time you answered [sic], there's documentary evidence that they were aware of what they were doing, the evidence is there that they were aware of what they were doing and that it was specifically designed to conceal the related party activity.

If they know that if you follow the standards you can't have a related party in then they can't have revenue, and then you conceal the fact that they're related to it from everyone else involved in this, what's -- you know, we got sworn testimony and we got documentary evidence, the record shows that they knew exactly what L&H was doing and why they were doing it and they assisted them, assisted them into doing it.

You know if someone says hey, this is okay, it's okay to cheat like this, it's okay, give me a break, it's okay, they'll accept it because, hey, we're pushing this stuff off to the side, no one sees it, who cares, we're trying to

176

LOVE

do the right thing, we believe this is revenue so we're trying to do the right thing. I mean, this is absolutely contrary to what the written record shows.

Q. Sir, are you going to launch into a speech about fraud and how you interpret the entire record in this case in response to every question that I ask you today?

MS. DYER: Mr. Butler, hold on. Don't answer that question.

Mr. Butler, that question is not appropriate. You don't like the answers, you've sought to suggest in your last question that there are untestified to oral conversations which occurred, despite there being 30 depositions of your -- of your own witnesses that are somehow going to exculpate your client.

I think it's inappropriate and a terribly inappropriate suggestion and would also be tantamount to perjury on the part of those witnesses who

177

LOVE

declined to testify to those conversations.

So please do not suggest that the witness is in any way acting inappropriately when you are suggesting that there is some exculpatory oral conversation which Dexia has failed to disclose in the many depositions and somehow didn't manage to get into the documents here, of which there are many.

CONTINUED EXAMINATION BY MR. BUTLER:

Q. Sir, I didn't ask you about exculpatory conversations. I asked you about a simple conversation about whether you were aware of oral conversations, and you launched into a big speech about fraud and all the conclusions that you have drawn from looking at the evidence that you have seen in that case, and my question is --

MS. DYER: Including the oral conversations, because he said in testimony --

LOVE

Q. My question is are you going to do that every time I ask you a question today.

MS. DYER: Objection to form and you do not need to answer that, Mr. Love.

Q. Is that your plan for today, to always just talk about how the big fraud occurred at L&H and that Dexia was involved in response to all of my questions?

MS. DYER: He is answering your questions responsibly, you don't like the answer, because there was fraud here, Mr. Butler.

Q. Do you understand my question, sir?

A. Yes.

Q. Can you answer it?

MS. DYER: Don't answer it. We'll take a break, you can take it to the Court if you want. I'm instructing him not to answer. It's an inappropriate question and the

LOVE

Court will make that clear. It is time for lunch.

MR. BUTLER: I want the record to be clear that you are instructing the witness not to answer the question.

MS. DYER: It's crystal clear. I am instructing the witness not to answer your harassing, inappropriate, immature question.

MR. BUTLER: The Court will make its own judgment as to whether it's a mature question.

MS. DYER: It certainly will.

MR. BUTLER: But we can go off the record.

THE VIDEOGRAPHER: We're going off the record. The time is 1:12. This is the end of tape three.

[Whereupon, after a luncheon recess was taken, the following was had:]

LOVE

A F T E R N O O N S E S S I O N

THE VIDEOGRAPHER: Back on the record. The time is 2:12.

CONTINUED EXAMINATION BY MR. BUTLER:

Q. Mr. Love, we've been talking about Love Exhibit 6 which is this fax from L&H to Patrick Faict.

MS. DYER: We're using Exhibit 6, I'm sorry?

MR. BUTLER: That's right.

Q. Sir, do you know what Mr. Faict did with this fax when he received it?

A. Undoubtedly he filed it, because it was in the bank's files, but what he personally did with it I wouldn't know.

Q. Did he read it?

A. I wouldn't know. I think though if you look at the record you'll see that the issues that are involved here and related parties and R&D were all taken into consideration and I believe some of those lending files have his name on them as well.

LOVE

Q. But do you, sir, know whether Mr. Faict actually read the contents of this fax?

MS. DYER: Objection to form. Asked and answered as well.

A. I don't know whether he read the fax, but record reflects in the loan files that he understood what a related party was and that Messrs. Lernout and Hauspie, Willaert and Bastiens were related parties.

MR. BUTLER: I'll move to strike your response, everything after the word "but" but we can continue.

Q. This document is written in English, this attachment; correct?

A. Yes.

Q. Do you know whether Mr. Faict was able to read English or --

A. No.

Q. Do you know whether he -- do you have any idea how well he understood English?

A. No.

182

LOVE

Q. Do you know whether Mr. Faict sent this document to anyone else within Paribas?

A. No.

Q. Do you know whether he sent it to anyone at Bacob?

A. Bacob?

Q. Bacob Bank.

MS. DYER: Same objection.

A. Do I know if he did, no. It just shows up in the records of the bank and is reflected in the credit files.

Q. Do you know whose files this document came from?

A. No.

Q. Do you know whether Mr. Faict discussed this document with anyone?

A. I'm trying to think. There were a lot of documents that relate to the loans and the application of these standards, and his name pops up frequently along with other people's names.

In order to give the proper answer I would have to look at all those

183

LOVE

files, but as I sit here today I don't know if he spoke to anyone about it.

Q. Do you know whether Mr. Faict understood the accounting principles that are set forth in this document?

MS. DYER: Objection to form.

A. From the records that I looked at, he understood the application of it as it related to Lernout & Hauspie and the lending that the bank was making to the LDCs.

Q. Which records are you referring to?

A. These are the bank credit files.

Q. But are you referring to some specific document that informs you of whether Mr. Faict understood this particular -- the accounting principles that are in this particular fax?

MS. DYER: Objection to form.

A. I don't understand the question, a document that informs me. A document written to me informing me of that? I don't understand what you're talking

184

LOVE

about.

Q. I thought I heard your answer to my question about whether Mr. Faict understood the accounting principles in this fax was that you've seen other documents that would suggest that he did understand; was that your testimony?

A. That he applied them. I don't know whether I said --

Q. My question, sir, is did he understand it.

MS. DYER: Are you finished, Mr. Love? Go ahead and finish your answer.

A. Well, I don't know the documents reflect the fact that it was applied and it was taken into consideration in the application of the lending process dealing with the loans that went to the LDC, and it was understood to the extent that the related parties guarantee was put in a side agreement and stated in the records in those loan files because they wanted to take it as revenue and they couldn't take

185

LOVE

it as revenue, essentially, I'm not saying -- these are not the exact words, if -- if indeed it was known that these were related party loans being made to L&H.

Q. My question, sir, once again, is do you know whether Mr. Faict understood the accounting principles that are in this document?

MS. DYER: Objection to form.

A. I think my question -- my answer to your question a number of times stands.

The application of it is in -- the understanding, if you read the credit files, there is definitely an understanding of a related party nature of engagements and the fact that the principals in L&H could not be connected with the loan otherwise they couldn't take into revenue the amount of money that they received that was funded by that loan.

Q. This is where we were before and so I'll ask you the same question again. Is it your testimony, sir, that you are

LOVE

aware of documents in the credit files that indicate that Mr. Faict understood the accounting principles that are set forth in this document?

MS. DYER: Objection to form. Asked and answered as well.

A. I have answered it before and he's applied it. Whether or not he knew it or not, I didn't test him, there was no test in the credit files of his accounting knowledge, but the principles that are outlined in here were followed by them in structuring the lending relationship with L&H as it related to the LDCs.

Q. When you refer to documents in the credit files, which specific documents are you referring to or do you have in mind when you give that response?

A. Let me see what I have here in my file, if I can do that.

There are a number of documents that we've referenced where we talk about the credit files and what the credit files say. Specific document. Let me get the

LOVE

first one as we go through here.

On page 32, DBB 007190, A fax from Mr. Faict to the Flemish Government, dated December 13, 1996, stated: Upon request of Mr. Paul Hauspie you'll hereby find enclosed the advice of an American law firm in respect of the requirements that need to be imposed upon the framework of the U.S. GAAP -- within the framework of the U.S. GAAP regulations so that the fees paid to Lernout & Hauspie Speech Products N.V. by Dictation Consortium N.V. in this operation will have the character of R&D fees.

Q. Do you interpret that document, sir, to indicate that Mr. Faict understood that --

A. I'm sorry, I haven't finished your other -- first question, if you can wait, let my finish your question then I'll go on to the second one. I'm still looking through here.

