274

LOVE

just quoted indicate to you that the bank understood that U.S. GAAP rules were being followed in this particular transaction and that SEC was monitoring the situation very closely?

MS. DYER: Objection to form.

A. Well, you're taking a sentence out of the whole paragraph, but it just says that the public nature, because it is a public company, U.S. GAAP rules must be followed very stringently, okay, and that the SEC will monitor this very closely, that you report to the SEC, the SEC can send you letters requesting additional information on your filings with them, that that goes in total with everything else that they've done, knowing that Lernout and Hauspie are related parties to L&H and they're supporting the funding of the money that's being used as this fraudulent fee that they're picking up as inappropriate and fraudulent revenue on L&H.

So what I'm -- what I'm saying

275

LOVE

is it says we know that you have to follow this very stringently, and then if you gotta go on after that, and I know you asked me just for that one, but if you go on, this is appropriate, it is appropriate for this, it is appropriate that L&H stay out of the loan transaction completely.

Hey, that's an understanding of what's going on here. That shows an understanding of the fact that you can't have them in there so that it will be posted, that's recorded, the bracket is what we put in, you know, means recorded, the funds needed for this project as revenue as well. It can post the funds needed for this product as revenue as well.

That's clearly an understanding in saying that you gotta keep them out of here or we got a problem, they are picking it up as revenue and they want to pick it up as revenue.

Q. And it is your understanding of U.S. GAAP, sir, that a company cannot

276

LOVE

recognize revenue from a transaction with a customer that is financed by a bank unless the company stays completely out and has absolutely nothing to do with the financing?

MS. DYER: Objection to form.

Do you need to hear the question back?

THE WITNESS: Yes, you know.

A. If you look at, we're talking about an R&D arrangement, and if you look at 8,C I believe it is, of the replacement and development standard, you'll see that it says precisely that, significantly involved, and they were significantly involved.

Well, I'm sorry, I gave you 8C, and 8C is the current text reference to it. Where you'll see it here is paragraph .106, item c, "A significant related party relationship between the enterprise and the parties funding the research and development exists at the time the enterprise enters into the agreement."

277

LOVE

Q. In your mind, sir, is that the same as saying that the company has to stay completely out of the loan transaction?

MS. DYER: Objection to form.

A. That shows an understanding of that aspect of it, that particular aspect, that that is an issue and a problem.

It doesn't say the company either, it says the enterprise -- the significant related party relationship between the enterprise, between L&H, and the parties funding the research and development, exists at the time the principal enters into the arrangement.

Q. So when you read this language that you quoted from page 49, this document that Mr. Van Helleputte created, you believe that he's explaining this rule in the research and development arrangements current text from the FASB that you just read, 106c?

MS. DYER: Objection to form.

Q. You believe that's what he is

278

LOVE

talking about here?

MS. DYER: Same objection.

A. Look, you say -- you say is he explaining it. No, he's saying that in order to -- he's not saying in order to comply, that this actual statement really refers to the compliance with that with what is 8C in the actual -- the original standard or paragraph .105c under the current tax.

Q. When you refer to "the original standard," you're talking about FAS 68?

A. Right.

Q. So you're talking about Section 8c of FAS 68?

A. Right.

Q. So let me make sure that the record is clear.

Are you saying that Mr. Van Helleputte is -- is describing in this text that you've underlined in the second paragraph here on page 49, paragraph 8c of FAS 68?

MS. DYER: Objection to form.

279

LOVE

A. No, no, no. What I'm saying is, what he is saying is that it's appropriate that they stay out of it completely so they can post it or record it as revenue is in order to comply -- that's what you have to do if you're gonna comply with subparagraph C that we've been talking about.

Q. Does subparagraph C say anything about staying out of a loan transaction completely?

A. A significant related party relationship between the enterprise -- and the enterprise is L&H -- a significant related party relationship and the majority, or not majority, the major shareholders and control managers of L&H are related parties, there's gotta be that significant -- and the party -- the significant related party has -- cannot be involved in the funding, the R&D development -- if it exists at the time, at the time that they get into it, that they are involved in the funding, okay,

280

LOVE

and here they are the parties involved in the funding because it's clear in the loan agreements or in the, I'm sorry, in the loan files, that they're really not looking at the value of DC or DC or any of them, because it goes for all of them, they're looking at the guarantees or the CDS as the repayment or an acquisition as a repayment.

Normally a banker would look at character of the borrower, the cash flow, particularly from operations, the collateral and the capital.

When you look at these loan credit files and the loan -- what they're doing is they're looking at the payment -- the repayment, they're looking to the guarantee as the strength of the financing, because in many of them nothing is there, they're just shell companies; so they're looking to this significant related party, and clearly they are significant related parties and they're involved in the funding.

281

LOVE

This is what that's saying. For this it is appropriate that L&H stay out of the loan transaction completely so that it can be recorded or posted of the funds that for this project as revenue as well, that they wanna record it as revenue and they need to be out.

Q. Sir, is it your understanding of U.S. GAAP or FAS 68, or FAS 57 for that matter, that involvement in financing for a customer creates a related party relationship?

MS. DYER: Objection to form.

A. That's not FAS 68. Read the title of FAS 68. It's R&D developments. Okay?

Now, if we want the other we have to go to another FAS, and that's the one that relates to -- you can see it on the recording of revenue on a right of return exists, and that will say roughly the same thing.

Q. Sir, regardless of the specific provision, my question is is it your

LOVE

understanding of U.S. GAAP, as an expert on U.S. GAAP, that involvement in the financing for a customer creates a related party relationship with that customer?

MS. DYER: Objection to form, and I'm not sure that you were finished with your last answer, Mr. Love. If you need to elaborate, please do.

Q. Sir, do you need to consult a document to answer that question?

A. No, no, I just wanted to have the document available, and if you have an objection to my consulting these documents just say so and we'll go on from there. Okay?

Would you please just answer the question again -- ask the question again.

You're talking about a customer relationship, you're talking about a customer relationship where the company is financing that customer.

There's more to consider than just -- you can -- you can finance a

LOVE

customer, then you will pick up a receivable, if it's a large dollar value sale you would look at that customer for credibility and can the customer pay back the amount.

If it shows -- if it appears that the customer can't pay it back then you can't record that income. So you can finance them but if a customer doesn't have the wherewithal to pay it back you can't record the income at that point in time, the time of the transaction.

Q. Sir --

A. It's a little more complicated than you're making it out to be. Just the blanket statement, an answer to that statement is going to be misleading.

People finance their customers. You set up a receivable from that customer. If you anticipate losses you set up a reserve for losses, that reduces the revenue you would receive on those transactions in the aggregate for smaller customers.

LOVE

Where you're dealing with larger customers and you're financing them and they don't have the economic substance or the ability to repay, then you cannot book the income at this point in time, you only book it generally when you receive the cash from the customer.

Q. Are you finished?

A. Yes.

Q. My question, sir, was is it your understanding of U.S. GAAP that any involvement that a company has in acquiring financing for its customer creates a related party relationship with that customer.

MS. DYER: Objection to form.

A. Finding -- not guaranteeing, okay, because we're taking out of context here.

If you're telling me that that seller of that product guarantees to the funding company the repayment, then I think you're back in the track that I was discussing when I answered it before.

LOVE

Okay?

Q. Well, sir, we'll get to different versions of this hypothetical, but please just answer the question I had.

This document indicates, this quote that you pointed to, indicates that L&H can't be involved in any way in the financing for its customer; and so my question to you, sir, you said that that's a reflection of U.S. GAAP in some way.

My question to you, sir, is is it your understanding of U.S. GAAP that if a company selling something has some involvement or any involvement in procuring financing for its customer, that that creates a related party relationship between the company and its customer?

MS. DYER: I'm going to object to the form, and I don't know that Mr. Love was actually finished answering the prior question before you cut him off.

A. I don't even think I said that.

If you look at this. Let's read

LOVE

it again. Maybe you don't understand it and I can try to help you understand it --

Q. Sir, reading the document is not going to help me understand. I would like to get your understanding.

MS. DYER: Hold on, hold on. Let Mr. Love --

A. Let me finish my question [sic]. I know I stepped on you and I'm sorry I did, I apologize for doing it before, it's wrong. So let me finish mine.

We were talking about, on page 37, was it?

MS. DYER: You are referring to your report?

MR. BUTLER: We were on page 49, sir.

THE WITNESS: 49, okay.

A. The sentence that says, "For this is appropriate that L&H stay out of the loan transaction completely so that it can be posted, record, the funds needed for this project as revenue as well." Okay?

LOVE

And I'm saying to you that is to comply with .106c that says a significant related party relationship between the enterprise and the parties funding the research and development exists at the time the enterprise enters into the agreement is an example of a presumption that the enterprise will repay the other parties, consequently you cannot record the fee as income. Okay?

Now, you're taking that and you're saying that the company obtains financing, and that's not what this is saying. That the funding, through a loan, through the creditworthiness of a related party, the creditworthiness of Messrs. Lernout, Hauspie, Willaert and Bastiens, is funding the loan that's used to pay the R&D fee that's going to Lernout & Hauspie.

I'm saying that then, understanding that, that's not just arranging, that's taking them to the bank and saying here, you know, here, Mr. Banker, here's this is a customer of mine,

LOVE

they need some money and they've got the wherewithal and they show that they have the wherewithal to pay it back; this is the actual funding is being supported by these individuals who are significant related parties to the enterprise, which is L&H.

I'm then saying that if you take that, and he's saying here, L&H has got to stay out of it. I'm just saying that that statement is to comply with that particular provision of the standards, and it shows a knowledge. Because if he didn't know that, why would you care? Or if someone didn't tell you that, that they had to stay out, why would you care? Why would you hide? Why would you go through all the trouble of hiding the guarantee if it had no effect whatsoever? No impact? People will act rationally at times, even people that are connected in a fraud, why go through that problem if it has no impact?

Q. Sir, I'm just trying to

LOVE

understand the connection that you're drawing between this language "stay out of the loan transaction completely" and the language in FAS 68, paragraph 8c, that refers to a related party relationship.

And my question, sir, is if a company does not stay out of a loan transaction completely, is it your understanding of U.S. GAAP that that creates a related party relationship?

MS. DYER: I'm going to object to form. Asked and answered as well.

A. That doesn't say it creates a related party, no, that doesn't, because what this is saying here -- and I'm not saying it's a related party transaction -- you know, it says here, you gotta understand what a related party is in order to read this particular document that went to Mr. Faict, and they have the related party standards that they've given them, and it says -- it doesn't say what you're making it out to be, it says clearly and distinctly it's not -- it says

290

LOVE

a significant related party relationship between the enterprise -- and the enterprise is L&H -- and the parties funding the research and development exists at the time of the enterprise into the arrangement.

That's why they tried to keep out -- that's why they kept out the names of Lernout, Hauspie, Willaert and Bastiens in the side agreements, because if they were the source of the funding, and their net worth was the source of the funding, that would preclude you from putting in the R&D.

It's part of the history of why this R&D standard came into effect, because years ago people were abusing that and they were funding the R&D themselves, and in that way keeping it off their books as an expense.

Q. Sir, maybe I'll ask the question this way: How do you determine whether a related party relationship exists under FAS 68, 8c between the enterprise and the

291

LOVE

parties funding the research and development?

A. Okay. If you read the document -- well, it's not in here, they don't have note three, it wasn't given him, because note three at the end is a note three, when you take these things sometimes from service, this looks like it was download from a service or something, that would have been a note 3, and note 3 refers to the related party provision.

But it's clear if you go so then you got to know what a related party is, so you look at it and say significant related party, related party, what's a related party? Well, I've got this other document here that was sent to me that says related parties. Related parties include transactions between a parent company, subsidiaries, these are examples, a parent company -- let me get to the actual wording of what a related party is.

Management, persons who are responsible for achieving the objectives

292

LOVE

of the enterprise -- that's what we got here, L&H -- and who have the authority to establish policies and make decisions by which those objectives are to be pursued, these are related parties, management normally includes members of the Board of Directors, the Chief Executive Officer, Chief Operating Officer, vice presidents in charge of principal business functions such as sales, administration or finance, and other persons who perform similar policy-making functions.

Wild leap between management of LHAP -- L&HSP and Mr. Willaert, Mr. Bastiens is the president, these are the founders of the company, Mr. Hauspie -- I missed one.

These are -- these are management. These are related parties. These two documents, I think, are clear on that, okay?

I don't know if Mr. Faict spoke English or not or was able to read this; but certainly that sentence shows that

293

LOVE

there's an understanding of that requirement, that if that occurred that would preclude the recording of revenue.

Q. Sir, you were just reading from DB B6799 and you quoted the portion on management, but isn't the definition of related parties just below that?

A. Members of the -- management, principal owners of the enterprise. It's management, members of the immediate families of the principal owners, you bet it's right underneath there and it says it.

Q. So, sir, just to have a clear record, there is a section on page DBB6799 that's headed "Related Parties," is it your understanding, sir, as an expert on U.S. GAAP, that this is the definition of related parties under FAS 57?

MS. DYER: Objection to form.

