# EXHIBIT B

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


--------------------------------x
STONINGTON PARTNERS, INC., a
Delaware Corporation, STONINGTON
CAPITAL APPRECIATION 1994 FUND
L.P., a Delaware Partnership
and STONINGTON HOLDINGS, L.L.C.,
a Delaware limited liability
Company,

        Plaintiffs,

      vs.        No. 04-CV-10411
                (PBS) Consolidated
DEXIA, S.A. and DEXIA BANK
BELGIUM (formerly known as
ARTESIA BANKING CORP., SA),

        Defendants.
--------------------------------x
GARY B. FILLER and LAWRENCE
PERLMAN, Trustees of the TRA
Rights Trust,

        Plaintiffs,

      vs.        No. 04-CV-10477
                (PBS) Consolidated
DEXIA, S.A. and DEXIA BANK
BELGIUM (formerly known as
ARTESIA BANKING CORP., SA),

        Defendants.
--------------------------------x
(Caption continues on the following page.)


Job No: 192557

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 2

```
 1
 2    --------------------------------x
      JANET BAKER and JAMES BAKER,
 3    JKBAKER LLC and JMBAKER LLC,
 4          Plaintiffs,
 5        vs.     No. 04-CV-10501
                  (PBS) Consolidated
 6    DEXIA, S.A. and DEXIA BANK
      BELGIUM (formerly known as
 7    ARTESIA BANKING CORP., SA),
 8          Defendants.
      --------------------------------x
 9
10
11
12      VIDEOTAPED DEPOSITION OF DAVID LARUE
13            New York, New York
14         Wednesday, March 21, 2007
15
16
17
18
19
20
21   Reported by:
     LESLIE FAGIN
22   JOB NO. 192557
23
24
25
```

Page 3

```
 1
 2            March 21, 2007
 3            9:15 a.m.
 4
 5      Deposition of DAVID LARUE, held at
 6   the offices of Boies, Schiller & Flexner
 7   LLP, 575 Lexington Avenue, New York, New
 8   York, pursuant to Notice and Federal
 9   Rules of Civil Procedure, before Leslie
10   Fagin, a Notary Public of the State of
11   New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2   APPEARANCES:
 3
 4   BOIES, SCHILLER & FLEXNER LLP
 5   Attorneys for Plaintiffs
 6      255 South Orange Avenue
 7      Suite 905
 8      Orlando, Florida 32801
 9   BY:  GARY K. HARRIS, ESQ.
10      KAREN DYER, ESQ.
11
12   CLIFFORD CHANCE
13   Attorneys for Defendants
14      31 West 52nd Street
15      New York, New York 10019
16   BY:  JEFF BUTLER, ESQ.
17      ANDREAS FRISCHKNECHT, ESQ.
18
19   ALSO PRESENT:
20      NORMAN S. ROTH
21      STEPHANIE HOLLYMAN, Videographer
22
23
24
25
```

Page 5

```
 1
 2          IT IS HEREBY STIPULATED AND AGREED,
 3   by and between the attorneys for the
 4   respective parties herein, that filing
 5   and sealing be and the same are hereby
 6   waived.
 7          IT IS FURTHER STIPULATED AND AGREED
 8   that all objections, except as to the
 9   form of the question, shall be reserved
10   to the time of the trial.
11          IT IS FURTHER STIPULATED AND AGREED
12   that the within deposition may be sworn
13   to and signed before any officer
14   authorized to administer an oath, with
15   the same force and effect as if signed
16   and sworn to before the Court.
17
18
19
20
21
22
23
24
25
```

ESQUIRE DEPOSITION SERVICES
212-687-8010

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 6

1
2      THE VIDEOGRAPHER: Good morning.
3  Here begins videotape No. 1 in the
4  deposition of David Larue in the matter
5  of Stonington versus Dexia, Case No.
6  04-CV-10411 Consolidated, with Filler v.
7  Dexia, Case No. 04-CV-10477
8  Consolidated, with Baker v. Dexia, Case
9  No. 04-CV-10501 in the U.S. District
10  Court, District of Massachusetts.
11      This deposition is being taken at
12  Boies Schiller & Flexner in New York and
13  was made at the request of Karen Dyer of
14  the law offices of Boies Schiller in
15  Orlando, Florida.
16      The certified legal videographer is
17  Stephanie Hollyman here on behalf of
18  Esquire Deposition Services located at
19  216 East 45th Street New York.
20      Would counsel and all present
21  please identify yourselves and state
22  whom you represent.
23      MR. HARRIS: Gary Harris, Boies,
24  Schiller & Flexner for the Baker
25  plaintiffs.

Page 7

1              D. Larue
2      MS. DYER: Karen Dyer, Boies,
3  Schiller & Flexner for the Baker
4  plaintiffs.
5      MR. BUTLER: Jeff Butler, Clifford
6  Chance, representing Dexia Bank Belgium.
7      MR. FRISCHKNECHT: Andreas
8  Frischknecht, also of Clifford Chance,
9  representing Dexia Bank Belgium.
10  D A V I D   L A R U E,  called as a
11  witness, having been duly sworn by a
12  Notary Public, was examined and testified
13  as follows:
14  EXAMINATION BY
15  MR. HARRIS:
16      Q.  Could you please state your full
17  name and business address for the record?
18      A.  My name is David Wayne Larue.  My
19  address is 1358 Hunters Field Close, Keswick
20  Virginia 22947.
21      Q.  And what business is located there?
22      A.  That's my home residence.  It's
23  also where I have my home office.
24      Q.  Is that the only place at which you
25  are employed?

Page 8

1              D. Larue
2      A.  No, sir.  I work at the University
3  of Virginia as an associate professor, that's
4  University of Virginia, McEntyre School of
5  Commerce in Charlottesville, Virginia.
6      Q.  Do you have an address on campus?
7      A.  Room 251, Monroe Hall.
8      Q.  Sir, do you prefer to be addressed
9  as doctor or mister today?
10      A.  Either.
11      Q.  Mr. Larue, I will hand you a
12  document that I will ask the court reporter
13  to mark as Larue Exhibit 1 and ask if you can
14  identify this for me.
15          (Curriculum vitae of David Larue
16      marked Larue Exhibit 1 for
17      identification.)
18      A.  Yes, this appears to be a printout
19  of the University's website description of --
20  brief description of my background.
21      Q.  You have seen this website before?
22      A.  I have.
23      Q.  To the best of your knowledge, is
24  it accurate?
25      A.  I haven't looked at it in quite

Page 9

1              D. Larue
2  sometime, but I have every reason to believe
3  it would be accurate.
4      Q.  Did you participate in preparing
5  Larue Exhibit 1?
6      A.  I did, yes.
7      Q.  Did you review it prior to its
8  being posted on the University of Virginia's
9  website?
10      A.  I don't recall whether I did or
11  not, it's been a while.
12      Q.  Is it fair to say in this
13  description of yourself and your professional
14  activities, that it identifies those
15  experiences in your career that you want
16  people to know about?
17      MR. BUTLER: Objection to form.
18      A.  It includes excerpts from my
19  resume.
20      Q.  How did you decide which excerpts
21  from your resume to post on the University of
22  Virginia's website?
23      A.  The University for all faculty
24  members they typically have a brief summary
25  your professional activities, background and

3  (Pages 6 to 9)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 10

D. Larue

1  then selected publications, so whatever their
2  format was that's the format that was
3  followed here.
4      Q. But, perhaps my question wasn't
5  clear. You said it is excerpts of your
6  resume?
7      A. Yes, sir.
8      Q. How did you decide which portions
9  of your professional activities did you -- to
10 list on the University of Virginia website?
11     A. Well, the website, there is a page
12 restriction of some sort, so you just provide
13 your resume and I think maybe a couple of
14 descriptions. They make a decision as to
15 what to put up there and whatnot.
16     Q. So you didn't decide which
17 activities to include within the website from
18 your resume?
19     A. Gosh, that's a -- it's been a
20 while. I just gave them a summary of my
21 background and a copy of my resume, they made
22 a decision as to how to format that and what
23 information to include that was consistent
24 with the information that had been presented
25

Page 11

D. Larue

1  for other faculty members.
2      Q. Did that summary that you provided
3  include a summary of your professional
4  activities?
5      A. I see here that it does, yes.
6      Q. And it does not include all of your
7  professional activities, correct?
8      A. That's correct.
9      Q. How did you decide which
10 professional activities to include in your
11 summary and which to not include?
12     MR. BUTLER: I object. I think he
13 answered that question.
14     You can answer.
15     A. I don't recall.
16     Q. Are you a certified public
17 accountant?
18     A. No.
19     Q. Are you a certified fraud examiner?
20     A. No, sir.
21     Q. Let me hand you a document which we
22 will mark as Larue Exhibit 2 and ask if you
23 can identify it for me.
24     (Form 10-K marked Larue Exhibit 2
25

Page 12

D. Larue

1  for identification.)
2      A. This is, reading from the cover
3  page, this is the Form 10-K filed by
4  Microstrategy Corporation with the SEC and it
5  appears to be for the fiscal year ending
6  December 31, 2006.
7      Q. And are you currently a director of
8  Microstrategy Incorporated?
9      A. Yes, sir, I'm an outside director.
10     Q. You were a director at the time
11 that Larue Exhibit 2 was filed with the SEC?
12     A. Yes, sir, I was.
13     Q. Did you sign Larue Exhibit 2?
14     A. Yes, sir.
15     Q. And prior to signing it, did you
16 read it?
17     A. Yes, sir.
18     Q. Did you understand it?
19     A. Yes, sir.
20     Q. Was there anything in there you
21 didn't understand?
22     A. I don't recall that there was.
23 It's a lengthy document.
24     Q. You would, as a director, if there
25

Page 13

D. Larue

1  was something in the 10-K you didn't
2  understand, you would ask someone to explain
3  it to you?
4      A. If I was concerned about it, yes, I
5  would.
6      Q. Do you recall asking anybody to
7  explain anything in Larue Exhibit 2 to you
8  before you signed it?
9      A. Well, that's the -- we have audit
10 committee meetings and board of directors
11 meetings over which we go through drafts of
12 the 10-K.
13     During those meetings, we discuss
14 various members of the board and the audit
15 committee discuss various issues with
16 management, with the CEO, with external
17 auditors with the internal control folks and
18 we discuss a variety of issues. The meeting
19 pretty much lasts the better part of the day.
20     Q. And so prior to your signature, you
21 had reviewed drafts of the 10-K?
22     A. That's correct.
23     Q. And you had an opportunity to fully
24 understand it, correct?
25

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 14

1                    D. Larue
2        A.  I had an opportunity to understand
3    it to the degree that I needed to understand
4    it, yes.
5        Q.  If you turn to what is labeled at
6    the top page 58 of 96, but, internally, it is
7    page 51 of Larue Exhibit 2?
8        A.  Yes, sir, I'm there.
9        Q.  Do you know what this is?
10        A.  This is the report of the
11    independent registered public accounting
12    firm.
13        Q.  And is it your understanding that
14    such a report is required with regard to all
15    public companies?
16        A.  Public companies that are required
17    to file with the SEC, yes.
18        Q.  So this is not an unusual document
19    for you to have seen?
20        A.  Not at all.
21        Q.  Is this type of document that is
22    reflected on pages 51 and 52 of the internal
23    and 58 and 59 of '96 have a shorthand name in
24    the profession?
25        A.  This is the auditor's report.

