D. Larue

Q. Can you identify Larue Exhibit 4 for me, please?

A. This appears to be a copy of the report that I filed in January of 2007.

Q. And Larue Exhibit 4 is a copy of the document that you were reading from just a moment ago when you identified what you were asked to do?

A. Yes, sir.

Q. And if you turn to Exhibit 3 of Larue Exhibit 4, it identifies the materials you considered in preparation for this report, correct?

A. That's what Exhibit 3 does, yes, sir.

Q. Is it complete?

A. As far as I know, it's complete.

Q. And if you turn to page 2 of Exhibit 3 of Larue Exhibit 4, it identifies two complaints on that page.

Do you see that?

A. Yes, sir.

Q. Are those the only two complaints that you reviewed prior to the submission of

D. Larue

your report on January 5, 2007 in this matter?

A. I think so. I don't remember -- I remember looking at two. I'm trying to remember if one -- I believe these are the two that I looked at.

Q. Have you reviewed any other complaints in this matter since the submission of your report on January 5, 2007?

A. No, sir.

Q. And so when you referred to plaintiff's assertions in your report, you are referring to the assertions in these two complaints, correct?

A. No, sir.

Q. What are you referring to?

A. I'm referring to the assertions that counsel had asked me to assume that plaintiff would make or had already made or were made in these complaints.

I didn't derive from these reports what complaints I would respond to or what I wouldn't.

Q. Were the assertions that were

D. Larue

provided to you by a counsel provided to you orally or in writing or both?

A. Orally.

Q. And the facts that were -- you were asked to assume as reflected in your report, were they provided to you orally or in writing?

A. By counsel, orally.

Q. Did anyone else provide you assumptions other than counsel?

A. I don't know. I certainly had some discussions with Amir Rosen at Cornerstone. I don't remember the content of all of those discussion. He may have reviewed a draft and suggested that this assumption was inappropriate. I just don't recall.

Q. And did Cornerstone provide you anything in writing?

A. In writing, dealing with what?

Q. Dealing with this matter?

A. Well, they provided me, I mean, they would comment on my draft and so that was a provision in writing, basically corrections or typos and so forth or

D. Larue

questions or comments on my drafts that I had sent out.

Did they provide me with other things? They provided me with a number of Bates stamped document.

Q. Is everything other than the draft that Cornerstone provided you related to this matter reflected on Exhibit 3?

MR. BUTLER: Objection to the form. He didn't say the drafts were provided by Cornerstone, but you can answer the question.

A. Let me be clear. I generated those drafts. I would get comments, written comments back sometimes on those drafts. Sometimes the comments would be oral.

Q. I didn't mean to suggest anything else.

I assume when you got it back, you referred to the comments on those drafts?

A. Yes, I just want to be clear. As far as the -- I reviewed this sheet, Exhibit 3.

As to the specific Bates numbers, I

2dfd6da5-8e66-4d39-80f9-bae02f49a691

D. Larue

believe that was provided to me by Cornerstone. They had accumulated and made a comprehensive listing of the documents I had been provided with. As far as I know, this is complete.

Q. So other than the marked up drafts, everything that Cornerstone provided to you relating to this matter is reflected on Exhibit 3?

A. I believe so.

Q. Now, you described what you were asked to do and I believe that you read paragraphs 4-A through 4-D of Larue Exhibit 3, is that correct?

A. Yes, sir.

Q. And did you do everything that you were asked to do as reflected in paragraphs 4-A through 4-D?

A. I believe I did.

Q. Did you do anything else in this matter?

A. Not that I recall.

Do you have a specific example?

Q. Just a question.

D. Larue

A. I don't recall doing anything else. What I did was write this report and review the documents.

Q. And are all of the opinions about which you are prepared to testify at trial in this matter reflected in your opening report and/or your rebuttal report?

A. As far as I know, they are.

Q. Are the bases for each of those opinions set forth in your opening report and/or rebuttal report?

A. I believe they are.

Q. If you look at page 4, at the top, it talks about based on certain factual assumptions, correct?

A. Yes, sir.

Q. Are all of the factual assumptions on which you base your opinions in paragraph 4-C set forth in Larue Exhibit 3?

MR. BUTLER: I don't understand.

Q. I'm sorry, Larue Exhibit 4, your report.

A. I named my appendices exhibits, so I'm getting confused.

D. Larue

Q. We will agree that your report is Larue Exhibit 4 and I will try to use the term report.

Fair enough?

A. Yes, sir.

Q. Let me rephrase the question.

At the top of page 4 of your report, you refer to certain factual assumptions, correct?

A. Yes, sir.

Q. It is those factual assumptions that you base the opinions set forth in paragraph 4-C of your report, Roman S-I through V, correct?

A. To the best my knowledge and belief, yes.

Q. Are all of the factual assumptions you refer to in paragraph C set forth in your report?

A. To the best of my knowledge and belief, they are.

I would also indicate I filed a rebuttal case in this report and I believe there may have been some assumptions stated

D. Larue

there in response to Mr. Love's report.

Q. Are the factual assumptions, if you can turn to, page 23, there is a section 4, Roman I, entitled Relevant Factual Background, correct?

A. Yes, sir.

Q. That goes through about somewhere on page 26, correct?

A. Roman numeral I goes through page 26. I'm sure that throughout some of the other discussions, there are additional factual assumption that are articulated.

Q. Is all of Roman I on pages 23 through 26 factual assumptions that you were asked to make by counsel for Dexia?

A. Directly or indirectly, I would say the answer to that question is yes.

I will say that I have reviewed, for example, I think you referred to the first complaint or the third complaint or fourth complaint and I had -- my recollection is that I had prepared a draft based on what I took to be factual representations in that complaint and I believe I drafted up, you

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 114

D. Larue

know, my understanding of the facts and circumstances and in subsequent -- counsel reviewed that draft and may have made corrections or additions.

I know in a couple of cases, probably made some additions to the facts that I had assumed to be true in this case, so I prepared the first draft based on, I believe, these complaints and those facts were revised in order to more accurately depict what was going on.

Q. More accurately depict not what was going on, but what counsel wanted you to assume?

MR. BUTLER: That's not what his testimony was.

A. It's my understanding that the factual assumptions that I was asked to make were factual assumptions and the opinion of counsel were true and correct.

I don't believe I was asked to assume anything and I didn't find anything that would cause me to believe that I was asked to assume something that was incorrect.

Page 115

D. Larue

Q. So -- but let me make sure this is -- that I'm sure I understand.

There are statements of facts set forth in your report, correct, about this matter?

A. As I've indicated on page 23, I had been asked to make factual assumptions. I'm not stating factually that -- the assumptions certainly under Roman numeral I are assumptions that I believed to be true, but I haven't made any independent investigation to confirm the accuracy of those assumptions or facts.

Q. That's really what I want to make sure I understand is that the statements which appear to be statements of fact are really statements of your assumption, correct?

MR. BUTLER: I object to the form of the question. He stated, quite clearly stated that these are factual assumptions.

A. I did state there that these are factual assumptions.

Page 116

D. Larue

I presume that most of the facts or all of the facts stated as stated are true and correct, but I presented them as factual assumptions. I didn't perform any independent investigation of the facts to determine the accuracy of those facts.

Q. And, fair enough, I just wanted to make sure that if someone were to pick this up and miss -- pick it up on page 20, start reading on page 25 and not have read paragraph 58, that they understand that those statements are statements of assumptions, not statements of facts based on your investigation of the facts?

A. That's a fair statement.

Q. That's true of all statements that appear to be statements of facts in your report, correct, they are assumptions?

A. No, that's not true.

In section 4, beginning on page 37, I do believe I make specific references to specific documents that were reviewed.

Which is not to say there aren't assumptions in there, as well, but I believe

Page 117

D. Larue

a number of these facts were verified to the extent that the documentation indicated them to be so.

Q. I guess I'm really now not understanding. I think it's important that I do try to understand.

You are referring to section 4 that begins on what page?

A. Thirty-seven.

Q. So this is Roman IV, not section 4 that begins on page 26?

A. That's correct.

Q. So Roman IV through page 43, correct?

A. Yes, sir.

Q. And just so I understand correctly, that in certain statements here, you set forth what was reflected in documents, correct?

A. Reflected in the footnoted documents, yes.

Q. Did you do anything to determine whether or not those documents were accurate?

MR. BUTLER: I object to the form

Page 118

D. Larue

of the question.

