Page 202

```
1              D. Larue
2    GAAS.
3         Q.  But this is neither to GAAS or to
4    GAAP, it's to typical auditing procedures, so
5    paragraph 7 has nothing to do -- you were
6    expressing no opinion as to whether or not
7    KPMG Belgium would or would not have
8    typically reviewed the loan files in Belgium,
9    correct?
10        MR. BUTLER:  Objection to form.
11        A.  That's not correct.
12        Q.  That's not correct?
13        A.  No, the financial statements I am
14   looking at and reviewed are not the financial
15   statements compiled under Belgium GAAP or
16   audited under Belgium GAAS.
17        My report focuses on the financial
18   statement filed under U.S. GAAP which require
19   the application of U.S. GAAS.
20        Q.  Okay.  But that was a different --
21   that's the answer to a different question.
22        Here is my question.  You are not
23   expressing -- you say, Furthermore, there was
24   no reason to expect that this loan
25   documentation or any other funding
```

Page 203

```
1              D. Larue
2    documentation would have been reviewed by
3    KPMG as typical auditing procedures would not
4    have called for such a review, correct?
5         A.  That's what I said, yes.
6         Q.  That's what you say, but, in fact,
7    you don't know what KPMG Belgium typically
8    does, correct?
9         A.  I do know that -- what I'm
10   referring to here are the applications of
11   U.S. auditing principles that KPMG was
12   required, my understanding, to apply in order
13   to render an opinion that the financial
14   statements prepared under U.S. GAAP were in
15   conformity with U.S. GAAP.
16        Q.  I'm asking really a different
17   question, so let's see if I can do it.
18        It is not your opinion, is it, that
19   if Belgium auditing standards requires KPMG
20   to review funding documentation, but U.S.
21   GAAP does not, that KPMG was prohibited from
22   reviewing that documentation, are you?
23        MR. BUTLER:  Can I hear the
24   question again.
25        (Record read.)
```

Page 204

```
1              D. Larue
2         A.  Prohibited by whom?
3         Q.  U.S. GAAS.
4         A.  U.S. GAAS, as far as I know,
5    doesn't prohibit the reviewing of any
6    document that an auditor would like to review
7    or considers necessary to review.
8         Q.  So you say there was no reason to
9    expect that this loan documentation or any
10   other funding documentation would have been
11   reviewed by KPMG, but is it fair to say that
12   you don't know what is the typical auditing
13   in Belgium of software companies in Belgium?
14        A.  That's correct.
15        Q.  And so you do not know, do you not,
16   whether or not there was a reason to expect
17   KPMG to review the funding documents of the
18   LDCs in performing its typical audit under
19   Belgium standards?
20        A.  Under Belgium standards?
21        Q.  Yes.
22        A.  I don't know what the Belgium
23   standards are.
24        Q.  So, in fact, KPMG may or may not,
25   as part of its auditing -- audit of L&H,
```

Page 205

```
1              D. Larue
2    sought to review the loan documentation of
3    the LDCs, correct?
4         A.  Are you asking me are they
5    prohibited under Belgium auditing principles
6    from reviewing those documents?
7         Q.  No.
8         A.  Are you asking me, are they
9    required to review those documents under
10   Belgium GAAS, is that what you're asking me?
11        Q.  No.  What I'm asking you, you do
12   not know one way or another whether or not
13   KPMG ordinarily would review funding
14   documents of software customers of software
15   companies in Belgium, correct?
16        A.  Under Belgium GAAS, I don't know.
17        Q.  Do you consider yourself an expert
18   in auditing procedures?
19        A.  In auditing standards, yes.
20        Q.  What about in auditing procedures?
21        A.  I have a great deal of experience
22   in doing forensic analyses of lengthy
23   thousands of pages of documents to arrive at
24   an opinion on the application or
25   non-application of GAAP.
```

52  (Pages 202 to 205)

Page 206

D. Larue

1
2  Q. And do you consider yourself an
3  expert in auditing procedures?
4  A. I think I just answered that
5  question. I thought I said yes.
6  Q. I will take it as a yes.
7  Based upon your expertise in
8  auditing procedures and auditing standards
9  and in forensic evaluations, can you think of
10  any reason that Dexia would not include the
11  personal guarantees or the credit default
12  swaps in Dexia's loan file other than to hide
13  that fact?
14  MR. BUTLER: Objection to form.
15  A. There may be other reasons.
16  Q. What may they be?
17  A. They may have to do with tax
18  issues, they may have to do with personal
19  preferences of the parties involved.
20  Q. What do you mean, the parties
21  involved?
22  A. I guess there can be other reasons.
23  I don't think that's the only reason.
24  Q. I'm just asking you for what other
25  reasons?

Page 207

D. Larue

1
2  A. I think one other reasons would --
3  and, again, I'm not an expert in Belgium tax
4  law, but there may have been a tax reason to
5  do that. There may have been a perception on
6  one or more of the parties that by doing it
7  one way would qualify under one GAAP or SEC
8  rule, whereas doing it a different way may
9  qualify under a different GAAP procedure or
10  principle.
11  Q. When you say different GAAP
12  procedure...
13  A. Principle.
14  Q. Or qualify it.
15  Qualify what?
16  A. There may have been a perception on
17  the part of either a bank or the borrower
18  that if something was done one way, you would
19  get one accounting result or one tax result
20  or one economic result, but if you did it
21  another way, you would get a different tax
22  result, accounting result or economic result
23  or finance result. I don't know.
24  Q. So one thing -- clearly one reason
25  would be to try to hide it, correct?

Page 208

D. Larue

1
2  MR. BUTLER: Objection to form.
3  A. I don't know.
4  Q. In your forensic examinations, you
5  don't believe that people who have side
6  agreements or don't include typical
7  documentation in accordance with their
8  policies are trying to commit fraud?
9  A. It's a possibility.
10  Q. It is a possibility, it's one
11  possible reason?
12  A. It's a possible reason.
13  Q. And, in fact, as a forensic
14  examiner, aren't side agreements red flags
15  for forensic examiners?
16  MR. BUTLER: Objection to form.
17  A. They certainly can be. It depends
18  on the facts and circumstances. What the
19  side agreement relates to, the accounting
20  issues involved.
21  Q. A second reason you said was that
22  keeping the credit default swap outside the
23  loan documentation may be perceived to
24  provide a different result under GAAP,
25  correct?

Page 209

D. Larue

1
2  A. That's one possible reason.
3  Q. If you look at paragraph 9, and
4  feel free to review it, I'm just trying to
5  understand whether or not paragraph 9 is a
6  statement of fact, an assumption or an
7  opinion?
8  MR. BUTLER: Objection to form.
9  A. I think it's a statement of fact.
10  It's a statement of fact because that, in
11  fact, is what the audit committee report says
12  and the loans and related party issues are
13  not addressed anywhere that I recall in that
14  report as being a factor in the audit
15  committee's conclusion that revenue
16  recognition was improper.
17  Q. Is it fair to say that your
18  forensic accounting and other claimed
19  expertise did not play a role in reaching
20  that statement of fact, correct?
21  A. In paragraph 9?
22  Q. Yes.
23  A. That's correct.
24  Q. I assume in your view, any
25  reasonably intelligent person who could read

53 (Pages 206 to 209)

ESQUIRE DEPOSITION SERVICES
212-687-8010

2dfd6da5-8e66-4d39-80f9-bae02f49a691

## Page 210

D. Larue

1 would reach the same statement of fact?
2 A. Anybody who could read could see
3 that the audit committee said revenue
4 recognition was improper for reasons given
5 that were unrelated to the bank loans or to
6 the related party issues.
7 Q. Now, if you look at paragraph 10,
8 what Artesia related loan transactions are
9 you referring to?
10 A. I'm referring to -- I'm certainly
11 referring to the Radial loans, the DLIC loans
12 and the LDH loans. I don't recall whether or
13 not, I believe I did, let me look. Yes,
14 paragraph 196 refers to the BTG loan.
15 Q. Okay. BTG loan and how much was
16 that loan?
17 A. I don't recall. The dollar amounts
18 are disclosed in paragraph 196, but I see
19 it's broken down.
20 Q. So paragraph 10 is to a small
21 percentage of the overall alleged revenue,
22 that includes Radial, LDH, LDF and LIC,
23 correct?
24 A. Radial, LIC and LDH.

## Page 211

D. Larue

1 Q. And BTG or not BTG?
2 A. I believe that statement refers
3 more to those three.
4 Q. Those three?
5 A. I believe so.
6 Q. Then why when you get to -- this is
7 the summary of conclusions, correct?
8 A. Yes, sir.
9 Q. When you -- where is this
10 conclusion discussed more fully in the
11 section?
12 A. It's actually discussed through the
13 entirety of section 5 because I believe in
14 that section, for the most part, I included
15 dollar amounts in each one of these.
16 Q. And do you set forth the
17 percentage, you say in paragraph 10 that it's
18 a small percentage.
19 Do you set forth that percentage
20 anywhere?
21 A. Paragraph 202.
22 Q. So the smallest percentage that's
23 in paragraph 10 is the 3.2 percent that's set
24 forth in 202, is that correct?

## Page 212

D. Larue

1 A. This says, for example, if the
2 plaintiffs are successful in proving that
3 Artesia is liable for the Radial and LIC
4 transactions, those loans were 3.2 percent of
5 L&H's alleged overstatement of revenues.
6 Q. Now, so that does not -- the 3.2
7 percent is not the percentage that would be
8 the percentage if it was BTG, Radial?
9 A. Radial is included.
10 Q. LIC and LDF, correct?
11 A. That's correct. If you combined
12 those amounts, you would end up with a larger
13 percentage.
14 Q. What percentage would you end up
15 with?
16 A. I don't know.
17 Q. You only took the loan amounts,
18 correct?
19 A. That's correct.
20 Q. Based upon your asserted expertise
21 as an -- in GAAP and GAAS, would L&H have
22 been permitted to recognize any revenues from
23 LDF absent the loan by Dexia?
24 MR. BUTLER: Objection to form.

## Page 213

D. Larue

1 A. Permitted by whom?
2 Q. GAAP.
3 MR. BUTLER: Are you asking if they
4 came up with the money in some other
5 way, would it be okay?
6 MR. HARRIS: No, I'm asking what I
7 asked him.
8 MR. BUTLER: Let me hear the
9 question again.
10 (Record read.)
11 MR. BUTLER: I object to the form
12 of the question.
13 A. I don't really understand the
14 context of your question.
15 Q. All right. Let's see if I can
16 help, and perhaps we can turn to Larue
17 Exhibit 5 --
18 A. I could.
19 If you're asking me is it
20 permissible for a customer to basically issue
21 an account receivable or account payable,
22 receivable in L&H in payment of a license,
23 yes, it is permissible.
24 Q. That's not what I was asking.