Q. Fair enough.

A. On page 33, the following

LOVE

excerpt from an internal bank memo from Bernard Mommens, M-O-M-M-E-N-S, the Bank's lead in-house legal counsel, Mr. Mommens, in, quote, to Mr. Faict dated May 14, 1997, indicates that the bank was well aware that the DC transactions lacked economic substance, and this is a quote from that "As yet, I would like to mention that I do not understand why the financing has to go by Dictation Consortium NV that received the license from L&HSP for technology with the right to further develop it. DC then contracts out to L&HSP that also receives a commercialization order from DC. As compensation for receiving mentioned license DC must pay a 'consent fee' (i.e. 150 Mio BEF) to L&HSP, and the last mentioned has right to 50% of the net sales revenue. In addition, DC must pay a compensation to L&HSP in the case of every immediate delivery that together adds up to 750 Mio BEF.

"While reading the draft of the

LOVE

'Memorandum of the Flemish Government' written by [and this I'll never get right] Loeff, Claeys & Verbeke, the artificial character of the structure emerges.

"It has to be mentioned that memorandum was presented to us as legal opinion including with regards to securities. However, the memorandum does not comply with this. That is why the impression raises that L&HSP and the law firm want to pass the risks of contracts analysis and the securities be taken to Paribas. Do we accept this.

Then point number 5: Based on the documents we have received we have to determine that DC is an empty company without customers, without contracts, without -- I'm sorry -- without contracts, without customers and even without any commercial activity. No company exists, for this reason it is not possible to take a warranty of the company.

Q. I don't mean to interrupt, but I think you misread that portion. Perhaps

LOVE

you should read it again. It doesn't say anything about contracts.

A. Without contact with customers. I'm sorry.

Q. Correct.

A. That would be, thank you counsel.

And it goes further on there, and this is on page 34 now, and this is the legal department to Mr. Faict: "While reading the file we are slightly surprised about the fact that Dictation [and they spell dictation all upper case] applies for this kind of credit with so few assets and objectives. We do not understand the economic goal that the parties strive to accomplish by means of these actions. To us it seems that only Lernout & Hauspie is developing and commercializing the software. A valid security would be a pledge of the receivables of Dictation towards Lernout & Hauspie. However, as Dictation appears to be a 100% branch of Lernout & Hauspie, in the event of

LOVE

financial difficulties [and there is parens around financial] at one or the other, the value of such pledge will be random. By means of such pledge we do, however, obtain a certain level of control on the activity.

On page 35 at the top it starts "Mr. Faict paraphrased the BRF&G November 1996 letter and stated: This file will be presented again as: Political games squeeze [all upper case, new paragraph].

"It is important to L&H that the fees for the development of Dictation software may, under the American accounting principles (U.S. GAAP), be characterized as R&D fees and consequently may be booked as income. To have the fees for the development acknowledged as income for L&H, the payments need to be non-repayable.

"The transaction needs to have the characteristics of the development agreement between independent companies, (arm's length principle), so that it would

LOVE

not be considered a financing operation in the event the transaction would be qualified for a financing operation. The U.S. 25 million would not qualify as income for L&H."

On page 37: In an August 5, 1996 memo to the Bank's Management Committee, Mr. Faict stated in section 4.1: [And this is the statement] "L&HSP N.V. [periods after the N and the V] who will develop the 'Speech-to-Text Dictation' software, intends to incorporate Dictation Consortium N.V. to commercialize the software.

In connection herewith L&HSP found a number of private investors, the families involved in the startup of -- I'm sorry there was a paren before the families, the families involved in the start-up of L&HSP willing to participate in the dictation initiative and to bring in a capital of 45 million -- 450 million (that is 50% of the total amount of 90 [sic] million to be received [sic]. For

LOVE

the remaining 50% of the amount to be financed, the Flemish Government and banks are approached with the objective of finding formulas to obtain the other 450 million -- and there's a -- on this thing here there's the square brackets B-E-F.

Now, those were specific to Mr. Faict and there are some more but there are also other banking documents that I was talking about.

On page 38: The bank also recognized that related party relationships and the -- that related party relationships in an internal bank memorandum as follows: FLV was under the impulse of Mr. Lernout and Mr. Hauspie incorporated on December 22, 1995 for the purpose of providing risk capital to starting and growing companies within the sector of language and speech technology as well as promoting the establishment of these companies in the Ieper, square open bracket, Belgium, square close bracket region.

194

LOVE

Page 41: Mr. De Coen's, C-O-E-N-S, C-O-E-N-'S testimony: Typically are guarantees referenced in credit agreements? Yes. Apart from the Dictation Consortium where you were involved in any loan was a guarantee requested that would be excluded from the credit agreement? I don't recall.

There are other bankers of, a Mr. Van Helleputte, H-E-L-E-P-U-T-T-E, Credit Analyst: Question: Have you ever used a side letter guarantee? That is a difficult question. Not that I can immediately recall.

On page 49, I'll give you the reference, it's reference to Footnote 104, which is DBB 038286. We can state that this credit is being used to finance Machine Translation project within L&H. On account of reasons intrinsic to NASDAQ, N-A-S-D-A-Q/E-A-S-D-A-Q listing of L&H, the financing of the entire project was classified into Special Purpose Vehicle Brussels Translation Group NV. As a

195

LOVE

result that translation can be viewed merely as a commercial transaction and can -- and came about between independent and unassociated parties under normal economic circumstances, such as this transaction certainly should be -- not be classified as a loan under U.S. GAAP. In view of the public nature of NV L&H, the U.S. GAAP rule must be implemented in a very stringent manner and the SEC will monitor this very closely.

For this it is appropriate that L&H stay out of the loan transaction completely so that it can post, closed bracket -- square bracket -- open bracket record, square close bracket, the funds needed for this project as revenues as well. According to the prevailing rules in terms of stock exchange authorities, the transaction must be -- must meet the following characteristics, and there's a bracket Cf. Letter from KPMG as part of the Dictation project).

This, you know, I gave you that

196

LOVE

quote but really comes from it's a follow-up internal bank memo from J. Van Helleputte, Credit Analyst, the independence of L&H is -- that's item 2.1 in that memo.

Okay, on page 50: In an internal bank memorandum, item 3 entitled "U.S. GAAP Restrict the Possible Structurings of the Operation" it stated: The operation has two benefits of L&H, the loan for the financing of the development cost is granted to a third party, that BT -- that is BTG, and will consequently not affect the balance sheet of L&H.

The compensation for development costs, which BTG will pay to L&H, will constitute company income to L&H.

To realize this benefit it is essential under U.S. GAAP that the transaction between BTG and L&H be considered as a mere commercial transaction taking place between independent and free parties under normal economic circumstances.

197

LOVE

By taking the stock market quotation of L&H on the Nasdaq into consideration the U.S. GAAP regulations will need to be applied in a stringent manner which will be monitored strictly by the American Securities and Exchange Commission.

Concretely, the transaction in accordance with the applicable regulation needs to show the following conditions, in conformity with a letter from KPMG within the framework of a similar Dictation project.

Item 3 of the bank's memo concluded with the following: It goes on to page 51 of the report. In the event L&H obtains control of BTG, the development compensation, which was already -- has already been paid during the course of the same year, may no longer be booked as turnover -- there's a square bracket, revenue, square bracket of L&H.

On page 52, a memo to the Management Committee from Mr. Faict stated

198

LOVE

under the caption -- I'm reading what we put in there -- Impossibility of having the entirety of our risks covered by L&H under U.S. GAAP.

On account of reasons intrinsic to the NASDAQ/EASDAC listing of L&H, the financing of the entire project was classified into the special purpose vehicle Brussels Translation Group NV. As a result that transaction must be able to be viewed merely as a commercial transaction that came about between independent and unassociated parties under normal economic circumstances, such as this transaction certainly shall not be reclassifiable as a loan under U.S. GAPP. With reference to Footnote 113, which is 113 is DBB 038286.

Page 54 of the report, from the deposition of Mr. Janssens, reference to Footnote 124, transcription page 107, lines 19 to 25, page 108, lines 1 to 10.

And is it also true that the Brussels Translation Group transaction was

199

LOVE

similar, that the Brussels Translation Group act -- Translations Group transaction was similar to the Dictation transaction in that there were limitations placed on Lernout & Hauspie's role in any financing so that Lernout & Hauspie could recognize revenue on its dealing with Brussels Translation Group? Yes, that is why, that's right, there was a similarity.