A. This is the definition of a related party that's in FAS 57, that's correct, and that's management, principal owners of the enterprise, its management,

LOVE

its management, the enterprise's management, and what I'm saying to you, that that is -- management is the significant related party relationship with the enterprise and they are also the parties funding the research and development through lending their value to the loan from Artesia, and that's why your client kept their names out of the loan agreement and that's why it said here "for this it is appropriate that L&H stay out of the loan transaction completely so that it can post, record, the funds needed for this project as revenue as well."

Q. Sir, I just want to ask you about this document because I'm trying to understand these provisions of U.S. GAAP, and I understand that you are an expert on them.

Is it your understanding when you look at FAS 68 and see the term "related party," that that's referring back to this definition that's in FAS 57?

MS. DYER: Objection to form.



LOVE

A. Excuse me.

MR. BUTLER: Could you read my question again.

A. The question is sort of like you're argue with me? You know, I don't understand it.

I've said it a dozen times here to you. I showed you where it comes from, each one of these standards. I showed you how it ties into what was said and you're still going at it again and again. Either you're very dense or I'm not explaining this well.

Q. I think it's the latter, sir, so I would like you to answer my question.

When FAS 68, 8c refers to related parties, is it your understanding, as an expert on U.S. GAAP, that that's referring back to the definition of related parties in FAS 57?

A. Yes.

Q. But in FAS 68 it says "significant related party relationship." What is the difference between a



LOVE

significant related party relationship and a related party relationship under FAS 57?

MS. DYER: Objection to form.

A. The difference? The management of the company, the people that run the company have a very significant related party relationship with the enterprise. It's just not a casual relationship of sorts.

So that that is -- that is probably one of the most significant related party relationships that exists between the management and ownership of the company and the enterprise.

Q. All I'm trying to understand, sir, is FAS 57 refers to related parties and FAS 68 refers to significant related parties. What is your understanding of the difference between related parties in FAS 57 and significant related parties in FAS 68?

MS. DYER: Objection to form.

A. The related parties in FAS 57, or R36 in the current text, is a



LOVE

definition of all related parties.

A significant related party relationship is just what it says, it's not a casual relationship, it is a significant relationship, and it's clear to any practicing accountant that the management of a company and major shareholders have a significant related party relationship.

Q. What criteria do you use as a practicing attorney [sic] to determine whether a related party trans -- relationship, sorry, is a casual one or a significant one?

MS. DYER: Objection to form.

THE WITNESS: Do you wanna read that back?

MR. BUTLER: I can read the question again if you'd like.

Q. What criteria do you use, sir, as a practicing accountant to determine whether a related party relationship is a casual one or a significant one?

A. What do I do? Okay. Related

LOVE

party -- it's tough to keep both of these things open at the same time. Okay.

One, C says related party and then before that it is significant related party. What would I do to know? How much control does that person have over the enterprise? If that person is a human resources vice president they may be related but they have very little control.

So the amount of control that these four individuals have over Lernout & Hauspie is what makes them significant related parties.

Q. So your understanding is it's a matter of the degree of control that one related party exerts over another; is that fair to say?

MS. DYER: Objection to form.

A. And that's just one of the things that I said.

Q. Well, I'm trying to get your complete understanding of this topic.

MS. DYER: Let him finish, Mr. Butler.

LOVE

A. You can have other significant relationships and related parties that may be shares-based between companies and subsidiaries and they are clearly related parties. You have common ownership, the owners of one company are the owners of the other, and that would be significant related parties because they control both entities.

But here we're talking about a related party relationship with the company itself, and if you look at what the managers do, they can influence everything, they can make the decisions for that company, that is a significant capability, and when they're defined as related parties, if they're management and they have that control, that is significant control; and it's more than control, nothing is done in a vacuum in real life -- maybe in a classroom it is and in a case study -- but in real life you look at every aspect of what's going on to determine whether or not they're

LOVE

significant control; and I've never heard from another CPA who ever told me that the management and principal shareholders of a company were not significant related parties.

Q. FAS 57 defines related parties. Are you aware of any U.S. GAAP that defines the term significant related parties?

A. When you go -- when you go into the literature that goes beyond, you know, FAS 57 or what we have here -- because let's stick with what we have in front of us, which is R33, the current text, related parties -- when you go into the other literature I don't have anything that I can point to specifically, but I've read analyses of related party transactions and the significant influence of the related party, and that they were significant related parties, I'm just telling you that manager of a company in this particular situation is significant, a significant related party to the

LOVE

company, because they're right there at company and they can -- if they've got control they could do what they want with the company, and boy, if that isn't a significant related party relationship nothing is.

Q. Is it possible, sir, that a lay man who doesn't have your extensive experience and accounting background would not know what the meaning of a significant related party relationship is from reading this document, Love Exhibit 6?

MS. DYER: Objection to form.

A. You're talking about just reading the document. I'm saying there's more than the document involved here.

And my whole question is in this particular atmosphere why are they hiding the relationship in a side agreement between these people and the lending?

Why are they hiding it if it means nothing? If they don't understand that they are significant, that they are important, why are they hiding it?

LOVE

Q. Sir, my --

A. I can't understand that as a fraud examiner.

Q. Sir, my question is, is it possible that a lay man, from reading this document which you say put the bank on notice of the relevant accounting rules, would not know the meaning of the term significant related party relationship by reading this Love Exhibit 6?

MS. DYER: Objection to form.

A. I didn't say that this was all the bank had. I didn't say that at all, that this document is all that they had.

We went through a lot of things that the bank had, including the letter from the attorneys. We haven't gone through the KPMG letters that went to them directly and the analysis there of what could be and not be done.

So it's not simply from reading this. If it's simply from reading this then they couldn't come to this conclusion unless they can interpret this.

LOVE

They cannot come to this conclusion here unless they know what this means over in 68, over in R55, which is the current text for FAS 68, because this sentence is directly responsive to 106 point C.

Q. Okay, sir, we got sidetracked a little bit talking about some of these principles, but we were going through the evidence that you had cited as indications that Mr. Faict understood these accounting principles that we discussed a little bit.

And the next document you cited or quoted was on page 50. It looks like it's an internal bank memorandum is how you described it.

Can you tell me, what is it about this document that leads you to believe that Mr. Faict understood these principles of U.S. GAAP concerning related party transactions and research and development arrangements?

A. Just looking at something else, I'm sorry, I apologize, because I think I

LOVE

just --

MS. DYER: How much time is on the tape?

THE VIDEOGRAPHER: 56 minutes on this tape.

MS. DYER: That's what we have left?

THE VIDEOGRAPHER: No, no, we have 26 minutes left on this tape.

A. I probably should have included in my other answer Mr. Janssens' testimony, it's on the top of that page, but let's leave that for now and go to the one on page 50 that you were pointing out.

Q. Well, sir, let me ask you if you think that Mr. Janssens' testimony at the top of the page, do you think that is an indication that Mr. Faict understood the accounting principles concerning related party transactions and research and development arrangements.

A. Let me read the question and answer. The question is, that was given to Mr. Janssens under oath, Is it true

LOVE

that the bank was informed that Lernout and Hauspie could not be liable directly or indirectly or by means of a guarantee with respect to the repayment of the financing of the BTG loan? Yes, that is correct." Okay?

That, again, is to comply with the standards. They were informed, that's the bank, it's Mr. Janssens, and I said this before, they are lending officers, they're a group of lending officers, they all together, Mr. Faict is with them, not direct, same as the one that we get to next, it's not direct.

Q. Sir, I'm asking about Mr. Faict. Is there anything in this testimony from Mr. Janssens that leads you to believe that Mr. Faict was informed of the accounting principles that apply to related party transactions and research and development arrangements.

A. Well, first of all, he was informed of them because that the exhibit that you just pointed to, because this

LOVE

went to Mr. Faict and it says Love 6.

So to begin with he did have them. He was informed, okay? So that part of the question is answered yes, he was informed.

Q. Sir, my question is about this language that you just quoted. We have already talked about this other document, you don't have to go back to it again and again.

A. That's not the question you asked.

Q. My question is very specific.

Did this language, this testimony that you just quoted from Mr. Janssens, did that in any way indicate to you that Mr. Faict understood the accounting principles for related party transactions and research and development arrangements?

A. And, as I said before, I -- once we ended where Mr. Faict was directly on the memos, that everything else that came after that, this was information that was

LOVE

available to all of the banking officers but not -- there is no, right now as I sit here, direct connection to Mr. Faict, but on many of these things he may have been named.

This is a group of people, these are lending people at a bank, and they usually talk to each other, but I have no connection to that.

I'm saying that -- so we can stop, if you want Mr. Faict we can stop already because these are items that I qualified in my answer to you to begin with that were the bank's understanding of it and that Mr. Faict was an officer of the bank.

Q. So is it correct, this question and answer that you just read, is in that category that it just relates to the bank's general understanding and not Mr. Faict's specifically; correct?

A. Not his personal understanding but the bank's understanding, and he's an officer of the bank.

LOVE

Q. Do you know what Mr. Faict's position was in 1996 at the bank?

A. As we sit here, no, but he was one of the major lending officers in this thing, I believe.

Q. Why do you say that he was an officer of the bank?

A. He was a lending officer.

Q. What do you mean when you use the term "officer"?

A. Well, in a bank it probably means a lot of people and people that are dealing with the credits are generally called lending officers. It's not an executive officer of the bank.

Q. That's what I wanted to clarify. You're talking about a lending officer, not an executive officer?

A. Yes.

Q. If you look at the next excerpt that you cite on page 50, could you just tell me, is this another excerpt that goes to the general knowledge of the bank or is this one specific to Mr. Faict?

LOVE

A. I'd have to get the actual document itself, and I don't have that here with me to see who is involved in this internal memo, Mr. Faict was on it or not.

Q. Okay. If you go to the next language that you cite, I think that's on page 52 where you cite a memo to the Management Committee, and I think in your testimony you even cited the Bates number associated with that document in Footnote 113, DBB38286.

My question, sir, is is that the same document that we talked about before on page 49?

A. Page 49, that's the same document.

Q. I mean, I'm a little confused then because on page 52 you say that the memo came from Mr. Faict and on page 48 you indicate that the memo came from Mr. Van Helleputte.

Do you know which is correct?

MS. DYER: I'm going to object

LOVE

to form, to the extent that it assumes it's either or.

Q. That's a fair question.

Do you know, did both of them write this, did both of -- in one place you say it is Mr. Van Helleputte, in another place you say it's Mr. Faict; how do you explain that?

A. I'd have to see the document to understand that and be sure that we got the numbers right on both of those and that there isn't an error in the number.

But this one relates to a memo to the Management Committee, but there could also be attached to that -- there could be both people are on it, it could be, um, I'd have to look at the document itself to clear it up and I'd like to clear it up at some point and I will clear it up but right now --

Q. Okay.

A. -- but right now, let's assume, I'm assuming that, because we checked all these documents and I do have them set

LOVE

aside, that either there's an error or that this comes from both people. There is an error, you know, in the reference to what the document is.

Q. Okay, sir, regardless of who it's from, on page 52, what is it about the quoted portion that leads you to believe that Mr. Faict understood the accounting principles concerning related party transactions and research and development arrangements?

A. Okay. Let me say another thing too, that I just want to also be sure that it's Mr. Faict, I assume that it is, but, you know, I'm going to go back and check that.

But why, if you look at that, transaction must be viewed merely as a commercial transaction that came about between independent parties and unassociated parties under normal economic conditions such that this transaction certainly shall not be classified as a loan under U.S. GAAP. Okay?

LOVE

That whole thing is really paraphrasing all of the issues that must be addressed in determining whether you can record the income as revenue.

Q. Well, what is it paraphrasing? What portion of the GAAP that's set forth in Love Exhibit 6 is it paraphrasing?

MS. DYER: Objection to form.

A. It all goes to the related party aspect of it and the fact that a related party is someone, um, that you would be independent of, a commercial transaction came about between independent and unassociated parties.

That means it can't be a related party under normal economic circumstances. But that part that it's merely -- it must be viewed merely as a commercial transaction that came about between independent and unassociated parties, that's the related party aspect of it, independent and unrelated or unassociated, if they're a related party they're not independent necessarily in the transaction

LOVE

and they're not unassociated parties.

Q. Can you tell me where that -- that document is included in the current text from FASB concerning related party transactions?

MS. DYER: Objection to form.

A. Examples of transactions between related parties include transactions between an enterprise and its principal owners, management or members of their family -- immediate families and affiliates (indicating); and 103, transactions involving related parties cannot be presumed to be carried out on an arm's length basis.

Well, this is merely a commercial transaction between independent and unassociated parties under normal economic circumstances, that is a -- that is not something -- that would be an arm's length transaction. That basically is it.

I mean, that is disclosing a separate, independent organization and not a related party organization, and if

LOVE

you're saying that this is involving L&H and it must be viewed merely as a commercial transaction, what you're saying, these are the rules we have to circumvent, related party rules, because we have to have unassociated and independent parties in a commercial transaction where both parties in essence have their own objectives.

Q. Sir, my question is is there anything about independent and unassociated parties in normal economic circumstances in the FASB current text associated with related parties that you've already indicated is authoritative on the subject?

MS. DYER: Objection to form. Objection asked and answered.

A. I just stated that.

Q. The only thing you pointed me to was the statement, quote, "Transactions involving related parties cannot be presumed to be carried out on an arm's length basis"; is that what your answer

LOVE

is?