Page 15

1                    D. Larue
2        Q.  The auditor's report?
3        A.  The auditor's opinion.
4        Q.  Would you prefer I refer to this as
5    an auditor's report or auditor's opinion?
6        A.  Auditor's report is fine.
7        Q.  If I use the term auditor's report
8    throughout the day, you will understand that
9    I am referring to the type of document that
10    is reflected on internal pages 51 and 52 of
11    Larue Exhibit 2?
12        A.  That's correct.
13        Q.  And is the -- Microstrategy's
14    independent registered public accounting firm
15    for the year ending December 31, 2006 was
16    Graham Thorton LLP, correct?
17        A.  Yes, sir.
18        Q.  And they performed certain audit
19    procedures prior to issuing their report,
20    correct?
21        A.  Yes, sir.
22        Q.  Have you ever signed an auditor's
23    report with regard to a public company that
24    is required to file with the SEC?
25        A.  No, sir.

Page 16

1                    D. Larue
2        Q.  Have you ever performed an audit
3    relating to a public company that is required
4    to file with the SEC?
5        A.  Are you asking me did I ever
6    participate in the performance of an audit
7    under GAAP for the purposes of preparing
8    financial statements to be filed with the
9    SEC?
10        Q.  Yes.
11        A.  No, I haven't.
12        Q.  Have you ever conducted a fraud
13    examination?
14            MR. BUTLER:  Objection to form.
15        A.  You would have to define fraud
16    examination for me.
17            In connection with some of the work
18    that I have done as an expert witness, I have
19    conducted a number of forensic analyses
20    primarily in the conduct of civil tax
21    disputes or civil issues dealing with the
22    application of generally accepted accounting
23    principles or economic analysis or other
24    things.
25            In one case, I did -- in one case,

Page 17

1                    D. Larue
2    the defendant was charged with criminal tax
3    conspiracy, so forensic analysis, yes, I've
4    conducted many of those.
5        Q.  Have you ever conducted a forensic
6    analysis outside of the conduct of a tax
7    investigation?
8        A.  The litigation involved tax issues.
9    My forensic analysis typically involved
10    economic or financial analyses or analyses
11    that were designed to determine the
12    application of generally accepted accounting
13    principles.
14        Q.  Have you ever, just so it is clear,
15    have you ever conducted a forensic
16    examination in any context in which the
17    issues of tax were not present?
18            MR. BUTLER:  I object to the form
19    of the question.
20            You can answer, sir.
21        A.  No, I believe in the all of the
22    expert witness engagements I've been
23    involved, in the issue in dispute ultimately
24    was a tax issue, so that's outside of the
25    classroom, inside the classroom we use

ESQUIRE DEPOSITION SERVICES
212-687-8010

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 18

D. Larue

1 business cases and so forth.
2 Q. So with regard to non-tax related
3 forensics examination, it's fair to say that
4 your experience is limited to classroom, is
5 that correct?
6 MR. BUTLER: Objection to form.
7 A. I wouldn't agree with that. The
8 litigation I was involved in had tax issues
9 that were being litigated. My role in many
10 of these cases was to opine as to whether or
11 not generally accepted accounting principles
12 were applicable or what those principles were
13 or to do economic analyses or financial
14 analyses. My role was not to opine on tax
15 ramifications.
16 Q. Mr. Larue, have you ever conducted
17 a forensic examination other than as an
18 expert witness?
19 A. Some time back, I did some due
20 diligence work in connection with mergers and
21 acquisitions.
22 Q. And what type of due diligence work
23 did you do?
24 A. Looking through financial

Page 19

D. Larue

1 statements, looking at books and records.
2 Q. And was that -- is it fair to say
3 your understanding with regard to most
4 mergers and acquisitions, the buyer and the
5 seller conduct due diligence?
6 A. Yes, sir, they normally do.
7 Q. Was your due diligence the ordinary
8 type of due diligence one does with respect
9 to mergers and acquisitions?
10 A. Ordinary due diligence. I would
11 say it's customary to do a due diligence
12 analysis of the financial statements and
13 books and records and old tax returns and so
14 forth of the buyer and the seller.
15 Q. Would you consider the due
16 diligence you did to be a forensic
17 examination?
18 A. I think I would put that label on
19 it, yes, sir.
20 Q. So that the investment bankers who
21 do due diligence in mergers and acquisitions
22 in your mind do forensic examination of
23 account statements, is that correct?
24 MR. BUTLER: Objection to form.

Page 20

D. Larue

1 A. That may be true. Forensic
2 examinations are part of the due diligence
3 process, certainly not the totality.
4 Q. And are there any qualifications
5 that are required to conduct the type of
6 forensic examinations that you have described
7 in the context of due diligence for mergers
8 and acquisitions?
9 A. When you say, qualifications, I'm
10 not sure what you mean.
11 Q. Could I do it?
12 A. Do you have a finance accounting
13 and economics background?
14 Q. Sure.
15 A. If you have the knowledge to be
16 able to conduct those kinds of analyses, I
17 think that's what people are concerned about.
18 Q. Okay. So there is no particular
19 degree or certification that is required that
20 conduct the type of forensic examination that
21 you conducted in the context of due diligence
22 with regard to mergers and acquisitions,
23 correct?
24 A. When you say, degree required, do

Page 21

D. Larue

1 you mean required in a legal sense?
2 Q. Well, it is my understanding, and I
3 don't know this for sure and we will see this
4 for sure, can anyone perform brain surgery?
5 A. No, they can't.
6 MR. BUTLER: Objection. This
7 doesn't make any sense for me. Your
8 questioning is getting a little bit
9 ridiculous, but go ahead.
10 Q. And why do you believe that not
11 everyone can do brain surgery?
12 A. Well, it requires, obviously,
13 specialized background training and
14 experience.
15 It also requires, I would guess,
16 understate law, it requires that you have the
17 appropriate medical licenses.
18 Q. And is it your understanding that
19 understate law, certain licenses are required
20 to perform audits of public companies?
21 A. To express an opinion on the
22 financial statements under generally accepted
23 accounting principles, you're generally
24 required to be a CPA.

6 (Pages 18 to 21)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 22

D. Larue

1
2  Q.  And you are not, is that correct?
3  A.  That's correct.
4  Q.  And so in the context -- is there
5  any license that is required by the State, to
6  your knowledge, to be able to perform a
7  forensic examination of the type that you
8  have described with regard to due diligence
9  in the context of mergers and acquisitions?
10   MR. BUTLER:  Can you clarify what
11  state you're asking about?
12  Q.  Any.
13  A.  To perform a forensic analysis?
14  Q.  Of the type that you've described
15  in the context of due diligence work for
16  mergers and acquisitions.
17  A.  I don't believe there is any formal
18  legal requirement for a particular
19  certification or license generally.
20  Q.  Now, other than -- have you ever
21  advised a public company that is required to
22  file with the SEC regarding revenue
23  recognition under generally accepted
24  accounting principles?
25  A.  In my capacity as chairman of the

Page 23

D. Larue

1
2  audit committee for Microstrategy, I'm
3  involved in the oversight process and work
4  with the CFO, the director of internal
5  controls, with management, the other members
6  of the audit committee, with the external
7  auditors in terms of examining GAAP issues as
8  they apply, among other things, to revenue
9  recognition.
10  Q.  Other than Microstrategy, have you
11  ever provided advice to a public company
12  required to file with the SEC regarding
13  revenue recognition under generally accepted
14  accounting principles?
15  A.  Not directly to a public company,
16  but certainly in conjunction with work that I
17  have done for some of the public accounting
18  firms.
19   I'm always asked for my advice on
20  various issues that the participants in my
21  classes are involved with.
22  Q.  But that's in the general context
23  of providing advice under an academic
24  structure. I'm talking about with regard to
25  a particular public company.

Page 24

D. Larue

1
2  A.  Not -- let me go back to your
3  predicate.
4   In an academic context, I would
5  disagree with that.  In some of the training
6  programs that I have taught, the people who
7  are in those training programs are partners
8  or managers or senior managers who are
9  working with clients.  The questions that
10  they typically ask me are sometimes academic
11  questions, but there are other times -- I
12  have a client who has a particular situation.
13  Let me describe the facts to you and could I
14  get your advice on how this should be
15  handled?
16   So in that sense, the advice that I
17  render is not to them, is not dealing with
18  academic issues.  It's dealing with
19  practical, real world issues that these
20  individuals are facing.
21  Q.  To your knowledge, did the public
22  company authorize those questioners to seek
23  your advice?
24  A.  I have no knowledge one way or the
25  other.  Whoever the public company would have

Page 25

D. Larue

1
2  been, I wouldn't have been notified as to the
3  identity of the public company.
4  Q.  So, to your knowledge, other than
5  Microstrategy, you cannot identify a single
6  public company that you have provided advice
7  to regarding revenue recognition under GAAP,
8  correct?
9  A.  Not that I recall.
10  Q.  And is it fair to say that no
11  public company has ever retained you to
12  provide for the purpose of providing revenue
13  recognition advice?
14  A.  Again, as chairman of the audit
15  committee, that's part of my oversight
16  responsibilities, so in that capacity, yes.
17  Q.  So as the chairman of the audit
18  committee of Microstrategy?
19  A.  That's correct.
20  Q.  Other than Microstrategy, have you
21  ever been retained by a public company to
22  provide it with advice regarding revenue
23  recognition under generally accepted
24  accounting principles?
25  A.  No, sir.

7 (Pages 22 to 25)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 26

D. Larue

1
2    Q.   Looking at Larue Exhibit 1, it
3  identifies you as an associate professor of
4  commerce?
5    A.   That's correct.
6    Q.   What is an associate professor?
7    A.   I am an associate professor with
8  tenure at the University of Virginia.
9    Q.   What does associate professor --
10    A.   It's a rank.
11    Q.   Is it the highest range?
12    A.   No, sir.
13    Q.   So the University of Virginia has
14  not bestowed upon you it's highest rank,
15  correct?
16    A.   That's correct.  The -- I'm not a
17  full professor.  I've never put in my papers
18  to be promoted for full professor.  It's an
19  application process that's initiated by the
20  faculty member.
21    Q.   So is taking a certified public
22  accountancy exam, correct?
23    A.   I'm sorry.
24    Q.   You don't become a certified public
25  accountant unless you take an exam, correct?