A. You'll have to define what you mean by accurate. They were to the best of my knowledge and belief, the documents.

Q. For example, and this is an extreme, but I just want to understand your methodology.

If a document said Joe Lernout killed his mother, you did nothing to determine whether, in fact, Joe Lernout killed his mother?

MR. BUTLER: Objection to form.

A. I don't like that exhibit. If a KPMG document said we performed this procedure and this is how we did it and here are the documents we found to support that, I assume that's what they did.

I didn't interrogate or interview any of the people who authored the documents. I assume the documents provided in the KPMG file were accurate reflected what they were purported to reflect, unless I've stated otherwise, which I may have someplace along the way.

Page 119

D. Larue

Q. So the only documents that you're referring to in Roman IV are KPMG work papers?

A. I would have to look at the footnotes.

No, sir, there were references to BDB Bates numbers. There is at least one reference there.

Q. Can you identify that for me?

A. No, sir.

Do you mean read the number?

Q. Just point me to the page.

A. I'm sorry, 41. I thought you wanted me to tell you what was on that document from memory.

Footnote 129.

Q. Any other non-KPMG work papers that are reflected in Roman IV?

MR. BUTLER: Objection to form.

A. I don't see any as I sit here looking at them.

Let me clarify, some of the factual assumptions made in this report, as referenced in the report, were from the audit

Page 120

D. Larue

committee report.

Q. Okay. Did you reject any facts from the audit committee report?

MR. BUTLER: Objection to form.

A. Any facts or opinions?

Q. Facts.

A. The portion of the audit committee report that addressed the issues that I was looking at, I don't recall that I reflected -- I don't recall that I rejected any facts, but, again, there may have been facts in there that I may have rejected that had to do with other aspects of the transaction or earlier transactions.

I don't know what you mean by reject.

Q. Did you assume that the facts set forth in the audit report were true?

MR. BUTLER: Objection to form.

A. I would have to go back and reread the report.

I don't remember. When you say that, they may have used some terminology that I didn't feel comfortable with or I

Page 121

D. Larue

didn't feel accurately reflected or I felt was ambiguous. I would have to go back and reread it.

Q. Fair enough.

Is this a fair statement, if the facts that you were asked to assume were inaccurate, then your opinions would be different?

A. That's not fair to assume. As a global statement, clearly, it would depend on what facts you're referring to.

If the facts proved to be different, they may or may not be relevant to the opinions I expressed.

If, in fact, they are different, in what way are they different? What is the order of magnitude of the difference and how does that effect my overall opinion?

So if it proved to be the case that some of the facts on which I stated that I based my opinion proved to be incorrect or inaccurate, I would have to go back and review those facts and circumstances to make a determination as to whether or not that has

2dfd6da5-8e66-4d39-80f9-bae02f49a691

D. Larue

any effect on the opinion that I expressed and I actually indicated that in section 1, that any additional information that would change those underlying facts, that's one reason I disclose all of the facts that I'm relying on in my opinion -- in my report.

Q. Are any of the facts that you disclose in your -- are any of the -- they're just factual assumptions, correct?

A. They're factual assumptions, presumably they're factual.

Q. Why do you presume that?

A. Well, I presume that some of the -- they're factual assumptions.

Q. Okay. And who do you believe would -- is more likely to provide complete and unvarnished facts regarding this -- the events at issue here, the United States Security and Exchange Commission or Dexia's counsel?

MR. BUTLER: Objection to form.

You guys really like the SEC.

You can answer the question.

A. I believe that the factual

D. Larue

assumptions upon which I was asked to rely provided to me by counsel -- I'm trying to find a way to answer your question.

Q. Just try answering it.

A. I believe what I was told by counsel, I reflected that in this report, I've done that, so opposing counsel and opposing counsel's expert has an opportunity to test the veracity of those assumptions.

I tried to write a report. I believe I did write a report that was transparent in that sense. I don't know anything -- I don't know about the SEC. I don't know anybody at the SEC. I don't know what kind of time and effort was put into this. I don't know what kind of documents the SEC consulted, who they consulted, who they interviewed, if they interviewed anyone.

I don't know the bases upon which they or the thoroughness upon which they based their conclusions or recitation or interpretation of the facts.

Q. In providing the facts, do you know who Dexia's counsel consulted?

D. Larue

A. Specifically by name?

Q. Yes.

A. No.

Q. By category?

A. I know there have been a number of depositions in this case.

Specifically where they derived the facts that they asked me to assume in this case, I couldn't tell you.

Q. Because you had said you don't know who the SEC interviewed.

Do you know who Dexia's counsel interviewed?

A. No.

Q. And you know that there were depositions in this case, but you chose not to read any?

A. I don't believe the depositions -- again, I made the factual assumptions clearly stated in my report. I wasn't engaged and did not conduct a thorough independent investigation of the underlying facts and circumstances in order to test the veracity of the facts and circumstances that I assumed

D. Larue

in my report and that is why I disclosed what facts I was relying on.

Q. Just so it's clear, you did not conduct a thorough and complete investigation to determine any facts in this case, correct?

A. To determine the veracity of the facts in this case, my understanding is there are over a million and a half pages of documents.

I did not review all of those documents. I did not look for documents for the purpose of determining whether or not the document was complete or factually correct.

Q. Okay. If you look at page 4 of your report, paragraph 4-C, Roman I.

You refer to these transactions, correct?

A. These transactions, yes, sir.

Q. What transactions?

A. The specific transactions at issue that are described in section 4.

Q. What are they?

A. Those were the licensing transactions involving the Radial LDCs, the

2dfd6da5-8e66-4d39-80f9-bae02f49a691

D. Larue

LIC, LDCs and the LDF LDCs.

Q. Just so it's clear, those transactions are not described in your report.

What is described is assumptions about those transactions that you were asked to make, correct?

MR. BUTLER: Objection to form.

A. As far as I know, the transactions, to the extent that they are described in my report are, as far as they go, accurate descriptions of the transactions that took place.

Frankly, some of those descriptions, to some extent or to some considerable extent, those transactions or my description of those transactions was, in part, derived from the complaints I cited in Exhibit 3 to my report.

Q. Is it your position that all the facts set forth in those complaints are true and correct?

A. Absolutely not.

Q. How do you decide which were true

D. Larue

and correct and which weren't?

MR. BUTLER: Objection to form. He said he conducted no factual investigation and he hasn't been asked or done any determination as to whether any particular fact in this case is true or not.

MR. HARRIS: But he keeps saying, to the best of my knowledge, they're true, and I want to know what that knowledge is, so I'm going to keep asking him.

MR. BUTLER: If you think he is wrong, tell him what's wrong. His opinions are his opinions. His factual assumptions are clearly set forth.

I don't -- you're spending all your time asking about his factual assumptions when you should be asking about his opinions, so if you think any of them are wrong, you can --

MR. HARRIS: I saw your deposition yesterday.

MR. BUTLER: You'll get much better

D. Larue

answers from this witness.

MR. HARRIS: The truth will allow it.

Q. Mr. Larue, you said that exhibit -- section 4 sets forth the true facts, to the best of your knowledge?

MR. BUTLER: It's not true.

A. The facts, to the best of my knowledge.

MR. BUTLER: Object to the question.

MR. HARRIS: Read back his last answer.

(Record read.)

Q. You say as far as I know. The transactions are accurate and all you know, because you didn't do an independent investigation, is what you were told by counsel, correct?

A. No, sir.

Q. What else did you do?

A. As I explained, I also had -- I also reviewed and made an initial understanding of my facts from

D. Larue

representations made, I believe by some -- I don't remember who the complaint was issued by or who -- I'm not an attorney, so I don't really understand, but I did read that complaint.

There were factual assertions being made in that report, okay, that were part of my summary of the facts in section 4 of my report, so it wasn't -- my understanding of the facts or the factual assumptions didn't derive solely from counsel, it derived also, in particular, from the report of the audit committee from the text of whatever complaint that I have cited in my report.

Q. So let me make sure I understand.

When you say that they are accurate, as far as you know, that is based on what you were told by Dexia's counsel, what plaintiffs alleged in two complaints, but not the Baker plaintiffs and by the audit committee report, correct?

A. One more thing.

Q. Okay.

A. That is, that I've never seen

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 130

D. Larue

anything that I would have considered to have contradicted those facts.

Q. Did you ask for anything?

A. Obviously, I asked for the work papers that had been identified from the KPMG work papers to independently review.

Did I ask for anything else? I don't recall that I did.

Q. And so who decided what documents you would review?

A. At the end of the day, I would say I made that decision, but let me explain.

The documents were provided to me from Cornerstone Research. I didn't request specific documents. I don't believe I requested specific documents other than the KPMG work papers anywhere along the way.