Page 214

1        D. Larue
2        MR. BUTLER: There is clearly some
3   confusion over your question.
4        Q.   Let's turn to Larue Exhibit 5,
5   which is your rebuttal report, and I'm
6   particularly going to direct your attention
7   to page 9 and Exhibit 7-A.
8        A.   Which is my appendix D.
9        Q.   You talk about that you do not
10  believe the amount of revenue overstatement,
11  and I'm looking at paragraph 40, in excess of
12  the loan amounts is attributable to the bank.
13       Do you see that?
14       A.   Actually, I don't see it.
15       Q.   In paragraph 40, the next to last
16  sentence.
17       A.   I see.
18       Q.   It says, Therefore, I do not
19  believe that the amount of revenue
20  overstatement in excess of the 30.4 million,
21  15.6 million and 20 million in loans in 1997,
22  1998 and 1999 respectively is attributable to
23  the bank.
24       Do you see that?
25       A.   I do.

Page 215

1        D. Larue
2        Q.   Now, do you disagree with Mr.
3   Love's conclusion that L&H overstated
4   revenues by more than those amounts in 1997,
5   1998 and 1999?
6        A.   That's my understanding.
7        Q.   What is your understanding?
8        A.   That revenues were overstated or at
9   least allegedly overstated by amounts greater
10  than the amounts you just articulated.
11       Q.   And, for example, the loan -- let's
12  assume that a loan was $10 million, but they
13  booked $20 million as revenue, 10 in accounts
14  receivable, 10 in cash that were the proceeds
15  of the loan, the numbers may be different,
16  but that is your understanding of what L&H
17  did with regard to the LDCs that Dexia
18  funded, is that correct?
19       A.   Yes, it is.
20       Q.   I'm going to ask you, the first is,
21  your opinion that you don't -- you only think
22  the loan amount is attributable to the bank,
23  is that a legal conclusion?
24       A.   Let me back up a second.
25       First of all, once again, you know,

Page 216

1        D. Larue
2   the accuracy of the financial statements is
3   management's responsibility, not the bank's
4   responsibility, management's responsibility,
5   how they report the cash that they received,
6   the accounts receivable from the sales of
7   these licenses, that's the responsibility of
8   management.
9        Q.   Okay.  When you say I do not
10  believe the amount of -- in excess of 20
11  million is attributable to the bank and what
12  I'm trying to understand is what kind of an
13  opinion is that, is it a legal opinion or
14  what?
15       A.   Well, they weren't attributable to
16  the bank.
17       Q.   What does that mean, attributable?
18  How do you mean attributable?
19       A.   Well, the bank loans were reported
20  as revenue and an additional amount, a
21  decision was made by L&H to report an
22  additional amount of revenues in the form of
23  the accounts receivable.
24       Q.   What do you mean by attributable?
25       A.   The bank didn't finance the

Page 217

1        D. Larue
2   accounts receivable.
3        My understanding is there was no
4   expectation that the bank would loan
5   additional funds in order for the LDCs to
6   payoff the accounts receivable.
7        As far as I knew, the bank knew
8   nothing about it.  They were out of that part
9   of the picture.
10       Q.   As you understand it, that is an
11  assumption that you were asked to make as to
12  the amount of the loan.
13       Now, what I'm trying to understand
14  is the context of your use of the term and
15  belief about what is and is not attributable
16  to Dexia.
17       A.   The portion of the revenues
18  financed by the accounts receivable, it's my
19  understanding had nothing to do with the
20  bank.
21       Q.   When you say had nothing to do with
22  the bank...
23       A.   The bank wasn't involved in any way
24  or didn't expect to be involved in any way my
25  understanding in the payment of those

55 (Pages 214 to 217)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 218

1  D. Larue
2  accounts receivable.
3  Q. But you're not suggesting that as a
4  legal matter, that Dexia cannot be held
5  liable for more than the amounts of the loan,
6  are you?
7  A. I'm not saying anything as a legal
8  matter. I'm not an attorney, let alone an
9  attorney knowledgeable in Belgium law.
10  Q. As a factual matter, you only know
11  what you've been asked to assume, correct?
12  A. What I've been asked to assume has
13  been disclosed in my opening report and my
14  rebuttal report.
15  Q. So really what paragraph 40 says is
16  that I was asked to assume that Dexia had
17  nothing to do with anything other than the
18  amount of the loans, is that what 40 says?
19  A. I've been asked to assume that
20  Dexia made these loans in these amounts and
21  that there was no contemplation or no plan or
22  agreement that would have resulted in Dexia
23  making additional loans to these LDCs.
24  Q. And so that is all an assumption of
25  fact that you were asked to make, correct?

Page 219

1  D. Larue
2  A. Yes.
3  Q. And so if you turn to Exhibit D of
4  your rebuttal report, am I correct that what
5  this does is it takes Mr. Love's Exhibit 7-A
6  report and substitutes in the amount of the
7  loans that you were told to assume Dexia made
8  to certain people?
9  A. I believe that's true.
10  Once again, I would like to see Mr.
11  Love's report, but I'm pretty sure that's
12  true.
13  Q. You excluded the other amounts from
14  Dexia -- of revenue ruled LDCs that Mr. Love
15  includes because you were told to assume that
16  Dexia had nothing to do with it, correct?
17  A. I was -- I assumed that Dexia would
18  not be involved or there were no plans for
19  Dexia to be involved in the payment of those
20  accounts receivable.
21  Q. And you assumed that as a matter of
22  fact?
23  A. It's a factual assumption that I
24  assumed in preparing my report, yes, sir.
25  Q. You were not attempting to suggest

Page 220

1  D. Larue
2  through Exhibit D that as a matter of legal
3  liability, Dexia should not be held
4  responsible for the other Dexia related LDC
5  revenues?
6  A. I'm not an attorney, I'm not
7  opining on any legal issue.
8  Q. And you're not doing so as a matter
9  of economics, are you?
10  MR. BUTLER: Objection to form.
11  A. I'm not sure what you mean by that.
12  Q. You're not saying they were not
13  economically responsible for that, are you?
14  You're not opining on anything in this chart?
15  MR. BUTLER: Objection to form.
16  This chart speaks for itself.
17  He can answer the question.
18  A. It says, Therefore I do not believe
19  that the amount of revenue overstatement in
20  excess of 30 million, 15.6 and 20 is
21  specifically attributable to the bank.
22  Q. And you're not saying that on the
23  basis of any analysis or conclusion other
24  than you were told to assume that, correct?
25  A. Assume what?

Page 221

1  D. Larue
2  Q. That --
3  A. My factual -- my understanding of
4  the facts is that Dexia would not be involved
5  in the payment of these accounts receivable.
6  I was not asked to assume that that amount of
7  revenue overstatement was -- therefore, I do
8  not believe that the amount of revenue
9  overstatement is attributable to the bank. I
10  wasn't asked to assume that. That's my
11  opinion.
12  Q. Is that opinion based on accounting
13  expertise?
14  A. It's based on the factual
15  assumption that Dexia wouldn't be a part of
16  paying off these accounts receivable at any
17  point in time in the future.
18  Q. When you say it should not --
19  A. It's based on that and it's based
20  on an accounting issue and that is, again, it
21  was management's decision to include not only
22  the revenues that they generated from the LDH
23  LDCs as revenue when they did, but to also
24  include the accounts receivable from the LDH
25  LDCs as revenue. That was management's

56 (Pages 218 to 221)

ESQUIRE DEPOSITION SERVICES
212-687-8010

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 222

1           D. Larue
2  decision.
3       Q.  Based on your assertive expertise
4  in auditing standards, do you believe that
5  KPMG would have allowed L&H to recognize the
6  accounts receivable as a revenue if L&H had
7  not gotten the cash portion when it did?
8       MR. BUTLER:  Objection to form.
9       A.  Are we assuming the same total
10  amount of revenue?
11      Q.  Uh-huh.
12      A.  So basically we're talking about
13  instead of having a smaller account
14  receivable, we have a larger account
15  receivable.
16      Q.  And no cash?
17      A.  And no cash.
18      Q.  Correct.
19      A.  SOP 97-2 requires an assessment as
20  to whether or not the amounts to be received
21  under this licensing agreement meet certain
22  criteria.
23          Are those amounts fixed and
24  determinable and is collection probable, KPMG
25  would normally -- an auditor would normally

Page 223

1           D. Larue
2  go out and perform whatever tests the auditor
3  deemed necessary to make an assessment as to
4  whether or not the collection of the accounts
5  receivable was probable and if and to the
6  extent not required either a non-recognition
7  of that revenue until collection became
8  probable or to require the establishment of a
9  reserve for bad debts.
10      Q.  I understand how KPMG would have
11  gone about it.  My question was different.
12          Do you have an opinion as to
13  whether or not KPMG would have allowed L&H to
14  recognize any of the revenue from the Dexia
15  related LDCs if L&H had not gotten the Dexia
16  cash when it did?
17      MR. BUTLER:  Objection to form.
18      A.  I don't know.  These are management
19  representations, KPMG what kind of
20  information would they have done to try to
21  determine collectability.
22      Q.  That's not what I asked.
23          Do you want the question read back?
24      A.  No.  I don't know what kind of
25  information would have been available to them

Page 224

1           D. Larue
2  to make a determination that the collection
3  was probable.
4       Q.  And it is possible, is it not, that
5  but for the amounts that Dexia loaned in the
6  Dexia related LDCs that ultimately ended up
7  in cash in L&H, that KPMG would not have
8  permitted L&H to recognize any revenues from
9  the Dexia related LDCs?
10      MR. BUTLER:  Objection to form.
11      A.  Anything is possible.
12      Q.  You don't have an opinion really
13  one way or the other?
14      A.  I don't have the facts and
15  circumstances available to me to know what
16  information KPMG might or did have available
17  to them in testing the accounts receivable.
18      Q.  If we turn back to paragraph 40 of
19  your rebuttal report, I'm just trying to
20  understand what the 30.4 million for 1997
21  represents, what loans are those that you've
22  assumed?
23      A.  The '97 loan, would that be BTG, I
24  believe.  I think that's the BTG loan.  Yes,
25  that appears to be the BTG loan and it