Is it true that the bank was informed that Lernout & Hauspie could not be liable directly or indirectly, or by means of a guarantee with respect to the repayment of the financing of the BTG loan? Answer: Yes, that is correct.

Page 62, going over to 63, the reference is to DBB 003726. We consequently request to only make reference in the letter to a reference number of the C-D-S, capital C, capital D, capital S, transaction and not to make reference to the identity of the private individuals. Motivation hereto is that the client does not agree to make

200

LOVE

reference to the identity of the private individuals as in that case a link will be made between the debtor and those private individuals. With regards to the outer world it is not desirable for the client that a direct link be made.

This issue clearly surpasses the fiscal asset, whereby I mean that the private individuals who concluded the CDS possess sufficient financial means or could possess sufficient financial means which would justify the commitment entered into on the basis of their fiscal known capital or potential.

A later bank memo states that the funds being disbursed --

Q. Sir, what page are you on?

A. I'm sorry, I'm sorry, page 84 I'm starting at the bottom and it's just an "a" at the bottom. A later bank memo states that the funds being disbursed to Messrs. Lernout, Hauspie and Willaert would be loaned immediately to LDF.

There is a reference to

201

LOVE

DBB003647.

The memo state -- further stated: After completion of the R&D stage, these special purpose companies will be repurchased by LHS who will then commercialize the languages (only a moral commitment.) To -- that's reference to 202, which is the same reference.

LDF, as umbrella holding, is already 100% shareholder of three Language Development Companies.

That's just speaking about -- so what I'm going to do, Mr. Butler, is go down to the bottom of that and start off with the paragraph that says, The borrower, close bracket, Messrs. Lernout and Hauspie and Willaert, close square bracket, close bracket, leads these funds -- lends these funds to LDF, which in turn grants a loan to the new LDC who buys the licenses with it.

As LHS's books the license fee -- the license sale as turnover, and there's a bracket, revenue, closed

LOVE

brackets, is essential under the U.S. GAAP, that there is complete independence between LDF and LHS, consequently LHS itself cannot be in any way a party to -- implied in an agreement concerning repayment of the requested financing.

THE VIDEOGRAPHER: We're going to run out of tape.

MR. BUTLER: We need to take a quick break to change the tape, but you can continue your answer when we finish.

THE VIDEOGRAPHER: Going off the record. The time is 3:01. This is the end of tape three.

(Discussion held off the record.)

THE VIDEOGRAPHER: We're back on the record. The time is 3:06. This is the beginning of tape four.

A. That's the ones that I've noticed, going through that as quickly as I could, but there may be others in there, references that I haven't picked out

LOVE

exactly.

Q. Mr. Love, you identified in response to my question, by my count, 15 excerpts from documents that are quoted in your report.

Is it your testimony, sir, that each of those excerpts that you quoted indicates to you that Mr. Faict understood the accounting principles that are set forth in Love Exhibit 6?

A. I said I told you the ones -- going through my answer, I gave you correspondence that, in fact, Mr. Faict is either the author or the receiver, and I said when I was in there that the others showed that the bank -- the bankers got theirs also, as Mr. Faict has it -- I assume that Mr. Faict is a bank officer -- and there's also an understanding throughout that the bank is aware of the provisions and what the provisions mean in regard to the recording of revenue.

Q. Okay, but in answer to my

LOVE

specific question, which documents indicate to you that Mr. Faict personally understood these accounting principles, are they the ones that you quoted that he was either the author of or the recipient of?

A. I don't think you used personally in your answer [sic], I think you just said Mr. Faict, but that's neither here nor there.

You want to know now, as I understand it, there are references in the manual, in my report, to those that were either memos that were either sent or received by Mr. Faict. I don't know if he is on -- I don't have the documents with me here -- he may have been a recipient of the others as well, but there are other bank documents.

I don't know right now as I sit here, without looking at the documents I've quoted from throughout the report, if he's one of the people who is -- has been copied on them or not.

LOVE

Q. Do you know whether Mr. Faict had any training in U.S. GAAP?

MS. DYER: Objection to form.

A. I don't know what you would call "training," if you receive a letter that tells you what U.S. GAAP is, if that is considered training. Are you talking about a formal education?

Q. Well, let's break it down.

Has he had any, to the best of your knowledge, has Mr. Faict had any formal education in U.S. GAAP?

A. I don't know.

MS. DYER: Objection to form.

Q. Has Mr. Faict attended any seminars or presentations by CPAs on U.S. GAAP?

A. Versus attending them by non-U.S. CPA? I have no knowledge of whether or not he attended them.

Q. You have no knowledge either way, it doesn't matter whether they are CPAs teaching the class.

A. Either way, yes, Mr. Butler.

LOVE

Q. Do you have any knowledge that Mr. Faict received any information about U.S. GAAP, apart from the information that's contained in Love Exhibit 6?

MS. DYER: Objection to form.

A. I'd have to look at the documents again, because he was involved in the lending relationship and there are -- there are comments in those documents that may reflect on your question.

Q. Have you ever met Mr. Faict?

A. No.

Q. Is it fair to say that your only knowledge of his understanding of U.S. GAAP comes from the documents that you've reviewed in this case?

MS. DYER: Objection to form.

A. Well, first of all, you are talking about U.S. GAAP and it's not U.S. GAAP that he's got to know, okay? It's very specific, two pieces of it that we have here that he's been given.

He's been given the related party correspondence or standards, the

LOVE

current text, and the current text for software development. So it's not U.S. GAAP. It's two specific elements of U.S. GAAP.

Q. Well, let me rephrase my question then.

Is it your understanding -- strike that.

Is it fair to say that the only understanding that you have of whether Mr. Faict understood the accounting principles that are set forth in Love Exhibit 6 comes from the documents that you've reviewed in this case?

A. Yes.

Q. So let's just walk through the documents that you referred me to. The first is on page 32. You say -- you said, I believe that, and you quoted the language that's excerpted at the top of the page as evidence that Mr. Faict understood these principals; is that correct?

A. Yes.

LOVE

Q. What is it in this language that makes you believe that Mr. Faict understood the principles?

A. Well, he's making a representation in a fax to the Flemish Government that -- that upon request of Mr. Paul Hauspie you'll hereby find enclosed the advice of American law firm in respect of the requirements that need to be imposed upon the framework of the U.S. GAAP regulations so that the fees paid to Lernout & Hauspie Speech Products N.V. by Dictation Consortium in this operation will have the character of R&D fees; and I believe what he is referring to is the BRF&G letter, and BRF&G.

Is the U.S. law firm, so he has that letter besides then or he's -- I don't understand his representation to the Flemish Government, and all of those point-by-point say what you need to do, and it's very simple.

Q. Sir, isn't he just transmitting some advice from an American law firm

LOVE

here?

MS. DYER: Objection to form.

A. He is sending a fax to the Flemish Government making a representation to the Government that this has been received from an American law firm in respect to U.S. GAAP regulations. So he knows that those GAAP regulations are required so that if the fees are going to be paid to Lernout & Hauspie by Dictation Consortium and its operations they will have the character of R&D fees.

Q. When he said advice of an American law firm, what did you understand him to mean?

A. That he was transmitting the letter from the American law firm that he then states in respect of the requirement that requirements need to be imposed upon the framework of U.S. GAAP regulations so that the fees paid to Lernout & Hauspie -- that's his words, that doesn't come out of the law firm's words -- Speech Products N.V. by Dictation Consortium N.V. in this

210

LOVE

operation will have the character of R&D.

So he's got to understand that those requirements have that impact and he understands that there's an impact on the fees and whether they can be recognized as R&D fees or not based upon the requirements set out in the law firm's letter.

Q. Isn't it possible, sir, that Mr. Faict forwarded this advice from an American law firm to the Flemish Government without having a full understanding of the U.S. GAAP that is reflected in Love Exhibit 6?

MS. DYER: Objection to form.

A. Love Exhibit 6?

Q. Do you have Love Exhibit 6 in front of you? This is the document I've been asking about.

A. Okay, but this -- this does not -- counselor, this does not state -- this has nothing to do with that statement that's being made here by -- in the fax from Mr. Faict to the Flemish Government.

211

LOVE

He's not saying I am transmitting to you the current text for related parties and the current text for research and development arrangements; he's saying I'm sending to you another document that he then has in his possession and he's saying that that shows the U.S. GAAP regulations or the fees paid to Lernout & Hauspie Speech Products N.V. by Dictation Consortium N.V. in this operation will have the character of the R&D fees. He's not sending Love 6, Exhibit Love 6.