A. That's part of my answer, you didn't listen to all of my answer.

My answer also went back to the examples of transactions between related parties and transactions between an enterprise, its principal owners, management or members of their immediate families as well.

Q. This excerpt indicates that -- that the consequence they're seeking to avoid is that the transaction could be reclassified as a loan under U.S. GAAP; do you see that?

MS. DYER: Objection to form.

THE WITNESS: Can I have the question back again. There's a part that I don't understand.

[The requested portion of the record was read.]

MS. DYER: Same objection.

A. I'm sorry, what I don't understand is the first part of it, who is trying to avoid.

LOVE

MR. BUTLER: I'll rephrase the question.

Q. This text that you pointed to refers to transactions being reclassified as a loan under U.S. GAAP; do you see that language?

A. Yes.

Q. Is there anything in the FASB current text associated with related party transactions that indicates that if there's a related party transaction revenue has to be reclassified as a loan under U.S. GAAP?

MS. DYER: Objection to form.

A. That part of the text is not in the related party thing, but we go to the 8c again and if you look at the two paragraphs that precede the 8C and they say what it's doing. You cannot take it as revenue, if you receive the money it has to be set up then as a payable or as a loan, okay?

And that would be on L&H's books, it is a loan, regardless of if it's

LOVE

cloaked in secrecy or all the provisions of it are cloaked in secrecy. It's always a loan on the bank's books, so you can only be talking about L&H's books.

Q. So is it possible that in this excerpt, whoever drafted it is confusing the requirements of FAS 57 and FAS 68?

MS. DYER: Objection to form. Calls for speculation.

A. No, not at all.

Q. Well, you initially testified, sir, that this was explaining something that had to do with related party transactions under FAS 57; and now you've just said that the last part of it is really talking about Section 8c of FAS 68. Doesn't that indicate that there may be some confusion about these provisions?

MS. DYER: I'm going to object to form and I'm going to object as mischaracterizing his testimony, asked and answered.

A. That is mischaracterizing my testimony, I didn't say that. You said

318

LOVE

what's the connection between this and it says we talked about the understanding of related party and this is saying that in order to do this the way L&H wants to do it, it can't be viewed merely as a -- it must be able to be viewed merely as a commercial transaction that came about between independent and unassociated parties, that means non-related parties.

It's not a quantum leap. So you to know what a related party is to be able to make sure that it's viewed merely as a commercial transaction that came about between independent and unassociated parties. Can't have it. It can't be viewed as being between related parties.

Q. Well, you seem to be saying that a non-related party is the same as an unassociated party; am I hearing that correctly?

MS. DYER: Objection to form.

A. I'm saying that a related party is not an unassociated -- an independent unassociated party, because there -- it is

319

LOVE

associated with the enterprise or with the company.

Q. Let me ask my question again.

Is it your understanding of U.S. GAAP that an unassociated -- that to be an unrelated party you have to have no association at all with the other party?

MS. DYER: Objection to form. Objection, asked and answered.

A. But that's an absurd question the way you ask that question. I mean, you could have connection with different companies, your firm, my firm have connections with different companies. We're not related parties to those companies, okay? But independent and unassociated would make it a related party.

Q. So I'm still trying to understand -- and I'm struggling, to be honest -- to understand the connection between this excerpt and the GAAP provisions that are in Love Exhibit 6.

You indicate that the last

320

LOVE

portion of this quote relates to Section 8c of FAS 68. Is there anything in FAS 68 about independent and unassociated parties under normal economic circumstances?

MS. DYER: Objection to form.

A. Let me read it again.

A significant related party relationship between the enterprise and the parties funding the research and development exists at the time the enterprise enters into the arrangement. This is one of the conditions that would not allow you to record the income that you receive on the fees.

A significant related party relationship, as a commercial transaction that came about between independent and unassociated parties (indicating).

Q. Are you finished?

A. Yes.

Q. Let me ask a slightly different question. This says that transaction, in order to recognize revenue -- I think it's talking about revenue here -- transaction

321

LOVE

must be able to be viewed merely as a commercial transaction that came about between independent and unassociated parties under normal economic circumstances.

Is it your understanding, sir, that under U.S. GAAP and the GAAP that applies to research and development arrangements that as long as the transaction can be viewed as a commercial transaction that came about between independent and unassociated parties under normal circumstances, that it's okay to recognize revenue?

MS. DYER: Objection to form.

A. It's again a question that can't be answered with a yes or no.

There are four, really, pieces to the recognition of revenue in most instances. One of the things, it could be a commercial transaction, it could be between independent parties but you may not be able to recognize that revenue, you cannot recognize revenue on software

LOVE

contracts unless you can demonstrate that you determined at the time of the transaction that the amount was collectable.

There are a lot of other issues involved in the recognition of income.

Q. Well, sir, I understand that there may be some other issues involved, but focusing on FAS 68, is this excerpt that I just read an accurate statement of FAS 68?

MS. DYER: Objection to form.

A. I never said it was an accurate statement of FAS. It doesn't say that word-for-word in FAS 68.

What I said is that relates to meeting the compliance in this particular instance with that portion of FAS 68.

So an understanding of FAS 68, or someone just telling you, look, you're gonna account for this revenue, like a letter from KPMG or from the attorneys for the company, they can't be a relationship between these companies [sic]. If there

LOVE

is this relationship you're not gonna be able to record it as income. And they even told them that it's gotta be reviewed as a commercial transaction between independent and unassociated parties, and they're going now to a lot of the revenue recognition issues besides the related party issues.

Q. Sir, my question is under FAS 68, if it's true that the transaction can be viewed merely as a commercial transaction that came about between independent and unassociated parties under normal circumstances, is it okay to recognize revenue?

MS. DYER: Objection to form, and objection asked and answered.

A. And I answered it a number of times. There are more -- there's more to it than that. In everyday life you deal with companies that are not related parties as well.

Most of your transactions in most commercial companies and public

LOVE

companies are with non-related parties, okay?

There are other factors that deal with revenue recognition. The ability to collect the amount of revenue is a factor that's taken into consideration.

In project accounting it would be the ability to complete the project within the estimated time and money -- or money more than the time -- to determine whether you have a loss on the contract or a gain on the contract.

You can take revenue in in different ways. That's what he told me.

Q. Are you finished with your answer, sir?

A. We have two, yes.

Q. The factors that you just described are those things that are outside of FAS 68?

MS. DYER: Objection to form.

A. They are in the literature.

Q. But are they outside of FAS 68?

LOVE

A. To a certain extent none of it is outside of FAS 68 because they all have to be in place in order to apply FAS 68.

Q. Well, sir, I'm asking you only about FAS 68; do you understand that?

MS. DYER: I'm going to object to form.

A. Yes.

Q. My question is, limiting the question to FAS 68 -- I understand there are other revenue recognition factors -- but limiting your answer to FAS 68, is it true that under that provision as long as you have revenue that is viewed merely as a commercial transaction that came about between independent and unassociated parties under normal economic circumstances that it's okay under FAS 68 to recognize the revenue?

MS. DYER: Objection to form.

A. I just don't understand the question, doesn't make any sense.

Q. What don't you understand about the question?

LOVE

A. I don't understand what you are trying to get at. You seem hell bent to get at something. And all I'm saying is that when you look at FAS 68 and you look at the significant related party relationship between the parties, independent and unassociated means, in this particular case what they have in context here, this is in context right here, with these companies involved you have to have an independent party.

This is what they're saying and this is saying here that there's a significant related party relationship. So to get rid of that they have to create the appearance of independence. It's got to be viewed as independence.

MR. BUTLER: Let's take a break to change the tape.

THE VIDEOGRAPHER: We're off the record. The time is 5:39.

(Whereupon, a brief recess was taken).

THE VIDEOGRAPHER: Okay. We are

LOVE

back on the record. The time is 5:44. This is the beginning of tape six.

CONTINUED EXAMINATION BY MR. BUTLER:

Q. Sir, I'm sure I wasn't asking this question very elegantly before so let me just direct your attention back to page 52 and the text that you cited as an indication that Mr. Faict understood the accounting principles relating to -- to these -- well, the relevant accounting principles.

My question really, sir, is do you think that this excerpt here is an accurate reflection of U.S. GAAP under FAS 68?

MS. DYER: Objection to form.

A. Well, there is one problem with it, it just can't be viewed merely, it has to be a commercial transaction that came about between independent unassociated parties under normal circumstances.

Q. So in your opinion this is not quite right?

A. The "viewed as" -- the "viewed

LOVE

as" is the facade that has to be -- that they're talking about, that it has to be -- appear to be a transaction between independent parties.

I wouldn't say viewed at, I would say for really to be GAAP that it must be a commercial transaction between independent and unassociated parties.

When you're talking about the financing of the project and the Brussels Translation Group, because it's also qualified by that, and we're talking about the financing of this R&D.

Q. So if people within the bank believed that it only had to be viewed as an independent commercial transaction they'd be misinformed about U.S. GAAP; is that correct?

MS. DYER: Objection to form.

A. I don't think that's the connotation of what's being said. What is being said is that if this is going to be income and taken as income it's got to be viewed as so that then what you see from

LOVE

the bank records, they prepare these side agreements so that it be can be viewed as when it's not really a independent -- a transaction between an independent and an unassociated party.

So, you know, I don't know how you read the "viewed merely as," but that seems to relate to how it's gotta be presented.

Doesn't talk about what it is, but you have to understand what GAAP says in order to determine how to present it to get the result you want, even though it's probably the wrong result under GAAP, or is the wrong result under GAAP.

Q. Sir, I'm not asking about the connotations of this particular phrase. My question is if the bank believed that the transaction only had to be viewed as a commercial transaction between independent and unassociated parties, and didn't actually have to be a commercial transaction between independent and unassociated parties, would you agree that

LOVE

they were misinformed?

MS. DYER: Objection to form. Objection. Asked and answered.

A. I mean, again, it's a silly question.

Q. Sir, you don't need to tell me my question is silly. Please, just answer my question.

MS. DYER: Well, hold on, he's answered the question. What he said previously is they'd have to understand what the requirements were in order to understand that it merely had to be viewed as, that they had to present it as such, that they had to present it that it was supposed to be actually; but if you want him to answer it again he'll answer it again, and that's what he started to do, but don't cut him off, Jeff.

MR. BUTLER: He wasn't answering my question. I believe he said it was silly, but let me ask the question again.

LOVE

MS. DYER: He previously answered the question before you asked it a second time.

CONTINUED EXAMINATION BY MR. BUTLER:

Q. My question is if people within the bank believed that it was only necessary to be viewed as a commercial transaction that came about between independent and unassociated parties as opposed to actually being a commercial transaction that came about between independent and unassociated parties, would you agree that those people within the bank were misinformed about U.S. GAAP?

MS. DYER: Objection to form. Objection, asked and answered.

A. That is not -- your speculation about what the people believed at the bank is not supported by the documentary evidence in the loan files.

Q. I'm not asking whether it was supported, sir. My question is -- please listen to it carefully -- if people in the bank believed that the transaction only

LOVE

had to be viewed as a commercial transaction between independent and unassociated parties as opposed to actually being such a transaction, is it your understanding of U.S. GAAP that those people would be misinformed?

MS. DYER: Objection to form. Objection, asked and answered.

A. I just don't understand, because and that is also a legal question as to what they believed, is that are they misinformed. That's not what the documents show.

Q. I'm not asking about what the documents show, sir. I'm asking a simple question about U.S. GAAP, and I think you've testified that you are an expert on U.S. GAAP.

So my question is under U.S. GAAP, if somebody, if I believed that it was only necessary to be viewed as a commercial transaction that came about between independent and unassociated parties under normal economic

LOVE

circumstances, instead of actually being such a commercial transaction, would I be misinformed about U.S. GAAP?

MS. DYER: Objection to form. Calls for speculation. He answered it already but --

A. I think it is speculative. I -- I don't know what they thought, I just know what's in the records. I can't --

Q. Sir, I'm not asking about what they thought.

MS. DYER: Hold on, let Mr. Love finish.

A. I can't testify to anything that's not in the record or to a person's state of mind, then there's a legal conclusion as to whether or not if a person believes something different than what they've been told and what they have in the record, does that mean that they can't be held responsible for it? I just don't know.

Q. Sir --

A. I've seen nothing that says to

LOVE

me that they believe -- anyone at the bank in all the documents I read -- they believe that it just had to be viewed that way, we could just make it look like it's GAAP, even though we know it's not GAAP, if we could make it look like it's GAAP that's okay. That's fraud. Everyone understands that as fraud. You're making it out to look like something that it's not, that's fraud.

Q. Sir, my question is a purely hypothetical question based on your understanding of U.S. GAAP.

MS. DYER: He's told you he can't answer it because if you are told what the requirements are and you believe something different, that's a legal question as to whether that's fraud.

If I say I believe something but I was told the right answer, that's a legal question.

MR. BUTLER: I'm not asking him about what's fraud, believe me,

LOVE

believe me, I'm not asking about this witness about what's fraud, he's volunteering all of that.

MS. DYER: He made his answer.

MR. BUTLER: Listen, you've made your objection and I'm going to ask this question until I get a straight answer.

CONTINUED EXAMINATION BY MR. BUTLER:

Q. Sir, as an expert on U.S. GAAP, if I believed that under FAS 68 the transaction only had to be viewed as a commercial transaction that came about between independent and unassociated parties under normal economic circumstances as opposed to actually being such a transaction, would I be misinformed about FAS 68?