Page 27

D. Larue

1
2    A.   Correct.
3    Q.   You have to apply to become a
4  certified public accountant?
5    A.   Correct.
6    Q.   And many people who apply to become
7  certified public accountants don't become
8  certified public accountants, correct?
9    A.   I would suspect that's correct.
10    Q.   Mr. Larue, have you ever testified
11  as an expert regarding auditing standards?
12    A.   Regarding auditing standards, I
13  don't believe so.
14    Q.   Have you ever testified as an
15  expert regarding generally accepted
16  accounting principles?
17    A.   Yes, sir.
18    Q.   Have you ever testified as an
19  expert regarding revenue recognition under
20  generally accepted accounting principles?
21    A.   I would say yes.
22    Q.   In what cases did you do that?
23    A.   I would need to look at my resume.
24    Q.   Okay.  You don't recall right now?
25    A.   The various cases that I've worked

Page 28

D. Larue

1
2  on, some involved generally accepted
3  accounting principles and when you say
4  revenue recognition, there are a lot of
5  different issues that are rolled up into the
6  matters that I was testifying on.
7    Q.   And perhaps my question wasn't
8  clear.  Let me make it clear.
9        Have you ever provided expert
10  testimony regarding revenue recognition under
11  generally accepted accounting principles?
12    A.   I have testified an expert and
13  been recognized as an expert on generally
14  accepted accounting principles as they
15  applied to accounting issues, some of which
16  may have been revenue recognition issues.
17    Q.   I'm asking you which ones.
18    A.   I need to look at my resume.
19    Q.   If any.
20    A.   I don't think I have a listing of
21  all of the cases.
22        One would be the Tyson Food case
23  that had to do with the application of
24  accounting principles.
25    Q.   What aspect of revenue recognition

Page 29

D. Larue

1
2  did you provide an expert testimony?
3    A.   That had to do with -- let me think
4  about that.  That actually had more to do
5  with the cost accounting principles used by
6  Tyson Foods in computing their revenue, in
7  computing their gross income.
8    Q.   I'm a little confused.
9        Does cost accounting relate to
10  revenue recognition?
11    A.   It relates to the recognition of
12  income or of net income.
13    Q.   I understand that, but net income
14  is different than revenue, correct?
15    A.   I see what you're getting at.
16    Q.   Is that correct?
17    A.   Yes.
18    Q.   So I'm clear, I'm asking about
19  revenue.
20        You understand the term in
21  generally accepted accounting principles of
22  revenue?
23    A.   Yes, sir.
24    Q.   It is not net income, is it?
25    A.   No, sir.

8 (Pages 26 to 29)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 30

```
 1            D. Larue
 2      Q.  And cost accounting has nothing to
 3  do with recognition of revenue under
 4  generally accepted accounting principles,
 5  correct?
 6      A.  Yes.  Those are two different
 7  issues.
 8      Q.  Let's go back.
 9          Have you ever provided expert
10  testimony with regard to revenue recognition
11  under generally accepted accounting
12  principles?
13      A.  I don't recall.
14      Q.  You don't know one way or the
15  other?
16      A.  When you talk about generally
17  accepted accounting principles, you have a
18  number of -- in the issues I've dealt with,
19  there are a number of issues that have
20  converged that deal with basically the
21  determination of net income.
22      Q.  Well, and that income is -- is the
23  bottom line on an income statement, correct?
24      A.  That's correct.
25      Q.  What's the top line?
```

Page 31

```
 1            D. Larue
 2      A.  Revenue.
 3      Q.  On that top line, have you ever
 4  provided expert testimony with regard to the
 5  top line of the income statement, which is
 6  titled Revenue?
 7      A.  In at least one case, and that
 8  would be -- it's listed in my exhibit.  I
 9  gave a deposition.  I have not testified at
10  trial in the Proctor & Gamble case.
11      Q.  Do you have a copy of that
12  deposition?
13      A.  I may have a copy.
14      Q.  Would you be kind enough to provide
15  it to me?
16      MR. BUTLER:  You don't have to
17  answer that.  It has never been
18  requested before.  We will take your
19  request under advisement.
20      Q.  What was your testimony with regard
21  to revenue recognition with regard to Proctor
22  & Gamble?
23      A.  That case involved the appropriate
24  accounting treatment of the timing of
25  revenues recognized on certain transactions
```

Page 32

```
 1            D. Larue
 2  between the enterprise and certain parties
 3  related to that enterprise.
 4          This case also involved an opinion
 5  on the timing of the recognition of cost of
 6  goods sold and net income.
 7      Q.  Other than the Proctor & Gamble
 8  testimony, have you ever provided expert
 9  testimony with regard to revenue recognition,
10  the top line on an income statement under
11  generally accepted accounting principles?
12      A.  I don't believe so.  I don't
13  recall.
14      Q.  Mr. Larue, you previously testified
15  that in certain of your work as an expert,
16  you have conducted forensic examinations,
17  correct?
18      A.  Yes, sir.
19      Q.  Have any of those forensic
20  examinations related to whether or not
21  certain dollar amounts were properly
22  classified as revenues rather than capital
23  assets?
24      A.  Revenues classified -- say that
25  again.  Certain dollar amounts classified as
```

Page 33

```
 1            D. Larue
 2  revenues rather than capital assets?
 3      Q.  Yes.
 4      A.  I had one case where the issue was
 5  expenses versus capital assets.  I don't
 6  recall.
 7      Q.  Nothing comes to mind now?
 8      A.  Again, in some of these cases, I
 9  did an economic analysis to determine
10  revenue, how much revenue was economically
11  realized.  I don't recall whether I opined
12  whether or not that revenue would have been
13  recognized under GAAP.
14      Q.  In any of the forensic examinations
15  that you have engaged in as an expert, did
16  any involve dollar amounts that were claimed
17  as revenues rather than as expenses?
18      A.  In some of the cases there was a
19  claim that the enterprise had revenues that,
20  in fact, they didn't have, but in terms of
21  reclassifying expenses as revenues, I don't
22  recall specifically that I've ever addressed
23  that issue in an expert witness report.
24      Q.  What about reclassifying revenues
25  as expenses?
```

9 (Pages 30 to 33)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 34

```
1              D. Larue
2        A.  Reclassifying revenues as expenses,
3   I don't recall that I've ever addressed that
4   issue in a forensic analysis.  I may have,
5   but I don't recall that I did.
6        Q.  Mr. Larue, how does one -- how
7   should a public company that files with the
8   SEC account in its financial statements for a
9   fraudulent transaction?
10       MR. BUTLER:  Objection to form.
11       A.  That depends on the facts and
12  circumstances.  You would have to be a lot
13  more specific in terms of what kind of a
14  transaction you're referring or the
15  materiality, what kind of -- at what level
16  was the fraud committed, what type of fraud
17  was it, whether or not a restatement of
18  earnings or some dollar amount in the
19  financial statements themselves should be
20  reclassified or omitted or whether or not
21  there should be disclosure.  That's a
22  statement that you really can't answer in the
23  abstract.
24       Q.  Let me ask you -- let me try to
25  fill in some of those details.
```

Page 35

```
1              D. Larue
2        Consider the following
3   hypothetical:  Microstrategy is a software
4   vendor, is that correct?
5        A.  That's correct.
6        Q.  Microstrategy's chairman enters
7   into an agreement in which his brother will
8   give Microstrategy $3 million and, in
9   exchange, Microstrategy, on paper, says we
10  will provide you with licensing -- we will
11  provide you with our software and your
12  employees will work on that software and we
13  will get 50 percent of your net profits and
14  that's what the document reflects, but the
15  president of Microstrategy and his brother
16  agree orally that the brother will not have a
17  company, there will be no employees and there
18  will be no expectation by Microstrategy
19  because there are no employees and the
20  brother's company will do nothing, that there
21  will never be any future revenues from the
22  brother's company.
23       How should Microstrategy account
24  for that transaction?
25       MR. BUTLER:  Objection to form.
```

Page 36

```
1              D. Larue
2        If you need to hear it again, we
3   will have it reread.  It's a long
4   question.
5        A.  Let me see if I can distill.
6   Microstrategy has received $3 million free
7   and clear?
8        Q.  In reality, yes.
9        A.  In reality, yes.
10       In exchange for licenses for which
11  Microstrategy has no future obligation to
12  perform any additional services?
13       Q.  Correct.
14       A.  The $3 million is received by the
15  brother of the CEO of Microstrategy?
16       MR. BUTLER:  I'm not sure that's
17  right.  The brother is paying
18  Microstrategy.
19       A.  I'm sorry, the brother pays
20  Microstrategy $3 million, Microstrategy has
21  the $3 million, doesn't have to give it back?
22       Q.  Correct.
23       A.  And the brother can take that
24  license and pretty much do with it what he
25  chooses to do with it, he owns the license.
```

Page 37

```
1              D. Larue
2        Q.  There is a written document that
3   controls what he can and cannot do with that.
4        MR. BUTLER:  You need to clarify
5   the hypothetical.  He is asking, does he
6   own the license or not?
7        Q.  He owns the license with certain
8   limitations as to use?
9        A.  What is that license worth?
10       Q.  I don't know.
11       A.  If the license is worth $3 million
12  and he paid $3 million for it, whether or not
13  the brother actually makes a profit on his
14  own accord exploiting the license agreement,
15  I don't believe is material to Microstrategy.
16  The issue of Microstrategy as to whether or
17  not it has revenue.
18       Q.  So how would Microstrategy -- how
19  should Microstrategy account for that
20  transaction?
21       A.  Well, again, assuming there is no
22  obligation, there are no side agreements, it
23  appears to me from what you said and there
24  could be other qualifying facts and
25  circumstances, but it appears that
```

10 (Pages 34 to 37)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 38

```
 1            D. Larue
 2  Microstrategy has derived $3 million worth of
 3  revenue from a party related to its CEO.
 4       Q.  And so how should -- what is the
 5  accounting entry for that transaction?
 6       A.  That would be a debit to cash and a
 7  credit to revenue from a related party.
 8       Q.  And would Microstrategy be
 9  obligated in those circumstances to disclose
10  that related party transaction?
11       A.  I believe under FAS 57, certainly
12  Michael Saler, the CEO of Microstrategy, is a
13  related party, he is the majority
14  shareholder, he is also the CEO.
15       I believe members of the immediate
16  family to the CEO would be considered to be
17  related parties.  That amount would normally
18  be disclosed in the footnotes to financial
19  statements and possibly separately stated.
20       Q.  Now, let me change the hypothetical
21  slightly.
22       It is the exact same fact pattern,
23  only this time, the person agreeing with
24  Microstrategy's CEO is not his brother.  He
25  is unrelated to the CEO of Microstrategy and
```

Page 39

```
 1            D. Larue
 2  has no interest in Microstrategy.
 3       How then would Microstrategy
 4  account for that transaction?
 5       A.  Again, assuming this is a licensing
 6  agreement and -- assuming that this is an
 7  outright sale of a license and there is
 8  nothing else going on, then, of course,
 9  Microstrategy would have $3 million worth of
10  revenue once it satisfied all of the criteria
11  set forth by GAAP, generally under SOP 97-2.
12       Q.  On the facts that I have
13  identified, do you have an opinion as to what
14  the proper accounting for that transaction
15  should be by Microstrategy?
16       A.  I believe I just stated that.  If
17  Microstrategy sold a license to an unrelated
18  party and it met the criteria under GAAP for
19  revenue recognition, Microstrategy would
20  report the recognition of revenue in the
21  period in which all of those criteria have
22  been satisfied.
23       Q.  Do the facts, as you understand it,
24  from this hypothetical, meet the criteria for
25  revenue recognition under GAAP?
```

Page 40

```
 1            D. Larue
 2       A.  I need more facts and
 3  circumstances.
 4       Q.  What fact would you need?
 5       A.  One of the requirements under GAAP
 6  that the software actually be delivered, was
 7  the software delivered?
 8       Q.  Yes.
 9       A.  If the amount that was paid by the
10  unrelated party was in the form of an account
11  receivable, was collection of that account
12  receivable probably based on an analysis of
13  all of the underlying facts and
14  circumstances?  Was the amount and appears to
15  be here, the $3 million fixed and
16  determinable, was there persuasive evidence
17  of an agreement?
18       So those are generally the
19  requirements of SOP 97-2.  Once those
20  criteria are satisfied, then revenue
21  recognition would generally be appropriate,
22  again, assuming this is a license agreement
23  and not something else.
24       Q.  How would you determine whether it
25  was something else?
```