However, in my discussions with Cornerstone at the very beginning of this engagement, I wanted it understood very clearly if somewhere along the way, I felt there were documents I needed to see, that that was my decision to make, not counsel's decision, not Research Associates or

Page 131

D. Larue

Cornerstone Associates' decision to make.

Q. But you didn't ask for any additional documents?

A. I didn't, and one of the reasons I didn't is that I felt that the facts that I had available to me were sufficient to render the opinions that I've rendered in this report. I didn't feel there was a scope limitation of any sort, by virtue of not having these documents.

The other thing that is really critical here is the fact that, again, my report discloses the factual assumptions upon which I based my opinions and, of course, I know that you all are going to get a copy of this. Your expert is going to get a copy of this and, presumably, if there were any major problems in some of the factual statements, that would be brought to my attention and I would have an opportunity to reevaluate.

Q. When you say you haven't seen anything that contradicts it, you indicated there are millions of documents, lots of depositions, none of which you asked to see,

Page 132

D. Larue

correct?

A. That's correct.

Q. And so when you say, I haven't seen anything, the only thing you have seen is what Dexia's counsel thought you should see, correct?

MR. BUTLER: Objection to form.

A. Again, I would disagree with that. The only thing I've seen is what was provided to Cornerstone Research and provided to me presumably by counsel.

In the process of identifying what opinions I would render and what facts and circumstances I needed in order to be able to render those opinions I made a decision that the documents that I had reviewed were sufficient, assuming adequate disclosure in my report, which I believe I had done to render those opinions, so the documents I reviewed in this case, other than the KPMG documents, are documents that were provided to me and not requested by me.

Q. Let's just look at paragraph 73 on page 26. At the end of paragraph 23, you

Page 133

D. Larue

said, Moreover, Messrs. Lernout, Hauspie and Willard did not directly or indirectly own any equity interest in LDF and did not participate in the management of LDF, correct?

A. Yes.

Q. And it is fair to say that you have done no investigation as to whether or not Messrs. Lernout, Hauspie or Willard did, in fact, participate in the management of LDF?

A. That's correct.

Q. And so you were -- that is solely and whether or not there are documents out there that indicate that that is inaccurate, you neither saw them, nor asked to see them?

A. I don't recall seeing any documents that indicated that. How do you prove a negative? That indicated that they did not -- I don't recall seeing documents that indicated that they didn't participate in management and I don't know what documents would be available for that, but I didn't ask to see documents. That's a factual assumption that I've made.

D. Larue

Q. You didn't ask for documents, you didn't ask, are there any documents that show that they did participate in the management of LDF?

A. That's correct.

Q. And you would agree that the documents in this matter, you have reviewed a very small subset, correct?

A. If, in fact, there are 1.5 or thereabouts, millions of documents out there, I've looked at a lot of documents, but certainly it's a small subset of what's out there.

Q. You have not reviewed any testimony or interviews of individuals relating to this matter, correct?

A. I've seen, I've looked at some of the depositions or pages out of depositions. Certainly the depositions in Mr. Love's report, cited in Mr. Love's report.

I saw the comments that he was referring to in his report, so certainly I've seen that, but that's, I'm sure, a very small subset.

D. Larue

Q. It's fair to say that you really were not interested in determining whether or not these factual assumptions were accurate or inaccurate?

MR. BUTLER: Objection to form.

A. That's absolutely not true. I certainly wanted these factual assumptions to be correct. If I had believed that any of these factual assumptions were incorrect or had seen something to indicate that they were incorrect, I would have had a discussion with counsel about that.

Once again, I wasn't retained. I did not conduct any independent investigation of the underlying facts and circumstances to make the determinations about some of the factual assumptions that were stated very clearly in my report.

Q. And just so I make sure, if any of the facts in your report are inaccurate, one cannot know whether your opinion would change as a result of that inaccuracy, correct?

MR. BUTLER: Objection to form.

A. Well, let me talk about accurate

D. Larue

and inaccurate.

First of all, there may be factual statements that are unambiguous that a certain dollar amount is $12 and it turns out to be $14. There is an accuracy issue there.

Other facts lend themselves to various interpretations, so it may be there are facts and circumstances out there that would lend themselves to one interpretation by one person, a different interpretation by someone else, so we're using the term accurate versus inaccurate is probably a little bit of an overstatement for those facts and circumstances, but more to the point, if I felt there were facts and circumstances that were inaccurate, again, what I do is reevaluate my opinions in the light of those facts and circumstances and determine whether or not any sort of adjustment would be required or qualification would be required to any of my opinions I've rendered in this report.

Q. Let me ask this question just so I can understand.

D. Larue

If a juror was to determine that one of the facts that you set forth in your report was inaccurate, he would not know whether or not, as a result of that inaccuracy, you would or would not change your opinion, correct?

MR. BUTLER: Objection to form.

A. I'm not going to agree to that. What fact are you talking about?

Q. I don't know what fact he is going to find inaccurate.

A. I can't speak to the subjective state of mind of a juror. It depends what fact you're talking about. I think maybe you should ask that question again.

MR. HARRIS: Can you read it back.

(Record read.)

A. It depends on the context. It depends on what fact it is.

Q. Exactly.

A. Yes. If I said in my report I assumed that this transaction took place on March 28, 1998, in fact, it occurred on March 23rd of 1998, to the naked eye, that would,

Page 138

D. Larue

to my mind, indicate that while the factual assumption may not have been 100 percent accurate, it's not substantive insofar it goes to the facts upon which I -- that's not what I relied on in rendering my opinion. It depends on what facts you're talking about.

Q. So certain facts, if they were inaccurate, could change your opinion, correct?

A. Certainly. Not all.

Q. Is it fair to say only you know which facts, if found to be inaccurate, would or would not change your opinion?

MR. BUTLER: Object to the form.

A. I don't believe that is fair to say.

I believe that the rationale behind the opinions rendered is adequately disclosed or fully disclosed in this report.

If you understand the rationale behind the opinion, you can see, if you take the time and the effort to look at this report and read it and understand it, admittedly GAAP is extraordinarily complex,

Page 139

D. Larue

especially as it applies to research and development, but if one were to take the time, you could read the rationale behind my opinion. You could see the facts on which I formulated that opinion and you could make, in some cases, probably a pretty good determination or at least good guess as to what facts might have a bearing on the opinion and what kind of facts might result in a change of that opinion.

Q. If you look at two, is it fair to say that you were not asked to render an opinion as to whether or not L&H's revenue recognition related to these transactions was improper under then existing GAAP based on the loans made by Artesia?

MR. BUTLER: What were you referring to? You said based on two.

A. You mean Roman numeral II on pages 3 and 4.

MR. HARRIS: Can you read the question back.

MR. BUTLER: I don't know what you're referring. I have a right to

Page 140

D. Larue

know what you're referring to when you ask a question.

(Record read.)

MR. BUTLER: Can you tell me what you were referring to?

Q. Do you understand my question?

MR. BUTLER: Are you talking Exhibit 2, paragraph 2, page 2, Roman numeral II?

Q. Can you answer the question.

A. What I was asked to do was clearly set forth on page 4 -- 3 and 4 and I was not asked to opine as to the -- whether or not L&H's -- I'm trying to remember how you asked the question. I wasn't asked to opine as to whether L&H's accounting was correct.

Q. That wasn't my question.

Is it accurate that you were not asked to express an opinion whether or not L&H's revenue recognition related to the transactions described in your report were improper under then existing GAAP based on the loans made by Artesia?

A. That's correct.

Page 141

D. Larue

Q. Have you reached such an opinion?

A. No.

Q. If you look at paragraph 4-C Roman F-III, you refer to an outside observer.

I'm not sure what you mean by an outside observer.

A. An opinion as to whether an outside observer could determine L&H's accounting treatment for these transactions based on a review of public filings and press releases.

An outside observer who was -- in other words, based on just a review of the public disclosures and based on just a review of the information provided to the SEC, would it have been apparent to someone reviewing those disclosures what L&H's accounting treatment for the Radial LIC and LDF revenues had been.

Q. Now, if you look at paragraph 5, you say your understanding of the facts, it really summarizes the assumptions you made, correct, you were asked to make?

A. My understanding of the facts and circumstances upon which I was asked to rely

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 142

D. Larue

upon, yes.

Q. And your understanding, again, is not based on an independent investigation, but based on assumptions you were asked to make?

A. That's correct. I did not make an independent investigation, but the facts, to my mind, were not contradicted by any documents I reviewed.