Page 225

1           D. Larue
2  appears to not include any amount from the
3  Dictation Consortium loan.
4       MR. HARRIS:  Shall we take a break.
5       THE VIDEOGRAPHER:  We are going off
6  the record at 3:26 p.m. on tape No. 1.
7       (Recess.)
8       THE VIDEOGRAPHER:  We're going back
9  on the record.  The time is 3:39.  This
10  is tape No. 4.
11      Q.  If we could return, Mr. Larue, if
12  we could return to your report.  I would like
13  to direct your attention to the section in
14  which you discuss special purpose entities
15  and I believe that is section 3.
16          I believe that you earlier said
17  that the LDCs have many of the
18  characteristics of a special purpose entity,
19  is that correct?
20      A.  I predicated that statement by
21  pointing out, as I've done in my report,
22  there is no offerings definition of an SPE in
23  the accounting literature, so in answering
24  your question in general terms, the way these
25  have been described here, that the LDCs

ESQUIRE DEPOSITION SERVICES
212-687-8010

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 226

D. Larue

1
2  appear to have had several of the
3  characteristics, yes.
4      Q.  Are there any characteristics of a
5  special purpose entity which must be present
6  for an entity to qualify as a special purpose
7  entity?
8      A.  Again, there is no definition of a
9  special purpose entity under GAAP.
10      Q.  As you used the term.
11      A.  You're actually using the term in
12  your question to qualify for a special
13  purpose entity and my question back to you is
14  for what purpose?
15      Q.  For the purpose of your report.
16      A.  I've described in my report some of
17  the characteristics that appear from the
18  literature to be present with respect to what
19  many people refer to as a special purpose
20  entity.
21      Q.  And one characteristic is a
22  sponsor, correct?
23      A.  That's a characteristic, yes.
24      Q.  Do you have information that the
25  LDCs had any sponsors, as that term is used

Page 227

D. Larue

1
2  on page 12 of your report?
3      A.  Again, this deals not with the
4  facts of this case, but just a general
5  description of SPE.
6      Q.  I understand.
7      A.  Do I have any information of who
8  might be a sponsor?
9      Q.  Not who.  Whether or not the LDCs
10  had a sponsor, as the term sponsor is used on
11  page 12 in your report?
12      A.  It's my understanding that these
13  entities were created by -- not by L&H, not
14  by the shareholders of L&H or officers of
15  L&H, but, rather, were created by independent
16  investors, third party investors.
17      Q.  And the third party investors then
18  would be the sponsors of the SPE?
19      A.  I put that in parenthesis here.  I
20  described the party creating the SPE as a
21  sponsor.
22      Q.  And all corporations are created,
23  correct, by their investors?
24      A.  All corporations are created,
25  oftentimes it's my understanding that

Page 228

D. Larue

1
2  sometimes a corporation is created before it
3  actually has shareholders.
4      Q.  And so an SPE is created by
5  somebody, correct, that you term a sponsor?
6      A.  Yes, I've used that term in this
7  report, yes.
8      Q.  And all corporations are created by
9  somebody, correct?
10      A.  By some breathing human being,
11  yes -- well, actually, that's not true.
12  Corporations can create other corporations,
13  so, yes, corporations are created by
14  somebody.
15      Q.  And you say SPEs have no purpose
16  other than the transactions for which they
17  were created.
18          What does that mean?
19      A.  It means that generally, unlike a
20  regular ongoing business with multiple
21  operations and day in and day out operations,
22  it's my understanding when people refer to an
23  SPE, they typically are referring to an
24  entity that is designed, preordained,
25  actually, to do one thing.  It may be

Page 229

D. Larue

1
2  leasing, I might be the lessor of the
3  equipment to the lessee.  And I'm not running
4  a business, I am not doing anything else, I'm
5  just leasing these assets to a particular
6  lessee, so the scope is much more narrow than
7  you would find if somebody started up an
8  active trader business.
9      Q.  When you say no purpose other than
10  the transactions as for which they were
11  created, those are set forth in the SPE's
12  governing documents?
13      A.  I don't know that's the case.  It
14  may be there is a contract or -- I don't
15  know, I guess, you know, the purpose could be
16  established and the documents creating the
17  entity or by contract with another party.
18      Q.  Is Microstrategy the corporation of
19  which you are a director, a special purpose
20  entity, as you use that phrase in your
21  report?
22      A.  No, sir.
23      Q.  Does it do anything other than sell
24  software?
25      A.  Yes, sir.

58 (Pages 226 to 229)

ESQUIRE DEPOSITION SERVICES
212-687-8010

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 230

D. Larue

1
2     Q.  It does.
3         What else does it do?
4     A.  It develops software, updates the
5  software, conducts training sessions,
6  provides consulting services.
7         Microstrategy has a lot of
8  employees around the world.
9     Q.  Do you have any facts that suggest
10 that the LDCs did not have the power or the
11 authority to do everything that Microstrategy
12 does?
13        MR. BUTLER:  I object to the form
14 of the question.
15     A.  No.
16     Q.  Now, when you say that the LDCs did
17 have certain characteristics that -- of a
18 special purpose entity, as you used that term
19 in your report, please identify every
20 characteristic of the LDCs that it had that
21 Microstrategy does not have?
22        MR. BUTLER:  I object to the form
23 of the question.
24     A.  It's my understanding the LDCs did
25 not have any employees.  At the time that

Page 231

D. Larue

1
2  these revenues were recognized, what happened
3  to them later, I have no idea.
4     Q.  Holding companies often have no
5  employees, correct?
6     A.  That's correct.
7     Q.  Are they special purpose entities?
8     A.  No.  They wouldn't generally be
9  considered to be special purpose entities.
10    Q.  What other characteristics did the
11 LDCs have of a special purpose entity, as you
12 use that term in your report?
13    A.  My understanding is that they had
14 limited or no active trader business
15 operations.
16    Q.  At what point in time?
17    A.  At the time referenced in my report
18 during that period of time.
19    Q.  When they were created?
20    A.  When they were created.
21    Q.  Does any corporation have active
22 trade or business at the time its created?
23    A.  At the instant of its creation?
24    Q.  Yes.
25    A.  Yes.

Page 232

D. Larue

1
2     Q.  It does?
3     A.  Yes.
4     Q.  Which ones?  Identify them for me,
5  please.
6     A.  When you take a limited liability
7  company that's actively engaged in a trader
8  business and it decides to incorporate those
9  operations, the corporation is something
10 that -- the corporation is a new legal
11 entity, but it relates to the same business,
12 the business operations are ongoing.
13    Q.  Mr. Larue, is it -- is the
14 characteristic of a special purpose entity
15 that it has no employees throughout its
16 existence?
17    A.  I don't think I said that here.
18    Q.  I'm asking you.
19    A.  What I do think is that you might
20 start off as what most people would consider
21 to be or some people would consider to be a
22 special purpose entity and evolve into
23 something else.
24    Q.  Is it your understanding that the
25 LDCs from the time they were created intended

Page 233

D. Larue

1
2  to have employees?
3     A.  Again, you're asking me the
4  intention of the people who basically formed
5  and then managed those entities.  I can't
6  speak to their intention.
7         The other thing I would comment is,
8  once again, you're getting into, we have 13
9  LDCs here, it's my understanding that over a
10 period of time, the facts and circumstances
11 may have changed, the plans may have changed,
12 I don't know.
13    Q.  Did the license agreements with L&H
14 of the Dexia related LDCs, were they
15 identical in substance?
16    A.  You mean the terms of the licensing
17 agreement, not the dollar amounts, of course?
18    Q.  Yes.
19    A.  I don't know.
20    Q.  You don't know.
21        Let me hand you a document that we
22 will mark as Larue Exhibit 6?
23        (Document dated September 29, 1998
24 marked Larue Exhibit 6 for
25 identification.)

59  (Pages 230 to 233)

Page 234

D. Larue

1
2     Q.  And I will represent to you that
3  this is the agreement between the Slavic
4  Development Company and Lernout and Hauspie
5  Speech Products, NV dated September 29, 1998.
6        MR. BUTLER:  I can't agree with
7     that representation because there has
8     been no evidence about this document in
9     this case.
10     Q.  Have you ever seen this document
11  before?
12     A.  My records show I haven't seen this
13  document with either one of these Bates
14  numbers and I don't recall seeing this
15  document.
16     Q.  I believe your earlier testimony
17  was that you did not review, prior to
18  submission of either of your reports, any of
19  the agreements between the Dexia related LDCs
20  and L&H, correct?
21     A.  Say that again.
22        (Record read.)
23     A.  I didn't have access to any
24  documents between L&H and Dexia, I didn't
25  review them.

Page 235

D. Larue

1
2     Q.  When you say you didn't have
3  access, what do you mean?
4     A.  You are asking me before I was
5  engaged?
6     Q.  Before you submitted either of your
7  reports.
8     A.  Did I review this agreement?
9     Q.  Let me make sure the question is
10  clear.
11        Prior to the submission of each of
12  your reports, it is true, is it not, that you
13  did not review any agreement between a Dexia
14  related LDC and L&H?
15     A.  I don't recall that I reviewed any
16  such document.
17     Q.  And they were available to you,
18  correct?
19        MR. BUTLER:  Objection to form.
20     A.  Yes, I assume they were.
21     Q.  But you didn't ask for them,
22  correct?
23     A.  I shouldn't assume that they were.
24  I don't know what documents would have been
25  available to me had I asked.

Page 236

D. Larue

1
2     Q.  Did you ask?
3     A.  I did not.
4     Q.  I take it that's because you
5  believed that the contents of those
6  agreements were not important for your
7  opinions, correct?
8     A.  No.
9     Q.  No?
10     A.  No.
11     Q.  If you thought they were important,
12  why didn't you ask for them?
13     A.  I was asked to assume certain
14  factual aspects of these documents, which I
15  did assume, I thought that was important for
16  me to actually read through these documents,
17  not being an attorney, among other things, I
18  didn't consider to be important as long as
19  that fact was fully disclosed in my report.
20     Q.  I would like to direct your
21  attention to page 3 of the agreement.
22     A.  I'm there.
23     Q.  It says there that development by
24  the company of the products and in paragraph
25  2.3-B, Roman I, it says, The company shall be

Page 237

D. Larue

1
2  responsible for the hiring of qualified
3  personnel.
4     A.  I see that.
5     Q.  Do you have any reason to believe
6  that Slavic Development Company was not
7  responsible for hiring qualified personnel to
8  perform its obligations under the agreement
9  it had with L&H?
10        MR. BUTLER:  Objection to form.
11     A.  First of all, I don't know what
12  obligations you're referring to.
13     Q.  Did it have any obligations?
14     A.  Who?
15     Q.  The LDC.
16        MR. BUTLER:  Objection to form.
17     A.  I don't know.
18     Q.  You don't know one way or the
19  other?
20     A.  This is a lengthy document.  Who
21  are you talking about in terms of the
22  company?  Who is the company?  The agreement
23  between Slavic Development Company -- I think
24  I understand.
25        Would you ask your question again.