Q. Oh, I understand that, sir, and so my question is why do you believe that the fact that he forwarded this different document and makes a reference to character of R&D fees in this document, why do you believe that that indicates that Mr. Faict understood the accounting principles that are set forth in Love Exhibit 6 which is the thing I've been asking you about all along?

A. Let me just say it again. He

212

LOVE

has Love Exhibit 6, that's the GAAP for related parties and R&D, he has another item in his hand, it's a letter from a law firm that he's representing to the Flemish Government includes the framework or the requirements imposed within the framework of U.S. GAAP. He certainly must know if he's gonna write in there that it has to do with whether or not in essence, in other words, the fees to Lernout & Hauspie by Dictation will have the character of R&D fees and be taken into revenue. Excuse me. So that, that is an extended knowledge of this (indicating).

Now, we got this gentleman in two places having knowledge of requirements that he's also representing to the Flemish Government are the requirements in order to be able to recognize revenue.

Q. Since we're now clear on the documents I just want to ask you again, because I'm not sure I got a clear answer to this.

213

LOVE

So isn't it possible that Mr. Faict could have forwarded this advice from an American law firm to the Flemish Government without having an understanding or certainly without a good understanding of the accounting principles that are set forth in Love Exhibit 6?

MS. DYER: Objection to form. Objection asked and answered.

A. Let me just say and say it again. I think what you're saying, or maybe what you're saying, is this man gets a fax from the company that includes U.S. GAAP in English with no translation into Flemish that he may not understand because he may not speak Flemish or may not have any training, and then he gets a letter from a U.S. law firm that's in English that talks about U.S. GAAP requirements and breaks it down for him and then he also can understand or at least shows that he understands that this affects the recognition of fees as revenue and what, why I believe that is is evidence of the

LOVE

fact that he understood it.

I think the bank's got a lot of serious problems they got their people making comments based upon documents that they don't understand and can't read, especially to the Flemish Government, and documenting -- I don't know what the Belgium bank laws are for documentation of loan files, but documentation and loan files in the U.S. if they're falsified is a criminal offense, in my understanding as a lay person.

So we've got now two documents, both in English, both dealing with the same subject and with Mr. Faict saying that this is what -- he's representing to them this is what U.S. GAAP is in order to take these fees as having the characteristics of R&D fees.

Q. Let me ask you this: The American law firm that's referenced here, who did they represent in this transaction?

A. Lernout & Hauspie.

LOVE

Q. And why was Mr. Faict communicating this information about U.S. GAAP to the Flemish Government?

A. Because --

MS. DYER: Objection to form.

A. He wasn't --

THE WITNESS: Could I have that read back?

[The requested portion of the record was read.]

A. I'd have to read the whole fax to see why. However, as I understood it, there could have been someone -- they could have been attempting to get -- I don't know, I don't know why he would be saying that to the Flemish Government.

Q. In fact if Mr. Faict was involved in a fraud wouldn't you think that he would not want to inform the Flemish Government about it?

MS. DYER: Objection to form.

A. At this point in time he hasn't informed the Flemish Government about anything either way, except U.S. GAAP and

LOVE

U.S. GAAP requirements, and if you were required for one reason or another to send it to them it is also, he's never mentioned that, you know, and because of this we've helped them and we structure this so they wouldn't be seen as part of the deal and we know they're part of the deal because we know they guarantee the loan but we got that in a side agreement so that this is going to look like it's a regular R&D deal.

Q. Just in general, based on your experience as a fraud examiner and an expert on -- on the investigation of fraud, in your experience do people who are involved in a fraud provide information about that fraud to government authorities?

MS. DYER: Objection to form.

A. I can say quite clearly, Mr. Butler, this has nothing to do with information on the fraud, okay? It is a fraud to say though -- there's a fraud on omission and if he says that these are the

LOVE

rules, and, you know, the implication is that they're following the rules, that they got a free-standing company, that there is -- that the loan, the financing is not based on the creditworthiness of Lernout and Hauspie Willaert and Bastiens, then he could be lying for all I know to the Flemish Government so that they could get some sort of funding that they may need.

Q. Sir, I'll ask you my question again. I'm asking about your general experience, not this specific document.

A. Yes, the answer --

Q. Sir, let me finish, let me finish my question.

A. Sorry, I'm sorry.

Q. In your experience, in your experience as a fraud expert, do you believe that people who have involved or have you experienced people being involved in a fraud sending information about their fraud to government authorities?

MS. DYER: Objection to form.

218

LOVE

Objection asked and answered.

A. Your question is sending information about fraud. He's not saying there's a fraud going on. He's not saying -- if he wanted to say it right he'd say here's the rules and here's what we're doing, we're hiding the fact that they're involved in this, so that makes it structured so that they can use it because we can hide it. That's information about the fraud.

Lying to other people to stop the fraud from being uncovered, certainly I found that, certainly I found communications with people outside of a company that were not telling the truth to conceal the fraud but were about the issues that involved the fraud. That's how you do it.

Q. Sir, I'll ask you once again, and I would appreciate an answer to this question. I'm not asking about this particular transaction.

In your experience as an

219

LOVE

investigator of fraud, is it generally normal for people who are involved in a fraud to send information about their fraud to government authorities?

MS. DYER: Objection. Asked and answered. Objection to the form of the question as well.

A. I answered that question. They don't say it's a fraud, they say what's been going on and they keep back the fraudulent part, and that's exactly what happened here. That's what I've seen.

I've seen people communicate, say this was good income or this was the way the transaction was structured and hold back on the either oral or written side agreements. It happens quite frequently, you're right, and that's part of the fraud, you don't go out and tell them that it happened, you keep that under covers, under cover.

Q. Sir, what information --

A. So you don't tell them about the fraud. He's not telling anyone about a

220

LOVE

fraud.

Q. Sir, what information about the Dictation Consortium transaction was withheld from the Flemish Government?

A. Regulations so that the fee paid to Lernout & Hauspie Products N.V. by Dictation Consortium in this operation will have the characteristics of R&D fees. He doesn't tell them, okay, that Lernout & Hauspie and Willaert are guarantors on these loans, which makes it a related party financing, which under the R&D standards would preclude you from taking it into income. It's a fraud by omission not by commission.

Q. Are you saying that this was the only communication about this transaction with the Flemish Government and therefore because it doesn't include the facts that you referenced then the Flemish Government must have been misinformed; is that your belief?

MS. DYER: Objection to form.

A. Counselor, if you show me a

221

LOVE

document where he tells the Flemish Government that Lernout and Hauspie, Willaert and Bastiens were the guarantors of this loan I'd gladly accept it and take it into consideration. I've looked through those documents. People working for me looked through those documents, and I haven't seen it.

Q. You're speaking specifically of the guarantee, but let's set aside the personal guarantee. I think it comes up in your report of $4.5 million guarantee at a particular point in time.

Are you -- do you know whether the Flemish Government was fully informed of other aspects of the structure of the Dictation Consortium transaction?

MS. DYER: Objection to form.

A. I don't know if they were informed or not.

Q. Is it possible that they were fully informed of the structure and the only thing they did not know about was the side letter guaranteed from Messrs.

LOVE

Lernout and Hauspie Willard and Cloet?

MS. DYER: Objection to form.

A. That's beautiful, I love the question because what you're saying is the most important component, the one that's in plain, clear English in FAS 68 that would preclude you from taking the fees and revenue what they hid and they have off to the side. The financing, the related party of the enterprise, and the enterprise is L&H, and they were the related party of the enterprise being the basis of the financing, and if you look at the loan files you'll see that they are not lending on any aspects of the construction of DC, they are lending on the strengths of that guarantee that's in a side letter and not told to everyone. That's a beautiful question, it says that they committed fraud by not telling people that one aspect if that actually happened.

Q. Sir, I don't care if you love my question or not, I just want an answer to my question.

LOVE

A. I gave you the answer to the question.

Q. My question is, do you -- is it possible that the Flemish Government was fully informed of the structure of this transaction, setting aside the issue after whether they were informed of the personal guarantee, is it possible that they were informed of all aspects of the transaction apart from the $4.5 million personal guarantee?

MS. DYER: Objection to form. Objection asked and answered.