MS. DYER: Was your belief good faith or not, and were you informed of something different and then decided that you were going to testify that you took a belief; that's the problem with that question.

LOVE

Unless you have something else to add to your answer, Mr. Love, I'm going to instruct the witness not to answer.

MR. BUTLER: Karen, please don't coach the witness.

MS. DYER: Your question is inappropriate because no one knows what's meant by "believe."

MR. BUTLER: Could you read my question again, please.

MS. DYER: Your question has been read a hundred times.

How would you know if you're misinformed? If someone informed you of X, Y and Z and you say well, I believe A, B, C, how would you know?

MR. BUTLER: Karen, I think we've heard your objection and Mr. Love has heard how you think he should answer the question.

MS. DYER: Well, my objection came far after he answered the question. You can have the court

LOVE

reporter read the question again, that's fine.

Mr. Love, unless you have anything else to add to your prior answer I would instruct you to simply refer to your prior answer and that's it.

MR. BUTLER: Karen, I have to object to you instructing him how to answer the question.

MS. DYER: Well, I'm going to instruct him in a moment not to answer at all.

MR. BUTLER: I would rather that you do instruct him not to answer at all rather than instruct him what answer to give.

MS. DYER: I'm going to have you now have the court reporter read the question back and see if Mr. Love has anything else to add to it and then I'll instruct appropriately, depending on what he says.

MR. BUTLER: Let's all be quiet

LOVE

and let the court reporter read the question.

[The requested portion of the record was read.]

MS. DYER: I'm going to object to the form of the question and, Mr. Love, unless you have anything else to add --

MR. BUTLER: Just a second. I think there might have been a problem when I asked the question I said if I believe that, so let me ask the question again, maybe it was mistranscribed.

Q. My question sir, is as an expert on U.S. GAAP if I believed that it was only necessary to be viewed as a commercial transaction that came about between independent and unassociated parties under normal economic circumstances, instead of actually being such a transaction, I would be misinformed about U.S. GAAP as set forth in FAS 68?

MS. DYER: Objection to the

LOVE

question. Asked and answered.

Unless you have something new to add to your prior response I would instruct you not to answer.

A. In your answer [sic] you said if you were misinformed. How would I know that you were misinformed and not properly informed and decided or did believe something else?

Do you understand why I have a problem with that aspect of it?

Q. I believe that your problem is an artificial one, but let me see if I can cure that.

I'm really asking about your understanding of FAS 68. Let me ask the question this way: Is it your understanding of FAS 68 that it's not sufficient to merely be viewed as a commercial transaction that came about between independent and unassociated parties under normal economic circum- stances, but it actually has to be a commercial transaction that came about

LOVE

between independent and unassociated parties under normal economic circumstances?

MS. DYER: Objection asked and answered, but you can answer again.

A. Could you --

Q. Let me try the question a different way, because you're focusing on "misinformed," if I understand you correctly.

A. Well, that's part of the problem. The second part of the problem is I've seen nothing in the record that leads me to believe that anyone has been misinformed.

Q. But I'm not asking you about the records, I'm asking you go GAAP and your understanding of U.S. GAAP?

A. No, you're not asking me about GAAP, you're asking me about someone's misinformed if they believe something or not. GAAP is here. Okay? This is GAAP.

GAAP doesn't' say -- there's nothing in GAAP that tells me that I can

LOVE

say that you've been misinformed about anything when you've got the GAAP.

Q. Let me take "misinformed" out of the question for you, sir. Here's my question.

If someone believed that it was only necessary to be viewed as a commercial transaction that came about between independent and unassociated parties under normal economic circumstances, as opposed to actually being such a transaction, would they be wrong?

A. Yes.

MS. DYER: Objection to form.

Q. Thank you.

I think the next passage that you quote as evidence that Mr. Faict understood these provisions is on page 54, some testimony from Mr. Janssens.

Can you tell me, sir, whether that testimony that's excerpted on page 54 has to do with what you think is the bank's general knowledge or what you think

LOVE

is Mr. Faict's particular knowledge?

A. Well, this is Mr. Janssens' knowledge, Janssen, Janssen, and clearly it's what he knew; but it's also, as I said before, he's one of the people that are involved in this lending relationship; and the question is, and is it also true that the Brussels Translation Group transaction was similar to the Dictation transaction in that there were limitations placed on Lernout and Hauspie's role in any financing, so that Lernout and Hauspie could recognize revenue on its dealings with the Brussels Translation Group? Yes, that's why -- that is why, that's right, there was a similarity.

Is it true that the bank was informed -- the bank was informed that Lernout and Hauspie could not be liable directly or indirectly or by means of a guarantee with respect to the repayment of the financing of the BTG loan? Yes, that is correct.

That shows an understanding of

LOVE

the party relationships of the people. It shows an understanding of the fact that if the guarantee came from a significant related party to the enterprise that you could not -- the bank, the -- the lender, the borrower, rather, Lernout & Hauspie, could not recognize it as revenue.

Q. Sir, my question was simply does this relate to Mr. Faict's knowledge or does this relate to more general knowledge within the bank?

A. Well, it relates -- as I said, it relates to Mr. Janssens' knowledge and he was a part of the group that was the lending group for this particular relationship.

Q. The next document that you cite as evidence of Mr. Faict's knowledge is on -- begins on page 62 and carries over to page 63.

My question, sir, is does this document that you quoted in your answer refer to Mr. Faict's knowledge or someone else's supposed knowledge about U.S. GAAP?

LOVE

A. Excuse me. The question you asked was that I said that this was Mr. Faict's knowledge? When I've told you before unless that we went through the individual ones for Mr. Faict and I said the remainder of these are the bank, so what are you asking me?

Q. Sir, I'm just confirming, we're trying to go through these one by one.

A. Yes.

Q. An exorcize that I thought would take about ten minutes. I'm just trying to find out which of these are specific to Mr. Faict and which ones aren't.

So is it your testimony that this is one of the ones not specific to Mr. Faict?

A. You said it runs from 62 to 63?

Q. Correct.

MS. DYER: Bottom of 62.

A. That's to the bank.

Q. Okay. That's progress.

A. That's because you asked a specific question.

LOVE

Q. Thank you, sir.

The last document that you gave as part of your answer about Mr. Faict is the excerpt that's quoted on page 85, and my question sir is the same one, is this a document that's specific to Mr. Faict or is this something else?

MS. DYER: Objection to form.

A. The document that's -- what document on 65 is this?

MS. DYER: I think it was 85. Is that what you asked about, Mr. Butler?

MR. BUTLER: That's correct.

MS. DYER: Page 85.

THE WITNESS: 85? I'm sorry.

A. I'd have to see the document to see that it related specifically to Mr. Faict. The way it's here though, it would be the bank in general, without my seeing that to see if he was copied on it, in the same way I discussed the others.

Q. So returning to Love Exhibit 6, sir, which is the document that looks like

LOVE

it was faxed to Patrick Faict back in 1996, in your opinion would reading this document allow a person with no accounting training and no experience as an accountant to apply U.S. GAAP correctly to specific transactions?

MS. DYER: Objection to form.

A. It's a very general question, and you said applying U.S. GAAP. Let me get that question again because --

Q. Let me clarify the question, if I understand your concern.

In your opinion would reading this document allow a person with no accounting training, no experience as an accountant, to apply these provisions of U.S. GAAP to a specific transaction?

MS. DYER: Objection to form.

A. It would depend upon the -- I guess the mental ability of the person who's reading them. I know a lot of lawyers that could read this -- and I hate to say it, but lawyers are generally knowledgeable professionals who could then

LOVE

apply what's in here to a specific transaction -- so it would depend upon the level of knowledge of the person reading it.

I know a lot of businessmen who could do the same thing, they're familiar with business, have no formal accounting training, can read these standards and apply them to a specific transaction.

Q. Do you know whether Mr. Faict falls into either of the categories that you've just described?

A. No.

Q. At the top of page 17 of your report in the first line of the first full paragraph you refer to faxes from L&H's CFO; do you see that?

A. Yes.

Q. Apart from this document, Love Exhibit 6, are you aware of any other faxes from L&H' CFO?

MS. DYER: When you say Exhibit 6, are you referring to it in both the form six and seven?

LOVE

MR. BUTLER: They are the same document, we've already established that.

MS. DYER: Right.

Q. Apart from this fax, are you aware of any other faxes from L&H's CFO?

MS. DYER: And I object to the form of the question.

A. Again, you know, there's a lot of documents in this case and I'm just trying to go over what we had seen and who transmitted information to the bank, and even if the -- I know the KPMG Belgium transmitted directly, wrote a letter directly to the bank. I'm not certain of Brown Rudnick, whether that was forwarded to the bank by the CFO.

So no, as I sit here now I'm not that certain whether or not there are others. There may be other facts -- factors where the accounting was described, but I can't identify them as I sit here today.

MR. BUTLER: Let's mark this.

LOVE

(Whereupon, the above-mentioned multi-page document was marked Love Exhibit 8 for identification.)

Q. Sir, before we get to this document I want to refer you back to page 17 of your report, and at the top of that page you refer to faxes, you refer to the bank being expressly informed about U.S. GAAP, and you say in faxes from L&H's CFO, letters from L&H's auditors, KPMG Belgium, and L&H's outside counsel, Brown Rudnick Freed & Gesmer; do you see that?

A. Yes.

Q. I've marked as Exhibit 8 a document which -- well, bearing Bates numbers DBB128966, and also Love 1064, which indicates that this is a translation of a document, and the original document is right behind it in case it's helpful to reference it.

Is this one of the documents that you're referring to in that paragraph on page 17?

A. Not exactly, because I think I

LOVE

have with me another document here that isn't marked "draft" with a different Bates number for the translation, okay? With a different Bates number. This is marked "draft" but --

Q. Sir, let me just refer you to your report. You cite this document in Footnote 29 of your report; do not?

A. Yes.

Q. So is this one the documents that you're referring to in that paragraph on page 17?

MS. DYER: Well, you're talking about when you say "this one," you're talking about DBB128966 through 68 and the translation that was provided by Plaintiff's counsel as opposed to LOVE 001064?

MR. BUTLER: I'm sorry, I don't understand your question. LOVE1064 I'll represent to you is the translation provided to us by you.

MS. DYER: Right, by Plaintiff's counsel.

LOVE

MR. BUTLER: That I understand is the one that Mr. Love used for the purposes of preparing his report.

A. At the time I prepared the report, yes, you're right and then I asked for one -- I said can we search and find one that is a final, because I don't like working with the draft, and they searched the database and they came up with what appears to be, I don't know if it's final but it's not marked draft, but just a quick view of it it appears to be, as I sit here and not doing a word-for-word review, it seems to be the same.

MS. DYER: And how about for the sake of clarity and expediency you use what Mr. Butler provided to you, unless you think there is some issue you need to reference back; is that all right with you? You want him to use the one that you placed before him?

Q. Yes, the document that you referred to in your report and a

LOVE

translation that we were given by your counsel that I was told you used.

A. Yes.

Q. Is there another translation that you used of this document?

A. No. What I said to you is that I wanted one without "draft" on it. I wanted my people to find it. I had a lot of documents to search to find it.

When I did the report this is the one I had. This is the one I got subsequent to that period of time that doesn't have "draft," it has a different Bates number on it, I think.

What is the Bates number on that one?

Q. 128966 to 98.

A. It's the same Bates number but that one doesn't have "draft" on it. This one has "draft," so I don't understand it. Let me see that again, please.

Q. Yup.

Well, if you look at the original Dutch language document there's

LOVE

nothing on either version that says "draft"; do you see that?

A. Right, yes, yes, yes.

Q. So does the draft just refer to the translation?

A. Yes.

Q. And is it your understanding that the exhibit that I've shown you contains only a draft translation and not a final translation?

A. Well, it says "draft" on it, but the one that I have doesn't, and there may be a copy of it when they were agreed with it and they kept the same Bates number on it because --

Q. Okay, sir, well since we appear to have two different translations --

MS. DYER: No, I think they're identical.

A. Okay. I understand what happened. I think they are identical. I think I understand what happened. When I say the same Bates number and I was concerned with the draft and the

LOVE

non-draft, the Bates number that they have on the translation is really the Bates number from the underlying document, that's why they could have the same Bates number on both and have "draft" on one and not on the other, and I looked at them very quickly and they seemed to me to be the same, except that I kept saying there's gotta be a final, let's find a final somewhere, and after the report went out we found one without a "draft" stamp on it.

Q. Okay, sir, going back to my question then. Let's just use Love Exhibit 8, if you think it's identical to the other one, and we'll ignore the draft.

A. It makes it easier, yes.

Q. So is this Exhibit 8 the document that you are referring to on page 17 as a letter from L&H's auditors, KPMG Belgium?

A. Page 17?

Q. Right.

A. Yes.

LOVE

Q. You used the plural "letters" in your report. Are you aware of any other letters from L&H's auditors, KPMG Belgium, to the bank that describe U.S. GAAP?

A. I used the word "letters" because there were two, one from KPMG and one from Brown Rudnick.

Q. But here you're saying -- I see. So when you are using the plural you are just referring to one letter from L&H's auditors, KPMG, and one letter from Brown Rudnick.