Page 41

```
 1            D. Larue
 2       A.  I would begin by looking at the
 3  terms of the agreement between these two
 4  parties.
 5       Q.  Did you look at the terms of the
 6  agreement between Lernout and Hauspie and any
 7  LDC?
 8       A.  I don't recall that I did.
 9       Q.  Why not?
10       A.  I was asked to make certain factual
11  assumptions about the facts in this case and
12  I made those assumptions, stated those
13  assumptions in my report and based my opinion
14  on those assumptions.
15       Q.  If those assumptions were to
16  change, your opinion may or may not change,
17  correct?
18       A.  If the assumptions didn't bear out,
19  then there is a possibility that my opinion
20  might change.
21       Q.  Now, in opining about -- did you
22  opine about the proprietary of revenue
23  recognition, correct?
24       MR. BUTLER:  Objection to form.
25       There was not an opinion about whether
```

11 (Pages 38 to 41)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 42

D. Larue

1  D. Larue
2  revenue recognition was --
3      MR. HARRIS:  Are you testifying
4  today or is Mr. Larue?
5      MR. BUTLER:  Your question assumes
6  a fact that is not true.
7      MR. HARRIS:  You object and I
8  ignore you and we move forward.
9      MR. BUTLER:  Were you at the
10  deposition yesterday?  I know that's not
11  your firm's policy.
12      MR. HARRIS:  You are either going
13  to play by the rules or we will
14  terminate this deposition until you're
15  instructed to play by the rules.  We
16  will not have you giving long speeches.
17  We are going to have you objecting to
18  form.  If you believe my question is
19  improper based on its form, okay.
20      MR. BUTLER:  I know you're new to
21  this to case.  I will make my
22  objections.
23      MR. HARRIS:  I'm not new to the
24  practice of law.
25      MR. BUTLER:  Sir, just ask your

Page 43

1  D. Larue
2  questions.  I made my objection.
3      MR. HARRIS:  I've discussed with
4  you what is an appropriate and what is
5  not an appropriate objection.
6      MR. BUTLER:  Thank you for the
7  education.  Just ask this witness a
8  question.
9      MR. HARRIS:  Can you read back the
10  question.
11      (Record read.)
12      Q.  Have you opined with regard to the
13  propriety of revenue recognition by L&H in
14  this action?
15      A.  In my report, based on the
16  assumptions that I was given, I opined that
17  revenue recognition for particular reasons
18  was not clearly improper.
19      Q.  Did you not opine that it was
20  proper?
21      A.  I did not.
22      Q.  And you did not opine that it was
23  not improper, correct?
24      MR. BUTLER:  I object to the form
25  of the question.

Page 44

1  D. Larue
2      A.  I don't believe I opined that it
3  was not improper.
4      I believe I opined that it was not
5  clearly improper based on one particular
6  element of the underlying facts.
7      Q.  Now, with regard to Larue Exhibit
8  2, if you could pick that up and I direct
9  your attention to the financial statements in
10  Larue Exhibit 2.
11      A.  Do you have a page?
12      Q.  Sure.  We could begin on, for
13  example, page 63 of 96, and that particular
14  page of Larue Exhibit 2 does not bear an
15  internal page number.
16      This is titled, this table,
17  Microstrategy Incorporated Consolidated
18  Statement of Operations, correct?
19      A.  Yes, sir.
20      Q.  It also is referred to sometimes as
21  an income statement, correct?
22      A.  Yes, sir.
23      Q.  And when you signed Larue Exhibit
24  2, would you have been satisfied if your
25  accountant told you that the revenues

Page 45

1  D. Larue
2  reflected in Microstrategy's incorporated
3  maybe improper, but they're not clearly
4  improper?
5      MR. BUTLER:  Objection to the form
6  of the question.
7      You can answer.
8      A.  Would I have objected to the
9  financial statement?
10      Q.  Would you have been satisfied as a
11  director of Microstrategy?
12      A.  I would have to know much more.
13      Q.  Would you have signed Larue Exhibit
14  2 if you understood that the revenues
15  reflected in Microstrategy's income statement
16  in Larue Exhibit 2 were improper, but were
17  not clearly improper?
18      A.  I believe that all of these
19  revenues on these statements are clearly
20  proper.
21      If the auditors had informed me or
22  that the CFO had informed me that some of the
23  revenue recognition may have been improper,
24  clearly, I would need to know more facts and
25  circumstances in order to make a

12  (Pages 42 to 45)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 46

```
1                D. Larue
2    determination as to whether or not it would
3    be appropriate for me, not only to sign the
4    return, but as chairman of the audit
5    committee to recommend to the board of
6    directors that they sign the return.
7        Q.  Perhaps you didn't hear my
8    question.  Let me make sure you do or maybe
9    my question wasn't clear.
10              Would you have signed Larue Exhibit
11   2 if you were told that the amount of revenue
12   reflected in Microstrategy's income statement
13   in Larue Exhibit 2 was improper, but it was
14   not clearly improper?
15       A.  Again, I would need to know more.
16       Q.  And it is your understanding as a
17   director of Microstrategy that it is
18   permissible for Microstrategy to file with
19   the SEC, financial statements that it knows
20   are improper, but not clearly improper?
21       A.  That's not my understanding.
22       Q.  So is it your understanding that
23   Microstrategy cannot file with the SEC
24   financial statement that it knows are
25   improper?
```

Page 47

```
1                D. Larue
2        A.  Again, it's difficult to answer
3    that question simply because there are not
4    enough facts and circumstances that you've
5    given me.
6            What is the materiality of the
7    dollar amount?  What account balances does it
8    effect?  Why is it improper?  What is the
9    reason for its being classified or considered
10   to be improper?  Who thinks it's improper?
11   Does management think it's improper?  Does
12   the auditors think it's improper?  Do they
13   have different opinions on the propriety of a
14   particular treatment of a particular item?
15   Is this a recurring item?  Is it something
16   that will reverse next year?
17          There are an enormous number of
18   facts and circumstances that would have to be
19   examined and addressed.  You can't say in the
20   abstract -- I can't answer that question in
21   the abstract definitively.
22       Q.  Let's go back to our hypothetical.
23          Do you have it in mind?
24       MR. BUTLER:  Object to the form.
25   The hypothetical evolved over time, so
```

Page 48

```
1                D. Larue
2    it won't be clear.
3        Q.  Let me restate it.  I would like
4    you to -- the following hypothetical,
5    Microstrategy's CEO enters into an agreement
6    in writing with an unrelated person who is
7    the president of a corporation such that the
8    corporation named Johnny --
9        MR. BUTLER:  The corporation's name
10   is Johnny?
11       MR. HARRIS:  Yes.
12       Q.  Johnny provides Microstrategy with
13   $3 million cash and Microstrategy delivers a
14   software packages pursuant to the written
15   agreement that provides that Microstrategy
16   will be -- will receive 50 percent of
17   Johnny's net income over the next three
18   years.
19          Johnny's president also tells
20   Microstrategy that he intends never to have
21   any employees and does not intend to develop
22   any products based upon Microstrategy's
23   software.  Okay?
24       MR. BUTLER:  One question:  What is
25   the nature of the written agreement
```

Page 49

```
1                D. Larue
2    between the CEO of Microstrategy and
3    Johnny?
4        Q.  The written agreement is between
5    Microstrategy and Johnny.
6        I believe that you said
7    Microstrategy in that situation would book
8    that transaction as $3 million to cash as a
9    debit and $3 million to revenue, correct?
10       A.  Based on the assumptions that
11   you've given me and assuming no other
12   relevant facts and circumstances, yes, sir.
13       Q.  And there would be no requirement
14   to disclose any related party transaction,
15   correct?
16       A.  You defined the purchaser as being
17   an unrelated party, so assuming your
18   definition comports with GAAP, then I would
19   agree with that.
20       Q.  Now, let me add a fact to the
21   transaction.  The president of Johnny says to
22   Microstrategy, this sounds terrific to me, I
23   just don't have $3 million, I have 72,000.
24   Do you think I could borrow it someplace and
25   Microstrategy's president says, I think you
```

13 (Pages 46 to 49)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 50

```
1              D. Larue
2    might be able to borrow it from Z Bank.
3    Okay. The president of Johnny goes to Z
4    Bank, Z Bank says to him, here is $3 million,
5    sounds good to me. He comes back with the
6    money, gives it to Microstrategy.
7              How would Microstrategy account for
8    that transaction?
9         A.   Again, assuming there are no side
10   agreements or any other facts and
11   circumstances from Microstrategy's point of
12   view, they received $3 million in cash that
13   they're not obligated to pay back in exchange
14   for a license agreement that requires no
15   substantial future services from an unrelated
16   party. They would report that as revenue.
17        Q.   How about -- let me change the
18   facts now.
19             The president of Johnny says to the
20   president of Microstrategy, I don't have $3
21   million, I have 72,000 and the president of
22   Microstrategy says, don't worry, I'll lend it
23   to you.
24             The president of Microstrategy
25   lends it to Johnny, Johnny gives the $3
```

Page 51

```
1              D. Larue
2    million in cash to Microstrategy.
3              How should Microstrategy account
4    for that transaction?
5         A.   I would have to know more.
6         Q.   What would you have to know?
7         A.   I would have to know if there was
8    any express -- first, as a threshold matter,
9    would there be any express or implied
10   obligation on the part of Microstrategy to
11   reimburse Michael Saler for the loan in the
12   event that it wasn't repaid by the unrelated
13   party?
14        Q.   No.
15        A.   And you're saying the person who
16   loaned this money to Michael Saler is
17   actually a 62 percent owner of Microstrategy?
18        Q.   I didn't use Microstrategy.
19             MR. BUTLER: You said the CEO of
20   Microstrategy.
21             Is it your assumption it's a 62
22   percent owner?
23        Q.   Under the hypo, he is the CEO.
24        A.   He knows who the CEO is. That's
25   the problem with your hypothetical.
```

Page 52

```
1              D. Larue
2         Q.   Do you understand my question?
3         A.   Looking at the facts I've written
4    down here, so the CEO has made a personal
5    loan.
6         Q.   To Johnny?
7         A.   To the unrelated party.
8         Q.   To fund Johnny's license agreement
9    with Microstrategy, how should Microstrategy
10   account for that transaction?
11        A.   Again, assuming that there --
12   assuming that the CEO of Microstrategy was
13   acting in his individual capacity in terms of
14   making the loan, assuming that he bore all of
15   the risks and rewards that would result from
16   making that loan, assuming that there was no
17   expectation, reasonable or otherwise, that
18   Microstrategy would reimburse that loan in
19   the event that it was unpaid, these GAAP
20   rules are pretty complicated. I'm trying to
21   sift through them and just make sure.
22             I guess I would also assume there
23   was a realistic expectation that Johnny would
24   be able to repay that loan.
25        Q.   No, the president of Microstrategy
```

Page 53

```
1              D. Larue
2    knows he will do nothing, zero, he will have
3    no employees, there is -- nothing is ever
4    going to happen with those -- with that
5    license.
6              MR. BUTLER: That doesn't mean he
7    can't repay the loan.
8         Q.   He has no -- at the time he enters
9    it, he has no reason to believe that he will,
10   in fact, be repaid.
11        A.   Ever?
12        Q.   Ever.
13             MR. BUTLER: That's an important
14   fact.
15        A.   You would have to determine what
16   the substance of that transaction was, why
17   did he make that loan to a related party
18   knowing that he wouldn't be repaid if he
19   knew, in fact, he wouldn't be repaid, why
20   would he make a loan to the related party?
21             I don't understand the motivation.
22   It doesn't seem like a viable hypothetical.
23        Q.   He wanted to increase the
24   revenues -- he did it on the 29th of
25   September and Microstrategy's third quarter
```