Q. It then says, If and when any additional documentation, deposition testimony or other information becomes available to me.

What do you mean by available to you?

A. As this trial progresses, I assumed there would be additional documentation, additional depositions and other information that may become available to me.

Q. But so far, you have had available to you hundreds of depositions, correct?

A. I don't know about hundreds of depositions, but I've had available to me in the sense that they're out there and I didn't

Page 143

D. Larue

ask for them.

Q. You're not referring to those, are you?

A. No.

Q. Because you haven't asked for any deposition testimony, correct?

A. That's correct.

Q. When you say, any additional documentation, you mean any additional documentation that hasn't already been produced in this case because that's already been available to you?

MR. BUTLER: Objection to form.

A. I wouldn't say that. I would say certainly, old documentation, new documentation, new facts coming to light somewhere along the way, additional documents.

Certainly if I found something that indicated one of the factual assumptions on which I based my opinions were incorrect, then I would evaluate that -- my new understanding of the facts based on those documents to determine whether or not I

Page 144

D. Larue

needed to make a change in my assumptions and/or my opinions.

Q. Of course, that would be true if somebody handed you something and showed you it was false, you would reevaluate, but the phrase, becomes available to me, you were not suggesting that there were not upwards of a million documents that were available to you prior to the time you reviewed -- you created your report, correct?

MR. BUTLER: Objection to form.

A. I'm not suggesting that.

Q. And now, you then go on to your summary of conclusions and your first conclusion is, Given the uncertainty surrounding the underlying facts and circumstances of the software licensing agreements between L&H and the Language Development Companies at the time of the license fees were recognized as revenue by L&H.

Do you see that?

A. I do.

Q. What uncertainty are you referring

Page 145

D. Larue

to?

A. It's just a general statement, it's my impression there was a great deal of uncertainty as to the underlying facts and circumstances that may have been relevant in reaching an accounting conclusion.

Q. You're not suggesting that the facts and circumstances were not known, are you?

MR. BUTLER: Objection.

Known to who?

MR. HARRIS: I will ask that next question.

A. I certainly am suggesting that not all facts were known to all parties.

Q. We know that the true facts weren't provided to the investors in L&H, everybody knows that, that's why we're here.

MR. BUTLER: Objection. You may think you're being funny, but it's not that humorous.

Q. As used here, who are you saying was uncertain about the facts and circumstances of the licensing agreements?

Page 146

D. Larue

MR. BUTLER: Can I hear the question again, please.

(Record read.)

MR. BUTLER: Objection to form.

A. I will answer the question again, and that is that I believe that all of the facts and circumstances were not known to all of the parties. I don't know who knew what, but I certainly do have an impression that there were a lot of facts that were unknown to various parties or various -- I won't say parties, but just in general, people involved in some way or form or fashion with these transactions.

Q. Let me do it this way: Was Dexia uncertain about the facts and circumstances of the software licensing agreements between L&H and the Language Development Companies?

MR. BUTLER: Objection to form.

A. What facts?

Q. What facts you're referring to.

A. I'm sure -- first of all, who at Dexia and at what point in time are you referring to?

Page 147

D. Larue

Q. This is your conclusion, correct?

A. Yes.

Q. This is your opinion.

What facts and circumstances are you referring to in the first line of paragraph 6 of your report?

A. The facts and circumstances at the time the license fees were recognized as revenue.

Q. What facts and circumstances?

A. The facts and circumstances.

Q. Okay. Which facts and which circumstances?

A. Just in general.

Q. Just in general. Okay.

MR. BUTLER: He is asking you to clarify your question. That wasn't his answer.

Am I right, were you asking if you wanted a general answer?

THE WITNESS: I was.

Facts and circumstances in general that may have had a bearing on the accounting treatment of these license

Page 148

D. Larue

fees.

MR. BUTLER: Pardon me, I misunderstood.

Q. At the time the licensing fees were recognized by L&H, was L&H uncertain regarding the underlying facts and circumstances of the software licensing agreement between L&H and the Language Development Companies?

MR. BUTLER: Objection to form.

A. I don't know who at L&H. Who do you mean, L&H? L&H can't have an awareness, people at L&H, the CFO, the accountants, members of the board of directors? Who are you referring to at L&H?

Q. Who were you referring to as being uncertain?

A. I'm referring to just in general, there seemed to be a lot of facts and circumstances that parties were not aware of at the time these fees were recognized as revenue that may have had a bearing on the accounting for that revenue.

Q. And who -- was Mr. Lernout

Page 149

D. Larue

uncertain about the facts and circumstances of the software licensing agreements between L&H and the Language Development Companies?

MR. BUTLER: Objection to form.

A. How would I know that; A, how would I know that and; B, what facts and circumstances are you referring to that he may have been uncertain about? That's a question I can't answer.

Q. What did you use?

A. I don't know what facts and circumstances Mr. Lernout was aware of at the time these fees were recognized by L&H.

Q. So it's fair to say you don't know whether or not Mr. Lernout had any uncertainty relying the underlying facts and circumstances?

A. I don't know that. I don't know what he thought, what he knew.

Q. Do you know if anyone at Dexia was uncertain about the underlying facts and circumstances of the software licensing agreements between L&H and the Language Development Companies at the time the license

Page 150

D. Larue

fees were recognized as revenue by L&H?

A. I had a sense there were a lot of relevant facts that -- again, who at Dexia are you referring to?

Q. Anyone. This is your conclusion.

MR. BUTLER: I'll object to the form. He said his conclusion is not about the mental states, not about any individual.

You can continue to question him about that, though.

Q. Is it fair to say that you are talking about whether or not the recognition of these fees as revenue was clearly improper under GAAP in paragraph 6?

A. I'm talking about whether or not it was clearly improper under GAAP.

Q. And it is true, is it not, that uncertainty by certain people about the facts and circumstances has absolutely no bearing on whether or not the recognition was clearly improper under GAAP, correct?

A. I don't really understand your question.

Page 151

D. Larue

Q. It doesn't matter if in 1999, I was uncertain about the underlying facts and circumstances, that would have no bearing on whether or not the recognition of revenue was clearly improper under GAAP, is that correct?

A. That's correct.

Q. There are only certain parties or persons whose uncertainty would matter with regard to the determination as to whether or not the recognition of these fees were clearly improper under GAAP would be relevant, correct?

A. I'm still not following you.

Given the uncertainty surrounding the underlying facts and circumstances of the software agreements between L&H, and it goes on and then it concludes, L&H's recognition of these fees as revenue in 1999 -- 1998 and '99 did not, in my opinion, make L&H's recognition of these revenues clearly improper under GAAP.

Q. In reaching that conclusion, you focused on uncertainty, correct?

A. That's correct.

Page 152

D. Larue

Q. What I'm asking is, whose uncertainty mattered to you in reaching your conclusion set forth in paragraph 6 of your report?

MR. BUTLER: Objection to form.

A. I guess it depends on -- in my opinion -- clearly improper to whom?

Q. Under GAAP.

A. Insofar as the uncertainty surrounding the underlying facts and circumstances, would L&H's revenue recognition had been clearly improper to another observer.

Q. So this is not -- your opinion is not whether or not it was clearly improper under GAAP, but it was clearly improper under GAAP to another person, an outside observer?

MR. BUTLER: Objection to form.

A. Was it clearly improper based on -- excuse me.

The information that seems to have been available at the time given the uncertainty of all these different things that I've listed here in this paragraph, was

Page 153

D. Larue

their revenue recognition clearly improper under GAAP and I opined that it was not clearly improper.

Q. I understand that.

A. It was not apparent to the naked eye that the accounting for these revenues was clearly improper.

Q. When you say, the naked eye, the naked eye of whom?

A. Possibly of anybody.

Q. Right. Not limited to KPMG, right, your opinion is not limited to KPMG?

MR. BUTLER: Objection to form.

Go ahead.

A. I don't refer to KPMG in this paragraph, in this opinion.

Q. You are saying that -- let me just make sure I understand what you're saying in paragraph 6.

You're saying in paragraph 6, that an outside observer could not tell whether or not the accounting for -- strike all of that. Let me start over.

It is correct, is it not, that in

Page 154

D. Larue

paragraph 6, you were opining that it would not be clearly improper -- let me try again. Sometimes I can't ask a right question.

It is correct, is it not, that in paragraph 6, you were opining that it would not be apparent to an outside observer that L&H's recognition of these fees as revenue in 1998 and 1999 was clearly improper under GAAP, correct?