60  (Pages 234 to 237)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 238

D. Larue

2  Q. Sure.
3     Do you have any reason to believe
4  that Slavic Development Company was not
5  responsible for the hiring of qualified
6  personnel to fulfill Slavic Development
7  Company's obligations to L&H?
8     A. I can't. This is a lengthy
9  document. I would have to study that to make
10  an opinion about that. I don't know what
11  responsibilities the Slavic Company did or
12  did not have to Dexia -- I mean to L&H.
13     Q. Now, we were talking about -- let's
14  talk about the Slavic Development Company.
15     What characteristics did it have
16  that were consistent with a special purpose
17  entity, as you used that term in your report?
18     A. I don't know that much about that
19  specific company.
20     Q. Do you have -- do you know whether
21  or not Slavic Development Company had any
22  characteristic of a special purpose entity,
23  as you used that term in your report?
24     A. Do I know for a factual certainty,
25  no.

Page 239

D. Larue

2     Q. Do you know if any LDC had any
3  characteristic of a special purpose entity,
4  as you used that term in your report?
5     A. Do I know for a factual certainty?
6  No, I don't.
7     Q. When you say, factual certainty,
8  what do you mean?
9     A. You're asking me to basically look
10  at the facts surrounding these LDCs and try
11  to determine whether or not those facts match
12  up with the way I've described an SPE in
13  section 3 of my report.
14     Q. So you are not prepared to offer
15  any opinion at trial that any of the LDCs
16  were, in fact, SPEs, correct?
17     A. I made certain assumptions about
18  some of the characteristics of the LDCs
19  generally and I've disclosed those
20  assumptions in my report.
21     Q. Do you conclude in your report that
22  any of the LDCs were special purpose
23  entities, as you used that term in your
24  report?
25     A. I don't conclude one way or the

Page 240

D. Larue

2  other.
3     Q. And so you don't know whether or
4  not the accounting treatment for special
5  purpose entities have any relevance to the
6  Dexia related LDCs, correct?
7     A. That's not correct. That's what my
8  report largely is all about, is talking about
9  what the accounting standards are as they
10  apply to certain entities with certain
11  characteristics and how those compared with
12  the characteristics that I factually assumed
13  in preparing my report.
14     Q. Well, I understand that, but what
15  I'm really asking is something different.
16     You are not prepared to opine that
17  the accounting for special purpose entities
18  had any relationship to the Dexia related
19  LDCs as they, in fact, existed, correct?
20     A. No. I describe in section 3
21  accounting principles that are generally
22  applicable, not just necessarily to SPEs. I
23  applied those principles to the factual
24  assumptions I made in section 4.
25     Q. Let me keep --

Page 241

D. Larue

2     A. If I could, let me make it very
3  clear that GAAP, prior to a recent 2003
4  announcement which still doesn't refer to
5  SPEs, didn't have a rule that said if you're
6  an SPE and here is how we define an SPE, then
7  here are all of the accounting principles
8  that are going to apply to you.
9     In other words, once you make a
10  determination you are or not -- that you are
11  an SPE, then there is this whole basketful of
12  accounting principles that now apply to you
13  that would not have applied before.
14  Accounting principles don't define an SPE and
15  pull out the accounting principles that will
16  always be applied once the determination is
17  made that you are an SPE.
18     The accounting principles I
19  described in section 3 of my report are
20  accounting principles that deal with
21  consolidation issues related party
22  transactions and so forth, to the extent
23  those are applicable to the facts that I've
24  assumed in this case, I have applied them.
25     Q. Now, let me try my question again

61  (Pages 238 to 241)

ESQUIRE DEPOSITION SERVICES
212-687-8010

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 242

D. Larue

1
2  because, clearly, we're not doing so well in
3  terms of me making my question clear or you
4  hearing it.
5        Do you have my prior question in
6  mind?
7      A.  You better ask me again.
8      Q.  You don't, is that right?
9      A.  Would you ask me again, please.
10     Q.  Do you have in mind the question
11  that you just purported to answer?
12        MR. BUTLER:  I don't understand
13  this.
14        Can you just reread the question so
15  we all have it if mind.
16        MR. HARRIS:  No, she can't.
17        Can you answer my question.
18        MR. BUTLER:  You are asking if he
19  has it in mind again.  He just answered
20  the question.
21     Q.  Can you answer the question.
22     A.  I thought I did answer the
23  question.
24     Q.  Do you have the question in mind
25  that you just answered?

Page 243

D. Larue

1
2        MR. BUTLER:  I object to the
3  question.
4        You can answer to the best of your
5  ability.
6      A.  You asked me about accounting
7  principles for SPEs and whether or not
8  accounting principles for SPEs were
9  applicable to the LDCs.
10     Q.  As they existed in fact.
11     A.  As they existed in fact and based
12  on the factual assumptions that I made in my
13  report.
14     Q.  That was not my question.
15        MR. BUTLER:  Maybe you should reask
16  your question.
17     Q.  Maybe you should listen to my
18  question better.
19        MR. BUTLER:  Just a moment.  Don't
20  lecture the witness.  He is trying to
21  answer your questions, please.
22        MR. HARRIS:  We can obviously
23  disagree about lots of things.
24     Q.  Let me make sure it is clear.  Let
25  me ask another question first.

Page 244

D. Larue

1
2        Are there any accounting principles
3  set forth in section 3 that are not
4  applicable to non-special purpose entities
5  and by non-special purpose entities, I mean
6  an entity that is not a special purpose
7  entity, as you describe that term?
8      A.  I believe most of the discussion in
9  section 3 deals with accounting principles
10  that are applicable to all 10 practices.
11     Q.  Is there any accounting principal
12  set forth or discussed in section 3 of your
13  report that is not applicable to
14  Microstrategy?
15     A.  By applicable, do you mean
16  literally applicable to Microstrategy or do
17  you mean to entities like Microstrategy?
18     Q.  I mean applicable to Microstrategy.
19     A.  Yes.
20     Q.  Okay.  Which ones?
21     A.  As disclosed in its public
22  statements, Microstrategy doesn't have any
23  related party issues, so those rules are
24  inapplicable that they have not had to be
25  applied to the facts and circumstances

Page 245

D. Larue

1
2  related to Microstrategy in its operations
3  since I've been a member of the board of
4  directors.
5      Q.  Let me then, perhaps you didn't
6  understand what I meant by applicable, given
7  your answer.
8        Are there any accounting principles
9  or rules set forth in section 3 with which
10  Microstrategy does not need to comply?
11     A.  But for possible changes since the
12  years at issue here, these rules are
13  applicable to public companies like
14  Microstrategy, if their circumstances require
15  the application of those principles.
16     Q.  So all of the accounting principles
17  set forth in section 3 are applicable to
18  entities which are not special purpose
19  entities, correct?
20     A.  What I've described in this section
21  is generally accepted accounting principles
22  for purposes that are required to comply with
23  generally accepted accounting principles,
24  these rules would apply.
25     Q.  And so the title could also be for

62 (Pages 242 to 245)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 246

D. Larue

1
2  accounting -- entity which need to comply
3  with generally accepted accounting
4  principles, correct?
5         MR. BUTLER: Is this about debating
6      the title of section 3, sorry, can you
7      answer the question.
8      A.  The title could be whatever I
9  wanted it to be, the title --
10     Q.  You wanted it to be special purpose
11 entities to suggest that special purpose
12 entities had some relevance to this case, but
13 then you didn't identify anything in here
14 that was solely related to special purpose
15 entities, correct?
16        MR. BUTLER: Objection to form.
17     A.  Many of the principles that would
18 normally be applied to a special purpose
19 entity would be applied in the context of the
20 LDCs, but I could have -- that title could
21 have been accounting for -- relevant
22 accounting principles for publicly traded
23 companies or companies complying with GAAP.
24     Q.  Those same principles that would be
25 applicable to special purpose entities would

Page 247

D. Larue

1
2  be applicable to non-special purpose
3  entities, correct?
4         MR. BUTLER: Objection. Asked and
5      answered.
6      You can answer again.
7      A.  To the extent described in this,
8  yes.
9      Q.  And so -- let's then turn to page
10 16 of your report where you quote a portion
11 of FAS 57, correct?
12     A.  Yes, sir.
13     Q.  And it indicates that a party is
14 related to another party if it controls or
15 can significantly influence the management or
16 operating policies of the other to an extent
17 that one of the transacting parties might be
18 prevented from fully pursuing its own
19 separate interests, correct?
20     A.  That's what it says, yes.
21     Q.  And that is a recognized general
22 accounting principle, correct?
23     A.  This is a quote from FAS 57, yes,
24 it's a generally accepted accounting
25 principles.