Q. Can you answer my question, sir?

A. I just answered the question before. I said that that's a great question because what you're asking is that they have informed about anything -- it's possible that they can be informed about anything, anything, even in addition to this, but you're saying leaving out the guarantee and the side letter and not in the documents. I think that that says that they also lied to the Flemish

LOVE

Government, they didn't tell them all of the relevant facts for the Flemish Government to make any fair evaluation on what occurred.

Q. Is it possible, sir, that the Flemish Government was even informed of the $4.5 million guarantee?

MS. DYER: Objection to form.

A. I looked at all of the documents that we have, you know -- we probably didn't look at every one of the hundreds of thousands but we looked at quite a few of them -- we scanned them and we ran searches on them based upon key words, and I haven't found a document that shows me that they knew everything about it.

Q. Do you think that you have a complete record of all the documents that were exchanged between Lernout & Hauspie and the Flemish Government?

MS. DYER: Again object to form.

A. We got the documents that have been produced for discovery in this case, all of the documents, access to all of the

LOVE

documents, any document we wanted that was produced in this case.

Q. Well, there were no documents produced by Lernout & Hauspie in this case, right, they are not part of this case?

MS. DYER: Objection. Objection to form.

Q. My question, sir, is do you think you have a complete record of all the communications that took place between Lernout & Hauspie and the Flemish Government.

A. Okay. You just prefaced that with Lernout & Hauspie was not in this case, and if you're excluding all of Lernout & Hauspie's documents, the tens and even the hundred thousand or better documents that we have that are Lernout & Hauspie products, I haven't seen anything from the Flemish Government that I can recall.

I just don't understand the question. If you've got a document, let

226

LOVE
me see it. I'll take it into consideration. I'm not here to make a case, I'm here to say what the facts are that will support a conclusion or an opinion one way or the other. Give me the document, Counselor, I'll look at it. I can't address something that I don't have that could be fictitious and made up.
Q. I understand, sir, but you've reached some pretty firm conclusions and you've repeated them again and again today based on an incomplete documentation record.
MR. BUTLER: I'm asking a question here.
MS. DYER: We have the L&H documents in this case. They have been produced in this case. So to the extent that you are suggesting that he doesn't have access to the L&H documents in connection with this case, that's just a representation I can't let you make.
We have the L&H documents, they

227

LOVE
were produced in the prior litigation, they were then provided to you and your client in this litigation. Mr. Love has them as well.
So I don't know what you're asking and perhaps you don't understand what documents have been produced in this case, but the L&H documents are here.
MR. BUTLER: Are you finished?
MS. DYER: Yes.
MR. BUTLER: Okay. I'm not going to argue with you on the record. I just want an answer to my question.
MS. DYER: How could you --
Q. Do you have any way of knowing whether your opinions are based on a complete documentary record or merely a partial and fragmented documentary record?
MS. DYER: Object to form.
A. My opinions are based upon the documents that we have stated that we've looked at in this particular case, including the Lernout & Hauspie documents,

228

LOVE
just as it would normally be in any other case.
If you have any additional documents that you think I see -- I should see, I want to see them. I want to see them.
Q. Did you make an effort in preparing your report and in formulating your opinions, did you make an effort to try to find all the communications between Lernout & Hauspie and the Flemish Government regarding the Dictation Consortium transaction?
A. We scanned the files with different criteria involved in them, in it. If there's a document, give it to me, I want it, I really want it. I want to be right, that's my whole purpose in being here is to be right.
If there's something that refutes what I've said in here that shows that there wasn't fraud that was concealed from everybody I want to know about it.
Q. Sir, my question is did you make

229

LOVE
an effort as part of your investigation to find all communications between Lernout & Hauspie and the Flemish Government concerning the Dictation Consortium transaction?
MS. DYER: Objection to form. Asked and answered.
MR. BUTLER: Could you answer that question, please.
A. I -- we made a search to find every possible record that could bear on this case with all of the documents that were produced in the case.
I did not conduct an investigation outside of the case. A number of other people conducted those total investigations and that would have been, um, the Bryan Cave investigation, the Belgian Prosecutor, and the Belgian Prosecutor for sure would be able to get government correspondence; and I didn't see anything there about any communications between the Belgian Government and Lernout & Hauspie that

LOVE

would be exculpatory in this sense.

Q. Do you know whether the -- you've put in your report your opinion that the Dictation Consortium transaction had no economic substance.

Do you know if the -- the Flemish Government was informed of the same information that led you to conclude that there was no economic substance to this transaction?

MS. DYER: Objection to form.

A. I think in the Flemish Prosecutor's report, and I assume the Prosecutor is part of the Government, they said they have no economic substance. I believe they said that.

As I sit here today, I'd have to go back and look at the report. I have visions of looking at different things, they talked about it.

Q. My question is at the time of the Dictation Consortium transaction was the Flemish Government informed of the facts that led you to conclude that that

LOVE

transaction had no economic substance?

MS. DYER: Objection to form.

A. I don't know if they were informed or not. What I've seen leads me to believe they had no economic substance and what the bank saw or the bank's lawyers saw led them to believe there was no economic substance.

Q. If the Flemish Government had been informed of all of the facts that you think lead to the conclusion that the transaction had no economic substance, would it be your opinion that the Flemish Government was in on the fraud?

MS. DYER: Objection to form.

A. The Flemish Government didn't know about the side agreements so how could they be in on the fraud? The fraud was committed by the bank when they took those relationships out of the public eye and hid them in side agreements.

I see nothing and saw anything anywhere that the bank informed anyone other than Niko Willaert and the people

LOVE

from L&H that the side agreements were put in place, and they kept those people out of the public eye.

It's here, I mean, you know, who did they inform? If they would inform someone it may have been all over. The bank knew it. The bank knew that they were involved. It was a critical aspect of it. One of the critical aspects of the fraud was to hide it, and this is what they did.

Q. Sir, you keep coming back to the side agreements. Is it your testimony that the reason that the Dictation Consortium transaction lacked economic substance is because of the side agreement?

A. No, you questioned me on something more than the economic substance. I told you that there was -- that we found that there was no economic substance, okay, that the Belgium Prosecutor I believe, who was the government, found that there was no

LOVE

economic substance and that other people, including the SEC, found that there was no economic substance to these transactions, and even if the Flemish Government knew that there was no economic substance to these transactions, what did it have to do with the fraud? The fraud was committed by your client and L&H and it was committed through the side agreements.

Q. I'm just confused by your answer, sir. Are you saying that the side agreements are the reason why there's no economic substance or not?

MS. DYER: Objection to form. Asked and answered as well.

A. That's absolutely not what I said, you know it's not what I said.

Q. I'm asking you what you said.

A. I said something entirely different. The fact that the side letters are not there has nothing to do with the economic substance of the transaction.

The fact that the side letters are there have a lot to do with misleading

234

LOVE

the Flemish Government and other people who were interested in knowing what was going on. There were other aspects to this as well that are brought out in a lot of the Bryan Cave report before they knew of the related party activity of the bank, and that had to do with a lot of other, like the contract dates, when they were signed, when the money was transferred, it's all in the Bryan Cave report. So there's a lot more to this fraud than just the economic substance of the transaction.

Q. So I want to go back to my question. I'm asking about the facts that led you to conclude that there was no economic substance to the transactions.

And my question is, if the Flemish Government was fully informed of those facts that led you to that conclusion would you conclude that the Flemish Government was in on the fraud?

MS. DYER: Objection to form. Asked and answered.

A. And let me give you my answer

235

LOVE

once again. The Flemish Government didn't have all of the facts. The Flemish Government was asking for information and that is why they're getting -- possibly getting information.

Q. Isn't it possible, sir, that the jury could conclude that the Flemish Government had all the facts about the structure of the transaction and the nature of the parties involved?

MS. DYER: Objection to form. Calls for speculation.

A. The jury, depending upon what evidence you saw at the trial, can in the realm of possibility come to that conclusion; but if you have that information let me see it and I'll change my conclusion.

Maybe we'll put the Flemish Government in here if they knew it was a fraud and deliberately kept it quiet. But I haven't seen that evidence anywhere in the documents.

Your question is, in my mind,

236

LOVE

outlandishly speculative, unless you've got a basis for answering that question [sic], a factual basis, let me see the factual basis you have and I'll take it into consideration.

Q. I understand you are trying to -- you want to be in a position to help the jury reach the right conclusions about this case, and my question is if the jury concludes that the Flemish Government was fully informed should they believe that they were part of the fraud?

MS. DYER: Objection to form.

A. I said -- you said, you had left out the side agreements, okay? The Flemish -- you left out the absolute side agreement as still speculative.