A. Yes.

Q. Is that correct?

A. Yes.

Q. Why was this document sent to Paribas and Bacob?

MS. DYER: Objection to form.

A. It says "at your request," so I'm assuming if the writer of the letter is right it was requested by Paribas Bank and Bacob Bank, Bacob.

Q. Apart from what you read in this

LOVE

document, do you have any knowledge of why this document was sent to Paribas and Bacob?

A. No personal knowledge.

Q. Do you know who at Paribas Bank received this document?

A. No.

Q. Do you know at Bacob Bank received this document?

A. No.

The only thing, just the -- the only thing is it appears that it comes from the bank document production.

Q. So it appears that somebody at each of these banks received it from the document in the fact that we have it somewhere, but you don't know who specifically would have looked at this?

A. No, no, I don't know if it was received by one or the other, both; but I do know that the Bates stamp -- or I guess you can't call them Bates stamp anymore -- but the numbering sequence is the number sequence for the Dexia files, so Dexia

LOVE

somewhere had a copy of this.

MR. BUTLER: Let's mark this.

(Whereupon, the above-mentioned two-page document was marked Love Exhibit 9 for identification.)

Q. I've marked as Love Exhibit 9 a document bearing Bates numbers DBB5217 to 5218. Have you seen this document before, sir?

A. Yes.

Q. Is this the letter from Brown Rudnick that's referred to on page 17 of your report?

A. Yes.

Q. This appears to be a memo dated June 5, 1997 from someone named Phillip Flink, who was Phillip Flink?

A. He was a partner at Brown Rudnick.

Q. Do you know Mr. Flink?

A. No.

Q. Do you know -- do you recognize him as an expert on accounting issues?

A. I don't know whether or not he's

LOVE

an expert on accounting issues.

Q. I think you've indicated Brown Rudnick is a law firm, it's not an accounting firm; correct?

A. That's correct.

Q. Do you think it would be reasonable for someone to look to Brown Rudnick for accounting advice?

MS. DYER: Objection to form.

A. I have to read the entire letter.

Q. Take as much time as you need, sir.

(Witness peruses document.)

A. Well, they give advice on structuring of a transaction. I don't know whether Mr. Fink -- Flink is a CPA or has a background in accounting, but it is the structuring of a transaction and he's saying that these, I see at the last sentence, "some of the more important issues that have been brought to our attention by KPMG in the course of structuring this transaction."

LOVE

So it's their understanding of what KPMG has brought to their attention, and I don't know how they brought it to their attention.

MR. BUTLER: Could you read my question again.

MS. DYER: Objection to form.

[The requested portion of the record was read.]

Q. Sir, I'll ask the question again.

Do you think it to be reasonable for someone to look to Brown Rudnick a law firm for accounting advice?

MS. DYER: I'm going to object to form and also asked and answered.

A. And I would say that they're looking to Brown Rudnick for the structure of a transaction, which people normally do with their attorneys.

Brown Rudnick is saying that what they have here was brought to their attention by KPMG as far as the accounting is concerned. So there's nothing wrong

LOVE

with that, and someone asked for it, but it went to them.

Q. Is it your testimony, sir, that you know that someone at the bank asked for this document?

A. That's not my testimony. Someone asked them to send it to the bank, either to the bank or someone at Lernout & Hauspie I would assume.

Q. I was going to ask, do you know why this document was sent to Paribas and Bacob?

A. I don't know precisely when it was sent. It was sent about the same time as the KPMG letter, and maybe this is -- well, maybe is speculation so I don't know. I don't know why it was sent.

Q. Do you know who at Paribas received this document?

A. No.

Q. Do you know who at Bacob Bank received this document?

A. No.

Q. This document is written in

LOVE

English. Do you know whether the people who received this document at Paribas or Bacob spoke and understood English well enough to understand this document?

MS. DYER: Objection to form.

A. The people at the bank, that there are no people in the bank that understood English well enough? I don't understand. Are you saying anyone in the bank who could have read it and translated it?

Q. My question, sir, is do you know whether, whoever reviewed this in the bank, do you have any knowledge of whether those particular people understood English well enough to understand this document?

A. Well, you asked me the question did I know who it went to and I said no.

MS. DYER: Same objection.

A. I can't -- if I don't know the people who it went to I don't know whether they could speak English or not.

Q. So the answer is no; right?

A. But it's in their files. It's

362

LOVE

in the bank's files, that's simple, but I don't know because I don't know the people.

Q. So the answer is no; right?

A. Yes.

MS. DYER: We're past the seven hours, aren't we?

THE VIDEOGRAPHER: Yes, we are.

MS. DYER: We're past the seven hours.

MR. BUTLER: Well, I would like to, for clarity of the record, if we have a possibility to resume, could I just take two minutes to mark this document and ask him if it's the same one that we did previously.

MS. DYER: You can do that, I mean, obviously I object to any notion that there will be any resumption of this deposition. We've gone the full seven hours, but if it's just that question, certainly.

MR. BUTLER: I understand. So let me just mark this quickly then.

363

LOVE

(Whereupon, the above-mentioned two-page document was marked Love Exhibit 10 for identification.)

Q. My question, sir, is just quickly, do you agree that this is a slightly different version of the same document we were looking at before that was sent from Brown Rudnick to Lernout & Hauspie Speech Products?

MS. DYER: And with the different date.

A. It's more than the date.

This is going to Lernout & Hauspie well before the one that goes out to the bank, and it says "As we have discussed," and it says "In order to meet these tests, we've been advised by KPMG, L&H's accountants, that the transaction must at a minimum have the following characteristics," and the other one, the one that goes to the bank, it says "In order to meet these tests the transaction must at a minimum have the following characteristics."

364

LOVE

Q. Sir, is this, let me just ask this, is this one of the documents that you cite in Footnote 29 of your report?

A. Yes, that's correct.

Q. Do you have any reason to believe that this document, the one that went to Lernout & Hauspie, was given to anyone at Paribas or Bacob?

MS. DYER: Objection to form.

A. It was in their files. It's from their discovery, discovery of Dexia Bank. So if you look at the Bates number on it, that's where it came from, so I assume that they had it, they gave it to us, they got it.

Q. Apart from the Bates number, do you have any independent understanding or knowledge of whether this document was sent to Paribas or Bacob?

MS. DYER: Objection to form.

A. I don't, you know, on any document that we may receive -- now we're talking about, I'm sorry, let me get the right one in front of me. The Lernout & Hauspie one?

365

LOVE

Q. Correct.

A. It's not addressed to them but it's in their file so some way they got ahold of it. I don't know, there is nothing else on here that says this is going to them, but they did have it in their files, which means they had it.

Q. Do you know were they had it in November 1996?

A. No, I wouldn't know that because there is no transmittal date, except for the fact that it's on -- in their files, um --

MS. DYER: Did you have something to add, Mr. Love?

THE WITNESS: No, I'm just looking at it.

MR. BUTLER: Well, Karen I understand I've used up a little over seven hours today, and it's your position that you're cutting off the deposition after seven hours; is that correct?

LOVE

MS. DYER: I think the local rules and the Federal Rules, if not the local rules, actually take that position. So it's not my position, it's the position of the rules of civil procedure but --

MR. BUTLER: We have the power, as parties, to stipulate to a lenthier deposition. Do I understand you correctly, you are not willing to stipulate to more time?

MS. DYER: We are not willing to stipulate to something outside of the Federal Rules of the seven hours.

MR. BUTLER: Do we need to have any further meeting to confer on that before I raise the issue with the Court?

MS. DYER: Beyond the time that I've already allotted, which is additional, if you would either call me or put it in a letter, I'd like to know the bases for your request for additional time.

LOVE

MR. BUTLER: Well, simply that I'm not finished.

MS. DYER: Well, if that's the only reason, then no, we're not prepared to stipulate to that.

MR. BUTLER: Thank you.

THE VIDEOGRAPHER: Okay. The deposition is concluded for today. The time is 6:28. We're off the record.

____________________________
VINCENT J. LOVE

Subscribed and sworn to before me this __________ day of __________________, 2007.

____________________________
Notary Public

C E R T I F I C A T I O N

I, KATHLEEN PIAZZA LUONGO, a Notary Public for and within the State of New York, do hereby certify that the foregoing witness, VINCENT J. LOVE, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

KATHLEEN PIAZZA LUONGO

I N D E X

WITNESS

Vincent J. Love

| EXAMINATION BY | PAGE |
|---|---|
| Mr. Butler | 5-367 |

E X H I B I T S

| LOVE | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Preliminary Expert Witness Report of Vincent J. Love dated January 4, 2007 | 26 |
| 2 | Letter dated 2/11/07 with attached Amended Exhibit 3 to Preliminary Expert Witness Report of Vincent J. Love | 28 |
| 3 | Expert Witness Preliminary Rebuttal Report of Vincent J. Love dated 2/16/07 | 31 |
| 4 | Document bearing Bates number FV001735 | 65 |

(Cont'd.)

| LOVE | DESCRIPTION | PAGE |
|---|---|---|
| 5 | Document bearing Bates LHSP022159 | 97 |
| 6 | Document bearing Bates numbers DBB6796 - 6801 | 153 |
| 7 | Document bearing Bates numbers DBB74968 - 4973 | 155 |
| 8 | Document bearing Bates numbers DBB128966 | 349 |
| 9 | Document bearing Bates numbers DBB5217 - 5218 | 357 |
| 10 | Document bearing Bates numbers DBB007192 - 7193 | 363 |

LITIGATION SUPPORT INDEX

DIRECTION TO WITNESS NOT TO ANSWER

Page Line Page Line

(NONE)

REQUEST FOR PRODUCTION OF DOCUMENTS

Page Line Page Line

(NONE)

INFORMATION TO BE FURNISHED

Page Line Page Line

(NONE)

QUESTIONS MARKED FOR A RULING

Page Line Page Line

(NONE)

ERRATA SHEET
VERITEXT/SPHERION DEPOSITION SERVICES
1-800-362-2520
1350 BROADWAY
NEW YORK, NY 10018

NAME OF CASE: STONINGTON VS. DEXIA S.A.
DATE OF DEPOSITION: MARCH 20, 2007
NAME OF DEPONENT: VINCENT J. LOVE

| PAGE | LINE(S) | CHANGE | REASON |
|---|---|---|---|
| ____ | ____ | ____________ | ________ |
| ____ | ____ | ____________ | ________ |
| ____ | ____ | ____________ | ________ |
| ____ | ____ | ____________ | ________ |
| ____ | ____ | ____________ | ________ |
| ____ | ____ | ____________ | ________ |
| ____ | ____ | ____________ | ________ |
| ____ | ____ | ____________ | ________ |
| ____ | ____ | ____________ | ________ |
| ____ | ____ | ____________ | ________ |
| ____ | ____ | ____________ | ________ |
| ____ | ____ | ____________ | ________ |

____________________
VINCENT J. LOVE

SUBSCRIBED AND SWORN TO BEFORE ME THIS ____ DAY OF __________, 20__.

________________ ____________________
(NOTARY PUBLIC) MY COMMISSION EXPIRES:

## A

**abbreviations**
166:14
**ability** 44:13 55:20
241:24 246:20,22
247:8 284:5 324:6
324:10 346:21
**able** 15:17 21:20
22:25 69:17 71:3
72:3 78:23 110:24
119:6 125:16,21
132:18 146:12
162:12 181:20
198:11 212:20
229:21 271:19
292:24 318:7,13
321:2,24 323:3
**above-mentioned**
26:3 28:4 31:6
65:8 96:24 153:2
155:8 349:2 357:4
363:2
**absolute** 236:17
**absolutely** 176:4
233:17 276:5
**absolved** 45:6
**absurd** 319:11
**abused** 52:3
**abusing** 290:18
**accept** 82:25 83:4
135:5 175:23
189:14 221:5
242:19
**accepted** 7:5 23:9,25
25:14 32:4 33:21
33:23 46:17,18
55:23
**access** 48:4,9,10
49:5 74:7 115:16
224:25 226:21
**accomplish** 190:18
249:4
**account** 23:13 54:18
194:21 198:6
272:8 273:14,15

322:22
**accountant** 6:16
260:20 297:7,22
346:6,17
**accountants** 24:23
363:19
**accounting** 6:16 7:3
7:5,8,10,13 8:6 9:3
10:18 12:21,22
23:9,25 24:8,9,16
24:25 25:6,14,22
32:5 33:21 55:23
57:16 62:9 78:16
99:7 160:21,23
161:20 183:5,19
184:5 185:9 186:4
186:11 191:16
203:10 204:4
207:12 211:21
213:7 237:5
238:13 240:19
245:7 247:14
248:12,22 249:20
254:17 255:11
257:11,18 262:10
264:2 266:14
268:9 270:16
271:23 272:14
301:10 302:8
303:12 304:20
305:20 306:19
311:10 324:9
327:10,11 346:4
346:16 347:8
348:22 357:24
358:2,5,9,19
359:15,24
**accuracy** 31:24 32:9
35:8,25 36:13
40:16 43:2 44:20
61:10 67:15 70:19
**accurate** 32:15,18
32:21 48:5,17,23
49:8,23 50:15
51:22 52:11,15,23