14 (Pages 50 to 53)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 54

```
1              D. Larue
2    closes on September 30th.  He wanted to have
3    Microstrategy show increased revenues so he
4    entered into this transaction.
5          How should Microstrategy account
6    for this transaction?
7          MR. BUTLER:  I object to the
8    question because now you're asking a
9    totally different question and I ask you
10   to clarify the year you're talking about
11   because it may make a difference in
12   terms of the applicable GAAP, so can you
13   give a year for this hypothetical?
14   Q.   Mr. Larue, are you able to answer
15   my question?
16   A.   Well, are you talking about 1999?
17   Q.   Does it matter?
18   A.   I don't know if it matters or not.
19   GAAP changes over time.  I, in connection
20   with my report, I reviewed the GAAP that was
21   applicable during the period at issue.
22   Q.   Let me make sure I understand.  Is
23   it your testimony that in certain years --
24   let me -- given the facts that I have laid
25   out for you, could Microstrategy properly
```

Page 55

```
1              D. Larue
2    account for that transaction in the same
3    manner as when the money came right from
4    Johnny, there was no loan by Microstrategy's
5    CEO?  That is, can Microstrategy book the
6    transaction that I've described with
7    Microstrategy's president loaning the Johnny
8    $3 million, having no reason to believe that
9    he would ever be paid back?  Can
10   Microstrategy book that transaction as $3
11   million to cash and $3 million to revenue?
12         MR. BUTLER:  Objection to form.
13   A.   Again, you said that -- well,
14   again, you've said that Johnny doesn't intend
15   to develop the software.  That doesn't mean
16   that Johnny may not sell that software
17   license to someone else to generate a return
18   under which Johnny would use the proceeds
19   from that return or get outside investors to
20   repay the CEO of Microstrategy.
21   Q.   Anything can happen, I agree, but
22   Microstrategy's president has no reason to
23   believe that he will ever be repaid.
24   A.   Under those facts and, again, I·
25   guess my impression here is that this
```

Page 56

```
1              D. Larue
2    transaction, the way you described it
3    where -- this transaction, the way you
4    described it, appears to me, because these
5    are a pretty extreme set of facts and
6    circumstances, in substance, to be a
7    contribution to the capital of Microstrategy
8    by the CEO, in which case, your debit to
9    cash, the credit would be to owner's equity
10   section.
11   Q.   Why would Microstrategy not be able
12   to recognize it as revenue rather than paid
13   in capital?
14   A.   Because there is absolutely no
15   substance to this transaction beyond the CEO
16   contributing $3 million in cash to
17   Microstrategy and the substance of this
18   transaction under these extreme facts would
19   seem to indicate this is a contribution to
20   capital.
21   Q.   When you say, substance, what do
22   you mean?
23   A.   Gosh, that's a term that's almost
24   impossible to define.
25   Q.   Is it defined under generally
```

Page 57

```
1              D. Larue
2    accepted accounting principles?
3    A.   No, it's not.
4    Q.   But you understand what it means?
5    A.   No.
6    Q.   You don't understand what your own
7    word meant?
8          MR. BUTLER:  Please don't interrupt
9    the witness.
10         MR. HARRIS:  I thought he was done,
11   sorry.
12   A.   When we talk about substance versus
13   form, of course, I know what substance means.
14         In terms of attempting to define
15   what facts and circumstances in any
16   particular situation might be relevant to
17   determining what the substance of a
18   transaction is and how that may or may not
19   vary from the form of a transaction?  What
20   are those facts and circumstances that are
21   relevant?  What facts and circumstances
22   aren't relevant?  How do you weigh and
23   balance the facts and circumstances that you
24   determine to be relevant?  What qualitative
25   and quantitative factors go into making that
```

15  (Pages 54 to 57)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 58

1          D. Larue
2   determination and at the end of the day, how
3   do you conclude that this transaction does or
4   does not have substance?
5          So what does substance mean?  It's
6   a term that we all have a pretty good
7   understanding that that term is getting at,
8   but in terms of detailed principles and
9   guidelines for the implementation of
10  substance, oftentimes, those are lacking.
11         Q.  Well, I guess my question wasn't a
12  little -- was a little different and I,
13  again, apologize if I wasn't clear in my
14  question.
15         It was my understanding that you
16  used, in one of your answers, that the
17  transaction in which you said it should be
18  paid in capital, you used the term the
19  substance of the transaction, correct?
20         A.  I did.
21         Q.  And in using the term -- my
22  question was, in using the term substance,
23  did you understand what you meant?
24         A.  Yes.
25         Q.  Do you believe that others

Page 59

1          D. Larue
2   understood what you meant?
3          MR. BUTLER:  Objection to form.
4          Do you mean others in this room?
5          MR. HARRIS:  Yes.
6          A.  In the context of using substance,
7   in this context, I think we all know what it
8   means, have a general idea as to what it
9   means.
10         Q.  Now --
11         MR. BUTLER:  I will state for the
12  record, I don't know what it means.
13         MR. HARRIS:  That's why you're
14  still litigating this case.
15         Q.  Now, let's go back to the
16  hypothetical between Johnny and
17  Microstrategy's CEO.  Microstrategy says --
18  Microstrategy's CEO says to Johnny's
19  president, I will personally lend you the
20  money and then I will go out and look for
21  investors in Johnny.
22         A.  I'm sorry, would you back up and
23  repeat yourself.
24         Q.  Let me start over.
25         You have the fact of the prior hypo

Page 60

1          D. Larue
2   in mind, correct?
3          A.  Yes.
4          MR. BUTLER:  This fact involved an
5   actual transfer of a license, in this
6   hypothetical, there is always a transfer
7   of a license from Microstrategy to
8   Johnny, correct?
9          MR. HARRIS:  Yes.
10         MR. BUTLER:  Go ahead.
11         Q.  You said you had the facts of the
12  prior hypothetical in mind.
13         What I'm changing this time is that
14  Microstrategy's CEO says to Johnny's
15  president, I will lend Johnny the money to be
16  paid to Microstrategy and I will go out and
17  look for investors in Johnny and if I can
18  find them, I'll get repaid and if I can't, I
19  won't.
20         How should Microstrategy account
21  for that transaction?
22         A.  That muddies the water a bit.  I
23  don't know.
24         Q.  You don't know?
25         A.  I don't know.

Page 61

1          D. Larue
2          Q.  Good.
3          MR. HARRIS:  Should we take a
4   break?
5          THE VIDEOGRAPHER:  We are going off
6   the record.  It's actually 10:24.
7          (Recess.)
8          THE VIDEOGRAPHER:  We're going back
9   on the record.  The time is 10:38.  This
10  is tape No. 1.
11         Q.  Mr. Larue, you submitted two expert
12  reports in this matter, is that correct?
13         A.  I submitted an opening report and a
14  rebuttal report, yes, sir.
15         Q.  You submitted the opening report in
16  early January 2007, correct?
17         A.  Yes, sir.
18         Q.  And it's my understanding that you
19  submitted your rebuttal report in mid
20  February 2007, correct?
21         A.  Yes, sir.
22         Q.  At the time you submitted your
23  opening report in early January 2007, were
24  you aware that Dexia -- let me stop.
25         When I use the term Dexia, is it

16  (Pages 58 to 61)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 62

```
1              D. Larue
2    fair to say that you understand that to mean
3    the defendant, Dexia Bank Belgium?
4        A.  Yes, sir.
5        Q.  And can we agree that if I use the
6    term Dexia today, it includes its
7    predecessors in interest, like Artesia,
8    Paribas and Bacob?
9        A.  Yes, sir, if I can do the same.
10       Q.  If you use Dexia, I will understand
11   you to mean its predecessor in interest, as
12   well.
13            Is that a fair agreement?
14       A.  Yes.
15       Q.  So let me go back to your initial
16   or opening report.
17            At the time you submitted your
18   opening report in early January 2007, were
19   you aware that the Belgium authorities had
20   brought criminal proceedings against Dexia
21   with regard to its actions related to Lernout
22   and Hauspie Speech Products?
23       A.  I heard that.  I don't know.
24       Q.  You were aware or you were not
25   aware?
```

Page 63

```
1              D. Larue
2        A.  I don't remember where I heard
3    that.  I can't say I know for a fact that I
4    knew that -- that I knew that for a fact
5    rather.
6        Q.  Did you know that for a fact prior
7    to today?
8        A.  I don't know that for a fact as I
9    sit here.
10           Are you telling me they had brought
11   criminal charges against Dexia?
12       Q.  Yes.
13       A.  Then accepting your statement, I
14   know it for a fact.
15       MR. BUTLER:  I object.  There have
16       not been criminal charges filed in
17       Belgium.
18       Q.  If there were criminal charges
19   filed against Dexia regarding its activities
20   in relationship to Lernout & Hauspie Speech
21   Products, would that change any of your
22   opinions in your opening report?
23       A.  If they brought charges, we are not
24   talking about a conviction and when you say
25   activities, you would have to be more
```

Page 64

```
1              D. Larue
2    specific, but I don't -- no.
3        Q.  Is the same true for your -- with
4    regard to your opinions in your reply report
5    or rebuttal report?
6        A.  I believe that to be true.
7            You would have to be more specific
8    in terms of what facts or circumstances
9    you're referring to.
10       Q.  Let me hand you a document that we
11   will mark as Larue Exhibit 3.
12           (U.S. Securities and Exchange
13       Commission document marked Larue Exhibit
14       3 for identification.)
15       Q.  Have you ever seen Larue Exhibit 3
16   before?
17       A.  I believe I may have some time ago
18   and actually there are two documents here,
19   aren't there?
20       Q.  There are, although I think it is
21   one.  It is a press release by the United
22   States Securities and Exchange Commission
23   dated October 10, 2002 and attached to it is
24   a complaint in a civil injunction action
25   filed by the SEC against Lernout and Hauspie
```

Page 65

```
1              D. Larue
2    Speech Products, NV, correct?
3        A.  Yes.
4        Q.  And have you seen complaints issued
5    by the SEC against public companies in the
6    past?
7        A.  Yes.
8        Q.  So you understand what a complaint
9    by the SEC is?
10       MR. BUTLER:  Objection to form.
11       Are you asking for his legal
12       understanding of what it is?
13       MR. HARRIS:  I asked if he uses it.
14       If he does, he does.
15       A.  Injunctive relief, I'm not familiar
16   with that term.
17       Q.  Are you familiar with the SEC
18   sometimes sues companies?
19       A.  I've read through complaints
20   before, but I don't know anything about
21   suing.
22       Q.  Were you aware prior to -- at the
23   time you submitted your opening report, that
24   the SEC had filed an accounting fraud action
25   against Lernout and Hauspie Speech Products?
```

17 (Pages 62 to 65)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 66

D. Larue

1
2    A.   I believe. I had seen this before.
3    That I had reviewed this briefly before I
4    submitted my report.
5    Q.   And if you did, it would be in your
6    list of documents that you considered,
7    correct?
8    A.   I don't know.
9    Q.   Well, if you reviewed it before,
10   why wouldn't it be in the list of documents
11   that you considered?
12        MR. BUTLER:  I object to form.
13        Are you asking him what the legal
14        standard is in what needs to be included
15        in the expert report?  This witness will
16        not know the answer.
17        MR. HARRIS:  He can answer the
18        question.
19        MR. BUTLER:  What was your
20        question?  Can I have it reread, please.
21        (Record read.)
22        MR. BUTLER:  He didn't say he
23        considered it in formulating his
24        opinion.
25        MR. HARRIS:  Are you going to

Page 67

D. Larue

1
2    testify?
3        MR. BUTLER:  If I have to.
4        MR. HARRIS:  You can object to the
5        form.
6        I was very polite the first time,
7        I'm being polite this time.  If you
8        object to the form, you should object to
9        the form.
10        MR. BUTLER:  I'm objecting because
11        you're trying to use word play into
12        tricking this witness to answer a legal
13        question and I will not let you do that.
14   Q.   Can you answer the question?
15   A.   What was the question?
16   Q.   If you reviewed the SEC's complaint
17   against Lernout and Hauspie Speech Product
18   prior to the submission of your opening
19   report in January of 2007, why would it not
20   be included in the list of documents that you
21   considered?
22   A.   Well, it certainly wasn't a
23   document I considered in preparing my report
24   and I may have reviewed this before I became
25   involved in the Dexia case.