A. It would not have been apparent to an outside observer, depending on what you mean by outside observer, but certainly it would not be apparent to an outside observer that this revenue was necessarily even recognized, let alone proper under GAAP.

Q. Have I captured the entirety of your opinion in paragraph 6?

MR. BUTLER: Objection to form.

A. No, I don't believe so. I believe that depending upon what party you're looking at, that there may not have been enough facts and circumstances -- there was uncertainty in the facts and circumstances that you would need to make or need to understand in order

Page 155

D. Larue

to be able to apply GAAP and determine whether or not or render an opinion whether revenue recognition was appropriate.

Q. And --

MR. HARRIS: Can you read that back.

(Record read.)

Q. In paragraph 6, are you expressing an opinion as to whether or not, as an objective manner, the manner in which L&H accounted for the transactions reflected in your report was clearly improper?

A. To an outside observer, is that what you just said?

Q. No.

A. Well, to an observer who didn't have an understanding of the facts and circumstances that were relevant in determining how those licensing fees should be reported.

Q. Let me repeat my question because I think you may have lost it.

MR. BUTLER: Just give me chance to object.

Page 156

D. Larue

Q. In paragraph 6, are you opining that as an objective matter, L&H's recognition of these fees as revenue in 1998 and 1999 were or were not clearly improper under GAAP?

MR. BUTLER: Objection to form.

A. I'm having trouble with the word objective that you used. I will try to give you the answer.

The ultimate determination as to whether or not those revenues were proper would, in some respects, involve a subjective evaluation of the underlying facts and circumstances and would involve, for example, also possibly a substantive evaluation of certain terms and standards that might be applicable under GAAP, so there would be a subjective element.

What I'm saying is that there was no objective basis based on all of these factors that I've indicated in this report or in this paragraph to make a determination that revenue recognition was clearly improper.

Page 157

D. Larue

Q. For who to make that determination?

MR. BUTLER: Objection to form. The witness already testified -- he is not testifying about what any particular person believed at the time.

A. Again, there is a fair amount of subjectivity in the application of some of these GAAP rules, substance over form, presumptions, reasonableness, probability, there are some terms used in the relevant GAAP that required a subjective evaluation of all of the underlying facts and circumstances, so I don't believe that necessarily you're going find two people who objectively reviewed the same facts and circumstances necessarily coming up with the same conclusion.

Q. From what you've just said, it seems as though that in your accounting classes, there are no right or wrong answers, is that correct?

MR. BUTLER: Objection to form.

A. Absolutely not.

Q. Absolutely not?

Page 158

D. Larue

A. Absolutely, that is not a correct statement.

There are a great many questions to which there are definitive answers and objective parties looking at the same facts and circumstances can apply the same unambiguous rules and come up with the same result pretty much spot on every time, but there are a great many. GAAP is very complicated.

In many cases, it involves a subjective evaluation of facts and circumstances that the evaluator believes to be relevant, another evaluator may not believe to be relevant and an analysis of those facts and circumstances and how they interface with one another, what is the relative weight of this factor versus the relative weight of this factor and at the end of the day, you end up with an opinion that has large subjective elements. That is certainly not always the case.

There are oftentimes, probably more often than not, I don't know, there are

Page 159

D. Larue

definitive answers to many definitive questions, but that is not always the case and it certainly was not the case here.

Q. Now, coming back to the uncertainty, do you have any facts to suggest that there was any uncertainty at L&H regarding the underlying -- let me do this.

In paragraph 6, after the word given, there are parentheticals numbered one through four. There are then what appear to be statements of fact, correct?

MR. BUTLER: Objection to form. I don't understand your question.

Q. Well --

MR. BUTLER: If you understand, sir, you can answer.

A. The fact that the license fees received from Radial, LIC and LDF were paid from the proceeds, yes, that's --

Q. No, it says given one, that the uncertainty surrounding the underlying facts and circumstances of the software licensing agreements between L&H and Language Development Companies at the time of the

Page 160

D. Larue

licensing fee were recognized as revenue by L&H, correct, and it's given the uncertainty, correct?

A. Given the uncertainty and the three other --

Q. Right. The uncertainty, is that your opinion, is it a statement of fact or is it an assumption of fact?

A. I'm sorry. In part, it's an assumption of fact.

Q. You say, in part.

What else is it?

A. Well, in part, it's not knowing how things were going to pan out, but the facts, for example, it's my understanding that, you know, the guarantees weren't entered into until later on in the following year, so at the time this was reported as revenue, the facts were uncertain as to what extent there was an obligation or that -- or to what extent those guarantees would ultimately be entered into, in other words, at the time we recognized -- at the time the revenue was recognized, there were some facts that were

Page 161

D. Larue

uncertain because they were based on future events.

Q. So it is -- the uncertainty there that you were referring to are factual assumptions and uncertainty as to the future, correct?

MR. BUTLER: Objection to form.

A. I think that's correct.

Q. And what is it when you assume that there was uncertainty surrounding the underlying facts and circumstances, who is it that you are assuming had any uncertainty?

MR. BUTLER: Objection to form.

A. Well, again, the word uncertainty really has two dimensions; one, who knew what when and the other, subjectively, how would you evaluate those facts, how do you interpret those facts and circumstances, what do they mean?

Q. Was that No. 4?

MR. BUTLER: Maybe your question wasn't clear, you're asking only about point 1 and not about the paragraph 6 generally?

Page 162

D. Larue

MR. HARRIS: Correct. He uses uncertainty three times and subjectivity one time. I'm asking about his use of the word subjectivity, two words after the one in parenthesis in paragraph 6.

A. Have I not answered that question?

Q. Well, I think -- you said -- does uncertainty there include subjective evaluation?

A. Well, certainly to some extent.

How would you interpret these facts and circumstances, what facts and circumstances are relevant?

Q. And when you say given the uncertainty, among who?

MR. BUTLER: Objection. Form.

A. Any party that didn't have an understanding of all of the relevant facts and circumstances.

Q. Well, who is responsible for a party's financial statement?

A. Management with the oversight of the audit committee and the approval of the board of directors and, obviously, the

Page 163

D. Larue

external auditor is responsible for conducting an audit designed to provide reasonable assurance that the financial statements are fairly presented in every material respect in accordance with U.S. GAAP.

Q. So we have identified four points, management, audit committee, board of directors, outside auditors?

A. That's correct.

Q. Are you assuming here that the management of L&H was uncertain regarding the underlying facts and circumstances of the software licensing agreements between L&H and the Language Development Companies at the time the license fees were recognized as revenue by L&H?

A. I don't know what management knew or didn't know.

Q. My question is, are you -- in reaching your conclusion, did you assume that management was uncertain?

A. I don't know if management was uncertain or not. I don't know who knew what

Page 164

D. Larue

inside the organization.

Q. That's my question. Were you assuming that they were uncertain?

A. Not necessarily.

Q. So the uncertainty here does not refer to the management of L&H, in No. 1?

A. The management being who? It doesn't necessarily refer specifically to management or individuals within management.

Q. Does the uncertainty in No. 1 refer to the audit committee of L&H?

A. It could.

Q. I didn't ask if it could. I asked if it does?

A. I don't know what the audit committee did or did not know.

Q. I understand that.

A. It's my understanding that the specific details of a lot of the different aspects of these transactions were generally unknown by various participants.

Q. Who was the audit committee?

A. Who were the members of the audit committee?

Page 165

D. Larue

Q. Yes.

A. I don't know.

Q. What did they know about the facts and circumstances?

A. I don't know.

Q. So you don't know if they were uncertain or not?

A. From their vantage point, I don't know if there was uncertainty from their point.

Q. Who was the management at L&H?

A. There were a number of individuals.

Q. Were they uncertain about the facts and circumstances of the software licensing agreement?

A. They may have been, they may not have been.

Q. You don't know?

A. I don't know.

Q. Was the board of directors uncertain about the facts and circumstances -- was the board of directors of L&H uncertain about the underlying facts and circumstances of the software licensing

Page 166

D. Larue

agreements between L&H and the Language Development Companies?

A. I don't know.

Q. Was KPMG uncertain surrounding the underlying -- did they have any uncertainty surrounding the underlying facts and circumstances of the software licensing agreement between L&H and the Language Development Companies?

A. Again, you would have to specify who at KPMG, but as a general proposition, I had the impression that there were facts unknown to them at the time these revenues were recognized and there after, sometime thereafter.