Page 248

D. Larue

1
2      Q.  As a factual matter, you do not
3  know one way or the other whether or not
4  Lernout and Hauspie's principles were able to
5  and did control or significantly influence
6  the management or operating policy of the
7  Dexia related LDCs to the extent that one of
8  the transacting parties might be prevented
9  from fully pursuing its own special
10 interests, correct?
11     A.  That's correct. I don't know that,
12 but what I do know is or what I believe I
13 know, what I've been asked to factually
14 assume is that the principals of L&H did not
15 hold equity interests in the LDCs directly or
16 indirectly that those equity interests
17 represented a stake by unrelated parties.
18     Q.  But it doesn't talk in terms of
19 holding equity interests, does it? It talks
20 in terms of controls or could significantly
21 influence the management or operating
22 policies, correct?
23     A.  Yes, it does. That's relevant. I
24 mean, that fact is relevant to determining
25 the likelihood, I suppose, that unrelated

Page 249

D. Larue

1
2  independent investors that have their own
3  money at stake would permit the principals of
4  L&H to do things that were not in the best
5  interest of the investors. It goes to the
6  issue of significance.
7      Q.  Let me make sure I understand.
8      You're not suggesting that the
9  definition of related parties that we've just
10 looked at is limited to parties who hold an
11 equity interest in another, are you?
12     A.  No, sir.
13     Q.  Because it would be very easy for
14 the financial accounting standings board to
15 have used those words, that holds an equity
16 interest, correct?
17     A.  That's correct.
18     Q.  But they chose not to, correct?
19     A.  Under FAS 57, for the purposes of
20 disclosure set forth in 57, yes, for other
21 purposes we do look at equity interests, but
22 not here.
23     Q.  But not here?
24     A.  Yes, sir.
25     Q.  Right. And the financial

63 (Pages 246 to 249)

Page 250

```
1              D. Larue
2  accounting standing boards, therefore, does
3  know how to use the term equity interest and
4  when they use something else, they mean
5  something else, correct?
6         MR. BUTLER: Object to the form. I
7  don't understand this whole line.
8         MR. HARRIS: That's why you're
9  still litigating the case.
10        MR. BUTLER: This says principal
11 owners of the enterprise, this rule does
12 apply to equity interest, it's right
13 there on the page.
14        Q.  It applies to the principal owners
15 of L&H like Mr. Lernout and Hauspie, but they
16 don't have to have an equity interest in the
17 LDCs to significantly control their
18 management or policies, correct, Mr. Larue?
19        MR. BUTLER: Object to the form.
20        A.  I believe that's correct and I
21 believe I stated that in my report elsewhere.
22        Q.  If you look at page 17, you refer
23 to SEC Regulation S-X, Section 210.4-08-K,
24 correct?
25        A.  Yes, sir.
```

Page 251

```
1              D. Larue
2         Q.  Is this the same SEC whose
3  complaint we saw against Lernout and Hauspie
4  earlier today?
5         MR. BUTLER: Objection to the form.
6         A.  It is the SEC.
7         Q.  The same one?
8         A.  The United States SEC.
9         Q.  They set accounting standards,
10 don't they?
11        MR. BUTLER: Objection to form.
12        A.  They do not set accounting
13 standards, the FASB and AICPA sets accounting
14 standards.  The SEC also sets accounting
15 standards.  They are not the sole body that
16 sets accounting standards.
17        Q.  One of the SEC's jobs is to set
18 accounting standards, correct?
19        A.  That's correct.
20        Q.  Now, section -- in paragraph 47,
21 you quote a portion of that Regulation S-X,
22 210.4-08-K, correct?
23        A.  Yes, sir.
24        Q.  It talks about which related party
25 transactions should be identified, correct?
```

Page 252

```
1              D. Larue
2         A.  Not the quoted statements here.
3  The quoted statements, Related party
4  transactions should be identified in the
5  amounts stated on the face of the balance
6  sheet income statement or statement of cash
7  flows.
8         Q.  And the SEC does not limit those
9  related party transactions which should be
10 identified to material party transactions,
11 correct?
12        A.  The materiality threshold under
13 this -- wait -- not in this quoted section,
14 the SEC generally states that transactions
15 have to be disclosed if they are material.
16 There is an overarching requirement.
17        Q.  Let me make sure I understand the
18 testimony.
19        Are you testifying that related
20 party transactions should be identified
21 really means material related party
22 transactions should be identified, is that
23 your testimony?
24        A.  Under GAAP, you normally don't --
25        Q.  I didn't ask about GAAP.  I'm
```

Page 253

```
1              D. Larue
2  talking about SEC regulation --
3         MR. BUTLER: Please don't interrupt
4  the witness.  Do not talk over me.  I am
5  asking you as a courtesy not to
6  interrupt the witness.  Now please ask
7  the question.
8         A.  Under GAAP disclosure is not
9  normally required for immaterial items.
10        Q.  I was asking what the SEC imposes.
11 You say they impose additional requirements
12 for reporting related party transactions, is
13 that correct?
14        A.  Yes, I do.
15        Q.  Is one of the additional
16 requirements that the SEC imposes set forth
17 in paragraph 47 of your report?
18        A.  Yes.
19        Q.  Is that additional requirement for
20 reporting related party transactions set
21 forth in paragraph 47 limited to material
22 party transactions?
23        A.  I would have to check to be sure.
24        Q.  You don't know one way or the
25 other?
```

64  (Pages 250 to 253)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 254

D. Larue

1
2    A.  I think it is limited to material
3    transactions.  I know in Regulation S-K,
4    which I have referenced in the next
5    paragraph, materiality is actually defined by
6    the SEC with the $60,000 amount that they
7    referred to there.
8    Q.  And the SEC sometimes uses the term
9    material, correct?
10   A.  Yes.
11   Q.  But they didn't use it in
12   section -- in Regulation S-X, Section
13   210.4-08-K, correct?
14   A.  There may be other components to
15   that, I don't know that I cited the whole
16   thing, but certainly from the quoted
17   statements in my report, they don't use the
18   word material in that statement.
19       Now, as with FASB statements, there
20   is an overarching rule that says these
21   statements are not intended to be applied in
22   all circumstances where the dollar amounts
23   are immaterial.  It's an overarching thing
24   that may not be stated in every single FASB
25   statement and it's stated once, it applies to

Page 255

D. Larue

1
2    all of the FASB statements unless specified
3    otherwise, so it applies in the context of
4    those FASB statements.
5        I just don't recall from memory.
6    This is a long regulation.  I don't recall if
7    there is any special rule that would say any
8    and all related party transactions must be
9    identified or own the material.  Normally, it
10   would be only the material.  I can't tell you
11   without going back and looking at this
12   regulation and probably other regulations, as
13   well.
14   Q.  Just so we're clear, the FASB
15   overarching rule of materiality has no
16   applicability to SEC regulations, correct?
17   A.  It certainly does have
18   applicability to SEC regulations.
19   Q.  It does?
20   A.  SEC basically says that
21   pronouncements that are considered to be
22   authoritative GAAP are going to be part of
23   their regulations.
24       Basically, the SEC allows the
25   private sector to promulgate generally

Page 256

D. Larue

1
2    accepted accounting principles except as
3    modified or appended by the SEC.
4    Q.  Mr. Larue, I think I understand
5    that it's your testimony that the SEC just
6    omitted a word that you feel is applicable.
7    I understand.
8    A.  I'm just trying to answer your
9    question.
10   Q.  It really should read material
11   related transaction.  I understand.
12       MR. BUTLER:  So ask another
13       question, please.
14   Q.  Let's move on to paragraph 48 in
15   which you quote a portion of Regulation S-X,
16   Section 229.404.
17       Do you see that?
18   A.  Yes.
19   Q.  It says, Describe briefly any
20   transaction or series of similar transaction
21   in which the registrant was or is to be a
22   party in which the amount involved exceeds
23   $60,000 and in which any of the following
24   persons had or will have a direct or indirect
25   material interest.

Page 257

D. Larue

1
2        Did I read that correctly?
3    A.  Yes, sir.
4    Q.  Then you then quote the following
5    definition of following persons, correct?
6    A.  That's correct.
7    Q.  And the following persons include
8    the directors of executive officers of the
9    registrants, correct?
10   A.  That's correct.
11   Q.  So as you understand it, the SEC
12   Regulation S-X, 229.404 applies to you as a
13   director of Microstrategy, correct?
14   A.  Absolutely.
15   Q.  Now, it also talks about an
16   indirect material interest.
17       What is an indirect material
18   interest?
19   A.  They don't define it.
20   Q.  I'm asking you as an expert.
21   A.  What do they mean by indirect
22   material interest?
23   Q.  Aren't you an expert on applying
24   SEC Regulation S-X, Section 229.404?
25       MR. BUTLER:  Objection to form.

65 (Pages 254 to 257)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 258

D. Larue

1
2    You can ask the question, but he has
3    never been held out on that provision.
4    Q.  Mr. Larue, do you believe that you
5    are an expert in applying SEC Regulation S-K,
6    Section 229.404?
7    A.  I understand this regulation, yes.
8    Q.  What does indirect material
9    interest mean?
10    A.  It's not a defined term.
11    Q.  What does it mean?
12    A.  It could be different things to
13    different people.
14    Q.  What does the SEC intend it to
15    mean?
16    MR. BUTLER:  Objection to form.
17    How can he testify as to what the SEC
18    intends in a regulation to mean, so I
19    object to the question.
20    MR. HARRIS:  Most experts can't.
21    MR. BUTLER:  I know your experts
22    can't.
23    MR. HARRIS:  If they can't, then
24    they can't assist the jury.
25    MR. BUTLER:  That's not true.  You

Page 259

D. Larue

1
2    can't confuse the jury.
3    Q.  Do you have any understanding of
4    the term indirect material interest?
5    A.  Of course.
6    Q.  What is your understanding?
7    A.  My understanding would have to be
8    by way of example.
9    Q.  Provide me some examples.
10    A.  As I stated later in my report, the
11    fact that the officers loaned money to the
12    LDF -- to LDF meant that the officers of L&H
13    had an economic interest that was material,
14    that exceeded the $60,000 limit and for that
15    reason, if they were considered to be -- for
16    that reason, it appears that there should
17    have been a disclosure.
18    Q.  So, in fact, it is now clear that
19    on the facts, as you have assumed them, that
20    SEC Regulation S-X, Section 229.404 required
21    the loans by Lernout, Hauspie and Willard to
22    the LDF -- to LDF to be disclosed, correct?
23    MR. BUTLER:  Objection.  I think
24    you got the name wrong, but you can
25    answer.

Page 260

D. Larue

1
2    A.  I don't believe.  I would have to
3    see a full copy of this regulation.  I don't
4    believe that it sets forth specifically a
5    creditor interest.  I don't believe it
6    identifies a creditor interest.
7    In my opinion, they probably mean
8    to include -- they probably mean to have a
9    creditor interest subsumed in the term
10    material interest, but I don't believe they
11    state that explicitly.
12    Q.  Let me make sure I understand.
13    As you understand the term indirect
14    material interest, were the loans by Willard,
15    Lernout and Hauspie to LDF an indirect
16    material interest in LDF?
17    A.  I believe I opined that I felt that
18    they were.
19    Q.  So, in your opinion, L&H should
20    have disclosed those loans by Lernout,
21    Hauspie and Willard to LDF in L&H's 1999
22    financial statements, correct?
23    A.  I believe that's what I said.  I
24    would like to find that in my report to see
25    exactly what I said.