I'm not going to tell you what the jury will decide, you'll present your evidence to the jury. I'm just going to present my opinions based upon the evidence I've seen and any evidence that comes out between now and the time I testify at trial.

237

LOVE

Q. Okay, let's go to the next excerpt that you cited from your report as evidence that Mr. Faict understood the accounting principles that are set forth in Love Exhibit 6.

This is on page 33, you refer to a memo from Mr. Mommens to Mr. Faict. What is it in particular --

A. Didn't I go down -- I'm sorry. I thought the next one, and I may be wrong, I didn't make notes of it -- but didn't we go down into the second piece of that, the fax included the letter -- the fax included the letter excerpted on the previous chart which further stated in part, I said that also.

Q. I'm sorry, I don't follow, where are you reading from?

A. Right below the last quote that you have.

MS. DYER: Page 32 of your report.

A. Page 32.

Q. I'm sorry, did you read this

LOVE

other thing, too?

A. I thought I did.

Q. Oh, I missed that if you did. So let's talk about that first.

This is a -- the fax included the letter from the law firm, and we will get to this letter later, I mean we will talk about it in some detail; but if you did mention that, what is it about the contents of that letter that led you to conclude that Mr. Faict understood the accounting principles that are set forth in Love Exhibit 6?

A. He read the letter. He read -- Mr. Faict was not a delivery boy at the bank, he was an officer of the bank, he would be expected to read a letter that he's sending off to the Flemish Government, and that really takes these related party and the R&D and puts some of the -- some -- and says what they mean in another way.

This is the way that's in the standards, in the current text, not -- not

LOVE

the original pronouncement, and then he says, it says in the letter. These are the things that are in the letter.

Q. Do you know whether Mr. Faict read this letter?

MS. DYER: Objection to form.

A. If he's sending on a letter to the Flemish Government that he's stating to the Flemish Government sets forth the framework for U.S. GAAP, and he's an officer of the bank, I have concerns about what he's done. I don't --

Q. Sir, do you know whether he read the letter?

A. As I sit here now, no I'd have to read his testimony, but from what I've seen in the documents -- and you know there's so many documents it's hard to remember them all -- he is on credit analyses or parts of the credit file that deal with the implementation of this related party issue, saying that they have to be kept out of the loan agreement in order to take it as revenue.

LOVE

All along the bank has got these things on if we are to -- Lernout & Hauspie wants revenue from this so we've gotta keep any notification, we can't put Mr. Lernout, Mr. Hauspie, Mr. Willaert, Mr. Bastiens' names on these guarantees or anywhere in the credit agreements, we gotta get it outside. Okay.

Q. Are you finished?

A. So that's the stuff with Faict throughout, and with the bank.

Q. Okay, well, we're going to come back to this letter so I'll just move on to the next one.

At the bottom of page 33 you say that the memo from Mr. Mommens to Mr. Faict also supports your conclusion that Mr. Faict understood the accounting principles in Love Exhibit 6? What is it, in particular, about this memo that leads you to that conclusion?

A. Here you have the head of the bank, if you go back here and you look at -- or if you look at what's required and

LOVE

what's been told to the bank, that they need to have an economically -- a separate company that has nothing to with do with Lernout & Hauspie and that they had to have economic substance, economic substance is always important, and this is saying to -- to -- to Faict that this thing is an artificial character of the structure emerges is saying to Mr. Faict what's going on here, his own attorney, this is artificial.

Q. Sir, Love Exhibit 6, is it correct to say that Love Exhibit 6 explains the U.S. GAAP for two issues, related parties and research and development arrangements; is that correct?

A. Yes.

Q. Is there anything about related parties or research and development arrangements in this memo from Mr. Mommens?

A. The R&D current text talks about the ability to repay and none of it coming back to other parties or back to the

242

LOVE

party. This has got to go back to the letter that Mr. Faict has transmitted to the Flemish Government; okay?

Q. Sir, I'm not asking you about that letter. Please answer my question.

A. You asked me about Mr. Faict on this, and Mr. Faict has more than this.

Q. I asked you a very specific question, sir.

A. That's okay.

Q. My question is is there anything in Mr. Mommens' memo about research and development or related parties?

A. He's talking about L&HSP and the law firm wanting to pass the risks of the contracts' analysis and the securities to be taken by Paribas, and asking if they accept this.

He's talking about the factors here that Dictation Consortium, that received a license from L&HSP for a technology with a license to further develop it, DC then contracts out to LHSP that also receives a commercialization

243

LOVE

order for DC. These are related party issues. The extent of the contact between the two different companies is a related party -- can be a related party issue.

Q. Whether or not that could be a related party issue, sir, my question is is there anything in this memo that leads you to believe Mr. Faict understood the U.S. GAAP surrounding related parties?

MS. DYER: Objection to form. Asked and answered.

A. I think I've been asking that [sic] all the way along.

He's making representations about U.S. GAAP to the Flemish Government. He's sending on a letter from the attorneys for LHS&P [sic]. Mr. Mommens is talking about the transactions between Dictation Consortium and LHSP.

If he's going to say he doesn't know it, look, he can say he doesn't know it and that he did all of these things, made this loan without understanding whether or not it was right to make the

244

LOVE

loan.

Q. Sir, I'm asking a very simple question. You cited this memo as evidence that Mr. Faict understood the U.S. GAAP surrounding related party transactions and research and development arrangements.

Is there anything in this memo that discusses related party transactions or research and development arrangements?

A. You are taking pieces out and parsing them separately. We've got a continuum here of different information he received and letters that he's involved in showing that there are related party or potential party related activities.

You don't look at one piece of it then go on to the next piece and ignore everything else.

It's the entire -- this memo, to me, along with the other evidence that's on the record in here, leads me to believe that if he didn't know about it he certainly set it up so that they could -- they could go around those regulations and

245

LOVE

record the revenue as income even though it was fraudulent to do so.

Q. Sir, I can ask this question all afternoon. Is there anything in this memo that you cited as evidence that Mr. Faict understood these accounting issues; is there anything in this memo about related party transactions or research and development arrangements?

MS. DYER: Objection to form. That has been asked and answered.

A. And, as you say, you can ask the answer forever -- ask the question forever, I'll give you my answer, because that is my answer to your question.

Q. Sir, is there anything in this memo that you cited that refers to related party transactions or research and development arrangements. If so, please point me to the text that you're referring to.

MS. DYER: Objection to the form. Asked and answered.

A. These are all issues that relate

LOVE

to related party transactions that are included in here.

The contact between the parties, the artificial character of the structuring dealing with them, it's all taken into consideration in determining whether or not there's a related party.

You can't parse out little pieces. It doesn't say related party in here. It doesn't say -- well, it may say R&D arrangement, no, no, it doesn't -- but these are the issues that would relate to both of those.

Q. Thank you.

Let me ask another question. Does this memo say -- I think that you started an answer a while ago by saying something about research and development arrangements involving ability to repay. Does this memo from Mr. Mommens talk about ability to repay?

A. If there's an artificial structure that's being set up -- and the artificial structure that he's talking

LOVE

about is on his point five -- We have to determine that DC is an empty company without customers, without contact with customers and even without any commercial activity, no company exists and for this reason it's not possible to take a warranty on the company, then the ability to repay has got to come from the guarantors of the loan and not from the company.

Q. So is it on that basis that you conclude that based on this memorandum Mr. Faict understood the accounting principles associated with research and development arrangements?

MS. DYER: Objection to form. Asked and answered.

A. We can go through this forever. I gave you other comments that were made throughout my report and I also stated that Mr. Faict's name is on a lot of the analysis of the loan that's applying related party and attempt to circumvent the related party and R&D requirements.

LOVE

You're taking one piece of it. So this alone? No, not this alone. This in concert with everything in the real world and things don't happen the way you want them to here. There's a lot of knowledge and a lot of documents and those all have got to be taken into consideration.

Q. Well, moving systematically through the evidence that you cite that Mr. Faict understood these accounting principles. The next thing that you cite is on page 34, which is a memo from Mr. Audiart in the legal department of the bank.

What is it in this memo -- well, first of all was this memo -- it indicates it was sent to Mr. Faict, at least in your outline -- what is it in this memo that leads you to believe that Mr. Faict understood the accounting principles relating to related party transactions and research and development arrangements?