54:6 55:7 56:18
58:15 96:12
122:16 256:13
260:14 322:11,14
327:15 368:10
**achieving** 291:25
**acknowledged**
191:19 257:25
**acquire** 253:17,18
253:19
**acquired** 253:9
**acquiring** 284:14
**acquisition** 280:9
**acronym** 25:15
**acronyms** 93:2
**act** 141:17 199:3
288:21
**acted** 170:17
**acting** 177:5 252:5
**action** 1:2 2:2,12
148:24 368:14
**actions** 190:18
249:4
**active** 18:9
**activities** 77:13
113:5 244:16
**activity** 87:22 168:8
175:8 189:21
191:7 234:7 247:6
266:23
**actual** 56:5,8 57:16
58:10,12 59:4,23
59:25 61:19 83:11
83:17,21 85:7 87:4
87:5 98:14 106:19
249:20 257:5
278:7,9 288:5
291:23 309:2
**add** 133:16 336:3
337:5,22 338:9
339:4 365:17
**adding** 135:17
**addition** 160:15
188:21 223:21
**additional** 146:24

228:4 274:15
366:22,25
**address** 6:3,5,6
35:18 226:8
**addressed** 312:4
365:4
**addresses** 35:20
**addressing** 117:11
117:12
**adds** 188:23
**adjust** 128:8 133:17
**adjusted** 108:24
110:14 158:24
**adjustment** 133:5,6
134:3
**adjustments** 104:5
104:19 105:14,23
107:5 108:9
111:14
**administration**
12:20 13:5 292:11
**admonished** 21:25
**advice** 187:7 208:9
208:25 209:14
210:11 213:3
358:9,16 359:15
**advised** 363:18
**affect** 196:15
**affiliates** 313:13
**afraid** 259:19
**afternoon** 245:5
**aggregate** 80:5
283:24
**aggregated** 80:6
**ago** 135:23 151:3
246:18 290:18
**agree** 31:22 173:14
199:25 329:25
331:14 363:6
**agreed** 265:13
353:14
**agreement** 141:23
141:24,25 144:6
169:19 170:25
172:12 184:23

191:24 194:9
202:6 216:10
232:18 236:18
239:24 258:8
266:23 270:25
271:9 276:25
287:8 294:11
301:20
**agreements** 144:22
144:25 194:5
219:18 231:18,22
232:2,14 233:10
233:13 236:16
240:8 266:21
268:4 270:8 271:5
280:4 290:11
329:3
**agrees** 100:19
102:22
**ahead** 38:13 130:22
161:16 184:14
**ahold** 365:6
**AICPA** 24:14,22
**air** 119:22
**al** 4:10,13,15
**Alan** 3:12 5:12
**allegedly** 122:9
**allocated** 140:7,12
**allotted** 366:21
**allow** 149:16 163:20
168:9 320:14
346:4,15
**allowed** 11:18
**alphabet** 99:17
**Amended** 28:11,15
28:25 31:2 116:15
369:18
**amendment** 28:15
**American** 14:7
24:22 187:7
191:15 197:7
208:9,25 209:7,15
209:18 210:12
213:4 214:22
257:17

**amount** 9:16 76:22
87:19 92:21,23
104:6 124:18
126:7 128:23
132:5,7 133:14
134:12,14 185:21
192:24 193:2
262:23 283:6
298:11 322:4
324:6
**amounts** 63:12
64:17 67:19,20,21
67:22 79:2,4,5
95:2 130:9 132:18
140:18
**analogous** 25:18
137:3
**analogy** 136:3,20,25
137:20
**analyses** 239:21
300:19
**analysis** 78:16 99:23
151:19 189:13
242:17 247:23
302:20
**Analyst** 194:12
196:4
**analyzed** 74:17,18
**Andersen** 99:7
**Andreas** 5:6
**answer** 14:16 33:6
34:23 36:4 38:3
40:2,24 41:2,17,18
42:4,8,9,11 45:15
50:8,13,21 51:12
51:14 52:6 53:3,4
53:6,7,8,15,19,20
54:24 55:18 61:19
61:21 62:11,17
69:7 77:14,15 78:4
79:19 81:2 83:15
83:25 84:3,4,5
85:15,16,17,21
86:4,9 87:11,15
89:5,25 90:10

95:17 107:13
109:18,20 110:24
111:7 117:25
121:4,10 122:24
124:9 139:21
164:20 169:7
174:25 176:12
178:6,15,20,21,24
179:6,10 182:25
184:3,15 185:12
199:16 202:12
203:13,25 204:9
212:24 217:15
218:22 222:24
223:2,15 227:15
229:9 233:12
234:25 242:6
245:14,15,16
246:18 250:21
252:25 259:20
267:15 272:3,10
272:17 282:8,12
282:18 283:17
285:5 295:16
304:12,24 307:14
307:19 314:25
315:3,4,5 324:18
325:13 330:8,19
330:19 334:16,22
335:5,9 336:3,5,22
337:6,7,11,13,16
337:18 339:5,6
340:6 343:23
345:4 361:24
362:5 371:3
**answered** 21:9,11
37:24 38:17 39:8
40:20 43:5 44:23
50:2,2 51:6,7 53:2
54:9 55:10 56:22
58:18 61:13 78:7
82:8 83:14,25
85:12 86:16 87:10
93:16 95:13 107:7
108:20,21 109:19

117:24 150:21
175:2 181:6 186:7
186:8 213:10
218:2 219:7,9
223:14,16 229:8
233:16 234:24
243:12 245:12,24
247:18 284:25
289:13 306:5
314:19 317:23
319:10 321:18
323:18,19 330:4
330:11 331:3,17
332:9 333:6
336:24 339:2
340:6 359:17
**answering** 14:17
35:13 41:25 51:9
51:11 53:10 98:9
111:4 139:12
178:13 236:3
285:22 330:22
**answers** 35:12 41:14
42:18 44:24 53:13
84:7,8 86:14
142:13,22,25
143:19,22 176:15
**anticipate** 59:2
283:21
**anymore** 356:23
**anyone's** 169:11
**anyway** 143:12
**apart** 194:5 206:4
223:11 347:20
348:6 355:25
364:17
**APB's** 24:9
**apologize** 36:6
41:24 286:11
303:25
**apparent** 168:12
173:21
**appear** 37:7,15
101:11 328:4
353:17

**appearance** 326:17
**appears** 26:15 63:22 75:22 96:7 104:9 123:15 157:15 190:24 249:11 251:17 252:3,4,6 252:12,18 283:7 351:11,13 356:13 356:15 357:16
**apple** 164:2
**applicable** 197:10
**application** 8:11 25:13 47:13 57:25 182:21 183:9 184:19 185:14
**applied** 12:23 47:9 47:11 184:9,17 186:9 197:5 271:24 272:14
**applies** 164:25 190:14 321:9
**apply** 148:5 305:20 325:4 346:6,17 347:2,10
**applying** 247:23 346:10
**appreciate** 53:14 122:19 218:22
**APPRECIATION** 1:4
**approached** 193:4 262:25
**appropriate** 63:24 75:24 76:4 176:14 195:13 275:6,6,7 279:3 281:3 286:21 294:12
**appropriately** 337:23
**approximately** 24:3
**April** 63:13 66:19
**ARB** 159:23 160:19 161:22
**area** 12:23 57:9 71:9 111:25 134:15 156:22 160:10,16
**areas** 6:13,21 8:13 8:14 50:10 52:17 93:22 94:15 134:15
**argue** 227:14 295:6
**arises** 27:23
**Army** 151:9
**arm's** 191:25 258:9 313:16,21 314:24
**arrangement** 163:16 246:12 260:7,15 263:10 276:12 277:16 290:7 320:12
**arrangements** 159:14 163:5 164:22,24,25 211:5 241:17,21 244:7,10 245:10 245:20 246:20 247:16 248:24 255:13 257:13 262:13 264:3 266:16 270:18 271:25 272:16 277:22 303:23 304:22 305:22 306:21 311:12 321:10
**arranging** 287:23
**arrived** 115:3
**Artesia** 1:10 2:8,18 140:24 142:24 147:24 294:9
**Arthur** 99:6
**artificial** 189:4 241:9,12 246:5,23 246:25 339:14
**Asia** 65:24 72:17 124:19 127:8,17
**Asian** 69:21 72:7 73:7 79:4
**aside** 66:14 103:25 157:11 221:11 223:7 271:8 311:2
**asked** 11:6 14:16 15:2 21:8 22:13,22 34:12 37:23 39:7 39:16,24 40:19 43:4 49:25 50:5 52:25 54:8 55:10 56:22 58:18 60:10 61:12 77:18 78:7 83:13,24 85:11,23 85:24 86:15 87:9 91:17 93:16 95:12 107:7 108:20 117:23 139:18 143:5 170:13 177:15 181:6 186:7 213:10 218:2 219:6 223:14 229:8 233:16 234:24 242:7,9 243:12 245:12,24 247:18 259:22 275:5 289:13 306:13 314:19 317:22 319:10 323:18 330:4 331:3,17 332:9 338:12 339:2 340:5 344:3 344:24 345:13 351:6 359:17 360:2,5,8 361:18
**asking** 34:13 35:3,4 38:13 41:8 49:14 49:21 51:2,4 52:19 56:13,14 58:4 79:20 83:5,9 87:2 87:3 93:9 104:25 106:24 109:4,6 122:18 165:20,22 210:20 211:24 217:13 218:23 223:18 226:15 227:7 233:19 234:15 235:4 242:5,18 243:13 244:3 305:16 325:5 327:5 329:17 331:22 332:15,16 333:11 334:24 335:2 339:16 340:17,18 340:20,21 344:8
**aspect** 167:23 222:22 232:9 253:3 277:8,8 299:24 312:11,22 339:12
**aspects** 92:6 221:17 222:16 223:10 232:10 234:4
**asset** 200:9
**assets** 190:15
**assist** 15:10,15,18 15:21 16:9 145:12 145:18
**assisted** 36:19 40:12 175:18,18
**associated** 130:7 247:15 255:12 262:11 266:14 268:10 270:17 271:17,18 309:12 314:15 316:10 319:2
**association** 12:12 319:8
**assume** 11:15 42:8 48:3 59:10 203:19 230:14 266:9 310:23 311:15 360:10 364:15
**assumes** 121:2 310:2
**assuming** 80:20 310:24 355:22
**assumption** 87:21
**assumptions** 18:11
**atmosphere** 301:19
**attached** 164:10

310:16 369:17
**attaches** 28:10
**attachment** 28:5,15 157:19 181:17
**attachments** 157:19
**attempt** 247:24
**attempting** 215:15
**attended** 205:16,21
**attending** 205:19
**attention** 125:8 255:8 327:7 358:24 359:3,5,24
**attorney** 97:13,14 241:11 297:12
**attorneys** 3:5,11,16 9:24 10:4,22 148:14 243:18 302:18 322:23 359:21
**attributable** 144:18
**attribute** 156:22
**Audiart** 248:15 250:13 251:22 252:14 254:2,9
**audit** 7:23 13:17 33:14 37:16 43:24 46:15,16 47:22 49:10 52:13 56:10 69:23,24,24 70:9 76:19,25 79:13,14 82:22 102:12 151:15
**audited** 13:16,18 79:15 151:12
**auditing** 6:16 7:3 8:6 9:3 10:12 12:22,22 23:23 33:12,23 37:11,12 43:14 45:3 46:17 47:20,21 54:22 57:17 58:19
**auditor** 6:17 7:21 12:19 37:10,13 38:20 39:2 40:6 43:13,18 44:4,13 44:19 45:5 46:15 46:23,25 47:2,5,19 52:9 54:20 58:3,25 144:21 151:6,10 151:13 271:3
**auditors** 45:2 48:4 48:25 49:24 50:16 51:23 52:24 54:7 55:8,14 56:20 57:20 58:16 349:11 354:21 355:4,13
**auditor's** 37:10 43:25 46:25 47:14 55:20
**audits** 46:23
**August** 192:7 262:3
**auspices** 122:12
**authenticity** 84:11
**author** 203:15 204:6
**authoritative** 23:19 162:17 314:16
**authorities** 16:14,18 24:11 74:8 138:21 195:20 216:19 217:24 219:5
**authority** 12:11 162:16 292:3
**available** 30:9,14 48:12 64:16 282:14 307:2
**Avenue** 3:4 6:5
**avoid** 315:13,25
**aware** 19:21 55:3 64:22 95:8 117:20 120:13,14 139:18 139:21 149:4,6,9 173:23 174:19 175:4,5 177:17 186:2 188:7 203:22 272:8,13 300:8 347:21 348:7 355:3
**a.m** 1:15 4:7