Page 68

D. Larue

1
2        I do a lot of reading on a regular
3    basis.  Part of that reading includes various
4    publications and pronouncements by the SEC,
5    so when I read that, I honestly don't recall
6    that, but I do recall that I didn't consider
7    this or use this in the preparation of my
8    report.
9    Q.   Now, if you look at the first page
10   of Larue Exhibit 3, there is a section with
11   regard to Dictation Consortium and Brussels
12   Translation Group transactions.
13        Do you see that?
14   A.   No, sir, I don't.
15   Q.   Larue Exhibit 3.
16   A.   Yes, sir, I do.
17   Q.   Is it your understanding that Dexia
18   loaned money to one or both of Dictation
19   Consortium and Brussels Translation Group?
20   A.   I haven't read this document
21   recently.  I don't know what it says.
22   Q.   Feel free to read it.
23        MR. BUTLER:  He is asking about
24        your understanding, not about what this
25        document says.

Page 69

D. Larue

1
2    A.   It's my understanding.  I don't
3    know that for a fact, but it's my
4    understanding that loans were made to
5    Dictation Consortium and Brussels Translation
6    Group.
7    Q.   By Dexia?
8    A.   I don't know.  I think so.
9    Q.   If you look at the -- that section
10   that relates to Dictation Consortium and
11   Brussels Translation Group, the SEC says in
12   its press release, at the end, it says,
13   Because the transactions were, in substance.
14   A.   Where are you?
15   Q.   At the very --
16   A.   Here we go.
17   Q.   Because the transactions were, in
18   substance, disguised loans and not sales or
19   service transaction, Lernout and Hauspie
20   should not have recognized revenue from those
21   transactions under generally accepted
22   accounting principles.
23   A.   I see that.
24   Q.   Do you agree or disagree with the
25   SEC's statement?

18  (Pages 66 to 69)

D. Larue

1
2    A.  I don't have any basis for agreeing
3  or disagreement.  I don't know the underlying
4  facts and circumstances.
5    Q.  Then there is a section that
6  relates to Language Development Companies,
7  correct?
8    A.  Yes, sir.
9    Q.  Are you aware of any Language
10  Development Companies with regard to the
11  dispute in which you are currently an expert?
12    MR. BUTLER:  You mean this dispute?
13    MR. HARRIS:  Yes.
14    A.  Am I aware of them, yes.
15    Q.  Were they special purpose entities?
16    A.  The term special purpose entities
17  isn't defined under GAAP.
18    Q.  You used the term special purpose
19  entities?
20    A.  Not to describe them.
21    Q.  That's my question.
22    A.  The term isn't defined.  I guess
23  you can call that special purpose entities.
24  It's not a term that is defined under GAAP.
25    Q.  Did you understand that any of the

D. Larue

1
2  Language Development Companies that are
3  identified in your report to be special
4  purpose entities?
5    A.  I don't think I considered whether
6  they were special purpose entities or not.
7    Again, there is no definition or
8  there was no definition.  There still is no
9  definition of special purpose entities in
10  GAAP, so when you talk about a special
11  purpose entity, that may have a different
12  meaning to different people.
13    Q.  Do you know what relevance your
14  discussion of special -- do you believe that
15  your discussion of special purpose entities
16  has any relevance to the dispute in which
17  you're currently testifying?
18    MR. BUTLER:  I object to the form
19  of the question.
20    Go ahead.
21    A.  I was asked by counsel to discuss
22  the treatment of special purpose entities
23  under GAAP.
24    These particular entities had
25  certain characteristics, at least of what

D. Larue

1
2  most people would consider to be a special
3  purpose entity and the real issue, I
4  believe -- the reason I put that background
5  in there had to do with whether or not the
6  relationship between entities required that
7  one include the other in their consolidated
8  financial statements.  That was the purpose
9  of that discussion.
10    MR. HARRIS:  Can you read that
11  answer back.
12    (Record read.)
13    Q.  Just so I understand that last
14  question, the real purpose was whether or not
15  Lernout and Hauspie Speech Products needed to
16  consolidate the financials of the LDCs with
17  Lernout and Hauspie?
18    A.  That's correct.
19    Q.  Do you have an opinion as to
20  whether or not the Language Development
21  Companies were special purpose entities?
22    A.  If you'll define what you mean by
23  special purpose entities, I would be glad to
24  tell you whether or not I think they fit into
25  that category.

D. Larue

1
2    Once again, you're using a term
3  that doesn't have a precise unambiguous
4  definition under GAAP.
5    Q.  You used the term special purpose
6  entities, did you not?
7    A.  I did under section 3.
8    Q.  As you use the term in section 3 of
9  your report, do you have an opinion as to
10  whether or not the Language Development
11  Companies were special purpose entities?
12    A.  I didn't define the term.  I did
13  not set the parameters of what was and was
14  not a special purpose entity in my purpose.
15  There is no special entity to be had.
16    Q.  Do you understand what you meant by
17  special purpose entity when you wrote it in
18  your report?
19    A.  Of course.
20    Q.  But other people's understanding, I
21  take it, could be very different because
22  there is no definition of what special
23  purpose entity means?
24    A.  That's correct.  GAAP uses that
25  term, but it doesn't really define the term.

19  (Pages 70 to 73)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 74

D. Larue

1
2      Q.   As you use the term and understood
3   it in your report, special purpose entities,
4   do you have an opinion as to whether or not
5   the Language Development Companies were
6   special purpose entities?
7      A.   I don't know.
8      Q.   You don't know, as you sit here
9   today, you don't have an opinion?
10     A.   As I use the term, no, I don't.
11     Q.   No, you don't have an opinion or
12  no, you don't consider them to be?
13     A.   It depends on the facts and
14  circumstances of specific to the LICs in
15  terms of a variety of things and, again,
16  there is no unambiguous definition of what an
17  SPE is.
18     Q.   Based on your knowledge of the
19  Language Development Companies, do you have
20  an opinion, as you sit here today, whether or
21  not the Language Development Companies were
22  special purpose entities, as you use that
23  term in your opening report?
24     A.   I would say that the Language
25  Development Companies certainly had some of

Page 75

D. Larue

1
2   the characteristics of what typically people
3   would consider to be a special purpose entity
4   and, again, when you say Language Development
5   Companies, there were several different
6   Language Development Companies.
7         They had different characteristics.
8   They weren't all the same.  They were owned
9   by different parties.  They were capitalized
10  at different levels.  They were formed at
11  different times.  There are a number of
12  differences, so you have to be careful that I
13  don't lump them all together when they
14  shouldn't be lumped all together.
15     Q.   Is it your opinion, as you sit here
16  today, that any of the Language Development
17  Companies were special purpose entities, as
18  you used that term in your report?
19     A.   Possibly.
20     Q.   Possibly, you possibly may have an
21  opinion?
22     A.   No, they possibly may have been
23  special purpose entities as I used that term
24  in the report.
25        I don't have the underlying facts

Page 76

D. Larue

1
2   and circumstances for all of these entities.
3      Q.   Fair enough.
4         Now, if you turn to the complaint
5   that is part of Larue Exhibit 3, and I am
6   going to focus your attention to paragraph 16
7   and I would like you to review paragraph 16
8   and as much or as little of the complaint,
9   the SEC's complaint or Larue Exhibit 3 as you
10  would like and let me know when you're ready.
11        MR. BUTLER:  Why don't you ask him
12     a question so he knows what he is
13     looking for.  He doesn't want to
14     independently review that at all.
15     Q.   With that in mind, I would like you
16  to review paragraph 16.
17        MR. BUTLER:  With what in mind, you
18     haven't asked him a question?
19     Q.   Would you please review paragraph
20  16 of Larue Exhibit 3.
21        MR. BUTLER:  Okay.
22     A.   Yes, sir.  I've read paragraph 16.
23  I may need to read it again.
24     Q.   One of the sentences says, The SEC
25  asserts to bolster its reported revenue.  L&H

Page 77

D. Larue

1
2   want a new and elaborate scheme to, in
3   essence, create additional L&H customers.
4   These new customers, quote, the Language
5   Development Companies, end quote, or LDCs, in
6   quotes, enabled L&H to claim revenue of 100
7   million in license fees and 8.5 million in
8   prepaid royalties from the LDCs in 1996 and
9   1997, giving the false impression --
10     A.   I'm sorry, '98 and '99.
11     Q.   1998 and 1999, giving the false
12  impression of exponential growth.
13        Do you see that?
14     A.   I do.
15     Q.   Are you aware of any facts or
16  circumstances that would suggest the SEC's
17  statement there is inaccurate?
18     A.   That's a lot of statements.
19        First of all, let me just, to
20  bolster and scheme, these really look to
21  subjective intent on the part of L&H.
22        MR. BUTLER:  I just want to
23     clarify.  You're asking for his
24     understanding of the facts of the case,
25     is he aware of facts, you're not asking

ESQUIRE DEPOSITION SERVICES
212-687-8010

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 78

D. Larue

1  about his opinion?
2  MR. HARRIS: Correct.
3  A. You stated that in the negative.
4  Would you repeat the question?
5  Q. Are you aware of any facts that
6  would make the statements by the SEC that we
7  just read into the record inaccurate?
8  A. I'm certainly not aware of all of
9  the facts in this case.
10  I do have an impression that there
11  are facts that would dictate against a
12  conclusion, this conclusion. There are facts
13  perhaps on both sides of the issues. It
14  looks like they reviewed all of the facts and
15  came to a conclusion.
16  Q. So I believe that the answer you
17  gave me was yes, you are aware of certain
18  facts that would lead -- that would cause the
19  statements by the SEC to be inaccurate?
20  MR. BUTLER: Objection to form.
21  A. My expert report was based on the
22  assumptions I stated in the report.
23  In the process of preparing my
24  report, I did review some of the documents in
25

Page 79

D. Larue

1  this case, so I've had some exposure to some
2  of the facts clearly.
3  I think there probably are facts
4  out there that would dictate that this wasn't
5  a scheme or this wasn't the purpose behind
6  the LDCs, that there were other purposes
7  behind the LDCs perhaps or at least some of
8  the LDCs.
9  I make the other comment that this
10  statement refers to all of the LDCs and I'm
11  unfamiliar with the LDCs. I think there were
12  about 30 LDCs. They may also be referring to
13  some of the other entities that were named a
14  little differently. I'm not familiar with
15  those other entities or what happened or what
16  didn't happen.
17  Q. Just so I make sure I understand
18  the answer, do you have my question in mind?
19  What question did I ask you?
20  A. You asked me if I was aware of any
21  facts that would indicate that this
22  conclusion was wrong.
23  Q. Or inaccurate.
24  A. Or inaccurate.
25