Q. Who were the individuals at KPMG that were responsible for auditing Lernout and Hauspie?

A. I don't know. As a general statement, I think they were unfamiliar with a lot of the relevant facts.

Q. You don't know anyone?

A. Again, I can't opine as to what any particular individual knew or didn't know,

Page 167

D. Larue

but I have the impression that they were uncertain about enough of the key facts in terms of these arrangements at the time the revenues were recognized and that's borne out by some of the statements in the audit work papers that I've addressed later.

Q. Was Dexia -- was anyone at Dexia uncertain about the underlying fact and circumstances?

A. Was anyone at Dexia uncertain?

I'm sure there were people at Dexia who were uncertain about the underlying facts and circumstances.

Q. Who authorized the loans by Dexia to the LDCs?

MR. BUTLER: Objection to form. There were no loans to the LDCs.

A. There were no loans to the LDCs.

Q. Now that you've been coached by your --

MR. BUTLER: I don't think you meant to say this. You mean Lernout, Hauspie.

Q. Who authorized the $20 million loan

Page 168

D. Larue

to Messrs. Hauspie and Willard?

A. What individuals?

Q. Yes.

A. I don't know.

Q. Did they have any uncertainty regarding the underlying facts and circumstances of the software licensing agreements between L&H and the Language Development Companies at the time they made the loan?

A. My impression is that they did.

Q. Based on what?

A. My impression is that they did, that all of these facts were not known. You asked me, my impression is yes.

Q. I asked what your impression is based on.

A. Can I point to specific documents that tell me what facts and circumstances they knew or did not know and which members of a committee may have known or not known those facts? I can't comprehensively do that.

Q. Now, if the -- we go through, you

Page 169

D. Larue

say the uncertainty surrounding the nature and extent of the relationship between the LDCs and L&H and Messrs. Lernout, Hauspie and Willard, right?

Again, is uncertainty there an assumption, a statement of fact or an opinion?

A. It's an assumption supported, for example, in the audit committee report.

Q. Okay. And when you say uncertainty, it is an assumption, it assumes who was uncertain?

MR. BUTLER: Objection to form.

A. It's a general reference to the fact that the relationship between L&H and the LDCs and these three individuals, the full extent of the relationship and the nature of the relationship does not appear to have been known by various parties.

Q. But by whom, who is it important to your conclusion that it not be known to?

MR. BUTLER: Objection to form.

A. I suppose KPMG.

Q. Anyone else?

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 170

D. Larue

A. Artesia.

Q. What is the basis for your statement that Artesia was uncertain about the nature and extent of the relationship between LDCs and L&H and Messrs. Lernout, Hauspie and Willard?

A. Again, that's my general understanding as confirmed to the extent that is it is addressed in the audit committee report.

Q. Artesia or Dexia certainly knew that Lernout, Hauspie and Willard had entered into credit default swaps with regard to loans with regard to Radial and LIC, correct?

A. Presumably there were people at Dexia who approved those transactions, who knew of those transactions.

Q. And Dexia knew that it had loaned $20 million to Lernout, Hauspie and Willard to fund certain LDCs, correct?

A. I don't know that.

Q. You don't know that?

A. No.

Q. Do you know that they didn't know

Page 171

D. Larue

it?

A. No, I know that the loan -- I assumed that loan was made, but I don't know what or who at Dexia knew how the proceeds had been used.

Q. And you don't know whether they had any uncertainty about how it was going to be used, correct?

A. Again, you're referring to a specific individual or Dexia in general? I had the impression that there was uncertainty.

Q. That is based on?

A. It's an impression that I have.

Q. An impression?

A. Yes.

Q. In three, it says, The uncertainty and lack of definitive guidance available under GAAP, is that a statement of fact, an opinion or an assumption?

A. That's a statement of fact.

Q. Is there anything that you have come across that suggests that KPMG was uncertain as to the proper manner in which to

Page 172

D. Larue

account for various transactions?

A. If KPMG was uncertain as to how to account for various transactions, could you be more specific?

Q. You identified certain transactions as these transactions.

A. Correct.

Q. Is there -- is there anything that suggests that KPMG had any uncertainty or lack of definitive guidance available to it under GAAP to account for these transactions?

A. At the time the revenues were recognized?

Q. Yes.

A. I don't know what level of uncertainty or certainty went into the judgment as to whether or not the accounting treatment of these fees – the fees were apparently recorded as revenue.

KPMG apparently reviewed the recording of those revenues and management's policy in implementing SOP 97-2 and performed whatever audit procedures they felt necessary to gain reasonable assurance that the

Page 173

D. Larue

recording of those revenues was proper.

Whatever uncertainty they may have had they resolved apparently in favor of letting the recognition of revenues stand.

Q. Okay.

A. Apparently it was not clearly improper to them.

Q. You said they were uncertain about the facts?

MR. BUTLER: Objection to form.

A. It's my understanding they were uncertain about the facts, in terms of they didn't have all of the facts available to them.

Q. So based on the fact, it's your view that based on the facts available to KPMG, their view that the manner for the accounting was not clearly improper, correct?

MR. BUTLER: Objection to form.

A. Assuming these amounts were reported as revenues in the financial statements, assuming KPMG reviewed the accounting treatment of those fees, one would infer from that, that they ultimately

D. Larue

concluded that the recording of that revenue was not clearly improper.

Q. Based on what was known to them?

MR. BUTLER: Objection.

A. Based on a lot of things, what was known to them, their understanding of GAAP, the application of GAAP to the underlying facts and circumstances, based on all these things, you separated out these comments when they really roll into each other. There were a variety of things that to my mind allowed me to render this opinion.

Q. I understand that. I'm not the one who separated them, you did.

A. Yeah. They're part of the same paragraph. These are all reasons why. Any one of those reasons.

THE VIDEOGRAPHER: We're going off the record at 1:29. This is the end of tape No. 2.

(Luncheon recess taken at 1:29 p.m.)

D. Larue

AFTERNOON SESSION

(Time noted: 2:01 p.m.)

DAVID LARUE, resumed and testified as follows:

THE VIDEOGRAPHER: We're going back on the record. The time is 2:01 and this is tape No. 3.

EXAMINATION BY (Cont'd.)

MR. HARRIS:

Q. Mr. Larue, we were looking at paragraph 6 of your report, which I believe sets forth your first conclusion, correct?

A. Yes, that's a summary of conclusions.

Q. And you there indicate in -- you use the phrase in paragraph 6, at the time the license fees were recognized at revenue by L&H, correct?

A. Yes.

Q. I see that that is in one of the givens, but is that a part of your conclusion at the end?

And if you didn't understand that question, I'm happy to try to explain it, but

D. Larue

do you understand it?

A. Well, I assumed one of the factual assumptions I made was that L&H did, in fact, recognize these fees as revenue in 1998 and in 1999.

Q. So I guess my question is, is your conclusion that it did not make L&H's recognition of these fees as revenue in 1998 and 1999 clearly improper under GAAP, limited to the time in which -- to the time at which it was actually recognized as revenue?

A. Yes.

Q. And it is fair to say that you have not -- you have not expressed an opinion in either of your reports as to whether it was clearly improper for L&H to not restate its financials with regard to the transactions that you have assumed in your report?

MR. BUTLER: Objection to form.

A. It's the double negative that's getting me, clearly improper not to restate.

Q. That's exactly in your conclusion and it is -- I'm trying to follow your conclusion where you use the not and clearly

D. Larue

improper.

A. By golly, I do. I'm sorry about that. I'm guilty -- this opinion relates to the recognition of revenue on the assumption that that revenue was recognized from these LDCs in 1998, I believe, as alleged and in 1999.

Q. And when you say in 1999, when you say recognized as revenue, are you referring to calendar year 1999 as the time period in which it was recognized or are you referring to the time in which L&H's 1999 financial statements were issued to the public or some other time?

A. I believe this revenue -- the factual assumption that I made was that the revenue was recognized and reported in the quarterly press releases, as well as in the -- as well as in the financial statements for that year.

Ultimately, you know, the final decision in terms of whether or not to recognize revenue doesn't necessarily take place until it either is or isn't recognized

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 178

D. Larue

as revenue in the financial statement.

Q. I'm trying to focus in on the phrase, at the time the license fees were recognized as revenue by L&H.

What time did you mean by that?

A. At the time it was recognized as revenue and then reported out.

Q. And then reported out.

So that would be with regard to 1999, sometime in 2000?

A. No. Well, it was recognized on the financial statements or the filings with the SEC with the financial statements for the year 1999, but I believe it was also included in the quarterly results that were reported out during the year for the quarters.