Page 261

D. Larue

1
2    Q.  We looked at it earlier.
3    A.  I thought we had.
4    Q.  You suggested it was only if they
5    were related parties and now it appears as
6    though you are conceding that based on the
7    facts, that you've assumed that Lernout,
8    Hauspie and Willard were related parties to
9    LDF as defined by the SEC?
10    MR. BUTLER:  Objection to form and
11    there is no question there.
12    A.  That's not what I said.
13    In paragraph 119, it states here,
14    Disclosure by L&H of this loan to the LDF
15    LDCs would appear to have been required by
16    SEC Regulation S-K, Section 229.404 and I
17    don't qualify that by any reference to
18    related parties.
19    In the preceding paragraph, I
20    pointed out that there is a related party
21    issue under FASB 57.
22    Q.  So your correction is that your
23    report, in fact, makes clear that L&H should
24    have disclosed this loan, correct?
25    A.  I'm not correcting anything.  I'm

66 (Pages 258 to 261)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 262

D. Larue

1    D. Larue
2  correcting you.
3    Q.  That's what I meant.
4    A.  Okay. I thought you said I was
5  correcting myself.
6    Q.  Your correction was that in your
7  report, you believe you made clear that L&H,
8  in your opinion, should have disclosed in its
9  1999 financial statements the loan by
10  Lernout, Hauspie and Willard to LDF, correct?
11    A.  Under this regulation, I believe I
12  did make that clear.
13    Q.  Now, let's turn the guarantees and
14  let's take a look at -- can a guarantee ever
15  be an indirect material interest?
16    A.  Again, that term is not defined in
17  these old regulations, so could it be,
18  possibly, yes.
19    Q.  In your opinion?
20    A.  In my opinion, it could be.
21    Q.  And what would make a guarantee, in
22  your opinion, an indirect material interest?
23    A.  Whether the SEC considers that to
24  be an indirect material interest, again, in
25  paragraph 111, the regulation, that

Page 263

D. Larue

1    D. Larue
2  regulation does not provide clear and
3  specific guidelines for the appropriate
4  disclosure of guarantees or CDSs. It's not
5  clear whether L&H would have been required to
6  disclose the promised guarantees or CDSs made
7  by Lernout, Hauspie and Willard in their
8  personal capacities.
9    Q.  I understand that, but,
10  unfortunately, I don't think that Dexia is
11  going to have -- attempt to have the SEC come
12  testify, but they are going to attempt to
13  have you come testify, so that's why I'm
14  asking for your understanding.
15    Under what circumstances and your
16  understanding based upon your experience can
17  a guarantee be an indirect material interest,
18  as that term is used in the regulation quoted
19  in paragraph 48 of your report?
20    A.  Since the SEC doesn't define what
21  it means by material interest to include
22  guarantees, that would be a subjective
23  determination that could vary from one expert
24  to another as to whether or not that
25  terminology was meant at that time to include

Page 264

D. Larue

1    D. Larue
2  guarantees.
3    Q.  I'm asking for yours, you're the
4  expert whose I'm asking for. I understand
5  other experts may have a different view. I
6  understand that, but I'm asking for yours.
7    MR. BUTLER:  You don't have to give
8  him commentary on every answer. Just
9  ask a question.
10    A.  If it would have been me. I would
11  have been more comfortable disclosing the
12  guarantees.
13    Q.  But what, in your view, and I
14  understand that and I appreciate that, in
15  your view, what -- under what circumstances,
16  could a guarantee be an indirect material
17  interest?
18    A.  If the probability that the
19  guarantor may have to make good on the
20  guarantee is more than remote, then you get
21  into that materiality issue.
22    Is this a material interest and is
23  it the kind of interest that was contemplated
24  by the SEC?
25    Q.  Does the level of capitalization of

Page 265

D. Larue

1    D. Larue
2  the entity whose loan guarantee -- is
3  guaranteed effect whether or not it is likely
4  that the guarantee will be called upon?
5    A.  It could.
6    Q.  Let's turn to page 23 of your
7  report.
8    A.  Could I add something?
9    Q.  Sure.
10    A.  The SEC in its proposed amendments
11  to this regulation under SK was very critical
12  of its own regulation as being unclear and
13  ambiguous and one of the reasons that they
14  proposed these changes was to clarify and try
15  to minimize the amount of ambiguity and I
16  actually cited that later in my report, so
17  even the SEC thought these were pretty
18  ambiguous regulations and undertook to change
19  them.
20    What page?
21    Q.  Page 23.
22    If you look at the bottom, one of
23  the facts that you were asked to assume that
24  Radial was a company of limited liability
25  incorporated on May 28, 1998 with a capital

67  (Pages 262 to 265)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 266

```
 1          D. Larue
 2   of 2.5 million Belgium francs by Mr. Frans
 3   van Deun?
 4      A.  Yes, sir.
 5      Q.  How much in 1998 was 2.5 million
 6   francs?
 7      A.  A good guess is it would be about
 8   $72,000. I don't know what it was.  You used
 9   that number earlier in our discussion today,
10   but I think it was -- I don't know.
11      Q.  Did you ever ask anybody when you
12   were asked to assume this fact, how much is
13   this, is this a hundred million dollars or is
14   it two cents?
15      A.  I know I used some of the
16   conversion data that was contemporaneous, not
17   on that specific date, but about that time,
18   to make just a rough calculation.
19      Q.  What did you come up with?
20      A.  I don't remember.  It was probably
21   70 or $80,000.
22      Q.  So you were asked to assume that
23   Artesia loaned $6 million to a company that
24   was capitalized at $72,000, correct?
25      A.  Basically, that's correct.
```

Page 267

```
 1          D. Larue
 2      Q.  And you were asked to assume that
 3   they loaned that on either the last or next
 4   to last business day of L&H's third quarter,
 5   correct?
 6      A.  September 29, 1998.
 7      Q.  And you were asked to assume
 8   that -- well, were you asked to assume that
 9   Artesia did any due diligence on Radial's
10   ability to repay Artesia's loan to Radial?
11      A.  I don't know what, if anything,
12   Artesia did in terms of doing a due
13   diligence.
14      Q.  And were you asked to assume any
15   reason as to why Artesia looked to -- for
16   guarantees from Lernout and Hauspie
17   executives?
18      A.  The reason that a bank normally
19   requires or desires a guarantee is to
20   minimize its risk.
21      Q.  But why did they look -- do you
22   know why they looked to Lernout and Hauspie
23   executives for those guarantees?
24      A.  Why specifically they looked to
25   them?  No.
```

Page 268

```
 1          D. Larue
 2      Q.  Were you asked to assume whether or
 3   not Artesia asked for a personal guarantee
 4   from Frans Van Deun?
 5      A.  I don't know if the bank asked for
 6   a personal loan from that individual.  I
 7   don't know if he received a personal loan.
 8      Q.  I asked for a personal guarantee.
 9   Perhaps my question wasn't clear.  Let me
10   restate your question.
11          You were asked to assume that Dexia
12   asked Frans Van Deun to personally guarantee
13   Artesia's loan to Radial.
14      A.  I wasn't asked to assume that.
15      Q.  And you don't know one way or the
16   other, correct?
17      A.  I don't know one way or the other.
18      Q.  In your experience, have you ever
19   come across a bank that has obtained a
20   guarantee from executives of the seller of
21   goods where the -- let me change that.
22          Mr. Larue, in your experience, have
23   you ever seen an instance in which a bank has
24   obtained personal guarantees from executives
25   of the selling corporation for a loan that
```

Page 269

```
 1          D. Larue
 2   the bank makes to the buying corporation?
 3          MR. BUTLER:  Objection to form.
 4      A.  Have I seen that in my personal
 5   experience?
 6      Q.  And professional experience.
 7      A.  Personal and professional
 8   experience, possibly.
 9      Q.  Identify it for me, please.
10      A.  I would refer to a case that I
11   testified in sometime back.  It was what they
12   call a lease strip case and there were a
13   number of guarantees circular flows of cash,
14   installment notes going back and forth.
15          I believe in one or more of those
16   lease strip cases, it may have been that the
17   owners of the seller guaranteed that the debt
18   of the buyer.
19      Q.  It may have been, but you don't
20   recall one way or the other?
21      A.  If I had time to think about it,
22   those were very, very complicated facts and
23   it's been some time since I testified in that
24   case.  I just don't recall, but it may be.
25      Q.  So is it fair to say that at most,
```

68 (Pages 266 to 269)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 270

1          D. Larue
2    in your entire professional career, you have
3    only come in contact with perhaps one other
4    time in which the executives of the seller
5    guaranteed the loans of the buyer?
6          A.  I alluded to the fact there were a
7    number of those cases.  One went to trial,
8    the other settled prior to trial, so it
9    wasn't just the one case, it was probably
10   three or four that I'm referring to.  I don't
11   recall that I've seen this from my personal
12   experience more than in those cases.
13         Q.  Now, as a director of
14   Microstrategy, if the CEO of Microstrategy
15   guaranteed the loan of any of Microstrategy's
16   customers, do you believe that
17   Microstrategy's investors would be interested
18   in that fact?
19         A.  Under the new regulations, SK, that
20   would have to be disclosed.
21         Q.  But I asked a different question.
22         I asked a question of as a director
23   of Microstrategy, it's not a question of
24   whether or not it has to be disclosed.  As a
25   director of Microstrategy, if the CEO of

Page 271

1          D. Larue
2    Microstrategy made a — guaranteed a $6
3    million loan of one of Microstrategy's
4    customers, do you think Microstrategy's
5    investors would want to know that?
6          MR. BUTLER:  Objection to form.
7          A.  I think it depends on the facts and
8    circumstances.
9          Q.  Okay.  So there are certain
10   instances in which you think the investors of
11   Microstrategy wouldn't care?
12         A.  Yes.
13         MR. BUTLER:  Objection to form.
14         Q.  Would it matter if the guarantee
15   was on a loan to a company that was
16   capitalized at $72,000 in 1998?
17         A.  That might be a fact or
18   circumstance that would be relevant to me.
19         Q.  Is it a fact or circumstance that's
20   relevant to you?
21         A.  Could be.
22         My concern would be to what extent
23   might Microstrategy be called upon to bear
24   the risk that individually, an officer of the
25   company had chosen to assume for his own

Page 272

1          D. Larue
2    personal and separate economic benefit or
3    detriment, as long as he accepted the
4    economic risks and obtained all of the
5    economic benefits as a result of that
6    transaction and as long as it was very clear
7    that Microstrategy was under no express or
8    implied obligation to reimburse him in the
9    event of losses and as long as the customer
10   wasn't or didn't have the capacity to become
11   a major competitor as a result of this loan
12   and guarantee, I'm not sure I would have a
13   lot of problems with that other than I would
14   know that under the SEC regulations, that
15   would have to be disclosed.
16         Q.  Mr. Larue, given your experience as
17   a forensic examiner, is there any reason that
18   you can think of that Messrs. Lernout,
19   Hauspie and Willard would have guaranteed
20   Radial's loan other than to ensure that L&H
21   booked revenue in the third quarter of 1998?
22         MR. BUTLER:  Objection to form.
23         A.  It's my understanding that when
24   they ultimately did sell a CDS, that they
25   were entitled to a fee.