A. He's telling Mr. Faict from a

LOVE

legal perspective we do not understand the economic goal that the parties strive to accomplish by means of these actions. To us, to the legal department, it seems that only Lernout & Hauspie is developing and commercializing the warehouse.

A valid security would be a pledge on the receivables of Dictation towards Lernout & Hauspie; however, as dictation appears to be a 100 percent branch of Lernout & Hauspie, an event of financial difficulties at one or the other, the value of such pledge will be random.

He's talking to him about related party criteria.

Now this is coming off of having this information from the law firm, from the accounting firm, from the actual standards themselves.

Q. Well, sir, this --

A. Why would he be talking to Mr. Faict about this if Mr. Faict doesn't understand it?

LOVE

Q. Sir, what you just said though is not true. This memo was written in December of 1996; do you know when the memo from the law firm was sent? Maybe I have my chronology wrong.

A. The Standards the Standards was March of '96.

Q. You know, I withdraw the question. I think I have my chronology wrong. Let me ask another question.

You said that this memo indicates that Mr. Audiart of the legal department believed that Dictation was a 100 percent branch of Lernout & Hauspie. Do you believe, sir, that Dictation Consortium was a 100 percent branch of Lernout & Hauspie?

MS. DYER: Objection to form.

A. I think it was a related party.

Q. Is the answer no?

MS. DYER: Objection to form.

A. I don't know. I never sat down and said -- first of all, it's not operated as a branch so it would have to

LOVE

be a 100 percent owned subsidiary, okay?

I'd have to sit down and look at everything again.

It's clearly a related party and clearly the loan was made for the financing of the -- that they used for the LDC and for the research was financing that in effect came from a related party, L&H, which would lead you to the conclusion that it could not be taken in as revenue.

Q. So is it correct, sir, that your understanding is that Dictation Consortium was not a 100 percent branch of Lernout & Hauspie.

A. He says it appears to be a 100 percent branch. It would not be a branch, it could be something else but it's not a branch.

Q. Isn't it clear to you, sir, that Mr. Audiart of the legal department was misinformed about the nature of this transaction?

A. Not at all.

LOVE

MS. DYER: Objection to form.

A. He's saying it appears to be. It appears to be 100 percent owner. He's not saying it is, he's saying it's acting as is, probably, it appears to be.

That's different than saying that this is a 100 percent owned branch of Lernout & Hauspie.

He's taking a look at everything and saying, boy, the relationship is very tight here; this appears to be a branch instead of what it's put out to be.

Q. Do you know what Mr. Audiart was thinking when he wrote those words?

MS. DYER: Objection to form.

A. I'm interpreting what is in here. He says appears. It's a common English word. It's not it is a branch, okay?

Q. Do you know whether this document was written in English?

MS. DYER: Are you finished, Mr. Love? If not, please complete your answer.

LOVE

A. No, he prefaced that with the whole aspect of we do not understand the economic goal, we don't understand because Lernout & Hauspie is developing and commercializing the software itself, why Dictation is there; and of course, you know, with hindsight if you go and fast forward, they acquired Dictation, Dictation becomes a part of L&H and of course pays off the loans.

Q. Well, at the time of the transaction, sir, was Lernout & Hauspie required to do that?

A. Lernout & Hauspie's -- let me -- they -- there was a commitment, supposedly an oral, moral commitment to acquire Dictation Consortium, and they did acquire it. They said they were going to acquire it.

I'm sitting here now without all of the files in front of me and going to a specific file; but I think this is one of the instances where that is in the record.

Q. Well, going back to this memo

LOVE

from Mr. Audiart, do you know what language this memo was written in?

A. No, I don't know if it's one of the translated ones or one of the Flemish ones.

Q. Do you know whether there has been testimony in this case from Mr. Audiart?

A. I believe there has been testimony from him.

Q. Did you review that testimony to prepare your report?

A. I personally didn't review it.

Q. Let's go to the next document that you cite as evidence that Mr. Faict understood these accounting principles.

MS. DYER: Before we move on could we take a quick break?

MR. BUTLER: Sure.

MS. DYER: Thank you.

THE VIDEOGRAPHER: We're off the record. The time is 4:04. This is the end of tape four.

(Whereupon, a brief recess was

LOVE

taken).

THE VIDEOGRAPHER: We're back on the record. The time is 4:18. This is the beginning of tape five.

CONTINUED EXAMINATION BY MR. BUTLER:

Q. Mr. Love, I was directing your attention before the break to page 35. There is another excerpt which you quoted as what you see as evidence that Mr. Faict understood the accounting principles associated with related parties and research and development arrangements.

In this document your report indicates that Mr. Faict is paraphrasing the Brown Rudnick November 1996 letter. Is it your understanding that that is what he was doing in this document?

A. Yeah, if you go down and look at bullet points, um, I would say that that's paraphrasing it, not taking the whole thing step-by-step, but summarizing and paraphrasing what's -- what's needed.

Q. In this memo he refers to, or based on your translation that you quote

LOVE

here, he refers to something political games squeeze; do you have any idea what was meant by?

A. That no, I don't. I think that may be just that -- I don't know. I don't know what was meant by that. It's unusual. I think this is a translation. I don't -- I don't know. It's just that it's there, it's in the record that that's the proper translation.

Q. Did you do anything to insure yourself that you were reviewing accurate translations of Dutch language documents?

MS. DYER: Objection to form.

A. We knew they were certified translations.

Q. In cases where you saw English phrases that you didn't understand or that confused you, did you go back to the translators and ask if some mistake might been made?

MS. DYER: Objection to form.

A. No, I don't think I came across any -- sharing money was one, but I looked

LOVE

it up and found out exactly what that was. That's the one that was interesting, and I just wanted to see what the translation of it, the actual -- if I could find something actually on it, and I found things on it and so I was happy with that.

Q. What is it about this memo that's referred to on this page that leads you to the conclusion that Mr. Faict understood the accounting principles concerning related party transactions and research and development arrangements?

A. Just what he says. It's important that L&H -- to L&H that the fees for development of Dictation Consortium software made, under the American accounting principles (U.S. GAAP), be characterized as R&D fees and consequently may be booked as income.

Well, he's saying that it's important that under these standards this -- that we -- that they want to characterize this as R&D fees, to have the fees for the development acknowledged as

258

LOVE

income for L&H, so he knows one way it's not gonna be and one way it is gonna be, otherwise why is he saying this? The payments need to be non-repayable. There's a condition that is in there, and two, the transaction needs to have the characteristics of a development agreement between independent companies (arm's length principle) so that it would not be considered a financing operation. In the event the transaction would be qualified as a financing operation the U.S. 25 million would not the qualify as income for L&H.

And that's basically a paraphrase. It even reads more into the standard than is there, because there are more specific bullet points, and in essence he's got to the basic underlying principle that led to some of the rules that wind up in the standards themselves, particularly the R&D standard.

Q. You said that this memo reads more into the standard than is there; what

259

LOVE

did you mean by that?

A. Well, it says in the event the transaction should be qualified as a financing operation, the USD $25 million would not qualify as income; and that's why you get the repayment portion of it, the company would be repaying it, or that related parties be involved.

That, in essence, what then is happening, it's a financing operation, you're getting a loan to do your R&D and you're not really one in the -- and you're not two distinct operations, you're one company, and you just set this up purely to get the financing -- and you don't want it to qualify for mere financing, you want to qualify as a separate entity.

Q. I'm afraid I don't understand your answer, sir.

A. Okay, I'm sorry.

Q. I asked you what you meant when you said that this memo reads more into the standard than is there.

A. No, what I'm saying is it reads

260

LOVE

into -- it reads -- it goes behind the standard and gives a reason why the standard is in place.

Q. When you say "the standard," are you referring to the research and development arrangement standard or the related party standard?

A. The R&D standard, which also refers to related party standard because the R&D standard will talk about related party.

Q. Do you think that this memo is an accurate characterization of the research and development arrangement standard under FAS 68?

A. It is --

MS. DYER: Objection to form.

A. -- in very general terms, not written by an accountant, it is. It's in there. It's in the ballpark with a lot of things that are in that standard.

Q. And because it's in the ballpark with a lot of things that are in that standard that's what leads you to the

261

LOVE

conclusion that Mr. Faict understood the standard?

MS. DYER: Objection to form.

A. He couldn't -- he couldn't paraphrase it like this unless he understood it.

Q. Is it your testimony, sir, that a person can't paraphrase language without understanding exactly what's being paraphrased?

MS. DYER: Objection to form.