**B**

**B** 2:4 336:18 369:10
**back** 20:24 21:6 33:3 38:11 40:22 42:6 64:14 74:23 75:3 81:19 91:14 95:6 104:13 117:8 118:20 130:20 139:24 143:17 152:21 162:9 168:6 169:6 170:9 180:4 202:19 215:9 219:11,17 230:19 232:13 234:14 240:14,24 241:25,25 242:2 253:25 255:3 256:20 276:9 283:5,8,11 284:24 288:4 294:24 295:20 297:18 306:10 311:16 315:5,18 327:2,7 337:21 346:2 349:6 351:20 354:14
**background** 301:10 358:19
**Bacob** 182:7,8,9 355:19,24,24 356:4,9 360:13,22 361:4 364:9,20
**badger** 86:3
**badgering** 85:19
**badly** 137:14
**Baker** 2:14,14 3:5 3:11 4:14 5:10,13 5:16 137:25 138:6
**Bakers** 138:8
**balance** 54:18 196:15
**balances** 127:17
**ballpark** 260:21,23
**bank** 1:9,19 2:7,18 3:16 4:11 5:5 6:17 7:21,24,25 8:4 12:19,19,24 13:5 13:18,20,25 14:2,4 14:6,10 16:13,15 18:7,25 19:14,16 20:9,20,21 21:22 27:5 59:14 74:9 75:2 77:10 87:17 88:22 139:14,19 140:24 142:4,9,11 147:24 149:3 150:3,3 151:6,16 152:4 167:2,4,10 167:14 168:4 170:4 173:3,4 182:9,12 183:11 183:15 188:2,6 193:12,15 196:3,8 199:11 200:16,21 203:17,19,21 204:20 214:9 231:7,20,24 232:8 232:8 234:7 238:17,17 239:12 240:2,12,24 241:2 248:16 263:19 264:19,25 265:14 265:16,24 268:16 272:6,7 274:2 276:3 287:23 302:7,14,17 303:16 305:2,10 307:8,17,25 308:3 308:8,12,16,24 328:15 329:2,19 331:7,15,19,25 334:2 342:18,19 343:6,12 344:7,22 345:21 348:13,16 348:18 349:9 355:5,23,24 356:6 356:9,14 360:5,8,9 360:22 361:7,8,11 361:15 363:16,22 364:13
**banker** 59:7,11 60:2

61:9 62:3,19
149:12 150:4,24
151:2,5 280:11
287:25
**bankers** 194:10
203:17
**banking** 1:10 2:8,18
6:18 7:19,20 8:9,9
12:23 13:13,16,22
14:8 144:24
193:10 307:2
**bankruptcy** 63:15
**banks** 13:19 14:13
14:19 92:23
151:12,13 193:3
262:24 356:16
**bank's** 15:22 17:9
18:9 149:24
167:20 180:16
188:3 192:8
197:15 214:3
231:7 262:4 265:8
265:23 273:8,12
307:15,21,24
317:4 341:25
362:2
**based** 9:22 13:6
18:6 20:17 35:4
54:12 57:20,20
63:22 64:15 71:4
75:22 76:23 87:20
104:21,23 115:5
123:9 126:3
146:19 189:15
210:7 214:5
216:13 217:6
224:15 226:13
227:18,22 236:22
247:13 255:25
269:25 334:13
**bases** 114:2 366:24
**basic** 160:22 258:20
**basically** 45:6 71:8
106:11 107:14
128:22 147:6

258:16 313:22
**basis** 38:6 68:4 76:2
86:18 87:3 89:23
114:7 119:7,10
150:5,9,11 200:14
222:14 236:3,4,5
247:12 313:16
314:25
**Bastiens** 149:22
181:11 217:7
221:4 240:7
287:18 290:10
292:16
**Bates** 65:9,14 95:3
96:25 97:6 104:23
153:3,7 155:9,13
155:22,25 266:3
309:11 349:16
350:4,5 352:15,16
352:19 353:15,24
354:2,3,5 356:22
356:23 357:8
364:13,17 369:24
370:5,7,9,12,14,17
**Beacon** 30:4
**bear** 229:12
**bearing** 65:9,13
96:25 153:3,7
155:9,13 349:16
357:8 369:24
370:4,6,9,11,14,16
**bears** 97:5
**beautiful** 222:4,20
**BEF** 188:19,24
**began** 72:13 112:10
**beginning** 56:25
57:3,7 81:21 102:7
109:16 111:14
117:13 136:5,7,9
136:22 152:23
159:20 202:21
255:5 327:3
**begins** 263:22
272:25 343:20
**Belgian** 14:10,13,19

16:14 74:4,8 76:10
88:2 144:24 152:3
229:20,20,24
271:4
**Belgium** 1:9,19 2:7
2:18 3:16 4:11 5:5
13:13,16,18 14:2,8
14:9,18 88:7 89:3
138:19,21 139:15
139:20 166:10
193:24 214:9
232:23 267:24
348:14 349:11
354:22 355:5
**belief** 69:10 220:23
335:20,24
**believe** 6:25 8:20
9:24 11:6 20:7
26:9 30:12 31:12
34:22 52:10 59:18
70:4 72:6,11 76:17
82:19 86:16 88:3
89:7,20 95:20
111:3 112:3 117:7
121:13 129:2
132:5,7,11 137:24
147:17 148:8
158:20 169:8
170:2 171:8 176:2
180:23 207:20
208:3,16 211:16
211:20 213:25
217:21 230:17
231:6,8 232:24
236:12 243:9
244:22 248:21
250:16 254:10
263:21,25 265:21
266:13 267:4
270:11 276:13
277:20,25 303:20
305:18 308:6
311:9 330:23
334:2,4,18,21,25
335:2 336:10,18

338:13 339:9,13
340:15,22 364:7
**believed** 250:14
328:16 329:19
331:7,19,25
332:12,21 335:12
338:17 341:7
**believes** 333:19
**believing** 76:2
**benefit** 196:19
**benefits** 196:11
**bent** 326:3
**Bernard** 188:3
**best** 28:22 87:6
88:25 109:21
205:11
**bet** 116:17 293:12
**better** 15:6 20:8
225:19
**beyond** 143:9
300:12 366:20
**big** 177:18 178:9
**bigger** 129:18
**bit** 303:9,13
**blanket** 283:17
**blindly** 92:20 93:5
**blossomed** 72:14
**board** 7:24 24:8,10
24:17 63:13,21
66:18 67:25 68:12
68:20 70:9 99:5
134:7 151:14
292:7
**body** 113:10,19
114:9,19,24
153:17
**Boies** 3:3 5:9,14
**book** 39:9 284:5,7
**booked** 191:18
197:22 257:20
**books** 11:14 23:14
48:10,14,24 49:5
158:22 160:22,22
161:9 201:23
290:20 316:25

317:4,5
**borrower** 201:17 280:12 343:7
**borrowing** 150:2
**bottom** 25:17 108:11,23 124:13 133:8,13 153:14 153:18 200:20,21 201:15 240:16 264:13 266:2 344:21
**box** 30:5
**boxes** 30:3,4,6
**boy** 238:16 252:11 301:5
**bracket** 193:24,24 195:16,16,16,17 195:23 197:23,23 201:17,19,19,25 275:13
**brackets** 193:7 202:2
**branch** 190:24 249:12 250:15,17 250:25 251:15,18 251:18,20 252:8 252:12,19
**break** 58:8 81:24 150:23 152:11,12 175:22 178:22 202:11 205:10 254:19 255:8 326:19
**breakdown** 65:20 97:20
**breaks** 71:15 213:21
**BRF&G** 191:9 208:17,17
**brief** 81:17 152:19 254:25 326:23
**bring** 17:4,5 22:11 39:15,16 151:4 192:22
**broad** 58:4,5
**BROADWAY** 372:3
**broke** 99:17
**broken** 112:7
**brought** 26:20,22,24 27:2 234:5 358:23 359:3,4,23
**Brown** 255:16 348:17 349:12 355:9,13 357:12 357:19 358:3,8 359:14,19,22 363:9
**Brussels** 14:2,3 91:8 113:25 121:20 123:10 129:15 131:13,20 140:2,5 140:11 166:9,11 166:12 167:6 194:25 198:10,25 199:2,9 328:11 342:9,15
**Bryan** 16:16 73:22 76:7 77:3,4,8,19 77:20,25 78:8 79:3 79:21 80:17,20,25 81:3 82:4,9,14 83:9,12,18,23 84:10,12,16,20,22 85:3,9 86:12,19 87:7,14,15 97:12 97:15,22,24 98:2 98:23,24 99:2,9 102:5,10 138:16 229:19 234:6,11
**BT** 196:13
**BTG** 130:7 133:18 166:9 196:14,17 196:21 197:18 199:15 305:6 342:23
**bud** 136:21 137:23
**bullet** 27:12 255:20 258:19
**Bulletin** 160:21
**business** 6:4 67:24 68:2,5,7,13,14,15 69:4 70:3 76:21 83:2 110:12 292:10 347:8
**businessmen** 347:6
**business-produced** 134:6
**Butler** 3:17 5:3,3,23 5:25 17:2,18 25:25 28:2,8 31:4,11 34:10,18,24 35:2 38:12 41:4,6,22,23 42:7,13,20 45:12 50:6,7,24 51:2,6 51:15,17 55:12 62:10 65:6 79:18 80:22 81:11,22 85:18,25 96:22 97:4 103:8 111:4 116:11 119:24 120:2,21 121:3 122:2,17,23 150:17 152:11,24 153:6,9 155:6,12 156:17 174:6,11 176:11,13 177:13 178:16 179:4,12 179:16 180:6,12 181:13 201:14 202:10 205:25 216:22 226:15 227:11,13 229:9 254:20 255:6 286:17 295:3 297:19 298:25 316:2 326:19 327:4 330:22 331:5 334:24 335:6,10 336:6,11 336:19 337:9,15 337:25 338:10 345:14,15 348:2 348:25 350:20 351:2,18 357:3 359:6 362:12,24 365:20 366:8,16 367:2,7 369:8
**buys** 201:22
**B-E-F** 193:7
**B6799** 293:6

**C**

**c** 3:2 5:20 199:21 276:21 279:8,10 298:4 303:7 336:18 368:2,2
**calculate** 112:15 125:16,21
**calculated** 124:12 126:15 128:22 135:17
**calculating** 122:8
**calculation** 122:5
**calculations** 125:24
**call** 18:13,17 30:4 34:11 118:22 158:13 162:17 205:6 356:23 366:22
**called** 5:20 11:13 97:13 308:15
**calls** 17:16,19,24 18:16 34:7 53:8,9 145:10 235:13 317:10 333:6
**capability** 299:17
**capital** 1:4 35:21 192:23 193:19 199:21,21,22 200:15 267:19 269:8 280:14
**caption** 198:2
**capture** 30:23
**care** 51:19 83:6 222:23 288:15,17
**carefully** 331:24
**cares** 175:25
**carried** 313:15 314:24
**carries** 343:20
**cart** 164:2

**CAs** 11:12
**case** 4:10,11,13,16 6:10,23,24 8:3 14:24 15:8,19 16:21 19:10 22:6 22:16,18 26:10,17 30:10 31:17 32:8 53:23 73:9 116:12 146:21 171:19 176:8 177:21 188:22 190:14 191:12 200:3 206:17 207:15 224:24 225:3,6,7 225:17 226:4,18 226:19,23 227:9 227:24 228:3 229:13,14,16 236:10 254:8 299:23 326:9 348:11 349:20 372:5
**cases** 20:5 256:18
**cash** 280:12 284:8
**casual** 296:9 297:5 297:14,24
**catch** 43:8 136:12
**categories** 124:3 347:12
**category** 129:7 135:16 307:20
**cause** 73:8 76:17 124:23
**caused** 19:25 70:15 114:14,14
**cautioned** 77:11
**Cave** 16:16 73:22 76:7 77:3,4,8,19 77:20,25 78:8 79:3 79:21 80:17,20,25 81:3 82:4,10,14 83:10,12,18,23 84:11,12,16,20,23 85:3,9 86:12,19 87:7,14,15 97:12 97:15,22 98:2 99:2 99:9 102:5,10 138:16 229:19 234:6,11
**caveat** 112:7
**Cave's** 97:24 98:23 98:24
**CBE** 15:13
**CDS** 141:11,12 200:10 280:9
**century** 11:11
**certain** 7:17 10:15 12:13 23:2 27:9 29:22 46:11 85:3 101:6 111:25 132:18 140:23 147:23 148:13 191:6 325:2 348:16,20
**certainly** 30:18 141:8 171:11 179:15 195:7 198:16 212:8 213:6 218:14,15 244:24 292:25 311:24 362:23
**certified** 6:15,17,18 7:19,21 8:18 9:19 9:20,22 10:6,9,14 10:16,20,23 12:2 12:12,18 15:12 24:23 256:16
**certify** 368:7,12
**Cf** 195:23
**CFE** 8:25 12:11
**CFO** 154:6 165:9,25 167:13 347:18,22 348:7,18 349:10
**chair** 7:22
**chaired** 151:15
**Chance** 1:21 3:14 4:19 5:4,8
**change** 65:25 66:2 77:13 81:13 104:11,16 109:10 124:2 163:8 202:11 235:18 326:20 372:7
**changed** 159:6
**changes** 158:15 159:2 160:11
**character** 74:22 187:14 189:5 208:15 209:13 210:2 211:13,19 212:12 241:9 246:5 280:12
**characteristics** 191:23 195:22 214:20 220:9 258:8 363:21,25
**characterization** 260:14
**characterize** 138:11 138:13 257:24
**characterized** 128:10 138:17,18 191:17 257:19
**characterizing** 138:15 139:5,9
**charge** 16:14 292:10
**charges** 16:13,15 74:10 138:23
**chart** 65:19 67:16 70:11 75:13 77:6 80:14 88:4 90:18 91:2 93:8,13 94:11 94:23 95:4,4,11 96:8,17 98:18 99:10,11 101:18 101:20 106:25 107:2,17,19 108:5 110:25 111:5,9 114:8 120:17 130:6 132:7 133:17 139:24 140:5 237:16
**charter** 12:18
**charts** 63:4 81:6 107:12
**cheat** 175:21
**check** 311:16
**checked** 310:24
**Chief** 153:19 292:8 292:9
**Chin** 22:7
**Chris** 4:21
**Christopher** 3:21
**chronology** 250:6 250:10
**circum** 339:23
**circumstances** 7:17 195:6 196:25 198:15 312:17 313:20 314:14 320:5 321:6,14 323:15 325:19 327:22 333:2 335:17 338:22 340:4 341:12
**circumvent** 38:19 247:24 314:6
**circumventing** 38:25
**cite** 65:16 80:8 81:5 94:11 95:11 96:20 101:13 248:11,13 254:16 270:11 308:22 309:8,9 343:18 350:8 364:4
**cited** 37:21 80:21 162:10,13 237:3 244:4 245:6,18 263:13 303:11,14 309:11 327:8
**cites** 39:11
**City** 4:24
**civil** 1:2 2:2,12 366:7
**Claeys** 189:4
**clarifi** 160:9
**clarification** 160:9
**clarify** 33:19 34:25 35:11 89:25