Page 80

D. Larue

1  Q. And is the answer to that question
2  you do or you don't have such facts?
3  A. I think there are always facts and
4  circumstances on both sides of the issue, so
5  certainly there are going to be facts out
6  there that would lead in one direction and
7  other facts that would lead in another
8  direction and I've seen documents that refer
9  to some of those facts.
10  Q. And I guess what I'm really asking
11  you is not to speculate about what facts may
12  be out there, but what facts -- any facts
13  that you are aware of, as you sit here today?
14  A. Yes.
15  Q. What are those facts?
16  A. Oh, gosh. There are a number of
17  facts. I guess one fact would be that it
18  appears that the technology that was
19  licensed -- the technology development tools
20  that were licensed to the LDCs were
21  functional and capable of performing as
22  advertised.
23  I believe that the licenses --
24  license agreements were real, that they
25

Page 81

D. Larue

1  conveyed certain rights and privileges to the
2  LDCs. The LDCs had had independent
3  investors, it's my understanding from the
4  audit committee report that at least
5  initially the LDCs, the intention of the LDCs
6  was to actually develop the language specific
7  software within the LDC, so those are some of
8  the facts that would seem to indicate that
9  the LDCs, at least initially or at least some
10  of them had purposes that were different from
11  what's described here.
12  Q. When you say, initially, what do
13  you mean by initially and which LDCs do you
14  consider to be initial?
15  A. I don't recall. I didn't look at
16  specific -- the audit committee report, I
17  believe, referred to a couple of the LDCs.
18  There were several LDCs out there.
19  I never really reviewed or
20  assimilated into my report any of the
21  specific facts and circumstances about the
22  activities of the specific LDCs.
23  MR. HARRIS: Can you read that
24  back.
25

21 (Pages 78 to 81)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 82

D. Larue

1
2  (Record read.)
3      Q.  Now, you say you never really
4  reviewed the facts and circumstances of the
5  particular LDCs except those four in your
6  report?
7      A.  For each one of the specific LDCs,
8  that's correct.  I don't believe information
9  is available for most of them or some of the
10  information.
11     Q.  Is that true, as you sit here
12  today, not limiting it to your report, but
13  you never reviewed the particular facts and
14  circumstances of specific LDCs?
15     A.  All of the facts and circumstances
16  surrounding specific LDCs, no.
17     Q.  Did you review any of the facts and
18  circumstances involving any specific LDC?
19     A.  Well, of course I did.
20     Q.  What facts and circumstances did
21  you --
22     A.  I knew, for example, that Radial
23  had formed three LDCs, LIC had formed four
24  LDCs and LDF had formed, I believe, six LDCs.
25          Can I ask a question?

Page 83

D. Larue

1
2      Q.  Yes.
3      A.  This says complaint for injunctive
4  relief.  This doesn't mean a final
5  determination has been made by the SEC as to
6  the complaint alleged, this is still an
7  allegation, this is not a conclusion or
8  enforcement action on the part of the SEC, is
9  that correct?
10         It says complaint.  Is this
11  something that's been alleged or is this
12  something that -- it says alleges, SEC
13  alleges.  Okay, I understand now.
14         MR. BUTLER:  What's the answer to
15  that question?  You said he could ask
16  it.
17         MR. HARRIS:  I said he can ask it.
18         MR. BUTLER:  Should you tell him
19  the answer to the question or should I?
20         MR. HARRIS:  Nobody should tell him
21  the answer to the question.
22         MR. BUTLER:  The answer to your
23  question is these are allegations.
24     Q.  These are the final conclusions by
25  the SEC against L&H and they are bringing it

Page 84

D. Larue

1
2  in a District Court.  This is what the SEC
3  finally believes to be true and accurate,
4  otherwise, they could not allege it in
5  District Court.
6          MR. BUTLER:  Sir, that is not true.
7  These are allegations.  They are no more
8  true than the allegations in this
9  complaint in this case and you are not
10  going to be able to mislead this
11  witness.  This is a complaint.  A
12  complaint is a complaint.  You know what
13  it means, I know what it means.  The SEC
14  is often wrong.
15         I'm sure that Boies, Schiller has
16  defended clients against the SEC and if
17  you want to take the position --
18         MS. DYER:  A consent order was
19  issued here.  They copped to all the
20  allegations.  Why are you wasting
21  everyone's time?
22         MR. HARRIS:  The SEC reached the
23  conclusion -- if you want to mislead
24  your own witness, you clearly have done
25  that throughout his report process.

Page 85

D. Larue

1
2          MS. DYER:  If you're going to get
3  on your high horse, why don't you read
4  the consent order before do you so.
5          MR. BUTLER:  If there is a consent
6  order that you want to ask this witness
7  about that I don't think he has ever
8  seen, you can ask him about that, but
9  even a consent order --
10         MR. HARRIS:  I didn't want to ask
11  him about that.
12         MR. BUTLER:  It does not establish
13  the facts in this case and you should
14  not pretend otherwise with this witness.
15  You haven't proven anything at trial yet
16  and so I don't know why you think it's
17  ridiculous for me to suggest that you
18  may have the facts wrong.
19         MR. HARRIS:  Because this is not
20  the time to do it.
21         MR. BUTLER:  I agree it's not the
22  time to do it, but you said he can ask a
23  question and you decided to show him
24  this document.
25         Go ahead.  I don't mean to

ESQUIRE DEPOSITION SERVICES
212-687-8010

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 86

D. Larue

1 interrupt.
2    MR. HARRIS: Yes, you do mean to
3 interrupt and you've been doing it all
4 morning.
5    I'm going to ask you again to try
6 to be professional. I understand that
7 is difficult for you. You have not
8 demonstrated that here this morning.
9    You are to object to the form and
10 nothing else. Stop coaching the witness
11 and stop interrupting the examination.
12 I have been polite before, but it is
13 time for you to stop. You understand.
14    MR. BUTLER: I've heard all this.
15 You told this witness he could ask a
16 question. It, unfortunately, did not
17 turn out too well, but why don't you
18 just ask your next question.
19    Q. Are there any facts and
20 circumstances -- identify all facts and
21 circumstances of which you are aware that
22 would make any statement in paragraph 16 of
23 Larue Exhibit 3 inaccurate.
24    MR. BUTLER: Objection to form.

Page 87

D. Larue

1    A. Again, I did a very limited review
2 of the facts and circumstances. My report is
3 based on the assumptions that I made in
4 formulating my opinion.
5    Q. Mr. Larue, again, I'm going to ask
6 you if you had my question in mind?
7    MR. BUTLER: Sir, he answered your
8 question. Ask your next question.
9    Q. What was my prior question?
10    MR. HARRIS: Could you reread his
11 prior question, please.
12    (Record read.)
13    MR. BUTLER: I think he answered
14 that question, so you don't have to
15 answer it again, but if you want to ask
16 it again, you're free to do so.
17    Q. I believe you didn't answer the
18 question. I didn't ask you about your
19 report. I didn't ask what you did or didn't
20 do.
21    I asked about all facts of which
22 you are currently aware which would make the
23 statements in paragraph 16 of Larue Exhibit 3
24 inaccurate.

Page 88

D. Larue

1    MR. BUTLER: I object to the form
2 of the question.
3    We're not presenting Professor
4 Larue as an expert on the facts and his
5 factual assumptions are set forth in his
6 report, so your question is
7 inappropriate.
8    Q. You can answer the question now.
9    A. First of all, you're asking me for
10 all of the facts.
11    I don't remember all of the facts
12 that I may have been aware of or been exposed
13 to and, frankly, I don't remember in every
14 case what are facts or what are things that I
15 thought might have been facts or had reason
16 to believe might have been facts, but didn't
17 know for a fact that they were facts, so, you
18 know, in my report, I knew that Radial or at
19 least I understood that Radial had been
20 formed by a private investor whose name was,
21 I believe, Van Deun, V-a-n D-e-u-n, and I
22 believe it was in March of '98, that that
23 investor had contributed Belgium francs to
24 Radial, that Radial had formed three LDCs. I

Page 89

D. Larue

1 believe it was Turkish, Farci and Bassa.
2 That the LDCs entered into licensing
3 agreements with Lernout and Hauspie. The
4 LICs were formed by Hardeman, I believe,
5 sometime in 1998 with contributions and other
6 investors and that LIC formed, I believe,
7 four LDCs, Czech, Slavic, Polish, Hungarian
8 and purchased licenses, nonrefundable
9 licenses from L&H.
10    LDF, I believe, was formed sometime
11 in '98 or '99 by, among others, an insurance
12 company in Belgium who made contributions to
13 the capital and LDF formed, I think, six
14 LDCs, I think 14 was the total.
15    It's my understanding that Artesia
16 made loans to the LDCs.
17    What else?
18    Q. Is there any other fact of which
19 you are aware that you believe makes the
20 statements in paragraph 16 of Larue 3
21 inaccurate?
22    MR. BUTLER: Objection to form.
23    A. I can't recall all the facts and
24 circumstances that I reviewed in connection

23 (Pages 86 to 89)

ESQUIRE DEPOSITION SERVICES
212-687-8010

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 90

D. Larue
with preparing my report.
I can state that the facts that I relied upon and the assumption that I relied upon as represented to me by counsel are stated clearly in my report.
Q. And have we now exhausted, as you sit here today, all facts of which you are aware today and can remember that would make the statements in paragraph 16 of Larue Exhibit 3 inaccurate in your view?
MR. BUTLER: Objection to form.
A. No, I don't think so.
Q. Please provide those to me.
A. One of the problems that I have in answering your question is that certain facts I don't know to be facts.
I don't know -- I haven't seen documentation that allows me to independently make a determination as to what something that I understood to be the case was, in fact, a fact of the case.
Once again, the facts upon which I relied and the assumptions on which I relied are clearly stated in my report as the basis

Page 91

D. Larue
for the opinions rendered in that report.
I can't -- I just can't remember all of the things -- I can't make the distinction sometimes between, you know, what was alleged a fact to have been in one of the complaints that I reviewed and what is, in fact, a fact and one of the things that I have noticed is that oftentimes, people are pretty careless with the accuracy of the facts that they assert.
Q. Let's move to paragraph 18 of Larue Exhibit 3.
I would ask that you review that and I am going to direct your attention to various statements therein.
A. All right. I've read it.
Q. Now, in paragraph 18, among other things, the SEC states, The LDC were little more than shell companies.
Do you see that?
A. I do.
Q. Do you understand it?
A. Well, there is no definition as to what a shell company is. It certainly isn't

Page 92

D. Larue
defined under GAAP. It's one of the terms that is used that is subject to various means.
The term shell company is not a term that is defined anywhere in GAAP throughout the relevant period, but I have a general idea as to what they must mean.
Q. Okay. What is that understanding?
A. Well, it appears that they're describing companies without -- without employees or assets, liabilities, business activities and so forth and let me make a note that it says more than shell companies, so they were more than shell companies.
And if I could, one other comment.
MR. BUTLER: Feel free to finish your answer.
Q. Go on as long as you want. At some point, you'll answer my questions.
A. I thought I had.
The public disclosure, this is a summary of the public disclosure from the financial statements, it's not a verbatim restatement of that disclosure, it's worded