Q. So you are not -- you are talking about the time in which it is first recognized and first reported?

A. That's correct.

Q. And you are not identifying any -- you are not opining as to whether or not any actions subsequent to that date with regard to that reported revenue was clearly

Page 179

D. Larue

improper, correct?

MR. BUTLER: Object to the form.

A. I think that's correct, yes.

Q. And so you are not opining as to whether L&H should or should not have restated its financials with regard to these transactions at some point in the future, correct?

A. I'm not opining on that.

Q. And you're not opining as to whether or not L&H's failure to do so prior to June 1, 2000 was or was not clearly improper, correct.

A. I'm not opining on that. It seems that's an ongoing issue. If you reported revenue that you shouldn't have reported, then it should be corrected at some point in time.

Q. You talked about the uncertainty and the uncertainty was about what some things would happen in the future, correct?

A. Yes, that's part of the uncertainty.

Q. And once that happens, the company

Page 180

D. Larue

has an opportunity to either restate or not restate its financials once it knows what has happened, correct?

MR. BUTLER: Objection to form.

A. It does have that opportunity.

Q. And when you had identified the uncertainty about whether or not a loan would actually occur or not occur, you assume at some point, in fact, it did occur, correct?

MR. BUTLER: Objection to form.

A. My understanding is that the loan did occur, the loans did occur in 1998 and 1999.

I'm not sure I follow you.

Q. You had said when I asked you what uncertainty was in subparagraph 1 of paragraph 6 of your report, you said the uncertainty about what would happen in the future, you said there was an expectation a loan would be made, but you didn't know whether or not, in fact, a loan would be made, so there was that uncertainty at the time that L&H recognized as revenue the amounts from the LDC, correct?

Page 181

D. Larue

MR. BUTLER: Objection to form.

A. I don't think I said there was uncertainty about the loan being made.

Q. What uncertainty was there about the future then?

A. I think one of the uncertainty I referred to earlier was it's my understanding that the loan was made, but at the time the funds were disbursed, the guarantees or the CDSs had not been finalized or contemplated, whatever.

Q. You do assume that after the revenue was recognized, the CDSs were, in fact, issued and formalized and put into place, correct?

A. Yes.

Q. And so my question is, you are not opining whether or not once that, quote, uncertainty about the future was cleared up, L&H should or should not have restated its financials, correct?

A. I believe that's correct.

Q. And trying to avoid the double negative, you are not opining whether L&H's

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 182

D. Larue

failure to restate its financials with regard to the LDCs prior to June 1, 2000 was or was not clearly improper, correct?

MR. BUTLER: Objection to form.

A. That's beyond the scope of the opinion expressed in this summary.

Q. Is it beyond the scope of the opinion expressed in the report and the rebuttal report?

A. Verify that for me again. Was it clearly improper -- I'm just not following what you were saying, I'm trying, but I'm just not following that.

Q. Some of this revenue was recognized in 1998, correct?

A. Yes.

Q. You are not offering an opinion whether or not L&H's failure to make adjustments with regard to that revenue recognized in 1998 some point thereafter, but prior to June 1, 2000, was or was not clearly improper?

MR. BUTLER: Objection to form.

A. This opinion is limited to the time

Page 183

D. Larue

period when the revenue was recognized and reported originally.

Q. When you say, this opinion, the opinion in your report and rebuttal report, correct?

A. That's correct.

Q. Is there any opinion in your report or your rebuttal report as to whether or not L&H's failure to disclose the transactions that are described in your reports as related parties clearly improper?

A. There is an opinion.

Q. There is? Where is that?

A. Again, what we've been looking at are summary opinions. The opinions are elaborated more fully in section 4 of my report. I know it's in here. I'm looking at paragraphs 110 through 112 on page 34 and 117 through 119.

Q. So as I read those opinions, it is your opinion that L&H should have disclosed the loans to the LDF LDCs?

A. Paragraph 118 referring to the LDF LDCs states that if LDF LDCs, if they were

Page 184

D. Larue

considered to be related parties, but not related parties under common control, FAS 57 would have required disclosure of the loans made by Lernout, Hauspie and Willard to the LDF LDCs, but L&H would not have been required to defer their recognition of revenue and then in 119, disclosure by L&H of this loan to the LDH LDCs would have appeared to be required under the SEC regulations.

Q. Did L&H disclose the loan in its financial statements prior to June 1, 2000?

MR. BUTLER: Objection to form.

A. They didn't disclose the details of the loan, no.

Q. Did they disclose in the manner that you say would also appear to have been required?

A. I don't believe they did, no.

Q. Is it your opinion that the failure to disclose this loan to LDF LDCs was improper?

A. If they were considered to be related parties, then my interpretation of that regulation is that it seems to require

Page 185

D. Larue

disclosure.

Q. Do you have an opinion as to whether or not L&H and the LDF LDCs were related parties?

A. I believe I expressed that opinion. In paragraphs 115 and 116, it seems clear that a loan of the proceeds from the LHW personal loan to the LDF LDCs would not, in and of itself, make L&H and the LDF LDCs and related parties under FAS 57, and I go on to explain why that is.

Q. Sure.

A. And then in 116, L&H and the LDCs may have been related parties if Lernout, Hauspie and Willard received or held a substantial equity interest in the LDF LDCs.

Actually, back in 115, that last sentence, For accounting purposes, for a loan to make L&H a related party to LDF and the LDF LDCs the loan would have had to give L&H or parties controlling L&H control or significant influence over the entities -- over these entities such that these entities might have been prevented from pursuing their

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 186

D. Larue

own separate interests from L&H.

Q. I see that, but my question was a little different.

Do you have an opinion as to whether or not L&H and the LDF LDCs were related parties?

MR. BUTLER: Objection. Asked and answered.

You can answer it again.

A. No, I don't. The reason I don't is because I don't have the kind of information that I would need to determine whether or not there was significant influence as required under FAS 57.

Q. And it flows from that that you do not have an opinion as to whether or not L&H's failure to disclose its relationship with the LDF LDCs was clearly improper?

A. It's not clearly improper from the information that I have available to me and I've indicated that here. L&H and the LDCs may have been related parties.

Q. But you don't have -- you are not opining one way or another whether or not it

Page 187

D. Larue

was or it was not clearly improper for L&H to fail to disclose its relationship with the LDF LDCs?

A. It depends on whether or not they would be considered to be related parties.

Q. Correct. Since you have no opinion to the former, you can't have an opinion to the latter?

A. If there was related parties, there is one route that should be taken and if you didn't take it, it is clearly improper, if they are not related parties, there is another route.

From the facts and circumstances, I can't conclude they were related parties.

Q. And you can't conclude that they were not, correct?

A. That's correct.

Q. If we look at paragraph 7 of your report, you talk -- you have a conclusion there.

Is it correct that in paragraph 7, you indicate that L&H's public financial statements have, in fact, hidden the revenues

Page 188

D. Larue

received by Radial, LIC and LDF LDCs so that the outside investor or shareholder or analysts could not determine whether or not L&H had recognized the revenue?

MR. BUTLER: Objection to form.

A. You paraphrased what I said in that paragraph.

From a review of their public financial statements and/or press releases, it would not have been possible for a shareholder, creditor or other interested party to determine if or when some or all of the amounts received by L&H from the Radial LDCs, the LIC LDCs and LDF LDCs had been recognized by L&H as revenue.

Q. And, right, L&H hid it?

MR. BUTLER: Objection.

Q. I know you didn't use it, but isn't that the logical conclusion?

MR. BUTLER: Objection to form.

A. Hidden to me sounds like something deliberate and looks to the subjective state of mind of someone who has done something deliberately or inadvertently.

Page 189

D. Larue

The fact that these revenues may have been reported, in those financial statements was not clear from the presentation of the financial statements or from the notes, footnote disclosure to the financial statements.

Q. Wasn't it deliberate by L&H not to include those revenues in the footnote disclosures under related parties?

MR. BUTLER: Objection to form.

A. I don't know.

Q. You don't know?

A. You're asking me to opine on the subjective state of mind of whoever might have been involved in the decision. If, in fact, an affirmative decision was made, an overt decision was made. I can't do that.

Q. If L&H and the LDF LDCs were related parties, then it would have been clearly improper, would it not have, for L&H not to disclose that the related party transactions with the LDF LDCs?

A. Subject to a materiality standard, if, in fact, they were related parties, that

Page 190

D. Larue

information should have been disclosed, yes.