Page 273

1          D. Larue
2          Q.  How much?
3          A.  I don't remember.
4          Q.  Did you ever know?
5          A.  I've seen some reference to that.
6    I can't recall where.
7          Q.  And what was the magnitude of that
8    fee?
9          A.  I don't remember what it was.
10         Q.  Do you have any approximation, a
11   hundred bucks, a million bucks?
12         A.  It wasn't a million, it wasn't a
13   hundred bucks.
14         Q.  Was it a thousand or a hundred
15   thousand?
16         A.  I don't recall.
17         You asked me was there any other
18   fact or circumstance that might motivate
19   somebody like Lernout, Hauspie and Willard to
20   sell a CDS.  Yes, there is an economic
21   motive.  I assume the risk and I get paid for
22   that.
23         Q.  And so any other -- other than
24   trying to make some money, however it may --
25         MR. BUTLER:  Pretty classic

69  (Pages 270 to 273)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 274

```
 1              D. Larue
 2      motivation.
 3          Q.  However much it may have been, and
 4      to ensure that L&H was able to book revenue
 5      in the third quarter of 1998, can you think
 6      of any other reason that Lernout, Hauspie and
 7      Willard would have guaranteed Dexia's loan to
 8      Radial?
 9          MR. BUTLER:  Objection to form.
10          A.  Again, I don't know what they were
11      thinking when they made that decision.  They
12      could have.  I guess anything is possible.
13      They could have believed correctly or
14      incorrectly that there might be a difference
15      between a guarantee that was issued by L&H
16      versus a guarantee that their stockholders
17      had issued.  That this would achieve legal or
18      tax or accounting objectives that were
19      different from those that would have resulted
20      if they had structured the transaction
21      differently.
22          It's difficult to anticipate the
23      universe of possibilities correctly or
24      incorrectly that might have gone through
25      someone's mind to motivate them.
```

Page 275

```
 1              D. Larue
 2          Q.  But the notion that they could have
 3      achieved different accounting treatment would
 4      be wrong, correct, because accounting looks
 5      at substance rather than form, correct?
 6          A.  Well, accounting as a general
 7      statement, yes, looks to substance, typically
 8      looks to substance rather than form where the
 9      two do not comport with one another.
10          However, and this is a big however,
11      GAAP is extremely complex, it has a lot of
12      detailed rules.  Sometimes it has very, very
13      bright lines and as I pointed out in my
14      rebuttal report, sometimes the difference
15      between a little bit of difference in form
16      produces a very, very different result under
17      GAAP, even though you have two -- more or
18      less economic equivalents, option A, option
19      B, there is a formal difference, but not
20      really a substantive difference, yet GAAP
21      makes a meaningful distinction of how those
22      transactions are respectfully accounted for.
23          Q.  Were you asked to assume whether or
24      not Dexia actually paid Lernout, Willard and
25      Hauspie on the CDS?
```

Page 276

```
 1              D. Larue
 2          A.  I was not asked to assume one way
 3      or the other.
 4          Q.  You don't know whether it was ever
 5      put?
 6          A.  I don't know for a fact.
 7          Q.  Do you have a belief?
 8          A.  I believe they were paid something
 9      on one of the CDSs, but, honestly, that's a
10      vague recollection.
11          Q.  And nothing on the other CDS?
12          A.  I don't think I've seen anything
13      one way or the other on the other CDS or
14      other CDSs.
15          It certainly wasn't a basis for
16      forming my opinions.
17          Q.  Let's turn to your rebuttal report,
18      which I believe is Larue Exhibit 5.
19          Now, on page 1, you have some
20      paragraphs with regard to shell entity and
21      economic substance, correct?
22          A.  Yes, sir.
23          Q.  Do you understand the term shell
24      entity?
25          A.  I have my conception as to what a
```

Page 277

```
 1              D. Larue
 2      shell entity is.  It's not defined under
 3      GAAP.
 4          Q.  Do you have an understanding of
 5      what economic substance it?
 6          A.  Of course.
 7          Q.  Do you believe that most qualified
 8      accountants have an understanding of what
 9      economic substance means?
10          MR. BUTLER:  Objection to form.
11          A.  I would certainly hope so.
12          Q.  Now, you talked about your
13      understanding in various places in your
14      rebuttal report, for example, paragraph 9 on
15      page 2.
16          A.  Uh-huh -- yes.
17          Q.  Does your understanding come --
18      again, this is what you were asked to assume
19      by Dexia's counsel, correct?
20          A.  Well, it comes from my
21      understanding of what I was to assume and the
22      fact that I haven't seen anything that
23      contradicts that understanding.
24          Q.  But you didn't search for anything
25      that contradicts, correct?
```

ESQUIRE DEPOSITION SERVICES
212-687-8010

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 278

D. Larue

1    A.  Yes, sir.
2    Q.  In paragraph 11, you take issue
3 with Mr. Love's assertion that the
4 transactions between L&H and the LDCs were
5 not legitimate arm's length transactions,
6 correct?
7    A.  Yes.
8    Q.  You don't know one way or the
9 other, do you, whether or not the
10 transactions between L&H and the LDCs were or
11 were not legitimate arm's length
12 transactions, correct?
13    A.  You'll have to define what you mean
14 by legitimate arm's length transaction.
15    Q.  Well, you didn't do anything to
16 investigate the nature of the relationship,
17 the transactions between L&H and LDC,
18 correct.
19    A.  I believe it was Mr. Love who
20 asserted that these were not legitimate arm's
21 length transactions.  He cites a number or
22 refers to a number of factual assertions to
23 support that statement, but this, what this
24 paragraph does is it points out four things.

Page 279

D. Larue

1    First of all, there are facts and
2 circumstances that negate the assertion that
3 these were not legitimate arm's length
4 transactions.  One of those is the fact that
5 you had independent -- I factually assumed
6 that there were independent investors who had
7 money at stake to varying degrees, depending
8 upon which of the entities we're referring to
9 who were unrelated to Lernout, Hauspie and
10 Willard.
11    I also pointed out on page 3, I
12 have factually assumed that the tools that
13 the LDCs acquired were functional tools that
14 had the inherent capacity to be developed to
15 exploit a market that the LDCs actually had a
16 bonafide enforceable license to exploit and
17 the other things that I have listed in my
18 report.
19    Q.  Now, I understand that.  I guess --
20 you said the facts and circumstances
21 undermine Mr. Love's contentions, correct?
22    What you really meant was that the
23 assumptions that you were asked to make by
24 Dexia's counsel undermine Mr. Love's

Page 280

D. Larue

1 assertions, correct?
2    A.  Estimate and were not contradicted
3 by documents that I reviewed, yes.
4    Q.  Correct, but you cannot say that
5 you disagree with Mr. Love on the facts
6 following an investigation of the facts,
7 correct?
8    A.  Whose investigation?
9    Q.  Yours.
10    A.  I didn't conduct an investigation.
11    Q.  Exactly.  So you don't know whether
12 or not the relationships between L&H and LDCs
13 were or were not legitimate arm's length
14 transactions, whatever it means?
15    A.  No, I won't agree with that.
16    I don't know with certainty what
17 the underlying facts were.  I stated the
18 facts that I've assumed clearly in my report
19 and in my rebuttal report.
20    Based on the facts that I have
21 assumed, do those facts support Mr. Love's
22 conclusion that these were not legitimate
23 arm's length transactions, that these
24 entities were empty shell entities, they were

Page 281

D. Larue

1 shams and had no economic substance?
2    Some facts may support that.  Other
3 facts detract from that.  That's what I
4 pointed out here.  He makes a factual
5 assertion that there were no assets in those
6 LDCs and I don't -- the fact that I've
7 assumed indicate that the LDCs did, in fact,
8 have rights that had value.
9    Q.  But you haven't even made a factual
10 assertion, you just repeated assumptions, so
11 when you say the fact, what you mean is my
12 assumptions, correct?
13    A.  My factual assumptions for which I
14 have not found documents that would indicate
15 otherwise and which were not rebutted in his
16 rebuttal report.
17    Q.  Is it fair to say that you don't
18 find something unless you look for it?
19    MR. BUTLER:  Objection to form.
20    Mr. Love looked for it.  He didn't find
21 it either.
22    A.  I've stated the facts on which I
23 base my opinions.
24    Q.  Let me try my question again.

71 (Pages 278 to 281)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 282

D. Larue

1    Is it true that you don't find
2 something unless you look for it?
3    A.  Unless you look for it or you're
4 provided with information about it,
5 especially when that information has been
6 indirectly validated by another source.
7    Q.  What other source?
8    A.  I don't believe that Mr. Love, in
9 his rebuttal report, takes issue with any of
10 the facts I represented in my report that I
11 was relying upon.
12    Q.  By not taking issue with it, you're
13 saying he is confirming them?
14    A.  No, I'm not saying he is confirming
15 them.  I would have expected if I had made a
16 mistake or had a misunderstanding of a
17 material fact on which I based my opinion and
18 stated clearly in my report that he would
19 have made mention of that in his rebuttal
20 report.
21    Q.  Don't you think he is entitled to
22 assume that you are entitled to assume
23 whatever you want to assume, all you would
24 say is I just assumed it, I'm not saying it's

Page 283

D. Larue

1 right or wrong, I just assumed it because
2 that's been your testimony here today,
3 correct?
4    A.  Mr. Love can write his rebuttal
5 report any way he sees fit.  I would have
6 expected that if there were significant
7 factual misstatements in my report, however
8 well intended, that he would have observed --
9 made observations about that and would have
10 addressed or would have opined as to how that
11 might have factored in my opinion.
12    Q.  I just want to make clear, there
13 were no factual statements or misstatements
14 in your report.  There were simply statements
15 of what you were asked to assume, correct?
16    A.  I was asked to assume facts that it
17 is my belief and understanding will be borne
18 out by the record.
19    Q.  And what is your belief and
20 understanding based on, the extensive
21 discovery that you've read?
22    MR. BUTLER:  Objection to form.
23    Q.  I forgot you didn't read a single
24 deposition transcript.