A. You can -- you can paraphrase language taking it sentence-by-sentence or piece-by-piece, but he's done more than that here by going into not wanting the transaction to qualify as a financing operation and the like.

It's -- it's -- to me, and it may not be to you, but to me, and it's my opinion it sounds like he understands what's happening.

Q. And from that document that's -- strike that.

Let's go to the next piece of

LOVE

evidence that you refer to on page 37, I think you referred to an August 5, 1996 memo to the Bank's Management Committee, and you quoted the first -- the first part of that memo that you said is from Mr. Faict.

What is it about that language that leads you to the conclusion that Mr. Faict understood the accounting standards associated with related party transactions and research and development arrangements?

A. Well, he understands the need to find private investors. The connection here with L&HSP found a number of private investors, the family involved -- the families involved in the start-up of L&HSP, he knows enough to understand that there is a connection between L&HSP.

Here's where the Flemish Government comes in with the remaining 50 percent of the amount to be financed, the Flemish Government and banks are approached with the objective of finding

LOVE

formulas to obtain it.

It's just written to me -- again, it may not be to you -- written to me that someone not totally knowledgeable, it doesn't go right into the standards and say here are the standards, but it's someone that has the knowledge of the corporate structure that you need to get an R&D fee arrangement that he said in his earlier quotes.

Q. Let's go to the next document that you've cited. It's on page 38. There's a quote that starts with the word FLV.

A. Didn't I go down to the next one with the colon and I said this was not Mr. Faict, but it's the same thing, it's the bank, and he's a part of that.

Q. Well, you can correct me if I'm wrong, but I believe you quoted the portion that begins "FLV was..."

So my question is is there anything in that quote that leads you to believe that Mr. Faict understood the

LOVE

accounting principals relating to research and development arrangements and related party transactions?

A. I'm sorry, I missed. What part did I quote?

Q. On page 38.

A. I'm talking about 37. Didn't I quote -- didn't I touch on Mr. De Coen's statement?

Q. I'm sorry, you're saying that I missed one in between?

A. Yeah, on the bottom of 37.

MS. DYER: It was read into the record.

Q. Okay, sir, well, I'll be happy to ask you about that.

So this indicates that Mr. De Coen stated in an internal bank memo dated June 16, 1997. Do you know, was Mr. Faict a recipient of this memo?

A. I don't know, and I said that, that those -- I think we went to ones that were directly related to him and then others that were related to the bank and

LOVE

that he as the lending officer would be involved in looking at the files and all that sort of stuff.

Q. I just really want to focus on the ones that relate to him.

So is this one of the ones that relate to the bank's general knowledge as opposed to Mr. Faict's personal knowledge?

A. Without the memo in front of me and without any of the documents that I can see if Mr. Faict could, saw this, read this and agreed with this or went to him, right now it's just a bank document that shows that the lending people collectively at the bank understood it.

Q. Okay, how about the next excerpt that you quoted, which I think is the one on page 38 that starts with "FLV..."

Is that one that leads you to believe that Mr. Faict had an under-standing or does that just have to do with the bank's general understanding?

A. This is an internal bank memorandum. If you got a copy of that --

LOVE

I just have it down at the bottom with the file number -- with the Bates number on the document where it was included. So right now, um, I would have to say that I don't know if Mr. Faict got this or not.

Q. And is it fair to say that you are not -- you don't know whether this -- well, let's assume Mr. Faict did get this document -- I don't know one way or the other -- but if he did, is there anything in the content of this document that leads you to believe that Mr. Faict understood the accounting principles associated with related party transactions and research and development arrangements?

A. Well, in here they're saying that FLV was under the impulse of Lernout & Hauspie, and it shows that in structuring a loan where they did the side agreements, that they had to know, that they had to get these -- this in a side agreement because all of this activity could -- could demonstrate that -- that they were a related party, that FLV was a

LOVE

related party, which was disclosed in the L&H work, um, the L&H financial statements, I believe it is.

So if you know this is under the impulse and is disclosed, you've got to know that the others not being disclosed that are occurring may also have problems. So you have to know something about -- you have to know something about related parties and R&D to understand a lot of what's being said in the lending files, this being a piece of it.

Q. I'm having a little trouble understanding your answer.

This quote says, quote, "FLV was under the impulse of Mr. Lernout and Mr. Hauspie incorporated on December 22, 1995 with the purpose of providing risk capital to starting and growing companies within the sector of language and speech technology as well as promoting the establishment of these companies in the Ieper, Belgium region."

There is nothing -- isn't it

LOVE

true, sir, there is nothing in that quote that I just read to you about side agreements or related parties?

A. That's correct.

Q. So what is it about the language that I've just quoted that leads you to conclude that Mr. Faict might be knowledgeable about the accounting principles associated with related parties?

MS. DYER: Objection to form.

A. I didn't say that this was one that was directly related to Mr. Faict.

This is one that's related to the fact that the bank knows, that they have FLV as a related party, it's under the impulse of Mr. Lernout and Mr. Hauspie.

Q. This document says that FLV under the impulse of Mr. Lernout and Mr. Hauspie was incorporated on December 22, 1995.

What relevance does that have to whether there were related party issues in

LOVE

the Dictation Consortium transaction?

A. Excuse me. Where are you reading from? Oh, okay. No, okay, that that was incorporated by them in 1995 and that's why it's a related party, but it's under the impulse for the purpose of providing risk capital to starting and growing companies within the sector of language.

So FLV was a related party, and if FLV is connected with any of these other loans that they had, to a company that's connected with any of these other loans, and I think FLV had an ownership in one of them somewhere, that that was also a related party, and that happened in DC, but they never gave the full extent of the fact that they had guaranteed the loans as disclosure.

So it's, look, it's not separately something that you point to and says here he is saying that they -- that they understand the principles. It's saying based upon what I've found in the

270

LOVE

files, all of it together, when you put it all together, makes it clear that they understood what the prohibitations [sic] were and what related parties were.

Q. But there's nothing in this phrase that I just quoted about related parties or side agreements; correct?

A. That's correct.

Q. Let's go to the next document that you cite, which I believe is on page 41. This is an expert -- an excerpt from Mr. De Coen's testimony, and what is it about this testimony that, if anything, that leads you to the conclusion that Mr. Faict understood the accounting principles associated with related parties and research and development arrangements?

A. Well, the whole scheme to leave it out was a scheme to mask the fact that they were related parties.

Look, if it doesn't matter whether or not they guaranteed the loan, then you'll normally find those guarantees as part of the lending agreement.

271

LOVE

As a matter of fact, as I recall, the internal auditor said under Belgian regulations those guarantees had to be in the lending agreements.

So now he's saying that this Dictation Consortium, were you involved in any other loan aside from that, that was excluded from the agreement, he's saying I don't recall. It's not a normal occurrence.

It was done here for a particular purpose, and there's more testimony on that, too, it's done at the request of Lernout & Hauspie, they didn't want it in there because they didn't want to be associated with it and everything they got they said if you're associated with it they're not going to be able to take the revenue into income.

Q. Sir, did Mr. De Coen say anything in this excerpt about whether Mr. Faict understood the accounting principles that applied to related party transactions and research and development arrangements?

272

LOVE

A. You know, as I was going through my answer I said, I stopped, this is where, and I said this is where it's directly with Mr. Faict, now here are other things that shows that the bank, and he's a bank officer, he's working on this account, he should be aware of all this stuff.

Q. Sir, could you answer my question.

Does this excerpt say anything about whether Mr. Faict was aware of the accounting principles that applied to related party transactions and research and development arrangements?

A. No, and the rest of my answer that I gave before comes right after that, and I won't repeat it.

Q. Thank you.

Could you turn to page 49 where I think the next excerpt is that you quoted.

The description of this document begins on page 48. You say that it's an

273

LOVE

internal memo from Juris Van Helleputte. It doesn't indicate here who it was sent to. Do you know whether this memo was given to Mr. Faict?

A. No.

Q. Is this one of documents that's just generally about the bank's knowledge or is this a document that's specific to Mr. Faict?

A. This is generally about the bank's knowledge, that these things are generally part of the credit files for this account, and Mr. Faict -- Faict was involved with this account, and that's the connection I draw to it.

Q. In this document Mr. Van Helleputte says, and I'm quoting the portion that you underscored at the end of the first paragraph, quote, "In view of the public nature of the NV L&H, the U.S. GAAP rules must be implemented in a very stringent manner and the SEC will monitor this very closely."

Does that language that I've