308:17 346:12
**clarity** 351:17 362:13
**class** 205:24
**classic** 172:12
**classified** 194:24 195:7 198:9 311:24
**classroom** 299:22
**CLDCs** 115:6
**clear** 36:10 38:18 51:16 52:2 53:7 92:11 94:25 105:22 120:10 126:25 142:15 143:6 148:3 179:2 179:5,8 212:22,24 222:7 251:21 270:3 278:19 280:3 291:13 292:21 293:15 297:6 310:19,20 310:20
**clearly** 8:25 19:20 46:12 59:2 84:8 102:20 150:4,14 200:8 216:21 251:5,6 275:19 280:23 289:25 299:5 342:4
**client** 21:4 138:24 176:21 199:25 200:6 227:4 233:9 294:10
**client's** 138:19
**Clifford** 1:20 3:14 4:18 5:4,7
**cloaked** 317:2,3
**clock** 86:6
**Cloet** 222:2
**close** 54:16 193:24 195:17 201:17,18 201:19
**closed** 195:15 201:25
**closely** 195:12 273:24 274:6,13
**coach** 122:3 336:7
**coaching** 122:6
**Coen** 264:19 271:21
**Coen's** 194:2 264:9 270:13
**collaborate** 44:9
**collaborator** 172:9
**collateral** 280:14
**collect** 324:6
**collectable** 322:5
**collectively** 265:15
**college** 151:7
**collusion** 33:15 43:19
**colon** 263:17
**coloring** 158:25
**come** 8:15 15:11 17:2,3 18:5 92:8 93:22 100:15 105:15 119:22 124:18 127:15,24 147:7 158:19 159:15 209:23 235:16 240:13 247:9 302:24 303:2
**comes** 73:18 74:13 74:15 98:23 106:21 108:3,12 108:14 126:22 131:18 134:16 136:22 144:23 147:9 196:2 206:16 207:14 221:12 236:24 262:22 272:18 295:9 311:3 356:13
**comfort** 78:24 79:6 79:10 82:12 84:17 88:17
**comfortable** 86:25 94:4,7 106:17
**coming** 72:18,19 125:3 134:11 146:13 161:9 165:7 168:14 232:13 241:24 249:18
**comments** 206:10 214:5 247:20
**commercial** 189:21 195:3 196:22 198:12 247:5 311:20 312:13,19 313:18 314:4,8 318:8,14 320:17 321:3,11,22 323:5 323:12,25 325:16 327:20 328:8,17 329:21,23 331:8 331:11 332:2,23 333:3 335:14 338:19 339:21,25 341:9
**commercialization** 188:16 242:25
**commercialize** 192:14 201:7
**commercializing** 190:20 249:7 253:6
**commission** 197:8 220:16 372:25
**commit** 137:15
**commitment** 200:13 201:8 253:16,17
**committed** 9:13 72:8 92:22,24 119:11 143:25 222:21 231:20 233:8,10
**committee** 7:23 70:9 102:12 151:16 192:8 197:25 262:4 309:10 310:15
**committing** 138:2
**common** 252:18 299:6
**communicate** 219:14
**communicating** 215:3
**communication** 220:18
**communications** 218:16 225:12 228:11 229:3,24
**companies** 10:18 46:7 60:22 88:9,10 88:11,11 109:2 113:5 137:10,11 191:24 193:20,23 201:5,12 243:4 258:9 267:20,23 269:9 280:21 299:4 319:14,15 319:17 322:25 323:22,25 324:2 326:11
**company** 1:6 9:17 20:24 23:15 30:5 34:5 35:8 40:11 46:22 47:7 48:11 54:7 59:8,12 60:13 60:15,20 62:8 63:25 68:3,6,23 70:2 71:12 75:25 117:3 150:7 151:11 173:19 189:17,21,23 196:18 213:14 217:4 218:17 241:4 247:3,6,8,11 259:8,15 269:13 274:11 275:25 276:4 277:3,10 282:22 284:13,23 285:14,18 287:13 289:8 291:21,22 292:17 296:6,7,15 297:8 299:7,13,16

300:5,23 301:2,3,5
319:3 322:24
**company's** 31:23,25
32:5 34:3 36:12,14
40:16 43:3 44:18
44:21 48:6 55:7
56:19 59:6 60:2,3
61:11 62:3,4,8,15
62:20
**compensation**
188:17,22 196:16
197:19
**competence** 54:20
54:21
**competency** 58:24
**competent** 54:11
110:19
**complete** 32:15,18
32:21 162:5,19
164:6,23 202:3
224:19 225:11
227:19 252:24
298:23 324:10
**completely** 22:16
101:7 195:15
275:8 276:4 277:4
279:4,12 281:4
286:22 289:4,9
294:13
**completeness** 31:24
32:10 35:25 36:14
40:16 43:2 44:20
61:10
**completion** 201:4
**compliance** 278:8
322:18
**complicated** 283:15
**complied** 167:16
**comply** 89:15
167:12 170:19
189:10 278:7
279:6,7 287:3
288:12 305:8
**complying** 170:5,7
170:20

**component** 222:6
**conceal** 172:18
173:19 175:7,12
218:18
**concealed** 144:16
172:8 228:23
**concealment** 144:17
172:10
**concepts** 25:5,6
**concern** 346:13
**concerned** 133:4
353:25 359:25
**concerning** 165:18
202:6 229:5
257:12 303:21
304:20 311:10
313:5
**concerns** 239:12
**concert** 248:4
**conclude** 17:13
130:23 230:9,25
234:16,21 235:8
238:12 247:13
268:8
**concluded** 130:11
131:6 197:16
200:10 367:9
**concludes** 236:11
**conclusion** 18:5
34:8,11 45:11
84:21 133:21
145:10 226:5
231:12 234:21
235:17,19 240:18
240:22 251:11
257:10 261:2
262:9 270:15
302:24 303:3
333:18
**conclusions** 15:11
17:15,21 145:21
177:19 226:11
236:9
**Concretely** 197:9
**condition** 258:6

**conditions** 197:11
311:23 320:13
**conduct** 229:15
**conducted** 99:4
229:17
**conducting** 56:10
68:15 76:25 77:2
**confederates** 172:2
**confer** 366:17
**confirm** 26:11 49:6
90:2 153:15
**confirmation** 52:17
54:16,25 55:15
**confirmations** 55:18
58:23
**confirming** 344:9
**conform** 37:15
**conformity** 197:12
**confuse** 36:8
**confused** 124:8
129:10 233:11
256:20 309:19
**confusing** 317:7
**confusion** 317:19
**connect** 150:2
**connected** 185:19
269:12,14 288:22
**Connecticut** 6:7
**connection** 192:16
226:22 262:15,20
273:16 289:2
307:4,10 318:2
319:13,22
**connections** 319:15
**connotation** 328:22
**connotations** 329:18
**consent** 188:18
**consequence** 315:12
**consequently** 55:24
191:17 196:14
199:19 202:4
257:19 287:10
**consider** 13:12
282:24
**consideration**

180:23 184:18
197:4 221:6 226:3
236:6 246:7 248:9
324:8
**considered** 16:12
28:19,24 29:17,19
138:21,22 192:2
196:22 205:8
258:11
**consistency** 47:13
**consistent** 83:19,20
83:23 88:3 89:9
**consistently** 47:9,10
**consolidated** 2:2,13
4:12,14 14:4
**Consortium** 91:8
112:17,19 113:18
121:19 123:10
129:3 166:8
187:13 188:11
192:14 194:6
208:14 209:12,25
211:11 220:4,8
221:18 228:14
229:5 230:5,23
232:16 242:21
243:20 250:17
251:14 253:18
257:16 269:2
271:7
**constantly** 115:8
**constitute** 196:18
**construction** 222:17
**consult** 282:11
**consulting** 282:15
**contact** 190:4 243:3
246:4 247:4
**contain** 77:5 79:22
80:2
**contained** 31:25
36:21 67:15 79:23
80:4 82:6 83:18
85:9 86:12 87:6
90:4 96:16 103:5,6
103:13 105:6,7

112:16 114:8,8,21
121:7,12 206:5
**contains** 125:10
353:10
**contemporaneously**
135:4
**content** 266:12
**contents** 181:3
238:11
**context** 34:14 167:9
168:15,25 284:19
326:10,10
**continually** 115:9
**continue** 12:14
41:14 86:8 136:5
136:11 152:14
156:19 173:17
181:15 202:12
**continued** 35:2
42:20 51:17 63:25
75:25 81:22
122:23 153:9
177:13 180:6
255:6 327:4 331:5
335:10
**continues** 136:10
**continuing** 29:8
82:16 105:25
154:4
**continuum** 244:13
**contract** 234:9
324:13,14
**contracts** 188:14
189:12,18,19
190:3 242:17,24
322:2
**contrary** 176:5
**contribute** 38:21
**control** 119:4 191:6
197:18 279:18
298:7,10,11,16
299:9,19,20,21
300:2 301:4
**Cont'd** 370:2
**convention** 35:15

**conventions** 23:6,11
**conversation** 149:10
177:8,16
**conversations** 149:5
173:24 174:4,5,9
174:14,20 176:17
177:3,15,17,24
**convinced** 21:3
**copied** 204:25
345:22
**copies** 155:21
**copy** 26:9,12 265:25
353:14 357:2
**copyright** 159:16,17
**corner** 97:6
**CORP** 1:10 2:8,19
**corporate** 263:9
**Corporation** 1:4
14:8
**correct** 6:11,12 7:20
8:18,19 11:19,20
16:4 18:14 32:11
36:15 48:21 62:23
67:4,22 75:10
82:13 89:22 90:5
100:25 104:12,16
105:25 106:2
112:5,5 113:21
119:15 124:23
129:8,19 130:2,9
130:14 131:14,15
131:24 132:3,9
133:14,15 135:2
135:19 140:16
141:2 145:3,22
146:21 152:4
154:9 156:4,13
158:6 171:5
181:17 190:6
199:16 207:24
241:14,17 251:13
263:20 268:5
270:8,9 293:24
305:7 307:18,22
309:24 328:19

342:24 344:20
345:15 355:16
358:5,6 364:5
365:3,25
**corrections** 63:23
75:23 76:3
**correctly** 42:22
75:11 88:23
161:11 318:21
340:11 346:6
366:11
**correlate** 101:12
**correlation** 101:5,8
127:13
**correlations** 102:9
**correspond** 104:10
**correspondence**
93:24 203:14
206:25 229:22
**corresponds** 98:7
**corroborate** 44:8
**cost** 9:16 196:13
**costs** 196:17
**Cotler** 3:12 5:12,12
**counsel** 4:25 20:21
22:10,20,20 60:8
76:18 81:10
108:22 121:9,14
144:21 173:15
188:4 190:8
349:12 350:18,25
352:3
**counselor** 21:10
39:17 109:13
146:17 210:22
220:25 226:7
**count** 54:15 203:4
**counting** 131:19
**country** 13:24
**couple** 24:10 27:5
**course** 7:24 10:15
11:10,17,25 25:3
27:20 67:24 68:7
68:14 69:3 70:3
73:2 76:21 83:2

120:4 171:15
197:21 253:7,11
358:24
**courses** 10:8,11,12
10:13 12:17 13:20
57:24
**court** 1:1 2:1,11
4:16,22,23 5:18
22:2,6 178:23
179:2,12 336:25
337:20 338:2
366:19
**cover** 60:7 157:13
219:22
**covered** 198:4
**covers** 219:22
**CPA** 9:2 10:21 11:9
11:10,15,18,22
12:7 13:2 15:12
205:20 300:3
358:18
**CPAs** 11:11 205:17
205:24
**CPA's** 10:17
**create** 326:16
**created** 11:11 73:12
277:19
**creates** 281:12
282:4 284:15
285:17 289:11,14
**credentials** 151:5
**credibility** 283:5
**credit** 20:19 141:12
142:9 149:11,13
149:14 150:4
151:17,18,18,23
151:24 152:3,9,10
167:21 173:3,5
182:13 183:15
185:15 186:2,11
186:17,24,24
190:15 194:5,9,12
194:19 196:4
239:20,21 240:8
273:13 280:16