Page 93

D. Larue
differently. For example, they refer to strategic partners in the public disclosure. I don't believe they refer to LDCs by that name. Paragraph 18, where it says, Within that public disclosure, what follows that is someone else's description of what was actually said in the disclosure. It's not verbatim.
Q. That someone else is the Securities and Exchange Commission, correct?
A. Yes.
Q. It is the Securities and Exchange Commission that used the term shell companies?
A. In this document, yes.
Q. And you have provided your understanding of what the SEC meant by the term shell companies.
Now, do you have any facts to believe that the SEC got it wrong, that the LDCs were, in fact, more than little more than shell companies?
A. I have an understanding that the LDCs were more than what one might infer from

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 94

```
1              D. Larue
2    the use of that term here.
3         Q.  Where does that understanding come
4    from?
5         A.  It probably comes from the
6    documents that I reviewed or it may have come
7    from the complaint that I reviewed, that set
8    forth what purported to be facts and may or
9    may not have been facts.  That's probably
10   where it came from.
11        Q.  Now, you said that generally
12   accepted accounting principles does not
13   define shell companies, correct?
14        A.  That's correct.
15        Q.  Does generally accepted accounting
16   principles define Wednesday?
17        MR. BUTLER:  Objection to form.
18        A.  Not to my knowledge.
19        Q.  Do you think that there is -- do
20   you think that it is, that all terms that
21   accountants use are defined in GAAP?
22        A.  I think that technical terms that
23   could lead to different definitions or
24   different interpretations or at least
25   critical terms, many of those terms,
```

Page 95

```
1              D. Larue
2    certainly not all of them have been defined
3    in GAAP.
4         GAAP does contain several
5    definitions of what they mean and some of
6    those definitions are very complicated, but,
7    yes.
8         THE VIDEOGRAPHER:  We are going off
9    the record.  This is the end of tape 1.
10   The time is 11:23.
11        (Recess.)
12        THE VIDEOGRAPHER:  We are going
13   back on the record.  This is tape No. 2.
14   The time is 11:35.
15        MR. HARRIS:  Could you read back
16   the last question and answer.
17        (Record read.)
18        Q.  Having had an opportunity to review
19   the statements by the SEC in Larue Exhibit 3,
20   is there anything in there that causes you to
21   change any of your opinions in this matter?
22        A.  No, sir.
23        Q.  Mr. Larue, when were you retained
24   in this matter?
25        A.  I don't recall.  It was in spring
```

Page 96

```
1              D. Larue
2    of 2006, sometime in late -- I don't recall,
3    April, May, possibly.
4         Q.  And do you have -- can you
5    approximate the amount of time that you spent
6    from the time that you were retained until
7    January 5, 2007 working on this matter?
8         A.  Three hundred hours.  Probably
9    more.
10        Q.  Mr. Larue, did anyone assist you
11   with regard to the work that you did in this
12   case?
13        A.  Yes, sir.
14        Q.  And who was that?
15        A.  As I've indicated in my report,
16   Cornerstone Research Associates assisted me
17   with this report.
18        Q.  Did anyone else assist with you
19   this report, your report?
20        A.  Of course, I had discussions with
21   attorneys along the way, but in terms of
22   assisting me with the report, Cornerstone
23   Associates and individuals with Cornerstone
24   Associates.  I didn't hire anyone to help me,
25   no.
```

Page 97

```
1              D. Larue
2         Q.  Was there a particular person that
3    you viewed as the point person at Cornerstone
4    Associates?
5         A.  That would be Amir Rosen.
6         Q.  And had you worked with Mr. or Mrs.
7    Rosen --
8         A.  Mr.
9         Q.  Had you worked with Mr. Rosen in
10   the past?
11        A.  No.
12        Q.  Why did you decide to use Mr. Rosen
13   at this point?
14        A.  I didn't make that decision.
15   Cornerstone Research Associates decided who
16   they would assign to this case.
17        Q.  Maybe I wasn't clear.
18        Had you worked with Cornerstone
19   Associates previously?
20        A.  I had not worked with them, no,
21   sir.
22        Q.  How did you decide to use
23   Cornerstone Associates to assist you with
24   this report?
25        MR. BUTLER:  Do you mean
```

25 (Pages 94 to 97)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 98

```
 1              D. Larue
 2   Cornerstone Research, the company, or
 3   associates at Cornerstone?
 4      A.  How did I decide?
 5      Q.  Yes.
 6      A.  Adele Turki contacted me on behalf
 7   of counsel.  They contacted me.
 8      Q.  I see.
 9          What did they say to you?
10      A.  They asked me if I would have an
11   interest in working with them on a case.
12      Q.  And was that your first contact
13   with regard to this case?
14      A.  With regard to this case, that's my
15   first contact with regard to this case, yes,
16   I believe it was, yes.
17          Let me back up.  Just to be clear,
18   I had met Dr. Turki in January of 2006.
19      Q.  Was the telephone call from Mr.
20   Turki -- Dr. Turki, I'm sorry -- the first
21   exposure you had to this matter?
22      A.  To this matter?
23      Q.  Yes.
24      A.  Probably not.
25      Q.  You were already retained?
```

Page 99

```
 1              D. Larue
 2      A.  No, no, sir.  When I say probably
 3   not, I mean I do read a lot.  I do keep up
 4   with things.  I've got, certainly in my
 5   capacity as chairman of the audit committee,
 6   I read a great deal during the course of any
 7   given week and, you know, one of the things
 8   that I read are SEC publications.
 9          So whether or not I heard of Dexia
10   or when I first learned of that, was that
11   before or after they contacted me, I can't
12   tell you.
13      Q.  At the time that Dr. Turki
14   contacted you, you had not yet been retained
15   as an expert in this matter, correct?
16      A.  That's correct.
17      Q.  What did Cornerstone Research do
18   for you?
19      A.  Well, they would review drafts of
20   my report and they would look over the drafts
21   of that report.
22          I assumed that they were verifying
23   the accuracy of the representations that I
24   made in terms of the applications of GAAP, I
25   assume they were doing that.  They would
```

Page 100

```
 1              D. Larue
 2   catch typographical errors and so forth.
 3          Certainly in connection with
 4   reviewing the KPMG work papers, they did a
 5   comprehensive, or at least they did a search
 6   of the KPMG database, as I've described in
 7   this report, and drafted up a summary of
 8   their findings for me to review.
 9      Q.  Did Cornerstone Research do
10   anything else with regard to your report?
11      A.  I think that covers it.
12      Q.  Who retained you as an expert in
13   this matter?
14      A.  I believe I was retained by Mr.
15   Butler.  That was communicated to me by Dr.
16   Turki.
17      Q.  And what were you asked to do as an
18   expert in this matter?
19      A.  I've indicated in my report what I
20   was asked to do.
21      Q.  What was it?
22      A.  I was asked to offer the following
23   information and opinions:
24          An overview of financial reporting
25   of U.S. generally accepted accounting
```

Page 101

```
 1              D. Larue
 2   principles and auditing principles as they
 3   would apply to a public company such as
 4   Lernout and Hauspie.
 5          An overview of, in particular, of
 6   the accounting for revenues from special
 7   purpose entities based on factual assumptions
 8   about specific transactions at issue in this
 9   litigation.
10          I was asked to provide a
11   description of the accounting principles
12   under GAAP that were relevant to whether or
13   not -- whether and under what conditions L&H
14   could recognize revenue from these
15   transactions.
16          An opinion as to whether plaintiffs
17   are correct in asserting that L&H's revenue
18   recognition related to these transactions was
19   clearly improper under then existing GAAP
20   based on the loans made by Artesia.
21          An opinion as to whether, to an
22   outside observer, could determine L&H's
23   accounting treatment for these transaction
24   based on a review of public filings and press
25   releases.
```

26  (Pages 98 to 101)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 102

D. Larue

1
2          An opinion based on a review of the
3    documents produced in this litigation from
4    the files of L&H as auditor KPMG as to
5    whether KPMG was misled by the loan
6    documentation prepared by Artesia in
7    connection with these transactions and an
8    opinion as to whether the reasons given by
9    L&H's audit committee for announcing a
10   restatement of 373 million in L&H revenue are
11   the same as those alleged by plaintiffs in
12   this case.
13          I was also asked to provide a
14   description of the various ways in which,
15   according to plaintiffs, L&H inflated its
16   publicly reported revenue pursuant to an
17   alleged scheme to defraud and an estimate of
18   the relative size of Artesia's role in that
19   alleged scheme.
20       Q.   Let the record reflect you were
21   reading from your report, is that correct?
22       A.   Yes, sir.
23       Q.   Did you, as you sit here today, do
24   you have an understanding of why you were
25   asked to do what you've just read?

Page 103

D. Larue

1
2       A.   My understanding is that this was
3    in connection with a civil suit brought by
4    certain individuals against Dexia as
5    successor to Artesia.
6       Q.   Do you have any understanding as to
7    whether or not any of what you were asked to
8    do relates in any way to that civil suit?
9       A.   Yes, I assume that the opinions
10   expressed in this report relate to
11   plaintiff's assertions or expected assertions
12   in connection with that suit.
13       Q.   And so your understanding of the
14   relationship between your opinions and how it
15   relates to the civil matter is your
16   assumption about plaintiff's assertions,
17   correct?
18          MR. BUTLER:  Objection to form.
19          Can I hear that question again.
20          (Record read.)
21       A.   Not all of these things that I've
22   listed relate to plaintiff's assertions, but
23   some of them do.
24       Q.   Which relate to plaintiff's
25   assertion and which do not and can you

Page 104

D. Larue

1
2    identify them by paragraph?
3       A.   Paragraphs A and B, for the most
4    part, provide a background for the opinions
5    and descriptions that I've listed in
6    paragraph C and I believe that these relate
7    to plaintiff's assertions or expected
8    plaintiff assertions.
9          Possibly also D.
10       Q.   Okay.  Possibly also D is
11   background or relates to plaintiff's
12   assertions?
13          MR. BUTLER:  Object to form.
14       A.   I don't know.
15       Q.   When you say, plaintiffs, who do
16   you mean?
17       A.   At the time I prepared this report
18   as a non-attorney, my understanding is that
19   the plaintiffs were the individuals indicated
20   on the cover of my expert witness report and
21   my rebuttal report.
22       Q.   And at the time you prepared your
23   report, did you understand that all of the
24   plaintiffs made identical assertions?
25       A.   I don't know if they did or not.

Page 105

D. Larue

1
2    I'm not an attorney.  I don't know how these
3    kinds of cases are really conducted.
4          Excuse me, if I can clarify my
5    answer.  I will tell you, as a non-attorney,
6    it has always been my correct or incorrect
7    understanding that these cases were going to
8    be litigated together and tried together, so
9    I would assume that the assertions would be
10   made in common for all four groups.
11          I may be wrong about that, but I
12   think that was my assumption if I ever took
13   the time to think about it.
14       Q.   From reviewing your report, I
15   understood that you reviewed the assertions
16   of the class plaintiffs, is that correct?
17       A.   You'll have to be clear.  I don't
18   know what you mean by class plaintiffs.
19          Are you referring to the class --
20   are you referring to section 5?
21       Q.   Let's go to -- let me mark as Larue
22   Exhibit 4, a copy of your report.
23          (Copy of report of David Larue
24   marked Larue Exhibit 4 for
25   identification.)

27  (Pages 102 to 105)

2dfd6da5-8e66-4d39-80f9-bae02f49a691