Q. You're not suggesting that the transactions with the LDF LDCs were not material to L&H's financials, are you?

A. I haven't suggested one way or the other.

Q. Do you have an opinion?

A. I haven't formed an opinion.

Q. How much did L&H recognize from the LDF LDCs?

A. Well, again, that wasn't separately disclosed in the public financial statements, so there is no way for me to know how much of the revenue that was reported was from the LDF LDCs.

Q. Didn't you assume that amount in your rebuttal report?

A. I assumed that they had recognized that revenue.

Q. How much did they assume -- how much revenue did you assume that L&H recognized from the LDF LDCs?

A. The loan, my recollection, was for $20 million. I believe that most or all of

Page 191

D. Larue

that was recognized as revenue. Some of that may have been deferred. From the LDCs, I believe there were also accounts receivable that may have been recognized at revenue.

Q. I'm just asking about the LDF LDCs.

A. I'm referring to the LDF LDCs.

Q. When do you assume that the transaction with the LDF LDCs was entered into?

A. By transaction, you mean the licensing agreement?

Q. Yes.

A. In paragraph 127, I state that the matter in which L&H accounted for the amounts it received from the LDF LDCs in the second quarter of 1999 was not separately disclosed on the July 28, 1999 press release or on the 10-Q for that quarter, for the second quarter or on the 10-K for the year.

Q. So it was the second quarter of 1999, correct?

A. Yes, sir.

Q. And how much did L&H recognize in revenue from the LDF LDCs in the second

Page 192

D. Larue

quarter of 1999?

MR. BUTLER: Objection. Form.

A. Again, that information is not knowable from the public disclosures.

Q. But you know it?

A. I've assumed that they recognized $20 million or thereabouts.

Q. Isn't it more like 32 or thereabouts -- 36 or thereabouts?

MR. BUTLER: Are you referring to something in his report?

A. I don't see that number.

As I mentioned a moment ago, if you're talking about the amount of revenue recognized from the LDF LDCs, that included, I believe, not only revenue that was paid in the form of cash, but also accounts receivable.

Q. And the 20 million was in cash, correct?

MR. BUTLER: Objection to the form. You're getting way beyond his factual assumptions.

You can answer the question.

Page 193

D. Larue

So the record is clear, this witness does not know any of the facts in the case, aside from what he has been asked to assume, so your questions related to the fact, I don't see the relevance.

Q. Let me make it clear.

How much did you assume that L&H recognized in revenue with regard to the LDF LDCs?

A. I don't see the amount.

Q. Let me hand you what we will mark as Larue Exhibit 5.

(Rebuttal report marked Larue Exhibit 5 for identification.)

Q. And ask if you can identify it for me, please?

A. This appears to be a copy of my rebuttal to Mr. Love's report.

Q. I'll direct your attention to Exhibit D and can we refer to this as your rebuttal report so we don't get into the exhibit problem?

A. Yes, sir.

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 194

D. Larue

Q. I direct your attention to Exhibit D to your rebuttal report.

A. I'm there.

Q. What is Exhibit D?

A. It's an adjustment to the Love report, Exhibit 7-A.

Q. And how does it adjust, what are the adjustments that you make?

A. I believe that in his report, his Exhibit 7-A included the total amount of revenues that he considered to have been reported from the LDF LDCs.

What this does is it separates out the amount of those revenues that was financed in the form of cash from the loans made to Lernout, Hauspie and Willard.

Q. Is it fair to say that what Exhibit D does is it caps the, quote, improperly recognized revenues at the amount of the loan by Dexia and excludes all other revenues recognized from an LDC that Dexia made a loan to?

A. I believe that's right.

Q. And if we look at quarter 2 for

Page 195

D. Larue

1999, does that help you identify -- you have a $16 million adjustment in Exhibit D, correct?

A. Yes, sir.

Q. And if I am correct, that is the amount, if I understand your chart correctly, tell me if I'm wrong, it's your chart, that is the amount of revenue that L&H recognized from the LDF LDCs in excess of the $20 million loan from Dexia to Lernout, Hauspie and Willard?

MR. BUTLER: Objection to form.

A. You said the excess of the loan?

Q. Correct.

A. That's not the excess, that's the amount of the loan.

Q. Sixteen million?

A. I believe that excludes the accounts receivable revenue recognition.

Q. Which accounts receivable?

A. I'm assuming there were accounts receivable.

Q. I agree. I understand that completely.

Page 196

D. Larue

It is my understanding that you are capping it at the amount of the loans and so maybe I'm getting confused by the subtractions.

What you're subtracting?

MR. BUTLER: Objection to form.

A. A moment ago you said excess. I don't believe you meant to say the word excess.

This chart shows how much revenue was recognized by the LDF LDCs that was financed by the loans from Willard, Lernout, Hauspie and it does not include the total amount of revenue that was apparently recognized and disclosed in Mr. Love's report.

Q. Do you have any -- so whatever that total amount that Mr. Love reported would be the total amount that L&H recognized with regard to the LDF LDCs, correct?

MR. BUTLER: Objection to form.

A. I need to see his report.

Q. You can't tell from looking at your report?

Page 197

D. Larue

A. I can speculate, but I would rather see the report.

Q. All right. Let's make this easy because what we're looking at, Exhibit D, do you consider the amount of money recognized as revenue by L&H from the LDF LDCs to be material to L&H's financial statements?

MR. BUTLER: Objection. Form.

A. Say that again, the amount of.

MR. HARRIS: Can you read it back.

(Record read.)

A. You're referring to amounts in this table?

Q. Sure.

A. There is a bigger amount in Mr. Love's Exhibit 7-A, I believe.

Q. I agree. But I assume that -- let's start with the $20 million that you show on your chart, if that's material to, the bigger amount will be material, as well.

Do you consider the $20 million that you show on Exhibit D in your rebuttal report which are the amounts L&H recognized as revenue from the transaction with the LDF

Page 198

D. Larue

LDCs to be material to L&H's financial statements?

A. Are you referring to the quarterly results or to the year end results?

Q. Let's start with quarterly.

A. Quarterly, the amount, $16 million relative to $76 million worth of reported revenues, I believe would be considered to be material.

Q. Okay. And now that we have that opinion, let's go back.

Is it true that if the LDF LDCs were related parties to L&H, then it was clearly improper for L&H not to disclose those transactions in its second quarter financial statements?

MR. BUTLER: Can I hear the question again, please.

(Record read.)

Q. That's second quarter 1999.

A. Again, you're assuming, you've asked me to assume if they are considered to be related parties, which I didn't conclude in my report.

Page 199

D. Larue

Q. Correct.

A. Yes. This should have been disclosed.

Q. If we return to your original report. In paragraph 8, you refer to something called typical auditing procedures, correct?

A. Yes, sir.

Q. Now, you have never employed typical auditing procedures, correct?

A. Under generally accepted auditing standards?

Q. Yes.

A. Outside the classroom.

Q. You never have?

A. Outside the classroom, my experience in employing generally accepted auditing standards is limited to my role as the audit committee chairman for Microstrategy.

Q. In fact, you're not qualified to conduct an audit for a public company that files its reports with SEC?

A. I wouldn't agree with that.

Page 200

D. Larue

Q. You could do it tomorrow?

A. I think I could.

Q. You could?

A. I have the knowledge of auditing standards and I've been teaching auditing and accounting for years and years.

Q. But you're not a certified public accountant?

A. You didn't ask me if I was qualified to express an opinion. I'm not qualified to express an opinion because I'm not a CPA. I am qualified to conduct an audit.

Q. But outside of the classroom, you have never employed typical auditing procedures in their entirety, correct?

A. In their entirety, I don't really understand what you mean by that.

Q. Let me change that.

A. There are a number of procedures that I employed when I do forensic analysis.

Q. Let me change that.

Is it true that auditors, when they are auditing a public company that files with

Page 201

D. Larue

the SEC, prepares before the audit begins, a detailed audit plan?

A. Yes, sir.

Q. Have you ever prepared a detailed audit plan for a public company outside of the classroom?

A. No, sir.

Q. Now, are the detail auditing plans for all public companies identical?

A. Certainly not.

Q. Have you ever -- do you have any experience in auditing Belgium companies?

A. No, sir.

Q. Do you have any knowledge of auditing standards under Belgium practice?

A. No, sir.

Q. And so when you say KPMG here under typical auditing procedures, you are not referring to under -- how KPMG would have typically conducted its audit in Belgium of L&H, correct?

A. Actually, I state that, that very thing on page 6 of my report. All references and discussions are to U.S. GAAP and U.S.

ESQUIRE DEPOSITION SERVICES
212-687-8010

2dfd6da5-8e66-4d39-80f9-bae02f49a691