Page 284

D. Larue

1    MR. BUTLER:  This sarcasm has no
2 place. Stop. Stop. Stop.
3    MR. HARRIS:  Are you instructing
4 him not to answer it?  Then instruct him
5 not to answer it.  That's what you are
6 entitled to do.
7    MR. BUTLER:  You are not entitled
8 to use that tone of voice and sarcasm.
9 You've gone around and around on this.
10 His answers have all been consistent and
11 so I object to the tone you were using
12 with this witness.
13    Q.  What is the basis of your belief
14 and understanding that the record will bear
15 out as true the assumptions that you set
16 forth in your report?
17    A.  Several reasons.  One is that the
18 complaints that I referred to in Exhibit 3 of
19 my report, which I believe are on the other
20 side of this issue, basically disclose or
21 make these representations in that
22 representation of the underlying facts and
23 circumstances.  That's part.
24    The other thing, quite frankly,

Page 285

D. Larue

1 what possible benefit would counsel have had
2 in misrepresenting facts to me at the end of
3 the day.  These facts will -- the facts upon
4 which I relied will be established as being
5 either accurate or not accurate.
6    Why ask me to write a report based
7 on facts known to be contradictory to the
8 actual facts in this case.  That doesn't make
9 sense to me.
10    Q.  It didn't make sense to us either,
11 but it happened.
12    MR. BUTLER:  I object to the
13 commentary.  I obviously disagree with
14 your commentary and I think it's
15 inappropriate for you to give commentary
16 to the answers.  I think you should just
17 ask questions.
18    MR. HARRIS:  We had this
19 discussion.  You disagree with what I'm
20 supposed to do and I disagree with what
21 you've done, but you haven't paid any
22 attention.  You want to do it the way
23 you want to do it, whether it's proper
24 or not.

72  (Pages 282 to 285)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 286

```
1              D. Larue
2         MR. BUTLER:  You have about six
3    minutes left by my clock.
4         A.  The facts I have been asked to
5    assume have not been contradicted by any of
6    the documents I looked at and I looked at a
7    lot of documents, a small percentage of the
8    underlying documents, but as you can see from
9    Exhibit 3, it's a rather lengthy list and,
10   fourth, I can't speak for Mr. Love and how he
11   goes about preparing rebuttal reports, but
12   certainly one of the things that I would do
13   and have done is if I were rebutting someone
14   else's report and I saw a fact that I knew or
15   believed to be incorrect and if that fact
16   were a basis upon which the opposing expert
17   based their opinion, it would be something
18   that I would address in my report and,
19   frankly, I would have expected someone to
20   address that in my report that's one reason
21   for the transparency of my report.
22        Q.  Mr. Larue, did the complaint by the
23   SEC against Lernout and Hauspie Speech
24   Products, Exhibit 3, undermine the factual
25   assumptions that you were asked to make in
```

Page 287

```
1              D. Larue
2    your complaint, in your review?
3         MR. BUTLER:  Objection to form.
4         A.  I would need to read that 10-page
5    document from start to finish and my report
6    again to know.
7         Q.  I see.  So --
8         A.  And I would also refer back to our
9    earlier conversation.
10        My understanding is these are
11   allegations that have not been definitively
12   established or adjudicated, if that's the
13   right term.
14        I don't know who wrote this report.
15   I don't know how much time and effort went
16   into preparing this report.  I don't know how
17   many of the 1.5 million documents that are
18   apparently out there were reviewed by the
19   people who drafted this report.  There are a
20   lot of things I don't know, so I don't know.
21        Q.  I was just focusing, you said you
22   saw no document that undermined any of the
23   factual assumptions.
24        Does the SEC's allegation that the
25   LDCs were little more than shell companies
```

Page 288

```
1              D. Larue
2    support Mr. Love's assertion or support the
3    facts you were asked to assume about the
4    LDCs?
5         MR. BUTLER:  Objection to form.
6         A.  Let me clarify, and I wasn't clear
7    before, when I said document, I didn't mean
8    someone else's opinion or someone's
9    secondhand interpretation of the underlying
10   facts and circumstances and I wasn't clear
11   about that.
12        When I said document, I meant the
13   Bates numbered documents listed in Exhibit 3.
14        Q.  Now, I believe in your rebuttal
15   report, you say there is no evidence that
16   you're aware of that suggests Lernout,
17   Hauspie or Willard controlled or managed any
18   of the LDCs, correct?
19        A.  Where do I say that?
20        THE VIDEOGRAPHER:  I was asked to
21   mention for the record, it's 5:04, seven
22   hours into the deposition.
23        MR. BUTLER:  Let's wrap it up.  If
24   you can finish quickly, we appreciate it
25   because he has a plane to catch.
```

Page 289

```
1              D. Larue
2         MR. HARRIS:  It's either about the
3    seven hours or not.  Do you want to
4    continue or end it?
5         MR. BUTLER:  You said you were
6    willing to live within seven hours.
7         Do you need more time?
8         MR. HARRIS:  I'm willing to play by
9    the rules of the court and so if you are
10   insisting upon that I end in seven
11   hours, that's fine.
12        MR. BUTLER:  I'm not insisting.  I
13   will talk about it with you.  We need to
14   leave to catch a plane, so if you have
15   one or two more questions, otherwise,
16   let's go off the record.
17        Q.  If you look at page 5 of your
18   rebuttal report, in paragraph 20, you say,
19   Mr. Love asserts that under GAAP, the LDCs
20   were related parties to L&H because of the
21   extensive role played by L&H and its
22   principal shareholders and senior officers in
23   creating and financing these companies.
24        Do you see that?
25        A.  I do.
```

73  (Pages 286 to 289)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 290

D. Larue

Q.  Is Mr. Love's assertion in your
view that L&H played an extensive role and
its senior shareholders and officers in
creating and financing the LDCs accurate?
MR. BUTLER: Objection to form.
A.  Unfortunately, here, as throughout
most of that report, there is no citation or
authority that he relies on in making that
assertion.
It wasn't possible for me to check
Bates stamp numbers or look at the
documentation that he was apparently relying
on in making an independent assessment as to
whether or not that documentation supported
or detracted from his opinion here.
He also doesn't define role and I
would point out that there is GAAP, there is
TPA 5100.63 -- I think it's 64, that
explicitly states that -- I'll -- that
permits basically involvement in the
facilitation of financing without that being
considered prohibited financing activity.
Q.  Do you have any facts -- are you
aware of any facts that suggest Mr. Love's

Page 291

D. Larue

statement that you quote there is inaccurate?
A.  I didn't assert this statement.
Q.  I take it the answer is no?
MR. BUTLER:  Objection to form.
A.  Again, my comment here is the fact
that he didn't support his conclusion, I
don't know whether that statement is true or
not.
Q.  If you look at page 3, paragraph
13-A, you say, It's my understanding that the
respected owners/investors of the LDCs
contributed substantial amounts of cash to
them at the time of their formation and, in
some cases, guaranteed loans or pledged
personal assets to secure loans made to these
entities, correct?
A.  That's correct.
Q.  Is it your -- do you consider the
$72,000 that was used to capitalize Radial to
be a substantial amount?
A.  It would be to me.
Q.  I understand that it would be to
you, but you're a professor and you're not an
auditor or something like that, but I want to

Page 292

D. Larue

know whether here, you considered $72,000 to
be a substantial amount that was contributed
by the respective owners and investors of the
LDCs?
A.  You suggested I apply a GAAP
materially standard in a context of why I
take an exception to his reference to these
entities as being empty and with no assets.
That's not what I've done here.  He makes
this statement.  We're not talking about GAAP
materiality.  He made the representation that
these were empty shell entities with no
assets.  That does not comport with my
understanding of the fact.
My understanding of the facts is
that Radial had some capitalization from
independent investors.  My understanding is
that LIC had more and that some of the --
there were loans guaranteed by Mr. Hardeman
and assets, personal assets of Mr. Hardeman
that were pledged for the Artesia loan and
it's also my understanding that LDF had a
substantial amount of capital, debt capital
or equity capital from sources other than

Page 293

D. Larue

Artesia.
It's also my understanding that
these entities had, you know, real licenses
and real tools with which to develop those
licenses or to sell to someone else.
For his statement -- his repeated
statement that these are empty shell entities
with no assets, that doesn't comport with my
understanding of the underlying facts and
that's the point that I've made here.
Q.  I didn't ask about that.  I asked
about paragraph 13-A.
A.  That's what I'm talking about.  I'm
sorry.
Q.  Do you --
MR. BUTLER:  Just a second.
Q.  Do you consider $72,000 to be a
substantial amount?
MR. BUTLER:  We have to go to catch
this man's plane.  You're continuing,
but we're past seven hours, so I think
we should go off the record.
MR. HARRIS:  Is this concluded?
MR. BUTLER:  We're concluded.

74  (Pages 290 to 293)

2dfd6da5-8e66-4d39-80f9-bae02f49a691

Page 294

```
 1          D. Larue
 2       THE VIDEOGRAPHER:  This concludes
 3    today's proceeding of the deposition of
 4    David Larue.
 5       The total number of videotapes used
 6    was four.
 7       The time is 5:10.
 8       (Time noted:  5:10 p.m.)
 9
10
11    _____
            DAVID LARUE
12
13    Subscribed and sworn to before me
14    this ___ day of _____, 2007.
15
16
17    _____
18
19
20
21
22
23
24
25
```

Page 296

```
 1
 2    -------------I N D E X-------------
 3    WITNESS       EXAMINATION BY    PAGE
 4    DAVID LARUE   MR. HARRIS        7
 5
 6    ----------INFORMATION REQUESTS----------
 7    REQUESTS: PAGE / LINE
 8         31    15
 9
10    ----------------EXHIBITS----------------
11    LARUE              FOR ID.
12    1  Curriculum vitae of David     8
13       Larue
14    2  Form 10-K                    12
15    3  U.S. Securities and Exchange  64
16       Commission document
17    4  Copy of report of David Larue 105
18    5  Rebuttal report              193
19    6  Document dated September 29,  233
20       1998
21
22
23
24
25
```

Page 295

```
 1
 2       C E R T I F I C A T E
 3    STATE OF NEW YORK   )
 4                       : ss.
 5    COUNTY OF NEW YORK  )
 6
 7       I, LESLIE FAGIN, a Notary Public
 8    within and for the State of New York, do
 9    hereby certify:
10       That DAVID LARUE, the witness whose
11    deposition is hereinbefore set forth, was
12    duly sworn by me and that such deposition
13    is a true record of the testimony given
14    by the witness.
15       I further certify that I am not
16    related to any of the parties to this
17    action by blood or marriage, and that I
18    am in no way interested in the outcome of
19    this matter.
20       IN WITNESS WHEREOF, I have hereunto
21    set my hand this 26th day of March, 2007.
22
23
24    _____
         LESLIE FAGIN, RPR
25
```

75 (Pages 294 to 296)

2dfd6da5-8e66-4d39-80f9-bae02f49a691